**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| STATE OF NEBRASKA,<br>STATE OF MISSOURI,<br>STATE OF ARKANSAS,<br>STATE OF IOWA,<br>STATE OF KANSAS, and<br>STATE OF SOUTH CAROLINA,<br><br>        *Plaintiffs*,<br><br>  v.<br><br>JOSEPH R. BIDEN, Jr.,<br>in his official capacity as the President of<br>the United States of America;<br><br>MIGUEL CARDONA, in his official<br>capacity as Secretary, United States<br>Department of Education; and<br><br>UNITED STATES DEPARTMENT OF<br>EDUCATION,<br><br>        *Defendants*. | No. 4:22-cv-01040 |

**PLAINTIFF STATES' MEMORANDUM IN SUPPORT OF MOTIONS FOR**
**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

In June, the Supreme Court warned federal agencies against "asserting highly consequential power beyond what Congress could reasonably be understood to have granted" by statute. *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). In August, the Biden Administration did exactly that through its recently announced student loan cancellation program—the Mass Debt Cancellation. Determined to pursue across-the-board debt cancellation and stymied by repeated failures to achieve that goal through legislation, the Administration resorted to the now-concluded

1

COVID-19 pandemic and a federal law that applies to military operations and national emergencies as its justification for taking this dramatic action.

The law on which the Administration relies—known as the Higher Education Relief Opportunities for Students Act of 2003 (HEROES Act)—has never been used to do anything like this before.  It is inconceivable that when Congress passed the HEROES Act, it thought it was authorizing the President to provide across-the-board debt cancellation, which in this case will result in around a *half trillion dollars* in losses to the federal treasury.  *See The Biden Student Loan Forgiveness Plan: Budgetary Costs and Distributional Impact*, Penn Wharton University of Pennsylvania (Aug. 26, 2022), https://tinyurl.com/4y9rz8w5 (attached as Campbell Decl. Ex. C) [Penn Report].

The proof that this was inconceivable is that no one thought the HEROES Act does what Defendants now claim.  House Speaker Nancy Pelosi put it best:  "People think that the President of the United States has the power for debt forgiveness.  He does not.  … That has to be an act of Congress.  …  The President can't do it.  So that's not even a discussion."  Lauren Camera, *Pelosi: Biden Lacks Authority to Cancel Student Debt*, U.S. News & World Report (July 28, 2021), https://tinyurl.com/33ex63de.  And Defendant U.S. Department of Education (the Department) previously concluded that the HEROES Act is not a latent source of authority to cancel student debt.  *See* Memorandum from Reed Rubinstein, Principal Deputy General Counsel, Department of Education, to Betsy DeVos, Secretary of Education 6 (Jan. 12, 2021), https://tinyurl.com/3kp29ys6 [2021 DeVos Memo].

Speaker Pelosi and the prior Administration were right.  The HEROES Act allows Defendant Secretary of Education Miguel Cardona "to waive or modify any statutory or regulatory provision applicable to" certain student financial assistance programs "in connection with a war or other military operation or national emergency" to protect those negatively affected by the

2

operation or emergency.  Pub. L. No. 108-76, 117 Stat. 904; 20 U.S.C. § 1098bb(a)(1).  It is not a categorical get-out-of-debt provision that the Administration can invoke to achieve its long-desired political goals.

Even if the HEROES Act could permit some discharge of student loan debt, it does not authorize the Mass Debt Cancellation.  The Act empowers the Department to ensure that "recipients of student financial assistance … are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals."  20 U.S.C. §1098bb(a)(2)(A).  But the Mass Debt Cancellation is not tied to this statutory text.  The Cancellation justifies relief for a massive class of borrowers based on talismanic reference to the COVID-19 pandemic.  It makes no difference to the Administration's Cancellation whether the pandemic rendered a borrower better or worse off or how much financial harm the borrower suffered in relation to her loans.  Thus, the Mass Debt Cancellation is not remotely tailored to address the effects of the pandemic on federal student loan borrowers, as required by the HEROES Act.  The Cancellation instead disregards the Act's objectives and express requirements and distorts the Act beyond recognition in the service of the Administration's political agenda on student loans.  It is the epitome of unlawful and arbitrary agency action, and it should be set aside.

This Court should immediately enter a temporary restraining order (TRO).  Prompt relief is needed because Defendants have indicated that they will start cancelling loan balances as early as next week.  A TRO is in order because Plaintiff States are likely to succeed on the merits, and the other equitable TRO factors weigh in their favor.  In addition, temporarily enjoining the Mass Debt Cancellation will preserve the status quo and give the Court time to consider full briefing on the preliminary-injunction motion and the lawfulness of a half-trillion-dollar agency action that cannot be undone once unpaid loans begin to disappear.  Importantly, no borrower will be

3

disadvantaged by immediate injunctive relief because loan repayments and interest accruals have been paused since March 2020.

    If the Court denies the TRO request, Plaintiff States ask the Court to immediately rule on their related request for a preliminary injunction.  That would allow the States to seek relief from the appellate court before outstanding student loans start disappearing.

STATEMENT OF FACTS

I.    **Unsuccessful Federal Efforts And Promises To Provide Mass Student Loan Cancellation**

    Over the last few years, multiple attempts to enact sweeping legislation cancelling student loan debt have come up empty.  In July 2019, for example, Senator Elizabeth Warren introduced the Student Loan Debt Relief Act of 2019, a bill that would have automatically canceled $50,000 of student loan debt for those who make under $100,000.  *See* S. 2235, 116th Cong. (2019).  That bill failed.  And in March 2021, Representative Al Lawson introduced the Income-Driven Student Loan Forgiveness Act to cancel the outstanding balance on loans for all borrowers under a certain income cap.  *See* H.R. 2034, 117th Cong. (2021).  That bill also failed.

    Amidst those unsuccessful legislative efforts, then-candidate Biden announced a student-loan proposal while campaigning for the presidency.  He promised to "forgive all undergraduate tuition-related federal student debt from two- and four-year public colleges and universities for debt-holders earning up to $125,000, with appropriate phase-outs to avoid a cliff."  Joe Biden, *Joe Biden Outlines New Steps to Ease Economic Burden on Working People*, Medium (Apr. 9, 2020), https://tinyurl.com/3cbw4zh2 [Biden Medium Article].

II.   **Background on Relevant Student Loan Programs**

    The Higher Education Act (HEA) establishes several student-loan programs.  The two that are the most relevant here are the Direct Loan Program (DLP) and Federal Family Education Loan

4

Program (FFELP).   20 U.S.C. §§ 1071 *et seq*., 1087a *et seq*.  The origination of new FFELP loans

stopped on July 1, 2010, but many FFELP loans still exist and are subject to ongoing repayment.

All student loans originating under the HEA since July 1, 2010, have been, and in the future will

be, originated under the DLP.

Many entities, some of which are state instrumentalities, service FFELP and DLP loans

and generate revenue from that servicing work.  *See* Talent Decl. Ex. B, C.  Some of those same

entities also hold FFELP loans as assets and earn income from the payments on those loans.  *See*

Talent Decl. Ex. A, at 49; Williams Decl. ¶ 6.  In addition, a diverse array of investors, some of

which are state agencies, invest in student-loan asset-backed securities (SLABS) secured by

FFELP loans.  *See* Walden-Newman Decl., ¶¶ 4–5.  SLABS are FFELP loans bundled, rated, and

sold in segments to institutional investors as bonds.  Jack Du, *Student Loan Asset-Backed*

*Securities: Safe or Subprime?*, Investopedia (Aug. 31, 2021), https://tinyurl.com/5f7yxh4w.

Student-loan borrowers may consolidate FFELP loans into DLP loans.  *See* 34 C.F.R.

§ 685.220 (providing the criteria for consolidation).  Those direct consolidation loans come "at no

cost" to the borrower.  *Direct Consolidation Loan Application*, Federal Student Aid, https://

tinyurl.com/bdfhxser (last visited Sept. 28, 2022) [Consolidation Loan Application].

## III.    The Higher Education Loan Authority of the State of Missouri (MOHELA), the Arkansas Student Loan Authority (ASLA), and the Nebraska Investment Council (NIC)

The Higher Education Loan Authority of the State of Missouri (MOHELA) is "a body

politic and corporate" that is "a public instrumentality and body corporate" of the State of Missouri.

Mo. Rev. Stat. § 173.360.  It performs "essential public function[s]" that include ensuring "post-

secondary education students have access to student loans" and providing financial support to

Missouri's public colleges and universities.  *Id.*  To advance these goals, MOHELA originated

FFELP loans, and it continues to hold many of them to this day. *See* Talent Decl. Ex. A, at 49, 56. As of June 30, 2021, MOHELA held over 29,000 FFELP loans. *See id.* at 81–83. MOHELA also may issue bonds "to obtain funds to purchase student loan notes or finance student loans," which are then secured—in part—by those notes. Mo. Rev. Stat. § 173.385.1(6).

MOHELA has entered into contracts with the federal government to service student debt. *See* Talent Decl. Exs. B, C. It services both FFELP loans and DLP loans. *See* Talent Decl. Ex. A, at 49. "As of June 30, 2021, MOHELA was servicing $1.1 billion in FFELP loans representing 59,181 accounts … and $59.1 billion in [DLP loans] representing 2,726,179 accounts." *Id.* The borrowers whose loans MOHELA services are located throughout the country. *See id.* at 81–82 (listing the geographic distribution of loans securing a MOHELA bond offering); *see also* Mo. Rev. Stat. § 173.385.1(18) (permitting MOHELA "[t]o service student loans for any owner thereof, regardless of whether such student loans are originated in this state or out of this state"). Eliminating the student loans that MOHELA services eliminates the revenue the entity would earn from servicing those loans. *See* Talent Decl. Ex. A, at 55 (noting that MOHELA gets "ongoing revenue" from serving FFELP loans); Talent Decl. Ex. B, at 13 (contracting for "servicing of outstanding debt"); Talent Decl. Ex. C, at 6–7 (providing the contractual fees per task related to servicing a student loan account).

The Arkansas Student Loan Authority (ASLA)—a division of the Arkansas Development Finance Authority—is "the instrumentality of the state charged with a portion of the responsibility of the state to provide educational opportunities in keeping with all applicable state and federal laws." Ark. Code Ann. 15-5-1902(a)(2). Before the Administration's Mass Debt Cancellation, ASLA held approximately $100 million dollars in FFELP loans. Williams Decl., ¶ 6. ASLA financed those loans through the issuance of bonds. *Id.* at ¶ 9. Interest payments received from

borrowers are used to satisfy ASLA's obligations to those bondholders.  *Id.*  ASLA receives a percentage of the outstanding FFELP loan balance each month as an administrative fee.  *Id.* at ¶ 6. Revenue from that administrative fee is then used for administrative and servicing costs.  *Id.* Excess revenue (the administrative fee minus administrative and servicing costs) is used to advance ASLA's finance- and education-focused mission.  *See id.*; Ark. Code Ann. 15-5-1904(c) (listing those goals).

The Nebraska Investment Council (NIC) is responsible for investing various assets held by the State of Nebraska, including the State's pension fund.  *See* Neb. Rev. Stat. § 72-1239.01.  NIC has multiple accounts with money invested in SLABS.  *See* Walden-Newman Decl., ¶¶ 4–7.  For instance, one of its accounts is invested in a fund that holds approximately $24.8 million in FFELP SLABS.  *Id.* at ¶ 4.  Early payoff of the FFELP loans held in FFELP SLABS returns the principal to investors before the maturity date and ends the interest income flow that SLABS are intended to generate.  *See* Talent Decl. Ex. A, at 37.  Undermining these investments harms the pensioners supported by NIC's asset management.

## IV.    The Department's Relief To Borrowers Throughout The COVID-19 Pandemic And The Administration's Concession That The Pandemic Has Ended

The COVID-19 pandemic began in March 2020.  Immediately, the Department waived interest payments on student loans for three months and gave borrowers the option to suspend principal payments for two months for federally held student loan debt.  *Delivering on President Trump's Promise, Secretary DeVos Suspends Federal Student Loan Payments, Waives Interest During National Emergency*, U.S. Department of Education (Mar. 20, 2020), https://tinyurl.com/yc3yxs4y.  The Trump and Biden Administrations then repeatedly extended this pause, and it is currently in place.  *See Biden Harris Administration Announces Final Student Loan Pause Extension Through December 31 and Targeted Debt Cancellation to Smooth Tran-*

*sition to Repayment*, U.S. Department of Education (Aug. 24, 2022), https://tinyurl.com/3e7wy5jn [Repayment Pause Announcement].  As a result of these protective measures, most borrowers are better off today than before the pandemic with respect to their student loans because they have paid nothing for nearly three years, no interest has accrued on their loans, and rampant inflation has reduced the real-dollar value of their debts.  Indeed, for certain borrowers, such as those in income-driven repayment (IDR) plans, the periods of payment pauses are treated as if those borrowers were actually making payments when determining if they meet conditions for loan forgiveness. *See COVID-19 Relief: Income-Driven Repayment (IDR) Plans*, U.S. Department of Education (last visited Sept. 28, 2022), https://tinyurl.com/2cpwk7bm; *see also* 34 C.F.R. § 685.221(f)(1)(i), (v).

Throughout the last few months, the Administration has openly acknowledged the waning—and now ending—of the pandemic.  In April 2022, the Administration filed a legal brief stating that "the pandemic 'ha[d] shifted to a new phase,'" one with minimal COVID-19 hospital-izations and deaths and fewer disruptions on daily life.  Mem. Opp'n Pls' Mot. Prelim Inj. at 8, *Arizona v. CDC*, No. 6:22-cv-00885 (W.D. La. Apr. 29, 2022), ECF No. 40.  And in September 2022, President Biden was more definitive about the current state of the pandemic, declaring that "[t]he pandemic is over."  60 Minutes (@60Minutes), Twitter (Sept. 18, 2022), https://tinyurl.com/2s35maau [60 Minutes Twitter].  Meanwhile, on August 24, 2022, the Admin-istration invoked the pandemic to justify its Mass Debt Cancellation.

## V.    The Department's Mass Debt Cancellation

Even though most borrowers of federally held student loans are in no worse position with respect to their loans than they were before the pandemic began—and some are in a better position—the Department promised to cancel up to $10,000 or $20,000 in student debt for all borrowers who have loans owned by the Department and whose annual income during the

pandemic was less than $125,000 (or $250,000 for married borrowers who file jointly).  *FACT SHEET: President Biden Announces Student Loan Relief for Borrowers Who Need It Most*, The White House (Aug. 24, 2022), https://tinyurl.com/2p8zmh2b [Aug. Fact Sheet].  Borrowers who received a Pell Grant are eligible for $20,000 in loan cancellation, while borrowers who did not are eligible for $10,000.  *Id.*  The Administration estimates that "over 40 million borrowers are eligible" for the Mass Debt Cancellation.  *FACT SHEET: The Biden-Harris Administration's Plan for Student Debt Relief Could Benefit Tens of Millions of Borrowers in All Fifty States*, The White House (Sept. 20, 2022), https://tinyurl.com/ekrbnvn4 [Sept. Fact Sheet].

Under this program, DLP loans qualify for cancellation.  *One-Time Student Loan Debt Relief*, Federal Student Aid, https://tinyurl.com/yc7bban8 (last visited Sept. 28, 2022) (attached as Campbell Decl. Ex. A) [Cancellation Program Webpage].  So do FFELP "loans held by ED."  *Id.*

In addition, FFELP borrowers who consolidate their privately held loans into DLP loans are also eligible for cancellation.  *Id.*  In fact, the Department is telling "borrowers with privately held federal student loans," including FFELP loans, that they "can receive this relief [cancellation] by consolidating these loans into the Direct Loan program [DLP]."  *Id.*  The Mass Debt Cancellation thus creates a compelling—even irresistible—incentive for borrowers to consolidate their privately held FFELP loans, including those held by state entities, into DLP loans.  *See* Carmen Arroyo, *Biden's Student-Loan Relief Plan Stirs a $100 Billion Plus Debt Market*, Bloomberg (Sept. 2, 2022), https://tinyurl.com/43sc7ec4 (explaining that the Cancellation "plan is also likely to incentivize borrowers to swap" FFELP loans for DLP loans).

Eligible borrowers who made payments on their debt during the pandemic will have those payments refunded to them.  Cancellation Program Webpage, *supra* ("You will automatically receive a refund of your payments during the payment pause if: you successfully apply for and

receive debt relief under the Administration's debt relief plan, AND your voluntary payments during the payment pause brought your balance below the maximum debt relief amount you're eligible to receive but did not pay off your loan in full.").  The Department has advised its loan servicers that borrowers do "not have to state [that] their refund request is specifically due to [COVID-19]."  Talent Decl. Ex. G, at 9.  The number of refunds requested and processed since the Department announced the Mass Debt Cancellation has risen exponentially.  Talent Decl. Ex. H.

In short, the Department has announced a detailed and definitive plan for its Mass Debt Cancellation.  *See* Cancellation Program Webpage, *supra*.  And over the last month, the agency has engaged in extensive communications with the entities that service federally held student loans to set up the infrastructure to carry out this massive government handout.  *See, e.g.*, Talent Decl. Exs. D–G, I.  The Department has instructed its loan servicers to have their "initial discharge capability *fully operational" by October 1, 2022*, just days from now.  Talent Decl. Ex. I, at 1 (emphasis added).

With the infrastructure now in place, the Department is set to start wiping student loans off the books any day now.  It has announced that many DLP borrowers—an estimated eight million of them—will receive cancellation "*automatically* because relevant income data is already available" to the agency.  *The Biden-Harris Administration's Student Debt Relief Plan Explained*, Federal Student Aid, https://tinyurl.com/msj29rdx (last visited Sept. 28, 2022) (emphasis added) (attached as Campbell Decl. Ex. B) [Cancellation FAQs] ("[T]here are 8 million people for whom we have data and who will get the relief automatically.").  For borrowers whose income data is not available to ED, the Administration will release a loan cancellation application in early October, and their loans will be erased shortly after that.  *Id.*

The Mass Debt Cancellation is no small economic matter. The Wharton School of the University of Pennsylvania released a study concluding that the Cancellation alone will cost up to $519 billion over ten years. *See* Penn Report, *supra*. The Department is setting up to impose that cost on the taxpayers of the country with a push of a button, and it is doing so based on no better authorization than a post-9/11 statute that, until August 24, 2022, no one thought allowed this kind of agency action.

**VI.     The Mass Debt Cancellation's Announcement**

The White House's public messaging shows that the Administration created the Mass Debt Cancellation to advance policy goals that have no real connection to the pandemic. A senior administration official explained during a press briefing that President Biden had "promised to provide targeted student debt relief" "[d]uring the [2020 presidential] campaign" and was now "following through on that promise." *Background Press Call by Senior Administration Officials on Student Loan Relief*, The White House (Aug. 24, 2022), https://tinyurl.com/9a85ehn5 (attached as Campbell Decl. Ex. D) [Cancellation Backgrounder]. Later in the briefing, the same official emphasized that the Cancellation is intended to "narrow the racial wealth gap," "promot[e] equity," allow more Americans to obtain "a ticket to a middle-class life" through "post-high school education," and address education costs that have been rising "[o]ver the last 40 years." *Id.* The official did not mention the COVID-19 pandemic. *Id.*

In a legal memorandum accompanying the Mass Debt Cancellation's announcement, the Department revoked its prior view that it lacks authority to declare mass cancellation of student debt. *Notice of Debt Cancellation Legal Memorandum*, 87 Fed. Reg. 52,943 (Aug. 30, 2022). Changing its position, the Department declared that the HEROES Act allows it to effectuate a program of "loan cancellation directed at addressing the financial harms of the COVID-19 pandemic." *Id.* at 52,944.

11

**ARGUMENT**

"In the Eighth Circuit, courts apply the same standards to a motion for a TRO as to a motion for a preliminary injunction." *ARC of Iowa v. Reynolds*, 559 F. Supp. 3d 861, 872–73 (S.D. Iowa 2021). Courts consider four factors: "(1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to other litigants; and (4) the public interest." *Watkins Inc. v. Lewis*, 346 F.3d 841, 44 (8th Cir. 2003) (citing *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)). The most important is the likelihood of success. *See Craig v. Simon*, 980 F.3d 614, 617 (8th Cir. 2020) (per curiam). Here, all four factors favor Plaintiff States.

**I.     Plaintiff States Are Likely To Succeed on the Merits of Their Claims.**

   **A.     Plaintiff States Have Standing.**

"[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006). "To establish standing, plaintiffs must show at a minimum 'an injury in fact, meaning the actual or imminent invasion of a concrete and particularized legal interest; a causal connection between the alleged injury and the challenged action of defendant; and a likelihood that the injury will be redressed by a favorable decision of the court.' " *Kuehl v. Sellner*, 887 F.3d 845, 850 (8th Cir. 2018) (quoting *Sierra Club v. Kimbell*, 623 F.3d 549, 556 (8th Cir. 2010)).

An injury-in-fact sufficient to confer standing is an injury "that is concrete, particularized, and actual or imminent." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citation omitted). Financial harms, no matter how minor, constitute injuries-in-fact. *See, e.g., Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.' "); *Demarais v. Gurstel Chargo, P.A.*, 869 F.3d 685,

693 (8th Cir. 2017) (same).  Intangible harms can also constitute concrete harms.  *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) (gathering sources).  And future injuries can support standing so long as "the threatened injury is certainly impending, or there is a substantial risk that the harm will occur."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (cleaned up).

"An injury is 'fairly traceable' to a challenged statute when there is a 'causal connection' between the two."  *Alexis Bailly Vineyard, Inc. v. Harrington*, 931 F.3d 774, 779 (8th Cir. 2019) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)); *see Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019) ("Article III requires no more than *de facto* causality.") (cleaned up).  And "a plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself," though "[h]e need not show that a favorable decision will relieve his *every* injury."  *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982); *see also Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021) (effectuating "a partial remedy satisfies the redressability requirement") (cleaned up).  "[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal."  *Warth v. Seldin*, 422 U.S. 490, 500 (1975).

Plaintiff States raise both a separation-of-powers claim and APA claims.  For a separation-of-powers claim, a plaintiff needs to show that it "sustains injury from an executive act that allegedly exceeds the official's authority."  *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2196 (2020) (cleaned up).  And for an APA claim that implicates the States' sovereign and quasi-sovereign interests, Plaintiff States are "entitled to special solicitude in [the] standing analysis."  *Massachusetts v. E.P.A.*, 549 U.S. 497, 520 (2007).  "[I]f nothing else, that means imminence and redressability are easier to establish here than usual."  *Texas v. Biden*, 20 F.4th 928, 970 (5th Cir. 2021), *rev'd on other grounds* 142 S. Ct. 2528 (2022).

13

Plaintiff States have standing here. The Department has announced a definitive and detailed Mass Debt Cancellation program, and it is currently working with student-loan servicers—some of which are state entities such as MOHELA—to set up the infrastructure for the cancellation. *See* Talent Decl. Exs. D–G, I. These actions are inflicting ongoing harms on Plaintiff States. In addition, the Secretary will imminently publish a waiver or modification under the HEROES Act, which will exacerbate those injuries and add others. Plaintiff States' injuries fall into three categories: ongoing financial injuries, imminent injuries, and sovereign or quasi-sovereign injuries.

### 1.     Plaintiff States Are Experiencing Financial Injuries.

Starting with the ongoing financial injuries, the Mass Debt Cancellation has created an enormous incentive to consolidate FFELP loans not held by the Department (which are not currently eligible for cancellation) into DLP loans (which are eligible for cancellation). *See* 34 C.F.R. § 685.220 (providing the criteria for consolidation). In fact, the Department's Mass Debt Cancellation rollout expressly advises that "borrowers with privately held federal student loans" such as FFELP loans "can receive this relief by consolidating these loans into the Direct Loan program." Cancellation Program Webpage, *supra*. The incentive to consolidate is particularly compelling since a direct consolidation loan comes "at no cost" to the borrower. Consolidation Loan Application, *supra*. But that consolidation results in the prepayment and immediate elimination of many of those FFELP loans. *See* Talent Decl. Ex. A, at 37 (discussing this fact in noting the risk from competition from the federal DLP). This "predictable effect of Government action on the decisions of third parties," which is sufficient to establish standing, *see Dep't of Commerce*, 139 S. Ct. at 2566, is harming Plaintiff States in at least five ways.

*First*, it injures entities like MOHELA and ASLA that hold FFELP loans because they lose a vital established source of income. For example, MOHELA issued bonds secured by the revenue

provided by over 29,000 FFELP loans, representing over 15,000 borrowers, with a principal amount (including capitalized interest) of over $200 million, and with a weighted interest rate over 5 percent.  Talent Decl. Ex. A, at 76; *see also* Mo. Rev. Stat. § 173.385.1(6) (authorizing MOHELA to "finance student loans").  And MOHELA's Fiscal Year 2021 audited financial statements indicate that the entity had almost $1.1 billion in FFELP loans, which had a weighted average interest rate for the year of 6 percent.  MOHELA, 2021 Financial Statements 47 (Sept. 14, 2021), https://tinyurl.com/4chp295x.

Left alone, those loans will continue to generate millions of dollars per year in interest payments to fund students and educational institutions in Missouri.  Talent Decl. Ex. A, at 76 (showing a weighted average remaining term of 169 months).  But the consolidation of FFELP loans into DLP loans prompted by the Mass Debt Cancellation eliminates much of that revenue. That loss of existing income streams "reduc[es] the return on [MOHELA's] investments" and thereby inflicts an "actual financial injury."  *Franchise Tax Bd. of Cal. v. Alcan Aluminum Ltd.*, 493 U.S. 331, 336 (1990); *see also State of Iowa ex rel. Miller v. Block*, 771 F.2d 347, 354 (8th Cir. 1985) (citing *Department of Energy v. Louisiana*, 690 F.2d 180, 187 (5th Cir. 1982), favorably, which held a "state may challenge [federal] regulations which affect its finances adversely as a landowner and sovereign"); *Arkla Expl. Co. v. Tex. Oil & Gas Corp.*, 734 F.2d 347, 354 (8th Cir. 1984) ("The injury alleged by the State of Arkansas is the loss of revenue to which it is statutorily entitled.").

The harm to ASLA is similar.  Before the Mass Debt Cancellation, ASLA held about $100 million dollars in FFELP loans.  Williams Decl., ¶ 6.  ASLA estimates that, since the Administration's announcement of the program, approximately $5-6 million of its FFELP loan holdings have been consolidated by borrowers into DLP loans.  *Id.* at ¶ 7.  Because ASLA's administrative

fee is calculated based on the total outstanding balance of its FFELP loans, the Mass Debt Cancellation will result in a significant reduction in the revenue ASLA receives from its FFELP loans. *Id.* at ¶ 8.

*Second*, holders of FFELP loans, even as they retain some of those loans following consolidation, are hurt in another way. The reduction of FFELP loans is decreasing "the level of competition currently in existence in the secondary market for FFELP Loans." Talent Decl. Ex. A, at 36. And that is "resulting in fewer potential buyers of FFELP Loans and lower prices available in the secondary market for those FFELP Loans." *Id.* Thus, the FFELP loans that state entities like MOHELA continue to hold are worth less because consolidation reduces the total number of FFELP loans in the market. This kind of "economic injury resulting from governmental actions that alter competitive conditions" is "sufficient to satisfy the Article III injury-in-fact requirement." *Clinton v. City of New York*, 524 U.S. 417, 433 (1998) (cleaned up) (quoting 3 K. Davis & R. Pierce, *Administrative Law Treatise* 13–14 (3d ed. 1994)).

*Third*, state entities that service FFELP loans, which MOHELA does, are likewise harmed by the Mass Debt Cancellation. *See* Mo. Rev. Stat. § 173.385.1(18) (authorizing MOHELA to "service student loans for any owner thereof"). MOHELA's servicing of "approximately $1.1 billion of its own FFELP Loans" provides "ongoing revenue streams for many years to come." Talent Decl. Ex. A, at 55. Yet widespread consolidation of those loans into DLP loans will wipe away a substantial percentage of that servicing income. That too is a cognizable injury-in-fact.

*Fourth*, consolidation will affect MOHELA as a bond issuer. MOHELA is an active issuer of bonds. *See* Elec. Mun. Mkt. Access, *Missouri Higher Ed Ln. Auth. Student Ln Rev (MO)*, https://tinyurl.com/5e67nssm (last visited Sept. 28, 2022) (showing past MOHELA debt offerings); Talent Decl. Ex. A (providing an offering statement for a 2021 MOHELA bond offering).

When MOHELA does so, it must pay those bonds only from specified sources, one of which is "revenues derived from or by reason of the ownership of student loan notes or financing of student loans, or both." Mo. Rev. Stat. § 173.385.1(6); *see also* § 173.390 (same). So a reduction in the FFELP loans held by MOHELA decreases a source of revenue it can use to issue debt.

This will have one of two effects—either MOHELA will have to reduce its bond offerings and, by extension, its ability "to obtain funds to purchase student loan notes or finance student loans, or both," or the entity will have to authorize a bond resolution. *See*, *e.g.*, Mo. Rev. Stat. §173.385.1(6). Both are cognizable harms to Missouri, as either MOHELA will have lesser borrowing capacity, *see*, *e.g.*, *Miller*, 771 F.2d at 353–54, or it will be forced to go through the steps of authoring a bond resolution, *see Texas v. United States*, 809 F.3d 134, 156–57 (5th Cir. 2015) ("[T]he possibility that a plaintiff could avoid injury by incurring other costs does not negate standing."); *Iowa League of Cities v. EPA*, 711 F.3d 844, 868, 870 (8th Cir. 2013) (putting a plaintiff to the choice of losing money or taking steps to avoid the loss is an injury for standing).

*Fifth*, States that invest in SLABS are also experiencing harm. For example, the State of Nebraska, acting through NIC, currently has investments in SLABS, including one fund that holds FFELP SLABS with an approximate market value of $24.8 million. *See* Walden-Newman Decl., ¶ 4. Yet consolidating FFELP loans into DLP loans raises "repayment rates" on the loans held in FFELP SLABS, which returns the principal early and ends the interest income flow that SLABS are intended to generate. Talent Decl. Ex. A, at 37; Arroyo, *supra* (explaining that "[a]round 50–60% of the $100 billion" FFELP SLABS "market is expected to be paid down within the next six to nine months," causing money managers holding those SLABS to "get their money back earlier than expected"); Walden-Newman Decl., ¶ 8 (relaying investment manager's expectation that the Cancellation "will increase prepays for FFELP SLABS").

17

All these harms are traceable to the Mass Debt Cancellation.  That program provides a powerful incentive to borrowers to consolidate their loans in anticipation of the discharge.  *See Dep't of Commerce*, 139 S. Ct. at 2566 (finding traceability based "on the predictable effect of Government action on the decisions of third parties").  And evidence from the States shows that such consolidation is currently occurring.  *See* Williams Decl. ¶ 7; *cf.* Talent Decl. Ex. H (showing that refund requests are up, which shows borrowers are responding to the incentives from the Mass Debt Cancellation in predictable ways).  As those incentives will remain—indeed, as they likely become stronger once the Department starts erasing loans—these harms will only increase.

The redressability prong of standing is satisfied for all these ongoing financial injuries. After all, a court order enjoining the Mass Debt Cancellation will directly ameliorate the present incentive to consolidate FFELP loans into DLP loans, and the relief need not fully resolve all injuries to satisfy Article III requirements.  *See Massachusetts*, 549 U.S. at 525 (finding redressability where a court order could provide partial relief); *Uzuegbunam*, 141 S. Ct. at 801 (effectuating "a partial remedy satisfies the redressability requirement") (cleaned up).

### 2.    Plaintiff States Face Imminent Injuries.

Next are the imminent harms that Plaintiff States face, most of which are also financial. These injuries will occur as soon as the Secretary formally publishes the HEROES Act waiver or modification in the Federal Register.  *See* 20 U.S.C. §1098bb(b)(1) (discussing this notice).  That is just around the corner.  The Department has instructed its loan servicers to have their "initial discharge capability *fully operational" by October 1, 2022*, just days from now, Talent Decl. Ex. I, at 1 (emphasis added), and the agency announced that its applications for loan cancellation "will be available online by early October 2022," Cancellation Program Webpage, *supra*; *see also* Aug. Fact Sheet, *supra* (instructing the Department to "work quickly" to set up the process).  It is likely that the waiver or modification will be published around that time.

18

In addition, the Department has worked extensively with loan servicers like MOHELA over the last month to create the infrastructure for the Mass Debt Cancellation. *See* Talent Decl. Exs. D–G, I. Countless borrowers have already acted in reliance on the cancellation by either seeking refunds of pandemic-era loan payments, *see* Talent Decl. Ex. H, or consolidating their loans, *see* Williams Decl. ¶ 7. The Secretary cannot turn back now. The issuance of the waiver or modification, which is akin to a ministerial act now that the infrastructure is in place, is a foregone conclusion.

Equally important, Plaintiff States cannot wait to pursue immediate injunctive relief. The Department has promised that "there are 8 million people for whom we have data and who will get the relief *automatically*." *The Biden-Harris Administration's Student Debt Relief Plan Explained*, Federal Student Aid, https://tinyurl.com/msj29rdx (last visited Sept. 28, 2022) (emphasis added); *see also* Talent Decl. Ex. G, at 3 (mentioning automatic forgiveness). The Department is thus poised to begin wiping loans off the books as soon as the Secretary issues the waiver or modification. Once that happens, the States will suffer two forms of injuries.

*First*, state entities like MOHELA that service federally held student debt face the imminent loss of revenue in their role as servicers of DLP loans. *See* Mo. Rev. Stat. § 173.385.1(18) (authorizing MOHELA to "service student loans for any owner thereof"); Talent Decl. Exs. B, C (MOHELA's contracts with the Department to service federally held student debt). "As of June 30, 2021, MOHELA was servicing … $59.1 billion in [DLP] loans representing 2,726,179 accounts." Talent Decl. Ex. A, at 49. MOHELA's revenue as a servicer of DLP loans is a function of the number of accounts it services. *See* Talent Decl. Ex. B, at 3–4, 15–16. That includes payment for tasks linked to the existence of student loan accounts. *See* Talent Decl. Ex. C, at 3–7. When student loan balances go to zero, as they will en masse under the Mass Debt

Cancellation, MOHELA will lose the revenue from servicing those loans. That lost revenue, regardless of its amount, is a concrete, particularized injury-in-fact. *See Czyzewski*, 137 S. Ct. at 983.

That loss is traceable to the Mass Debt Cancellation because cancellation will eliminate some student loan accounts entirely, as the Department's own documents show. *See* Talent Decl. Ex. E, at 2 (directing how servicers should handle cancellations that reduce the loan to zero); Talent Decl. Ex. F, at 1 (providing an example that results in a full discharge of the loan). Similarly, an order preventing the Secretary from erasing loan debt will redress the imminent loss of revenue by keeping the existing DLP loans on the books for MOHELA to service.

*Second*, the Mass Debt Cancellation will inflict lost tax revenue. Nebraska, Iowa, Kansas, and South Carolina have a sufficiently "direct injury in the form of a loss of specific tax revenues" to confer standing, *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992), because there is a "fairly direct link between [their] status as a collector and recipient of revenues and the legislative or administrative action being challenged." *Miller*, 771 F.2d at 353 (citation omitted). This loss of tax revenue is not merely the result of "actions taken by United States Government agencies [that injure] a State's economy and thereby caused a decline in general tax revenues." *Wyoming*, 502 U.S. at 448.

*Wyoming* illustrates the principle. There, the State of Wyoming challenged an Oklahoma law requiring Oklahoma utilities to use at least 10 percent Oklahoma-mined coal. *Wyoming*, 502 U.S. at 444. As a result, Oklahoma utilities—which had purchased virtually all their coal from Wyoming sources—cut their purchases of Wyoming-mined coal, thus resulting in Wyoming losing severance taxes. *Id.* at 444–45; *see also El Paso County v. Trump*, 982 F.3d 332, 339 (5th Cir. 2020) (providing the case's background). "The coal that, in the absence of the Act, would

have been sold to Oklahoma utilities by a Wyoming producer would have been subject to the tax when extracted." *Wyoming* 502 U.S. at 447 (quoting the special master).  That, the Court said, established "a direct injury in the form of a loss of specific tax revenues" as opposed to injury to "a State's economy and … a decline in general tax revenues."  *Id.* at 448; *see also Miller*, 771 F.2d at 353–54 (adopting the same principle).

Plaintiff States of Nebraska, Iowa, Kansas, and South Carolina have established standing under the principles announced in *Wyoming*.  To determine an individual's taxable state income, Nebraska, Iowa, Kansas, and South Carolina use the individual's federal adjusted gross income as a baseline.  *See* Neb. Rev. Stat. § 77-2714.01(1); Iowa Code § 422.7; Kan. Stat. Ann. § 79-32,117(a); S.C. Code § 12-6-40; South Carolina Dep't of Revenue Information Letter 22-14 (Sept. 1, 2022), https://tinyurl.com/3vzwrva2.  Normally, federal adjusted gross income includes student loan discharge.  *See* 26 U.S.C. § 61(a)(11).  Under the American Rescue Plan Act of 2021, however, the discharge of student loan debt is not included in federal adjusted gross income if it occurs between December 31, 2020, and January 1, 2026.  *See* 26 U.S.C. § 108(f)(5).

There will undoubtedly be student loan debt discharge in the future.  Under federal Income-Driven Repayment (IDR), borrowers receive cancellation after repaying their loans for a certain period of years (20 to 25 years, depending on the loan).  *See* 34 C.F.R. § 685.221(f).  The Government Accountability Office (GAO) estimates that by 2030 "about 1.5 million loans held by about 600,000 borrowers" will be eligible for IDR loan cancellation.  U.S. Gov't Accountability Office, GAO-22-103720, Federal Student Aid: Education Needs to Take Steps to Ensure Eligible Loans Receive Income-Driven Repayment Forgiveness 15 (2022), https://tinyurl.com/bdhzca8z [GAO Report].  Of those loans, roughly 1.2 million will be forgiven between 2026 and 2030.  *See id.* at 16 fig. 3.  And data from 2021 shows that the average amount of loan cancellation under the

program so far has been about "$34,000 per borrower." *Id.* at 10.  Thus, significant amounts of federal loan cancellation will occur after 2026—including for residents in Nebraska, Iowa, Kansas, and South Carolina.  *See Student Debt and the Class of 2020 Interactive Map*, Inst. for Coll. Access & Success, https://tinyurl.com/5n6k6cd7 (last visited Sept. 28, 2022) (indicating the percentage of college graduates in each State that have debt when they graduate).  As a rough estimate—using the average amount of cancellation in 2021 ($34,000), *see* GAO Report at 10, and the ratio of loans to borrowers through 2030 (about 2.5), *see id.* at 15—approximately $16.6 billion of loan cancellation will occur between 2026 and 2030.  By operation of law, then, substantial income tax revenue will be coming to Nebraska, Iowa, Kansas, and South Carolina.

The Mass Debt Cancellation, however, will reduce that tax revenue by decreasing the amount of outstanding student loan debt.  Using the $34,000 average amount of forgiveness in 2021, *see* GAO Report at 10, the up to $20,000 cancellation under the Mass Debt Cancellation equals an up to 60 percent reduction in outstanding principal for borrowers who qualify under the IDR program.  This means that the next time Nebraska, Iowa, Kansas, and South Carolina tax student loan discharge, there will be less discharge to tax.  The Mass Debt Cancellation will thus deprive those States of tax revenue—and do so as soon as the debt is discharged.  Plaintiff States have standing to protect against such losses.

### 3.   Plaintiff States Are Experiencing Sovereign and Quasi-Sovereign Injuries.

Plaintiff States also have standing to vindicate the sovereign and quasi-sovereign interests that the Mass Debt Cancellation impair.  The Supreme Court has recognized that States have "sovereign interests" in "the exercise of sovereign power over individuals and entities within [their] jurisdiction."  *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982).  The Court has also affirmed that each State has "a quasi-sovereign interest in the health

22

and well-being—both physical and economic—of its residents in general." *Id.* at 607. This quasi-sovereign interest arises when a defendant's conduct threatens harm to a "sufficiently substantial segment of [a State's] population." *Id.*

States, to be sure, cannot use *parens patriae* lawsuits to "intrude on the sovereignty of the federal government and ignore important considerations of our federalist system." *Miller*, 771 F.2d at 355. But that is not what is happening here. Plaintiff States are asserting their own "sovereign and quasi-sovereign interests" against "the United States and its agents." *Kentucky v. Biden*, 23 F.4th 585, 598 (6th Cir. 2022). That kind of suit "is permissible." *Id.* Having established that Plaintiff States may raise their sovereign and quasi-sovereign interests, they assert three of them here.

*First*, MOHELA's purpose is to (1) ensure that students in Missouri have access to school loans and (2) provide financial aid to Missouri's public colleges and universities. Mo. Rev. Stat. § 173.360. MOHELA is thus a fulfillment of the state legislature's constitutional duty to "adequately maintain the state university and such other educational institutions as it may deem necessary." Mo. Const. art. IX, § 9(b). Because the Mass Debt Cancellation impairs Missouri's chosen method of fulfilling that purpose, it undermines the State's regulatory scheme for accomplishing its constitutional prerogatives. That harms the State's sovereign interest, *see Alfred L. Snapp*, 458 U.S. at 601, in "the structure of its government," *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).

*Second*, Missouri recognizes that MOHELA's dual purpose of ensuring access to student aid and providing additional funding to the State's public colleges and universities furthers "an essential public function." Mo. Rev. Stat. § 173.360. So when the Mass Debt Cancellation costs MOHELA revenue and diminishes its access to bond markets, Defendants impair the State's

23

educational system.  That qualifies as an injury to the State's "quasi-sovereign interest in the …
well-being … of its residents."  *Alfred L. Snapp*, 458 U.S. at 607.  The same is true of ALSA.  The
reduction in ALSA's revenue caused by the Mass Debt Cancellation will limit its ability to provide
educational opportunities to Arkansans through financing further student loans.  *See* Williams
Decl. ¶¶ 7–8.

 *Third*, the Mass Debt Cancellation harms Nebraska's quasi-sovereign interest in protecting
the well-being of its public employees.  Much of the money that the NIC invests supports the
pension fund for those employees.  *See* Walden-Newman Decl., ¶ 3.  By harming NIC's existing
investments, the Mass Debt Cancellation invades Nebraska's quasi-sovereign interest in the
economic well-being of its residents.  *See Alfred L. Snapp*, 458 U.S. at 607.

 These injuries to Plaintiff States' sovereign and quasi-sovereign interests further demon-
strate that they have standing to pursue their claims.  Were the Mass Debt Cancellation enjoined,
those harms will not occur, and so a favorable ruling will redress them.

* * *

 At bottom, Plaintiff States have standing for the simple reason that they are active players
in the student loan arena—they are holders of loans and servicers of loans, have set up tax systems
accounting for the discharge of debt like student loans, and have established education-promoting
entities that are actively participating in the student loan market.  Whatever else may be said of the
Mass Debt Cancellation, it is enormously disruptive of the current status quo—and the cost of that
disruption falls, in significant part, on the States.  They therefore have standing.

### B. Plaintiffs' Separation-of-Powers Claim Is Likely to Succeed.

 The U.S. Constitution divides the powers of the "Federal Government into three defined
categories[:] Legislative, Executive, and Judicial."  *Free Enter. Fund v. Pub. Co. Acct. Oversight
Bd.*, 561 U.S. 477, 483 (2010).  When reviewing Executive Branch action under the separation-of-

24

powers doctrine, the President's and his Administration's "power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).  Defendants here do not assert that the Constitution gives them any inherent executive authority to forgive student loans.  Nor could they.  *See Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013) (noting that the power to spend funds, including "the authority to impose" terms on their use, belongs to Congress).  That means the power, if any, must stem from a statutory grant of authority.  Here, Defendants' sole justification for unilaterally wiping out hundreds of billions of dollars in student loan debt rests on the HEROES Act.

The HEROES Act provides that the Department, acting through the Secretary, may "waive or modify any statutory or regulatory provision applicable to [certain] student financial assistance programs" when "necessary in connection with a war or other military operation or national emergency." 20 U.S.C. § 1098bb(a)(1).  The Act further specifies, as relevant here, that this waiver or modification must be "necessary to ensure that" one of the statutory objectives is achieved, including to ensure that "recipients of student financial assistance … who are affected individuals are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals."  § 1098bb(a)(2)(A).  The Act defines "affected individuals" as including individuals who (1) "reside[] or [are] employed in an area that is declared a disaster area by any Federal, State, or local official in connection with a national emergency" or (2) "suffered direct economic hardship as a direct result of a war or other military operation or national emergency, as determined by the Secretary."  §1098ee(2)(C)–(D).  This statutory text does not authorize the Mass Debt Cancellation's elimination of $10,000 to $20,000 in federally held student loan debt for *every* American who earns less than $125,000 per year (or $250,000 per household

for married people) no matter where they have lived during the COVID-19 pandemic (even if they resided and worked overseas), and no matter how they were financially affected by the pandemic.

### 1.      The Major-Question Doctrine Applies In This Case.

In *West Virginia v. Environmental Protection Agency*, 142 S. Ct. 2587 (2022), the Supreme Court recently discussed the major-questions doctrine, reiterating that when a federal agency purports to address issues of immense "economic and political significance," it may do so only with explicit congressional authorization. *Id.* at 2608. In such cases, "both separation of powers principles and a practical understanding of legislative intent" provide "reason to hesitate before concluding that Congress meant to confer" sweeping agency authority—even where such "regulatory assertions ha[ve] a colorable textual basis." *Id.* at 2608–09 (quotation marks omitted). The Court "presume[s] that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *Id.* at 2609 (cleaned up).

At least five factors that the Supreme Court has considered in its major-question doctrine cases show that the doctrine applies here.

*First*, the Department is unquestionably claiming the authority to resolve a matter of great "political significance." *West Virginia*, 142 S. Ct. at 2608 (citation omitted); *accord NFIB v. OSHA*, 142 S. Ct. 661, 665 (2022) (per curiam) (*OSHA Vaccine Mandate Case*) (quoting *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (per curiam)). There is little doubt that cancelling student loans is "one of today's most hotly debated issues." *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 614 (5th Cir. 2021); *see also Gonzales v. Oregon*, 546 U.S. 243, 267 (2006) ("The importance of the issue of physician-assisted suicide, which has been the subject of an earnest and profound debate across the country, makes the oblique form of the claimed delegation all the more suspect.") (citation omitted). The White House's public messaging confirmed that this is political, affirming that the Mass Debt Cancellation is President

Biden's attempt to "follow[] through on [a campaign] promise" and achieve other political goals like promoting "equity." Cancellation Backgrounder, *supra*. The media, too, has understood the political overtones, saying that "Democrats needed this" and that the Cancellation is "a political win for Biden." Deepa Shivaram, *Student loan forgiveness is politically popular. But not all Democrats are on board*, NPR (Aug. 26, 2022), https://tinyurl.com/yc9zjpes. And the historical context—that Defendants announced this program just months before a consequential midterm election—further illustrates the point. *See Dep't of Commerce*, 139 S. Ct. at 2575 (courts "are not required to exhibit a naiveté from which ordinary citizens are free").

*Second*, underscoring that the Mass Debt Cancellation is a matter of political significance, the Department adopted a massive fiscal program that Congress has "conspicuously and repeatedly declined to enact itself." *West Virginia*, 142 S. Ct. at 2610. Time and again, legislative attempts to enact sweeping student-loan debt cancellation have failed. *E.g.*, S. 2235, 116th Cong. (2019); H.R. 2034, 117th Cong. (2021). Attempts to legislate on this issue have fallen so flat that many members of Congress have concluded that political support for cancelling student-loan debt simply does not exist. *See* Zack Friedman, *4 Reasons Why Congress Hasn't Cancelled Your Student Loans*, Forbes (Mar. 8, 2022), https://tinyurl.com/ycku743t ("Democrats recognize that there isn't widespread support among their colleagues to pass student loan cancellation.").

*Third*, the Mass Debt Cancellation is a decree of vast "economic … significance." *West Virginia*, 142 S. Ct. at 2608. According to the nonpartisan Penn Wharton Budget Model, the Mass Debt Cancellation "will cost up to $519 billion." Penn Report, *supra*. Even in today's world of trillion-dollar federal spending bills, that is a massive economic hit by any account. *See* Center for Medicaid Services, Accounting for Federal COVID Expenditures in the National Health Expenditure Accounts, https://tinyurl.com/4ezvv5tx (last visited Sept. 28) (reporting that the

CARES Act provided $1.8 trillion in funding).  To put it in perspective, the Treasury Department reports that the United States' current national debt that has been accruing for decades is around $30 trillion.  *What is the national debt?*, U.S. Treasury Department Fiscal Data, https://tinyurl.com/5c62damp (last visited Sept. 28, 2022).  An executive branch decree that adds more than a half trillion to the national debt is more than enough to invoke the major-questions doctrine.  After all, the Supreme Court has said that an economic effect of $50 billion—about a tenth the amount at issue here—was sufficient.  *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489.

*Fourth*, through the Mass Debt Cancellation, the Department is asserting authority unprecedented in scope and impact—a truly "unheralded power."  *West Virginia*, 142 S. Ct. at 2610 (citation omitted); *see also OSHA Vaccine Mandate Case*, 142 S. Ct. at 666 ("It is telling that OSHA, in its half century of existence, has never before adopted a broad public health regulation of this kind"); *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, we typically greet its announcement with a measure of skepticism.") (cleaned up).

Until now, the Department has "generally invoked the HEROES Act relatively narrowly to grant relief to limited subsets of borrowers, such as deployed military service members or victims of certain natural disasters."  Kevin M. Lewis & Edward C. Liu, *The Biden Administration Extends the Pause on Federal Student Loan Payments: Legal Considerations for Congress*, Congressional Research Service, at 2–3 (Jan. 27, 2021), https://tinyurl.com/yxwm4eyj.  The Department has not "relied on the HEROES Act or any other statutory, regulatory, or interpretative authority for the blanket or mass cancellation … of student loan principal balances, and/or the material change of repayment amounts or terms."  2021 DeVos Memo at 6.  Finding such grand

power in a statute that the Department has previously used in such modest ways suggests that an illegitimate power grab is afoot.

Consistent with this historical practice, it was widely recognized—from Speaker Pelosi to the Trump Administration—that the HEROES Act does not authorize mass loan cancellation.  *E.g.*, Camera, *supra* (quoting Pelosi); 2021 DeVos Memo at 6 (concluding that "Congress never intended the HEROES Act as authority for mass cancellation … of student loan principal balances").  Against this background of consensus, purporting to unearth this power now is dubious, to say the least.

*Fifth*, the Department is seeking to significantly expand—to the point of "transform[ing]"—its regulatory authority.  *West Virginia*, 142 S. Ct. at 2610 (citation omitted).  The Department is assigned a range of functions, *see* 20 U.S.C. § 3402, but mass debt cancellation is not among them.  Congress has identified many classes of borrowers who are entitled to the cancellation of their student loans.  *E.g.*, 20 U.S.C. § 1078-10 (loan cancellation for teachers); 20 U.S.C. § 1078-11 (loan cancellation for service in areas of national need); 20 U.S.C. § 1087ee (loan cancellation for certain public service).  Yet it has not given the Department the power to identify any such classes.  What the Department seeks to do is to take a statute authorizing it to provide specific relief to individuals aggrieved by a national emergency and convert it into the power to categorically erase hundreds of billions of dollars of debt anytime a national emergency arises.  That would take the Department's historic role of "improv[ing] the management and efficiency of Federal education activities" such as "administrative structures for the dispersal of Federal funds," 20 U.S.C. § 3402(6), and transform it into an agency that balances the many fiscal considerations implicated by policy decisions on mass debt eradication.  That the Department has

"no comparative expertise" on this topic strongly suggests that Congress did not give it this power. *West Virginia*, 142 S. Ct. at 2613 (citation omitted).

* * *

Justice Kavanaugh, when he was a judge on the D.C. Circuit, best summarized the major-questions doctrine: "If an agency wants to exercise expansive regulatory authority over some major social or economic activity … an *ambiguous* grant of statutory authority is not enough.  Congress must *clearly* authorize an agency to take such a major regulatory action."  *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 421 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from the denial of rehearing en banc).  Whatever else it may be, the authority to cancel billions of dollars of loans for tens of millions of student borrowers is clearly a claim of "authority over some major social or economic activity."  *Id.*  "[T]his is a major questions case."  *West Virginia*, 142 S. Ct. at 2610.

## 2. Defendants Lack Clear Congressional Authorization For The Mass Debt Cancellation.

Because the major-questions doctrine applies, the government's claim of authority should be treated with "skepticism."  *West Virginia*, 142 S. Ct. at 2614.  "To overcome that skepticism, the Government must … point to clear congressional authorization" permitting its action.  *Id.* (quotation marks omitted).  None exists here.

The HEROES Act allows the Secretary to "waive or modify any statutory or regulatory provision applicable to [certain] student financial assistance programs" when "necessary in connection with a war or other military operation or national emergency" to ensure that "recipients of student financial assistance … who are affected individuals are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals." 20 U.S.C. §1098bb(a)(1), (a)(2)(A).  Dividing this statutory text into three components illustrates that the Mass Debt Cancellation does not fit within the Act.

30

*First*, Defendants have not shown—and cannot show—that the Mass Debt Cancellation is "necessary in connection with a … national emergency." 20 U.S.C. §1098bb(a)(1).  Tellingly, the White House's announcement of the Mass Debt Cancellation touted its fulfillment of a campaign promise and its achievement of political goals unconnected to the pandemic.  *See* Cancellation Backgrounder, *supra*.  It is also notable that the Mass Debt Cancellation did not come until (1) nearly two-and-a-half years after the pandemic began, (2) months after the Administration observed that "the pandemic 'ha[d] shifted to a new phase'" far less disruptive of everyday life, Mem. Opp'n Pls' Mot. Prelim Inj. at 8, *Arizona v. CDC*, No. 6:22-cv-00885 (W.D. La. Apr. 29, 2022), ECF No. 40, and (3) just weeks before the President declared that "[t]he pandemic is over," 60 Minutes Twitter, *supra*.  In light of this, it is not plausible to assert that this belated Mass Debt Cancellation is "necessary in connection with" the COVID-19 pandemic.

*Second*, the Mass Debt Cancellation is not "necessary to ensure"—and is not even calculated to ensure—that "recipients of student financial assistance … are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals." 20 U.S.C. §1098bb(a)(2)(A).  For starters, the Cancellation is not limited to people who are in "a worse position financially," whether in general or "in relation to [their student] financial assistance.  *Id.*  To illustrate, a single man who was earning $50,000 per year and had $10,000 in remaining student loans when the pandemic began—and now is married with an annual household income of $245,000 and only $9,000 of student loan debt after making all his loan payments throughout the pandemic—is in a decidedly better all-around and loan-specific financial position.  Yet he and countless others like him are entitled to a full cancellation of their debt and a refund of the $1,000 paid during the pandemic.  Such a program is not remotely justified by the text of the HEROES Act.

Moreover, because of the relief efforts that the Department has already taken, it is difficult to fathom that many borrowers are in "a worse position financially in relation to [their student loan] financial assistance" since the beginning of the pandemic.  20 U.S.C. §1098bb(a)(2)(A). When the pandemic began, the Department suspended most student-loan borrowers' obligations to make loan payments and stopped interest from accruing on their loans, and that pause remains in place.  *See* Repayment Pause Announcement, *supra*.  As a result, most borrowers are better off today than before the pandemic with respect to their student loans because they have paid nothing for nearly three years, no interest has accrued on their loans, and inflation has reduced the real-dollar value of their debts.  *See* Daniel Mangrum, et al., *Liberty Street Economics: Three Key Facts from the Center for Microeconomic Data's 2022 Student Loan Update*, Federal Reserve Bank of New York (Aug. 9, 2022), https://tinyurl.com/59d9j8bp (observing that 80 percent of all student-loan borrowers saw their credit scores *increase* during the pandemic); 34 C.F.R. §685.221(f)(1)(i), (v) (indicating that borrowers in the IDR program earned credit toward their discharge eligibility even though they were not making payments).  Despite this, every person with federally held student loan debt who makes less than $125,000 per year (or $250,000 per household for married borrowers) qualifies for the Mass Debt Cancellation.

In addition, no nexus exists between the goal of ensuring that borrowers are "not placed in a worse position financially in relation to [their student loan] financial assistance" and the blanket cancellation of $10,000 to $20,000 of debt per eligible borrower.  For beneficiaries of the Mass Debt Cancellation, the elimination of $10,000 or more of debt goes *far* beyond relieving pandemic-related burdens on student loans.

*Third*, Defendants have not limited the Mass Debt Cancellation to "affected individuals." 20 U.S.C. §1098bb(a)(2)(A).  The Act defines "affected individuals," in relevant part, as people

32

who (1) "reside[] or [are] employed in an area that is declared a disaster area by any Federal, State, or local official in connection with a national emergency" or (2) "suffered direct economic hardship as a direct result of a war or other military operation or national emergency, as determined by the Secretary." 20 U.S.C. § 1098ee(2)(C)–(D).  But as discussed above, Defendants have not even tried to restrict the Mass Debt Cancellation to borrowers who have suffered "direct economic hardship as a direct result" of the pandemic.  Nor is the program confined to people who live or work in the United States because nothing precludes people who have lived abroad during the pandemic from obtaining the cancellation.

In short, the complete disconnect between the textual requirements of the HEROES Act and the Administration's action is more than sufficient to conclude that the Mass Debt Cancellation falls outside the statute's scope.  Defendants cannot come close to overcoming the "skepticism" with which this Court must approach their major executive action.  *West Virginia*, 142 S. Ct. at 2614.

The Office of Legal Counsel (OLC) tried to provide cover for Defendants' unlawful action. *See* Use of the HEROES Act of 2003 to Cancel the Principal Amounts of Student Loans, 2022 WL 3975075, at *1 (O.L.C. Aug. 23, 2022).  But to no avail.  Per OLC, "the Secretary can exercise the waiver or modification authority granted by the HEROES Act … to reduce or cancel the principal balances of student loans, provided the Secretary *deems* the reduction or cancellation necessary to ensure that affected individuals are not placed in a worse position financially in relation to their financial assistance because of their status as affected individuals."  *Id.* at *17 (emphasis added). The key is the word "deems," which OLC thinks gives the Secretary unfettered discretion "beyond the scope of judicial review."  *Id.* at *15.

This reading fails for two reasons.  The first is a matter of text.  OLC is conflating two separation provisions in the Act.  Section 1098bb(a)(1) permits the Secretary to "waive or modify any statutory or regulatory provision applicable to the student financial assistance program ... as the Secretary *deems* necessary ...."  (emphasis added).  This addresses the choice of which statutory or regulatory provisions to waive.  The next part—Section 1098bb(a)(2)(A)—authorizes the Secretary "to waive or modify any provision described in paragraph (1) as may be *necessary* to ensure that recipients of student financial assistance … are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals." (emphasis added).  This speaks to who receives the benefit and whether the waiver will accomplish the statutory goal.  Through a sleight of hand, the OLC opinion takes the "deems" in subsection (a)(1) and applies it to the goal in subsection (a)(2)(A).  In so doing, OLC seeks unreviewable deference on all aspects of the waiver.  But the far better reading, since it does not take "deem" from one part of the statute and place it into another, *see United States v. Daifullah*, 11 F.4th 888, 894 (8th Cir. 2021), is that subsection (a)(2)(A) calls for meaningful judicial review of the Secretary's efforts to achieve the congressionally prescribed goal.

The second flaw is that OLC's reading has untenable implications.  According to OLC, the Secretary has effectively unreviewable discretion to determine which provisions to waive, who to include in the waiver, whether the waiver is appropriate, and if the waiver will accomplish the statutory goal.  2022 WL 3975075, at *15.  In other words, OLC's reading of the HEROES Act has no limits except the Secretary's imagination.  The government's failure to reckon "with the implications of its position" or provide "any limiting principle" to its construction is fatal. *Kentucky*, 23 F.4th at 608.  It is hard to believe that is what Congress intended when it passed the

34

HEROES Act, and because there is no "clear congressional authorization" for such an interpreta-tion, there is no reason to adopt it in this case.  *West Virginia*, 142 S. Ct. at 2614.

### C.    Plaintiffs' APA Claims Are Likely To Succeed.

Plaintiff States also challenge the Mass Debt Cancellation under the APA.

### 1.    The Mass Debt Cancellation Is Final Agency Action.

The threshold question for their APA claims is whether the Mass Debt Cancellation is "final agency action" subject to challenge under the APA.  5 U.S.C. § 706.  The Supreme Court "has consistently taken a 'pragmatic' and 'flexible' approach to the question of finality."  *Hawkes Co. v. U.S. Army Corps of Eng'rs*, 782 F.3d 994, 997 n.1 (8th Cir. 2015).  To be final, an agency's action must meet two requirements.  "First, the action must mark the 'consummation' of the agency's decisionmaking process."  *Bennet v. Spear*, 520 U.S. 154, 177–78 (1997) (citation omitted).  "And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *Id.* at 178 (citation omitted).  Applying a pragmatic and flexible analysis, both requirements are met here.

*First*, the Mass Debt Cancellation marks the end of the Department's decisionmaking process.  The detail with which the agency has outlined the Cancellation—both in its public-facing documents from the Department and the President, *see* Cancellation Program Webpage, *supra*; Aug. Fact Sheet, *supra*; and even more so in its communications with loan servicers like MOHELA, *see* Talent Decl. Exs. D–G—leaves no doubt that the program has been definitively established.  Further confirming that there is nothing "tentative" about the Mass Debt Cancellation, *Sisseton-Wahpeton Oyate of Lake Traverse Reservation v. U.S. Corps of Eng'rs*, 888 F.3d 906, 915 (8th Cir. 2018), the Department has sent official Business Operations Change Request Forms to its loan servicers instructing them "to implement a process to request large volumes" of "borrower discharges," *see* Talent Decl. Ex. E, at 1.  Also, the Department's General Counsel

officially revoked the 2021 DeVos Memo, leaving no doubt that the agency has adopted a new official position on this issue. *See* 87 Fed. Reg. at 52,943–45. Given all this, there is no realistic prospect that the Department might change its mind about this program.

That the Mass Debt Cancellation is embodied primarily in public announcements, government websites, communications with loan servicers, and contract change requests does not prevent it from qualifying as final agency action. Indeed, this action is final because the Department's documents and public communications "show that the Secretary made a final decision about how to evaluate [certain] claims for borrowers." *Calvillo Manriquez v. Devos*, 345 F. Supp. 3d 1077, 1095 (N.D. Cal. 2018). What matters is that the Mass Debt Cancellation—the amounts, the program contours, and the timeline—have been determined and are not going to change.

*Second*, the Mass Debt Cancellation has "determined rights [and] obligations." *Sackett v. EPA*, 566 U.S. 120, 126 (2012) (quotations marks omitted). Obviously, it determines the rights of millions of student-loan borrowers, and legal consequences will flow from it. *See* Sept. Fact Sheet, *supra* (estimating that "over 40 million borrowers are eligible"). The Department's public communications state in no uncertain terms that "[y]ou're eligible for student loan debt relief if your annual federal income was below $125,000 (individual or married, filing separately) or $250,000 (married, filing jointly or head of household) in 2021 or 2020." Cancellation Program Webpage, *supra*. And the Department identifies the specific "types of federal student loans" that "are eligible for relief." *Id.* More importantly, the agency says that the eight million borrowers for whom the government has "income data on hand . . . will get the relief automatically." *Id.* Without question, debt cancellation that rolls out automatically affords rights and initiates legal consequences. The Mass Debt Cancellation thus constitutes final agency action.

36

To be sure, before student loan debts are officially erased from the books, the Secretary must publish a HEROES Act waiver or modification.  *See* 20 U.S.C. §1098bb(b)(1) (discussing this notice).  But at this point—with all that has occurred so far to roll out the Cancellation, including the processing of countless refund requests, *see* Talent Decl. Ex. H—publication of the waiver or modification is little more than a ministerial act.  More importantly, the Department has clearly bound it, its staff, and loan servicers like MOHELA to carrying out the Mass Debt Cancellation.  That suffices for finality.  "[W]here agency action withdraws an entity's previously-held discretion, that action alters the legal regime, binds the entity, and thus qualifies as final agency action."  *Texas v. EEOC*, 933 F.3d 433, 442 (5th Cir. 2019) (citation omitted).  Thus, for example, the Supreme Court recently concluded that a decision binding agency staff to discontinue a program was "final agency action under the APA."  *Biden v. Texas*, 142 S. Ct. 2528, 2545 (2022).

## 2. The Mass Debt Cancellation Exceeds the Department's Statutory Authority and Violates the Constitution.

Under the APA, a reviewing court shall "hold unlawful and set aside agency action" that is "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory . . . authority[,] . . . limitations, or short of statutory right."  5 U.S.C. § 706(2)(A)–(C).  In the separation-of-powers section above, Plaintiff States already explained how the Mass Debt Cancellation exceeds the authority that Congress has given the Department.  The same analysis demonstrates that the Department has acted in excess of its statutory authority and in violation of the Constitution.  Plaintiff States incorporate that analysis here.

## 3. The Mass Debt Cancellation Is Arbitrary and Capricious Agency Action.

Courts applying the APA must "hold unlawful and set aside agency action" that is "arbitrary" or "capricious."  5 U.S.C. § 706(2)(A).  The APA's arbitrary-and-capricious standard requires that "the agency has acted within a zone of reasonableness and, in particular, has reason-

ably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). It also demands that the agency "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1915 (2020). Under these principles, the Mass Debt Cancellation is arbitrary and capricious for at least six reasons.

*First*, the program is arbitrary and capricious because "the agency has relied on factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). As previously mentioned, a senior administration official explained that the Department's Mass Debt Cancellation is intended to "narrow the racial wealth gap" and "promot[e] equity." Cancellation Backgrounder, *supra*. These are not factors that Congress intended the Secretary to consider when deciding whether to issue a waiver or modification under the HEROES Act. *See* 20 U.S.C. § 1098bb(a)(2) (listing the goals the waiver or modification must accomplish).

*Second*, the Department's reliance on COVID-19 as a justification for the Mass Debt Cancellation is an impermissible "*post hoc* rationalization." *Regents*, 140 S. Ct. at 1908 (citation omitted). The agency did not first identify the Cancellation as "necessary to ensure that recipients of [certain] student financial assistance … are not placed in a worse position financially in relation to that financial assistance" because of the COVID-19 pandemic. 20 U.S.C. § 1098bb(a)(2)(A). Rather, this kind of categorical student loan cancellation has long been a goal of the President, and his Administration is using the pandemic as a justification to impose it. While on the campaign trail, President Biden announced a proposal to "forgive all undergraduate tuition-related federal student debt from two- and four-year public colleges and universities for debt-holders earning up

to $125,000, with appropriate phase-outs to avoid a cliff." Biden Medium Article, *supra*. The Mass Debt Cancellation, which uses the same $125,000 cut-off, was admittedly his effort to "follow[] through on that promise." Cancellation Backgrounder, *supra*. "In reviewing agency pronouncements, courts need not turn a blind eye to the statements of those issuing such pronouncements," *BST Holdings, L.L.C. v. Occupational Safety & Health Admin., United States Dep't of Lab.*, 17 F.4th 604, 614 (5th Cir. 2021), nor is the Court "required to exhibit a naiveté from which ordinary citizens are free," *Dep't of Commerce*, 139 S. Ct. at 2575 (citation omitted). In short, the COVID-19 justification is merely a *post hoc* rationalization for achieving one of the President's policy goals. That cannot "serve as a sufficient predicate for agency action." *Regents*, 140 S. Ct. at 1909 (citation omitted).

*Third*, for similar reasons, the Mass Debt Cancellation is impermissibly "pretextual." *Dep't of Commerce*, 139 S. Ct. at 2573. The Department "pursued [this] regulatory initiative only as a legislative 'work-around.'" *OSHA Vaccine Mandate Case*, 142 S. Ct. at 668 (Gorsuch, J., concurring) (citation omitted); *see BST Holdings*, 17 F.4th at 612 (noting the same). The background leading up to the Mass Debt Cancellation "reveal[s] a significant mismatch between the decision the [Administration] made and the rationale [it] provided." *Dep't of Commerce*, 139 S. Ct. at 2575. It is telling that shortly before announcing the Mass Debt Cancellation, the Administration argued in court that the pandemic's impact is now relatively modest, *see* Mem. Opp'n Pls' Mot. Prelim Inj. at 8, *Arizona v. CDC*, No. 6:22-cv-00885 (W.D. La. Apr. 29, 2022), ECF No. 40, and soon after announcing the Mass Debt Cancellation, President Biden admitted that the pandemic is "over," 60 Minutes Twitter, *supra*. "The reasoned explanation requirement of administrative law … is meant to ensure that agencies offer genuine justifications for important decisions." *Dep't of Commerce*, 139 S. Ct. at 2575–76. "In order to permit meaningful judicial

review, an agency must disclose the basis of its action." *Id.* at 2573. Defendants did not do that here, and so their actions are capricious.

*Fourth*, the exceedingly broad scope of the Mass Debt Cancellation is arbitrary. As explained under the separation-of-powers argument above, the Cancellation is not confined to people who are in "a worse position financially"—let alone those who are "in a worse position financially in relation to [their student] financial assistance" because of the pandemic. 20 U.S.C. §1098bb(a)(2)(A). Nor is there any connection between the significant sums of debt cancelled ($10,000 to $20,000) and the generally minimal student-loan-related harms to borrowers that might possibly have occurred during the pandemic—harms greatly mitigated by other Department actions such as deferring payments and interest accrual. The inexplicably vast reach of the Mass Debt Cancellation contradicts any claim of reasoned agency decisionmaking.

*Fifth*, the Department failed to properly analyze the reversal of its prior position. The agency, to be sure, explained why it changed its *legal* position that it could not grant categorical debt cancellation under the HEROES Act. *See* 87 Fed. Reg. at 52,943–45. But nowhere has the Department discussed the underlying *factual* predicates justifying the change in course. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (noting that an agency must provide a more detailed explanation when "its new policy rests upon factual findings that contradict those which underlay its prior policy"). The pandemic has waxed and waned over the last two-and-a-half years, and as noted above, it is basically over. The Department's failure to explain why it must *now* forgive student debt is a reversal in policy that it had to explain but failed to do so.

*Sixth*, the Department failed to consider the reliance interests of Plaintiff States. Direct holders of FFELP loans like MOHELA and ASLA, investors in SLABS like NIC, and servicers of student loans like MOHELA all have made important financial decisions based on the

Department's historical practices.  Never before has the Department attempted to unilaterally decree the mass cancellation of student loan debt.  In fact, it issued multiple HEROES Act waivers and modifications during the COVID-19 pandemic, and none of those erased unpaid loan balances. *See Regents*, 140 S. Ct. at 1915 (stating that an agency must consider reliance interest when it is "not writing on a blank slate").  Doing that now, without considering the important financial reliance interests of state actors such as MOHELA, ASLA, and NIC, is a hallmark of capricious agency action.

Plaintiff States also have reliance interests in their tax codes.  As explained above, States like Nebraska, Iowa, Kansas, and South Carolina stand to lose significant tax revenue because of the Mass Debt Cancellation.  But the Department shows no signs that it considered the States' reliance on the existing tax laws before imposing this massive financial loss on them.

\* \* \*

The Department failed to "reasonably consider[] the relevant issues and reasonably explain[] the decision" to implement the Mass Debt Cancellation.  *Prometheus Radio Project*, 141 S. Ct. at 1158.  To approve the Department's actions here would be to permit the Executive Branch to make multi-billion judgments affecting millions of people with no reasoned decisionmaking to support it.  Bedrock principles of administrative law forbid that.

## II.    The Remaining Factors Also Support Plaintiffs.

The remaining TRO and preliminary injunction factors are "(2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to other litigants; and (4) the public interest."  *Watkins Inc.*, 346 F.3d at 44.  These also weigh in Plaintiff States' favor.

41

A.     **Plaintiffs Face Irreparable Harm To Their Financial, Sovereign, Quasi-Sovereign Interests.**

Without immediate injunctive relief, Plaintiff States will suffer irreparable harm to their financial, sovereign, and quasi-sovereign interests. "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). Plaintiff States face the following four irreparable injuries.

*First*, Plaintiff States' ongoing financial injuries are irreparable. Recall that those harms arise because the Mass Debt Cancellation creates an overwhelming present incentive to consolidate FFELP loans into DLP loans. And the precise injuries include, among others, MOHELA's and ASLA's loss of income as a holder of FFELP loans, MOHELA's loss of servicing income as a servicer of FFELP loans, NIC's loss of interest income as an owner of FFELP SLABS, and MOHELA's diminished ability to make bond offerings unless it finds other revenue and authorizes its use to secure bond debt with a resolution. With every passing day, more FFELP loans are consolidated into DLP loans, and these injuries are growing. No post-judgment relief can undo this harm.

*Second*, Plaintiff States' imminent financial harms are also unable to be remedied post-judgment. These injuries include MOHELA's immediate loss of revenue for serving DLP loans and Nebraska's, Iowa's, Kansas's, and South Carolina's loss of future tax revenue. The cause of these harms is the elimination of existing DLP loans. Once the Mass Debt Cancellation begins—including the automatic processing of loans owed by eight million borrowers—those loans will disappear, commencing Plaintiff States' imminent financial harms and rendering them irreparable. Even if the Court could quantify those losses, Plaintiff States "would be unable to recover any damages" because Defendants have "sovereign immunity in federal court in suits requesting

money damages." *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir. 1994) (finding irreparable harm in that circumstance). Those sorts of financial harms are irreparable. *See California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) ("Economic harm … is irreparable here because the states will not be able to recover monetary damages.").

*Third*, as a servicer of DLP loans, MOHELA is already incurring compliance costs to implement the Mass Debt Cancellation, as reflected in the official Business Operations Change Request Forms and the extensive Q&A sheet that MOHELA received from the Department. *See* Talent Decl. Exs. E, G. These sorts of "nonrecoverable compliance costs" that arise from implementing agency action "later held invalid" are undoubtedly an "irreparable harm." *BST Holdings*, 17 F.4th at 618 (citation omitted); *see also Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996) ("The threat of unrecoverable economic loss ... does qualify as irreparable harm.").

*Fourth*, undermining MOHELA's and ASLA's financial health harms Missouri's and Arkansas's quasi-sovereign interests in higher education. And jeopardizing NIC's investments of its pension funds frustrates Nebraska's quasi-sovereign interest in protecting the well-being of its public employees. Injuries to these quasi-sovereign interests are widely dispersed, difficult to quantify, and thus cannot be adequately remedied with damages. They are irreparable. *Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003) (harms that are "difficult, if not impossible, to quantify in terms of dollars" "can constitute irreparable injury"). Indeed, all harms to the States' sovereign and quasi-sovereign interest are necessarily irreparable. Those are rights that the Constitution gives the States, and so, like any constitutional right, their deprivation "for even minimal periods of time, unquestionably constitutes irreparable harm." *Lowry ex rel. Crow v. Watson Chapel Sch. Dist.*, 540 F.3d 752, 762 (8th Cir. 2008) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)).

**B.      The Balance Of Harms And The Public Interest Favor The Plaintiffs.**

When the party opposing a TRO or injunction is the federal government, the balance-of-harms factor "merge[s]" with the public-interest factor. *Nken v. Holder*, 556 U.S. 418, 435 (2009). That balance weighs heavily in Plaintiff States' favor. On the one hand, as explained above, Plaintiffs stand to suffer all sorts of irreparable harms absent immediate injunctive relief. But on the other hand, an order preventing the Department from enforcing its unlawful Mass Debt Cancellation will inflict no cognizable injury on the agency because officials "do[] not have an interest in the enforcement of [illegal government action]." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). Nor will a TRO or injunction harm borrowers because their loan payments have been deferred and interest is not accruing. Thus, no one will be harmed by temporary injunctive relief enabling this Court to give due consideration to Plaintiff States' claims.

The public interest similarly supports a TRO and injunction. "[T]he public's true interest lies in the correct application of the law." *Kentucky*, 23 F.4th at 612; *see also Rodgers v. Bryant*, 942 F.3d 451, 458 (8th Cir. 2019). Accordingly, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). "[O]ur system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Alabama Ass'n of Realtors*, 141 S. Ct. at 2490. Since the Mass Debt Cancellation is unlawful, the public interest calls out for the Court to enjoin it.

## CONCLUSION

The Court should grant Plaintiff States' motion for a TRO and its corresponding motion for a preliminary injunction.

Dated: September 29, 2022

Respectfully submitted,

**DOUGLAS J. PETERSON**
**Attorney General of Nebraska**

*/s/ James A. Campbell*
James A. Campbell
   *Solicitor General of Nebraska*
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68509
(402) 471-2686
Jim.Campbell@nebraska.gov
*Counsel for Plaintiffs*

**ERIC S. SCHMITT**
**Attorney General of Missouri**

*/s/ Michael E. Talent*
Michael E. Talent, #73339MO
   *Deputy Solicitor General of Missouri*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
(314) 340-4869
Michael.Talent@ago.mo.gov
*Counsel for Plaintiffs*

**LESLIE RUTLEDGE**
**Attorney General of Arkansas**

*/s/ Dylan L. Jacobs*
Nicholas J. Bronni
   *Solicitor General of Arkansas*
Dylan L. Jacobs
   *Deputy Solicitor General of Arkansas*
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-2007
Dylan.Jacobs@arkansasag.gov
*Counsel for State of Arkansas*

**JEFFREY S. THOMPSON**
**Solicitor General of Iowa**

*/s/ Samuel P. Langholz*
Samuel P. Langholz
   *Assistant Solicitor General*
Office of the Iowa Attorney General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 281-5164
jeffrey.thompson@ag.iowa.gov
sam.langholz@ag.iowa.gov
*Counsel for State of Iowa*

**DEREK SCHMIDT**
**Attorney General of Kansas**

*/s/ Shannon Grammel*
Shannon Grammel
   *Deputy Solicitor General*
Office of the Kansas Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
(785) 296-2215
shannon.grammel@ag.ks.gov
*Counsel for State of Kansas*

**ALAN WILSON**
**Attorney General of South Carolina**

*/s/ J. Emory Smith, Jr.*
J. Emory Smith, Jr.
   *Deputy Solicitor General*
Office of the Attorney General of South Carolina
P.O. Box 11549
Columbia, SC 29211
803-734-3680
ESmith@scag.gov
*Counsel for State of South Carolina*

45

**CERTIFICATE OF SERVICE**

I hereby certify that, on September 29, 2022, a true and correct copy of the foregoing and any attachments were filed electronically through the Court's CM/ECF system, to be served on counsel for all parties by operation of the Court's electronic filing system for all parties who have appeared and to be served on those parties who have not appeared in accordance with the Federal Rules of Civil Procedure or other means agreed to by the parties.

*/s/ Michael E. Talent*
Michael E. Talent