**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| THE STATE OF NEBRASKA, *et al.* | |
| *Plaintiffs*, | |
| v. | No. 4:22-cv-01040 |
| JOSEPH R. BIDEN, JR., *et al.* | |
| *Defendants*. | |

## <u>DECLARATION OF MICHAEL E. TALENT</u>

## DECLARATION OF MICHAEL E. TALENT

I, Michael E. Talent, declare and state as follows:

1.      I am an attorney licensed to practice law before this Court and a Deputy Solicitor General for the State of Missouri in the Office of the Attorney General for the State of Missouri, a plaintiff in this case.  I have personal knowledge of the facts stated herein and if called upon to do so, I will testify thereto.

2.      Attached as **Exhibit A** is a true and correct copy of an offering statement for bonds issued in 2021 by the Missouri Higher Education Loan Authority downloaded from https://emma.msrb.org/IssueView/Details/P1413589

3.      The Office of the Attorney General served Sunshine Law Requests on MOHELA on August 26, 2022, and September 2, 2022.

4.      As required by law, MOHELA provided the Office of the Attorney General responsive records.  *See* Mo. Rev. Stat. § 610.026.1.

5.      The following documents were received in response to the August 26, 2022, Sunshine Law Requests, which requested "All existing contracts for servicing student loans held by the federal government, including but not limited to the loans described at https://fsapartners.ed.gov/knowledge-center/library/electronic-announcements/2022-07-29/ teacher-education-college-and-higher-education-grant-program-transitioning-fedloan-servicing-mohela-updated-aug-22-2022 and https://fsapartners.ed.gov/knowledge-center/library/electronic-announcements/2022-06-03/public-service-loan-forgiveness-program-transitioning-fedloan-servicing-mohela-updated-aug-22-2022."

6.      Attached as **Exhibit B** is a true and correct copy of Contract No. ED-FSA-11-D-0012 between MOHELA and the U.S. Department of Education, Federal Student Aid/Mission Support Group, effective date September 27, 2011.

2

7.      Attached as **Exhibit C** is a true and correct copy of Contract No. 91003120D0002 between MOHELA and the U.S. Department of Education, FSA-Acquisitions, effective date June 23, 2020.

8.      The following documents were received in response to the September 2, 2022, Sunshine Law Requests, which requested "Any emails from any individual working at, or affiliated with, the Department of Education involving the student loan forgiveness program described at the following website: https://www.whitehouse.gov/briefing-room/statements-releases/2022/08/24/fact-sheet-president-biden-announces-student-loan-relief-for-borrowers-who-need-it-most/."

9.      Attached as **Exhibit D** is a true and correct copy of a document entitled "Overview of how the Pandemic-connected Discharge process will work."  The document was attached to an email from the Department of Education to MOHELA.

10.     Attached as **Exhibit E** is a true and correct copy of a document entitled "Business Operations Change Request Form," dated September 2, 2022.  The document was attached to an email from the Department of Education to MOHELA.

11.     Attached as **Exhibit F** is a true and correct copy of a document entitled "Federal Servicing Examples of GD01 discharges."  The document was attached to an email from the Department of Education to MOHELA.

12.     Attached as **Exhibit G** is a true and correct copy of a spreadsheet entitled "Change Request 6391 (Pandemic-connected Discharge) – Q & A."  The document was attached to an email from the Department of Education to MOHELA.

13.     Attached as **Exhibit H** is a true and correct of a spreadsheet with data referring to "Borrower Refund Volume."  The spreadsheet was attached to an email from MOHELA to the Department of Education.

14.     Attached as **Exhibit I** is a true and correct of an email sent September 1, 2022, with the subject line "RE: CR 6391 IA & CP."

Dated: September 28, 2021                                    Respectfully submitted,

                                                            */s/ Michael E. Talent        *

4

# EXHIBIT

# A

NEW ISSUE—BOOK-ENTRY-ONLY

**$197,500,000**

**cMOHELA®**  **Higher Education Loan Authority of the State of Missouri**
**Taxable Student Loan Asset-Backed Notes,**
**Series 2021-3**

The Higher Education Loan Authority of the State of Missouri (the "Issuer"), a public instrumentality and body politic and corporate of the State of Missouri (the "State") is issuing $197,500,000 aggregate principal amount of its Taxable Student Loan Asset-Backed Notes, Series 2021-3 (the "Notes") in three classes as set forth below:

| Class | Principal Amount | Interest Rate | Offering Price | Maturity Date | Ratings (DBRS/S&P) |
|---|---|---|---|---|---|
| Fixed Rate Class A-1A Notes | $15,000,000 | 1.58% | 99.98398% | August 25, 2061 | AAA (sf)/AA+ (sf) |
| Floating Rate Class A-1B Notes[(1)] | $178,000,000 | One-Month LIBOR plus 0.57% | 100.00000% | August 25, 2061 | AAA (sf)/AA+ (sf) |
| Floating Rate Class B Notes[(1)] | $4,500,000 | One-Month LIBOR plus 1.15% | 99.06001% | August 25, 2061 | A (sf)/AA (sf) |

[(1)] Each class of floating rate notes will accrue interest at a floating rate based on a benchmark, which will initially be One-Month LIBOR. However, the benchmark may change in certain situations. For more information on how One-Month LIBOR is determined and the circumstances under which the benchmark may change, see the caption "DESCRIPTION OF THE NOTES—Calculation of LIBOR" and "—Benchmark Transition Event" in this Offering Memorandum.

The Notes are limited obligations of the Issuer and are payable solely from the discrete trust estate created under the Indenture consisting primarily of the pool of student loans originated under the Federal Family Education Loan Program as described more fully herein and not from any of the other assets of the Issuer. Credit enhancement for the Notes will consist of overcollateralization, excess spread, cash on deposit in certain funds created under the Indenture (as defined herein), and, for the Class A Notes, the subordination of the Class B Notes, as described in this Offering Memorandum.

The Notes shall be issued in fully registered form only, without coupons, and when issued will be registered in the name of Cede & Co., as nominee of The Depository Trust Company ("DTC"), New York, New York. DTC is to act as securities depository for the Notes. Individual purchases of the Notes are to be made in book-entry form only, in the principal amount of $100,000 and integral multiples of $1,000 in excess thereof. Purchasers of the Notes will not receive certificates representing their interest in the Notes purchased. The Notes will receive monthly distributions of principal and interest on the twenty-fifth day (or the next Business Day if it is not a Business Day) of each calendar month as described in this Offering Memorandum, commencing November 26, 2021. Receipts of principal and certain other payments received on the student loans held in the trust estate established under the Indenture will generally be allocated for payment of principal first to the Class A Notes until paid in full and then to the Class B Notes until paid in full. All distributions of principal on the Notes through DTC will be treated by DTC, in accordance with its rules and procedures, as "Pro Rata Pass-Through Distribution of Principal."

*Investors should consider carefully the risks involved in purchasing the Notes, including those described under the caption "RISK FACTORS" in this Offering Memorandum.*

**THE NOTES SHALL NOT BE DEEMED TO CONSTITUTE A DEBT OR LIABILITY OR OBLIGATION OF THE STATE OF MISSOURI OR OF ANY AGENCY OR POLITICAL SUBDIVISION OF THE STATE OF MISSOURI, NOR SHALL THE NOTES AND THE OBLIGATIONS OF THE ISSUER CONTAINED IN THE INDENTURE BE DEEMED TO CONSTITUTE A PLEDGE OF THE FULL FAITH AND CREDIT OF THE STATE OF MISSOURI OR OF ANY AGENCY OR POLITICAL SUBDIVISION OF THE STATE OF MISSOURI. THE NOTES SHALL NOT DIRECTLY, INDIRECTLY OR CONTINGENTLY, OBLIGATE THE STATE OF MISSOURI OR ANY AGENCY OR POLITICAL SUBDIVISION THEREOF TO LEVY ANY FORM OF TAXATION THEREFOR OR TO MAKE ANY APPROPRIATION FOR THEIR PAYMENT. THE NOTES ARE SPECIAL, LIMITED OBLIGATIONS OF THE ISSUER AND ARE SECURED BY AND PAYABLE SOLELY FROM THE TRUST ESTATE PLEDGED AS SECURITY THEREFOR AS PROVIDED IN THE INDENTURE. NO OTHER ASSETS OF THE ISSUER ARE PLEDGED TO THE PAYMENT OF THE NOTES. THE STATE OF MISSOURI SHALL NOT BE LIABLE IN ANY EVENT FOR THE PAYMENT OF THE PRINCIPAL OF OR INTEREST ON THE NOTES OR FOR THE PERFORMANCE OF ANY PLEDGE, MORTGAGE, OBLIGATION, OR AGREEMENT OF ANY KIND WHATSOEVER WHICH MAY BE UNDERTAKEN BY THE ISSUER. NO BREACH OF ANY SUCH PLEDGE, MORTGAGE, OBLIGATION, OR AGREEMENT MAY IMPOSE ANY PECUNIARY LIABILITY UPON THE STATE OF MISSOURI OR ANY CHARGE UPON THE GENERAL CREDIT OR TAXING POWER OF THE STATE OF MISSOURI.**

**THE NOTES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY OTHER STATE SECURITIES OR BLUE SKY LAWS, NOR HAS THE INDENTURE BEEN QUALIFIED UNDER THE TRUST INDENTURE ACT OF 1939, AS AMENDED, IN RELIANCE UPON CERTAIN EXEMPTIONS SET FORTH IN SUCH ACTS. NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED THESE SECURITIES OR PASSED UPON THE ACCURACY OR ADEQUACY OF THIS OFFERING MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.**

The Issuer is not registered or required to be registered as an "investment company" under the Investment Company Act of 1940, as amended, pursuant to Section 2(b) thereof, and is not a "covered fund" for purposes of the Volcker Rule under the Dodd-Frank Act. See the caption "CERTAIN INVESTMENT COMPANY ACT CONSIDERATIONS" in this Offering Memorandum.

The Notes are being offered through the underwriter named below (the "Underwriter"), subject to prior sale and to the right of the Issuer or the Underwriter to withdraw, cancel or modify such offer and to reject orders in whole or in part. It is expected that delivery of the Notes will be made in book-entry-only form through DTC on or about September 21, 2021.

**BofA Securities**

**September 9, 2021**

The information in this Offering Memorandum supersedes in its entirety any information contained in any prior offering memorandum, other disclosure or statistical information relating to the Notes that you may have received.  You should rely only on the information in this Offering Memorandum in making your investment decision.

This Offering Memorandum does not constitute an offer of, or an invitation by or on behalf of the Issuer or the Underwriter to subscribe for or purchase, any of the Notes in any circumstances or in any state or other jurisdiction where such offer or invitation is unlawful.  Except as set forth herein, no action has been taken or will be taken to register or qualify the Notes or otherwise to permit a public offering of the Notes in any jurisdiction where actions for that purpose would be required.  The distribution of this Offering Memorandum and the offering of the Notes in certain jurisdictions may be restricted by law.  Persons into whose possession this Offering Memorandum comes are required by the Issuer and the Underwriter to inform themselves about and to observe any such restrictions.  This Offering Memorandum has been prepared by the Issuer solely for use in connection with the proposed offering of the Notes described herein.

No dealer, broker, salesman or other person has been authorized by the Issuer or the Underwriter to give any information or to make any representations other than those contained in this Offering Memorandum.  If given or made, such information or representations must not be relied upon as having been authorized by the Issuer or the Underwriter.  Certain information set forth herein has been obtained from the Issuer, and other sources believed to be reliable, but is not guaranteed as to accuracy or completeness, and is not to be construed as a representation by the Underwriter.  Neither the delivery of this Offering Memorandum nor any sale made hereunder shall, under any circumstances, create any implication that there has not been any change in the facts set forth in this Offering Memorandum or in the affairs of any party described herein after the date hereof.

In making an investment decision, prospective investors must rely on their own independent investigation of the terms of the offering and weigh the merits and the risks involved with ownership of the Notes.  Representatives of the Issuer and the Underwriter will be available to answer questions from prospective investors concerning the Notes, the Issuer and the Financed Eligible Loans.

Prospective investors are not to construe the contents of this Offering Memorandum, or any prior or subsequent communications from the Issuer or the Underwriter or any of their officers, employees or agents as investment, legal, accounting, regulatory or tax advice.  Prior to any investment in the Notes, a prospective investor should consult with its own advisors to determine the appropriateness and consequences of such an investment in relation to that investor's specific circumstances.

No representation or warranty, express or implied, is made by the Underwriter as to the accuracy or completeness of the information set forth herein, and nothing contained herein is, or shall be relied upon as, a promise or representation as to the past or the future.  The Underwriter has not independently verified any such information or assumed responsibility for its accuracy or completeness.  The Underwriter has reviewed the information in this Offering Memorandum pursuant to its responsibilities to investors under the federal securities laws, but the Underwriter does not guarantee the accuracy or completeness of such information.

There currently is no secondary market for the Notes.  There are no assurances that any market for the Notes will develop or, if it does develop, how long it will last.  The Issuer does not intend to list the Notes on any exchange.

The Notes are being offered subject to prior sale or withdrawal, cancellation or modification of the offer without notice and subject to the approval of certain legal matters by counsel and certain other conditions.  No Notes may be sold without delivery of this Offering Memorandum.

In connection with the offering, the Underwriter may over allot or effect transactions with a view to supporting the market price of the Notes at levels above that which might otherwise prevail in the open market for a limited period.  However, there is no obligation to do this.  Such stabilizing, if commenced, may be discontinued at any time.

THIS OFFERING MEMORANDUM CONTAINS SUMMARIES OF CERTAIN DOCUMENTS THAT ARE BELIEVED TO BE ACCURATE, BUT REFERENCE IS HEREBY MADE TO THE ACTUAL DOCUMENTS, WHICH ARE INCORPORATED BY REFERENCE, AND ALL SUCH SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE ACTUAL DOCUMENTS.  THIS OFFERING MEMORANDUM DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUER OR THE UNDERWRITER AND ANY ONE OR MORE PURCHASERS OR OWNERS OF THE NOTES.

## U.S. RISK RETENTION

The transaction described herein is not subject to the U.S. risk retention rules (Regulation RR (17 C.F.R. Part 246) promulgated under Section 15G of the Securities Exchange Act of 1934, as amended (the "Securities Exchange Act").

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

This Offering Memorandum contains forward-looking statements within the meaning of Section 27A of the Securities Act and Section 21E of the Securities Exchange Act of 1934, as amended (the "Securities Exchange Act").  In some cases, investors can identify forward-looking statements by terminology such as "may," "will," "should," "could," "would," "expect," "plan," "anticipate," "believe," "estimate," "project," "predict," "intend," "potential," and the negative of such terms or other similar expressions.

Any forward-looking statements reflect the Issuer's current expectations and views about future events.  The forward-looking statements involve known and unknown risks, uncertainties and other factors which may cause the Issuer's actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by the forward-looking statements.  Given these risks and uncertainties, investors should not place undue reliance on the forward-looking statements.

Investors should understand that the following factors, among other things, could cause the Issuer's results to differ materially from those expressed in forward-looking statements:

- changes in terms of Financed Eligible Loans and the educational credit marketplace arising from the implementation of applicable laws and regulations and from changes in these laws and regulations that may reduce the average term and yields or increase the costs on education loans under the Federal Family Education Loan Program;

- changes resulting from the termination of the origination of new loans under the Federal Family Education Loan Program effective June 30, 2010;

- changes in the general interest rate environment and in the securitization market for student loans, which may increase the costs or limit the marketability of financings;

- losses from student loan defaults; and

- changes in prepayment rates and interest rate spreads.

Many of these risks and uncertainties are discussed throughout this Offering Memorandum and particularly in greater detail under the caption "RISK FACTORS" herein.

Investors should read this Offering Memorandum and the documents that are referenced in this Offering Memorandum completely and with the understanding that the Issuer's actual future results may be materially different from what the Issuer expects.  The Issuer is not obligated to update the forward-looking statements, even though the Issuer's situation may change in the future, unless the Issuer has obligations under the federal securities laws to update and disclose material developments related to previously disclosed information.  All of the forward-looking statements are qualified by these cautionary statements.

# Table of Contents

SUMMARY OF TERMS ................................................. 1

RISK FACTORS ....................................................... 14

Purchasers may have difficulty selling their Notes ............ 14

The Notes are not a suitable investment for all
investors ......................................................... 14

Purchasers of the Notes may be unable to reinvest
principal payments at the yield earned on the Notes ....... 14

The Notes are payable solely from the Trust Estate
and investors will have no other recourse against
the Issuer or the State of Missouri .................................. 15

There will be no market valuation of the Financed
Eligible Loans ..................................................... 15

State not liable with respect to the Notes ........................... 15

The ratings of the Notes are not a recommendation to
purchase and may change ........................................ 16

There is the potential for conflicts of interest and
regulatory scrutiny with respect to the Rating
Agencies rating the Notes ......................................... 17

Subordination of the Class B Notes may result in a
greater risk of loss for holders of Class B Notes ............ 17

Holders of the Notes may be required to accrue
original issue discount as income for tax purposes
before they receive cash attributable to such
original issue discount ............................................ 17

EU and UK Securitization Regulations may affect the
liquidity of the Notes ............................................. 18

Funds available in the Reserve Fund and Capitalized
Interest Fund are limited and, if depleted, there may
be shortfalls in payments to Noteholders ..................... 20

The target overcollateralization level may not be
reached or maintained ............................................. 20

Certain amendments to the Indenture and other actions
may be taken without the consent of Noteholders,
upon satisfaction of a Rating Agency Condition or
by less than all of the Noteholders .............................. 20

Rights to waive defaults may adversely affect
Noteholders ....................................................... 21

The rate of payments on the Financed Eligible Loans
may affect the maturity and yield of the Notes ............... 21

Different rates of change in interest rate indexes may
affect Trust Estate cash flow ..................................... 22

The timing of changes in the interest rates payable on
the Class A-1B Notes and Class B Notes as
compared to the Financed Eligible Loans may
affect cash flow to the Trust Estate ............................. 23

Social and economic factors may adversely affect
repayment of the Financed Eligible Loans ..................... 23

Deterioration of general economic conditions and
turmoil in the credit markets as a result of
COVID-19 Pandemic ............................................. 24

Impact of turmoil in the credit markets on the business
of the Issuer ....................................................... 25

Cashflows to the Trust Estate may be affected by
natural disasters or pandemics .................................. 25

Impact of COVID-19 Pandemic on the Issuer and
student loan related legislation resulting from
COVID-19 Pandemic ............................................. 25

Forbearance granted as a result of the COVID-19
Pandemic may delay payments of interest and
principal ........................................................... 28

LIBOR is being discontinued as a floating rate
benchmark, and various aspects of the
discontinuation are uncertain and will affect the
financial markets and may also affect the Financed
Eligible Loans and the Class A-1B Notes and the
Class B Notes ..................................................... 30

Federal financial regulatory legislation may affect the
Notes .............................................................. 34

Changes to the Higher Education Act, including the
enactment of the Health Care and Education
Reconciliation Act of 2010, changes to other
applicable law and other Congressional action may
affect investors' Notes and the Financed Eligible
Loans .............................................................. 36

Competition from the Federal Direct Student Loan
Program ........................................................... 37

Other litigation risks ................................................ 38

The Issuer may be subject to student loan industry
investigations ..................................................... 38

Military service obligations, natural disasters and
pandemics may cause a delay in payments on the
Financed Eligible Loans .......................................... 38

Higher Education Relief Opportunities for Students
Act of 2003 may result in delayed payments from
borrowers .......................................................... 39

Consumer protection laws may affect enforceability of
Financed Eligible Loans .......................................... 40

Noteholders will rely on the Servicers for the
servicing of the Financed Eligible Loans ...................... 40

Bankruptcy or insolvency of PHEAA could result in
payment delays to Noteholders .................................. 40

A default by a Servicer could adversely affect the
Notes .............................................................. 40

If a Servicer or a successor Servicer fails to comply
with the Department of Education's or State
License Regulator's regulations, payments on the
Notes could be adversely affected ............................... 41

Servicing Fees may increase over time in relation to
the outstanding principal balance of the Financed
Eligible Loans ..................................................... 41

Failure to comply with loan origination and servicing
procedures for Financed Eligible Loans may result
in loss of Guarantee or other benefits ........................... 42

Limitation on enforceability of remedies against the
Issuer could result in payment delays or losses ............. 42

Lewis and Clark Discovery Initiative ............................. 43

The obligations of each of the Trustee, the Servicer
and the Backup Servicer are limited ............................ 43

Certain factors relating to security ................................. 43

The use of master promissory notes for the Financed
Eligible Loans may compromise the Trustee's
security interest .................................................... 43

Investors may incur losses or delays in payment on
their Notes if borrowers do not make timely
payments or default on their Financed Eligible
Loans .............................................................. 44

Risk of geographic concentration of the Financed
Eligible Loans ..................................................... 45

The Trustee may be forced to sell the Financed
Eligible Loans at a loss after an event of default ........... 45

The Notes may be repaid early due to an optional
prepayment, which may affect their yield, and
investors will bear reinvestment risk ........................... 45

The characteristics of the portfolio of Financed
Eligible Loans may change ....................................... 45

Payment offsets by a Guaranty Agency or the
Department of Education could prevent the Issuer
from paying Noteholders the full amount of the
principal and interest due on the Notes ......................... 46

The Financed Eligible Loans are unsecured and the
ability of the applicable Guaranty Agency to honor
its Guarantee may become impaired ............................ 47

Commingling of payments on Financed Eligible
Loans could prevent the Issuer from paying the full
amount of the principal and interest due on the
Notes .............................................................. 47

# Table of Contents
## (continued)

Incentive or borrower benefit programs may affect the Notes ............................................................. 48
The Notes are expected to be issued only in book-entry form ............................................................. 48
Structuring tables are based upon assumptions and models .................................................................... 48
HIGHER EDUCATION LOAN AUTHORITY OF THE STATE OF MISSOURI ...................................................... 48
    General ............................................................................. 48
    Members and Staff ........................................................... 49
    Permissible Activities; Limitations ................................. 52
    Previous Financings of the Issuer .................................. 53
    Financial and Other Information ...................................... 53
    Repurchase Requests ....................................................... 54
    Lewis and Clark Discovery Initiative; Scholarship Funding .......................................................................... 54
    Direct Loan Servicing ..................................................... 54
    Direct Loan Servicing Performance Metrics .................. 55
THE ISSUER'S FFEL PROGRAM ........................................ 55
    General ............................................................................. 55
    Change to Index for Calculation of Special Allowance Payments ......................................................................... 57
SERVICING OF THE FINANCED ELIGIBLE LOANS ........... 57
    Servicing by the Issuer ................................................... 58
    Backup Servicing by PHEAA ......................................... 59
GUARANTY AGENCIES ...................................................... 65
    Information Regarding the State Guaranty Agency ......... 66
    Information Regarding PHEAA ........................................ 67
    Information Regarding Ascendium .................................. 69
FEES AND EXPENSES .......................................................... 73
USE OF PROCEEDS ............................................................. 74
CHARACTERISTICS OF THE FINANCED ELIGIBLE LOANS ................................................................................ 74
    General ............................................................................. 74
    Borrower Benefits ........................................................... 86
DESCRIPTION OF THE NOTES ........................................... 86
    General ............................................................................. 86
    Interest Payments ............................................................ 86
    Calculation of LIBOR ..................................................... 88
    Benchmark Transition Event ........................................... 88
    Principal Distributions .................................................... 94
    Optional Prepayment of Notes When the Then Outstanding Pool Balance is 10% or Less of Initial Pool Balance .................................................................... 95
    Prepayment, Yield and Maturity Considerations ............ 96
SECURITY AND SOURCES OF PAYMENT FOR THE NOTES ................................................................................. 97
    General ............................................................................. 97
    Funds ............................................................................... 98
    Fund Deposits .................................................................. 98
    Student Loan Fund; Deposit of Financed Eligible Loans ............................................................................... 98
    Reserve Fund ................................................................... 99
    Capitalized Interest Fund ................................................ 99
    Department SAP Rebate Fund ....................................... 100
    Costs of Issuance Fund .................................................. 100
    Collection Fund; Flow of Funds .................................... 100
    Flow of Funds After Events of Default and Acceleration .................................................................. 103
    Investment of Funds Held by Trustee ........................... 103
BOOK-ENTRY REGISTRATION ........................................ 103
TRUSTEE ............................................................................ 106
SUMMARY OF THE INDENTURE PROVISIONS ............... 107
    Parity and Priority of Lien ............................................ 107
    Representations and Warranties .................................... 108
    Sale of Financed Eligible Loans ................................... 109
    Further Covenants .......................................................... 109
    Statements to Noteholders ............................................ 110

Servicing and Enforcement of the Servicing Agreements ................................................................... 110
Additional Covenants With Respect to the Higher Education Act ............................................................... 111
Continued Existence; Successor ..................................... 112
Events of Default ............................................................ 113
Remedies on Default ...................................................... 113
The Trustee ..................................................................... 117
Force Majeure ................................................................ 121
Supplemental Indentures ................................................ 121
Trusts Irrevocable .......................................................... 123
Satisfaction of Indenture ................................................ 123
    Optional Release of All Financed Eligible Loans ......... 124
CREDIT ENHANCEMENT .................................................. 124
CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS ........................................................... 125
    Characterization of the Notes ........................................ 126
    Taxation of Interest Income and Original Issue Discount ......................................................................... 127
    Sale or Exchange of Notes ............................................ 130
    Backup Withholding ...................................................... 131
    State, Local or Foreign Taxation .................................. 131
    Tax-Exempt Investors .................................................... 132
    Foreign Investors ........................................................... 132
    Foreign Account Tax Compliance Act .......................... 132
MISSOURI INCOME TAX ................................................... 133
ERISA CONSIDERATIONS ................................................. 133
    Plan Assets Regulation .................................................. 134
    Prohibited Transactions ................................................. 135
    Purchaser's/Transferee's Representations and Warranties ..................................................................... 136
    Consultation with Counsel ............................................ 136
CERTAIN INVESTMENT COMPANY ACT CONSIDERATIONS ........................................................... 136
ADDITIONAL INFORMATION; REPORTS TO NOTEHOLDERS ............................................................... 136
UNDERWRITING ................................................................ 137
FINANCIAL ADVISOR ....................................................... 137
LEGAL PROCEEDINGS ...................................................... 138
LEGAL MATTERS .............................................................. 138
CONTINUING DISCLOSURE .............................................. 138
RELATIONSHIPS AMONG FINANCING PARTICIPANTS ................................................................. 138
RATINGS ............................................................................ 139
OTHER MATTERS .............................................................. 139
GLOSSARY OF TERMS ...................................................... 141

APPENDIX A   DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM
APPENDIX B   WEIGHTED AVERAGE LIVES, EXPECTED MATURITIES AND PERCENTAGES OF ORIGINAL PRINCIPAL REMAINING AT CERTAIN MONTHLY DISTRIBUTION DATES FOR THE NOTES
APPENDIX C   FORM OF CONTINUING DISCLOSURE AGREEMENT

v

## SUMMARY OF TERMS

This summary highlights selected information from this document and does not contain all of the information you need to make your investment decision.  To understand all of the terms of this offering, read this entire document.

References in this Offering Memorandum to the "Issuer" refer to the Higher Education Loan Authority of the State of Missouri (the "Issuer").  This Offering Memorandum contains forward-looking statements that involve risks and uncertainties.  See the caption "SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS" herein.  Certain terms used in this Offering Memorandum are defined under the caption "GLOSSARY OF TERMS" herein.

### Principal Parties and Dates

*Issuer*.  Higher Education Loan Authority of the State of Missouri (the "Issuer").

*Servicer*.  The Issuer (the "Servicer").

*Backup Servicer*.  Pennsylvania Higher Education Assistance Agency ("PHEAA").

*Guaranty Agencies*.  Missouri Department of Higher Education and Workforce Development (the "State Guaranty Agency"), Pennsylvania Higher Education Assistance Agency, Ascendium Education Solutions, Inc. (f/k/a Great Lakes Higher Education Guaranty Corporation) or any other entity authorized to guarantee student loans under the Higher Education Act identified under the caption "THE GUARANTY AGENCIES" herein (each, a "Guaranty Agency" and collectively, the "Guaranty Agencies").

*Trustee*.  U.S. Bank National Association, as trustee (in such capacity, the "Trustee").

*Monthly Distribution Dates*.  The monthly distribution dates for the Notes will be the twenty-fifth day of each calendar month, or, if not a Business Day, the next Business Day, commencing November 26, 2021.  These dates are sometimes referred to herein as "Monthly Distribution Dates."  Certain fees and expenses of the Trust Estate established under the hereinafter described Indenture (such as the Administration Fee, the Servicing Fee and the Trustee Fee) will also be paid on the Monthly Distribution Dates.  The calculation date for each Monthly Distribution Date generally will be the second Business Day before such Monthly Distribution Date.

*Collection Periods*.  The Collection Period with respect to a Monthly Distribution Date will be the calendar month preceding such Monthly Distribution Date (each, a "Collection Period").  However, the Collection Period for the initial Monthly Distribution Date of November 26, 2021 will begin on the Date of Issuance and end on October 31, 2021.  With respect to any other Monthly Distribution Date, the "related" or the "preceding" Collection Period shall be the Collection Period ending on the last day of the month immediately preceding the month in which such Monthly Distribution Date occurs.

*Interest Accrual Periods*.  The initial Interest Accrual Period for the Class A-1A Notes begins on the Date of Issuance and ends on November 24, 2021 and the initial Interest Accrual Period for the Class A-1B Notes and the Class B Notes begins on the Date of Issuance and ends on November 25, 2021.  For all other Monthly Distribution Dates, (a) the Interest Accrual Period for the Class A-1A Notes, will begin on (and include) the twenty-fifth day of a month, whether or not a Business Day, and end on (and include) the twenty-fourth day of the following month (notwithstanding that the actual Monthly Distribution Date may occur after the twenty-fifth day of either such month); and (b) the Interest Accrual Period for the Class A-1B Notes and Class B Notes will begin on the prior Monthly Distribution Date and end on the day before such Monthly Distribution Date (each, an "Interest Accrual Period").

*Financed Eligible Loans*. The loans made to finance post-secondary education that are made under the Higher Education Act (each, an "Eligible Loan") that are pledged by the Issuer to the Trustee under the Indenture and not released from the lien thereof are sometimes referred to herein as the "Financed Eligible Loans." The information presented in this Offering Memorandum under the caption "CHARACTERISTICS OF THE FINANCED ELIGIBLE LOANS" herein relating to the Eligible Loans the Issuer expects to pledge to the Trustee on the Date of Issuance is as of June 30, 2021, which is referred to as the "Statistical Cut-Off Date." The Issuer believes that the information set forth in this Offering Memorandum with respect to the Eligible Loans as of the Statistical Cut-Off Date is representative of the characteristics of the Financed Eligible Loans as they will exist on the Date of Issuance for the Notes.

*Date of Issuance*. On or about September 21, 2021.

## Description of the Notes

*General*. The Higher Education Loan Authority of the State of Missouri is issuing $197,500,000 of its Taxable Student Loan Asset-Backed Notes, Series 2021-3 in the following classes:

- $15,000,000 Taxable Student Loan Asset-Backed Notes, Senior Series 2021-3A-1A Notes (the "Class A-1A Notes")

- $178,000,000 Taxable Student Loan Asset-Backed Notes, Senior Series 2021-3A-1B Notes (the "Class A-1B Notes" and together with the Class A-1A Notes, the "Class A Notes")

- $4,500,000 Taxable Student Loan Asset-Backed Notes, Subordinate Series 2021-3B (the "Class B Notes").

The Class A Notes and the Class B Notes (collectively, the "Notes") will be issued pursuant to the terms and provisions of the Indenture of Trust, dated as of September 1, 2021 (the "Indenture"), between the Issuer and the Trustee. The Notes will receive payments primarily from collections on a discrete pool of Eligible Loans held by the Issuer and pledged to the Trustee under the Indenture.

The Class A Notes will be senior Notes and the Class B Notes will be subordinate Notes. The Notes will be issued in minimum denominations of $100,000 and in integral multiples of $1,000 in excess thereof. Interest and principal on the Notes will be payable to the owners of record of the Notes as of the close of business on the day before the related Monthly Distribution Date.

*Interest on the Notes*. The Class A-1A Notes will bear interest at a fixed rate equal to 1.58% per annum.

The Class A-1B Notes will bear interest at an annual rate equal to the applicable Benchmark (initially One-Month LIBOR), except for the initial Interest Accrual Period, plus 0.57%.

The Class B Notes will bear interest at an annual rate equal to the applicable Benchmark (initially One-Month LIBOR), except for the initial Interest Accrual Period, plus 1.15%.

If One-Month LIBOR or the then current benchmark is less than 0.00% for any Interest Accrual Period, it shall be deemed to be 0.00% and the interest rate for the Class A-1B Notes and the Class B Notes for such Interest Accrual Period shall be deemed to be the interest rate margin set forth above for such class of Notes.

The Trustee will obtain One-Month LIBOR and the Issuer will calculate the applicable interest rate on the Notes (other than the Class A-1A Notes) on the second Business Day prior to the start of the applicable Interest Accrual Period; provided that if One-Month LIBOR does not appear on a page of a financial reporting service in general use in the financial services industry, the Issuer will obtain One-Month LIBOR. Additionally, if One-Month LIBOR is no longer an available benchmark rate, the Issuer will cause an alternative rate to be calculated as described under the caption "DESCRIPTION OF

2

THE NOTES—Benchmark Transition Event" herein.

Interest on the Class A-1A Notes will be calculated on the basis of a 360-day year consisting of twelve 30-day months, and interest on the Class A-1B Notes and the Class B Notes will be calculated on the basis of the actual number of days elapsed during the Interest Accrual Period divided by 360 and rounding the resultant figure to the fifth decimal place.

The rate of interest on the Class A-1B Notes and the Class B Notes for the initial Interest Accrual Period will be determined by reference to the following formula:

x + [(a / b) * (y-x)] + 0.57% for the Class A-1B Notes and + 1.15% for the Class B Notes

where:

x = two-month LIBOR;

y = three-month LIBOR;

a = the actual number of days from the maturity date of two-month LIBOR to the first Monthly Distribution Date; and

b = the actual number of days from the maturity date of two-month LIBOR to the maturity date of three-month LIBOR.

Interest accrued on the outstanding principal balance of the Notes during each Interest Accrual Period will be paid on the following Monthly Distribution Date in the order and priority described under the caption "—Flow of Funds" below.

Failure to pay interest on the Class B Notes is not an Event of Default so long as any of the Class A Notes remain outstanding.

***Principal Distributions***.  Principal distributions will be allocated to the Notes on each Monthly Distribution Date in an amount equal to the funds available to pay principal, in the amount equal to the lesser of:

(a) the Principal Distribution Amount for that Monthly Distribution Date; and

(b) funds available for the payment of principal as described under the caption "—Flow of Funds" below and under the caption "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES— Collection Fund; Flow of Funds" herein.

Principal will be paid, first, on the Class A Notes (pro rata) until paid in full and, second, on the Class B Notes until paid in full.

"*Principal Distribution Amount*" means, as determined by the Issuer for each Monthly Distribution Date other than a Note Final Maturity Date, the amount, not less than zero, by which (i) the Outstanding Amount of the Notes immediately prior to such Monthly Distribution Date exceeds (ii) the Adjusted Pool Balance for that Monthly Distribution Date less the Specified Overcollateralization Amount.  Notwithstanding the foregoing; (A) on or after the Maturity Date for a class of Notes, the Principal Distribution Amount shall not be less than the amount that is necessary to reduce the outstanding principal balance of such class of Notes to zero; and (B) the Principal Distribution Amount shall not exceed the Outstanding Amount of the Notes as of any Monthly Distribution Date (before giving effect to any distributions on such Monthly Distribution Date).

"*Specified Overcollateralization Amount*" means, for any Monthly Distribution Date, the greater of:

(a) 6.5% of the Adjusted Pool Balance for that Monthly Distribution Date; and

(b) $4,000,000.

"*Adjusted Pool Balance*" means, for any Monthly Distribution Date, the sum of the Pool Balance as of the end of the immediately

preceding Collection Period and the amounts on deposit in the Capitalized Interest Fund and the Reserve Fund on such Monthly Distribution Date after giving effect to any payments to or releases from the Capitalized Interest Fund and the Reserve Fund.

The Principal Distribution Amount is intended to provide credit support so that, if sufficient funds are available on each Monthly Distribution Date, the Adjusted Pool Balance will continue to exceed the Outstanding Amount of the Notes by the greater of (a) 6.5% of the Adjusted Pool Balance for that Monthly Distribution Date, and (b) $4,000,000.

"*Pool Balance*" means, for any date, the aggregate principal balance of the Financed Eligible Loans on that date, including accrued interest that is expected to be capitalized, after giving effect to the following, without duplication:

> (a)    all payments received by the Issuer through that date from borrowers;

> (b)    all amounts received by the Issuer through that date from required purchases or repurchases of Financed Eligible Loans by Servicers or sellers;

> (c)    all Liquidation Proceeds and Realized Losses on the Financed Eligible Loans through that date;

> (d)    the amount of any adjustment to balances of the Financed Eligible Loans that the Servicer makes under its related servicing agreement, if any, recorded through that date; and

> (e)    the amount by which Guaranty Agency reimbursements of principal on defaulted Financed Eligible Loans through that date are reduced from 100% to 97%, or other applicable percentage, as required by the risk sharing provisions of the Higher Education Act.

See the caption "DESCRIPTION OF THE NOTES—Principal Distributions" herein.

In addition to the principal payments described above, (i) if a Principal Acceleration Trigger (as defined under the caption "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES—Collection Fund; Flow of Funds" herein) is in effect for any Monthly Distribution Date occurring on and after the October 2026 Monthly Distribution Date through and including the September 2031 Monthly Distribution Date, (ii) on and after the October 2031 Monthly Distribution Date or (iii) if the Financed Eligible Loans are not released from the lien of the Indenture when permitted pursuant to the optional release described below, the Notes may receive supplemental payments of principal from certain money remaining in the Collection Fund as described under the caption "—Flow of Funds" below and under the caption "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES—Collection Fund; Flow of Funds" herein.

Each principal payment on a class of Notes will be allocated to all Noteholders of such class of Notes on a pro rata basis, based upon the principal amounts of such class of Notes held by each such Noteholder.

***Final Maturity***.  The final Maturity Date for each class of the Notes will be August 25, 2061.

The final payment of the Notes is expected to occur prior to the above date (see Appendix B hereto) and could be earlier than expected to the extent that:

> (a)    there are significant prepayments on the Financed Eligible Loans;

> (b)    additional payments of principal are made from money available in the Collection Fund to pay the Notes in full prior to maturity;

> (c)    the Issuer exercises its option to direct the release of all of the Financed Eligible Loans remaining in the Trust Estate established under the Indenture from the lien of the Indenture (which will not occur until a date when the then outstanding Pool Balance is 10% or less of the initial Pool Balance); or

(d)     the Trustee sells all of the remaining Financed Eligible Loans upon an Event of Default.

**Description of the Issuer and the Trust Estate**

*General*. The Issuer is a body politic and corporate constituting a public instrumentality of the State. The Issuer was established in 1981 pursuant to the Missouri Higher Education Loan Authority Act, Title XI, Chapter 173, Section 173.350 to 173.445 of the Missouri Revised Statutes, inclusive, as amended (the "Authorizing Act") for the purpose of assuring that all eligible post-secondary education students have access to guaranteed student loans. The Authorizing Act was amended, effective August 28, 1994, to provide the Issuer with generally expanded powers, including the power to finance, acquire and service student loans, including, but not limited to, those guaranteed or insured pursuant to the Higher Education Act.

*Use of Proceeds.* As described under the caption "USE OF PROCEEDS" herein, certain of the proceeds from the sale of the Notes will be used to make the initial deposits to the Capitalized Interest Fund, Cost of Issuance Fund and the Reserve Fund described below. Certain of the remaining proceeds from the sale of the Notes will be used to refinance student loans originated under the Federal Family Education Loan Program ("FFELP" or the "FFEL Program" and such loans, "FFELP Loans" or "Eligible Loans") presently pledged by the Issuer under the Warehouse Agreement (as defined herein) or held unencumbered by the Issuer, all of which have been identified and are described under the caption "CHARACTERISTICS OF THE FINANCED ELIGIBLE LOANS" herein. The FFELP Loans will be pledged to the Trustee on the Date of Issuance and will be subject to the lien of the Indenture. See the caption "USE OF PROCEEDS" herein.

The only sources of funds for payment of the Notes issued under the Indenture are the Financed Eligible Loans and investments pledged to the Trustee and the payments the Issuer receives on those Financed Eligible Loans and investments. On the Date of Issuance, the parity ratio will be not less than 108.0% of the principal amount of the Class A Notes and not less than 105.5% of the principal amount of all of the Notes.

*The Trust Estate Assets*. The assets of the trust estate securing the Notes issued under the Indenture will be a discrete trust estate that will include (collectively, the "Trust Estate"):

(a)     the Available Funds (other than moneys deposited in the Department SAP Rebate Fund and moneys released from the lien of the Trust Estate as provided in the Indenture);

(b)     all moneys and investments held in the funds created under the Indenture (other than the Department SAP Rebate Fund), and other than moneys and investments released from the lien of the Trust Estate as provided in the Indenture), including all proceeds thereof and all income thereon;

(c)     the Financed Eligible Loans held by the Issuer and pledged under the Indenture and all obligations of the obligors thereunder including all moneys received thereunder on or after the Cut-Off Date (but in no event including any Financed Eligible Loans released from the lien of the Trust Estate as provided in the Indenture);

(d)     the rights of the Issuer in and to any Servicing Agreement, any Backup Servicing Agreement, any Joint Sharing Agreement, any Student Loan Purchase Agreement, any Custodian Agreement, any Origination Agreement and the Guarantee Agreements as the same relate to the Financed Eligible Loans;

(e)     to the extent constituting or directly related to the components of the Trust Estate described in clauses (a) through (f), inclusive, property of the Issuer in the nature of Accounts, General Intangibles (including Payment Intangibles), Promissory Notes, and Instruments (each as defined in the Uniform Commercial Code of the State of

Missouri), but it shall not be necessary that an item be an Account, General Intangible, Payment Intangible, Promissory Note or Instrument for such item to be part of the Trust Estate if it is otherwise described, referenced, or included in clauses (a) through (d), or in this clause (e), but in no event shall this interest attach to any properties, cash or other trust estates of the Issuer which are unrelated to the properties described in clauses (a) through (d) above or this clause (e); and

(f)     all proceeds from any property described in clauses (a) through (e) above and any and all other property, rights and interests of every kind or description that from time to time is specifically granted, conveyed, pledged, transferred, assigned or delivered to the Trustee as additional security under the Indenture.

All of the Eligible Loans pledged to the Trustee under the Indenture will be serviced by the Issuer. See the caption "RISK FACTORS—Failure to comply with loan origination and servicing procedures for Financed Eligible Loans may result in loss of guarantee or other benefits" herein. All of the Eligible Loans pledged to the Trustee under the Indenture are, as of the time of such pledge, guaranteed by a Guaranty Agency and reinsured by the U.S. Department of Education (sometimes referred to herein as the "Department of Education"). See the caption "GUARANTY AGENCIES" herein.

Except under limited circumstances set forth in the Indenture, Financed Eligible Loans may not be transferred out of the Trust Estate established under the Indenture. See the caption "SUMMARY OF THE INDENTURE PROVISIONS—Sale of Financed Eligible Loans" herein.

*The Student Loan Fund*. The Eligible Loans being pledged by the Issuer will be deposited into the Student Loan Fund on the Date of Issuance. See the caption "CHARACTERISTICS OF THE FINANCED ELIGIBLE LOANS" herein. Except for any acquisition of Eligible Loans that were previously Financed Eligible Loans from a

Guaranty Agency or a Servicer as described under the caption "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES—Collection Fund; Flow of Funds" herein, there will be no acquisitions of Eligible Loans into the Trust Estate after the Date of Issuance.

*The Collection Fund*. The Trustee will deposit into the Collection Fund upon receipt all revenues derived from Financed Eligible Loans and money or investments of the Issuer on deposit with the Trustee, amounts received under any Joint Sharing Agreement and all amounts transferred from the Capitalized Interest Fund, the Student Loan Fund, the Department SAP Rebate Fund and the Reserve Fund. Money on deposit in the Collection Fund will be used to make any required payments under any applicable Joint Sharing Agreement or to otherwise remove amounts deposited in the Trust Estate which represent amounts that are allocable to Eligible Loans that are not Financed Eligible Loans, to make any required payments to the Department of Education, to pay Administration Fees (including the amounts allocated for the payment of Program Fees), Servicing Fees and Trustee Fees, to pay interest and principal on the Notes and to replenish the Reserve Fund. See the captions "—Flow of Funds" below and "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES—Collection Fund; Flow of Funds" herein.

*The Capitalized Interest Fund*. On the Date of Issuance, $6,000,000 will be deposited into the Capitalized Interest Fund. If on any Monthly Distribution Date, money on deposit in the Collection Fund is insufficient to pay amounts owed to the Department of Education or to a Guaranty Agency (other than to recall claims with respect to or repurchases of Eligible Loans), to pay amounts payable under any applicable Joint Sharing Agreement or to otherwise remove amounts deposited in the Trust Estate which represent amounts that are allocable to Eligible Loans that are not Financed Eligible Loans, or to pay Administration Fees (including the amounts allocated for the payment of Program Fees), Servicing Fees, Trustee Fees and interest on the Notes, then money on deposit in the Capitalized Interest Fund will be transferred to the Collection

6

Fund to cover the deficiency, prior to any amounts being transferred from the Reserve Fund. Amounts released from the Capitalized Interest Fund will not be replenished. Amounts will be transferred from the Capitalized Interest Fund to the Collection Fund as described under the caption "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES—Capitalized Interest Fund" herein. On the September 2023 Monthly Distribution Date, any amounts remaining in the Capitalized Interest Fund in excess of $4,400,000 shall be transferred by the Trustee to the Collection Fund. On the September 2025 Monthly Distribution Date, any amounts remaining in the Capitalized Interest Fund in excess of $2,400,000 shall be transferred by the Trustee to the Collection Fund. On the September 2027 Monthly Distribution Date, any amounts remaining in the Capitalized Interest Fund shall be transferred by the Trustee to the Collection Fund.

*The Reserve Fund*. On the Date of Issuance, a deposit will be made to the Reserve Fund in an amount equal to 0.65% of the initial Pool Balance. The Reserve Fund is to be maintained at an amount equal to the greater of (a) 0.65% of the Pool Balance as of the close of business on the last day of the immediately preceding Collection Period; and (b) $201,159; provided that in no event will such balance exceed the Outstanding Amount of the Notes; and provided further, that such Specified Reserve Fund Balance may be reduced upon satisfaction of the Rating Agency Condition (as defined under the caption "GLOSSARY OF TERMS" herein). On each Monthly Distribution Date, to the extent that money in the Collection Fund is not sufficient to pay amounts owed to the Department of Education or to a Guaranty Agency (other than to recall claims with respect to or for repurchases of Eligible Loans), to pay amounts payable under any applicable Joint Sharing Agreement or to otherwise remove amounts deposited in the Trust Estate which represent amounts that are allocable to Eligible Loans that are not Financed Eligible Loans, or to pay Administration Fees (including the amounts allocated for the payment of Program Fees), Servicing Fees, Trustee Fees and the interest then due on the Notes, an amount equal to the deficiency will be transferred from

the Reserve Fund to the Collection Fund, if such deficiency has not been paid from the Capitalized Interest Fund. To the extent the amount in the Reserve Fund falls below the Specified Reserve Fund Balance, the Reserve Fund will be replenished on each Monthly Distribution Date from funds available in the Collection Fund as described under the captions "—Flow of Funds" below and "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES—Collection Fund; Flow of Funds" herein. Funds on deposit in the Reserve Fund in excess of the Specified Reserve Fund Balance will be transferred to the Collection Fund upon Issuer Order. Other than such excess amounts, principal payments due on the Notes will be made from the Reserve Fund only (a) on the respective Note Final Maturity Date for the related class of Notes; (b) on any Monthly Distribution Date when the market value of securities and cash in the Reserve Fund and the Collection Fund is sufficient to pay the remaining principal amount of and interest accrued on the Notes; or (c) upon the exercise of the option to prepay the Notes described below.

*The Department SAP Rebate Fund*. The Trustee will establish a Department SAP Rebate Fund as part of the Trust Estate established under the Indenture. The Higher Education Act requires holders of Eligible Loans first disbursed on or after April 1, 2006 to rebate to the Department of Education interest received from borrowers on such loans that exceeds the applicable special allowance support levels. The Issuer expects that the Department of Education will reduce the special allowance and interest benefit payments payable to the Issuer by the amount of any such rebates owed by the Issuer. However, in certain circumstances the Issuer may owe a payment to the Department of Education or to another trust if amounts were deposited into the Trust Estate that represent amounts that are allocable to Eligible Loans that are not Financed Eligible Loans. If the Issuer believes that it is required to make any such payment, the Issuer will direct the Trustee to deposit into the Department SAP Rebate Fund from the Collection Fund the estimated amounts of any such payments. Money in the Department SAP Rebate Fund will be transferred to the Collection Fund to the extent amounts have been deducted

by the Department of Education from payments otherwise due to the Issuer, or will be paid to the Department of Education or to another trust if necessary to discharge the Issuer's rebate obligation. See "DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM—Special Allowance Payments" in Appendix A hereto.

***Characteristics of the Student Loan Portfolio***. The Issuer will pledge to the Trustee under the Indenture a portfolio of Eligible Loans originated under the FFELP, having, as of the Statistical Cut-Off Date, an aggregate outstanding principal balance of approximately $201,530,098, which includes $9,664,923 of interest expected to be capitalized upon commencement of repayment. As of the Statistical Cut-Off Date (and based on the aggregate outstanding principal balances of the Financed Eligible Loans as of such date), the weighted average annual interest rate of the Eligible Loans expected to be pledged to the Trustee under the Indenture (excluding Special Allowance Payments and not giving effect to currently utilized borrower benefit programs) was approximately 5.14% and their weighted average remaining term to scheduled maturity was approximately 169 months. The portfolio of Eligible Loans expected to be pledged by the Issuer to the Trustee is described more fully below under the caption "CHARACTERISTICS OF THE FINANCED ELIGIBLE LOANS" herein.

In the event that the principal amount of Eligible Loans required to provide collateral for the Notes varies from the amounts anticipated herein, whether by reason of a change in the collateral requirement necessary to obtain the expected ratings on the Notes (see the caption "—Ratings of the Notes" below), the rate of amortization or prepayment on the portfolio of Eligible Loans from the Statistical Cut-Off Date to the Date of Issuance varying from the rates that were anticipated, or otherwise, the portfolio of Eligible Loans to be pledged to the Trustee under the Indenture may consist of a subset of the pool of Eligible Loans described herein or may include additional Eligible Loans not described under the caption "CHARACTERISTICS OF THE FINANCED ELIGIBLE LOANS" herein.

The Issuer believes that the information set forth in this Offering Memorandum with respect to the Eligible Loans as of the Statistical Cut-Off Date is representative of the characteristics of the Financed Eligible Loans as they will exist on the Date of Issuance of the Notes.

As of the Statistical Cut-Off Date, approximately 4.71% of the Financed Eligible Loans by aggregate outstanding principal balance are "rehabilitation loans," which are Eligible Loans that have previously defaulted, but for which the borrower thereunder has made a specified number of on-time payments as described under "APPENDIX A—DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM—Insurance and Guarantees—*Rehabilitation of Defaulted Loans*" hereto.

***Flow of Funds***. Administration Fees and Servicing Fees will be paid to the Issuer and the Servicer (initially the Issuer) on each Monthly Distribution Date from money available in the Collection Fund. The amounts of the initial Trustee Fee, Administration Fee and the Servicing Fee payable in clauses Second, Third and Fourth below (including the amounts allocated for the payment of Program Fees) are specified under the caption "FEES AND EXPENSES" herein and are subject to increase upon satisfaction of the Rating Agency Condition. Carryover Servicing Fees in clause eleventh below are initially $0.00 and may only be increased to the extent permitted by the Indenture. The Issuer, as administrator, will be responsible for paying when due any fees or expenses owed to the Backup Servicer, the Rating Agencies and any other Program Fees. In addition, each month money available in the Collection Fund will be used to pay amounts due with respect to the Financed Eligible Loans to the Department of Education and to the Guaranty Agencies (including the State Guaranty Agency), to make any payments required under any applicable Joint Sharing Agreement or to otherwise remove amounts deposited in the Trust Estate which represent amounts that are allocable

to Eligible Loans that are not Financed Eligible Loans, to purchase from the lien of the Indenture Financed Eligible Loans in the limited circumstances described under the caption "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES—Collection Fund; Flow of Funds" herein and to transfer amounts required to be deposited into the Department SAP Rebate Fund.  On each Monthly Distribution Date, prior to an Event of Default, money in the Collection Fund will be used to make the following deposits and distributions, to the extent funds are available, as set forth in the following chart:

[Remainder of page intentionally left blank]



**COLLECTION FUND**

First — To make any payments required under any applicable Joint Sharing Agreement or to otherwise remove amounts deposited in the Trust Estate which represent amounts that are allocable to Eligible Loans that are not Financed Eligible Loans

Second — Trustee
(Trustee Fee and any prior unpaid Trustee Fees)

Third — Servicers (initially the Issuer)
(Servicing Fee and any prior unpaid Servicing Fees)

Fourth — Issuer
(Administration Fee, and any prior unpaid Administration Fees)

Fifth — Class A Noteholders
(Interest on the Class A Notes of each class pro rata based on amounts owed)

Sixth — Class B Noteholders[*]
(Interest on the Class B Notes)

Seventh — Reserve Fund
(Amounts necessary to restore the Reserve Fund to the Specified Reserve Fund Balance)

Eighth — Noteholders
(Principal Distribution Amount will be allocated, *first*, to the Class A Notes pro rata among the Class A-1A Notes and Class A 1B Notes, until they have been paid in full and, *second*, to the Class B Notes, until they have been paid in full)

Ninth — Noteholders
((A) if a Principal Acceleration Trigger (as defined under the caption "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES—Collection Fund; Flow of Funds" herein) is in effect for any Monthly Distribution Date occurring on and after the October 2026 Monthly Distribution Date through and including the September 2031 Monthly Distribution Date, or (B) on and after the October 2031 Monthly Distribution Date, to the Noteholders, supplemental payments of principal, *first*, to the Class A-1A Notes and Class A-1B Notes, until they have been paid in full and, *second*, to the Class B Notes until they have been paid in full)

Tenth — Trustee
(Aggregate unpaid amount of any expenses and indemnities)

Eleventh — Issuer
(Aggregate unpaid amount of any Carryover Servicing Fees)

Twelfth — Noteholders
(if the Financed Eligible Loans are not released when permitted pursuant to the optional release, to the Noteholders, supplemental payments of principal, *first*, to the Class A Notes pro rata among the Class A-1A Notes and Class A-1B Notes, until they have been paid in full and, *second*, to the Class B Notes until they have been paid in full)

Thirteenth — Released to the Issuer
(all remaining funds)

---

[*] On and after the Maturity Date of the Class A Notes, the Noteholders of each class of Class A Notes will receive amounts representing payment of the principal balance of each class of Class A Notes after clause Fifth above until each such class is paid in full prior to the Class B Notes receiving payments of any payments of interest pursuant to clause Sixth above.

*Payments on Maturity Dates*. Notwithstanding the foregoing, on and after the Class A-1A Maturity Date and the Class A-1B Maturity Date, the Class A-1A Noteholders and the Class A-1B Noteholders will receive amounts representing payment of the principal balance of the Class A-1A Notes and the Class A-1B Notes after clause Fifth above until the Class A-1A Notes and Class A-1B Notes have been paid in full and prior to the Class B Noteholders receiving interest payments on their Class B Notes pursuant to clause Sixth above.

*Flow of Funds After Events of Default and Acceleration*. Following the occurrence of an Event of Default that results in an acceleration of the maturity of the Notes and after the payment of certain fees and expenses, payments of principal and interest on the Notes will be made, ratably, without preference or priority of any kind, first, to the Class A Notes ratably and second, to the Class B Notes, in that order, until the Notes are repaid in full. See the caption "SUMMARY OF THE INDENTURE PROVISIONS—Remedies on Default" herein.

**Credit Enhancement**

Credit enhancement for the Notes will consist of overcollateralization, excess spread and cash on deposit in the Capitalized Interest Fund and the Reserve Fund and, for the Class A Notes, the subordination of the Class B Notes, as described under the caption "CREDIT ENHANCEMENT" herein.

**Servicing and Administration**

The Issuer will act as the Servicer for all the Financed Eligible Loans. The Issuer will be responsible for servicing and making collections on the Financed Eligible Loans and will be paid monthly Servicing Fees not to exceed the amounts set forth under the caption "FEES AND EXPENSES" herein.

PHEAA will act as the backup servicer (the "Backup Servicer") and will service the Financed Eligible Loans upon the occurrence of certain events described herein under the caption "SERVICING OF THE FINANCED ELIGIBLE

LOANS—Backup Servicer and Backup Servicing Agreement" herein.

The Issuer will act as the administrator of the Trust Estate and will be paid a monthly Administration Fee not to exceed the amount set forth under the caption "FEES AND EXPENSES" herein. The Issuer, as administrator, will be responsible for paying when due any fees or expenses owed to the Backup Servicer, the Rating Agencies and any other Program Fees.

**Optional Prepayment of Notes When the Then Outstanding Pool Balance is 10% or Less of Initial Pool Balance**

The Issuer shall have the option to direct the release of the Financed Eligible Loans from the lien of the Indenture on the Monthly Distribution Date next succeeding the last day of the Collection Period on which the then outstanding Pool Balance is 10% or less of the initial Pool Balance, and on any Monthly Distribution Date thereafter. If this option is exercised, the Financed Eligible Loans and any other remaining assets of the Trust Estate will be released to the Issuer free from the lien of the Indenture.

For the Issuer to exercise its release option, the Issuer must deposit in the Collection Fund an amount that, when combined with amounts on deposit in the other funds and accounts held under the Indenture (other than the Department SAP Rebate Fund), would be sufficient to:

(a) reduce the Outstanding Amount of the Notes then outstanding on the related Monthly Distribution Date to zero;

(b) pay to the Noteholders the interest payable on the related Monthly Distribution Date; and

(c) pay any Monthly Consolidation Rebate Fees and other amounts payable to the Department of Education, pay amounts payable under any Joint Sharing Agreements or otherwise remove amounts deposited in the Trust Estate which represent amounts that are allocable to Eligible Loans that are not

Financed Eligible Loans, and pay unpaid Administration Fees, Servicing Fees, Trustee Fees and Program Fees.

**Book-Entry Registration**

The Notes will be delivered in book-entry form through The Depository Trust Company. Purchasers of the Notes will not receive a certificate representing their Notes except in very limited circumstances.   See the caption "BOOK-ENTRY REGISTRATION" herein.

**U.S. Federal Income Tax Consequences**

Kutak Rock LLP will deliver an opinion to the effect that, for U.S. federal income tax purposes and assuming the accuracy of and compliance with certain assumptions, representations and covenants, when issued, the Notes will be characterized as debt if and to the extent beneficially acquired on the Date of Issuance by persons or entities unaffiliated with the Issuer.   By accepting its Notes, each Noteholder agrees to treat its Notes as indebtedness for U.S. federal income tax and all applicable state and local income and franchise tax purposes in all tax filings, reports and returns and otherwise, and will not take, or participate in the taking of or permit to be taken, any action that is inconsistent with such tax treatment and tax reporting of the Notes, unless required by applicable law.

Although the Class A-1A Notes and the Class B Notes will be issued with a de minimis discount from par, the Class A-1A Notes, the Class A-1B Notes and the Class B Notes will not be issued with original issue discount ("OID") as defined in Section 1273 of the Internal Revenue Code of 1986, as amended (the "Code"), in each case, based on their initial offering prices to the public.   Except as described below with respect to the Class B Notes, the stated interest on the Class A-1A Notes, the Class A-1B Notes and the Class B Notes will be includible in gross income when received or accrued by the Noteholders in accordance with their respective methods of tax accounting and the applicable provisions of the Code.   However, the Class B Notes may be treated as issued with OID due to the possibility

of interest deferral under the terms of the Class B Notes, and stated interest and the de minimis discount from par at issuance on the Class B Notes would be includible in gross income in accordance with the method under the Code that applies to OID.   Absent official guidance on this point, the Issuer does not intend to treat the possibility of interest deferral on the Class B Notes as creating OID, although it may revise such treatment in the future if it should determine a change to be appropriate.   See the caption "CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS" herein.

**ERISA Considerations**

Fiduciaries of employee benefit plans, retirement arrangements and other entities in which such plans or arrangements are invested may choose to invest in the Notes subject to the Code, the Employee Retirement Income Security Act of 1974, as amended, other applicable law, and the considerations and representations addressed under the caption "ERISA CONSIDERATIONS" herein.

**Certain Investment Company Act Considerations**

The Issuer is not registered or required to be registered as an "investment company" under the Investment Company Act of 1940, as amended (the "Investment Company Act"), pursuant to Section 2(b) of the Investment Company Act. The Issuer does not rely upon the exclusions from the definition of "investment company" set forth in Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act.   The Issuer does not constitute a "covered fund" for purposes of Section 619 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010), also known as the Volcker Rule (the "Volcker Rule").   Since the Issuer has not registered, and does not intend to register, as an investment company under the Investment Company Act, Noteholders will not be afforded protections of the provisions of the Investment Company Act designed to protect investment company investors.

**Ratings of the Notes**

It is a condition to the Underwriter's obligation to purchase the Notes that the Notes are rated at least as follows:

Class A Notes:

    DBRS:  "AAA (sf)"
    S&P:  "AA+(sf)"

Class B Notes:

    DBRS:  "A (sf)"
    S&P:  "AA(sf)"

A securities rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning Rating Agency.   See the caption "RATINGS" herein.

See the caption "RISK FACTORS—The ratings of the Notes are not a recommendation to purchase and may change" herein.

**CUSIP Numbers†**

Class A-1A Notes:  606072 LJ3
Class A-1B Notes:  606072 LK0
Class B Notes:  606072 LL8

**International Securities Identification Numbers ("ISIN")**

Class A-1A Notes:  US606072LJ37
Class A-1B Notes:  US606072LK00
Class B Notes:  US606072LL82

---

†CUSIP is a registered trademark of the American Bankers Association.  CUSIP and ISIN data herein is provided by Standard & Poor's CUSIP Global Services.  The CUSIP and ISIN numbers listed above are being provided solely for the convenience of Noteholders only at the time of issuance of the Notes and the Issuer does not make any representation with respect to such numbers or undertake any responsibility for their accuracy now or at any time in the future.

## RISK FACTORS

Potential investors in the Notes should consider the following risk factors together with all other information in this Offering Memorandum in deciding whether to purchase the Notes.  The following discussion of possible risks is not meant to be an exhaustive list of the risks associated with the purchase of the Notes and does not necessarily reflect the relative importance of the various risks.  The order in which these considerations are presented is not intended to represent the magnitude of the risks discussed.  Additional risk factors relating to an investment in the Notes are described throughout this Offering Memorandum, whether or not specifically designated as risk factors.  There can be no assurance that other risk factors will not become material in the future.

Although the various risks discussed in this Offering Memorandum are generally described separately, prospective investors in the Notes should consider the potential effects of the interplay of multiple risk factors.  Where more than one significant risk factor is present, the risk of loss to an investor may be significantly increased.

**Purchasers may have difficulty selling their Notes**

There currently is no secondary market for the Notes.  There is no assurance that any market will develop or, if it does develop, that it will continue or will provide investors with a sufficient level of liquidity for their investment.  If a secondary market for the Notes does develop, the spread between the bid price and the asked price for the Notes may widen, thereby reducing the net proceeds to investors from the sale of their Notes.  The Issuer does not intend to list the Notes on any exchange.  From time to time, any existing secondary market for the Notes may be adversely affected by periods of general market illiquidity or by events in the global financial markets in general or in the securitization market in particular.  Accordingly, investors may not be able to sell their Notes when they want to do so (and may be required to bear the financial risks of an investment in the Notes for an indefinite period of time) or they may not be able to obtain the price that they wish to receive for their Notes and, as a result, they may suffer a loss on their investment.  The market values of the Notes may fluctuate and movements in price may be significant.

Additionally, recent events in the United States and the global financial markets as the result of the coronavirus pandemic may cause a reduction of liquidity in any existing secondary market for the Notes.

**The Notes are not a suitable investment for all investors**

The Notes are not a suitable investment if an investor requires a regular or predictable schedule of payments of interest or principal on any specific date.  The Notes are complex investments that should be considered only by investors who, either alone or with their financial, tax and legal advisors, have the expertise to analyze the prepayment, reinvestment, default and market risk, the tax consequences of an investment, and the interaction of these factors.

**Purchasers of the Notes may be unable to reinvest principal payments at the yield earned on the Notes**

Asset-backed securities usually produce increased principal payments to investors when market interest rates fall below the interest rates on the collateral—the Financed Eligible Loans in this case—and decreased principal payments when market interest rates rise above the interest rates on the collateral.  As a result, Noteholders may receive more money to reinvest at a time when other investments generally are

producing lower yields than the yield on the Notes.  Similarly, Noteholders may receive less money to reinvest when other investments generally are producing higher yields than the yield on the Notes.

**The Notes are payable solely from the Trust Estate and investors will have no other recourse against the Issuer or the State of Missouri**

Interest and principal on the Notes will be paid solely from the funds and assets held in the discrete Trust Estate created under the Indenture.  There will be no subsequent acquisitions of or recycling of Eligible Loans into the Trust Estate after the Date of Issuance.  There may, however, be recall claims with respect to or for any repurchase of Eligible Loans that were previously Financed from a Guaranty Agency or a Servicer as described under the caption "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES—Collection Fund; Flow of Funds" herein.

No insurance or guarantee of the Notes will be provided by any government agency or instrumentality, including the State of Missouri, by any insurance company or by any other person or entity. Therefore, an investor's receipt of payments on the Notes will depend solely on:

     (a)     the amount and timing of payments and collections on the Financed Eligible Loans and interest paid or earnings on the amounts held in the funds and accounts established pursuant to the Indenture; and

     (b)     amounts on deposit in the Collection Fund, the Capitalized Interest Fund, the Reserve Fund and certain other funds and accounts held in the Trust Estate.

Investors will have no recourse against any party if the Trust Estate created under the Indenture is insufficient for repayment of the Notes.

**There will be no market valuation of the Financed Eligible Loans**

The Financed Eligible Loans are all currently owned by the Issuer and are not being acquired pursuant to a bidding process, and the value of the Financed Eligible Loans is based on the amount necessary to release such Financed Eligible Loans from the lien of the Warehouse Agreement and is not based upon their fair market value as determined by any independent advisor.

**State not liable with respect to the Notes**

The Notes shall not be deemed to constitute a debt or liability or obligation of the State of Missouri or of any agency or political subdivision of the State of Missouri, nor shall the Notes and the obligations of the Issuer contained in the Indenture be deemed to constitute a pledge of the full faith and credit of the State of Missouri or of any agency or political subdivision of the State of Missouri.  The Notes shall not directly, indirectly or contingently, obligate the State of Missouri or any agency or political subdivision thereof to levy any form of taxation therefor or to make any appropriation for their payment.  The Notes are special, limited obligations of the Issuer and are secured by and payable solely from the trust estate pledged as security therefor as provided in the Indenture.  No other assets of the Issuer are pledged to the payment of the Notes.  The State of Missouri shall not be liable in any event for the payment of the principal of or interest on the Notes or for the performance of any pledge, mortgage, obligation, or agreement of any kind whatsoever which may be undertaken by the Issuer.  No breach of any such pledge, mortgage, obligation,

or agreement may impose any pecuniary liability upon the State of Missouri or any charge upon the general credit or taxing power of the State of Missouri.

The Notes are not insured or guaranteed by any other government agency or instrumentality, by any insurance company or by any other person or entity.  The Authorizing Act does not in any way create a so-called moral obligation of the Issuer, the State or of any political subdivision thereof to pay debt service in the event of a default.  The Issuer does not have taxing power.

**The ratings of the Notes are not a recommendation to purchase and may change**

It is a condition to the Underwriter's obligation to purchase the Notes that DBRS assign a rating of at least "AAA (sf)" to the Class A Notes and "A (sf)" to the Class B Notes.  It is a condition to the Underwriter's obligation to purchase the Notes that S&P assign a rating of at least "AA+(sf)" to the Class A Notes and "AA(sf)" to the Class B Notes.  The S&P rating for the Class A Notes and the Class B Notes is a result of S&P's August 5, 2011 action lowering the long-term sovereign debt rating of the United States to "AA+" from "AAA."  S&P has identified the Notes as being of a type that are impacted by the United States' credit rating due to the Notes being secured by Financed Eligible Loans originated under the FFEL Program.  There can be no assurance that the ratings of the Notes will not be downgraded or placed on negative watch by DBRS or S&P or any other Rating Agency in the future.

Ratings are based primarily on the creditworthiness of the underlying Financed Eligible Loans, the amount of credit enhancement and the legal structure of the transaction.  The ratings are not a recommendation to any investor to purchase, hold or sell the Notes inasmuch as the ratings do not comment as to the market price or suitability for any investor.  The assignment of a credit rating to a class of Notes should not be interpreted to mean that there is no risk, or a reduced risk, of loss on that class.  Further, no credit rating should be interpreted to be an indication of the expected return on a class of Notes.  Ratings may be increased, lowered or withdrawn by any Rating Agency at any time if in the Rating Agency's judgment circumstances so warrant.  A downgrade in the rating of the Notes is likely to decrease the price a subsequent purchaser will be willing to pay for an investor's Notes.

Certain actions affecting the Financed Eligible Loans and the Trust Estate, including actions relating to the servicing of the Financed Eligible Loans and the administration of the Trust Estate, including changes in the fees for such Servicing Fees and Administration Fees (including the amounts allocated for the payment of Program Fees), may be taken by the Issuer or the Trustee (at the written direction of the Issuer) upon satisfaction of a Rating Agency Condition.

Under the Indenture, a "Rating Agency Condition" is defined as a requirement, with respect to any proposed action, failure to act or other event expressly conditioned thereon in the Indenture that, prior to the effectuation thereof: (a) the Issuer shall have provided prior written notice to each Rating Agency at least 30 calendar days prior to such proposed action, failure to act, or other event specified therein; and (b) the Issuer shall have delivered an Issuer Order to the Trustee dated no less than 30 calendar days subsequent to the date of such written notice stating that, as of the date of such Issuer Order, the Issuer reasonably believes that completion of such proposed action, failure to act or other event will not result in a downgrade to any Rating then assigned to any of the Notes by any Rating Agency or cause such Rating Agency to suspend, withdraw or qualify any such Rating (other than a Rating that is then applicable only to Notes that will no longer be outstanding upon such completion).

**There is the potential for conflicts of interest
and regulatory scrutiny with respect to the
Rating Agencies rating the Notes**

The Issuer will pay fees to the Rating Agencies to assign the initial credit ratings to the Notes on or before the Date of Issuance and to maintain the ratings on the Notes. The SEC has said that being paid by an issuer to issue and/or maintain a credit rating on asset-backed securities creates a conflict of interest for a rating agency, and that this conflict is particularly acute because arrangers of asset-backed securities transactions provide repeat business to such a rating agency. This conflict of interest may affect the ratings that the Rating Agencies hired by the Issuer assign to the Notes and other functions that the Rating Agencies perform relating to the Notes.

Furthermore, the Rating Agencies have been and may continue to be under scrutiny by federal and state legislative and regulatory bodies and such scrutiny and any actions such legislative and regulatory bodies may take as a result thereof may also have an adverse effect on the price that a subsequent purchaser would be willing to pay for the Notes and an investor's ability to resell its Notes.

**Subordination of the Class B Notes may result
in a greater risk of loss for holders of Class B
Notes**

Payments of interest on the Class B Notes are subordinated in priority of payment to payments of interest on the Class A Notes. Similarly, payments of principal on the Class B Notes are subordinated to payments of interest and principal on the Class A Notes. Principal on the Class B Notes will not be paid until the Class A Notes have been paid in full. Thus, investors in the Class B Notes will bear a greater risk of loss than the holders of Class A Notes. Investors in the Class B Notes will also bear the risk of any adverse changes in the anticipated yield and weighted average life of their Class B Notes resulting from any variability in payments of principal or interest on the Class B Notes.

The Class B Notes are subordinated to the Class A Notes as to the direction of remedies upon an Event of Default. In addition, as long as any of the Class A Notes are outstanding, the failure to pay interest or principal on the Class B Notes will not constitute an Event of Default under the Indenture. Consequently, holders of the Class B Notes may bear a greater risk of losses or delays in payment than holders of Class A Notes.

**Holders of the Notes may be required to
accrue original issue discount as income for
tax purposes before they receive cash
attributable to such original issue discount**

Although the Class A-1A Notes and the Class B Notes will be issued with a de minimis discount from par, the Class A-1A Notes, the Class A-1B Notes and the Class B Notes will not be issued with OID for U.S. federal income tax purposes, in each case, based on their initial offering prices to the public. However, the Class B Notes may be treated as issued with OID for U.S. federal income tax purposes due to the possibility of interest deferral under the terms of the Class B Notes, and stated interest and the de minimis discount from par at issuance on the Class B Notes would be includible in gross income in accordance with the method under the Code that applies to OID. However, absent official guidance on this point, the Issuer does not intend to treat the possibility of interest deferral on the Class B Notes as creating OID, although it may revise such treatment in the future if it should determine a change to be appropriate. If the Class B Notes were to be treated as issued with OID, a pro rata portion of OID would be allocable to each day in any "accrual period" using a constant yield method under the Code that takes into account both

17

the prepayment assumption used in pricing the Class B Notes and the actual prepayment experience.  As a result, the amount of OID on the Class B Notes that would accrue in any given accrual period may either increase or decrease depending upon the actual prepayment rate and may increase due to any compounding of interest on the Class B Notes.  No representation is made as to the actual rate at which the Financed Eligible Loans will prepay or that the Notes will prepay in accordance with any prepayment assumption.  Such accrual of any OID could result in a holder of the Class B Notes being required to include OID in gross income in advance of the receipt of cash attributable to such income regardless of such holder's method of accounting.  Also, if losses on the Financed Eligible Loans exceed available credit support, some or all of this cash may not be received.  See the caption "TAX MATTERS—Taxation of Interest Income and Original Issue Discount" herein.

**EU and UK Securitization Regulations may affect the liquidity of the Notes**

If prospective investors' investment activities are subject to investment laws and regulations, regulatory capital requirements or review by regulatory authorities in the European Union ("EU") or the United Kingdom ("UK"), prospective investors may be subject to due diligence and monitoring requirements with respect to their investment in the Notes.  Prospective investors should consult legal, tax and accounting advisers for assistance in determining the suitability of and consequences of the purchase, ownership and sale of the Notes.

Regulation (EU) 2017/2402 of the European Parliament and of the Council of 12 December 2017 (the "EU Securitization Regulation") has direct effect in member states of the EU and will be applicable in any non-EU states of the European Economic Area (the "EEA") in which it has been implemented.

Investors should independently assess and determine whether they are subject to the investor due diligence and monitoring requirements (the "EU Due Diligence Requirements") of Article 5 of the EU Securitization Regulation, which apply to "institutional investors," which are defined under the EU Securitization Regulation to include (a) a credit institution or an investment firm as defined in and for purposes of Regulation (EU) No 575/2013, as amended, known as the Capital Requirements Regulation (the "EU CRR"), (b) an insurance undertaking or a reinsurance undertaking as defined in Directive 2009/138/EC, as amended, known as Solvency II, (c) an alternative investment fund manager as defined in Directive 2011/61/EU that manages and/or markets alternative investment funds in the EU, (d) an undertaking for collective investment in transferable securities ("UCITS") management company, as defined in Directive 2009/65/EC, as amended, known as the UCITS Directive, or an internally managed UCITS, which is an investment company that is authorized in accordance with that Directive and has not designated such a management company for its management, and (e) with certain exceptions, an institution for occupational retirement provision falling within the scope of Directive (EU) 2016/2341, or an investment manager or an authorized entity appointed by such an institution for occupational retirement provision as provided in that Directive.  Pursuant to Article 14 of the EU CRR, the EU Due Diligence Requirements also apply to investments by certain consolidated affiliates, wherever established or located, of institutions regulated under the EU CRR (such affiliates, together with all such institutional investors, "EU Affected Investors").

No party to the transaction described in this Offering Memorandum or any of their respective affiliates is required, or undertakes, to retain a material net economic interest in the securitization transaction described in this Offering Memorandum in accordance with the EU Securitization Regulation, or makes any representation or agreement that it or any other party is undertaking or will undertake to take or refrain from taking any other action to facilitate or enable the compliance by EU Affected Investors with the EU Due Diligence Requirements, or to comply with the requirements of any other law or regulation now or hereafter in effect in the EU or the EEA, in relation to risk retention, due diligence and monitoring, credit granting standards or any other conditions with respect to investments in securitization transactions

by EU Affected Investors.  The transaction described in this Offering Memorandum is structured in a way that may not allow EU Affected Investors to comply with the EU Due Diligence Requirements.

Failure by an EU Affected Investor to comply with the EU Due Diligence Requirements with respect to an investment in the Notes described in this Offering Memorandum may result in the imposition of a penalty regulatory capital charge on such investment or of other regulatory sanctions by the competent authority of such EU Affected Investor.

With respect to the UK, relevant UK established or UK regulated persons (as described below) are subject to the restrictions and obligations of Regulation (EU) 2017/2402 as it forms part of UK domestic law by operation of the European Union (Withdrawal) Act 2018, as amended (the "EUWA"), and as amended by the Securitisation (Amendment) (EU Exit) Regulations 2019 (and as it may be further amended, supplemented or replaced, from time to time) (the "UK Securitization Regulation", and together with the EU Securitization Regulation, the "Securitization Regulations").

Article 5 of the UK Securitization Regulation places certain conditions on investments in a "securitisation" (as defined in the UK Securitization Regulation) (the "UK Due Diligence Requirements", and together with the EU Due Diligence Requirements, the "Due Diligence Requirements") by an "institutional investor", defined by the UK Securitization Regulation to include (a) an insurance undertaking as defined in section 417(1) of the Financial Services and Markets Act 2000, as amended ("FSMA"); (b) a reinsurance undertaking as defined in section 417(1) of the FSMA; (c) an occupational pension scheme as defined in section 1(1) of the Pension Schemes Act 1993 that has its main administration in the UK, or a fund manager of such a scheme appointed under section 34(2) of the Pensions Act 1995 that, in respect of activity undertaken pursuant to that appointment, is authorised for the purposes of section 31 of the FSMA; (d) an AIFM as defined in regulation 4(1) of the Alternative Investment Fund Managers Regulation 2013 which markets or manages AIFs (as defined in regulation 3 of those Regulations) in the UK; (e) a management company as defined in section 237(2) of the FSMA; (f) a UCITS as defined by section 236A of the FSMA, which is an authorized open ended investment company as defined in section 237(3) of the FSMA; and (g) a CRR firm as defined by Article 4(1)(2A) of Regulation (EU) No 575/2013, as it forms part of UK domestic law by virtue of the EUWA.  The UK Due Diligence Requirements may also apply to investments by certain consolidated affiliates, wherever established or located, of such CRR firms (such affiliates, together with all such institutional investors, "UK Affected Investors", and together with EU Affected Investors, "Affected Investors").

No party to the transaction described in this Offering Memorandum or any of their respective affiliates is required, or undertakes, to retain a material net economic interest in the securitization transaction described in this Offering Memorandum in accordance with the UK Securitization Regulation, or makes any representation or agreement that it or any other party is undertaking or will undertake to take or refrain from taking any other action to facilitate or enable the compliance by UK Affected Investors with the UK Due Diligence Requirements, or to comply with the requirements of any other law or regulation now or hereafter in effect in the UK, in relation to risk retention, due diligence and monitoring, credit granting standards or any other conditions with respect to investments in securitization transactions by UK Affected Investors.  The transaction described in this Offering Memorandum is structured in a way that may not allow UK Affected Investors to comply with the UK Due Diligence Requirements.

Failure by a UK Affected Investor to comply with the UK Due Diligence Requirements with respect to an investment in the Notes may result in the imposition of a penalty regulatory capital charge on that investment or of other regulatory sanctions by the competent authority of such UK Affected Investor.

Prospective investors should analyze their own regulatory position and are encouraged to consult with their own investment and legal advisors regarding compliance with the Securitization Regulations and

the suitability of the Notes for investment.  None of the Issuer, the Servicer, the Backup Servicer, the Underwriter, the Trustee nor any other party to the transaction makes any representation to any prospective investor or purchaser of the Notes regarding the regulatory capital treatment of their investment in the Notes on the Date of Issuance or at any time in the future.  Failure by a UK Affected Investor to comply with the UK Due Diligence Requirements with respect to an investment in the Notes may result in the imposition of a penalty regulatory capital charge on that investment or of other regulatory sanctions by the competent authority of such UK Affected Investor.

**Funds available in the Reserve Fund and Capitalized Interest Fund are limited and, if depleted, there may be shortfalls in payments to Noteholders**

The Reserve Fund and the Capitalized Interest Fund will each be funded on the Date of Issuance. Amounts on deposit in the Reserve Fund will be replenished to the extent of available funds in the Collection Fund so that the amount on deposit in the Reserve Fund will be maintained at the Specified Reserve Fund Balance.  The Capitalized Interest Fund will not be replenished and will be available only for a limited period of time.  Funds may be transferred out of the Reserve Fund and the Capitalized Interest Fund from time to time as described under the caption "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES" herein.  In the event that the funds on deposit in the Capitalized Interest Fund and the Reserve Fund are exhausted and there are insufficient available funds in the Collection Fund, the Noteholders will bear any risk of loss.

**The target overcollateralization level may not be reached or maintained**

The Specified Overcollateralization Amount is intended to protect the Noteholders from losses on the Financed Eligible Loans in excess of those anticipated.  No assurances can be provided as to whether or when the target overcollateralization level will be met or, if such level is met, whether such level will be maintained.

**Certain amendments to the Indenture and other actions may be taken without the consent of Noteholders, upon satisfaction of a Rating Agency Condition or by less than all of the Noteholders**

The Indenture permits the Issuer and the Trustee (at the written direction of the Issuer) to take certain actions based upon satisfaction of a Rating Agency Condition, without the consent of the Noteholders.  These include, without limitation, increases in certain fees, reduction of the Specified Reserve Fund Balance, addition of permitted investments and a change in a Servicer.  In addition, subject to the limitations described under the caption "SUMMARY OF THE INDENTURE PROVISIONS—Supplemental Indentures—Supplemental Indentures Requiring Consent of Noteholders," changes may be made to the Indenture or other actions taken without the consent of the Noteholders and without satisfaction of a Rating Agency Condition.  See the caption "SUMMARY OF THE INDENTURE PROVISIONS—Supplemental Indentures—Supplemental Indentures Not Requiring Consent of Noteholders" herein.

Under the Indenture, Noteholders of specified percentages of the Outstanding Amount of the Notes may amend or supplement or waive provisions of the Indenture without the consent of the other Noteholders, including, but not limited to, the ability to redeem the Notes at a price of par or greater with the consent of the Noteholders of a majority of the Outstanding Amount of the Notes.  Investors have no

recourse if the required percentage of Noteholders vote and other investors disagree with the vote on these matters.  The Noteholders may vote in a manner which impairs the ability to pay principal and interest on the Notes.

**Rights to waive defaults may adversely affect**
**Noteholders**

Generally, the Noteholders of at least a majority of the outstanding principal amount of the Notes of the highest priority (initially the Class A Notes and thereafter the Class B Notes) (the "Highest Priority Notes") have the ability, with specified exceptions, to waive certain defaults under the Indenture, including defaults that could materially and adversely affect the Noteholders who did not vote to waive such default.

**The rate of payments on the Financed Eligible**
**Loans may affect the maturity and yield of the**
**Notes**

Financed Eligible Loans may be prepaid at any time without penalty.  If the Issuer receives prepayments on the Financed Eligible Loans, those amounts will be used to make principal payments as described below under the caption "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES— Collection Fund; Flow of Funds" herein, which could shorten the average life of the Notes.  Factors affecting prepayment of loans include general economic conditions, legislative, executive orders and administrative initiatives, prevailing interest rates and changes in the borrower's job, including transfers and unemployment.  Refinancing opportunities that may provide more favorable repayment terms, including those that may be offered under potential government initiatives to consolidate or otherwise refinance existing FFELP Loans to the Federal Direct Loan Program (the "Direct Loan Program"), also affect prepayment rates.  For example, legislation has been proposed periodically that would allow eligible student loan borrowers with FFELP Loans or private loans to refinance those student loans at lower interest rates currently offered to new borrowers, with refinanced FFELP Loans to be fully paid and reissued as loans under the Direct Loan Program, and with borrower eligibility requirements to be established by the Department of Education based on income or debt-to-income financial need metrics.  Also, the President of the United States has indicated his support for legislation or a potential executive order providing for the cancellation or prepayment of up to $50,000 per student in student debt.  In addition, defaults on Financed Eligible Loans owned by the Issuer and pledged under the Indenture result in guarantee payments being made on such Financed Eligible Loans, which will accelerate the prepayment of the Notes.

Scheduled payments with respect to the Financed Eligible Loans may be reduced and the maturities of Financed Eligible Loans may be extended as authorized by the Higher Education Act.  Also, periods of deferment and forbearance may lengthen the remaining term of the Financed Eligible Loans and the average life of the Notes.

The rate of principal payments to investors on the Notes will be directly related to the rate of payments of principal on the Financed Eligible Loans.  Changes in the rate of prepayments may significantly affect investors' actual yield to maturity, even if the average rate of principal prepayments is consistent with investors' expectations.  In general, the earlier a prepayment of principal of a loan, the greater the effect may be on an investor's yield to maturity.  The effect on an investor's yield as a result of principal payments occurring at a rate higher or lower than the rate anticipated by an investor during the period immediately following the issuance of the Notes may not be offset by a subsequent like reduction, or increase, in the rate of principal payments on the Notes.  Investors will bear entirely any reinvestment risks resulting from a faster or slower incidence of prepayment of the Financed Eligible Loans.

As of the Statistical Cut-Off Date, $9,496,737 of the principal amount of the Financed Eligible Loans (representing approximately 4.71% of the Financed Eligible Loans by principal amount) are "rehabilitation loans," which are Eligible Loans that have previously defaulted, but for which the borrower thereunder has made a specified number of on-time payments as described in "APPENDIX A— DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM—Insurance and Guarantees—*Rehabilitation of Defaulted Loans*" hereto.  Although rehabilitation loans benefit from the same guarantees as other FFELP student loans, rehabilitation loans have generally experienced re-default rates that are higher than default rates for FFELP student loans that have not previously defaulted.

**Different rates of change in interest rate indexes may affect Trust Estate cash flow**

The interest rates on the Class A-1B Notes and Class B Notes may fluctuate from one Interest Accrual Period to another in response to changes in the specified index rates.  The Eligible Loans that will be refinanced with the proceeds from the sale of the Notes bear interest either at fixed rates or at rates which are generally based upon the bond equivalent yield of the 91-day U.S. Treasury Bill rate.  In addition, the Financed Eligible Loans may be entitled to receive Special Allowance Payments from the Department of Education based upon a one-month LIBOR rate or the 91-day U.S. Treasury Bill rate.  See the caption "CHARACTERISTICS OF THE FINANCED ELIGIBLE LOANS" herein and "DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM" in Appendix A hereto.  If there is a decline in the rates payable on Financed Eligible Loans, the amount of funds representing interest deposited into the Collection Fund may be reduced.  If the interest rate payable on the Class A-1B Notes and Class B Notes does not decline in a similar manner and time, the Issuer may not have sufficient funds to pay interest on the Notes when due.  Even if there is a similar reduction in the rate applicable to the Class A-1B Notes and Class B Notes, there may not necessarily be a reduction in the other amounts required to be paid by the Issuer, such as certain expenses, causing interest payments to be deferred to future periods.  Similarly, if there is a rapid increase in the interest rate payable on the Class A-1B Notes and Class B Notes without a corresponding increase in rates payable on the Financed Eligible Loans, the Issuer may not have sufficient funds to pay interest on the Notes when due.  Sufficient funds may not be available in future periods to make up for any shortfalls in the current payments of interest on the Notes or expenses of the Trust Estate created under the Indenture.  In addition, if One-Month LIBOR is no longer available, the interest rate on the Class A-1B Notes and Class B Notes will bear interest based upon a replacement index as described under the caption "—LIBOR is being discontinued as a floating rate benchmark, and various aspects of the discontinuation are uncertain and will affect the financial markets and may also affect the Financed Eligible Loans and the Class A-1B Notes and the Class B Notes" below and the caption "DESCRIPTION OF THE NOTES—Benchmark Transition Event" herein.  The Department of Education has not indicated what index it will use to calculate Special Allowance Payments presently based upon one-month LIBOR if one-month LIBOR is no longer available, and any such replacement index may differ from the index used to calculate interest on the Class A-1B Notes and the Class B Notes. A bill was recently introduced in the House of Representatives (the "Sherman Bill") that, at one point in its drafting, would have changed the index used to calculate Special Allowance Payments from One-Month LIBOR to a replacement benchmark rate established by the Board of Governors of the Federal Reserve System.  This language related to Special Allowance Payments has been removed from the current version of the Sherman Bill, but if reinserted during the committee process could tie Special Allowance Payment to a replacement benchmark rate based upon SOFR that could take effect no later than June 30, 2023, unless the Board of Governors of the Federal Reserve System determines that any LIBOR tenor will cease to be published or ceases to be representative on a different date.  No assurance can be given that the proposed Sherman Bill will be adopted or, if adopted, will be adopted in its current form or in a form containing a provision relating to a change in the calculation of Special Allowance Payments.  If the Department of Education uses an alternative index to one-month LIBOR other than the Benchmark Replacement selected by the Issuer as described above to calculate Special Allowance Payments, the Issuer and the Trustee (at the written direction of the Issuer) may enter

into a LIBOR Related Amendment to change the index used to calculate the interest rate on the Class A-1B Notes and the Class B Notes to the applicable alternative index to one-month LIBOR selected by the Department of Education plus or minus a comparable spread and any associated changes that are reasonably necessary in the opinion of the Issuer to adopt or to implement such rate change, which shall become effective upon either (i) obtaining the consent of the Noteholders of not less than a majority of the Outstanding Amount of the Class A-1B Notes and the Class B Notes and satisfaction of the Rating Agency Condition, or (ii) obtaining the consent of the Noteholders of not less than a majority of the Outstanding Amount of each class of the Notes.

For Eligible Loans disbursed prior to April 1, 2006, lenders are entitled to retain interest income in excess of the special allowance support level in instances when the Eligible Loan interest rate exceeds the special allowance support level.  However, owners of the Eligible Loans are not allowed to retain interest income in excess of the special allowance support level on loans disbursed on or after April 1, 2006 and are required to rebate any such "excess interest" to the federal government on a quarterly basis.  This modification effectively limits such owners' returns on those loans to the special allowance support level and could require a lender to rebate excess interest accrued but not yet received.  For fixed rate loans, the excess interest owed to the federal government will be greater when one-month LIBOR rate is relatively low, causing the special allowance support level to fall below the student loan rate.  There can be no assurance that such factors or other types of factors will not occur or that, if they occur, such occurrence will not materially adversely affect the sufficiency of the Trust Estate established under the Indenture to pay the principal of and interest on the Notes, as and when due.

**The timing of changes in the interest rates payable on the Class A-1B Notes and Class B Notes as compared to the Financed Eligible Loans may affect cash flow to the Trust Estate**

The interest rates payable on most of the Eligible Loans held in the Trust Estate are fixed rates, with Special Allowance Payments that reset on a daily basis, while the interest rates payable on the Class A-1B Notes and Class B Notes reset on a monthly basis.  In a declining interest rate environment, the differences in the timing of the interest rate resets may lead to a compression of the spread between the amount of Eligible Loan interest the Trust Estate receives, and the amount of interest paid on the Notes.  In a rising interest rate environment, the spread may increase.  If the spread between the amount of Eligible Loan interest received by the Trust Estate and the amount of interest paid on the Notes compresses, there may not be sufficient funds available in future periods to pay the expenses of the Trust Estate and interest and principal on the Notes.

**Social and economic factors may adversely affect repayment of the Financed Eligible Loans**

Collections on the Financed Eligible Loans during a Collection Period may vary greatly in both timing and amount from the payments actually due on the Financed Eligible Loans for that Collection Period due to a variety of economic, social and other factors.  Economic factors include interest rates, unemployment levels, housing price declines, commodity prices, adjustments in the borrower's payment obligations under other indebtedness incurred by the borrower, the rate of inflation and consumer perceptions of economic conditions generally.  Social factors include changes in consumer confidence levels and changing attitudes in respect of incurring debt and changing attitudes regarding the stigma of personal bankruptcy.  Economic conditions may also be impacted by global or localized economic or political conditions, weather events, environmental disasters, national or localized outbreaks of a highly contagious or epidemic disease or pandemics and any related quarantines and terrorist events or wars or a

23

deterioration or improvement in economic conditions in one of the markets where borrowers of the Financed Eligible Loans are concentrated.  The Issuer is unable to determine and has no basis to predict to what extent social or economic factors will affect the Financed Eligible Loans.

Following the financial crisis that began in 2008, the United States experienced an extended period of economic weakness or recession.  This period was marked by high unemployment, substantial decreases in home value, increased mortgage and consumer loan delinquencies, decreased availability of consumer credit, increased volatility in financial markets, general deleveraging of consumer balance sheets, and defaults and losses on consumer loans and receivables, including personal loans similar to the Financed Eligible Loans.  The United States began to experience a recession as a result of the COVID-19 pandemic and a significant increase to the unemployment rate as described under "—Deterioration of general economic conditions and turmoil in the credit markets as a result of COVID 19 Pandemic" below.  The number of delinquencies and defaults on consumer receivables is significantly influenced by the employment status of borrowers.  There can be no assurance that high levels of unemployment or underemployment will not recur, or that other factors relating to the uncertain economic climate will not result in increased delinquencies and defaults with respect to consumer receivables in the future.  Such adverse economic conditions may also materially impair the ability of the Issuer, the Servicer, the Backup Servicer or the Trustee to meet their respective obligations under the transaction documents.  The occurrence of any increased delinquencies or defaults with respect to the Financed Eligible Loans or material impairment of the ability of the above referenced parties to meet their respective obligations under the transaction documents could affect the timing and amount of Available Funds for any Collection Period and the payment of principal of and interest on the Notes.

Failures by borrowers to pay the principal of and interest on their Financed Eligible Loans on schedule or an increase in deferments or forbearances could affect the timing and amount of Available Funds for any Collection Period and the payment of principal of and interest on the Notes.  The effect of these factors, including the effect on the timing and amounts of Available Funds for any Collection Period and the payment of principal of and interest on the Notes, is difficult to predict.

**Deterioration of general economic conditions
and turmoil in the credit markets as a result of
COVID-19 Pandemic**

Beginning at the end of March 2020, financial markets began to experience significant volatility as a result of the outbreak of COVID-19, and the United States economy and various other world economies experienced a sudden downturn.  The COVID-19 Pandemic has adversely impacted local, state and national economic conditions and has resulted in substantial employment disruption in the United States and record unemployment claims.  Additionally, several eviction moratoriums have been put into place by the U.S. Centers for Disease Control and Prevention since the beginning of the COVID-19 Pandemic which may result in widespread eviction actions once they fully expire.  The long-term impact of a continuation of these developments, while currently unknown, could result in an increase in delays by borrowers in paying Financed Eligible Loans, thus causing increased default claims to be paid by a Guaranty Agency (including the State Guaranty Agency).  It is impossible to predict the status of the economy or unemployment levels or at what point a downturn in the economy would significantly reduce Issuer revenues or a Guaranty Agency's (including the State Guaranty Agency's) ability to pay default claims.  The COVID-19 Pandemic and the economic downturn might also affect the ability of the transaction parties to perform their duties and obligations under the transaction documents, which could adversely affect the market value of the Notes or limit the ability of an investor to resell its Notes.

General economic conditions may also be affected by other events including the prospect of increased hostilities abroad.  Certain of such events may have other effects, the impact of which is difficult to project.

**Impact of turmoil in the credit markets on the business of the Issuer**

There have been changes in the national credit markets since the fall of 2007 and more recently since March 2020 that have dramatically changed the way that the Issuer does business.  Since the Issuer's creation pursuant to the Authorizing Act in 1981, the Issuer regularly financed its student loan purchases on a long-term basis through the issuance of revenue bonds or notes secured by the student loans it had originated or purchased with the proceeds of such bonds or notes.  Due to the turmoil in the credit markets, the cost of asset-backed financings has increased.   Some of the issues that have made asset-backed borrowings more difficult include: the recession that began in March 2020 as the result of the COVID-19 Pandemic, the collapse of the auction rate securities market; the downgrade of national bond insurers; the investigations and related matters as to the manipulation of LIBOR; limited availability of credit support and liquidity in the market; the requirement by those credit and liquidity providers that are in the market of higher amounts of equity and higher fees payable to such credit and liquidity providers; the establishment by the credit rating agencies of significantly more rigorous cash flow assumptions and requirements; and the downgrading of the long-term sovereign credit rating on the obligations of the United States by S&P.  In addition to the turmoil in the credit markets, the changes in the FFEL Program imposed by the Health Care and Education Reconciliation Act of 2010 (as discussed herein) have adversely impacted the profitability of financing FFELP Loans.  In addition, the elimination of the FFEL Program described below has impacted the Issuer's business.

**Cashflows to the Trust Estate may be affected by natural disasters or pandemics**

Student loan borrowers in regions affected by natural disasters or pandemics may experience difficulty in timely payment of their Eligible Loans.  This could reduce the funds available to the Issuer to pay principal and interest on the Notes.

**Impact of COVID-19 Pandemic on the Issuer and student loan related legislation resulting from COVID-19 Pandemic**

On January 31, 2020, the United States Department of Health and Human Services Secretary declared a public health emergency in response to the spread of the novel coronavirus ("COVID-19" and the "COVID-19 Pandemic").  On March 13, 2020, the President of the United States declared a national emergency beginning March 1, 2020.  On April 3, 2020, the Missouri Governor issued an order restricting certain activities in the state, which restrictions were in effect from April 6, 2020 until May 4, 2020.  The President's declaration of a national emergency allowed the Issuer to begin granting administrative forbearance under the federal regulations.  In addition, the Department of Education's Office of Federal Student Aid ("FSA") has published several announcements permitting lenders of FFELP Loans to voluntarily grant the same relief that the Department of Education is granting to federally owned loans.  The Issuer has advised its loan borrowers that it or the Department of Education has adopted a number of temporary relief measures, including:

- disaster forbearance allowing a borrower facing financial hardship to suspend interest and principal payments for up to 90 days; then 30-day increments at the verbal request of the borrower following the original 90 days;

- all otherwise available options to suspend or reduce monthly payments remain in full force;

- availability of reduced monthly payments for FFELP borrowers requesting relief continues to be available and is based on regulations and eligibility;

- temporary waiver or reduction of certain non-negotiable funds fees and late fees (as of July 1, 2020, the Issuer no longer assesses late fees and all outstanding late fees for the period prior to July 1, 2020 have been waived); and

- reports of delinquencies on non-defaulted loans to credit reporting agencies does not occur until 90 days past due.

The Issuer reserves the right to adopt additional relief measures in response to the COVID-19 Pandemic.

During the first few weeks of the COVID-19 Pandemic, the Issuer successfully increased the percentage of operations performed in a remote or "work-at-home" manner utilizing full system interfaces. The Issuer has begun to gradually phase in personnel to begin working in its facilities while complying with applicable federal, state and county restrictions. The Issuer has the ability to redeploy its employees to work from home if needed based on the future status of the COVID-19 Pandemic. Management continually reviews this strategy and expects to be able to adjust current staffing arrangements if necessary. The Issuer has never had to run its operations to such extent remotely for an extended period of time, and it is possible the Issuer will encounter significant challenges to running its businesses. The Issuer's operations rely on the efficient and secure collection, processing, storage, and transmission of personal, confidential, and other information in a significant number of customer transactions on a continuous basis through its computer systems and networks and those of its third-party service providers. Unanticipated issues arising from handling personal, confidential, and other information from a less efficient work-at-home environment could adversely impact the Issuer's operations and lead to greater risks for the Issuer, including cybersecurity risks. Approximately 73% of the Issuer's loan servicing portfolio is from the Federal Direct Loan Program. As a result of the Federal Relief Acts (defined below), approximately 1,625,000 borrowers in repayment were placed in a Federal Relief Acts forbearance status, which significantly reduced the call volume to the Issuer's call center and resulted in a reduction of approximately 20% of the Issuer's workforce.

***The Federal Relief Acts***. The United States Congress has enacted several COVID 19-related bills, including the Coronavirus Aid, Relief, and Economic Security Act, signed into law on March 27, 2020 ("CARES Act"), the Paycheck Protection and Health Care Enhancement Act, signed into law on April 24, 2020, the Student Veteran Coronavirus Response Act, signed into law on April 28, 2020, the COVID–19 Consumer Protection Act (Title XIV of the Consolidated Appropriations Act, 2021), signed into law on December 27, 2020 and the American Rescue Plan Act of 2021, signed into law on March 11, 2021 (collectively, the "Relief Acts"), that authorize numerous measures in response to the economic effects of the COVID-19 Pandemic. Such measures include, but are not limited to: direct financial aid to American families; temporary relief from certain federal tax requirements (including forgiveness of indebtedness on student loans), the scheduled payment of federally owned education loans, including federally owned FFELP Loans and loans originated under the Direct Loan Program ("Direct Loans"), and from certain other federal higher education aid requirements; temporary relief for borrowers with federally-related mortgage loans; payroll and operating expense support for small businesses and nonprofit entities; federal funding of higher education institutions' emergency aid to students and operations and support for the capital markets loan assistance for distressed industries; financial assistance to governmental entities; and capital market support.

The Relief Acts also authorized the United States Department of the Treasury (the "Treasury") to provide up to approximately $450 billion in loans, loan guarantees and other investments to support programs and facilities established by the Board of Governors of the Federal Reserve System (the "Federal Reserve") that are intended to provide liquidity to the financial system and facilitate lending to eligible businesses and to states, political subdivisions and instrumentalities. Such injection of liquidity followed actions by the Federal Reserve, including the purchase of Treasury securities and mortgage backed securities, facilitating the flow of credit to municipalities by expanding its Money Market Mutual Fund Liquidity Facility to include a wider range of securities, including certain municipal variable rate demand notes, and facilitating the flow of credit to municipalities by expanding its Commercial Paper Funding Facility to include high quality, tax exempt commercial paper as eligible securities. No assurance can be given that such liquidity assistance from the federal government will assure that a secondary market exists for Issuer debt obligations, including the Notes, or the availability to the Issuer of adequate liquidity to fully fund its program needs at any particular time.

On August 6, 2021, the President of the United States signed an executive order instructing the Department of Education to continue to extend the student loan payment forbearance and the halting of interest accrual and collections activities through January 31, 2022 for federally-owned loans (which do not include the Financed Eligible Loans). It is possible such period could be extended to a later date, although the Department of Education has stated that this extension will be the final extension. The Issuer provides COVID-19 related forbearances to borrowers of the Financed Eligible Loan upon request for 30-day periods. Interest continues to accrue on any Financed Eligible Loans for which a COVID-19 related forbearance is requested and granted. Such forbearances could cause the rate of repayment of the Financed Eligible Loans to be slower than expected, which would have a corresponding impact on the payment of the Notes.

***Uncertainty of Future Impacts***. As of the date hereof, the Issuer is not aware of federal or state consumer lending law changes in response to the COVID-19 Pandemic that it expects to materially and adversely affect its operation of its student loan program. Any further COVID-19 Pandemic relief measures that may be required by law or voluntarily implemented by the Issuer and that are applicable to the Financed Eligible Loans would be expected to result in a delay in the receipt of, or in a reduction of, the revenues received from the Financed Eligible Loans. The Issuer cannot accurately predict the number of Financed Eligible Loan borrowers that would utilize any benefit program that requires borrower action. The greater the number of borrowers that utilize any relief measures, the lower the total current loan receipts on the Financed Eligible Loans. If actual receipt of Financed Eligible Loan revenues or actual Financed Eligible Loan administrative expenditures were to vary materially from those projected, the ability of the Trust Estate created under the Indenture to provide sufficient revenues to fund interest and administrative costs and to amortize the Notes might be adversely affected.

The full impact of the COVID-19 Pandemic, and of directly and indirectly related developments, on the Issuer's finances and operations, on the performance of the Financed Eligible Loans constituting security for the Notes, and on the security, market value and liquidity of the Notes cannot be predicted at this time. It is not currently possible to project with certainty the nature, degree and duration of economic and legal changes that may result from the COVID-19 Pandemic. The COVID-19 Pandemic could adversely affect global, national, regional or local economies in a manner that might reduce the ability of certain Financed Eligible Loan borrowers to make full and timely loan repayment. The number and aggregate principal balance of Financed Eligible Loans for which repayment may be so affected by the COVID-19 Pandemic is not known at this time but may be significant. As a result, there may be a delay in, or reduction of, total Financed Eligible Loan collections that might materially and adversely affect the ability of the Trust Estate created under the Indenture to provide sufficient revenues to fund interest and administrative costs and to amortize the Notes, as initially projected or as projected herein. Further federal legislative or administrative action, including forgiveness of principal on Financed Eligible Loans by the

27

Department of Education, could result in an increase in the percentage of incidence of on-time payments of Financed Eligible Loan or of prepayments of Financed Eligible Loans.  There can be no assurance, however, that such further federal action will occur, or as to the number or aggregate principal balance of Financed Eligible Loans that might be so affected.  The Issuer is monitoring and assessing the economic and legal impact of the COVID-19 Pandemic and of governmental responses thereto, including orders, laws, regulations and mandates adopted by the State of Missouri or the federal government, on its operations and financial position.

**Forbearance granted as a result of the COVID-19 Pandemic may delay payments of interest and principal**

The Issuer, as the Servicer, has agreed to service the Financed Eligible Loans.  The Higher Education Act permits, and in some cases requires, "forbearance" periods from loan collection in some circumstances.  Interest that accrues during a forbearance period is never subsidized.  Forbearance is most often granted to borrowers for periods of economic hardship affecting the borrower, which may occur for a variety of reasons.  During periods of deteriorating economic conditions in the United States or globally, such as during disruptive political, social or economic events, forbearance requests typically increase.  Forbearance is also often granted to borrowers when a federal disaster or emergency has been declared such as in response to COVID-19.  See the caption "Impact of COVID-19 Pandemic on the Issuer and student loan related legislation resulting from COVID-19 Pandemic" above.

The COVID-19 Pandemic has resulted in a temporary increase in the number of borrowers of Financed Eligible Loans who have requested forbearance.  In April of 2020, the Issuer placed the borrowers of any of its FFELP Loans, including any Financed Eligible Loans, that were more than 15 days' delinquent in their payments into a 90-day disaster forbearance period (which also deemed such borrowers to be "current" in their payments)  As more borrowers contacted the Issuer to request such forbearances, delinquency rates dropped significantly as delinquent borrowers were moved from delinquent status to disaster forbearance status.  For qualified loan borrowers who are adversely impacted by the COVID-19 pandemic, the Issuer continues to provide short-term, extended forbearance relief from payments upon request.

In May 2021, per a Dear Colleague Letter ("DCL") issued by the Department of Education, the Issuer reinstated the automatic disaster forbearance.  All loans that were more than 30 days delinquent were brought current and a placed into a disaster forbearance.  In addition, any loan that becomes more than 30 days delinquent will also have a 90-day disaster forbearance placed on the account.  The Issuer will also clear any negative credit reported on borrowers eligible for the disaster forbearance retroactive to March 13, 2020.  While the Department of Education has recently extended the automatic disaster forbearance for direct student loans to January 31, 2022, the Issuer is currently assessing whether to end its automatic disaster forbearance policies for FFELP Loans (including the Financed Eligible Loans) on September 30, 2021 or to extend such policies to January 31, 2022.  If the Issuer terminates the automatic disaster forbearance, disaster forbearance would remain available to borrowers, at their request, during the disaster forbearance declaration period.  As shown below, the reinstatement of this automatic disaster forbearance has caused the percentage of both the Issuer's portfolio of FFELP Loans and the Financed Eligible Loans in this status to increase.

Forbearance usage rates by principal amount of FFELP Loans owned by the Issuer in forbearance as a percentage of all FFELP Loans owned by the Issuer for the months indicated were approximately as follows:

| Month-End | Percentage of Issuer's FFELP Loans in Regular Forbearance | Percentage of Issuer's FFELP Loans in Disaster Forbearance | Total Percentage of Issuer's FFELP Loans in Forbearance |
|---|---|---|---|
| December 2019 | 8.78% | 0.19% | 8.96% |
| January 2020 | 9.23% | 0.02% | 9.25% |
| February 2020 | 12.55% | 0.02% | 12.58% |
| March 2020 | 12.96% | 0.06% | 13.03% |
| April 2020 | 7.05% | 18.49% | 25.54% |
| May 2020 | 3.34% | 28.47% | 31.81% |
| June 2020 | 3.67% | 19.87% | 23.54% |
| July 2020 | 4.04% | 18.45% | 22.49% |
| August 2020 | 6.78% | 12.64% | 19.42% |
| September 2020 | 10.61% | 3.83% | 14.44% |
| October 2020 | 9.89% | 4.37% | 14.26% |
| November 2020 | 8.51% | 4.66% | 13.17% |
| December 2020 | 8.26% | 4.98% | 13.24% |
| January 2021 | 9.22% | 3.99% | 13.20% |
| February 2021 | 14.46% | 2.96% | 17.42% |
| March 2021 | 15.38% | 2.70% | 18.08% |
| April 2021 | 8.90% | 14.69% | 23.59% |
| May 2021 | 6.12% | 18.96% | 25.08% |
| June 2021 | 5.82% | 23.22% | 29.04% |
| July 2021 | 4.83% | 26.19% | 31.02% |

[Remainder of page intentionally left blank]

Forbearance usage rates by principal amount of Financed Eligible Loans in forbearance as a percentage of all Financed Eligible Loans for the months indicated were approximately as follows:

| Month-End | Percentage of the Financed Eligible Loans in Regular Forbearance | Percentage of the Financed Eligible Loans in Disaster Forbearance | Total Percentage of the Financed Eligible Loans in Forbearance |
|---|---|---|---|
| December 2019 | 8.35% | 0.09% | 8.44% |
| January 2020 | 8.85% | 0.00% | 8.85% |
| February 2020 | 11.49% | 0.01% | 11.50% |
| March 2020 | 11.53% | 0.03% | 11.55% |
| April 2020 | 6.24% | 17.44% | 23.68% |
| May 2020 | 3.09% | 26.69% | 29.78% |
| June 2020 | 3.43% | 18.50% | 21.94% |
| July 2020 | 3.82% | 15.92% | 19.74% |
| August 2020 | 5.94% | 10.73% | 16.67% |
| September 2020 | 9.25% | 3.54% | 12.79% |
| October 2020 | 9.43% | 4.05% | 13.48% |
| November 2020 | 8.00% | 4.53% | 12.54% |
| December 2020 | 7.67% | 4.55% | 12.23% |
| January 2021 | 8.57% | 3.31% | 11.88% |
| February 2021 | 12.90% | 2.66% | 15.56% |
| March 2021 | 13.56% | 2.37% | 15.93% |
| April 2021 | 8.98% | 14.36% | 23.34% |
| May 2021 | 6.34% | 18.55% | 24.89% |
| June 2021 | 5.75% | 22.18% | 27.93% |
| July 2021 | 4.98% | 25.50% | 30.48% |

For details of forbearance policies under the FFELP see "APPENDIX A—DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM—Deferment and Forbearance Periods" herein.  An increase in forbearances on the Financed Eligible Loans may result in a delay in payments of interest or principal on the Financed Eligible Loans, which could negatively affect the ability of the Issuer to generate sufficient cash flow to pay its obligations and which, in turn, may cause losses on the Notes.

**LIBOR is being discontinued as a floating rate benchmark, and various aspects of the discontinuation are uncertain and will affect the financial markets and may also affect the Financed Eligible Loans and the Class A-1B Notes and the Class B Notes**

The interest rates payable on the Class A-1B Notes and Class B Notes and the Special Allowance Payments on substantially all of the Financed Eligible Loans are currently based on a spread over one-month LIBOR.   See "APPENDIX B—DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM—Special Allowance Payments" hereto.  The London Interbank Offered Rate, or LIBOR, serves as a global benchmark for home mortgages, student loans and what various issuers pay to borrow money.  As a result of longstanding initiatives, LIBOR is being discontinued as a floating rate benchmark.

The United Kingdom's Financial Conduct Authority (the "FCA") assumed regulatory oversight and supervision of LIBOR and the regulator of the administration of LIBOR, which is ICE Benchmark Administration Ltd. (the "IBA").

On March 5, 2021, the FCA announced that, after specified dates (the "Cessation Dates"), LIBOR settings will cease to be provided by any administrator or will no longer be representative which Cessation Dates will be:

- June 30, 2023, in the case of the principal U.S. dollar LIBOR tenors (overnight and one, three, six and 12 months); and

- December 31, 2021, in all other cases (i.e., one week and two-month U.S. dollar LIBOR and all tenors of non-U.S. dollar LIBOR).

The FCA's announcement and a related announcement made by IBA on March 5, 2021 are referred to herein as the "FCA/IBA Announcements." The FCA and certain U.S. regulators have emphasized that, despite expected publication of U.S. dollar LIBOR through June 30, 2023, no new contracts using U.S. dollar LIBOR should be entered into after December 31, 2021 and that, for certain purposes, market participants should transition away from U.S. dollar LIBOR sooner.

As to any particular LIBOR-based obligation, the actual transition from LIBOR to another reference rate will generally require two events to occur. The first event includes the FCA/IBA Announcements; the second event is the occurrence of a contractually defined benchmark replacement date. Although in most cases the benchmark replacement date will correspond to the relevant Cessation Date, some may not, depending on the relevant contractual terms; as a result, the actual transition date in any one situation will not necessarily be the same in another situation (even if the two situations are similar).

Although the foregoing reflects the likely timing of the LIBOR discontinuation, and the balance of this risk factor reflects certain related details and consequences, there is no assurance that LIBOR, of any particular currency or tenor, will continue to be published until any particular date or in any particular form.

See the caption "DESCRIPTION OF THE NOTES—Benchmark Transition Event" herein for a description of the process for determining a replacement benchmark rate under the Indenture if One-Month LIBOR is no longer an available benchmark rate. The Department of Education has not indicated what index it will use to calculate Special Allowance Payments presently based upon One-Month LIBOR if One-Month LIBOR is no longer available, and any such replacement index may differ from the index used to calculate interest on the Class A-1B Notes and Class B Notes. If the Department of Education uses an alternative index to One-Month LIBOR other than the Benchmark Replacement selected by the Issuer as described under the caption "DESCRIPTION OF THE NOTES—Benchmark Transition Event" herein to calculate Special Allowance Payments, the Issuer and the Trustee (at the written direction of the Issuer) may enter into a LIBOR Related Amendment to change the index used to calculate the interest rate on the Class A-1B Notes and the Class B Notes to the applicable alternative index to One-Month LIBOR used by the Department of Education plus or minus a comparable spread and any associated changes that are reasonably necessary in the opinion of the Issuer to adopt or to implement such rate change, which shall become effective upon either (i) obtaining the consent of the Noteholders of not less than a majority of the Outstanding Amount of the Class A-1B Notes and the Class B Notes and satisfaction of the Rating Agency Condition, or (ii) obtaining the consent of the Noteholders of not less than a majority of the Outstanding Amount of each class of the Notes. The Issuer cannot provide any assurances that any replacement benchmark rate will be representative of market interest rates or consistent with previously published One-Month LIBOR during the life of the Notes. If a published One-Month LIBOR is unavailable at any time prior to the occurrence of a Benchmark Transition Event and its related Benchmark Replacement Date

(each as defined under the caption "DESCRIPTION OF THE NOTES—Benchmark Transition Event" herein), One-Month LIBOR will be the same as the rate of interest for the immediately preceding Interest Accrual Period, and could remain the rate of interest for the remaining life of the Class A-1B Notes and the Class B Notes.  See the caption "DESCRIPTION OF THE NOTES—Calculation of LIBOR" herein.

In addition, as described under the caption "DESCRIPTION OF THE NOTES—Benchmark Transition Event" herein, One-Month LIBOR will be replaced as the benchmark for the Class A-1B Notes and Class B Notes following the occurrence of a Benchmark Transition Event (which has occurred, as described below) and its related Benchmark Replacement Date (which has not occurred, as described below).  The Benchmark Transition Events generally include the making of public statements or publication of information by the administrator of the benchmark, its regulatory supervisor or certain other governmental authorities that the benchmark will no longer be provided or is no longer representative of market interest rates, and such benchmark administrator permanently or indefinitely ceasing to provide the benchmark or when a specified percentage of the underlying assets convert to an alternate index.  In the Issuer's opinion, the FCA/IBA Announcements on future cessation and loss of representativeness of the LIBOR benchmarks constitute a "Benchmark Transition Event" under the Indenture.  It appears, based on the FCA/IBA Announcements, that the related Benchmark Replacement Date will not occur until the first interest determination date after June 30, 2023.  It is possible for additional Benchmark Transition Events to occur under the Indenture, which may result in a different (and possibly earlier) Benchmark Replacement Date.  The Class A-1B Notes and the Class B Notes will accrue interest by reference to LIBOR until the Benchmark Replacement Date.

Further, as described under the caption "DESCRIPTION OF THE NOTES—Benchmark Transition Event" herein, the Benchmark Replacement (as defined under the caption "DESCRIPTION OF THE NOTES—Benchmark Transition Event" herein), will depend on the availability of various alternative benchmarks, the first of which is Term SOFR, the second of which is Compounded SOFR or Simple Average SOFR, at the option of the Issuer (each as defined under the caption "DESCRIPTION OF THE NOTES—Benchmark Transition Event" herein) and the last two of which are not currently specified.  The Secured Overnight Financing Rate, or "SOFR," was selected by the Alternative Reference Rates Committee, or "ARRC," of the Federal Reserve Bank of New York, or the "FRBNY," as the replacement for LIBOR plus, in the case of existing LIBOR contracts and obligations, a spread adjustment; as a consequence of the FCA/IBA Announcements, the spread adjustments for different tenors of U.S. dollar LIBOR have been set.  There are important fundamental differences between LIBOR and SOFR.  LIBOR is an unsecured rate that represents interbank funding costs for different short-term maturities or "tenors."  LIBOR is a forward-looking rate reflecting expectations regarding interest rates for those tenors.  LIBOR is intended to be sensitive, in certain respects, to bank credit risk and to term interest rate risk.  SOFR, on the other hand, is a secured, risk-free rate, intended to be a broad measure of the cost of borrowing funds overnight in transactions that are collateralized by U.S. Treasury securities.  Thus, SOFR is largely insensitive to credit risk considerations and to short-term interest rate risks.  As a result, SOFR will not be representative of LIBOR.  The FRBNY started publishing SOFR in April 2018.  The FRBNY has also started publishing historical indicative SOFR dating back to 2014, although such historical indicative data inherently involves assumptions, estimates and approximations.  Since the initial publication of SOFR, daily changes in SOFR have, on occasion, been more volatile than daily changes in comparable benchmark or market rates, and SOFR over the term of the Notes may bear little or no relation to the historical actual or historical indicative data.  For these reasons, among others, there is no assurance that SOFR or rates derived from SOFR will perform in the same or similar ways as LIBOR would have performed at any time, and there is no assurance that SOFR-based rates will be a suitable substitute for LIBOR and that  SOFR-based rates, as modified by an applicable spread adjustment, will be the economic equivalent of LIBOR.

Term SOFR, which is expected to be a similar forward-looking term rate which will be based on SOFR, is the first alternative among the Benchmark Replacement alternatives.  On July 29, 2021, the ARRC

announced its recommendation of Term SOFR rates published by the CME Group Inc. An earlier ARRC announcement stated that legacy contracts that have adopted the ARRC's recommended fallback provisions will fall back to rates based on the Term SOFR rates when the legacy contracts' contractual LIBOR replacement date occurs.  The fallback provisions of the Class A-1B Notes and Class B Notes are based on the ARRC's recommended fallback provisions, and, accordingly, it is expected that Term SOFR (plus the Benchmark Replacement Adjustment) will be the benchmark replacement as of the Benchmark Replacement Date.  Nonetheless, there is no assurance that such form of Term SOFR, or any other form, will be available as of the Benchmark Replacement Date. For example, it is possible, though not expected, that the ARRC could revise or withdraw its recommendation regarding Term SOFR rates before the Benchmark Replacement Date and, in the latter case, that neither the ARRC nor another Relevant Governmental Body may have selected or recommended another forward-looking term rate based on SOFR.  If Term SOFR for the appropriate tenor is not available as of the Benchmark Replacement Date, the next available Benchmark Replacement is Compounded SOFR or Simple Average SOFR, at the option of the Issuer.  In order to compensate for these differences in the benchmark, a Benchmark Replacement Adjustment (as defined under the caption "DESCRIPTION OF THE NOTES—Benchmark Transition Event" herein) will be included in any Benchmark Replacement.  However, the Issuer cannot provide any assurances that any Benchmark Replacement Adjustment will be sufficient to produce the economic equivalent of the then-current benchmark, either at the Benchmark Replacement Date or over the life of the Class A-1B Notes and the Class B Notes.  As a result of each of the foregoing factors, the Issuer cannot provide any assurances that the characteristics of any Benchmark Replacement will be similar to the then-current benchmark that it is replacing, or that any Benchmark Replacement will produce the economic equivalent of the then-current benchmark that it is replacing.  However, if the initial Benchmark Replacement is either Compounded SOFR or Simple Average SOFR and the Issuer later determines that Term SOFR can be determined, then, in the absence of a LIBOR Related Amendment, Term SOFR will become the new Unadjusted Benchmark Replacement and will, together with a new Benchmark Replacement Adjustment for Term SOFR, replace Compounded SOFR or Simple Average SOFR, as applicable on the next Benchmark determination date for Term SOFR, which could lead to further volatility in the interest rate on the Class A-1B Notes and the Class B Notes.

Finally, the Issuer will have discretion in certain elements of the Benchmark Replacement process, including determining when a Benchmark Replacement Date will occur, determining which Benchmark Replacement (and related Benchmark Replacement Adjustment) is available and, if no other designated Benchmark Replacements are available, selecting a Benchmark Replacement and determining its Benchmark Replacement Adjustment, and making Benchmark Replacement Conforming Changes (as defined under the caption "DESCRIPTION OF THE NOTES—Benchmark Transition Event" herein).  The Noteholders will not have any right to approve or disapprove of these changes and will be deemed to have agreed to waive and release any and all claims relating to any such determinations.

As a result of the foregoing, the rate at which the Class A-1B Notes and Class B Notes bear interest could be adversely affected by misconduct in the rate-setting process for One-Month LIBOR, changes to such process or the phasing out of the rate entirely.  There may be a negative effect on the interest rate on, or the market value of, the Class A-1B Notes and Class B Notes if the One-Month LIBOR global benchmark is no longer available or if any Benchmark Replacement does not produce the economic equivalent of the then-current benchmark that it is replacing.

The discontinuation of LIBOR, particularly if the replacement for LIBOR is not well received by borrowers, the CFPB, the Department of Education or other governmental authorities that regulate education lending, may also have an adverse impact on the Issuer and could give rise to litigation or regulatory actions. The Issuer continues to evaluate the potential impact of the LIBOR transition and the establishment of an alternative reference rate, and it cannot predict what impact any related changes may have on the Financed Eligible Loans or the Class A-1B Notes and the Class B Notes.

Financial markets, particularly the trading market for LIBOR-based obligations, may be adversely affected by the discontinuation of LIBOR, the remaining uncertainties regarding its discontinuation, the alternative reference rates that will be used when LIBOR is discontinued (including SOFR-based rates) and other developments related to LIBOR and its replacement.

The occurrence and implementation of a Benchmark Transition Event also may have certain adverse U.S. federal income tax consequences to the Noteholders.  See the captions "DESCRIPTION OF THE NOTES—Benchmark Transition Event" and "CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS—Sale or Exchange of Notes" herein.

**Federal financial regulatory legislation may
affect the Notes**

The Dodd Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) (the "Dodd-Frank Act"), which was enacted in July 2010, represented a comprehensive overhaul of the financial services industry within the United States, and established the federal Consumer Financial Protection Bureau (the "CFPB").  The CFPB, an independent agency within the Federal Reserve, regulates consumer financial products, including education loans, and other financial services offered primarily for personal, family, or household purposes, and the CFPB and other federal agencies, including the Securities and Exchange Commission (the "SEC") and the Commodity Futures Trading Commission (the "CFTC"), are required to undertake various assessments and rulemakings to implement the law.  The majority of the provisions in the Dodd-Frank Act are aimed at financial institutions.  However, there are components of the law that have impacted the Issuer.

In December 2014, the SEC and federal banking agencies published final regulations, effective December 24, 2016 for issuers of student loan asset-backed securities, generally requiring issuers of asset-backed securities or persons who organize and initiate asset-backed securities transactions to retain a portion of the underlying assets' credit risk; however, the Issuer is exempt from these risk retention rules. In addition, the SEC approved changes to the rules applicable to issuers of asset-backed securities under the Securities Act and the Securities Exchange Act, that substantially revise Regulation AB and other rules governing the offering process, disclosure and reporting for asset-backed securities issued in registered and certain unregistered transactions.  It is not clear how the revisions to Regulation AB will be implemented, and to what extent the Issuer may be affected.  No assurance can be given that the new standards contained in the amended Regulation AB will not have an adverse impact on the Issuer or on the value or marketability of the Notes.

The documents entered into in connection with prior Issuer sponsored securitization transactions and this transaction contain covenants requiring the repurchase or replacement of Eligible Loans in the case of a breach of certain representations and warranties.  Therefore, pursuant to Rule 15Ga-1, the Issuer is responsible for disclosure of all fulfilled and unfulfilled repurchase requests for student loans in such securitization transactions.  There have not been any unfulfilled repurchase requests for student loans with respect to any of the Issuer sponsored securitization transactions.  With respect to the Notes, the Issuer will furnish a Form ABS-15G at the times required by and pursuant to Rule 15Ga-1 of the Securities Exchange Act as required by the SEC, which will be furnished on the Municipal Securities Rulemaking Board through its EMMA system ("EMMA") at www.emma.msrb.org, which information and website are not part of, and are not incorporated by reference into, this Offering Memorandum.

In September 2014, the SEC adopted new rules further regulating rating agencies' activities with respect to rating asset-backed securities, and requiring that issuers of asset-backed securities, effective June 15, 2015, disclose third-party due diligence findings, including certain agreed-upon procedure reviews.  The Issuer engaged Ernst & Young LLP to perform certain agreed-upon procedures which

compared or recomputed information contained in a data file containing information with respect to the Financed Eligible Loans to or based upon the corresponding information in the loan files for certain randomly selected Financed Eligible Loans, and no exceptions were noted.  The Issuer has made such report publicly available on EMMA at www.emma.msrb.org, which information and website are not part of, and are not incorporated by reference into, this Offering Memorandum.

Student loans and student loan servicing are top priorities for the CFPB.  In May 2015, the CFPB launched a public inquiry into student loan servicing practices throughout the industry.  In September 2015, the CFPB issued a report discussing public comments submitted in response to the inquiry and, in consultation with the Department of Education and Department of the Treasury, released recommendations to reform student loan servicing to improve borrower outcomes and reduce defaults.  In July 2016, the Department of Education expanded on these joint principles by outlining enhanced customer service standards and protections that will be incorporated into federal servicing contracts and guidelines.  The CFPB has also announced that it may issue student loan servicing rules in the future.

The Dodd-Frank Act gave the CFPB authority to supervise private education lenders.  In addition, the CFPB adopted a rule in December 2013 that enables it to federally supervise certain non-bank student loan servicers that service more than one million borrower accounts, to ensure that bank and non-bank servicers follow the same rules in the student loan servicing market.  The rule covers both federal and private student loans.  Both the Issuer and the Backup Servicer currently service more than one million student loan borrower accounts and would therefore be subject to this rule.  The CFPB has on several occasions audited various aspects of the Issuer's servicing activities.  These audits have not resulted in any threats of or actual legal actions against the Issuer or the imposition of any financial penalties.  See also the caption "SERVICING OF THE FINANCED ELIGIBLE LOANS—Backup Servicer and Backup Servicing Agreement—Consumer Protection and Similar Laws" herein.  If the CFPB were to determine that a servicer is not in compliance, it is possible that this could result in material adverse consequences to such servicer, including, without limitation, settlements, fines, penalties, adverse regulatory actions, changes in a servicer's business practices, or other actions.  However, it is not possible to estimate at this time any potential financial or other impact to any such Servicer, including any impact on its ability to satisfy its obligations with respect to the Financed Eligible Loans, that could result from the CFPB's examinations, in the event that any adverse regulatory actions occur.

In addition to its supervisory authority, the CFPB has broad authority to enforce compliance with federal consumer financial laws applicable to private student lenders and student loan servicers, including the Dodd-Frank Act's prohibition on unfair, deceptive or abusive acts or practices, by conducting investigations and hearings, imposing monetary penalties, collecting fines and requiring consumer restitution in the event of violations.  It may also bring a federal lawsuit or administrative proceeding.

Also in December 2013, the banking regulators and other agencies principally responsible for banking and financial market regulation in the United States implemented the final rule under the so-called Volcker Rule under the Dodd-Frank Act, which in general prohibits "banking entities" (as defined therein) from (a) engaging in proprietary trading; (b) acquiring or retaining an ownership interest in or sponsoring certain hedge funds, private equity funds (broadly defined to include any entity that would be an investment company under the Investment Company Act but for the exemptions provided in Section 3(c)(1) or 3(c)(7) of the Investment Company Act) and certain similar funds; and (c) entering into certain relationships with such funds.  Although the Issuer is not registered or required to be registered as an "investment company" under the Investment Company Act pursuant to Section 2(b) thereof and, as such, is not a covered fund, the general effects of the final rules implementing the Volcker Rule remain uncertain.  Any prospective investor in the Notes, including a U.S. or foreign bank or an affiliate or subsidiary thereof, should consult its own legal advisors regarding such matters and other effects of the Volcker Rule and regulatory implementation.

At this time, it is also difficult to predict the extent to which the Dodd-Frank Act or the resulting regulations will impact the Issuer's business and operations and the business and operations of a Servicer, the Backup Servicer and their affiliates.  As rules and regulations are promulgated by the federal agencies responsible for implementing and enforcing the provisions of the Dodd-Frank Act, the Issuer, each Servicer, and the Backup Servicer will need to apply adequate resources to ensure that they are in compliance with all applicable provisions.  Compliance with these new laws and regulations may result in additional costs and may otherwise adversely impact the Issuer's, another Servicer's and the Backup Servicer's results of operations, financial condition, or liquidity.

**Changes to the Higher Education Act, including the enactment of the Health Care and Education Reconciliation Act of 2010, changes to other applicable law and other Congressional action may affect investors' Notes and the Financed Eligible Loans**

On March 30, 2010, the Health Care and Education Reconciliation Act of 2010 ("HCERA" or the "Reconciliation Act") was enacted into law.  Effective July 1, 2010, the Reconciliation Act eliminated the origination of new FFELP Loans.  All loans made under the Higher Education Act beginning on July 1, 2010 have been, and in the future will be, originated under the Direct Loan Program.  The terms of FFELP Loans originated prior to July 1, 2010 are not materially affected by the Reconciliation Act and continue to be subject to the terms of the FFEL Program.

The curtailment of the FFEL Program could have a material adverse impact on the Issuer, the Servicer, the Backup Servicer and the Guaranty Agencies.  For example, the Servicers (including the Issuer and the Backup Servicer) may experience increased costs due to reduced economies of scale to the extent the volume of loans serviced by such Servicers is reduced.  Those cost increases could affect the ability of the Servicers to satisfy their obligations to service the Financed Eligible Loans held in the Trust Estate securing the Notes.  FFELP Loan volume reductions could further reduce revenues received by the Guaranty Agencies available to pay claims on defaulted FFELP Loans.  In addition, the level of competition currently in existence in the secondary market for FFELP Loans could be reduced, resulting in fewer potential buyers of FFELP Loans and lower prices available in the secondary market for those FFELP Loans.

In addition to the passage of the Reconciliation Act, Title IV of the Higher Education Act and the regulations promulgated by the Department of Education thereunder have been the subject of frequent and extensive amendments and reauthorizations.  See "APPENDIX A—DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM" hereto for more information on the Higher Education Act and various amendments thereto.  There can be no assurance that the Higher Education Act or other relevant federal or state laws, rules and regulations may not be further amended or modified in the future in a manner that could adversely affect the Issuer or its student loan programs, the Trust Estate created under the Indenture, the Financed Eligible Loans, or the financial condition of or ability of the Issuer, the Servicer, the Backup Servicer or the Guaranty Agencies to comply with their obligations under the various transaction documents or the Notes.  Future changes could also have a material adverse effect on the revenues received by the Guaranty Agencies that are available to pay claims on defaulted Financed Eligible Loans in a timely manner.  In addition, if legislation were to be passed in the future requiring the sale of the Financed Eligible Loans held in the Trust Estate to the federal government, proceeds from such sale would be deposited to the Collection Fund and used to pay the Notes in advance of their current expected Maturity Date.  No assurance can be given as to the amount that would be received from such sale or whether such amount would be sufficient to pay all principal and accrued interest due on the Notes, as there

36

is no way to know what purchase price would be paid by the federal government for the Financed Eligible Loans.

Funds for payment of Interest Benefit Payments, Special Allowance Payments and other payments under the FFEL Program are subject to annual budgetary appropriations by Congress.  Federal budget legislation has contained provisions that restricted payments made under the FFEL Program to achieve reductions in federal spending.  For example, federal budget provisions that became effective on July 1, 2014 reduced payments by the Department of Education to Guaranty Agencies for assisting student loan borrowers with the rehabilitation of defaulted loans under the FFEL Program.  As a result, the revenue earned by the Issuer from rehabilitating defaulted FFEL Program loans (collection services) on behalf of Guaranty Agencies decreased, and the Issuer anticipates such revenue will continue to be negatively impacted by these federal budget provisions.  Future federal budget legislation may adversely affect expenditures by the Department of Education, and the financial condition of the Issuer, the Servicer, the Backup Servicer and Guaranty Agencies.

Bills have been proposed which would forgive all or part of existing federal student loans.  If such bills were to pass, if FFELP Loans are included in such loan forgiveness, or if such legislation creates an incentive for FFELP Loan borrowers to consolidate their loans into Federal Direct Consolidation loans, repayment rates on the Eligible Loans could increase, thereby increasing monthly distributions of principal on the Notes.

The Issuer cannot predict whether any other changes will be made to the Higher Education Act or other relevant federal laws, and rules and regulations promulgated by the Secretary of Education in future legislation, or the effect of such legislation or executive orders on the Issuer, the Servicer, the Backup Servicer, the Guaranty Agencies, the Financed Eligible Loans or the Issuer's loan programs.

### Competition from the Federal Direct Student Loan Program

The Direct Loan Program was established under the Student Loan Reform Act of 1993.  Under the Direct Loan Program, approved institutions of higher education, or alternative loan originators approved by the Department of Education, make loans to students or parents without application to or funding from outside lenders or guaranty agencies.  The Department of Education provides the funds for such loans, and the program provides for a variety of flexible repayment plans, including consolidations under the Direct Loan Program of existing FFEL Program student loans.  Such consolidation permits borrowers to prepay existing student loans and consolidate them into a Federal Direct Consolidation Loan under the Direct Loan Program.  As a result of the enactment of the Reconciliation Act, no FFELP Loans have been, or in the future will be, originated after June 30, 2010, and all loans made under the Higher Education Act will be originated under the Direct Loan Program.  The Direct Loan Program may result in prepayments of Financed Eligible Loans if such Financed Eligible Loans are consolidated under the Direct Loan Program.

Because of the limited recourse nature of the Trust Estate created under the Indenture for the Notes, competition from the Direct Loan Program should not impact the payment of the Notes unless it causes (a) erosion in the finances of the Issuer to such an extent that it cannot honor any administration or similar obligations under the Indenture; or (b) prepayments of Financed Eligible Loans if such Financed Eligible Loans are consolidated under the Direct Loan Program.  See the caption "—The rate of payments on the Financed Eligible Loans may affect the maturity and yield of the Notes" above.

**Other litigation risks**

The Issuer may be subject to various claims, lawsuits, tax audits and proceedings that arise from time to time.  See the caption "LEGAL PROCEEDINGS" herein.

**The Issuer may be subject to student loan
industry investigations**

A number of state attorneys general and the U.S. Senate Committee on Health, Education, Labor and Pensions have conducted broad inquiries or investigations of the activities of various participants in the student loan industry, including, but not limited to, activities that may involve perceived conflicts of interest.

The Issuer has made loans to students from across the country.  The Issuer has been periodically contacted by various Attorneys General over the years, but none of those Attorneys General have ever followed-up on those initial contacts and it has been nearly a decade since the last contact.  Since such processes are typically confidential, the Issuer will not necessarily be able to advise of any such contacts or its involvement in such matters.  The activity and number of investigations nationally appears to have greatly diminished.

The Department of Education has adopted regulations that impact the practices which are the subject of the foregoing investigations.  See the caption "—Changes to the Higher Education Act, including the enactment of the Health Care and Education Reconciliation Act of 2010, changes to other applicable law and other Congressional action may affect investors' Notes and the Financed Eligible Loans" above.

There is no assurance that the Issuer will not be subject to inquiries or investigations.  While the ultimate outcome of any inquiry or investigation cannot be predicted, it is possible that these inquiries or investigations and regulatory developments may materially affect the Issuer's ability to perform its obligations under the Indenture or the Issuer's ability to pay principal of and interest on the Notes from assets in the Trust Estate.

**Military service obligations, natural disasters
and pandemics may cause a delay in payments
on the Financed Eligible Loans**

Military service obligations, natural disasters and pandemics may result in delayed payments from borrowers.  Congress has enacted, and may enact in the future, statutes and other guidelines that provide relief to borrowers who enter active military service, to borrowers in reserve status who are called to active duty after the origination of their Eligible Loan, and to individuals who live in a disaster area or suffer a direct economic hardship as a result of a national emergency.

The number and aggregate principal balance of the Financed Eligible Loans that may be affected by the application of these statutes and other guidelines will not be known at the time the Notes are issued. If a substantial number of borrowers of the Financed Eligible Loans become eligible for the relief under these statutes and other guidelines, or any actions Congress may take to respond to natural disasters or pandemics, there could be an adverse effect on the total collections on those Financed Eligible Loans and the Issuer's ability to provide for payments of principal and interest on the Notes.

The Servicemembers Civil Relief Act limits the ability of a lender under the FFELP to take legal action against a borrower during the borrower's period of active duty and, in some cases, during an additional three-month period thereafter, and may limit the interest rate on a Financed Eligible Loan to 6%

per annum while the borrower is in military service if the loan was incurred before the borrower's entry into military service.

The Issuer does not know how many Financed Eligible Loans have been or may be affected by the application of the Servicemembers Civil Relief Act.  Payments on Financed Eligible Loans may be delayed as a result of these requirements, which may reduce the funds available to the Issuer to pay principal and interest on the Notes.

**Higher Education Relief Opportunities for Students Act of 2003 may result in delayed payments from borrowers**

The Higher Education Relief Opportunities for Students Act of 2003 ("HEROS Act of 2003"), signed into law on August 18, 2003, authorizes the Secretary of Education to waive or modify any statutory or regulatory provisions applicable to student financial aid programs under Title IV of the Higher Education Act as the Secretary deems necessary for the benefit of "affected individuals" who:

(a)      are serving on active military duty or performing qualifying national guard duty during a war or other military operation or national emergency;

(b)      reside or are employed in an area that is declared by any federal, state or local office to be a disaster area in connection with a national emergency; or

(c)      suffered direct economic hardship as a direct result of war or other military operation or national emergency, as determined by the Secretary.

The Secretary is authorized to waive or modify any provision of the Higher Education Act to ensure that:

(a)      such recipients of student financial assistance are not placed in a worse financial position in relation to that assistance;

(b)      administrative requirements in relation to that assistance are minimized;

(c)      calculations used to determine need for such assistance accurately reflect the financial condition of such individuals;

(d)      provision is made for amended calculations of overpayment; and

(e)      institutions of higher education, eligible lenders, guaranty agencies and other entities participating in such student financial aid programs that are located in, or whose operations are directly affected by, areas that are declared to be disaster areas by any federal, state or local official in connection with a national emergency may be temporarily relieved from requirements that are rendered infeasible or unreasonable.

The number and aggregate principal balance of Financed Eligible Loans that may be affected by the application of the HEROS Act of 2003 is not known at this time.  Accordingly, payments the Issuer receives on Financed Eligible Loans made to a borrower who qualifies for such relief may be subject to certain limitations.  If a substantial number of borrowers become eligible for the relief provided under the HEROS Act of 2003, there could be an adverse effect on the total collections on the Financed Eligible Loans and the Issuer's ability to pay principal and interest on the Notes.

**Consumer protection laws may affect enforceability of Financed Eligible Loans**

Numerous federal and state consumer protection laws, including various state usury laws and related regulations, impose substantial requirements upon lenders and servicers involved in consumer finance.  Some states impose finance charge ceilings and other restrictions on certain consumer transactions and require contract disclosures in addition to those required under federal law.  These requirements impose specific statutory liability that could affect an assignee's ability to enforce consumer finance contracts such as the Financed Eligible Loans.  In addition, the remedies available to the Trustee or the Noteholders upon an Event of Default under the Indenture may not be readily available or may be limited by applicable state and federal laws.

**Noteholders will rely on the Servicers for the servicing of the Financed Eligible Loans**

Noteholders will be relying on the Issuer to service all of the Financed Eligible Loans.  The Issuer is dependent on PHEAA to provide certain equipment, software, training and related support with respect to the Financed Eligible Loans serviced by the Issuer, and PHEAA will also be engaged to act as the Backup Servicer upon the occurrence of certain events described under the caption "SERVICING OF THE FINANCED ELIGIBLE LOANS—Backup Servicer and Backup Servicing Agreement" herein.  The cash flow projections relied upon by the Issuer in structuring the issuance of the Notes were based upon assumptions with respect to servicing costs which the Issuer based on its costs to service the Financed Eligible Loans and PHEAA's costs to act as Backup Servicer.  No assurance can be made that the costs to the Issuer and the Backup Servicer for servicing the Financed Eligible Loans will not increase, or that the Issuer would be successful in entering into servicing agreements with other Servicers that would be acceptable to the Rating Agencies at the assumed level of servicing cost.  Although the Issuer and the Backup Servicer are obligated to service the Financed Eligible Loans in accordance with the Higher Education Act and the Indenture, the timing of payments to be actually received with respect to the Financed Eligible Loans will be dependent upon the ability of the Issuer or any future Servicer to adequately service the Financed Eligible Loans.  In addition, the Noteholders will be relying on the Issuer's and any future Servicer's compliance with applicable federal and state laws and regulations.

**Bankruptcy or insolvency of PHEAA could result in payment delays to Noteholders**

The Financed Eligible Loans are on PHEAA's servicing system, which the Issuer uses pursuant to PHEAA's Remote Servicing line of business.  PHEAA provides the Issuer with certain equipment, software, training and related support necessary for the Issuer to service the Financed Eligible Loans.  PHEAA also acts as the Backup Servicer for the Issuer.  In the event of PHEAA's insolvency or bankruptcy, the Issuer may lose its ability to access the servicing system, software and support provided by PHEAA and would have to develop or contract with a new provider of a computer servicing system and engage a substitute Backup Servicer, and delays in collections in respect of the Financed Eligible Loans may occur.  Any delay in the collections of Financed Eligible Loans may delay payments to Noteholders.

**A default by a Servicer could adversely affect the Notes**

If the Issuer defaults on its obligations to service the Financed Eligible Loans serviced by it, the Backup Servicer would become the successor Servicer for those Financed Eligible Loans.  In the event of a default by any third-party Servicer or the removal of any Servicer, including the Issuer, and the appointment of a successor Servicer, there may be additional costs associated with the transfer of servicing

to the successor Servicer, including, but not limited to, an increase in the Servicing Fees the successor Servicer charges.  In addition, the Issuer cannot predict the ability of the successor Servicer to perform the obligations and duties under any servicing agreement.  If any such successor third-party Servicer defaults on its obligations to service the loans serviced by it, the Issuer may remove the third-party successor Servicer without the consent of any other party.

**If a Servicer or a successor Servicer fails to comply with the Department of Education's or State License Regulator's regulations, payments on the Notes could be adversely affected**

The Department of Education regulates each servicer of federal student loans.  Numerous states have implemented legislation requiring the licensing and regulation of student loan servicers.  Under these regulations, a servicer is jointly and severally liable with its client lenders for liabilities to the Department of Education arising from its violation of applicable requirements.  Liabilities are also imposed for violations of state servicer licensing laws.  In addition, if any lender or servicer fails to meet standards of financial responsibility or administrative capability included in the federal regulations, or violates other requirements, the Department of Education may impose penalties or fines and limit, suspend, or terminate the lender's ability to participate in or a servicer's eligibility to contract to service loans originated under the FFEL Program.

If a Servicer (including the Issuer as lender or as Servicer) were so fined, or its FFEL Program eligibility were limited, suspended or terminated, payment on the Notes could be adversely affected.  If any successor Servicer were so fined or held liable, or its FFEL Program eligibility were limited, suspended, or terminated, its ability to properly service the Financed Eligible Loans and to satisfy any remedies owed by it to the Issuer under a servicing agreement relating to Financed Eligible Loans could be adversely affected. In addition, if the Department of Education terminates a Servicer's eligibility, a servicing transfer will take place and there may be delays in collections and temporary disruptions in servicing.  Any servicing transfer may temporarily adversely affect payments to the Noteholders.

**Servicing Fees may increase over time in relation to the outstanding principal balance of the Financed Eligible Loans**

The amount of monthly Servicing Fees payable out of the Trust Estate is equal to the greater of the percentage specified under "FEES AND EXPENSES" of the Pool Balance as of the last day of the preceding month and a Servicing Fee Floor equal to a monthly per borrower amount specified under "FEES AND EXPENSES" as adjusted for inflation.  To the extent that the Servicing Fees are calculated based on the per borrower Servicing Fee Floor rather than as a percentage of the Pool Balance, the amount of Servicing Fees (stated as a percentage of the principal balance of the Financed Eligible Loans) would increase over time.  If the optional release of the Financed Eligible Loans from the lien of the Indenture is not exercised when the Pool Balance is 10% or less of the Initial Pool Balance as described under "DESCRIPTION OF THE NOTES—Optional Release," the likelihood that the Servicing Fees would be calculated based on the Servicing Fee Floor is expected to increase, affecting the timing of payment of the Notes.  It is not expected that such increase in Servicing Fees would have an adverse effect on the ultimate payment of the Notes.

**Failure to comply with loan origination and servicing procedures for Financed Eligible Loans may result in loss of Guarantee or other benefits**

The Issuer and other lenders must meet various requirements in order to maintain the federal guarantee on the Financed Eligible Loans.  These requirements establish servicing requirements and procedural guidelines and specify school and borrower eligibility criteria.

A Guaranty Agency (including the State Guaranty Agency and any other Guaranty Agency guaranteeing the Financed Eligible Loans) may reject an Eligible Loan for claim payment due to a violation of the FFEL Program due diligence collection and servicing requirements.  In addition, a Guaranty Agency may reject claims under other circumstances, including, for example, if a claim is not timely filed or adequate documentation is not maintained.  Once a Financed Eligible Loan ceases to be guaranteed, it is ineligible for federal interest benefit and Special Allowance Payments.  If a Financed Eligible Loan is rejected for claim payment by a Guaranty Agency, the Issuer continues to pursue the borrower for payment or institutes a process to reinstate the guarantee.  Guaranty agencies may reject claims as to portions of interest for certain violations of the due diligence collection and servicing requirements even though the remainder of a claim may be paid.

Examples of errors that cause claim rejections include isolated missed collection calls, or failures to send collection letters as and when required.  Violations of due diligence collection and servicing requirements can result from human error.  Violations can also result from computer processing system errors, or from problems arising in connection with the implementation of a new computer platform or the conversion of additional loans to a servicing system.

**Limitation on enforceability of remedies against the Issuer could result in payment delays or losses**

The remedies available to the Trustee or the Noteholders upon an Event of Default under the Indenture are in many respects dependent upon regulatory and judicial actions which are often subject to discretion and delay.  Under existing constitutional and statutory law and judicial decisions, including specifically Title 11 of the United States Code, the remedies specified by the Indenture and such other documents may not be readily available or may be limited.  The various legal opinions to be delivered concurrently with the delivery of the Notes and the Indenture will be qualified as to the enforceability of the various legal instruments by limitations imposed by bankruptcy, reorganization, insolvency or other similar laws affecting the rights of creditors generally.

In addition, the Higher Education Act provides that a security interest in FFELP Loans may be perfected by the filing of notice of such security interest in the manner in which security interests in accounts may be perfected by applicable state law, which, under the Missouri Uniform Commercial Code, is accomplished by filing a financing statement with the Missouri Secretary of State.  Nonetheless, if through fraud, inadvertence or otherwise a third-party lender or purchaser acting in good faith were to obtain possession of any of the promissory notes evidencing the Financed Eligible Loans (or, in the case of a master promissory note, a copy thereof), any security interest of the Trustee in the related Financed Eligible Loans could be preempted.  The Issuer currently maintains control and shall continue to maintain control of all Financed Eligible Loans that are evidenced by an electronically signed note in compliance with applicable federal and state laws. Custody of all other promissory notes relating to Financed Eligible Loans will be maintained by the Issuer, or a custodial agent on its behalf, or by the Servicer (if other than the Issuer).

**Lewis and Clark Discovery Initiative**

The Issuer has been and may be significantly financially impacted by a Missouri law which established the Lewis and Clark Discovery Initiative (the "Initiative") and became effective August 28, 2007. See "THE HIGHER EDUCATION LOAN AUTHORITY OF THE STATE OF MISSOURI—Lewis and Clark Discovery Initiative; Scholarship Funding" herein for a more complete discussion of such law and its impact on the Issuer.

Due to the limited recourse nature of the Notes, the Initiative should not impact the payment of the Notes unless it causes erosion in the finances of the Issuer to such an extent that it cannot honor any repurchase, administration or similar obligations under the Indenture.

**The obligations of each of the Trustee, the Servicer and the Backup Servicer are limited**

The duties, actions and obligations of each of the Trustee, the Servicer and the Backup Servicer are limited to such duties, actions and obligations specifically set forth in the transaction documents and no implied covenants, duties or obligations are read into such documents. The remedies available against such transaction parties are similarly limited by the terms of the transaction documents. None of the foregoing transaction parties has any duty or obligation to take any additional action unless specifically directed to take such action and satisfactorily indemnified therefor. Additionally, certain of the duties and obligations of such parties are dependent upon receipt of information from other parties. Any failure of one party to timely and accurately deliver any information, or perform its duties and obligations, could prevent another party from being able to fulfill its duties and obligations.

**Certain factors relating to security**

The Issuer has covenanted in the Indenture that the assets constituting the trust estate pledged by the Issuer under the Indenture are and will be owned by the Issuer free and clear of any pledge, lien, charge or encumbrance thereon or with respect thereto prior to, of equal rank with or subordinate to the respective pledges created by the Indenture, and that all action on the part of the Issuer to that end has been duly and validly taken. The Issuer acquired the Financed Eligible Loans by purchasing such loans from other lenders. When purchasing student loans, the Issuer obtained warranties from the sellers as to certain matters, including that the loans were originated in accordance with the Higher Education Act and that the loans will be transferred to the Issuer free of any liens and that all filings (including UCC filings) necessary in any jurisdiction to give the Trustee, on behalf of the Issuer, ownership of the Financed Eligible Loans have been made. Notwithstanding the foregoing, under applicable law, security interests in such loans may exist and may not be ascertained by the Issuer. Therefore, no absolute assurance can be given that liens other than the lien of the Indenture do not and will not exist.

**The use of master promissory notes for the Financed Eligible Loans may compromise the Trustee's security interest**

Student loans made under the FFEL Program may be evidenced by a master promissory note. Once a borrower executes a master promissory note with a lender, additional FFELP Loans made by the lender to such borrower are evidenced by a confirmation sent to the borrower, and all Eligible Loans are governed by the single master promissory note.

A FFELP Loan evidenced by a master promissory note may be sold independently of the other Eligible Loans governed by the master promissory note. If the Issuer originated a Financed Eligible Loan

43

governed by a master promissory note and does not retain possession of the master promissory note, other parties could claim an interest in the Financed Eligible Loan.  This could occur if the holder of the master promissory note were to take an action inconsistent with the Issuer's rights to a Financed Eligible Loan, such as delivery of a duplicate copy of the master promissory note to a third-party for value.  Although such action would not defeat the Issuer's rights to the Financed Eligible Loan or impair the security interest held by the Trustee for the investors' benefit, it could delay receipt of principal and interest payments on the Financed Eligible Loan.

**Investors may incur losses or delays in payment on their Notes if borrowers do not make timely payments or default on their Financed Eligible Loans**

For a variety of economic, social and other reasons all the payments that are actually due on Financed Eligible Loans may not be made or may not be made in a timely fashion.  Borrowers' failure to make timely payments of the principal and interest due on the Financed Eligible Loans will affect the revenues of the Trust Estate created under the Indenture, which may reduce the amounts available to pay principal and interest due on the Notes.

The cash flow from the Financed Eligible Loans, and the Issuer's ability to make payments due on the Notes will be reduced to the extent interest is not currently payable on the Financed Eligible Loans.  The borrowers on most Eligible Loans are not required to make payments during the period in which they are in school and for certain authorized periods thereafter, as described in the Higher Education Act.  The Department of Education will make all interest payments while payments are deferred under the Higher Education Act on certain subsidized Eligible Loans that qualify for interest benefit payments.  For all other Eligible Loans, interest generally will be capitalized and added to the principal balance of the Eligible Loans.  The Financed Eligible Loans will consist of Eligible Loans for which payments are deferred as well as Eligible Loans for which the borrower is currently required to make payments of principal and interest.  The proportions of the Financed Eligible Loans for which payments are deferred and currently in repayment will vary during the period that the Notes are outstanding.

In general, a Guaranty Agency (including the State Guaranty Agency) reinsured by the Department of Education will guarantee 98% of each Financed Eligible Loan with a first disbursement after October 1, 1993 and before July 1, 2006, and 97% of each Financed Eligible Loan with a first disbursement on or after July 1, 2006.  All but an insignificant component of the Financed Eligible Loans had their first disbursements on or after October 1, 1993.  As a result, if a borrower of a Financed Eligible Loan defaults, the Issuer will experience a loss of approximately 2% or 3% of the outstanding principal and accrued interest on each of the defaulted loans depending upon when it was first disbursed.  The Issuer does not have any right to pursue the borrower for the remaining portion that is not subject to the guarantee.  If defaults occur on the Financed Eligible Loans and the credit enhancement described herein is not sufficient, investors may suffer a delay in payment or a loss on their investment.

As of the Statistical Cut-Off Date, $9,496,737 of the principal amount of the Financed Eligible Loans (representing approximately 4.71% of the Financed Eligible Loans by principal amount) are "rehabilitation loans," which are Eligible Loans that have previously defaulted, but for which the borrower thereunder has made a specified number of on-time payments as described in "APPENDIX A— DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM—Insurance and Guarantees—*Rehabilitation of Defaulted Loans*" hereto.  Although rehabilitation loans benefit from the same guarantees as other Eligible Loans, rehabilitation loans have generally experienced re-default rates that are higher than default rates for Eligible Loans that have not previously defaulted.

**Risk of geographic concentration of the Financed Eligible Loans**

The concentration of the Financed Eligible Loans in specific geographic areas may increase the risk of losses on the Financed Eligible Loans. Economic conditions in the states where borrowers reside may affect the delinquency, loan loss and recovery experience with respect to the Financed Eligible Loans. As of the Statistical Cut-Off Date, approximately 44.9%, 9.7% and 5.3% of the Financed Eligible Loans by principal balance were to borrowers with current billing addresses in the States of Missouri, Mississippi and Arkansas, respectively. As of the Statistical Cut-Off Date, no other State accounts for more than 5.0% of the Financed Eligible Loans by principal balance. Economic conditions in any state or region may decline over time and from time to time. Because of the concentrations of the borrowers in the above referenced states any adverse economic conditions, including the ongoing COVID-19 Pandemic, adversely and disproportionately affecting those states may have a greater effect on the performance of the Notes than if these concentrations did not exist.

**The Trustee may be forced to sell the Financed Eligible Loans at a loss after an event of default**

Generally, if an Event of Default occurs under the Indenture, the Trustee may sell, and, at the direction of Noteholders (in varying percentages and priority class as specified in the Indenture), will sell the Financed Eligible Loans. However, the Trustee may not find a purchaser for the Financed Eligible Loans, or the market value of the Financed Eligible Loans plus other assets in the Trust Estate created under the Indenture might not equal the principal amount of outstanding Notes plus accrued interest. Competition currently existing in the secondary market for student loans made under the FFEL Program also could be reduced, resulting in fewer potential buyers of the Financed Eligible Loans and lower prices available in the secondary market for the Financed Eligible Loans. Investors may suffer a loss if the Trustee is unable to find purchasers willing to pay prices for the Financed Eligible Loans sufficient to pay the principal amount of the Notes plus accrued interest.

**The Notes may be repaid early due to an optional prepayment, which may affect their yield, and investors will bear reinvestment risk**

The Notes may be repaid before investors expect them to be in the event of an optional release when the then outstanding Pool Balance is 10% or less of the initial Pool Balance of the Financed Eligible Loans, as described under the caption "DESCRIPTION OF THE NOTES—Optional Prepayment of Notes When the Then Outstanding Pool Balance is 10% or Less of Initial Pool Balance" herein. Such event would result in the early retirement of the Notes outstanding on that date. If this happens, the yield on the Notes may be affected and investors will bear the risk that they cannot reinvest the money they receive in comparable investments at an equivalent yield.

**The characteristics of the portfolio of Financed Eligible Loans may change**

The characteristics of the pool of Eligible Loans expected to be pledged to the Trustee under the Indenture are described herein as of the Statistical Cut-Off Date. The aggregate characteristics of the entire pool of Eligible Loans, including the composition of the Eligible Loans and the related borrowers, the related Guaranty Agencies, the distribution by student loan type, the distribution by interest rate, the distribution by principal balance and the distribution by remaining term to scheduled maturity, may vary from the information presented herein, since the information presented herein is as of the Statistical Cut-Off

Date, and the date that the Financed Eligible Loans will be pledged to the Trustee under the Indenture will occur after that date.

In the event that the principal amount of Eligible Loans required to provide collateral for the Notes varies from the amounts anticipated herein, whether by reason of a change in the collateral requirement necessary to obtain the rating on the Notes from each Rating Agency that will rate the Notes as indicated under "SUMMARY OF TERMS—Rating of the Notes" herein, the pricing of the interest rate on the Notes, the principal amount of Notes to be offered, the rate of amortization or prepayment on the portfolio of Eligible Loans from the Statistical Cut-Off Date to the Date of Issuance varying from the rates that were anticipated, or otherwise, the portfolio of Eligible Loans to be pledged to the Trustee under the Indenture may consist of a subset of the pool of Eligible Loans described herein or may include additional Eligible Loans not described under "CHARACTERISTICS OF THE FINANCED ELIGIBLE LOANS" herein.

The Issuer believes that the information set forth in this Offering Memorandum with respect to the pool of Eligible Loans as of the Statistical Cut-Off Date is representative of the characteristics of the pool of Eligible Loans as they will exist on the Date of Issuance for the Notes. However, investors should consider potential variances when making their investment decision concerning the Notes. See the caption "CHARACTERISTICS OF THE FINANCED ELIGIBLE LOANS" herein.

**Payment offsets by a Guaranty Agency or the Department of Education could prevent the Issuer from paying Noteholders the full amount of the principal and interest due on the Notes**

The Issuer uses the same Department of Education lender identification number for the Financed Eligible Loans included in the Trust Estate established under the Indenture as it uses for certain other Eligible Loans it holds. These include the Eligible Loans held under the Warehouse Agreement released upon issuance of the Notes and the resolutions and indentures securing other notes issued by the Issuer. See the caption "THE HIGHER EDUCATION LOAN AUTHORITY OF THE STATE OF MISSOURI— Previous Financings of the Issuer" herein. As a consequence, the billings submitted to the Department of Education and the claims submitted to the applicable Guaranty Agency (including the State Guaranty Agency) for the Financed Eligible Loans will be consolidated with the billings and claims for payments for Eligible Loans that are not included in the Trust Estate but using the same lender identification number. Payments on those billings by the Department of Education as well as claim payments by any applicable Guaranty Agency will be made to the Issuer in lump sum form. Those payments must be allocated by the Issuer to the Trust Estate and to the other trust estates or indentures of the Issuer or other Eligible Loans held by the Issuer that use the same lender identification number.

If the Department of Education or a Guaranty Agency determines that the Issuer owes any amount on any Eligible Loan held by it under a lender identification number, the Department of Education or a Guaranty Agency may seek to collect such amount by offsetting it against any payments due to the Issuer under that lender identification number. If the amount of any such offset exceeds the amount owed to the Trust Estate or other holder of such Eligible Loan, the offset could reduce the amounts otherwise available for payment in respect of Eligible Loans in the other trust estates, indentures and bond resolutions, including the Financed Eligible Loans pledged to secure the Notes. Any offsetting or shortfall of payments due to the Issuer could adversely affect the amount of funds available to the Trust Estate created under the Indenture and the Issuer's ability to pay principal and interest on the Notes.

**The Financed Eligible Loans are unsecured and the ability of the applicable Guaranty Agency to honor its Guarantee may become impaired**

The Higher Education Act requires that all FFELP Loans be unsecured.  As a result, the only security for payment of the Financed Eligible Loans are the guarantees provided by the applicable Guaranty Agency.

A deterioration in the financial status of an applicable Guaranty Agency and its ability to honor guarantee claims on defaulted Financed Eligible Loans could delay or impair that Guaranty Agency's ability to make claims payments to the Trustee.  The financial condition of a Guaranty Agency can be adversely affected if it submits a sufficiently large number of reimbursement claims to the Department of Education, which results in a reduction of the amount of reimbursement that the Department of Education is obligated to pay a Guaranty Agency.  The Department of Education may also require a Guaranty Agency to return its reserve funds to the Department of Education upon a finding that the reserves are unnecessary for a Guaranty Agency to pay its program fees or to serve the best interests of the Federal Family Education Loan Program.  The inability of a Guaranty Agency to meet its guarantee obligations could reduce the amount of money available to pay principal and interest to the owners of the Notes or delay those payments past their due date.

If the Department of Education has determined that the applicable Guaranty Agency is unable to meet its guarantee obligations, the Eligible Loan holder may submit claims directly to the Department of Education and the Department of Education is required to pay the full guarantee claim amount due with respect to such claims.  However, the Department of Education's obligation to pay guarantee claims directly in this fashion is contingent upon the Department of Education making the determination that a Guaranty Agency is unable to meet its guarantee obligations.  The Department of Education may not ever make this determination with respect to a Guaranty Agency and, even if the Department of Education does make this determination, payment of the guarantee claims may not be made in a timely manner.  See the caption "GUARANTY AGENCIES" herein and "APPENDIX A—DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM—Insurance and Guarantees" hereto.

**Commingling of payments on Financed Eligible Loans could prevent the Issuer from paying the full amount of the principal and interest due on the Notes**

Payments received on the Financed Eligible Loans generally are deposited into an account in the name of the Issuer each Business Day.  Payments received on the Financed Eligible Loans may not always be segregated from payments the Issuer receives on other Eligible Loans it owns or services, and payments received on the Financed Eligible Loans that are part of the Trust Estate created under the Indenture may not be segregated from payments received on other Eligible Loans that are not part of the Trust Estate created under the Indenture.  Such amounts that relate to the Financed Eligible Loans once identified by the Issuer as such are transferred to the Trustee for deposit into the Collection Fund within an average of two Business Days of receipt.  If the Issuer fails to transfer such funds to the Trustee, Noteholders may suffer a loss.

**Incentive or borrower benefit programs may
affect the Notes**

Substantially all of the Financed Eligible Loans are eligible to receive an interest rate reduction for enrolling in automatic bank draft payments.  Certain of the Financed Eligible Loans are subject to other borrower benefit programs, which may vary.  Any incentive program that effectively reduces borrower payments or principal balances on Financed Eligible Loans may result in the principal amount of Financed Eligible Loans amortizing faster than anticipated.  The Issuer may discontinue, increase or modify such benefits at any time, but only subject to the provisions of the Indenture.  The Issuer cannot accurately predict the number of borrowers that will utilize the borrower benefits provided under these programs.  The greater the number of borrowers that utilize such benefits with respect to Financed Eligible Loans, the lower the total loan receipts on such Financed Eligible Loans.  Although such borrower benefits may decrease the payments to be received from the Financed Eligible Loans, the Issuer does not expect these borrower benefits to impair its ability to make payments of principal and interest on the Notes when due.  See the caption "CHARACTERISTICS OF THE FINANCED ELIGIBLE LOANS—Borrower Benefits" herein.

**The Notes are expected to be issued only in
book-entry form**

The Notes are expected to be initially represented by certificates registered in the name of Cede & Co., the nominee for DTC, and will not be registered in any investor's name or the name of any investor's nominee.  Unless and until definitive securities are issued, holders of the Notes will not be recognized by the Trustee as Noteholders as that term is used in the Indenture.  Until definitive securities are issued, holders of the Notes will only be able to exercise the rights of Noteholders indirectly through DTC and its participating organizations.  See the caption "BOOK-ENTRY REGISTRATION" herein.

**Structuring tables are based upon
assumptions and models**

The decrement tables appearing in Appendix B hereto have been prepared on the basis of the modeling assumptions set forth in such Appendix B.  The model used in this Offering Memorandum for prepayments does not purport to be an historical description of prepayment experience or a prediction of the anticipated rate of prepayment of any pool of loans, including the Financed Eligible Loans in the pool.  It is highly unlikely that the Financed Eligible Loans will prepay at the rates specified.  The prepayment assumptions are for illustrative purposes only.  For these reasons, the actual weighted average lives of the Notes may differ significantly from the weighted average lives shown in the decrement tables.

## HIGHER EDUCATION LOAN AUTHORITY OF THE STATE OF MISSOURI

**General**

The Issuer was established in 1981 pursuant to the Missouri Higher Education Loan Authority Act, Title XI, Chapter 173, Sections 173.350 to 173.445 of the Missouri Revised Statues, inclusive, as amended (the "Authorizing Act") for the purpose of assuring that all eligible post-secondary education students have access to guaranteed student loans.  The Authorizing Act has been amended over the years to provide the Issuer with generally expanded powers, including the power to finance, acquire and service student loans including, but not limited to, those guaranteed or insured pursuant to the Higher Education Act, and in certain other respects.

The headquarters of the Issuer is 633 Spirit Drive, Chesterfield, Missouri 63005-1243 (at which approximately 272 employees are located).  The Issuer also has facilities in Columbia, Missouri (at which

48

approximately 72 employees are located) and Washington, D.C. (at which approximately 4 employees are located).  The telephone number of the Issuer is (636) 733-3700.  The Issuer's website address is http://www.mohela.com, where its financial statements and additional information can be found in the "About Us" section.  The Issuer's website is not incorporated into and shall not be deemed to be a part of this Offering Memorandum.

The Issuer provides full-service loan servicing for private student loans and FFELP Loans owned by the Issuer and by third parties.  The Issuer also services Direct Loans for the Department of Education, having been awarded a servicing contract as a not-for-profit servicer (an "NFP Servicer") in September 2011.  As of June 30, 2021, MOHELA was servicing $1.1 billion in FFELP loans representing 59,181 accounts, $18.6 billion in third-party lender owned private loans representing 320,566 accounts, $132.8 million in MOHELA-owned private loans representing 6,202 accounts and $59.1 billion in Direct Loans representing 2,726,179 accounts.

As described herein, the Issuer has significant private loan experience, including the third-party lender-owned private loans referred to above.  It also originated and services loans for its own private loan program which it began in 1995.  The Issuer originated and serviced over $370 million in private loans for over 30,000 borrowers before ending the program in 2008.  Through an affiliate and since 2013, the Issuer also services the Missouri Family Education Loan Program ("MOFELP"), an interest-free loan program for Missouri students meeting certain financial need and academic achievement standards.  As of June 30, 2021, MOFELP had approximately $23.5 million outstanding with 4,465 borrowers in repayment.

The Issuer licenses COMPASS, the servicing system used by PHEAA.

The Issuer's present contract to service Federal Direct Loans runs to March 31, 2022.  However, the Issuer was one of five bidders awarded a contract on June 24, 2020 by the Department of Education pursuant to its Business Process Operations Solicitation (the "BPO Contract") to service all Federal Direct Loans.  The Department of Education procedures for the BPO Contract may not be operational for some time.  In a related development, the Department of Education on October 28, 2020 issued a Solicitation to acquire an "Interim Servicing Solution" ("ISS") impacting the servicing of student loans and the BPO Contract.  The Issuer filed a Pre-Award Protest with the U.S. Government Accountability Office (the "GAO") as to the terms of this ISS Solicitation.  The Department of Education recently advised the GAO that it would be taking corrective action by either amending or cancelling the ISS Solicitation.  In response thereto, the GAO dismissed the Issuer's protest on January 12, 2021.

**Members and Staff**

The Issuer is governed by a board of seven members, five of whom are appointed by the Governor of the State, subject to the advice and consent of the Senate of the State, and two others who are designated by statute: the State Commissioner of Higher Education and a member of the State Coordinating Board for Higher Education. A member continues to serve after the expiration of his or her term until a successor is appointed and qualified or he/she is reappointed. The present members are listed on the next page:

| Name | Term Expires | Occupation/Affiliation |
|---|---|---|
| Mr. Jason C. Ramsey, Chair Columbia, Missouri | October 2017 | Lending Institution Representative Assistant Vice President The Callaway Bank |
| Mr. Robert Ballsrud, Vice Chair St. Louis, Missouri | October 2025 | Public at Large Retired Attorney, Private Practice |
| Mr. Marvin E. Wright, Secretary Columbia, Missouri | October 2019 | Public Higher Education Representative Retired General Counsel, University of Missouri |
| Ms. Tonya K. Grimm, Treasurer Kirksville, Missouri | October 2018 | Private Higher Education Representative Assistant Vice President, Finance A.T. Still University |
| Mr. Peter W. Detweiler Kirksville, Missouri | October 2016 | Lending Institution Representative President and CEO Alliant Bank |
| Mr. Dudley McCarter St. Louis, Missouri | Indefinite | CBHE Designate |
| Ms. Zora Mulligan Jefferson City, Missouri | Indefinite | MDHEWD Designate Commissioner, Missouri Department of Higher Education and Workforce Development |

The following is biographical information on the executive staff of the Issuer.

**Raymond H. Bayer, Jr.** serves as Executive Director, Chief Executive Officer, and Assistant Secretary of the Issuer.  Reporting directly to the Issuer's Board of Directors, he is responsible for all of the Issuer's operations and oversees each of its business units.  Mr. Bayer joined the Issuer in 1985.  Prior to becoming the Executive Director in 2006, he oversaw various business units including Loan Servicing, Loan Origination, and Business Development.  He holds a Bachelor of Science degree in Business Administration from the University of Missouri-St. Louis, a Master of Business Administration degree from Webster University, and a Master of Arts in Finance degree from Webster University.  Mr. Bayer serves as Secretary and Director of First State Bancshares of St. Charles of Missouri.  Additionally, Mr. Bayer serves as the Board Chair of the Missouri Scholarship and Loan Foundation and the Board Chair of Knowledge Finance, both non-profit companies controlled by the Issuer.  Mr. Bayer announced recently that he plans to retire on September 30, 2021 and he will be succeeded by Scott Giles, the Issuer's Deputy Executive Director.

**Scott D. Giles** serves as the Deputy Executive Director and Chief Operating Officer for the Issuer and, as of October 1, 2021, will become the Executive Director and Chief Executive Officer of the Issuer. Mr. Giles previously served as the Director of Finance and the Chief Financial Officer for the Issuer from 2006 to 2018 and as Treasurer for the Issuer from 2005 to 2006. In his prior roles with the Issuer, he was responsible for the Finance, Accounting, Treasury Management, Procurement, Printing and Mail Support Services, Facilities, Contracted Loan Servicing, and Lender Services and Reconciliation areas, as well as the Issuer's capital structure strategy, financing transactions, interest rate risk management, cash management, investing, and insurance. Mr. Giles most recently served as the President and Chief Executive Officer of Trellis Company from 2018 to 2021. Prior to joining the Issuer in 2005, he served as the Director of the Missouri Student Loan Group of the Missouri Department of Higher Education. Mr. Giles is currently the Chairman of the Board of Directors of the National Council of Higher Education Resources and he previously served as a member and Chairman of the Board for Mapping Your Future. He has also served as a commissioned bank examiner with the Federal Reserve Bank of St. Louis and as an assistant bank examiner with the Missouri Division of Finance. Mr. Giles holds a Bachelor of Science degree in Business Administration with an emphasis in Finance from Southeast Missouri State University and Master of Public Administration degree from the University of Missouri-Columbia.

**Ginny Burns** serves as Director of Borrower Experience & Processing. She is responsible for the overall Borrower Experience of the Issuer, including the Customer Advocacy Team, Specialty Servicing, Loan Servicing and Quality Assurance Group. Ms. Burns joined the Issuer in 2013. For the 28 years prior, she served as the Vice President-Manager of the Student Services division of Commerce Bank. Ms. Burns holds a Bachelor of Arts degree in Business Communication and a Master of Arts in Business Management from Lindenwood University, located in St. Charles, Missouri.

**Laura Catlett** serves as the Director of the Contact Center and Digital Customer Care for the Issuer. She is responsible for the Customer Service Operations and Contact Center strategic direction in addition to the customer experience on digital platforms like the website and mobile app. Customer Service units include: Inbound and Outbound call center teams at the Issuer's three locations, Chesterfield and Columbia, Missouri, and Washington D.C., Contact Center Workforce and Dialing Strategy, and Contact Center Operations/Systems Analysis. Ms. Catlett holds a Bachelor of Science in Business Administration from the University of Missouri-St. Louis and a Master of Business Administration from Webster University. Prior to joining the Issuer in June 2013, Ms. Catlett had oversight of Brown Shoe Company contact center operations. Ms. Catlett has over 18 years prior experience in the contact center industry and has served on expert panels.

**Jennifer Farmer** serves as Director of Federal Contracts. She is responsible for initiating, building and maintaining relationships with the Federal government and others related to Education Loan Services. Ms. Farmer is also responsible for oversight of the planning, design, and implementation of new and existing systems, processes and procedures, and borrower and school services associated with Federal Contracts. She has served on NCHELP Operations and Debt Management committees and currently participates in various workgroups associated with Federal Servicing. Ms. Farmer holds a Bachelor of Science degree in Business Administration from Lindenwood University located in Saint Charles, Missouri. Ms. Farmer joined the Issuer in 1995 and has held various senior and executive management roles throughout the organization.

**Marie George** serves as Chief Information Officer of the Issuer. She is responsible for Information Systems strategic direction, IT operations, software development, information security and business continuity management. Prior to joining the Issuer, Ms. George served in critical leadership roles for Mercy between 2007 and 2018, most recently serving as Executive Director IT—ERP, Supply Chain, Revenue. Prior to Mercy, her experience included quality assurance management responsibilities for Express Scripts. She is a graduate of Saint Louis University with a degree in Aerospace Engineering and received her

Master's Degree in Business Administration from Fontbonne University.  She also holds a Graduate Certificate of Information Management from Washington University.

**Frank Reyes** serves as Director of Finance and the Chief Financial Officer for the Issuer.  Mr. Reyes previously served as the Controller for the Issuer for 3 years.  Prior to serving as Controller, he served as Assistant Controller for the Issuer for nearly 7 years.  His duties are primarily in the Accounting, Finance, Treasury Management, Accounts Payable, Accounts Receivable, Procurement and Lender Services and Reconciliation areas.  Mr. Reyes is a certified public accountant and holds a Bachelor of Science degree with an emphasis in Accounting from Saint Louis University and a Master of Business Administration degree from Webster University.  Mr. Reyes joined the Issuer in April 2011 and has experience in auditing and financial reporting and analysis with large accounting firms and private companies.

**Dr. James Matchefts** serves as General Counsel for the Issuer.  Dr. Matchefts joined the Issuer in 2008.  Prior to joining the Issuer, Dr. Matchefts served for 10 years as General Counsel to the Missouri Department of Higher Education ("MDHE").  As part of his duties with MDHE, Dr. Matchefts oversaw the operation of the MDHE Student Loan Program, which is Missouri's state-designated guaranty agency under the Federal Family Education Loan Program.  For five years before joining MDHE, he worked in the St. Louis, Missouri City Counselor's Office, representing the City of St. Louis in various civil litigation and corporate matters.  He received his Juris Doctorate degree from Washington University in 1985 and his Doctor of Education degree from Saint Louis University in 2002.

**William C. Shaffner** serves as the Director of Business Development and Governmental Relations.  Starting with the Issuer in 2004 to help expand the Issuer's presence across the country, his duties have expanded to include Business Development, School Channel Sales and Lender Channel Support, E-Commerce, Marketing and Industry and Government Relations.  He also serves on the Missouri Scholarship & Loan Foundation Board of Directors.  Mr. Shaffner has over 38 years of experience in the Federal Family Education Loan Program working at University of Central Florida, USA Funds, USA Group, Sallie Mae and American Student Assistance.  Mr. Shaffner is a graduate of the University of Central Florida and holds a Bachelor of Science degree in Business Administration.

**Paul J. Mosquera** serves as Chief Compliance and Risk Management Officer of the Issuer.  He is responsible for the compliance management system as well as the internal audit and risk management functions.  Prior to joining the Issuer in 2017, Mr. Mosquera held senior and executive management roles in the financial services industry spanning over 25 years with an emphasis in banking.  His most recent position was at Scottrade, Inc., where he oversaw the audit teams for the $17 billion Scottrade Bank and brokerage operations.  He holds a Bachelor of Arts degree in Economics from the University of Arizona and a Juris Doctorate from Harvard Law School.  Mr. Mosquera also served four years as General Counsel and Legislative Liaison for a college in the western suburbs of Chicago.

**Permissible Activities; Limitations**

The Issuer was not formed as a "special purpose" entity and is legally authorized to and does operate as an active student loan lender and servicer and in related activities.  The Issuer generally does not have any significant restrictions on its activities to serve as a student loan lender and servicer under the Authorizing Act, including with respect to issuing bonds or other debt obligations or borrowing money or making student loans.  Under existing constitutional and statutory law and judicial decisions, specifically including Title XI of the United States Code, the remedies specified by the trust indentures and such other documents may not be readily available or may be limited.

**Previous Financings of the Issuer**

The Issuer has previously issued a significant number of series of bonds and notes secured by student loans.  The Issuer inadvertently made an underpayment of debt service on a recent transaction that resulted from a miscalculation of debt service due.  This underpayment was promptly corrected.  Otherwise, the Issuer has paid in full all scheduled interest due and payable on each outstanding series of bonds and notes, and there are no prior payment defaults on any debt securities issued by the Issuer.  As of June 30, 2021, the Issuer had outstanding bonds and notes in the following amounts issued under the following indentures and loan agreement.  The following table does not give effect to the issuance of the Notes as described herein or the use of certain proceeds from the sale of the Notes as described under the caption "USE OF PROCEEDS" herein to partially pay down the Warehouse Agreement listed below.

| Financing | Amounts Outstanding |
|---|---|
| 2021-1 Indenture[1] | $  431,313,961 |
| 2021-2 Indenture[2] | 521,277,229 |
| Warehouse Agreement[3] | 145,819,000 |
| Total | $1,098,410,190 |

_____

[1] Notes were issued pursuant to the Indenture of Trust dated as of February 1, 2021.

[2] Notes were issued pursuant to the Indenture of Trust dated as of April 1, 2021.

[3] The Issuer borrowed funds pursuant to the Revolving Credit and Security Agreement, dated as of December 19, 2018, as amended, among the Issuer, Bank of America, N.A., as the lender, and U.S. Bank National Association, as collateral agent (the "Warehouse Agreement").

These outstanding notes issued by the Issuer were issued under the indentures and Warehouse Agreement referred to above, are secured by separate collateral from and are not subject to the lien of the Indenture under which the Notes will be issued.  Furthermore, the Notes to be issued under the Indenture will not be secured by the indentures or the Warehouse Agreement referred to above, or any other resolution or transaction document with respect to the Issuer's prior issuances of bonds and notes or other debt obligations.

In addition, as of June 30, 2021, the Issuer had outstanding short-term indebtedness of $67.4 million, including arbitrage rebate payable, trade payables and Special Allowance Payments and Monthly Consolidation Rebate Fees payable to the Department, all of which is either unsecured or is secured by collateral separate and distinct from, and none of which has any interest in, the trust estate under the Indenture.  The Issuer also has a note payable to Commerce Bank in the principal amount as of June 30, 2021 of $10,745,708.  This loan is not secured by student loans.

**Financial and Other Information**

The most recent audited financial statements of the Issuer are available on the Issuer's website located at https://www.mohela.com/DL/common/publicInfo/financialStatements.aspx, which information and website are not part of, and are not incorporated by reference into, this Offering Memorandum.  The Issuer's financial statements include information with respect to its loan programs generally, including its FFELP Loan program and other information regarding the Issuer.  These financial statements are referenced for general background purposes only and for the convenience of Noteholders.  Since the Notes are limited obligations of the Issuer, payable solely from the Financed Eligible Loans and other assets pledged to the Trustee under the Indenture, the overall financial status of the Issuer, or that of its other programs, does not indicate and does not affect whether the Trust Estate created under the Indenture will be sufficient to fund

the timely and full payment of principal and interest on the Notes.  See "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES."

The Issuer's financial information included in this Offering Memorandum that is reported as of any date other than for the year ended June 30, 2020 is unaudited.

**Repurchase Requests**

The documents entered into in connection with prior Issuer sponsored securitization transactions and this transaction contain covenants requiring the repurchase or replacement of Eligible Loans in the case of a breach of certain representations and warranties.  Therefore, pursuant to Rule 15Ga-1, the Issuer is responsible for disclosure of all fulfilled and unfulfilled repurchase requests for Eligible Loans in such securitization transactions.  There have not been any unfulfilled repurchase requests for Eligible Loans with respect to any of the Issuer sponsored securitization transactions.  With respect to the Notes, the Issuer will furnish a Form ABS-15G at the times required by and pursuant to Rule 15Ga-1 of the Securities Exchange Act as required by the SEC, which will be furnished on the Municipal Securities Rulemaking Board through its EMMA system at www.emma.msrb.org, which information and website are not part of, and are not incorporated by reference into, this Offering Memorandum.

**Lewis and Clark Discovery Initiative; Scholarship Funding**

In 2007, state legislation was enacted relative to the then Missouri Governor's Lewis and Clark Discovery Initiative (the "Initiative") providing for the Issuer to fund designated capital projects at Missouri's public higher education institutions (the "Projects").  Pursuant to the legislation, the Issuer was to distribute $350 million for the Projects into a fund in the State treasury known as the "Lewis and Clark Discovery Fund" (the "Fund").  The payments were scheduled to begin with $230 million in Fall of 2007 and $5 million quarterly thereafter.  The Issuer distributed $245 million into the Fund by early 2008 but further distributions were then delayed due to Issuer determinations made pursuant to the terms of the legislation.  The determinations were based on dramatic changes in the federal student loan program and the credit market crisis and related great recession.  Shortly thereafter, in early 2009, the new Governor suspended the Projects and the Initiative became dormant.  Accordingly, with no Projects to fund and changes in the student loan program continuing, no further contributions to the Fund have been made by the Issuer pursuant to the terms of the legislation.  Related to the foregoing, successive Governors have made scholarship funding requests of the Issuer which are more consistent with its historical mission.  In response to those Governors' requests, since 2010, the Issuer has provided nearly $100 million in funding for college scholarships in the State of Missouri.  The Issuer has also established another vehicle for providing significant scholarship and grant funding to students at Missouri colleges and universities through its nonprofit Missouri Scholarship and Loan Foundation established in 2010.

**Direct Loan Servicing**

Prior to July 1, 2010, the Issuer primarily originated, acquired and serviced FFELP Loans.  The Issuer has not originated FFELP Loans since July 1, 2010.  This is due to the enactment of the Reconciliation Act, including the Student Aid and Fiscal Responsibility Act ("SAFRA"), which prohibited the origination of new FFELP Loans after June 30, 2010.  As of July 1, 2010, all loans made under the Higher Education Act are originated under the Direct Loan Program.  The terms of existing FFELP Loans are not materially affected by the Reconciliation Act.

The Issuer obtained a contract with the Department of Education to service Direct Loans in accordance with the HCERA, which requires the Department of Education to contract with each eligible

and qualified NFP Servicer to service loans.  On April 29, 2010, the Department of Education began the process to identify eligible NFP Servicers by issuing a Sources Sought Notice (Solicitation Number: NFP-SS-2010) (the "Sources Sought Notice") requesting that interested entities submit information to the Department of Education demonstrating eligibility as an eligible NFP servicer under the criteria set forth in the Reconciliation Act.

The Issuer responded to the Sources Sought Notice and was among the first twelve NFP Servicers that the Department of Education determined met the NFP Servicer eligibility criteria under the Reconciliation Act.  The Issuer applied to the Department of Education on November 24, 2010, to be permitted to proceed to develop a Memorandum of Understanding.  On February 2, 2011, the Department of Education published a determination that the Issuer was permitted to enter into a Memorandum of Understanding to pursue an Authorization to Operate ("ATO") and a contract award as an NFP Servicer. The Pennsylvania Higher Education Assistance Agency ("PHEAA") was identified as a key subcontractor for this arrangement.  On March 30, 2011, the Issuer entered into a Memorandum of Understanding with the Department of Education.  The Issuer was awarded an ATO on September 22, 2011 and a servicing contract to become an NFP Servicer to service federal assets including Direct Loans on September 27, 2011.  As of June 30, 2021, the Issuer had entered into "teaming arrangements" with 18 other NFP Servicers and was servicing approximately 2.7 million federal asset accounts, which are primarily Direct Loans, representing approximately $59.1 billion in student loans.

In addition to a federal loan servicing contract, the Issuer services approximately $1.1 billion of its own FFELP Loans which secure the bonds issued by the Issuer and will provide the Issuer ongoing revenue streams for many years to come.  This legacy portfolio and its related revenue have assisted and will continue to assist the Issuer in a gradual and smooth transition to a federal asset servicing business model. See the further discussion of the Issuer's Direct Loan Program servicing under the caption "HIGHER EDUCATION LOAN AUTHORITY OF THE STATE OF MISSOURI—General" herein.

**Direct Loan Servicing Performance Metrics**

Pursuant to its contractual agreement with each of its Direct Loan servicers, the Department of Education measures servicer performance in the areas of customer satisfaction and default prevention on a quarterly basis.  The Department of Education has stated its intention use such metrics to determine each servicer's allocation of future Direct Loan volume.

The Department of Education has provided the Issuer with its most recent Direct Loan servicer performance results for the quarters ended September 30, 2020 and December 31, 2020, and the allocations in effect from March 1, 2021 through August 31, 2021.  The average results for September 30, 2020 and December 31, 2020 were used to rank all servicers, both the original Title IV Additional Servicers ("TIVAS") and the NFP Servicers.  Based upon these recent performance scores, the Issuer was ranked 1st among all Direct Loan servicers on a combined pool basis.  The most current Direct Loan servicer customer service performance results are available by visiting the following web site: https://studentaid.gov/data-center/business-info/contracts/loan-servicing/servicer-performance, which information and website are not part of, and are not incorporated by reference into, this Offering Memorandum.

**THE ISSUER'S FFEL PROGRAM**

**General**

Since its inception, the Issuer has established a program for financing certain student loans originated pursuant to the Federal Family Education Loan Program ("FFELP" or the "FFEL Program"), authorized by Title IV of the federal Higher Education Act (such loans, "FFELP Loans").  The FFEL

Program authorized by the Higher Education Act is described in "APPENDIX A—DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM" attached hereto.

On March 30, 2010, the Reconciliation Act was enacted into federal law. Included in the Reconciliation Act were provisions that eliminated the origination of new FFEL Loans under the FFEL Program. As of July 1, 2010, no additional FFELP Loans may be originated and all new federal student loans will be originated solely under the Direct Loan Program. However, FFELP Loans originated under the Higher Education Act prior to July 1, 2010 which have been acquired by the Issuer (including the loans described in this Offering Memorandum under the caption "CHARACTERISTICS OF THE FINANCED ELIGIBLE LOANS" herein) continue to be subject to the provisions of the FFEL Program, and are not materially affected by the Reconciliation Act.

The Issuer has established its loan purchase program with respect to FFELP Loans (the "Program") in order to effectuate the general purposes of the Issuer and the specific objective of assisting students in obtaining a post-secondary education. It has modified the Program over the years and regularly reviews the Program. Through its Program, the Issuer seeks to increase the availability of funds for such purposes by financing: (a) loans that are guaranteed by a Guaranty Agency and reinsured by the Secretary pursuant to the Higher Education Act; (b) loans that are insured by the Secretary of Health and Human Services under the Public Health Service Act ("HEAL loans"); or (c) other educational loans permitted under the Authorizing Act. Such loans may be financed through the issuance of bonds and notes, subject to the terms and conditions of the particular bond resolutions or indentures securing such obligations. The Financed Eligible Loans pledged to the Trustee under the Indenture will consist only of loans described in clause (a) above.

Under the Authorizing Act and pursuant to the Program, the Issuer is authorized to either originate or acquire certain types of student loans. While the Issuer has, for some time, been permitted to either originate or acquire PLUS loans, Consolidation loans, HEAL loans, and loans by the Issuer to certain institutions of higher education pursuant to the Issuer's qualified institution loan program, until about 2008 it could not originate subsidized and unsubsidized Stafford loans. In 2008, a Missouri law was adopted allowing the Issuer to originate a limited amount of Stafford loans for borrowers attending Missouri institutions of higher education. As a result of the recent changes to the FFEL Program, as of July 1, 2010, no entity, including the Issuer, can originate new FFELP Loans under the FFEL Program.

In order to participate in the Issuer's finance programs with respect to FFEL Loans, each third-party lender had to enter into a loan purchase agreement with the Issuer and must have been an "eligible lender" under the Higher Education Act or be otherwise approved by the Issuer. An "eligible lender" under the Higher Education Act included certain commercial banks, mutual savings banks, savings and loan associations, credit unions, insurance companies, pension funds, certain trust companies and educational institutions. In its agreement with the Issuer, the selling lender had to make certain representations with respect to the loans to be sold, and agree to repurchase the loan at the Issuer's request if any representation or warranty made by the lender regarding the loan proves to be materially incorrect, if a maker or endorser of a note evidencing the loan asserts a defense which raises a reasonable doubt as to its legal enforcement or if the Secretary refuses to honor a claim with respect to the loan because of circumstances which occurred prior to the Issuer's purchase of the loan. See "APPENDIX A—DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM" hereto.

Most Financed Eligible Loans purchased or originated by the Issuer prior to July 1, 2008, were eligible, subject to certain conditions precedent in the Indenture, for rate relief programs offered by the Issuer (the "RR Programs"). Except for the 0.25% interest rate reduction for borrowers using auto-debit to make loan payments, the other RR Programs closed to new enrollments on January 1, 2010. Financed Eligible Loans purchased or made by the Issuer prior to July 1, 2008, which were participating in the RR

Programs prior to January 1, 2010, will continue to be eligible for certain interest rate reductions on such loans.  Substantially all of the Financed Eligible Loans securing the Notes are eligible to receive an interest rate reduction for enrolling in automatic bank draft payments.  Some of the Financed Eligible Loans are eligible to participate in other borrower benefit programs, which may vary.  See the caption "CHARACTERISTICS OF THE FINANCED ELIGIBLE LOANS—Borrower Benefits" herein.  The RR Programs and other benefits offered by the Issuer with respect to Financed Eligible Loans may be modified or terminated by the Issuer, provided the Issuer may not modify the RR Programs or other benefits other than as provided in the Indenture.

HEAL loans will not be eligible to be financed under the Indenture.

In addition, the Issuer may, to the extent permitted under the Authorizing Act, enter into agreements to finance loans that are not guaranteed or insured under the Higher Education Act.  Any such agreement may or may not have conditions similar to the Issuer's current agreements, including certain limitations on the principal amount of such loans.  Student loans subject to such agreements will not be eligible to be financed under the Indenture.

**Change to Index for Calculation of Special Allowance Payments**

The Issuer made an affirmative election under Public Law 112-74 to permanently change the  index for Special Allowance Payment calculations on substantially all FFELP Loans in its portfolio disbursed after January 1, 2000 (including all of the Financed Eligible Loans with such disbursement dates) from the three-month commercial paper rate to the one-month LIBOR index, commencing with the Special Allowance Payment calculations for the calendar quarter beginning on April 1, 2012.  See the caption "CHARACTERISTICS OF THE FINANCED ELIGIBLE LOANS— Distribution of the Financed Eligible Loans by SAP Interest Rate Index" herein and "APPENDIX A—DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM—Special Allowance Payments" hereto.

## SERVICING OF THE FINANCED ELIGIBLE LOANS

The Issuer and each other Servicer is required under the Higher Education Act, the rules and regulations of the Guaranty Agencies and, in the case of the Issuer, the Indenture, to use due diligence in the servicing and collection of the Financed Eligible Loans.  The Higher Education Act defines due diligence as requiring the use of collection practices at least as extensive and forceful as those generally practiced by financial institutions for the collection of consumer loans.  The Higher Education Act also requires the exercise of reasonable care and diligence in the making and servicing of student loans originated under the Higher Education Act and provides that the Secretary may disqualify an "eligible lender" (which could include the Issuer or the Trustee as holder of student loans originated under the Higher Education) from further federal insurance if the Secretary is not satisfied that the foregoing standards have been or will be met.  An eligible lender may not relieve itself of its responsibility for meeting these standards by delegation of its responsibility to any servicing agent and, accordingly, if any Servicer fails to meet such standards, the Issuer's ability to realize the benefits of insurance may be adversely affected.

The Higher Education Act requires that a Guaranty Agency ensure that due diligence will be exercised by an eligible lender in making and servicing student loans originated under the Higher Education Act guaranteed by such Guaranty Agency.  Each Guaranty Agency establishes procedures and standards for due diligence to be exercised by the servicer and by eligible lenders which service loans subject to such guaranty agencies' guarantee.  If the Issuer or any other Servicer does not comply with the established due diligence standards, the Issuer's ability to realize the benefits of any guaranty may be adversely affected.

The Trustee has no duties or obligations to service, collect or monitor the servicing and collecting of the Financed Eligible Loans.  The Trustee also is not responsible for accounting and reporting functions required under the Higher Education Act to preserve the guarantee of any Guaranty Agency or the insurance of the Secretary on the Financed Eligible Loans.

## Servicing by the Issuer

The Issuer currently services the Financed Eligible Loans serviced by it with the assistance of software developed and maintained by PHEAA.  The Issuer has entered into an agreement with PHEAA pursuant to which PHEAA has agreed to provide the equipment, software, training and related support necessary to enable the Issuer to comply with the provisions of the Higher Education Act.  As of June 30, 2021, the Issuer was servicing $1.1 billion in FFELP loans representing 59,181 accounts.  The Issuer services education loans for other lenders in addition to servicing most of the Issuer's own loan portfolio. As of June 30, 2021, the Issuer was also servicing $18.6 billion in third-party lender owned private loans representing 320,566 accounts, $132.8 million in Issuer-owned private loans representing 6,202 accounts and $59.1 billion in Direct Loans representing 2,726,179 accounts.

In its capacity as servicer of FFELP student loans, the Issuer submits default claims to guaranty agencies that guarantee the payment of principal and interest of such student loans.  See "APPENDIXA— DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM—Insurance and Guarantees" hereto.  A default claim package must include all information and documentation required under the FFELP regulations and the guaranty agency's policies and procedures.  Under certain circumstances, a guaranty agency may reject a default claim.  Set forth below is a table showing the Issuer's gross claim rejection ratio for the calendar years listed.

| Calendar Year | Gross Claim Reject Rate |
|---|---|
| 2020 | 0.16% |
| 2019 | 0.44 |
| 2018 | 0.12 |
| 2017 | 0.21 |
| 2016 | 0.33 |

All of the Financed Eligible Loans will, when pledged to the Trustee under the Indenture, be serviced by the Issuer pursuant to the servicing provisions set forth in the Indenture.  See the caption "SUMMARY OF THE INDENTURE PROVISIONS—Additional Covenants With Respect to the Higher Education Act" herein.  Under the Indenture, the Issuer has agreed to service the Financed Eligible Loans diligently and in accordance with the Higher Education Act, the policies and procedures of the Guaranty Agency and the terms of the Indenture, and the Servicer's standard practices and procedures.  Pursuant to the Indenture, the Issuer as Servicer will be paid the Servicing Fee (as defined under the caption "GLOSSARY OF TERMS" herein).  The Issuer may from time to time enter into other servicing agreements and arrangements in accordance with the terms of the Indenture.

The Issuer has covenanted in the Indenture that the Issuer will always have a Backup Servicing Agreement with a third-party servicer with respect to all Financed Eligible Loans serviced by it.  Below is certain additional information with respect to PHEAA as Backup Servicer and the Backup Servicing Agreement.

**Backup Servicing by PHEAA**

PHEAA is expected to initially act as Backup Servicer with respect to the Financed Eligible Loans serviced by the Issuer, and currently acts as backup servicer with respect to Eligible Loans currently serviced by the Issuer and previously financed by the Issuer under various indentures.

### *PHEAA*

*The following information has been furnished by PHEAA for use in this Offering Memorandum. Neither the Issuer nor the Underwriter makes any guarantee or any representation as to the accuracy or completeness thereof or the absence of material adverse change in such information or in the condition of PHEAA subsequent to the date hereof.*

PHEAA is a body corporate and politic constituting a public corporation and government instrumentality created pursuant to an act of the Pennsylvania Legislature. Under its enabling legislation, PHEAA is authorized to issue bonds or notes, with the approval of the Governor of the Commonwealth of Pennsylvania for the purpose of purchasing, making, or guaranteeing loans. Its enabling legislation also authorizes PHEAA to undertake the origination and servicing of loans made by PHEAA and others. PHEAA's headquarters are located in Harrisburg, Pennsylvania with regional offices located throughout Pennsylvania. For further information on PHEAA, see the caption "GUARANTY AGENCIES— Information Regarding PHEAA" herein.

As of March 31, 2021, PHEAA had approximately 2,400 employees and contractors. PHEAA services student loans through its Commercial Servicing line of business, FedLoan Servicing ("FLS") line of business and Remote Servicing line of business. The Commercial Servicing line of business services private student loans and FFELP Loans for customers which consist of national and regional banks and credit unions, secondary markets, and government entities. The FLS line of business services federally owned FFELP and Direct Loan Program loans. The Remote Servicing line of business provides PHEAA's systems to guarantors, other servicers and Not-for-Profit ("NFP") servicers, who were awarded servicing contracts under the Direct Loan Program for use in servicing borrowers.

As of March 31, 2021, PHEAA serviced approximately 9.7 million student borrowers representing an aggregate of approximately $416.2 billion outstanding principal amount under its Commercial Servicing and FLS lines of business.

Through its Commercial Servicing line of business, PHEAA serviced $26.9 billion for lenders as of March 31, 2021, with an approximately $7.4 billion principal balance of private student loans outstanding, which makes PHEAA one of the nation's largest servicers of private student loans.

PHEAA is also one of four primary servicers that were awarded a contract to service Title IV loans owned by the Department of Education. The initial phase of the Title IV Servicing Management contract involved FFELP Loans, which were sold to the Department of Education under the Ensuring Continued Access to Student Loans Act ("ECASLA"). ECASLA gave the Department of Education authority to purchase FFELP Loans from private lenders. In addition, PHEAA began servicing student loans originated under the Federal Direct Program during the 2010-2011 academic year. PHEAA's FLS line of business services the federally owned program loans, and as of March 31, 2021, the portfolio balance of loans and grants serviced by FLS was $389.3 billion.

Under PHEAA's Remote Servicing line of business, the remote clients service approximately 3.3 million student loan borrowers representing an approximately $82.3 billion outstanding principal amount, including $58.5 billion owned by the Department of Education.

### *FFELP Net Reject Rate*

As a servicer, PHEAA works to minimize the net reject rate, which is the amount of claims submitted for payment that are rejected by the guarantor and are subsequently unable to be cured. The net reject rate for both the number and dollar value of PHEAA's FFELP loans for the last three calendar years is listed below.

**FFELP Net Reject Rate**

| Year | Loans | Dollars |
|------|-------|---------|
| 2020 | 0.021% | 0.016% |
| 2019 | 0.020% | 0.011% |
| 2018 | 0.008% | 0.008% |

The net reject rate is calculated based on claims submitted three years prior which were unable to be cured during the three-year cure period which ended during the calendar years noted above. The number and dollar value of rejected claims not cured is divided by the total claims filed during that same period three years prior.

PHEAA's most recent audited financial reports are available from PHEAA.

### *Litigation and Inquiries*

PHEAA is subject to various claims, lawsuits and other actions that arise in the normal course of business. PHEAA believes that these claims, lawsuits and other actions will not, individually or in the aggregate, have a material adverse effect on its business, financial condition or results of operations. Most of these matters are claims against its servicing and collection operations by borrowers and debtors alleging the violation of state or federal laws in connection with servicing or collection activities on such borrower's or debtor's student loans. In addition, PHEAA is routinely named in lawsuits in which the plaintiffs allege that PHEAA has violated a federal or state law in the process of collecting their accounts.

In the ordinary course of its business, it is common for PHEAA to receive information and document requests and investigative demands from legislative committees and administrative and enforcement agencies. These requests may be informational or regulatory in nature and may relate to PHEAA's business practices, the industries in which it operates, or other companies with whom it conducts business. PHEAA's practice has been, and currently is, to cooperate with these bodies and to be responsive to any such requests. However, PHEAA may find it necessary to initiate litigation to enforce its rights, to protect its business operations and practices or to determine the scope and validity of the rights of such bodies. Litigation is costly and time-consuming, and there can be no assurance that PHEAA's litigation expenses will not be significant in the future or that it will prevail in any such litigation.

Such inquiries and related information demands increase costs and resources PHEAA must dedicate to timely respond to these requests and may, depending on their outcome, result in payments of additional amounts of restitution, fines and penalties in addition to those described below under "Consumer Protection and Similar Laws."

### *Commonwealth of Massachusetts*

In September 2017, the Attorney General's Office for the Commonwealth of Massachusetts ("MA AG") commenced litigation against PHEAA in state court in Massachusetts, generally alleging that PHEAA's federal student loan servicing activities violated various state and federal consumer protection laws. After substantial discovery and thorough negotiations, on February 9, 2021 the trial court approved a settlement agreement between PHEAA and the MA AG. Most notably, the settlement agreement included no admission of liability, and did not assess any fine or penalty against PHEAA. Instead, PHEAA agreed, upon the submission of a claim-form, to review the accounts of federal student loan borrowers in Massachusetts for alleged errors or discrepancies. To the extent errors are discovered, accounts will be adjusted accordingly. In addition, out of approximately 250,000 federal student loan borrowers in Massachusetts, PHEAA agreed to remediate 25 borrowers through account-edits, or where edits could not be made, a limited refund of payments received. PHEAA also agreed to provide enhanced quality-assurance reviews for Massachusetts borrowers. Ultimately, the settlement agreement resulted in no financial impact to PHEAA, and the outcome demonstrates PHEAA's strong commitment to assisting borrowers.

### *State of New York*

Similar to the Massachusetts litigation described above, on October 3, 2019, the Attorney General for the State of New York filed an action against PHEAA in the United States District Court for the Southern District of New York. This action predominantly focuses on PHEAA's federal student loan servicing activities related to federal loans eligible for Public Service Loan Forgiveness ("PSLF"), as well as various types of unique deferments and repayment options. New York alleges violations of the Consumer Financial Protection Act, as well as a variety of New York statutory and common law claims. PHEAA strongly disagrees with the allegation of the Complaint. PHEAA believes that the risk of loss is remote and will continue to contest this matter vigorously.

### *Multi-District Litigation*

Similar to both actions noted above, several individual borrowers previously filed lawsuits against PHEAA and the Department of Education in several different federal courts related to PHEAA's activities as a federal student loan servicer. These lawsuits challenge PHEAA's servicing activities surrounding PSLF, deferment and forbearance, and loan repayment programs. These actions were previously ordered to be consolidated into one lawsuit to be filed in the United States District Court for the Eastern District of Pennsylvania. In October 2019, the plaintiffs collectively filed their one, Amended Complaint which purports to state all claims on behalf of all plaintiffs. The allegations against PHEAA and the Department of Education include a variety of tort-based statutory and common law claims. As of the date of this report, PHEAA and the Department of Education have filed their respective Motions to Dismiss, which have yet to be adjudicated. PHEAA believes the risk of loss is remote and will continue to contest this matter vigorously.

### *Consumer Protection and Similar Laws*

The CFPB has issued regulations subjecting PHEAA to the supervision of the CFPB as a "larger participant" (as defined for purposes of the Dodd-Frank Act). Applicable regulations provide for the examination and monitoring by the CFPB of larger participants in student loan servicing, such as PHEAA, thus giving the CFPB broad authority to examine, investigate, supervise, and otherwise regulate PHEAA's business, including the authority to impose fines and require changes with respect to any requirements that the CFPB finds to be unfair, deceptive or abusive. The CFPB seeks to make sure that all relevant federal consumer financial laws are followed by nonbank student loan servicers, such as PHEAA, and that such

rules are applied to both federal and private student loans, from origination through servicing to debt collection. The CFPB has substantial power and discretion to define the rights of consumers and the responsibilities of certain entities, such as PHEAA. There is continuing uncertainty regarding how the CFPB's strategies and priorities will impact PHEAA's, and other large nonbank student loan servicers', business and results of operations going forward. Additionally, the Dodd-Frank Act gives the CFPB authority to pursue administrative proceedings and litigation for violations of federal consumer financial laws. In these proceedings, the CFPB can obtain cease and desist orders (which can include orders for restitution or rescission of contracts, as well as other kinds of affirmative relief) and monetary penalties ranging from $5,000 per day for minor violations of federal consumer financial laws (including the CFPB's own rules) to $25,000 per day for reckless violations and $1 million per day for knowing violations. Also, where an entity has violated Title X of the Dodd-Frank Act (the Consumer Financial Protection Act of 2010) or CFPB regulations under Title X, the Dodd-Frank Act empowers state attorneys general and state regulators to bring civil actions for the kind of cease and desist orders available to the CFPB (but not for civil penalties). If the CFPB or one or more state or other federal officials find that PHEAA or its affiliates have violated the foregoing or other laws, they could exercise their enforcement powers in ways that may have a material adverse effect on PHEAA.

In addition to enforcing consumer financial laws directed at specific loan origination and servicing functions, such as loan disclosures and debt collection procedures, the CFPB is directed to prohibit "unfair, deceptive or abusive" acts or practices, and to ensure that all consumers have access to fair, transparent and competitive markets for consumer financial products and services. The review of services and practices to prevent unfair, deceptive or abusive conduct will be a continuing focus of the CFPB, as well as PHEAA's own internal reviews. Such ongoing internal and regulatory reviews are likely to result in changes in PHEAA's policies and practices, increased costs related to regulatory oversight, compliance, supervision and examination and may result in regulatory actions, including civil monetary penalties.

Since 2013, the CFPB has been a party to numerous public enforcement actions, either independently or in conjunction with other federal and state enforcement agencies, to enforce consumer protection laws within its jurisdiction or to support consumer protection efforts nationwide. The CFPB has also been investigating, based on potentially problematic practices identified by the CFPB or reported by consumers or others or investigations transferred to the CFPB by regulators or other federal agencies, potential violations of federal consumer financial laws. Potential penalties are significant, and several large settlements have been entered into by the CFPB and/or other federal and state agencies with, among others, consumer loan originators, servicers and other consumer credit businesses.

Because such supervision and enforcement authority continues to be subject to intensive rulemaking and public comment, which may result in further regulations and/or regulatory interpretations, PHEAA is unable to predict the final form that this regulatory regime will take or the ultimate effect such supervision or required examinations or enforcement actions, if any, could have on PHEAA's operations. PHEAA's operational expenses will likely increase to address new or additional compliance requirements that could be imposed on PHEAA's operations as a result of these developments and CFPB supervision and examination and, depending on their outcome, result in payments of additional amounts of restitution, fines and penalties in addition to those described above.

In response to the evolving regulatory environment, PHEAA has enhanced its compliance management system, has conducted and continues to conduct internal reviews, and has engaged outside firms to assist in compliance and risk assessments. This initiative has enabled PHEAA to better identify deficiencies in its existing processes, policies and procedures. PHEAA has made a commitment to continue to dedicate significant resources to address and remediate any deficiencies it has identified as well as those which may be identified as a result of future reviews and assessments. Notwithstanding such efforts, it is possible that PHEAA may be found to be out of compliance with certain laws applicable to servicing or

originating student loans, including the Financed Eligible Loans. Although management of PHEAA does not believe any such deficiencies would materially and adversely affect the ability of PHEAA to perform its obligations as a servicer, such an outcome cannot be assured.

### COVID-19 Pandemic

An outbreak of a new coronavirus, detected in China in December 2019, spread internationally in the first quarter of calendar year 2020 causing widespread disruption of the global economy and a rise in market volatility. Health officials have declared this to be a pandemic. The course of the pandemic and its ultimate effect on the United States, the global economy and markets are not fully known at this time. Management's evaluation is ongoing and it is not possible to predict the extent of the effect that the pandemic may have on PHEAA's financial position as the financial environment continues to change.

### Backup Servicing Agreement

The Issuer covenants in the Indenture to maintain a Backup Servicing Agreement with a third-party servicer with respect to all of the Financed Eligible Loans serviced by it and to pay all fees and expenses of such third-party servicer associated therewith. PHEAA will initially act as backup servicer (the "Backup Servicer") with respect to all of the Financed Eligible Loans serviced by the Issuer pursuant to a backup third-party servicing agreement dated July 9, 2021 (the "Backup Servicing Agreement"), between the Issuer and the Backup Servicer. The following is a summary of some of the provisions included in the Backup Servicing Agreement. All statements included in this summary are intended to be descriptive of the provisions of the Backup Servicing Agreement, but does not address all of the provisions of the Backup Servicing Agreement, does not fully state the provisions addressed and is subject to all of the definitive terms and conditions of the Backup Servicing Agreement in its entirety.

The Backup Servicing Agreement has a two-year term commencing on its effective date, unless earlier terminated by the Issuer or the Backup Servicer for the events described below (after notice of the same to the breaching party and the expiration of any applicable cure period) and automatically extends for successive one-year periods unless a party provides the other party of written notice of termination not less than 90 days prior to the annual termination date. In addition, to the extent the Backup Servicing Agreement is no longer required pursuant to the terms of the Indenture (which would require an amendment to the Indenture), the Backup Servicing Agreement will terminate 90 days after receipt of written notice from the Issuer of such event.

The Issuer may terminate the Backup Servicing Agreement upon the occurrence of any of the following events (with respect to the first, second and fourth bullet points below, after notice to the Backup Servicer and the right within 60 days to cure any such breach or error to the full satisfaction of the Issuer and the Trustee):

 • material breaches of representations or warranties made by the Backup Servicer in or pursuant to the Backup Servicing Agreement (or any information or report delivered by it) that has a Material Adverse Effect or Servicer Material Adverse Effect;

 • failure in any material respect of the Backup Servicer to perform or observe any term, covenant or agreement under the Backup Servicing Agreement which has a Material Adverse Effect or Servicer Material Adverse Effect;

 • the Backup Servicer discontinues its business, generally fails to pay its debts as such debts become due, makes a general assignment for the benefit of creditors, is subject to a voluntary or involuntary bankruptcy, reorganization, insolvency or other proceeding (whether

federal or state) relating to relief of debtors, or any judgment, decree or order, entered by a court of competent jurisdiction, which approves a petition seeking the Backup Servicer's reorganization or appoints a receiver, custodian, trustee, interim trustee or liquidator for itself or all or a substantial part of its assets continues in effect for thirty (30) consecutive days;

- a Servicer Material Adverse Effect shall have occurred;

- the Backup Servicer fails to remain eligible to service FFELP Loans under the Higher Education Act and related regulations; or

- certain force majeure events continue for over 20 days or to the extent that the Backup Servicer is unable to perform any obligations arising under the Backup Servicing Agreement as a result of having to give priority to administer existing programs on behalf of the Commonwealth of Pennsylvania.

A "Material Adverse Effect" means (a) a material adverse change in the value of a material portion of the Financed Eligible Loans or (b) any event which could reasonably be viewed as having a material adverse effect on (1) the validity, enforceability or collectability of a material portion of the Financed Eligible Loans or the Notes; (2) the status, existence, perfection, priority or enforceability of the Trustee's security interest in a material portion of the Financed Eligible Loans or (3) a Guaranty Agency's obligation to continue to guarantee payment of a material portion of the Financed Eligible Loans.

A "Servicer Material Adverse Effect" means the occurrence of an event or a change in circumstances that would have a material adverse effect on the ability of the Backup Servicer to perform its obligations under the Backup Servicing Agreement.

The Backup Servicer may terminate the Backup Servicing Agreement upon the occurrence of any of the following events:

- failure by the Issuer to perform or observe any of the material provisions or covenants of the Backup Servicing Agreement which materially and adversely affects the Backup Servicer's ability to perform its obligations thereunder;

- the Backup Servicer determines that it is no longer able to perform its obligations as a back-up third party servicer, upon one hundred eighty (180) days written notice to the Issuer and the Trustee;

- the Issuer and the Backup Servicer are unable to agree on a proposed increase in fees of the Backup Servicer (which increase may result from changes in applicable governmental regulations, guaranty agency program requirements or regulations, or any change in postage rates), after 270 days prior written notice to the Trustee and the Issuer; or

- failure of the Issuer to pay the Backup Servicer its fees due under the Backup Servicing Agreement (subject to the notice and cure periods specified therein).

If the Issuer determines that it does not want to continue servicing the Financed Eligible Loans (and provides 60 days written notice to the Backup Servicer) or if the Issuer is in material violation of its obligations to service the Financed Eligible Loans serviced by it as set forth in the Indenture, as determined by the Issuer (in which case it will promptly notify the Trustee of such), the Trustee (which has no duty to make such determination but is required to provide notice of any such material violation to the Noteholders) or the Noteholders of at least a majority of the principal amount of the Notes outstanding, and such violation

remains uncured after notice thereof and the expiration of any applicable cure period, and the Trustee (at the written direction of the Issuer or the Noteholders of at least a majority of the principal amount of the Notes outstanding) gives 60 days written notice to the Issuer and the Backup Servicer, the Backup Servicer would become the successor Servicer for the Financed Eligible Loans serviced by the Issuer.

## GUARANTY AGENCIES

All of the Financed Eligible Loans expected to be financed with proceeds of the Notes offered hereby are loans guaranteed (with respect to payments of principal and interest) by a Guaranty Agency and reinsured by the Secretary under the Higher Education Act.  The Guarantee provided by a Guaranty Agency is an obligation solely of that Guaranty Agency and is not supported by the full faith and credit of the federal or any state government.  However, the Higher Education Act provides that if the Secretary determines that a Guaranty Agency is unable to meet its insurance obligations, the Secretary shall assume responsibility for all functions of that Guaranty Agency under its loan insurance program.  Additional discussion that relates to Guaranty Agencies generally under the FFEL Program is included in "APPENDIX A—DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM" hereto.

In the issuance of Guarantees on loans, each Guaranty Agency is required to review loan applications to verify the completion of required information.  In addition, each Guaranty Agency is required to make a determination that the applicant has not borrowed amounts in excess of those permitted under the Higher Education Act.  In addition to the Guaranty Agencies described below, the Indenture provides that Financed Eligible Loans may be guaranteed by any entity authorized to guarantee student loans under the Higher Education Act and with which the Issuer has entered into a Guarantee Agreement.

As of the Statistical Cut-Off date (and based on the aggregate outstanding principal balances of the Financed Eligible Loans as of such date), of the Financed Eligible Loans to be held in the Trust Estate created under the Indenture, approximately:

—54.3% are guaranteed by the Missouri Department of Higher Education (the "State Guaranty Agency");

—18.9% are guaranteed by Pennsylvania Higher Education Assistance Agency;

—10.6% are guaranteed by Ascendium Education Solutions, Inc. (f/k/a Great Lakes Higher Education Guaranty Corporation); and

—the remaining approximately 16.2% are guaranteed by other Guaranty Agencies (each such Guaranty Agency guarantees less than 10% of the Financed Eligible Loans as of the Statistical Cut-Off Date).

[Remainder of page intentionally left blank]

The following is certain additional information with respect to the Guaranty Agencies which are expected to guarantee at least 10% of the Financed Eligible Loans held under the Indenture.

**Information Regarding the State Guaranty Agency**

*The following information has been furnished by the State Guaranty Agency for use in this Offering Memorandum. The Issuer makes no guarantee or representation as to the accuracy or completeness thereof or the absence of material adverse change in such information or in the condition of the State Guaranty Agency subsequent to the date hereof.*

In 1978, the Missouri General Assembly enacted legislation authorizing the Missouri Guaranteed Student Loan Program. The State Guaranty Agency has been designated to administer the FFEL Program on behalf of the Coordinating Board for Higher Education. The Missouri Guaranteed Student Loan Program became operative during October 1979. To be eligible for FFEL Program funds under the Missouri Guaranteed Student Loan Program, students must have attended institutions which are eligible institutions under the Higher Education Act.

The State Guaranty Agency has offices at 301 W High Street, Jefferson City, Missouri 65101 and currently employs 19 full time equivalent employees to administer the Federal subsidized and unsubsidized Stafford, SLS and PLUS programs. Certain processing and operational functions for these programs are performed by Educational Credit Management Corporation, Minneapolis, Minnesota, pursuant to a contract with the State Guaranty Agency.

The State Guaranty Agency's "reserve ratio" represents a measure of its ability to meet its future obligations on the existing portfolio of loans. The "reserve ratio" is computed by dividing the State Guaranty Agency's total Reserve Account balance by the amount of outstanding loans. The State Guaranty Agency's "reserve ratio" exceeds the regulatory minimum. The State Guaranty Agency's "federal trigger rate" represents the percentage of default claims (based on dollar value) submitted as reinsurance claims to the Secretary relative to its existing portfolio of loans in repayment. For the last five fiscal years, the State Guaranty Agency's "federal trigger rate" was as follows:

| Fiscal Year | Federal Trigger Rate |
|:-----------:|:--------------------:|
| 2020 | -0.32%[*] |
| 2019 | 1.49% |
| 2018 | 5.37% |
| 2017 | 1.72% |
| 2016 | 0.76% |

[*]The negative percentage is due to the number of accounts that were moved out of default status (mostly through rehabilitation of such loans) being greater than the number of accounts that were moved into default status (defaulted claims) during that Fiscal Year.

Since December 2015, the State Guaranty Agency has been reimbursed by the Secretary 100% of the amount the State Guaranty Agency paid lenders on claims.

The State Guaranty Agency's "recovery rate" is an indicator of the effectiveness of the State Guaranty Agency's collection efforts regarding student loans with respect to which the State Guaranty

Agency has paid default claims.  One method of calculating the "recovery rate" is by dividing the gross amount recovered during the year by the amount of defaulted loans in the State Guaranty Agency's portfolio at the beginning of the year.  Using this calculation method, the State Guaranty Agency's "recovery rate" for the last five fiscal years was as follows:

| Fiscal Year | Recovery Rate |
|---|---|
| 2020 | 24.06% |
| 2019 | 31.19% |
| 2018 | 26.33% |
| 2017 | 27.39% |
| 2016 | 24.99% |

The 1998 Amendments to the Higher Education Act required the State Guaranty Agency to establish an Agency Operating Fund and a Federal Student Loan Reserve Fund.  The primary purpose of the Agency Operating Fund is to finance guaranty agency and other student financial aid related activities, as selected by the State Guaranty Agency.  The primary purpose of the Federal Student Loan Reserve Fund is to purchase defaulted student loans from lending institutions.  The unobligated moneys not currently needed are invested by the state treasurer.  As of June 30, 2020, the State Guaranty Agency had total assets of $24,734,752, deferrals, accounts payable and other liabilities of $375,134, and an Agency Operating Fund balance of $24,359,618.

**Information Regarding PHEAA**

*The following information has been furnished by PHEAA for use in this Offering Memorandum. The Issuer makes no guarantee or representation as to the accuracy or completeness thereof or the absence of material adverse change in such information or in the condition of PHEAA subsequent to the date hereof.*

Pennsylvania Higher Education Assistance Agency ("PHEAA") is a body corporate and politic constituting a public corporation and government instrumentality created pursuant to the Pennsylvania Act of August 7, 1963, P.L. 549, as amended (the "Pennsylvania Act").  For further information on PHEAA, see the caption "SERVICING OF THE FINANCED ELIGIBLE LOANS—Backup Servicing by PHEAA—*PHEAA*" herein.

PHEAA has been guaranteeing student loans since 1964.  As of March 31, 2021, PHEAA has guaranteed a total of approximately $48.8 billion principal amount of Stafford Loans, $7.9 billion principal amount of PLUS and SLS Loans, and $52.1 billion principal amount of Consolidation Loans under the Higher Education Act.  PHEAA initially guaranteed loans only to residents of the Commonwealth of Pennsylvania (the "Commonwealth") or persons who planned to attend or were attending eligible education institutions in the Commonwealth.  In May 1986, PHEAA began guaranteeing loans to borrowers who did not meet these residency requirements pursuant to its national guarantee program.  Under the Pennsylvania Act, guarantee payments on loans under PHEAA's national guarantee program may not be paid from funds appropriated by the Commonwealth.

Effective April 1, 2013, PHEAA was designated as the guarantor for the State of Georgia.  PHEAA accepted the transfer and assignment of the rights, duties and responsibilities as a Guaranty Agency under the Federal Family Education Loan Program from the Georgia Higher Education Assistance Corporation's (GHEAC), the previous designated guarantor for the State of Georgia.  As a result, PHEAA accepted the transfer and assignment of student loans with an aggregate of $687.8 million in original principal, net of

cancellations.  All percentages and results for PHEAA in the charts below for periods of activity after April 1, 2013, include the impact of the additional guaranty volume received in the transfer.

PHEAA has adopted a default prevention program consisting of (i) informing new borrowers of the serious financial obligations incurred by them and stressing the financial and legal consequences of failure to meet all terms of the loan, (ii) working with institutions to make certain that student borrowers are enrolled in sound education programs and that the proper individual enrollment records are being maintained, (iii) assisting lenders with operational programs to ensure sound lending policies and procedures, (iv) maintaining up-to-date student status and address records of all borrowers in the guaranty program, (v) initiating prompt collection actions with borrowers who become delinquent on their loans, do not establish repayment schedules or "skip," (vi) taking prompt action, including legal action and garnishment of wages, to collect on all defaulted loans, and (vii) adopting a general policy that no loan will be automatically "written off."  Since the loan servicing program was initiated in 1974, PHEAA has never exceeded an annual default claims percentage of 5 percent and, as a result, federal reimbursement for default claims has thus far been at the maximum federal reimbursement level.

For the last five federal fiscal years (ended September 30), the annual default claims percentages have been as follows:

| Federal Fiscal Year | Annual Default Claims |
|---|---|
| 2016 | 0.46% |
| 2017 | 0.59 |
| 2018 | 1.10 |
| 2019 | 1.49 |
| 2020 | 0.82 |

As of March 31, 2021, PHEAA had total federal reserve fund assets of approximately $93.0 million.  Through March 31, 2021, the outstanding amount of original principal on loans that had been directly guaranteed by PHEAA and loans transferred from GHEAC under the Federal Family Education Loan Program was approximately $16.4 billion.  In addition, as of March 31, 2021, PHEAA had total assets of $4.1 billion, which does not include Federal Reserve Fund assets.

*Guarantee Volume*.  PHEAA's new origination guaranty volume (the approximate aggregate principal amount of federally reinsured education loans, including PLUS Loans but excluding federal consolidation loans) was zero for each of the last five federal fiscal years (ended September 30).

*Reserve Ratio*.  Under current law, PHEAA is required to manage the Federal Fund so net assets are greater than 0.25% of the original principal balance of outstanding guarantees.  The table below shows the reserve ratio for PHEAA for the last five federal fiscal years (ended September 30):

| Federal Fiscal Year | Reserve Ratio |
|---|---|
| 2016 | 0.37% |
| 2017 | 0.50 |
| 2018 | 0.60 |
| 2019 | 0.56 |
| 2020 | 0.61 |

The table displays PHEAA's calculation of the reserve ratio on a regulatory basis of accounting. Each year the reserve ratio includes an adjustment for gain contingencies not recognized under generally accepted accounting principles.

*Recovery Rates*. A guarantor's recovery rate, which provides a measure of the effectiveness of the collection efforts against defaulting borrowers after the guarantee claim has been satisfied, is determined for each year by dividing the current year collections by the total outstanding claim portfolio for the prior fiscal year.

The recovery rate decreased in 2020 due to the decrease in recoveries as a result of the COVID-19 Pandemic. The CARES Act provided an interest reprieve and implemented an automatic forbearance effective March 2020, for any borrower with a student loan held by the Department of Education. PHEAA took into account this guidance and addressed management of the default portfolio by suspending active garnishments and ceased referral of accounts to outside collection vendors. In addition, PHEAA suspended the series of standard default due diligence letters hence accounts were treated as deferred from further collections effective March 2020. PHEAA also limited outbound calls to borrowers.

The table below shows the cumulative recovery rates for PHEAA for the five federal fiscal years (ended September 30):

| Federal Fiscal Year | Reserve Ratio |
| --- | --- |
| 2016 | 28.35% |
| 2017 | 28.96 |
| 2018 | 25.82 |
| 2019 | 27.48 |
| 2020 | 23.91 |

**Information Regarding Ascendium**

Ascendium Education Solutions, Inc. f/k/a Great Lakes Higher Education Guaranty Corporation ("Ascendium") is a Wisconsin nonstock, nonprofit corporation, the sole member of which is Ascendium Education Group, Inc. f/k/a Great Lakes Higher Education Corporation ("Ascendium Education Group"). Ascendium's predecessor organization, Ascendium Education Group, was organized as a Wisconsin nonstock, nonprofit corporation and began guaranteeing student loans under the Higher Education Act in 1967. Ascendium is the designated guaranty agency under the Higher Education Act for Wisconsin, Arkansas, Iowa, Minnesota, Montana, North Dakota, Ohio, South Dakota, Puerto Rico and the Virgin Islands. On January 1, 2002, Ascendium Education Group (and Ascendium directly and through its support services agreement with Ascendium Education Group), outsourced certain aspects of its student loan program guaranty support operations to Great Lakes Educational Loan Services, Inc. Ascendium continues as the "guaranty agency" as defined in Section 435(j) of the Higher Education Act and continues its default aversion, claim purchase and compliance, collection support and federal reporting responsibilities as well as custody and responsibility for all revenues, expenses and assets related to that status. The primary operations center for Ascendium Education Group and its affiliates (including Ascendium) is in Madison, Wisconsin, which includes operational staff offices for guaranty functions. Ascendium also maintain offices in: Eagan, Minnesota; Aberdeen, South Dakota; and Indianapolis, Indiana. Ascendium will provide a copy of Ascendium Education Group's most recent consolidated financial statements on receipt of a written request directed to 2501 International Lane, Madison, Wisconsin 53704, Attention: Chief Financial Officer.

United Student Aid Funds, Inc. ("USAF") was organized as a private, nonprofit corporation under the General Corporation Law of the State of Delaware in 1960.  USAF (i) maintained facilities for the provision of guarantee services with respect to approved education loans made to or for the benefit of eligible students attending approved educational institutions; (ii) guaranteed education loans made pursuant to certain loan programs under the Higher Education Act, as well as loans made under certain private loan programs; and (iii) served as the designated guarantor for education-loan programs under the Higher Education Act in Arizona, Hawaii and certain Pacific Islands, Indiana, Kansas, Maryland, Mississippi, Nevada and Wyoming.

USAF was the sole member of the Northwest Education Loan Association ("NELA"), a guarantor serving the states of Washington, Idaho and the Northwest.  Ascendium Education Group became a member of USAF effective January 1, 2017.

Effective as of December 31, 2018, NELA was dissolved, with its remaining assets going to its sole member, USAF.  Immediately thereafter, USAF was merged into Ascendium.  Thus, the portfolios previously held by USAF and NELA are now held by Ascendium.

The information in the following tables has been provided to the Issuer from reports provided by or to the U.S. Department of Education and has not been verified by the Issuer,  Ascendium, or the Underwriter.  No representation is made by the Issuer, Ascendium, or the Underwriter as to the accuracy or completeness of this information.  Prospective investors may consult the U.S. Department of Education Data Books and Web sites http://www2.ed.gov/finaid/prof/resources/data/opeloanvol.html and http://www.fp.ed.gov/pubs.html for further information concerning Ascendium or any other guaranty agency.  Such websites are not incorporated into this Offering Memorandum.

***Guaranty Volume***.  Pursuant to the Reconciliation Act of 2010, Ascendium, the former USAF, and the former NELA ceased issuing new loan guarantees on June 30, 2010.  The most recent year for which the U.S. Department of Education has issued guaranty volume information is 2009.  Ascendium issued $7.0 billion in new loan guarantees in that year.

***Reserve Ratio***.  The reserve ratios for Ascendium, the former USAF and the former NELA are as follows:

#### The Ascendium Portfolio[*]

Following are Ascendium's reserve fund levels as calculated in accordance with 34 CFR 682.410(a)(10) for the last five federal fiscal years:

| Federal Fiscal Year | Federal Guaranty Reserve Fund Level[1] |
|---|---|
| 2016 | 1.37% |
| 2017 | 1.80 |
| 2018 | 2.21 |
| 2019 | 0.64 |
| 2020 | 0.96 |

The U.S. Department of Education's website has posted reserve ratios for Ascendium for federal years 2016, 2017, 2018, 2019 and 2020 of  0.827%, 1.000%,1.480%, 0.49% and 0.59% respectively. Ascendium believes the Department of Education has not calculated the reserve ratio in accordance with the Act and the correct ratio should be 1.37%, 1.80%, 2.21%, 0.64% and 0.96% respectively, as shown

above and as explained in the following footnote.  On November 17, 2006, the U.S. Department of Education advised Ascendium that beginning in Federal Fiscal Year 2006 it will publish reserve ratios that include loan loss provision and deferred revenues.  Ascendium believes this change more closely approximates the statutory calculation.  According to the U.S. Department of Education, available cash reserves may not always be an accurate barometer of a guarantor's financial health.

[1/] In accordance with Section 428(c)(9) of the Higher Education Act, does not include loans transferred from the former Higher Education Assistance Foundation, Northstar Guarantee Inc., Ohio Student Aid Commission, Puerto Rico Higher Education Assistance Corporation, Student Loan Guarantee Foundation of Arkansas, Student Loans of North Dakota, Montana Guaranteed Student Loan Program,  or designated states of Arizona, Hawaii, Idaho, Indiana, Kansas, Maryland, Mississippi, Nevada, Washington, Wyoming, and certain Pacific Trust Territories.  (The minimum reserve fund ratio under the Higher Education Act is 0.25%.)

[*] The percentages for 2015-2018 include only the Ascendium portfolio; the percentage for 2019 include the combined portfolios of Ascendium, USAF and NELA.

### The Former USAF Portfolio Now Held by Ascendium

Following are USAF's reserve fund levels as calculated in accordance with 34 CFR 682.410(a)(10) for the five federal fiscal years presented:

| Federal Fiscal Year | Federal Guaranty Reserve Fund Level[1] |
|---|---|
| 2014 | 0.277% |
| 2015 | 0.251 |
| 2016 | 0.308 |
| 2017 | 0.350 |
| 2018 | 0.363 |

[1/] In accordance with Section 428(c)(9) of the Higher Education Act, does not include loans transferred from the former Higher Education Assistance Foundation, Northstar Guarantee Inc., Ohio Student Aid Commission, Puerto Rico Higher Education Assistance Corporation, Student Loan Guarantee Foundation of Arkansas, Student Loans of North Dakota, Montana Guaranteed Student Loan Program,  or designated states of Arizona, Hawaii, Idaho, Indiana, Kansas, Maryland, Mississippi, Nevada, Washington, Wyoming, and certain Pacific Trust Territories.  (The minimum reserve fund ratio under the Higher Education Act is 0.25%.)

### The Former NELA Portfolio Now Held by Ascendium

Following are NELA's reserve fund levels as calculated in accordance with 34 CFR 682.410(a)(10) for the five federal fiscal years presented:

| Federal Fiscal Year | Federal Guaranty Reserve Fund Level[1] |
|---|---|
| 2014 | 0.377% |
| 2015 | 0.295 |
| 2016 | 0.373 |
| 2017 | 0.430 |
| 2018 | 0.460 |

[1/] In accordance with Section 428(c)(9) of the Higher Education Act, does not include loans transferred from the former Higher Education Assistance Foundation, Northstar Guarantee Inc., Ohio Student Aid Commission, Puerto Rico

Higher Education Assistance Corporation, Student Loan Guarantee Foundation of Arkansas, Student Loans of North Dakota, Montana Guaranteed Student Loan Program,  or designated states of Arizona, Hawaii, Idaho, Indiana, Kansas, Maryland, Mississippi, Nevada, Washington, Wyoming, and certain Pacific Trust Territories.  (The minimum reserve fund ratio under the Higher Education Act is 0.25%.)

*Claims Rate*.  The claims rate for Ascendium, USAF and NELA are as follows:

### The Ascendium Portfolio[*]

For the past five federal fiscal years, Ascendium's claims rate has not exceeded 5%, and, as a result, the highest allowable reinsurance has been paid on all Ascendium's claims.  The actual claims rates are as follows:

| Federal Fiscal Year | Claims Rate |
|---|---|
| 2016 | 1.00% |
| 2017 | 0.35 |
| 2018 | 0.35 |
| 2019 | 2.00 |
| 2020 | 1.40 |

[*] The percentages for 2016 through 2018 include only the Ascendium portfolio; the percentages for 2019 and 2020 include the combined portfolios of Ascendium, USAF and NELA.

### The Former USAF Portfolio Now Held by Ascendium

For the five federal fiscal years presented, USAF's claims rate has not exceeded 5%, and, as a result, the highest allowable reinsurance has been paid on all USAF's claims.  The actual claims rates are as follows:

| Federal Fiscal Year | Claims Rate |
|---|---|
| 2014 | 4.73% |
| 2015 | 4.71 |
| 2016 | 0.60 |
| 2017 | 0.67 |
| 2018 | 2.15 |

### The Former NELA Portfolio Now Held by Ascendium

For the five federal fiscal years presented, NELA's claims rate has not exceeded 5%, and, as a result, the highest allowable reinsurance has been paid on all NELA's claims.  The actual claims rates are as follows:

| Federal Fiscal Year | Claims Rate |
|---|---|
| 2014 | 1.37% |
| 2015 | 0.60 |
| 2016 | 1.31 |
| 2017 | 0.63 |
| 2018 | 1.52 |

As a result of various statutory and regulatory changes over the past several years, historical rates may not be an accurate indicator of current delinquency or default trends or future claims rates.

## FEES AND EXPENSES

The maximum Administration Fees (including the amounts allocated for the payment of Program Fees), Servicing Fees and the Trustee Fees payable by the Issuer under the Indenture are set forth in the table below.  The priority of payment of such fees and expenses is described under the caption "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES—Collection Fund; Flow of Funds" herein.  The amounts below are subject to increase upon satisfaction of a Rating Agency Condition.

| Fees | Recipient | Amount |
|------|-----------|--------|
| Administration Fee | The Issuer | 0.05% per annum[1] |
| Servicing Fee | The Issuer | 0.80% per annum[2] |
| Trustee Fee | U.S. Bank National Association | 0.03% per annum[3], plus expenses |

---

[1] As a percentage of the Pool Balance, payable monthly in arrears and determined as of the last day of the preceding calendar month, with no inflation adjustment.  The Administration Fee will also include annual reimbursement of expenses incurred by the Issuer under the Indenture (such as fees and expenses due to the Rating Agencies and the Backup Servicer and other fees of the Program (including compliance audits), limited to $100,000, less the portion of the Expense Cap (as hereafter defined) paid to the Trustee as described below during such year, which amount shall be payable solely on the Monthly Distribution Date in September of each year beginning in 2022.

[2] As a percentage of the Pool Balance, payable monthly in arrears and determined as of the last day of the preceding month, with no inflation adjustment.  The Servicing Fee for each month will not exceed the greater of the amount specified above and a servicing fee floor equal to $2.50 per borrower per month, subject to 3% annual inflation from the date of issuance.

[3] As a percentage of the outstanding principal amount of the Notes, payable quarterly in arrears, with a quarterly minimum of $1,500.

The Trustee is also entitled, as a part of the Trustee Fee, to expense reimbursement up to a maximum annual amount (prior to an Event of Default) equal to $50,000 (the "Expense Cap").  Any amounts described in the prior sentence that are not paid or reimbursed to the Trustee in any year shall be available to the Issuer (as administrator), as a part of the Administration Fee, on the September Monthly Distribution Date of each year beginning in 2022 to pay or reimburse the Issuer for Program Fees and other expenses of the Issuer incurred under the Indenture.

[Remainder of page intentionally left blank]

## USE OF PROCEEDS

The estimated sources and uses are expected to be applied as follows.  All amounts reflected in the table below are estimates and the final amounts will not be determined until the Date of Issuance.

| | |
|---|---|
| Source of Funds: | |
| Proceeds of the Notes | $197,500,000 |
| Less original issue discount | 44,703 |
| Less underwriting discount | 1,055,930 |
| Total | $196,399,367 |
| | |
| Uses: | |
| Deposit to Student Loan Fund[1] | $188,421,083 |
| Deposit to Capitalized Interest Fund | 6,000,000 |
| Deposit to the Reserve Fund | 1,307,534 |
| Deposit to Cost of Issuance Fund | 670,750 |
| Total | $196,399,367 |

_____
[1] To be used to refinance the Financed Eligible Loans as described below.

Certain of the proceeds deposited into the Student Loan Fund on the Date of Issuance will be (i) transferred by the Trustee to the lender under the Warehouse Agreement to refinance certain Eligible Loans that are being pledged to the Indenture and (ii) transferred by the Trustee to the Issuer in consideration of the pledge by the Issuer of certain Eligible Loans held unencumbered by the Issuer.  Contemporaneously with the receipt of such proceeds by the lender under the Warehouse Agreement, the applicable Eligible Loans under the Warehouse Agreement will be released, such Eligible Loans will be deposited to the credit of the Student Loan Fund, and such Eligible Loans will constitute Financed Eligible Loans under the Indenture.  Contemporaneously with the receipt of such proceeds by the Issuer, the Eligible Loans previously held unencumbered by the Issuer will be pledged by the Issuer under the Indenture, will be deposited to the credit of the Student Loan Fund and will constitute Financed Eligible Loans under the Indenture.

## CHARACTERISTICS OF THE FINANCED ELIGIBLE LOANS

**General**

The Eligible Loans expected to be pledged pursuant to the Indenture are loans made to finance post-secondary education made under the Higher Education Act (the "Eligible Loans").  Loans that meet the foregoing criteria are sometimes referred to in this Offering Memorandum as "Financed Eligible Loans."  As of the Statistical Cut-Off Date (June 30, 2021), the characteristics of the pool of Eligible Loans the Issuer expects to pledge to the Trustee pursuant to the Indenture on the Date of Issuance were collectively as described below.  The aggregate outstanding principal balance of the Eligible Loans in each of the following tables includes the principal balance due from borrowers and approximately $9,664,923 of interest expected to be capitalized upon commencement of repayment.  The percentages set forth in the tables below may not always add to 100% and the balances may not always add to $201,530,098 due to rounding.

In the event that the principal amount of Eligible Loans required to provide collateral for the Notes varies from the amounts anticipated herein, whether by reason of a change in the collateral requirement necessary to obtain the rating on the Notes from each Rating Agency that will rate the Notes as indicated under the caption "SUMMARY OF TERMS—Rating of the Notes" herein, the pricing of the interest rate

on the Notes, the principal amount of Notes to be offered, the rate of amortization or prepayment on the portfolio of Eligible Loans from the Statistical Cut-Off Date to the Date of Issuance varying from the rates that were anticipated, or otherwise, the portfolio of Eligible Loans to be pledged to the Trustee under the Indenture may consist of a subset of the pool of Eligible Loans described below or may include additional Eligible Loans not described below.

The aggregate characteristics of the entire pool of Eligible Loans expected to be pledged on the Date of Issuance, including the composition of the Eligible Loans and the related borrowers, the distribution by student loan type, the distribution by interest rate, the distribution by Special Allowance Payment ("SAP" or "Special Allowance Payment") index, the distribution by principal balance and the distribution by remaining term to scheduled maturity, may vary from the information presented below since the information presented below is as of the Statistical Cut-Off Date, and the date that the Financed Eligible Loans will be pledged to the Trustee under the Indenture will occur after that date.

The Consolidated Appropriations Act of 2012 authorized eligible lenders under the FFEL Program to make an irrevocable election to permanently convert the index upon which Special Allowance Payment calculations would be based, effective April 1, 2012, for all FFELP Loans owned by an electing lender that were disbursed after January 1, 2000 (except for excluded FFELP Loans as to which a third party had a contractual right to approve such an election, if such approval had not been obtained). The Special Allowance Payment calculations for FFELP Loans to which such an election applies are based on the one-month London Interbank Offered Rate for United States dollars in effect for each day of the applicable calendar quarter, as compiled and released by the British Bankers Association ("SAP One-Month LIBOR"), rather than on the three-month commercial paper (financial) rate, which remains applicable with respect to other FFELP Loans that were disbursed after January 1, 2000. The Issuer elected to permanently convert its FFELP Loans that were disbursed after January 1, 2000 to a SAP One-Month LIBOR basis.

An Eligible Loan originated under the FFELP that has previously defaulted, but satisfies the conditions described below, is known as a "rehabilitation loan." Approximately 4.73% of the Financed Eligible Loans will be rehabilitation loans. To rehabilitate an Eligible Loan originated under the FFELP, a borrower must pay the applicable Guaranty Agency at least nine full payments of an amount that is reasonable and affordable, as agreed to by the borrower and the Guaranty Agency, within twenty days of their monthly due dates over a 10-month period. Once the borrower has made the required payments, the loan may be purchased by an eligible lending institution. After a rehabilitation loan is purchased, it is eligible for all benefits under the Higher Education Act for which it would have been eligible if no default had occurred. See "APPENDIX A—DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM—Insurance and Guarantees—*Rehabilitation of Defaulted Loans*" hereto.

[Remainder of page intentionally left blank]

**Composition of the Financed Eligible Loan Portfolio
(as of the Statistical Cut-Off Date)**

| | |
|---|---|
| Aggregate Outstanding Principal Balance[*] | $201,530,098 |
| Accrued Interest to be Capitalized | $9,664,923 |
| Accrued Interest to be Capitalized Upon Commencement of Repayment | $3,219,625 |
| Accrued Interest to be Capitalized for Loans in Income Based Repayment | $6,445,298 |
| Accrued Interest not to be Capitalized | $618,190 |
| Aggregate Outstanding Principal Balance—Treasury Bill SAP | $3,831,917 |
| Percentage of Aggregate Outstanding Principal Balance—Treasury Bill SAP | 1.90% |
| Aggregate Outstanding Principal Balance—One-Month LIBOR SAP | $197,698,181 |
| Percentage of Aggregate Outstanding Principal Balance—One-Month LIBOR SAP | 98.10% |
| Total Number of Borrowers | 15,387 |
| Average Principal Balance per Borrower | $13,097 |
| Total Number of Loans | 29,132 |
| Weighted Average Borrower Age | 48 |
| Weighted Average Remaining Term (months) | 169 |
| Weighted Average Annual Interest Rate | 5.14% |
| Weighted Average Annual Interest Rate after Borrower Benefits | 5.05% |
| Aggregate Outstanding Principal Balance of Rehabilitated Loans | $9,496,737 |
| Percentage of Aggregate Outstanding Principal Balance of Rehabilitated Loans | 4.71% |

_____
[*]Includes accrued interest to be capitalized.

**Distribution of the Financed Eligible Loans by
Loan Type
(as of the Statistical Cut-Off Date)**

| Loan Type | Number of Loans | Aggregate Outstanding Principal Balance | Percent of Aggregate Outstanding Principal Balance |
|---|---|---|---|
| Consolidation Loans - Unsubsidized | 5,000 | $ 71,733,005 | 35.6% |
| Stafford Loans - Unsubsidized | 8,985 | 47,281,282 | 23.5 |
| Stafford Loans - Subsidized | 11,194 | 39,826,026 | 19.8 |
| Consolidation Loans - Subsidized | 3,449 | 36,378,428 | 18.1 |
| PLUS Loans | 504 | 6,311,357 | 3.1 |
| Totals | 29,132 | $201,530,098 | 100.0% |

[Remainder of page intentionally left blank]

**Distribution of the Financed Eligible Loans by
School Type
(as of the Statistical Cut-Off Date)**

| School Type | Number of Loans | Aggregate Outstanding Principal Balance | Percent by Aggregate Outstanding Principal Balance |
|---|---|---|---|
| 4-Year + | 19,879 | $148,934,398 | 73.9% |
| 2-Year | 5,676 | 22,785,634 | 11.3 |
| Proprietary | 3,118 | 21,155,582 | 10.5 |
| Consolidation Loan (Unknown) | 408 | 8,520,891 | 4.2 |
| Other | 51 | 133,592 | 0.1 |
| Totals | 29,132 | $201,530,098 | 100.0% |

**Distribution of the Financed Eligible Loans by
Range of Annual Borrower Interest Rate
(as of the Statistical Cut-Off Date)**

| Range of Annual Borrower Interest Rate | Number of Loans | Aggregate Outstanding Principal Balance | Percent by Aggregate Outstanding Principal Balance |
|---|---|---|---|
| Less than 1.00% | 7 | $ 48,717 | 0.0[*]% |
| 1.01% to 2.00% | 687 | 3,210,105 | 1.6 |
| 2.01% to 3.00% | 12,489 | 55,464,145 | 27.5 |
| 3.01% to 4.00% | 968 | 8,435,032 | 4.2 |
| 4.01% to 5.00% | 2,338 | 24,076,340 | 11.9 |
| 5.01% to 6.00% | 1,748 | 19,817,268 | 9.8 |
| 6.01% to 7.00% | 8,771 | 56,610,259 | 28.1 |
| 7.01% to 8.00% | 1,427 | 23,377,759 | 11.6 |
| 8.01% to 9.00% | 675 | 10,412,605 | 5.2 |
| 9.01% or more | 22 | 77,866 | 0.0[*] |
| Totals | 29,132 | $201,530,098 | 100.0% |

[*]Less than 0.05%, but greater than 0.00%.

[Remainder of page intentionally left blank]

**Distribution of the Financed Eligible Loans by**
**Payment Rate Reduction**
**(as of the Statistical Cut-Off Date)**

| Payment Rate Reduction | Number of Loans | Aggregate Outstanding Principal Balance | Percent by Aggregate Outstanding Principal Balance |
|---|---|---|---|
| None | 22,518 | $160,487,805 | 79.6% |
| Currently Receiving 0.25% | 5,592 | 37,957,075 | 18.8 |
| Currently Receiving 2.00% | 115 | 261,789 | 0.1 |
| Currently Receiving 2.50% | 18 | 93,087 | 0.0* |
| Currently Receiving 3.00% | 887 | 2,726,665 | 1.4 |
| Interest Rate set at 3.25% | 1 | 1,859 | 0.0* |
| Currently Receiving 4.00% | 1 | 1,817 | 0.0* |
| Totals | 29,132 | $201,530,098 | 100.0% |

_____
*Less than 0.05%, but greater than 0.00%.

**Distribution of the Financed Eligible Loans by**
**Range of Outstanding Principal Balance**
**(as of the Statistical Cut-Off Date)**

| Range of Outstanding Principal Balance | Number of Loans | Aggregate Outstanding Principal Balance | Percent by Aggregate Outstanding Principal Balance |
|---|---|---|---|
| $2,000.00 or less | 7,688 | $ 7,588,880 | 3.8% |
| $2,000.01 to $4,000.00 | 6,664 | 19,699,148 | 9.8 |
| $4,000.01 to $6,000.00 | 4,397 | 21,571,159 | 10.7 |
| $6,000.01 to $8,000.00 | 3,584 | 24,737,301 | 12.3 |
| $8,000.01 to $10,000.00 | 2,045 | 18,160,188 | 9.0 |
| $10,000.01 to $15,000.00 | 2,077 | 25,047,708 | 12.4 |
| $15,000.01 to $20,000.00 | 937 | 16,063,393 | 8.0 |
| $20,000.01 to $25,000.00 | 508 | 11,365,282 | 5.6 |
| $25,000.01 to $30,000.00 | 319 | 8,723,779 | 4.3 |
| $30,000.01 to $40,000.00 | 385 | 13,237,771 | 6.6 |
| $40,000.01 to $50,000.00 | 192 | 8,539,265 | 4.2 |
| $50,000.01 to $60,000.00 | 113 | 6,161,966 | 3.1 |
| $60,000.01 or more | 223 | 20,634,259 | 10.2 |
| Totals | 29,132 | $201,530,098 | 100.0% |

[Remainder of page intentionally left blank]

**Distribution of the Financed Eligible Loans by**
**Date of Disbursement (dates correspond to changes in guarantee percentage)**
**(as of the Statistical Cut-Off Date)**[*]

| Date of Disbursement (and corresponding guarantee percentage) | Number of Loans | Aggregate Outstanding Principal Balance | Percent by Aggregate Outstanding Principal Balance |
|---|---|---|---|
| On or after July 1, 2006 (97%) | 12,476 | $109,311,170 | 54.2% |
| October 1, 1993 – June 30, 2006 (98%) | 16,572 | 91,903,173 | 45.6 |
| Before October 1, 1993 (100%) | 84 | 315,755 | 0.2 |
| Totals | 29,132 | $201,530,098 | 100.0% |

[*]Student loans disbursed prior to October 1, 1993 are 100% guaranteed by the Guaranty Agency.  Student loans disbursed on or after October 1, 1993 and before July 1, 2006 are 98% guaranteed by the applicable Guaranty Agency.  Student loans for which the first disbursement is made on or after July 1, 2006 and before July 1, 2010 are 97% guaranteed by the applicable Guaranty Agency.

**Distribution of the Financed Eligible Loans by**
**Number of Days Delinquent**
**(as of the Statistical Cut-Off Date)**

| Number of Days Delinquent | Number of Loans | Aggregate Outstanding Principal Balance | Percent by Aggregate Outstanding Principal Balance |
|---|---|---|---|
| 30 days or less | 29,127 | $201,521,422 | 100.0% |
| 31-60 days | 4 | 8,479 | 0.0[*] |
| 91-120 days | 1 | 196 | 0.0[*] |
| Totals | 29,132 | $201,530,098 | 100.0% |

[*]Less than 0.05%, but greater than 0.00%.

[Remainder of page intentionally left blank]

**Distribution of the Financed Eligible Loans by
Remaining Term to Scheduled Maturity (in months)
(as of the Statistical Cut-Off Date)**

| Range of Remaining Term to Scheduled Maturity (in months) | Number of Loans | Aggregate Outstanding Principal Balance | Percent by Aggregate Outstanding Principal Balance |
|---|---|---|---|
| 12 or less | 1,120 | $ 614,837 | 0.3% |
| 13 to 24 | 1,406 | 1,490,642 | 0.7 |
| 25 to 36 | 1,185 | 2,045,896 | 1.0 |
| 37 to 48 | 1,109 | 2,811,538 | 1.4 |
| 49 to 60 | 1,302 | 4,840,957 | 2.4 |
| 61 to 72 | 1,460 | 6,505,528 | 3.2 |
| 73 to 84 | 1,221 | 6,031,206 | 3.0 |
| 85 to 96 | 1,122 | 5,985,178 | 3.0 |
| 97 to 108 | 1,366 | 7,572,312 | 3.8 |
| 109 to 120 | 2,034 | 12,919,449 | 6.4 |
| 121 to 132 | 1,760 | 12,877,460 | 6.4 |
| 133 to 144 | 2,303 | 17,393,800 | 8.6 |
| 145 to 156 | 2,806 | 18,457,770 | 9.2 |
| 157 to 168 | 2,278 | 17,425,754 | 8.6 |
| 169 to 180 | 1,282 | 13,188,118 | 6.5 |
| 181 to 192 | 826 | 10,839,331 | 5.4 |
| 193 to 204 | 873 | 9,965,236 | 4.9 |
| 205 to 216 | 673 | 7,841,951 | 3.9 |
| 217 to 228 | 521 | 6,194,071 | 3.1 |
| 229 to 240 | 398 | 5,280,277 | 2.6 |
| 241 to 252 | 393 | 5,167,815 | 2.6 |
| 253 to 264 | 297 | 4,050,439 | 2.0 |
| 265 to 276 | 221 | 3,533,350 | 1.8 |
| 277 to 288 | 220 | 3,605,560 | 1.8 |
| 289 to 300 | 162 | 2,311,598 | 1.1 |
| 301 to 312 | 166 | 1,939,546 | 1.0 |
| 313 to 324 | 108 | 1,858,942 | 0.9 |
| 325 to 336 | 65 | 972,605 | 0.5 |
| 337 to 348 | 48 | 765,684 | 0.4 |
| 349 to 360 | 53 | 1,111,234 | 0.6 |
| 361 or greater | 354 | 5,932,016 | 2.9 |
| Totals | 29,132 | $201,530,098 | 100.0% |

[Remainder of page intentionally left blank]

**Distribution of the Financed Eligible Loans by
Borrower Payment Status
(as of the Statistical Cut-Off Date)**

| Borrower Payment Status | Number of Loans | Aggregate Outstanding Principal Balance | Percent by Aggregate Outstanding Principal Balance |
|---|---|---|---|
| Deferment | 1,559 | $   9,490,558 | 4.7% |
| Forbearance | 1,360 | 11,510,515 | 5.7 |
| Disaster Forbearance (including COVID-19) | 6,003 | 44,571,557 | 22.1 |
| Grace | 12 | 113,047 | 0.1 |
| In-School | 52 | 267,825 | 0.1 |
| Repayment (First Year) | 8 | 47,101 | 0.0[*] |
| Repayment (Second Year) | 9 | 52,122 | 0.0[*] |
| Repayment (Third Year) | 11 | 42,149 | 0.0[*] |
| Repayment (More than 3 Years) | 20,118 | 135,435,224 | 67.2 |
| Totals | 29,132 | $201,530,098 | 100.0% |

_____
[*]Less than 0.05%, but greater than 0.00%.

**Distribution of the Financed Eligible Loans by
Geographic Location
(as of the Statistical Cut-Off Date)**

| Geographic Location | Number of Loans | Aggregate Outstanding Principal Balance | Percent by Aggregate Outstanding Principal Balance |
|---|---|---|---|
| Missouri | 13,733 | $  90,411,934 | 44.9% |
| Mississippi | 3,121 | 19,467,282 | 9.7 |
| Arkansas | 1,712 | 10,760,777 | 5.3 |
| California | 1,351 | 9,380,274 | 4.7 |
| Texas | 1,184 | 8,489,347 | 4.2 |
| Illinois | 1,110 | 8,361,005 | 4.1 |
| Georgia | 627 | 4,954,273 | 2.5 |
| Kansas | 649 | 4,503,883 | 2.2 |
| Florida | 566 | 4,155,813 | 2.1 |
| New York | 396 | 3,474,257 | 1.7 |
| Tennessee | 419 | 2,857,366 | 1.4 |
| North Carolina | 339 | 2,170,062 | 1.1 |
| Massachusetts | 150 | 2,014,674 | 1.0 |
| New Jersey | 133 | 1,932,177 | 1.0 |
| Arizona | 250 | 1,872,579 | 0.9 |
| South Carolina | 122 | 1,745,642 | 0.9 |

| Geographic Location | Number of Loans | Aggregate Outstanding Principal Balance | Percent by Aggregate Outstanding Principal Balance |
|---|---|---|---|
| Virginia | 240 | 1,652,380 | 0.8 |
| Colorado | 261 | 1,593,022 | 0.8 |
| Washington | 226 | 1,536,495 | 0.8 |
| Pennsylvania | 133 | 1,402,844 | 0.7 |
| Oklahoma | 210 | 1,359,746 | 0.7 |
| Alabama | 245 | 1,323,297 | 0.7 |
| Maryland | 141 | 1,253,474 | 0.6 |
| Michigan | 97 | 1,227,892 | 0.6 |
| Minnesota | 132 | 1,175,867 | 0.6 |
| Indiana | 119 | 1,170,261 | 0.6 |
| Ohio | 159 | 1,087,382 | 0.5 |
| Nevada | 98 | 1,048,829 | 0.5 |
| Kentucky | 98 | 957,001 | 0.5 |
| Iowa | 118 | 925,728 | 0.5 |
| Oregon | 191 | 881,628 | 0.4 |
| Connecticut | 59 | 620,759 | 0.3 |
| Louisiana | 116 | 618,041 | 0.3 |
| Nebraska | 100 | 613,468 | 0.3 |
| Wisconsin | 80 | 578,601 | 0.3 |
| Hawaii | 56 | 526,423 | 0.3 |
| Foreign Country | 48 | 438,457 | 0.2 |
| District of Columbia | 34 | 339,854 | 0.2 |
| Maine | 15 | 328,874 | 0.2 |
| New Hampshire | 33 | 325,759 | 0.2 |
| New Mexico | 25 | 322,119 | 0.2 |
| North Dakota | 25 | 246,658 | 0.1 |
| Idaho | 31 | 219,215 | 0.1 |
| Utah | 35 | 215,652 | 0.1 |
| Rhode Island | 25 | 190,781 | 0.1 |
| West Virginia | 13 | 151,180 | 0.1 |
| Delaware | 13 | 145,587 | 0.1 |
| Wyoming | 11 | 144,579 | 0.1 |
| Montana | 25 | 85,202 | 0.0[*] |
| South Dakota | 16 | 79,720 | 0.0[*] |
| Alaska | 15 | 59,765 | 0.0[*] |
| Vermont | 6 | 56,361 | 0.0[*] |
| Armed Forces Europe | 14 | 39,586 | 0.0[*] |
| Armed Forces Pacific | 3 | 25,982 | 0.0[*] |
| Puerto Rico | 3 | 9,310 | 0.0[*] |
| Virgin Islands | 1 | 974 | 0.0[*] |
| Totals | 29,132 | $201,530,098 | 100.0% |

_____
[*]Less than 0.05%, but greater than 0.00%.

**Distribution of the Financed Eligible Loans by**
**Current Repayment Schedule**
**(as of the Statistical Cut-Off Date)**

| Current Repayment Schedule | Number of Loans | Aggregate Outstanding Principal Balance | Percent by Aggregate Outstanding Principal Balance |
|---|---|---|---|
| Non-Income-Based Repayment | 12,430 | $ 84,065,423 | 41.7% |
| Income-Based Repayment (Partial Financial Hardship) [1] | 8,774 | 71,772,757 | 35.6 |
| Income-Based Repayment (Permanent Standard) [2] | 7,928 | 45,691,917 | 22.7 |
| Totals | 29,132 | $201,530,098 | 100.0% |

[1] A borrower has a partial financial hardship if the annual payment amount on all eligible FFELP and Direct Loans exceeds 15% of the difference between the borrower's adjusted gross income and 150% of the U.S. Department of Health and Human Services poverty guideline applicable to the borrower's family size and state of residence. Eligible FFELP and Direct loans include the outstanding balances on all loans except a defaulted loan, a FFELP or Direct parent PLUS loan and a FFELP or Direct Consolidation loan that repaid a FFELP or Direct parent PLUS loan.

[2] For repayment schedules available to a borrower under the income-based repayment plan. The payment amount is calculated on the basis of both of the following: the borrower's outstanding loan balance when the borrower begins repayment under an income-based repayment plan and a 10-year repayment period.

**Distribution of the Financed Eligible Loans by**
**Date of Disbursement**
**(Dates Correspond to Changes in Special Allowance Payment)**
**(as of the Statistical Cut-Off Date)**

| Date of Disbursement | Number of Loans | Aggregate Outstanding Principal Balance | Percent by Aggregate Outstanding Principal Balance |
|---|---|---|---|
| Pre-April 1, 2006[*] | 14,869 | $ 77,199,885 | 38.3% |
| April 1, 2006 through September 30, 2007 | 11,820 | 103,512,592 | 51.4 |
| October 1, 2007 and after[**] | 2,443 | 20,817,620 | 10.3 |
| Totals | 29,132 | $201,530,098 | 100.0% |

[*] The Higher Education Act provides that for certain FFELP Loans first disbursed prior to April 1, 2006 lenders are entitled to retain student loan interest income in excess of the special allowance support level for such loans, in instances when the loan rate exceeds the Special Allowance Payments. However, lenders are not allowed to retain such excess interest income on other loans, including FFELP Loans disbursed on or after April 1, 2006, and are required to rebate any such "excess interest" to the Secretary on a quarterly basis. For FFELP Loans disbursed on or after April 1, 2006 and before July 1, 2010, if the stated interest rate is higher than the rate applicable to such FFELP Loan including Special Allowance Payments ("SAP"), the holder of the FFELP Loan must credit the difference to the Department of Education. See the caption "APPENDIX A—DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM—Special Allowance Payments" hereto.

[**] FFELP Loans disbursed on or after October 1, 2007 have a higher SAP margin for eligible not-for-profit lenders such as the Issuer than for profit lenders, but have a 40 bps to 70 bps lower Special Allowance Payment margin than loans originated on or after January 1, 2000 and before October 1, 2007.

**Distribution of the Financed Loans by Date of Disbursement and Loan Type[1]**
**(Dates Correspond to Changes in Special Allowance Payment)**
**(As of the Statistical Cut-Off Date)**

| Date of Disbursement and Loan Type[1] | Number of Loans | Aggregate Outstanding Principal Balance | Percent by Aggregate Outstanding Principal Balance |
|---|---|---|---|
| **Consolidation Loans:** | | | |
| Before April 1, 2006[2] | 2,356 | $ 25,241,509 | 12.5% |
| April 1, 2006 – September 30, 2007 | 5,476 | 70,134,608 | 34.8 |
| On or After October 1, 2007 | 617 | 12,735,316 | 6.3 |
| Sub-Total | 8,449 | $108,111,433 | 53.6% |
| **Non-Consolidation Loans:** | | | |
| Before April 1, 2006[3] | 12,513 | $51,958,376 | 25.8% |
| April 1, 2006 – September 30, 2007 | 6,344 | 33,377,984 | 16.6 |
| On or After October 1, 2007 | 1,826 | 8,082,304 | 4.0 |
| Sub-Total | 20,683 | $93,418,665 | 46.4% |

---

[1] The Higher Education Act provides that for certain FFELP Loans first disbursed prior to April 1, 2006 lenders are entitled to retain student loan interest income in excess of the special allowance support level for such loans, in instances when the loan rate exceeds the Special Allowance Payments. However, lenders are not allowed to retain such excess interest income on other loans, including FFELP Loans disbursed on or after April 1, 2006, and are required to rebate any such "excess interest" to the Secretary on a quarterly basis. For FFELP Loans disbursed on or after April 1, 2006 and before July 1, 2010, if the stated interest rate is higher than the rate applicable to such FFELP Loan including Special Allowance Payments ("SAP"), the holder of the FFELP Loan must credit the difference to the Department of Education. FFELP Loans disbursed on or after October 1, 2007 have a higher SAP margin for eligible not-for-profit lenders such as the Corporation than for-profit lenders, but have a 40 bps to 70 bps lower SAP margin for such eligible not-for-profit lenders than loans originated on or after January 1, 2000 and before October 1, 2007.

[2] The weighted average annual interest rate of loans in this category is 4.31%.

[3] The weighted average annual interest rate of loans in this category is 2.45%.

[Remainder of page intentionally left blank]

**Distribution of the Financed Eligible Loans by
Guaranty Agency (as of the Statistical Cut-Off Date)**

| Guaranty Agency | Number of Loans | Aggregate Outstanding Principal Balance | Percent by Aggregate Outstanding Principal Balance |
|---|---|---|---|
| Missouri Department of Higher Education | 17,015 | $109,385,309 | 54.3% |
| Pennsylvania Higher Education Assistance Agency | 2,377 | 38,079,751 | 18.9 |
| Ascendium Education Solutions, Inc. | 4,064 | 21,341,252 | 10.6 |
| Education Credit Management Corporation | 2,862 | 17,873,035 | 8.9 |
| National Student Loan Program | 1,890 | 10,842,238 | 5.4 |
| Texas Guaranteed Student Loan Corporation | 329 | 1,927,564 | 1.0 |
| Kentucky Higher Education Assistance Authority | 134 | 698,355 | 0.3 |
| New York State Higher Education Services Corporation | 225 | 565,303 | 0.3 |
| American Student Assistance | 143 | 482,883 | 0.2 |
| Illinois Student Assistance Commission | 92 | 330,816 | 0.2 |
| Other | 1 | 3,592 | 0.0[*] |
| Totals | 29,132 | $201,530,098 | 100.0% |

_____
[*]Less than 0.05%, but greater than 0.00%.

**Distribution of the Financed Eligible Loans by
Borrower Age
(as of the Statistical Cut-Off Date)**

| Borrower Age | Number of Loans | Aggregate Outstanding Principal Balance | Percent by Aggregate Outstanding Principal Balance |
|---|---|---|---|
| Unknown | 25 | $ 126,522 | 0.1% |
| 31 - 40 | 11,241 | 51,287,834 | 25.4 |
| 41 - 50 | 10,850 | 78,908,287 | 39.2 |
| 51 - 60 | 4,056 | 34,300,633 | 17.0 |
| 61 - 70 | 2,329 | 27,457,101 | 13.6 |
| 71 - 80 | 603 | 8,803,745 | 4.4 |
| 81 - 90 | 28 | 645,976 | 0.3 |
| Totals | 29,132 | $201,530,098 | 100.0% |

**Borrower Benefits**

With respect to the Financed Eligible Loans that are expected to be pledged to the Trustee under the Indenture, the Issuer offers certain borrower benefits in the form of interest rate and principal reductions for prompt and regular payments or payments made by automatic draft, as well as loan forgiveness for certain borrowers.  All percentages of the Financed Eligible Loans described below are based on the outstanding principal balance of the Financed Eligible Loans as of the statistical cut-off date.

*Rate Relief Programs*.  As of the Statistical Cut-off Date, all of the Financed Eligible Loans are eligible (of which approximately 18.8% of the Financed Eligible Loans are receiving), an interest rate reduction of 0.25% for borrowers using auto-debit to make loan payments.  In addition, approximately 1.5% of the Financed Eligible Loans are receiving an interest rate reduction that ranges from 2.0% to 4.0%. Except for the 0.25% interest rate reduction for borrowers using auto-debit to make loan payments, the rate relief programs closed to new enrollments on January 1, 2010.  Any borrower on a Financed Eligible Loan who is not currently participating in a rate relief program or is hereafter disqualified from a rate relief program for any reason will only be eligible for the 0.25% interest rate reduction for borrowers using auto-debit to make loan payments in the future.

*Missouri Public Service Reward Program*.  Less than 0.001% of the Financed Eligible Loans are receiving an interest rate reduction from an original borrower rate to a fixed rate of 3.25%.  The remaining Financed Eligible Loans are not eligible for such interest rate reduction.

*Repayment Balance Reduction*.  All of the Financed Eligible Loans which are eligible for this program have already received a principal balance reduction of 2.0% in principal after making a prompt first month payment.  No Financed Eligible Loans are eligible for any further principal balance reduction.

The Issuer may discontinue, increase or modify the benefits offered by these programs at any time, but only subject to the provisions of the Indenture.  The Issuer cannot accurately predict the number of borrowers that will utilize the borrower benefits provided under these programs.  The greater the number of borrowers that utilize such benefits with respect to Financed Eligible Loans, the lower the total loan receipts on such Financed Eligible Loans.  See the captions "RISK FACTORS—Incentive or borrower benefit programs may affect your Notes" and "THE ISSUER'S FFEL PROGRAM" herein.

## DESCRIPTION OF THE NOTES

**General**

The Notes will be issued pursuant to the terms of the Indenture between the Issuer and U.S. Bank National Association, as Trustee.  The Indenture and the Notes will each be governed by the laws of the State of Missouri.  The following summary describes the material terms of the Notes and related provisions of the Indenture.  However, it is not complete and is qualified in its entirety by the actual provisions of the Indenture and the Notes.  Certain other provisions of the Indenture are described under the captions "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES" and "SUMMARY OF THE INDENTURE PROVISIONS" herein.

**Interest Payments**

Interest will accrue on the Notes at the interest rate described below during each Interest Accrual Period.  The initial Interest Accrual Period for the Class A-1A Notes begins on the Date of Issuance and ends on November 24, 2021 and the initial Interest Accrual Period for the Class A-1B Notes and the Class B Notes begins on the Date of Issuance and ends on November 25, 2021.  For all other Monthly Distribution

Dates, (a) the Interest Accrual Period for the Class A-1A Notes, will begin on (and include) the twenty-fifth day of a month, whether or not a Business Day, and end on (and include) the twenty-fourth day of the following month (notwithstanding that the actual Monthly Distribution Date may occur after the twenty-fifth day of either such month); and (b) the Interest Accrual Period for the Class A-1B Notes and Class B Notes will begin on the prior Monthly Distribution Date and end on the day before such Monthly Distribution Date.

Interest on the Notes will be payable to the Noteholders on each Monthly Distribution Date commencing November 26, 2021.  Monthly Distribution Dates for the Notes will be on the twenty-fifth day of each calendar month, or if any such day is not a Business Day, the next Business Day.  Interest accrued but not paid on any Monthly Distribution Date will be due on the next Monthly Distribution Date together with an amount equal to interest on the unpaid amount at the applicable rate per annum described below.

The Class A-1A Notes will bear interest at a fixed rate equal to 1.58% per annum.

The Class A-1B Notes will bear interest at an annual rate equal to the applicable Benchmark (initially One-Month LIBOR), except for the initial Interest Accrual Period, plus 0.57%.

The Class B Notes will bear interest at an annual rate equal to the applicable Benchmark (initially One-Month LIBOR), except for the initial Interest Accrual Period, plus 1.15%.

If One-Month LIBOR or the then current Benchmark is less than 0.00% for any Interest Accrual Period, the Benchmark shall be deemed to be 0.00% and the interest rate for the Class A-1B Notes and the Class B Notes for such Interest Accrual Period shall be deemed to be the interest rate margin set forth above for such class of Notes.

The Trustee will obtain One-Month LIBOR and the Issuer will calculate the applicable interest rate on the Class A-1B Notes and Class B Notes on the second Business Day prior to the start of the applicable Interest Accrual Period; provided that if One-Month LIBOR does not appear on a page of a financial reporting service in general use in the financial services industry, the Issuer will obtain One-Month LIBOR. Additionally, if One-Month LIBOR is no longer an available benchmark rate, the Issuer will cause an alternative rate to be calculated as described under the caption "Benchmark Transition Event" below.

The rate of interest on the Class A-1B Notes and the Class B Notes for the initial Interest Accrual Period will be determined by reference to the following formula:

$x + [(a / b) * (y–x)] + 0.57\%$ for the Class A-1B Notes and $+ 1.15\%$ for the Class B Notes

where:

$x$ = two-month LIBOR;

$y$ = three-month LIBOR;

$a$ = the actual number of days from the maturity date of two-month LIBOR to the first Monthly Distribution Date; and

$b$ = the actual number of days from the maturity date of two-month LIBOR to the maturity date of three-month LIBOR.

Interest accrued on the outstanding principal balance of each class of the Notes during each Interest Accrual Period will be paid on the following Monthly Distribution Date in the order and priority described under the caption "—Flow of Funds" below.

Failure to pay interest on the Class B Notes is not an Event of Default so long as any of the Class A Notes remain outstanding.

The Issuer will calculate the rate of interest on the Class A-1B Notes and the Class B Notes on the LIBOR determination date described below. The amount of interest distributable to holders of the Notes for each $1,000 in original principal amount will be calculated by applying the applicable interest rate for the Interest Accrual Period to the outstanding principal amount of each original principal amount of $1,000, multiplying that product by (a) 30 days for the Class A-1A Notes divided by 360; and (b) the actual number of days in the Interest Accrual Period for the Class A-1B Notes and the Class B Notes divided by 360, and rounding the resulting figure to the fifth decimal point.

**Calculation of LIBOR**

For each Interest Accrual Period, One-Month LIBOR will be determined by the Issuer by reference to the London Interbank Offered Rate (LIBOR) for deposits in U.S. Dollars having a maturity of one month which appears on Reuters LIBOR01 Page, or another page of this or any other financial reporting service in general use in the financial services industry, as of 11:00 a.m., London time, on the related LIBOR determination date. The LIBOR determination date will be the second Business Day before the beginning of each Interest Accrual Period. If this rate does not appear on Reuters LIBOR01 Page, or another page of this or any other financial reporting service in general use in the financial services industry, and the Issuer has not made a determination that a Benchmark Transition Event and its related Benchmark Replacement Date have occurred, One-Month LIBOR in effect for the applicable Interest Accrual Period will be One-Month LIBOR in effect for the previous Interest Accrual Period.

**Benchmark Transition Event**

Interest on the Class A-1B Notes and Class B Notes will accrue at a floating rate based on a "Benchmark," which will initially be One-Month LIBOR, but will be replaced by the Benchmark Replacement following the occurrence of a Benchmark Transition Event and its related Benchmark Replacement Date as described below. As described under the caption "RISK FACTORS—LIBOR is being discontinued as a floating rate benchmark, and various aspects of the discontinuation are uncertain and will affect the financial markets and may also affect the Financed Eligible Loans and the Class A-1B Notes and the Class B Notes" herein, in the Issuer's opinion, the FCA/IBA Announcements on future cessation and loss of representativeness of the LIBOR benchmarks constitute a "Benchmark Transition Event" under the Indenture; however, the related Benchmark Replacement Date has not yet occurred and so the Class A-1B Notes and the Class B Notes will accrue interest by reference to LIBOR until such related Benchmark Replacement Date or another Benchmark Transition Event and its related Benchmark Replacement Date occur. If the Issuer determines that a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior to the Reference Time in respect of any determination of the Benchmark on any date, the Benchmark Replacement will replace the then current Benchmark for all purposes relating to the Class A-1B Notes and Class B Notes in respect of such determination on such date and all determinations on all subsequent dates. If the Benchmark for the Class A-1B Notes and Class B Notes changes from One-Month LIBOR to another Benchmark, it is possible that the change may result in a deemed taxable exchange. Whether a particular investor recognizes gain will depend upon the investor's basis in the Class A-1B Notes and Class B Notes, the relationship between One-Month LIBOR and the other Benchmark at the time of the change, and other factors such as whether quotations on the Class A-1B Notes and Class B Notes are readily available.

The Internal Revenue Service (the "Service") has proposed regulations and issued additional guidance (the "LIBOR Proposed Regulations") concerning certain U.S. federal income tax consequences resulting from the transition from interbank offered rates (such as LIBOR) to other reference rates in debt instruments. The LIBOR Proposed Regulations, among other things, establish a safe harbor under which certain changes to the terms of a debt instrument in connection with the elimination of LIBOR will not be treated as a significant modification of the debt instrument resulting in a deemed exchange of the debt instrument under Section 1001 of the Code, including an alteration of the terms of a debt instrument to include a qualified rate as a fallback to a LIBOR reference rate and any associated alteration that is reasonably necessary to adopt or to implement the inclusion of a qualified fallback rate. A "qualified rate" is any one of the rates specified in the LIBOR Proposed Regulations; provided that the fair market value of the debt instrument after the alteration is substantially equivalent to the fair market value of the debt instrument before the alteration. Specified qualified rates include the Secured Overnight Financing Rate published by the Federal Reserve Bank of New York (SOFR), any rate that is determined by reference to another qualified rate (including a rate determined by adding or subtracting a specified number of basis points to or from the rate or by multiplying the rate by a specified number), certain qualified floating rates specified in the Treasury Regulations, and certain other rates that may be selected, endorsed or recommended by a central bank, reserve bank, monetary authority or similar institution (including any committee or working group thereof) or the Service in the future. See the caption "CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS—Sale or Exchange of Notes" herein.

In connection with the implementation of a Benchmark Replacement, the Issuer will have the right from time to time to make "Benchmark Replacement Conforming Changes," which are any technical, administrative or operational changes (including changes to the definition of "Interest Accrual Period," timing and frequency of determining rates and making payments of interest, and other administrative matters) that the Issuer decides may be appropriate to reflect the adoption of such Benchmark Replacement in a manner substantially consistent with market practice (or, if the Issuer decides that adoption of any portion of such market practice is not administratively feasible or if the Issuer determines that no market practice for use of the Benchmark Replacement exists, in such other manner as the Issuer determines is reasonably necessary).

Notice of the occurrence of a Benchmark Transition Event and its related Benchmark Replacement Date, the determination of a Benchmark Replacement and the making of any Benchmark Replacement Conforming Changes will be included in the monthly report to Noteholders and the Issuer shall also provide written notice to the Trustee of a Benchmark Transition Event and its Benchmark Replacement Date no later than one Business Day after the occurrence of such Benchmark Transition Event. Notwithstanding anything in the transaction documents to the contrary, upon the inclusion of such information in the monthly report to the Noteholders, the relevant transaction documents will be deemed to have been amended to reflect the new Unadjusted Benchmark Replacement, Benchmark Replacement Adjustment and/or Benchmark Replacement Conforming Changes without further compliance with the amendment provisions of the relevant transaction documents.

Any determination, decision or election that may be made by the Issuer in connection with a Benchmark Transition Event or Benchmark Replacement, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error, may be made in the Issuer's sole discretion, and, notwithstanding anything to the contrary in the documentation relating to the Class A-1B Notes and Class B Notes, shall become effective without consent from any other party. None of the Issuer, the Trustee, the Servicer, or the Backup Servicer will have any liability for any determination made by or on behalf of the Issuer in connection with a Benchmark Transition Event or a Benchmark Replacement as described above, and each Noteholder, by its acceptance of a Class A-1B Note or a Class B Note or a beneficial interest in a Class A-1B Note or Class B Note, will

be deemed to waive and release any and all claims against the Issuer, the Trustee, the Servicer, or the Backup Servicer relating to any such determinations.

The Trustee shall not be under any obligation to (a) monitor, determine or verify the unavailability or cessation of LIBOR (or other applicable Benchmark), or whether or when there has occurred, or to give notice to any other transaction party of the occurrence of, any Benchmark Transition Event or Benchmark Replacement Date; (b) select, determine or designate any Benchmark Replacement, or other successor or replacement benchmark index, or whether any conditions to the designation of such a rate have been satisfied; (c) select, determine or designate any Benchmark Replacement Adjustment, or other modifier to any replacement or successor index; or (d) determine whether or what Benchmark Replacement Conforming Changes are necessary or advisable, if any, in connection with any of the foregoing. The Trustee shall not be liable for any inability, failure or delay on its part to perform any of its duties set forth in the Indenture as a result of the unavailability of LIBOR (or other applicable Benchmark) and absence of a designated replacement Benchmark, including as a result of any inability, delay, error or inaccuracy on the part of any other transaction party, including without limitation the Issuer, in providing any direction, instruction, notice or information required or contemplated by the terms of the Indenture and reasonably required for the performance of such duties. The Trustee shall not be liable to any Noteholder for any losses, claims, damages, liabilities, forfeitures, fines, penalties, costs, fees or expenses (including attorneys' fees) sustained by any Noteholder resulting from the adoption of, a Benchmark Replacement or any related actions taken pursuant to the Indenture. The Trustee shall not be obligated to obtain LIBOR or determine the interest rate on any Notes after a Benchmark Replacement has taken effect in accordance with the Indenture.

"*Asset Replacement Percentage*" means, on any date of calculation, a fraction (expressed as a percentage) where the numerator is the aggregate outstanding principal balance of the Financed Eligible Loans, the Special Allowance Payments on which were indexed to the Benchmark Replacement, as of such calculation date and the denominator is the aggregate outstanding principal balance of the Financed Eligible Loans as of such calculation date.

"*Benchmark*" means, initially, One-Month LIBOR; provided that if the Issuer determines that a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to One-Month LIBOR or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement.

"*Benchmark Replacement*" means the first alternative set forth in the order below that can be determined by the Issuer as of the Benchmark Replacement Date:

(a)     the sum of: (i) Term SOFR; and (ii) the Benchmark Replacement Adjustment;

(b)     in the sole discretion of the Issuer, either (i) the sum of: (A) Compounded SOFR; and (B) the Benchmark Replacement Adjustment; or (ii) the sum of: (A) Simple Average SOFR; and (B) the Benchmark Replacement Adjustment;

(c)     the sum of: (i) the alternate rate of interest that has been selected or recommended by the Relevant Governmental Body as the replacement for the then-current Benchmark for the applicable Corresponding Tenor; and (ii) the Benchmark Replacement Adjustment; or

(d)     the sum of: (i) the alternate rate of interest that has been selected by the Issuer as the replacement for the then-current Benchmark for the applicable Corresponding Tenor giving due consideration to any industry-accepted rate of interest as a replacement for the then-current

Benchmark for U.S. dollar denominated securitization transactions at such time; and (ii) the Benchmark Replacement Adjustment.

If a Benchmark Replacement is selected pursuant to clause (b) above, then on the first day of each month following such selection, if a redetermination of the Benchmark Replacement on such date would result in the selection of a Benchmark Replacement under clause (a) above, then (A) the Benchmark Replacement Adjustment shall be redetermined on such date utilizing the Unadjusted Benchmark Replacement corresponding to the Benchmark Replacement under clause (a) above; and (B) such redetermined Benchmark Replacement shall become the Benchmark on each determination date on or after such date.  If redetermination of the Benchmark Replacement on such date as described in the preceding sentence would not result in the selection of a Benchmark Replacement under clause (a) above, then the Benchmark shall remain the Benchmark Replacement as previously determined pursuant to clause (b) above.

"*Benchmark Replacement Adjustment*" means the first alternative set forth in the order below that can be determined by the Issuer as of the Benchmark Replacement Date:

      (a)      the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected or recommended by the Relevant Governmental Body for the applicable Unadjusted Benchmark Replacement; or

      (b)      the spread adjustment (which may be a positive or negative value or zero) that has been selected by the Issuer giving due consideration to any industry-accepted spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the then-current Benchmark with the applicable Unadjusted Benchmark Replacement for U.S. dollar denominated securitization transactions at such time.

"*Benchmark Replacement Date*" means:

      (a)      in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein, and (ii) the date on which the administrator of the Benchmark permanently or indefinitely ceases to provide the Benchmark;

      (b)      in the case of clause (c) of the definition of "Benchmark Transition Event," the date of the public statement or publication of information referenced therein; or

      (c)      in the case of clause (d) of the definition of "Benchmark Transition Event," the Business Day following the date of such monthly report to the Noteholders.

provided, however, that on or after the sixtieth day preceding the date on which such Benchmark Replacement Date would otherwise occur (if applicable), the Issuer may give written notice to security holders in which the Issuer designates an earlier date (but not earlier than the thirtieth day following such notice) and represents that such earlier date will facilitate an orderly transition of the transaction to the Benchmark Replacement, in which case such earlier date shall be the Benchmark Replacement Date.

For the avoidance of doubt, if the event giving rise to the Benchmark Replacement Date occurs on the same day as, but earlier than, the Reference Time in respect of any determination, the Benchmark Replacement Date will be deemed to have occurred prior to the Reference Time for such determination.

"*Benchmark Transition Event*" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)       a public statement or publication of information by or on behalf of the administrator of the Benchmark announcing that such administrator has ceased or will cease to provide the Benchmark, permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the Benchmark;

(b)       a public statement or publication of information by the regulatory supervisor for the administrator of the Benchmark, the central bank for the currency of the Benchmark, an insolvency official with jurisdiction over the administrator for the Benchmark, a resolution authority with jurisdiction over the administrator for the Benchmark or a court or an entity with similar insolvency or resolution authority over the administrator for the Benchmark, which states that the administrator of the Benchmark has ceased or will cease to provide the Benchmark permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the Benchmark;

(c)       a public statement or publication of information by the regulatory supervisor for the administrator of the Benchmark announcing that the Benchmark is no longer representative; or

(d)       the Asset Replacement Percentage is greater than 50%, as reported in the most recent monthly report to the Noteholders.

On March 5, 2021, the ICE Benchmark Administration (the "IBA"), the administrator of LIBOR, and the Financial Conduct Authority, the regulatory supervisor of the IBA, declared in public statements (the "Public Statements") that the final publication or representativeness date for USD LIBOR for (i) one week and two month LIBOR settings will be December 31, 2021 and (ii) overnight, one month, three month, six month and 12 month LIBOR settings will be June 30, 2023.   At the time of the Public Statements no successor administrator was named to continue to provide the Benchmark.  The Public Statements resulted in the occurrence of a Benchmark Transition Event with respect to LIBOR and any obligation to notify of this Benchmark Transition Event shall be deemed satisfied.

As described above and under the caption "RISK FACTORS—LIBOR is being discontinued as a floating rate benchmark, and various aspects of the discontinuation are uncertain and will affect the financial markets and may also affect the Financed Eligible Loans and the Class A-1B Notes and the Class B Notes" herein, the FCA/IBA Announcements on future cessation and loss of representativeness of the LIBOR benchmarks constitute a "Benchmark Transition Event" under the Indenture; however, the related Benchmark Replacement Date has not yet occurred and so the Class A-1B Notes and the Class B Notes will accrue interest by reference to LIBOR until such related Benchmark Replacement Date or another Benchmark Transition Event and its related Benchmark Replacement Date occur.

"*Business Day*" means (a) for purposes of calculating LIBOR, any day on which banks in New York, New York, United States of America and London, England are open for the transaction of international business; and (b) for all other purposes, any day other than (i) a Saturday; (ii) a Sunday; or (iii) a day on which the Federal Reserve Bank or banks located in St. Louis, Missouri or the city in which the office of the Trustee from which the Indenture is being administered is located (initially Cincinnati, Ohio), are not authorized or required by law, regulation or executive order to remain closed.

"*Carryover Servicing Fees*" shall mean any fee for servicing the Financed Eligible Loans not permitted to be paid from funds available under clause THIRD described under the caption "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES—Collection Fund; Flow of Funds" herein; the

Carryover Servicing Fees shall initially be equal to $0.00 and may only be increased upon satisfaction of the Rating Agency Condition.

"*Compounded SOFR*" means the compounded average of SOFRs for the applicable Corresponding Tenor, with the rate, or methodology for this rate, and conventions for this rate (which, for example, may be compounded in arrears with a lookback and/or suspension period as a mechanism to determine the interest amount payable prior to the end of each Interest Accrual Period or compounded in advance) being established by the Issuer in accordance with:

> (a)       the rate, or methodology for this rate, and conventions for this rate selected or recommended by the Relevant Governmental Body for determining compounded SOFR; provided that

> (b)       if, and to the extent that, the Issuer determines that Compounded SOFR cannot be determined in accordance with clause (a) above, then the rate, or methodology for this rate, and conventions for this rate that have been selected by the Issuer giving due consideration to any industry-accepted market practice for U.S. dollar denominated securitization transactions at such time.

"*Corresponding Tenor*" means, with respect to a Benchmark Replacement, a tenor (including overnight) having approximately the same length (disregarding Business Day adjustment) as the applicable tenor for the then-current Benchmark.

"*Federal Reserve Bank of New York's Website*" means the website of the Federal Reserve Bank of New York at http://www.newyorkfed.org, or any successor source.

"*Reference Time*" means, with respect to any determination of the Benchmark, (a) if the Benchmark is LIBOR, 11:00 a.m., London time, on the day that is two Business Days preceding the date of such determination; and (b) if the Benchmark is not LIBOR, the time determined by the Issuer in accordance with the Benchmark Replacement Conforming Changes or LIBOR Related Amendment, as applicable.

"*Relevant Governmental Body*" means the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

"*Simple Average SOFR*" means the simple average of SOFRs for the applicable Corresponding Tenor, with the conventions for this rate (which, for example, may be in arrears with a lookback and/or suspension period as a mechanism to determine the interest amount payable prior to the end of each Interest Period or in advance) being established by the Issuer in accordance with:

> (a)       the conventions for this rate selected or recommended by the Relevant Governmental Body for determining simple average SOFR; provided that

> (b)       if, and to the extent that, the Issuer determines that Simple Average SOFR cannot be determined in accordance with clause (a) above, then the conventions for this rate that have been selected by the Issuer giving due consideration to any industry-accepted market practice for U.S. dollar denominated securitization transactions at such time.

"*SOFR*" means, with respect to any day, the secured overnight financing rate published for such day by the Federal Reserve Bank of New York, as the administrator of the benchmark, (or a successor administrator) on the Federal Reserve Bank of New York's Website.

"*Term SOFR*" means the forward-looking term rate for the applicable Corresponding Tenor based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"*Unadjusted Benchmark Replacement*" means the Benchmark Replacement excluding the Benchmark Replacement Adjustment.

**Principal Distributions**

The final Maturity Date for each class of the Notes will be August 25, 2061.

The actual date on which the final distribution on each class of the Notes will be made is expected to be earlier than the final Maturity Date set forth above as a result of a variety of factors.  Principal payments will be made to the Noteholders on each Monthly Distribution Date in an amount equal to the lesser of:

> (a)  the Principal Distribution Amount for that Monthly Distribution Date; and

> (b)  funds available for the payment of principal as described under the caption "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES—Collection Fund; Flow of Funds" herein.

There may not be sufficient funds available to pay the full Principal Distribution Amount on each Monthly Distribution Date.  Amounts on deposit in the Reserve Fund in excess of the Specified Reserve Fund Balance will be transferred to the Collection Fund and will be applied as described under the caption "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES—Collection Fund; Flow of Funds" herein.  Principal payments due on the Notes will be made from the Reserve Fund only (a) on the final Maturity Date for the Notes; or (b) on any Monthly Distribution Date when the market value of securities and cash in the Reserve Fund and the Collection Fund is sufficient to pay the remaining principal amount of and interest accrued on the Notes; or (c) upon the exercise of the option to prepay the Notes as described in the subsequent caption.

Principal will be paid, first, on the Class A Notes ratably until paid in full and, second, on the Class B Notes until paid in full.

"*Principal Distribution Amount*" means, as determined by the Issuer for each Monthly Distribution Date other than a Note Final Maturity Date, the amount, not less than zero, by which (a) the Outstanding Amount of the Notes immediately prior to such Monthly Distribution Date exceeds (b) the Adjusted Pool Balance for that Monthly Distribution Date less the Specified Overcollateralization Amount. Notwithstanding the foregoing; (i) on or after the Maturity Date for a class of Notes, the Principal Distribution Amount shall not be less than the amount that is necessary to reduce the outstanding principal balance of such class of Notes to zero; and (ii) the Principal Distribution Amount shall not exceed the Outstanding Amount of the Notes as of any Monthly Distribution Date (before giving effect to any distributions on such Monthly Distribution Date).

"*Specified Overcollateralization Amount*" means for any Monthly Distribution Date, the greater of:

> (a)  6.5% of the Adjusted Pool Balance for that Monthly Distribution Date; and (b) $4,000,000.

"*Adjusted Pool Balance*" means, for any Monthly Distribution Date, the sum of the Pool Balance as of the end of the immediately preceding Collection Period and the amounts on deposit in the Capitalized

Interest Fund and the Reserve Fund on such Monthly Distribution Date after giving effect to any payments to or releases from the Capitalized Interest Fund and the Reserve Fund.

The Principal Distribution Amount is intended to provide credit support so that, if sufficient funds are available on each Monthly Distribution Date, the Adjusted Pool Balance will continue to exceed the Outstanding Amount of the Notes by the greater of (a) 6.5% of the Adjusted Pool Balance for that Monthly Distribution Date; and (b) $4,000,000.

"*Pool Balance*" means, for any date, the aggregate principal balance of the Financed Eligible Loans on that date, including accrued interest that is expected to be capitalized, after giving effect to the following, without duplication:

(a)        all payments received by the Issuer through that date from borrowers;

(b)        all amounts received by the Issuer through that date from required purchases or repurchases of Financed Eligible Loans by Servicers or sellers;

(c)        all Liquidation Proceeds and Realized Losses on the Financed Eligible Loans through that date;

(d)        the amount of any adjustment to balances of the Financed Eligible Loans that the Servicer makes under its related servicing agreement, if any, recorded through that date; and

(e)        the amount by which Guaranty Agency reimbursements of principal on defaulted Financed Eligible Loans through that date are reduced from 100% to 97%, or other applicable percentage, as required by the risk sharing provisions of the Higher Education Act.

In addition to the principal payments described above, (i) if a Principal Acceleration Trigger is in effect for any Monthly Distribution Date occurring on and after the October 2026 Monthly Distribution Date through and including the September 2031 Monthly Distribution Date, (ii) on and after the October 2031 Monthly Distribution Date or (iii) if the Financed Eligible Loans are not released from the lien of the Indenture when permitted pursuant to the optional prepayment described below, the Notes may receive supplemental payments of principal from certain money remaining in the Collection Fund as described under the caption "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES—Collection Fund; Flow of Funds" herein.  Such supplemental payments of principal could result in the Notes being paid in full prior to their final maturity.

Each principal payment on a class of Notes will be allocated to all Noteholders of such class of Notes on a pro rata basis, based upon the principal amounts of such class of Notes held by each such Noteholder.

**Optional Prepayment of Notes When the
Then Outstanding Pool Balance is 10% or
Less of Initial Pool Balance**

The Issuer shall have the option to direct the release of all of the Financed Eligible Loans in whole on the Monthly Distribution Date next succeeding the last day of the Collection Period on which the then outstanding Pool Balance is 10% or less of the initial Pool Balance and on any Monthly Distribution Date thereafter.  If this release option is exercised, the Financed Eligible Loans and other remaining trust assets will be released to the Issuer free from the lien of the Indenture.

For the Issuer to exercise this release option, the Issuer must deposit in the Collection Fund an amount that, when combined with amounts on deposit in the other funds and accounts held under the Indenture, would be sufficient to:

      (a)     reduce the Outstanding Amount of the Notes then outstanding on the related Monthly Distribution Date to zero;

      (b)     pay to the Noteholders the interest payable on the related Monthly Distribution Date; and

      (c)     pay any Monthly Consolidation Rebate Fees and other amounts payable to the Department of Education, pay amounts payable under any Joint Sharing Agreements or otherwise remove amounts deposited in the Trust Estate which represent amounts that are allocable to Eligible Loans that are not Financed Eligible Loans, and pay unpaid Administration Fees, Servicing Fees, Trustee Fees and Program Fees.

**Prepayment, Yield and Maturity Considerations**

Generally, all of the Financed Eligible Loans are pre-payable in whole or in part, without penalty, by the borrowers at any time, or as a result of a borrower's default, death, disability or bankruptcy and subsequent liquidation or collection of guarantee payments with respect to such loans. The rates of payment of principal on the Notes and the yield on the Notes may be affected by prepayments of the Financed Eligible Loans. Because prepayments generally will be paid through to Noteholders as distributions of principal, it is likely that the actual final payments on the Notes will occur prior to the final Maturity Date of the Notes. Accordingly, in the event that the Financed Eligible Loans experience significant prepayments, the actual final payments on the Notes may occur substantially before the final Maturity Date, causing a shortening of the weighted average life of the Notes. Weighted average life refers to the average amount of time that will elapse from the Date of Issuance of a Note until each dollar of principal of such Note will be repaid to the investor.

The rate of prepayments on the Financed Eligible Loans cannot be predicted and may be influenced by a variety of economic, social and other factors. See the caption "Social and economic factors may adversely affect repayment of the Financed Eligible Loans" above.

Generally, the rate of prepayments may tend to increase to the extent that alternative financing becomes available on more favorable terms or at interest rates significantly below the interest rates payable on the Financed Eligible Loans. In addition, the Issuer is obligated to purchase from the Trust Estate created under the Indenture (or substitute a similar Eligible Loan) any Financed Eligible Loan that is determined to be encumbered by a lien other than the lien of the Indenture and if the same is not cured within the applicable cure period. If any Financed Eligible Loan ceases to be Guaranteed or Insured, and as a result thereof, a Guarantee or Insurance claim with respect to such Financed Eligible Loan is rejected by the applicable Guaranty Agency or an Insurance claim is not paid by the Secretary and the same is not cured within 180 days after such rejection, or if any Financed Eligible Loan is determined to be encumbered by any lien other than the lien of this Indenture, then the Issuer shall, if it is the Servicer, or shall cause the Servicer to, either: (i) purchase such Financed Eligible Loan from the Trust Estate for a purchase price equal to its principal amount plus unamortized premium, if any, and interest accrued thereon; or (ii) replace such Financed Eligible Loan with another Financed Eligible Loan of substantially identical characteristics; and provided, however, that, with respect to a third-party Servicer, this provision shall be applicable only to the extent that such repurchase or replacement is provided by the applicable Servicing Agreement. As of the Statistical Cut-Off Date, $9,496,737 of the principal amount of the Financed Eligible Loans (representing

approximately 4.71% of the Financed Eligible Loans by principal amount) are "rehabilitation loans," which are Eligible Loans that have previously defaulted, but for which the borrower thereunder has made a specified number of on-time payments as described in "APPENDIX A—DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM—Insurance and Guarantees—*Rehabilitation of Defaulted Loans*" hereto.  Although rehabilitation loans benefit from the same guarantees as other FFELP student loans, rehabilitation loans have generally experienced re-default rates that are higher than default rates for FFELP student loans that have not previously defaulted.

Scheduled payments with respect to the Financed Eligible Loans may be reduced and the maturities of Financed Eligible Loans may be extended, including pursuant to grace periods, deferral periods and forbearance periods.  The rate of payment of principal on the Notes and the yield on the Notes may also be affected by the rate of defaults resulting in losses on the Financed Eligible Loans that may have been liquidated, by the severity of those losses and by the timing of those losses, which may affect the ability of the Guaranty Agencies (including the State Guaranty Agency) to make guarantee payments on such Financed Eligible Loans.  In addition, the maturity of certain of the Financed Eligible Loans may extend beyond the final Maturity Date for the Notes.

More information on weighted average lives, expected maturities and percentages of original principal remaining at certain Monthly Distribution Dates for the Notes is set forth in "APPENDIX B—WEIGHTED AVERAGE LIVES, EXPECTED MATURITIES AND PERCENTAGES OF ORIGINAL PRINCIPAL REMAINING AT CERTAIN MONTHLY DISTRIBUTION DATES FOR THE NOTES" hereto.

## SECURITY AND SOURCES OF PAYMENT FOR THE NOTES

### General

The Notes will be limited obligations of the Issuer secured by and payable solely from the discrete Trust Estate pledged by the Issuer to the Trustee under the Indenture.  The following assets will serve as security for the Notes (collectively, the "Trust Estate"):

(a)     the Available Funds (other than moneys deposited in the Department SAP Rebate Fund and moneys released from the lien of the Trust Estate as provided in the Indenture);

(b)     all moneys and investments held in the funds created under the Indenture (other than the Department SAP Rebate Fund), and other than moneys and investments released from the lien of the Trust Estate as provided in the Indenture), including all proceeds thereof and all income thereon;

(c)     the Financed Eligible Loans held by the Issuer and pledged under the Indenture and all obligations of the obligors thereunder including all moneys received thereunder on or after the Cut-Off Date (but in no event including any Financed Eligible Loans released from the lien of the Trust Estate as provided in the Indenture);

(d)     the rights of the Issuer in and to any Servicing Agreement, any Backup Servicing Agreement, any Joint Sharing Agreement, any Student Loan Purchase Agreement, any Custodian Agreement, any Origination Agreement and the Guarantee Agreements as the same relate to the Financed Eligible Loans;

(e)     to the extent constituting or directly related to the components of the Trust Estate described in clauses (a) through (f), inclusive, property of the Issuer in the nature of Accounts,

General Intangibles (including Payment Intangibles), Promissory Notes, and Instruments (each as defined in the Uniform Commercial Code of the State of Missouri), but it shall not be necessary that an item be an Account, General Intangible, Payment Intangible, Promissory Note or Instrument for such item to be part of the Trust Estate if it is otherwise described, referenced, or included in clauses (a) through (d), or in this clause (e), but in no event shall this interest attach to any properties, cash or other trust estates of the Issuer which are unrelated to the properties described in clauses (a) through (d) above or this clause (e); and

(f)     all proceeds from any property described in clause (a) through (e) above and any and all other property, rights and interests of every kind or description that from time to time is specifically granted, conveyed, pledged, transferred, assigned or delivered to the Trustee as additional security under the Indenture.

**Funds**

The following funds will be created by the Trustee under the Indenture for the benefit of the Noteholders:

(a)     Student Loan Fund;

(b)     Capitalized Interest Fund;

(c)     Collection Fund;

(d)     Department SAP Rebate Fund;

(e)     Reserve Fund; and

(f)     Costs of Issuance Fund.

Money transferred from the Issuer or any other Servicer to the Trustee on account of the Financed Eligible Loans will be deposited into the Collection Fund for distribution in accordance with the terms of the Indenture.  The Trustee will invest money held in funds created under the Indenture in Investment Securities at the written direction of the Issuer.  Investment Securities may be purchased by the Trustee, through an affiliate of the Trustee or through a broker agent.  Money in any fund created under the Indenture may be pooled for purposes of investment.

**Fund Deposits**

As described under the caption "USE OF PROCEEDS" herein, certain of the proceeds from the sale of the Notes will be used to make the initial deposits to the Capitalized Interest Fund, the Cost of Issuance Fund and the Reserve Fund described below.  Certain of the remaining proceeds will be credited to the Student Loan Fund and immediately used to refinance certain of the Eligible Loans presently pledged by the Issuer under the Warehouse Agreement and certain Eligible Loans held unencumbered by the Issuer.  Such refinanced Eligible Loans will be pledged to the Trustee under the Indenture and credited to the Trust Estate in the books and records of the Servicer.

**Student Loan Fund; Deposit of Financed Eligible Loans**

Certain proceeds of the Notes will be transferred to the lender under the Warehouse Agreement and to the Issuer in order to refinance the Financed Eligible Loans.  On the Date of Issuance, such Eligible

Loans will be deposited into the Student Loan Fund created under the Indenture.  Such Eligible Loans expected to be pledged on or about the Date of Issuance have been identified and are described under the caption "CHARACTERISTICS OF THE FINANCED ELIGIBLE LOANS" herein.  Eligible Loans that are pledged to the Trust Estate created under the Indenture will be held by the Issuer and accounted for as a part of the Student Loan Fund.

**Reserve Fund**

On the Date of Issuance, a deposit will be made to the Reserve Fund in an amount equal to $1,307,534, which is 0.65% of the initial Pool Balance.  On each Monthly Distribution Date, to the extent that money in the Collection Fund is not sufficient to pay amounts owed to the Department of Education and the Guaranty Agencies (other than to recall claims with respect to or for repurchases of Eligible Loans), to pay amounts payable under any applicable Joint Sharing Agreement or to otherwise remove amounts deposited in the Trust Estate which represent amounts that are allocable to Eligible Loans that are not Financed Eligible Loans, or to pay certain of the Issuer's operating expenses, including Administration Fees (including the amounts allocated for the payment of Program Fees), Servicing Fees, Trustee Fees and the interest then due on the Notes, the amount of the deficiency will be transferred from the Reserve Fund to the Collection Fund to the extent moneys are not available to be transferred to the Collection Fund from the Capitalized Interest Fund.  Money withdrawn from the Reserve Fund will be restored through transfers from the Collection Fund as available.  The Reserve Fund may also be used in connection with the optional release of Financed Eligible Loans and related prepayment of the Notes.

The Reserve Fund is subject to a Specified Reserve Fund Balance equal to the greater of (a) 0.65% of the Pool Balance as of the close of business on the last day of the immediately preceding Collection Period; and (b) $201,159; provided that in no event will such balance exceed the sum of the Outstanding Amount of the Notes; and provided further, that such Specified Reserve Fund Balance may be reduced upon satisfaction of the Rating Agency Condition.

The Reserve Fund is intended to enhance the likelihood of timely distributions of interest to the Noteholders and to decrease the likelihood that the Noteholders will experience losses.  In some circumstances, however, the Reserve Fund could be reduced to zero.  Amounts on deposit in the Reserve Fund in excess of the Specified Reserve Fund Balance will be transferred to the Collection Fund and will be applied as described under the caption "—Collection Fund; Flow of Funds" below.  Other than such excess amounts, principal payments due on the Notes will be made from the Reserve Fund only (a) on the final Maturity Date for a class of Notes, or (b) on any Monthly Distribution Date when the market value of securities and cash in the Reserve Fund and the Collection Fund is sufficient to pay the remaining principal amount of and interest accrued on the Notes.  The Reserve Fund may also be used in connection with the optional release of Financed Eligible Loans and prepayment of the Notes described under the caption "DESCRIPTION OF THE NOTES—Optional Prepayment of Notes When the Then Outstanding Pool Balance is 10% or Less of Initial Pool Balance" herein.

**Capitalized Interest Fund**

On the Date of Issuance, $6,000,000 will be deposited into the Capitalized Interest Fund.  If on any Monthly Distribution Date, money on deposit in the Collection Fund is insufficient to pay amounts owed to the Department of Education and to the Guaranty Agencies (other than to recall claims with respect to or for repurchases of Eligible Loans), to pay amounts payable under any applicable Joint Sharing Agreement or to otherwise remove amounts deposited in the Trust Estate which represent amounts that are allocable to Eligible Loans that are not Financed Eligible Loans, or to pay Administration Fees (including the amounts allocated for the payment of Program Fees), Servicing Fees, Trustee Fees and interest on the Notes, then money on deposit in the Capitalized Interest Fund will be transferred to the Collection Fund to

99

cover the deficiency, prior to any amounts being transferred from the Reserve Fund. Amounts released from the Capitalized Interest Fund will not be replenished. On the September 2023 Monthly Distribution Date, any amounts remaining in the Capitalized Interest Fund in excess of $4,400,000 shall be transferred by the Trustee to the Collection Fund. On the September 2025 Monthly Distribution Date, any amounts remaining in the Capitalized Interest Fund in excess of $2,400,000 shall be transferred by the Trustee to the Collection Fund. On the September 2027 Monthly Distribution Date, any amounts remaining in the Capitalized Interest Fund shall be transferred by the Trustee to the Collection Fund.

**Department SAP Rebate Fund**

The Trustee will establish the Department SAP Rebate Fund as part of the Trust Estate created under the Indenture. The Higher Education Act requires holders of Eligible Loans first disbursed on or after April 1, 2006 to rebate to the Department of Education interest received from borrowers on such loans that exceeds the applicable special allowance support levels. The Issuer expects that the Department of Education will reduce the special allowance and interest benefit payments payable to the Issuer by the amount of any such rebates owed by the Issuer. However, in certain circumstances the Issuer may owe a payment to the Department of Education or to another trust if amounts were deposited into the Trust Estate that represent amounts that are allocable to Eligible Loans that are not Financed Eligible Loans. If the Issuer believes that it is required to make any such payment, the Issuer will direct the Trustee to deposit into the Department SAP Rebate Fund from the Collection Fund the estimated amounts of any such payments. Money in the Department SAP Rebate Fund will be transferred to the Collection Fund to the extent amounts have been deducted by the Department of Education from payments otherwise due to the Issuer or will be paid to the Department of Education or another trust if necessary to discharge the Issuer's rebate obligation or to the Issuer to reimburse it for the amount so deducted. See "APPENDIX A—DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM" hereto.

**Costs of Issuance Fund**

On the Date of Issuance, $670,750 will be deposited into the Costs of Issuance Fund. Amounts deposited to the Costs of Issuance Fund shall be used to pay the costs of issuing the Notes as set forth in closing settlement instructions or an Issuer Order. On the November 2021 Monthly Distribution Date, the Trustee upon written instructions of the Issuer will transfer any amounts remaining in the Costs of Issuance Fund to the Collection Fund, unless the Issuer instructs the Trustee to retain an amount therein through a later date.

**Collection Fund; Flow of Funds**

The Trustee will credit to the Collection Fund all revenues derived from Financed Eligible Loans; all proceeds of any sale of Financed Eligible Loans; all amounts received under any Joint Sharing Agreement; any amounts transferred from the Student Loan Fund, Capitalized Interest Fund, the Reserve Fund, and the Department SAP Rebate Fund; and any earnings on investment of funds and accounts established under the Indenture as they are earned.

Administration Fees, Servicing Fees and Trustee Fees will be paid to the Issuer, the Servicer (initially the Issuer) and the Trustee on each Monthly Distribution Date from money available in the Collection Fund. The amounts of the initial Servicing Fee, Administration Fee (including the amounts allocated for the payment of Program Fees) and Trustee Fee are specified under the caption "FEES AND EXPENSES" herein and each such fee is subject to increase upon satisfaction of a Rating Agency Condition. In addition, each month money available in the Collection Fund will be used to pay amounts due to the Department of Education with respect to Financed Eligible Loans, to deposit amounts required to be deposited into the Department SAP Rebate Fund and to recall claims with respect to or repurchase

Financed Eligible Loans in the limited circumstances described under the caption "Insurance and Guarantee—Loans Subject to Repurchase" in "APPENDIX A—DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM" hereto.

Upon written direction from the Issuer to the Trustee, moneys in the Collection Fund shall be used on any Business Day to pay to the Backup Servicer, when due, the one-time fees and expenses, in an amount not to exceed $300,000, associated with the conversion of the Financed Eligible Loans from the Servicer to the Backup Servicer.

On each Monthly Distribution Date, prior to an Event of Default, money available in the Collection Fund will be used to make the following deposits and distributions, to the extent funds are available, solely in accordance with the related Monthly Distribution Date Statement:

FIRST, to make any payments required under any applicable Joint Sharing Agreement or to otherwise pay to the appropriate Person, trust or other entity amounts deposited in the Collection Fund which represent amounts that are allocable to Eligible Loans which are not financed under the Indenture;

SECOND, to the Trustee, the Trustee Fee due and any prior unpaid Trustee Fees;

THIRD, to the Servicer (initially the Issuer), any Servicing Fee due and any prior unpaid Servicing Fees;

FOURTH, to the Issuer, the Administration Fee due and any prior unpaid Administration Fees;

FIFTH, to the Class A Noteholders of each class, interest payable on such Class A Notes on such Monthly Distribution Date, pro rata, based on amounts owed to each such party, without preference or priority of any kind;

SIXTH, to the Class B Noteholders, interest payable on the Class B Notes payable on such Monthly Distribution Date;

SEVENTH, to the Reserve Fund the amount, if any, necessary to reinstate the balance of the Reserve Fund up to the Specified Reserve Fund Balance;

EIGHTH, to the applicable Noteholders, the Principal Distribution Amount in the following order:

(a)     to pay, on a pro rata basis, based on the principal amount of Class A Notes Outstanding, principal to the Class A-1A Noteholders and Class A-1B Noteholders until the Class A-1A Notes and Class A-1B Notes have been paid in full; and

(b)     to pay principal to the Class B Noteholders until the Class B Notes have been paid in full;

NINTH, (A) if a Principal Acceleration Trigger is in effect for any Monthly Distribution Date occurring on and after the October 2026 Monthly Distribution Date through and including the September 2031 Monthly Distribution Date or (B) on and after the October 2031 Monthly Distribution Date, to pay as supplemental payments of principal on the Notes then Outstanding, to the Noteholders in the same order and priority as is set forth in EIGHTH above until the principal amount of the Notes is paid in full; and

TENTH, to the Trustee, any unpaid expenses or indemnities owed to the Trustee;

ELEVENTH, to the Issuer, the aggregate unpaid amount of any Carryover Servicing Fees;

TWELFTH, if the Financed Eligible Loans are not released when permitted by the Indenture for the optional redemption of the Notes, to pay as supplemental payments of principal on the Notes then Outstanding, to the Noteholders in the same order and priority as is set forth in EIGHTH above until the principal amount of the Notes is paid in full; and

THIRTEENTH, the Issuer all remaining funds.

Notwithstanding the foregoing, on and after the Maturity Date of the Class A-1A Notes and the Class A-1B Notes, the Class A-1A Noteholders and the Class A-1B Noteholders will receive amounts representing payment of the principal balance of the Class A-1A Notes and the Class A-1B Notes after clause FIFTH above until the Class A-1A Notes and the Class A-1B Notes have been paid in full and prior to the Class B Notes receiving payments of any payments of interest pursuant to clause SIXTH above.

The "Principal Acceleration Trigger" will be in effect for any Monthly Distribution Date occurring during the following periods (each, a "Principal Acceleration Measurement Period"):

- on and after the October 2026 Monthly Distribution Date and through and including the September 2027 Monthly Distribution Date, if the outstanding principal amount of the notes as of the September 2026 Monthly Distribution Date (after giving effect to all payments of principal made on the notes on such Monthly Distribution Date) exceeds $121,000,000;

- on and after the October 2027 Monthly Distribution Date and through and including the September 2028 Monthly Distribution Date, if the outstanding principal amount of the notes as of the September 2027 Monthly Distribution Date (after giving effect to all payments of principal made on the notes on such Monthly Distribution Date) exceeds $106,000,000;

- on and after the October 2028 Monthly Distribution Date and through and including the September 2029 Monthly Distribution Date, if the outstanding principal amount of the notes as of the September 2028 Monthly Distribution Date (after giving effect to all payments of principal made on the notes on such Monthly Distribution Date) exceeds $92,000,000;

- on and after the October 2029 Monthly Distribution Date and through and including the September 2030 Monthly Distribution Date, if the outstanding principal amount of the notes as of the September 2029 Monthly Distribution Date (after giving effect to all payments of principal made on the notes on such Monthly Distribution Date) exceeds $78,000,000; and

- on and after the October 2030 Monthly Distribution Date and through and including the September 2031 Monthly Distribution Date, if the outstanding principal amount of the notes as of the September 2030 Monthly Distribution Date (after giving effect to all payments of principal made on the notes on such Monthly Distribution Date) exceeds $64,000,000;

provided, however, if the Principal Acceleration Trigger is in effect for two Principal Acceleration Measurement Periods (regardless of whether they are consecutive), the Principal Acceleration Trigger will be deemed to be in effect for each remaining Principal Acceleration Measurement Period.

**Flow of Funds After Events of**
**Default and Acceleration**

Following the occurrence of an Event of Default that results in an acceleration of the maturity of the Notes, and after the payment of certain fees and expenses, payments of principal and interest on the Class A Notes will be made, ratably, without preference or priority of any kind, until the Class A Notes are paid in full.  Payments of principal and interest on the Class B Notes will only be made after all principal and interest on the Class A Notes has been made in full.  See the caption "SUMMARY OF THE INDENTURE PROVISIONS—Remedies on Default" herein.

**Investment of Funds Held by Trustee**

The Trustee will invest amounts credited to any fund established under the Indenture in Investment Securities as directed in writing (or orally, confirmed in writing) by an authorized representative of the Issuer.  In the absence of such direction, such amounts will be held un-invested by the Trustee.  Unless an Event of Default shall have occurred under the Indenture, the Issuer acting by and through an authorized representative is entitled to, and will, provide written direction, or oral direction confirmed in writing to the Trustee with respect to any discretionary acts required or permitted of the Trustee under any Investment Securities and the Trustee will not take such discretionary acts without such written direction.

The Trustee will not in any way be held liable for the selection of Investment Securities purchased in accordance with the written investment directions of the Issuer or by reason of any insufficiency in any fund or account resulting from any market loss on any Investment Security so purchased or sold, including without limitation from any loss incurred as a result of the liquidation of any investment prior to its stated maturity in accordance with the written investment directions of the Issuer or the failure of the Issuer to provide timely written investment directions, in each case, in the absence of a breach of the Trustee's standard of care in the implementation of such investment directions.

## BOOK-ENTRY REGISTRATION

The following information concerning DTC and DTC's book-entry system has been obtained from information made publicly available by DTC and contains statements that are believed to describe accurately DTC, the method of effecting book-entry transfers of securities distributed through DTC and certain related matters, but the Issuer and the Underwriter take no responsibility for the accuracy of such statements.

Investors acquiring beneficial ownership interests in the Notes issued in book-entry form may hold their Notes in the United States through DTC (as defined under the caption "—DTC" below).

Principal and interest payments on the Notes are to be made to Cede & Co.  DTC's practice is to credit direct participant's accounts upon receipt of funds and corresponding detail information from the Issuer on the payable date in accordance with their respective holdings shown on DTC's records.  Payments by participants to beneficial owners are governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and shall be the responsibility of the participant and not of DTC, the Trustee or the Issuer, subject to any statutory or regulatory requirements as may be in effect from time to time.  Payment of principal and interest is the responsibility of the Issuer, which the Trustee (acting at the direction of the Issuer) shall forward to Cede & Co. Disbursement of such payments to direct participants shall be the responsibility of DTC, and disbursement of such payments to the beneficial owners shall be the responsibility of direct and indirect participants.  Under a book-entry format, Noteholders may experience a delay in their receipt of payments, since payments will be forwarded by the Trustee to Cede & Co., which will forward the payments to its

participants who will then forward them to indirect participants or Noteholders.  Under a book-entry format, Noteholders may experience a delay in their receipt of payments, since payments will be forwarded by the Trustee to Cede & Co., which will forward the payments to its participants who will then forward them to indirect participants or Noteholders.

Redemption notices shall be sent to DTC.  If less than all of the Notes are being redeemed, DTC's practice is to determine by lot the amount of the interest of each direct participant in the Notes to be redeemed.

DTC has advised that it will take any action permitted to be taken by a Noteholder under the Indenture only at the direction of one or more participants to whose accounts with DTC the Notes are credited.

Neither DTC nor Cede & Co. will consent or vote with respect to the Notes.  Under its usual procedures, DTC mails an omnibus proxy to the trust, or the Trustee, as appropriate, as soon as possible after the record date.  The omnibus proxy assigns Cede & Co.'s consenting or voting rights to those direct participants to whose accounts the Notes are credited on the record date.

None of the Issuer, the Trustee or the Underwriter will have any responsibility or obligation to any DTC participants or the persons for whom they act as nominees with respect to the accuracy of any records maintained by DTC or any participant, the payment by DTC or any participant of any amount due to any beneficial owner in respect of the principal amount or interest on the Notes, the delivery by any DTC participant of any notice to any beneficial owner which is required or permitted under the terms of the Indenture to be given to Noteholders or any other action taken by DTC.

In certain circumstances, the Issuer may discontinue use of the system of book-entry transfers through DTC or a successor securities depository.  In that event, Note certificates are to be printed and delivered.  DTC may discontinue providing its services as securities depository with respect to the Notes at any time by giving reasonable notice to the Issuer or the Trustee.  In the event that a successor securities depository is not obtained, Note certificates are required to be printed and delivered in accordance with the Indenture.

The Notes will be issued in minimum denominations of $100,000 and in integral multiples of $1,000 in excess thereof, and may be held and transferred, and will be offered and sold, in principal balances of not less than these minimum denominations.

The Issuer will apply to DTC for acceptance in its book-entry settlement systems of the Notes.  The Notes will have the CUSIP numbers and ISINs, as applicable, set forth in under the caption "SUMMARY OF TERMS" herein.  Payments of principal, interest and any other amounts payable on the Notes will be made to or to the order of the relevant clearing system's nominee as the Noteholder of the Notes.

*DTC*.  The Depository Trust Company, or DTC, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act.  DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments (from over 100 countries) that DTC's participants, known as direct participants, deposit with DTC.  DTC also facilitates the post-trade settlement among direct participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between direct participants' accounts.  This eliminates the need for physical movement of securities

certificates.  Direct participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations and certain other organizations.  DTC is a wholly owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC").  DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies.  DTCC is owned by the users of its regulated subsidiaries.  Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a direct participant, either directly or indirectly as an indirect participant.  DTC has an S&P rating of "AA+."  The DTC Rules applicable to its participants are on file with the Securities and Exchange Commission.  More information about DTC can be found at www.dtcc.com.  This website is not incorporated into and shall not be deemed to be a part of this Offering Memorandum.

Purchases of the Notes under the DTC system must be made by or through direct participants, which will receive a credit for the Notes on DTC records.  The ownership interest of each actual purchaser of Notes, or beneficial owner, is in turn to be recorded on the direct and indirect participants' records.  Beneficial owners shall not receive written confirmation from DTC of their purchase.  Beneficial owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the direct or indirect participant through which the beneficial owner entered into the transaction.  Transfers of ownership interests in the Notes are to be accomplished by entries made on the books of direct and indirect participants acting on behalf of beneficial owners.  Beneficial owners will not receive certificates representing their ownership interests in the Notes, except in the event that use of the book-entry system for the class of any Notes is discontinued.

To facilitate subsequent transfers, all Notes deposited by participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC.  The deposit of such Notes with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership.  DTC has no knowledge of the actual beneficial owners of Notes; DTC's records reflect only the identity of the direct participants to whose accounts such Notes are credited, which may or may not be the beneficial owners.  The direct and indirect participants remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to direct participants, by direct participants to indirect participants, and by direct participants and indirect participants to beneficial owners are governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to Notes unless authorized by a Direct Participant in accordance with DTC's MMI Procedures.  Under its usual procedures, DTC mails an Omnibus Proxy to the Issuer as soon as possible after the record date.  The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those direct participants to whose accounts the Notes are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Redemption proceeds, distributions, and dividend payments on the Notes are to be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC.  DTC's practice is to credit direct participants' accounts upon DTC's receipt of funds and corresponding detailed information from the Issuer or the Trustee, on payable date in accordance with their respective holdings shown on DTC's records.  Payments by participants to beneficial owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such participant and not of DTC, the Issuer or the Trustee, subject to any statutory or regulatory requirements as may be in effect from time

to time.  Payment of redemption proceeds, distributions, and dividend payments to Cede & Co. (or such other name as may be requested by an authorized representative of DTC) is the responsibility of the Issuer (through the Trustee), disbursement of such payments to direct participants will be the responsibility of DTC, and disbursement of such payments to the beneficial owners will be the responsibility of direct and indirect participants.

## TRUSTEE

The Issuer will issue the Notes pursuant to the Indenture by and between the Issuer and U.S. Bank National Association, as Trustee.  The Trustee's duties are limited to those duties specifically set forth in the Indenture.

The following information has been furnished by U.S. Bank National Association ("U.S. Bank") for use in this Offering Memorandum.  Neither the Issuer nor the Underwriter guarantees or makes any representation as to the accuracy or completeness thereof or the absence of material adverse change in such information or in the condition of the Trustee subsequent to the date hereof.

U.S. Bank, a national banking association, will act as Trustee.  U.S. Bancorp, with total assets exceeding $559 billion as of June 30, 2021, is the parent company of U.S. Bank, the fifth largest commercial bank in the United States.  As of June 30, 2021, U.S. Bancorp operated over 2,200 branch offices in 26 states.  A network of specialized U.S. Bancorp offices across the nation provides a comprehensive line of banking, brokerage, insurance, investment, mortgage, trust and payment services products to consumers, businesses, and institutions.

U.S. Bank has one of the largest corporate trust businesses in the country with office locations in 48 domestic and 2 international cities.  U.S. Bank has provided corporate trust services since 1924.

As of June 30, 2021, U.S. Bank was acting as trustee with respect to over 111,000 issuances of securities with an aggregate outstanding principal balance of over $5 trillion.  This portfolio includes corporate and municipal bonds, mortgage backed and asset backed securities and collateralized debt obligations.

U.S. Bank and other large financial institutions have been sued in their capacity as trustee or successor trustee for certain residential mortgage backed securities ("RMBS") trusts.  The complaints, primarily filed by investors or investor groups against U.S. Bank and similar institutions, allege the trustees caused losses to investors as a result of alleged failures by the sponsors, mortgage loan sellers and servicers to comply with the governing agreements for these RMBS trusts. Plaintiffs generally assert causes of action based upon the trustees' purported failures to enforce repurchase obligations of mortgage loan sellers for alleged breaches of representations and warranties, notify securityholders of purported events of default allegedly caused by breaches of servicing standards by mortgage loan servicers and abide by a heightened standard of care following alleged events of default.

U.S. Bank denies liability and believes that it has performed its obligations under the RMBS trusts in good faith, that its actions were not the cause of losses to investors, that it has meritorious defenses, and it has contested and intends to continue contesting the plaintiffs' claims vigorously.  However, U.S. Bank cannot assure you as to the outcome of any of the litigation, or the possible impact of these litigations on the Trustee or the RMBS trusts.

On March 9, 2018, a law firm purporting to represent fifteen Delaware statutory trusts (the "DSTs") that issued securities backed by student loans (the "Student Loans") filed a lawsuit in the Delaware Court of Chancery against U.S. Bank in its capacities as indenture trustee and successor special servicer, and three

other institutions in their respective transaction capacities, with respect to the DSTs and the Student Loans. This lawsuit is captioned *The National Collegiate Student Loan Master Trust I, et al. v. U.S. Bank National Association*, et al., C.A. No. 2018 0167 JRS (Del. Ch.) (the "NCMSLT Action").  The complaint, as amended on June 15, 2018, alleged that the DSTs have been harmed as a result of purported misconduct or omissions by the defendants concerning administration of the trusts and special servicing of the Student Loans.  Since the filing of the NCMSLT Action, certain Student Loan borrowers have made assertions against U.S. Bank concerning special servicing that appear to be based on certain allegations made on behalf of the DSTs in the NCMSLT Action.

U.S. Bank has filed a motion seeking dismissal of the operative complaint in its entirety with prejudice pursuant to Chancery Court Rules 12(b)(1) and 12(b)(6) or, in the alternative, a stay of the case while other prior filed disputes involving the DSTs and the Student Loans are litigated.  On November 7, 2018, the Court ruled that the case should be stayed in its entirety pending resolution of the first filed cases. On January 21, 2020, the Court entered an order consolidating for pretrial purposes the NCMSLT Action and three other lawsuits pending in the Delaware Court of Chancery concerning the DSTs and the Student Loans, which remains pending.

U.S. Bank denies liability in the NCMSLT Action and believes it has performed its obligations as indenture trustee and special servicer in good faith and in compliance in all material respects with the terms of the agreements governing the DSTs and that it has meritorious defenses.  It has contested and intends to continue contesting the plaintiffs' claims vigorously.

U.S. Bank has not furnished or verified any information or statements contained in this Offering Memorandum other than the information contained in the third through tenth paragraphs of this caption "TRUSTEE", and U.S. Bank is not responsible for the sufficiency, completeness or accuracy of any information or statement contained in this Offering Memorandum other than the information provided directly by U.S. Bank.

The Issuer may maintain customary banking relations on arm's-length terms with the Trustee.

Subject to the terms of the Indenture, the Trustee will act on behalf of the Noteholders and represent their interests in the exercise of its rights under the Indenture.  See the caption "SUMMARY OF THE INDENTURE PROVISIONS—The Trustee" herein for additional information regarding the responsibilities of the Trustee.  The Trustee will not have any obligation to administer, service or collect the Financed Eligible Loans or to maintain or monitor the administration, servicing or collection of those Financed Eligible Loans.

## SUMMARY OF THE INDENTURE PROVISIONS

The following is a summary of some of the provisions in the Indenture.  This summary does not cover every detail contained in the Indenture and reference should be made to the Indenture and is subject to all of the terms and conditions of the Indenture in its entirety for a full and complete statement of its provisions.

### Parity and Priority of Lien

The provisions of the Indenture are generally for the equal benefit, protection and security of the Noteholders under the Indenture except as expressly provided in the Indenture with respect to certain payments and other priorities, including priority of payment of the Class A Notes before payment of the Class B Notes.

THE NOTES SHALL NOT BE DEEMED TO CONSTITUTE A DEBT OR LIABILITY OR OBLIGATION OF THE STATE OF MISSOURI OR OF ANY AGENCY OR POLITICAL SUBDIVISION OF THE STATE OF MISSOURI, NOR SHALL THE NOTES AND THE OBLIGATIONS OF THE ISSUER CONTAINED IN THE INDENTURE BE DEEMED TO CONSTITUTE A PLEDGE OF THE FULL FAITH AND CREDIT OF THE STATE OF MISSOURI OR OF ANY AGENCY OR POLITICAL SUBDIVISION OF THE STATE OF MISSOURI.  THE NOTES SHALL NOT DIRECTLY, INDIRECTLY OR CONTINGENTLY, OBLIGATE THE STATE OF MISSOURI OR ANY AGENCY OR POLITICAL SUBDIVISION THEREOF TO LEVY ANY FORM OF TAXATION THEREFOR OR TO MAKE ANY APPROPRIATION FOR THEIR PAYMENT.  THE NOTES ARE SPECIAL, LIMITED OBLIGATIONS OF THE ISSUER AND ARE SECURED BY AND PAYABLE SOLELY FROM THE TRUST ESTATE PLEDGED AS SECURITY THEREFOR AS PROVIDED IN THE INDENTURE.  NO OTHER ASSETS OF THE ISSUER ARE PLEDGED TO THE PAYMENT OF THE NOTES.  THE STATE OF MISSOURI SHALL NOT BE LIABLE IN ANY EVENT FOR THE PAYMENT OF THE PRINCIPAL OF OR INTEREST ON THE NOTES OR FOR THE PERFORMANCE OF ANY PLEDGE, MORTGAGE, OBLIGATION, OR AGREEMENT OF ANY KIND WHATSOEVER WHICH MAY BE UNDERTAKEN BY THE AUTHORITY.  NO BREACH OF ANY SUCH PLEDGE, MORTGAGE, OBLIGATION, OR AGREEMENT MAY IMPOSE ANY PECUNIARY LIABILITY UPON THE STATE OF MISSOURI OR ANY CHARGE UPON THE GENERAL CREDIT OR TAXING POWER OF THE STATE OF MISSOURI.

The revenues and other money, Financed Eligible Loans and other assets the Issuer pledges under the Indenture will be free and clear of any pledge, lien, charge or encumbrance, other than that created by the Indenture.  If any Financed Eligible Loan is found to have been subject to a lien at the time such Financed Eligible Loan was pledged to the Trust Estate created under the Indenture, the Issuer will cause such lien to be released, will purchase such Financed Eligible Loan from the Trust Estate for a purchase price equal to its principal amount plus unamortized premium, if any, and interest accrued thereon or will replace such Financed Eligible Loan with another Eligible Loan with substantially identical characteristics which replacement Eligible Loan will be free and clear of liens at the time of such replacement.

Except as otherwise provided in the Indenture, the Issuer:

(a)     will not create or voluntarily permit to be created any debt, lien or charge on the Financed Eligible Loans which would be on a parity with, subordinate to, or prior to the lien of the Indenture;

(b)     will not take any action or fail to take any action that would result in the lien of the Indenture or the priority of that lien for the Notes thereby secured being lost or impaired; and

(c)     will pay or cause to be paid, or will make adequate provisions for the satisfaction and discharge of all lawful claims and demands which if unpaid might by law be given precedence to or any equality with the Indenture as a lien or charge upon the Financed Eligible Loans.

**Representations and Warranties**

The Issuer will represent and warrant in the Indenture, among other things, that:

(a)     it is duly authorized to issue the Notes and to execute and deliver the Indenture;

(b)     all necessary action for the issuance of the Notes and the execution and delivery of the Indenture has been duly and effectively taken; and

(c)      the Notes in the hands of the Noteholders are and will be valid and enforceable obligations of the Issuer secured by and payable solely from the Trust Estate created under the Indenture.

**Sale of Financed Eligible Loans**

Except under limited circumstances described in the Indenture, Financed Eligible Loans may not be sold, transferred or otherwise disposed of by the Issuer free from the lien of the Indenture while any Notes are outstanding.  However, the Issuer may sell Financed Eligible Loans free from the lien of the Indenture, so long as the sale price for any Financed Eligible Loan is not less than the amount required to prepay in full such Financed Eligible Loan under the terms thereof, including all accrued interest thereon and any unamortized premium, and the collective aggregate principal balance of all such sales does not exceed 5% of the initial Pool Balance and the collective aggregate principal balance of all such sales in any calendar year does not exceed 1% of the Pool Balance as of the first date of such calendar year (or as of the Date of Issuance with respect to the first calendar year).

**Further Covenants**

The Issuer will cause financing statements to be filed in any jurisdiction necessary to perfect the security interest it grants under the Indenture.

Upon written request of the Trustee, the Issuer will permit the Trustee or its agents, accountants and attorneys, to examine and inspect the property, books of account, records, reports and other data relating to the Financed Eligible Loans, and will furnish the Trustee such other information as it may reasonably request.  The Trustee will be under no duty to make any examination unless requested in writing to do so by the Noteholders of at least 66-2/3% of the Outstanding Amount of the Notes at the time outstanding, and unless those Noteholders have offered the Trustee security and indemnity satisfactory to it against any costs, expenses and liabilities which might be incurred in making any examination.

The Issuer will keep and maintain proper books of account relating to its program of financing Eligible Loans under the Indenture (the "Program") including all dealings or transactions of or in relation to the business and affairs of the Issuer which relate to the Notes.  Within 180 days of the close of each fiscal year, the Issuer will receive an audit of the Program and the Issuer by an independent certified public accountant.  A copy of the audit report showing in reasonable detail the financial condition of the Program and the Issuer as at the close of each fiscal year will be filed with the Trustee within 60 days after it is received by the Issuer and will be available for inspection by any Noteholder.

The Issuer shall deliver to the Trustee, within 180 days after the end of each fiscal year, a brief certificate from an authorized representative of the Issuer including (a) a current list of the authorized representatives of the Issuer, and (b) a statement indicating whether or not, to the knowledge of the signers thereof, the Issuer is in compliance with all conditions and covenants under the Indenture and, in the event of any noncompliance, specifying such noncompliance and the nature and status thereof.

The Issuer makes a number of negative covenants in the Indenture, including, without limitation, that it will not (a) sell, transfer, exchange or otherwise dispose of any portion of the Trust Estate except as expressly permitted by the Indenture; (b) claim any credit on, or make any deduction from, the principal amount of any of the Notes by reason of the payment of any taxes levied or assessed upon any portion of the Trust Estate; (c) permit the validity or effectiveness of the Indenture, any supplemental indenture or any grant thereunder to be impaired, or permit the lien of the Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any person to be released from any covenants or obligations under the Indenture, except as may be expressly permitted thereby; (d) except as otherwise

109

provided in the Indenture, permit any lien, charge, security interest, mortgage or other encumbrance (other than the lien of the Indenture) to be created on or extend to or otherwise arise upon or burden the Trust Estate or any part thereof or any interest therein or the proceeds thereof; or (e) permit the lien of the Indenture not to constitute a valid first priority, perfected security interest in the Trust Estate.

**Statements to Noteholders**

Two Business Days preceding each Monthly Distribution Date, the Issuer shall prepare and provide a report to the Trustee, including the following:

(a) descriptions of portfolio characteristics;

(b) identification of remaining applicable Note balances;

(c) descriptions of amounts of the distribution allocable to principal and interest of the Class A Notes and the Class B Notes;

(d) changes in Pool Balance over the distribution period;

(e) fees paid by the Trust Estate; and

(f) limited descriptions of activity in the Capitalized Interest Fund, Reserve Fund, Collection Fund and Student Loan Fund.

Such report shall also be posted on the Issuer's website.  See the caption "ADDITIONAL INFORMATION; REPORTS TO NOTEHOLDERS" herein.  The Trustee shall provide or make electronically available a copy of any Monthly Distribution Date Certificate of the Issuer to any Noteholder who requests such in writing.

**Servicing and Enforcement of the Servicing Agreements**

The Issuer will at all times appoint, retain and employ competent personnel for the purpose of carrying out its respective programs under the Authorizing Act and the Program and will establish and enforce reasonable rules, regulations, tests and standards governing the employment of such personnel.

The Issuer will cause to be diligently enforced and taken all reasonable steps, actions and proceedings necessary for the enforcement of, all material terms, covenants and conditions of all servicing agreements, including, without limitation, the prompt payment of all principal and interest payments and all other amounts due the Issuer thereunder, including, all grants, subsidies, donations, insurance payments, Special Allowance Payments, Interest Benefit Payments and all Guarantee payments by a Guaranty Agency which relate to any Financed Eligible Loans.  Collections received on the Financed Eligible Loans once identified by the Issuer or applicable Servicer as such shall be transferred to the Trustee for deposit into the Collection Fund on average within two Business Days of receipt as cleared funds.  Except to the extent expressly permitted by the Indenture, the Issuer:

(a) will not permit the release of any material obligations of a Servicer under its servicing agreement, except in conjunction with amendments or modifications permitted by the Indenture and will defend, enforce, preserve and protect the material rights of the Issuer and the Trustee thereunder;

(b)        will not consent or agree to or permit any amendment or modification of a servicing agreement which will materially adversely affect the rights or security of the Trustee or the Noteholders; and

(c)        will duly and punctually perform and observe each of its obligations to each Servicer under its servicing agreement in accordance with the terms thereof.

Notwithstanding the foregoing, the Indenture does not prevent the Issuer from taking any action to replace a Servicer or from consenting or agreeing to, or permitting, any amendments, modifications to, or waivers with respect to, any servicing agreement, subject to the conditions set forth in the Indenture.

If at any time a Servicer fails in any material respect to perform its obligations under its Servicing Agreement or under the Higher Education Act or (in the case of the Issuer as Servicer) under the Indenture, or if any servicing audit shows any material deficiency in the servicing of Financed Eligible Loans by a Servicer, the Issuer will, or will cause the Servicer to, cure the failure to perform or the material deficiency or remove such Servicer and appoint another Servicer.  From the date of the Indenture until all of the obligations of the Issuer under the Indenture shall be paid in full, each Servicer (including in the Issuer as Servicer under the Indenture) will service, administer and make collections with respect to the Financed Eligible Loans in all material respects with Accepted Servicing Procedures.  The Issuer agrees to send notice to the Rating Agencies of any change in Servicer.

If any Financed Eligible Loan ceases to be Guaranteed or Insured, and as a result thereof, a Guarantee or Insurance claim with respect to such Financed Eligible Loan is rejected by the applicable Guaranty Agency or an insurance claim is not paid by the United States and the same is not cured within 180 days after such rejection or if any Financed Eligible Loan is determined to be encumbered by any lien other than the lien of the Indenture, then the Issuer will either: (a) purchase such Financed Eligible Loan from the Trust Estate created under the Indenture for a purchase price equal to its principal amount plus unamortized premium, if any, and interest accrued thereon; or (b) replace such Financed Eligible Loan with another Financed Eligible Loan of substantially identical characteristics; and provided, however, that, with respect to a third-party Servicer, this provision shall be applicable only to the extent that such repurchase or replacement is provided by the applicable Servicing Agreement.

The Issuer covenants to maintain a Backup Servicing Agreement with a third-party servicer and agrees to pay the fees and expenses associated therewith from moneys available as provided in the Indenture.

**Additional Covenants With Respect to the Higher Education Act**

The Issuer is responsible for the following actions, among others, with respect to the Higher Education Act:

(a)        maintaining its status as an Eligible Lender and administering, operating and maintaining the Issuer's Program with respect to Eligible Loans in such manner as to ensure that the Program and the Financed Eligible Loans are in material compliance with and will benefit from the benefits available under the Higher Education Act and the federal program of reimbursement for Eligible Loans pursuant to the Higher Education Act and will comply with the material provisions of the Higher Education Act and all other United States and state statutes and regulations which apply to the Program and to the Financed Eligible Loans;

(b)     entering into any Guarantee Agreement (or supplements thereto), maintaining such Guarantee Agreement and diligently enforcing its rights thereunder and not voluntarily consenting to or permitting any rescission of or consenting to any amendment to or otherwise taking any action under or in connection with any Guarantee Agreement or similar or supplemental agreement which in any manner would materially adversely affect the rights of the Noteholders under the Indenture;

(c)     maintaining all Certificates of Insurance and diligently enforce its rights thereunder, enter into such other similar or supplemental agreements as shall be required to maintain benefits for all Financed Eligible Loans covered thereby, and not voluntarily consent to or permit any rescission of or consent to any amendment to or otherwise take any action under or in connection with any such Certificates of Insurance or any similar or supplemental agreement which in any manner will materially adversely affect the rights of the Noteholders under the Indenture;

(d)     causing to be diligently enforced, and causing to be taken all reasonable steps necessary for the enforcement of all terms, covenants and conditions of all Financed Eligible Loans and agreements in connection with the Financed Eligible Loans, including the prompt payment of all principal and interest payments and all other amounts due to the Issuer thereby; not releasing the obligations of any borrower or agreeing to, permitting, allowing or causing any amendment or modification of any Financed Eligible Loan except to the extent permitted by the Indenture and making, or causing to be made by the applicable Servicer, every effort to perfect the Issuer's or such Servicer's claims for payment from the Secretary or such Guaranty Agency, of all payments related to such Financed Eligible Loans, no later than required by the Higher Education Act and the applicable Guarantee Agreement.  Nothing in the Indenture shall be construed to prevent the Issuer from (i) granting a reasonable forbearance to a borrower pursuant to the terms of the Higher Education Act; (ii) settling a default or curing a delinquency on any Financed Eligible Loan on such terms as shall be permitted by law; (iii) charging interest at a lower rate than is required by the Higher Education Act to the extent provided in an exhibit to the Indenture; (iv) establishing a program of discounts, fee reduction or waiver, rate reduction or waiver or forgiveness of principal of or interest on Financed Eligible Loans to the extent as provided in an exhibit to the Indenture hereto; or (v) allowing a borrower to repay a Financed Eligible Loan pursuant to any repayment plan pursuant to the Higher Education Act;

(e)     complying in all material respects with all United States and state statutes, rules, and regulations which apply to the Program and to the Financed Eligible Loans; and

(f)     administering and collecting (or causing to be administered and collected) all Financed Eligible Loans in a competent, diligent, and orderly fashion and in accordance with all applicable requirements of the Higher Education Act, the Secretary, the regulations of the Secretary and each Guaranty Agency, and the Indenture.

For the avoidance of doubt, the Trustee will have no obligation to administer, service or collect the Financed Eligible Loans or to maintain or monitor the administration, servicing or collection of such loans.

**Continued Existence; Successor**

The Issuer will do or cause to be done all things necessary to preserve and keep in full force and effect its existence, rights and franchises as a body politic and corporate constituting a public instrumentality of the State of Missouri, except as set forth below.  The Issuer will not (a) sell, transfer or otherwise dispose of all or substantially all, of its assets (except Financed Eligible Loans as permitted by the Indenture); (b) consolidate with or merge into another entity; or (c) permit one or more other entities to

consolidate with or merge into it.  The preceding restrictions will not apply to a transaction if the transferee or the surviving or resulting entity, if other than the Issuer, by proper written instrument for the benefit of the Trustee, irrevocably and unconditionally assumes the obligation to perform and observe the agreements and obligations of the Issuer under the Indenture.

## Events of Default

The Indenture will define the following events as events of default (each, an "Event of Default"):

(a)      default in the due and punctual payment of any interest on any Note when the same becomes due and payable and such default will continue for a period of five days; provided, however, that a default in the due and punctual payment of any interest on any Class B Notes shall not be an Event of Default under the Indenture so long as the Class A Notes are outstanding;

(b)      default in the due and punctual payment of the principal of any Note when the same becomes due and payable on the final Maturity Date of the Note;

(c)      default in the performance or observance of any other of the Issuer's covenants, agreements or conditions contained in the Indenture or in the Notes, and continuation of such default for a period of 90 days after written notice thereof is given to the Issuer by the Trustee (to extent a Responsible Officer of the Trustee has actual knowledge or has received written notice thereof), or such later time if diligent care to cure such default is being pursued by the Issuer and a remedy cannot reasonably be effected within 90 days; and

(d)      the occurrence of an Event of Bankruptcy in respect of the Issuer.

Notwithstanding anything to the contrary contained herein, in no event shall there be an Event of Default as a result of there being insufficient available funds in the Collection Fund to pay the principal on any Monthly Distribution Date other than a Note Final Maturity Date.

## Remedies on Default

***Possession of Trust Estate***.  Upon the happening and continuance of any Event of Default, the Trustee may (except with respect to an Event of Default described in the clause (c) (covenant default) under the caption "—Events of Default" above which has not resulted in an acceleration of the Notes) and upon its receipt of security or indemnity satisfactory to it, as described herein, at the written direction of the Noteholders representing not less than a majority of the Outstanding Amount of the Highest Priority Notes outstanding will, enter into and upon and take possession of any portion of the Trust Estate of the Issuer created under the Indenture that may be in the custody of others, and all property comprising the Trust Estate, may exclude the Issuer wholly therefrom and may have, hold, use, operate, manage and control those assets.  The Trustee may also, in the name of the Issuer or otherwise, conduct such Issuer's business and collect and receive all charges, income and revenues of the Trust Estate.  After deducting all fees, costs and expenses incurred and all other proper outlays authorized in the Indenture, and all payments which may be made as reasonable compensation for its own services, and for the services of its attorneys, agents, and assistants, and for indemnity payable to the Trustee, the Trustee will apply the rest and residue of the money received by the Trustee as follows:

FIRST, to the Department of Education, any department SAP rebate interest amount and Monthly Consolidation Rebate Fees due and owing thereto, to any Guaranty Agency amounts due and owing to such Guaranty Agency, and to any party to any Joint Sharing Agreement to which the Issuer may be a party or to any other person entitled to any amounts deposited in the Trust Estate

which represent amounts that are allocable to Eligible Loans that are not Financed Eligible Loans, any amounts due and owing thereto;

SECOND, to the Trustee for fees and any costs and out-of-pocket expenses of the Trustee due and owing, including, without limitation, the fees and expenses of its counsel;

THIRD, to (a) the Servicer (initially the Issuer), any Servicing Fee due and remaining unpaid; (b) the Issuer, any Administration Fee due and remaining unpaid; and (c) to the persons due any Program Fees, any remaining unpaid Program Fees;

FOURTH, to the Class A Noteholders for amounts due and unpaid on the Class A Notes for interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Class A Notes for such interest;

FIFTH, to Class A Noteholders for amounts due and unpaid on the Class A Notes for principal, ratably, without preference or priority of any kind, according to the amounts due and payable on the Class A Notes for principal until paid in full;

SIXTH, to the Class B Noteholders for amounts due and unpaid on the Class B Notes for interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Class B Notes for such interest;

SEVENTH, to Class B Noteholders for amounts due and unpaid on the Class B Notes for principal, ratably, without preference or priority of any kind, according to the amounts due and payable on the Class B Notes for principal until paid in full; and

EIGHTH, to the Issuer, but only after all amounts payable have been paid pursuant to the Indenture;

provided, however, that no amount that is deposited in the Department SAP Rebate Fund, or required hereby to be so deposited, shall be applied to any purpose, other than as expressly provided herein for amounts so deposited, prior to the full funding of such expressly provided purposes.

*Remedies on Default; Advice of Counsel*.  Upon the happening of any Event of Default, the Trustee may, and, subject to the provisions of the Indenture described under the caption "—The Trustee" below, at the written direction of the Noteholders representing not less than a majority of the Outstanding Amount of the Highest Priority Notes outstanding, shall, proceed to protect and enforce the rights of the Trustee and the Noteholders in such manner, whether for the specific performance of any covenant, condition, agreement or undertaking contained in the Indenture or in aid of the execution of any power therein granted; or for the enforcement of such other appropriate legal or equitable remedies as the Trustee or such Noteholders may deem to protect and enforce the rights aforesaid.  The Trustee will be entitled to rely upon the advice of counsel, which for this purpose may be note counsel, in exercising remedies under, or otherwise acting under or in enforcement of the Indenture.

*Sale of Trust Estate*.  Upon the happening of any Event of Default and if the principal of all of the outstanding Notes will have been declared due and payable in accordance with the Indenture as described below under the caption "—Accelerated Maturity" below, then the Trustee may, and, subject to the provision of the Indenture described under the caption "—The Trustee" below, at the written direction of the Noteholders representing not less than a majority of the Outstanding Amount of the Highest Priority Notes outstanding, will, sell the Trust Estate created under the Indenture, to the highest bidder in accordance with the requirements of applicable law; provided, however, that, the Trustee may engage a third party with

nationally recognized experience in the sale of student loan assets, such as the Trust Estate, to undertake such sale; and further provided, that any sale shall be subject to prior compliance with the succeeding paragraph.  In addition, the Trustee may proceed to protect and enforce the rights of the Trustee and the Noteholders in the manner as counsel for the Trustee may advise, whether for the specific performance of any covenant, condition, agreement or undertaking contained in the Indenture, or in aid of the execution of any power therein granted, or for the enforcement of such other appropriate legal or equitable remedies as may be more effectual to protect and enforce the rights aforesaid.  The Trustee is required to take any of these actions if requested to do so in writing by the Noteholders of at least a majority of the Outstanding Amount of the Highest Priority Notes outstanding under the Indenture and indemnified to its satisfaction.

However, the Trustee is prohibited from selling the Financed Eligible Loans following an Event of Default (whether or not the principal of all outstanding Notes will have been declared due and payable), other than a default in the payment of any principal or any interest on any Note, unless:

>    (a)    the Noteholders of all of the Highest Priority Notes at the time outstanding consent to such sale;

>    (b)    the proceeds of such sale are sufficient to discharge all outstanding Notes at the date of such sale pursuant to terms of the Indenture describing discharge of the Indenture; or

>    (c)    the Issuer determines that the collections on the Financed Eligible Loans would not be sufficient on an ongoing basis to make all payments on such Notes as such payments would have become due if such Notes had not been declared due and payable, and the Trustee obtains the consent of the Noteholders of at least 66-2/3% in Outstanding Amount of the Highest Priority Notes outstanding to such sale.

Such a sale following an Event of Default, other than a default in the payment of any principal or interest on any Note, will also require the consent of all the Noteholders of the Class B Notes (to the extent such Class B Notes are not the Highest Priority Notes outstanding at such time) unless the proceeds of such a sale would be sufficient to discharge the Class B Notes pursuant to the terms of the Indenture describing discharge of the Indenture at the date of such a sale.

***Appointment of Receiver***.  If an Event of Default occurs, and all of the outstanding Notes under the Indenture have been declared due and payable in accordance with the Indenture as described below under the caption "—Accelerated Maturity," and if any judicial proceedings are commenced to enforce any right of the Trustee or of the Noteholders under the Indenture or otherwise, then as a matter of right, the Trustee will be entitled to the appointment of a receiver for the Trust Estate created under the Indenture.

***Accelerated Maturity***.  If an Event of Default specified in clause (a), (b) or (d) above under the caption "—Events of Default" above) occurs and is continuing, the Trustee at the written direction of the Noteholders representing not less than a majority in Outstanding Amount of the Highest Priority Notes then outstanding under the Indenture will declare the principal of all Notes issued under the Indenture, and then outstanding, and the interest thereon, immediately due and payable.  If an Event of Default specified in clause (c) under the caption "—Events of Default" above occurs and is continuing, the Trustee at the written direction of the Noteholders representing not less than a majority in Outstanding Amount of each class of Notes then outstanding under the Indenture will declare the principal of all Notes issued under the Indenture, and then outstanding, and the interest thereon, immediately due and payable.  Such declaration of acceleration may be rescinded before a judgment or decree for the payment of the money due has been obtained by the Trustee if a majority of the Noteholders of the Highest Priority Notes then outstanding (with respect to the first sentence above) or a majority of the Noteholders of each class of Notes then outstanding under the Indenture (with respect to the second sentence above) provide written notice to the Issuer and the

Trustee and (a) if the Issuer has paid or deposited with the Trustee amounts sufficient, along with other amounts available in the Trust Estate for such purposes in accordance with the provisions of the Indenture, to pay all principal and interest due on all Notes and all other amounts that would then be due under the Indenture upon such Notes if such declaration of acceleration and the Event of Default giving rise to such acceleration had not occurred and all sums paid or advanced by the Trustee under the Indenture and the reasonable compensation, expenses, disbursements and advances of the Trustee, any Servicer, and their agents and counsel and, if applicable, any such other amounts due and owing to the Trustee; and (b) any other Event of Default has been cured or waived.

*Direction of Trustee*.  If an Event of Default occurs, except as expressly provided in the Indenture, the Noteholders of a majority in Outstanding Amount of the Highest Priority Notes then outstanding under the Indenture, upon indemnifying the Trustee for its fees and expenses, will have the right to direct and control the Trustee as to the method of taking any and all proceedings for any investment or sale of any or all of the Trust Estate (in accordance with and subject to satisfaction of the provisions of the Indenture described under the caption "—Sale of Trust Estate"), or for the appointment of a receiver, if permitted by law, and may at any time cause any proceedings authorized by the terms of the Indenture to be discontinued or delayed.

*Right To Enforce in Trustee*.  No Noteholder will have any right as a Noteholder to institute any suit, action or proceedings for the enforcement of the provisions of the Indenture or for the execution of any trust thereunder or for the appointment of a receiver or for any other remedy under the Indenture.  All rights of action under the Indenture are vested exclusively in the Trustee, unless and until the Trustee fails for 30 days to institute an action, suit or proceeding after the Noteholders of the requisite Outstanding Amount of the Notes then outstanding (such amount as specified in the applicable section of the Indenture as described under this caption "—Remedies on Default"):

(a)    will have given to the Trustee written notice of a default under the Indenture, and of the continuance thereof;

(b)    will have made written request upon the Trustee and the Trustee will have been afforded reasonable opportunity to institute such action, suit or proceeding in its own name; and

(c)    will have offered indemnity and security satisfactory to the Trustee against the costs, expenses, and liabilities to be incurred in or by an action, suit or proceeding in its own name.

*Waivers of Events of Default*.  The Trustee will waive an Event of Default under the Indenture and its consequences and rescind any declaration of acceleration of the Notes due under the Indenture upon the written request of the Noteholders of at least a majority of the Outstanding Amount of the Highest Priority Notes then outstanding under the Indenture, or with respect to an Event of Default, or resulting declaration of acceleration, based solely upon an Event of Default specified in clause (c) above under "—Events of Default," a majority of the Outstanding Amount of each class of Notes then outstanding under the Indenture. However, any Event of Default in the payment of the principal of or interest due on any Note issued under the Indenture may not be waived unless prior to the waiver or rescission, provision will have been made for payment of all arrears of interest or all arrears of payments of principal and all expenses of the Trustee in connection with such default.  A waiver or rescission of one default will not affect any subsequent or other default, or impair any rights or remedies consequent to any subsequent or other default.

**The Trustee**

*Acceptance of Trust*.  The Trustee will accept the express duties and obligations imposed upon it by the Indenture and will perform those express duties and obligations, but only upon and subject to the following terms and conditions:

(a)      except during the continuance of an Event of Default, the Trustee undertakes to perform only those duties as are specifically set forth in the Indenture and no implied duties (including fiduciary duties), covenants or obligations will be read into the Indenture against the Trustee;

(b)      except during the continuance of an Event of Default and in the absence of bad faith or negligence on its part, the Trustee may conclusively rely, not only as to due execution, validity and effectiveness, but also as to the truth of the statements and the correctness of the opinions expressed therein, upon Issuer Orders, Noteholder directions, certificates or opinions furnished to the Trustee and conforming to the requirements of the Indenture; but in the case of any such Issuer Orders, Noteholder directions, certificates or opinions which by any provisions of the Indenture are specifically required to be furnished to the Trustee, the Trustee will be under a duty to examine the same to determine whether or not they conform as to form with the requirements of the Indenture (but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein);

(c)      in case an Event of Default has occurred and is continuing of which a Responsible Officer of the Trustee shall have actual knowledge or shall have received written notice thereof, the Trustee, in exercising the rights and powers vested in it by the Indenture, will use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of his or her own affairs; and

(d)      before taking any action under the Indenture requested by Noteholders, the Trustee may require that it be furnished an indemnity bond or other indemnity and security satisfactory to it by the applicable Noteholders, for the reimbursement of all fees and expenses to which it may be put and to protect it against liability arising from any action taken by the Trustee.

No provision of the Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct (as determined by a court of competent jurisdiction), except that:

(a)      this provision shall not be construed to limit the effect of clause (a) of the prior paragraph;

(b)      the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts;

(c)      the Trustee shall not be liable with respect to any action taken or omitted to be taken in accordance with the written directions of (A) the Noteholders of not less than a majority of the Outstanding Amount of the Highest Priority Notes, or, with respect to a declaration of acceleration based solely upon an Event of Default specified in clause (c) under the caption "— Events of Default" above, or waiver of such declaration or of the underlying Event of Default, of a majority of the Outstanding Amount of each class of Notes, relating to the time, method and place of conducting any proceedings for any remedy available to the Trustee, or exercising any trust or

power conferred upon the Trustee pursuant to the provisions of the Indenture described under this caption "—The Trustee"; or (B) the Issuer, relating to any other actions that the Trustee may be required or permitted to take under the Indenture; subject, however, to satisfaction of any express requirements in the Indenture that may be applicable thereto; and

(d)      no provision of the Indenture or any other basic document shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers.

*Trustee May Act Through Agents*.  The Trustee may execute any of the trusts or powers under the Indenture and perform any duty thereunder, either itself or by or through its attorneys or agents, and it shall not be answerable or accountable for any default, bad faith, negligence or willful misconduct of any such attorneys or agents, if reasonable care has been exercised in the appointment of such attorneys or agents and, unless the Issuer is contractually entitled to supervise and monitor the performance of any such attorneys or agents (other than during the continuance of an Event of Default), in such supervision and monitoring.  All reasonable costs incurred by the Trustee and all reasonable compensation to all such persons as may be appointed by the Trustee in connection with the trusts under the Indenture shall be paid by the Issuer as part of the Trustee Fee (including after the occurrence and continuation of an Event of Default, as described under the caption "–Remedies on Default–Possession of Trust Estate" above).

*Recitals of Others*.  The Trustee will not make any representations as to the title of the Issuer in the Trust Estate created under the Indenture or as to the security afforded thereby and by the Indenture, or as to the validity or sufficiency of the Indenture or the Notes issued thereunder or of any offering materials.

*Trustee's Right to Reliance*.  The Trustee will be protected in acting upon any notice, resolution, request, consent, order, instruction, direction, certificate, report, appraisal, opinion, or document of the Issuer or a Servicer or other paper or document reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties.  The Trustee may consult with experts and with counsel (who may but need not be counsel for the Issuer, the Trustee or a Noteholder) and who may be note counsel, and the written advice or opinion of such counsel will be full and complete authorization and protection in respect of any action taken or suffered, and in respect of any determination made by it under the Indenture in good faith and in accordance with the written advice or opinion of such counsel.

The Trustee shall not be liable for any action taken, suffered or omitted by it in good faith in accordance with the Indenture or any other basic document or at the direction of the Noteholders evidencing the appropriate percentage of the Outstanding Amount of the Notes relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under the Indenture or any other basic document and believed by it to be authorized or within the discretion or rights or powers conferred upon it by the Indenture; provided, however, that the Trustee shall be liable for its bad faith, negligence or willful misconduct in taking such action (as determined by a court of competent jurisdiction).

*Indemnification of Trustee*.  The Trustee is generally under no obligation or duty to perform any act at the request of Noteholders or to institute or defend any suit to protect the rights of the Noteholders under the Indenture unless properly indemnified and provided with security to its satisfaction.  However, the Trustee may begin suit, or appear in and defend suit, execute any of the trusts created by the Indenture, enforce any of its rights or powers under the Indenture, or do anything else in its judgment proper to be done by it as Trustee, without assurance of reimbursement or indemnity.  In that case, the Trustee will be reimbursed or indemnified by the Noteholders requesting that action, if any, or, subject to the limitations set forth in the Indenture, by the Issuer in all other cases, for all reasonable and documented fees, costs and expenses (including reasonable attorneys' fees and expenses and court costs and any losses incurred in

connection with a successful defense, in whole or in part, of any claim that the Trustee breached its standard of care) reasonably incurred unless such fees, costs and expenses reasonably incurred in connection therewith are adjudicated to have resulted from the negligence or willful misconduct of the Trustee.  In furtherance and not in limitation of this paragraph, the Trustee will not be liable for, and will be held harmless by the Issuer from, any liability arising from following any Issuer Orders, instructions or other directions, and the Trustee is authorized to conclusively rely under the Indenture or any other agreement to which it is a party on such Issuer Orders, instructions or other directions.  If the Issuer or the Noteholders, as appropriate, shall fail to make such reimbursement or indemnification promptly, the Trustee may reimburse itself from any money in its possession as described under the captions "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES—Collection Fund; Flow of Funds" and "SUMMARY OF THE INDENTURE PROVISIONS—Remedies and Default–Possession of Trust Estate" herein.

The Trustee and its officers, directors, employees and agents (each a "Trustee Indemnified Person") shall further be indemnified for and held harmless by the Issuer from and against any loss, liability or expense incurred without bad faith, negligence or willful misconduct on the part of the Trustee or any other Trustee Indemnified Person arising out of or in connection with the Trustee's acceptance or administration of the trust created under the Indenture or its duties thereunder, including the reasonable costs and expenses of the Trustee Indemnified Persons in defending themselves against any claim or liability in connection with the exercise or performance of any of the Trustee's duties thereunder (collectively, "Losses").  The obligations of the Issuer under the Indenture, including without limitation any payment obligations of the Issuer arising under the Indenture provisions summarized in this caption, are limited to amounts held under the Indenture and available therefor.  If the Issuer or the Noteholders, as appropriate, shall fail to make such reimbursement or indemnification, the applicable Trustee Indemnified Person, subject to the provisions of the Indenture described under the caption "Remedies on Default—Possession of Trust Estate" above and the other provisions of the Indenture described under this caption (including without limitation that there has been no negligence or willful misconduct by such Trustee Indemnified Person), may reimburse itself from any money held under the provisions of the Indenture (other than the Department SAP Rebate Fund), subject only to the prior lien of the Notes for the payment of the principal thereof and interest thereon from the Collection Fund, including any required transfers thereto.

The provisions of the Indenture described under this caption to the contrary notwithstanding, and without limitation to the generality of the limitations in the Indenture described in the second paragraph (the legend) under the caption "Parity and Priority of Lien" above, all payment obligations of the Issuer under the Indenture provisions described in this caption, or otherwise resulting from or arising from the actions described under this caption, are expressly limited as to source of payment as provided in Indenture as described in the second paragraph (the legend) under the caption "Parity and Priority of Lien" above.

***Compensation of Trustee***.  Except as otherwise expressly provided in the Indenture, all Trustee Fees shall be paid by the Issuer as provided in the Indenture, but will be payable from the Trust Estate solely as expressly provided therein.  Subject to the limitations in the Indenture described in the second paragraph (the legend) under the caption "Parity and Priority of Lien" above, the compensation of the Trustee will not be limited to or by any provision of law in regard to the compensation of trustees of an express trust.  The Trustee Fees will be applicable so long as the Notes are outstanding.  In the event a successor Trustee is appointed under the Indenture, Trustee Fees will be agreed upon prior to the Trustee's succession and will be applicable so long as the Notes are outstanding; provided, however, the successor Trustee may not materially increase the Trustee Fees upon its appointment without an Issuer Order evidencing satisfaction of the Rating Agency Condition.  If not paid by the Issuer, the Trustee shall have a lien against all money held pursuant to the Indenture (other than the Department SAP Rebate Fund), subject only to the prior lien of the Notes for the payment of the principal thereof and interest thereon, for the Trustee Fees and such other reasonable fees, costs and expenses incurred in and about the execution of the trusts hereby created and the exercise and performance of the powers and duties of the Trustee thereunder

and the fees, costs and expenses incurred in defending against any other liability payable from the Trust Estate (other than pursuant to the Indenture) of any character whatsoever (unless such liability is adjudicated by a court of competent jurisdiction to have resulted from the bad faith, negligence or willful misconduct of the Trustee or any other Trustee Indemnified Person) and any other amounts due and owing the Trustee or any other Trustee Indemnified Person as described under the caption "—*Indemnification of Trustee*" above.

*Resignation of Trustee*.   The Trustee and any successor to the Trustee may resign and be discharged by giving the Issuer 30 days prior written notice specifying the date on which the resignation is to take effect; provided, however, that such resignation will only take effect on the day specified in such notice if a qualified successor Trustee will have been appointed pursuant to the Indenture.  If no successor Trustee has been appointed by that date or within 90 days of the Issuer receiving the Trustee's notice, whichever period is longer, then the Trustee may petition a court of competent jurisdiction to (a) require the Issuer to appoint a temporary successor, within three days of the receipt of citation or notice by the court, or (b) appoint a successor Trustee meeting the eligibility requirements of the Indenture.  In no event may the resignation of the Trustee be effective until a qualified successor Trustee shall have been selected and appointed.  In the event a temporary successor Trustee is appointed pursuant to clause (a) above, the Issuer may remove such temporary successor Trustee and appoint a successor thereto meeting the eligibility requirements of the Indenture pursuant to the terms thereof.

*Removal of Trustee*.   The Trustee or any successor to the Trustee may be removed:

     (a)     at any time by the Noteholders acting on behalf of the Noteholders of a majority of the Outstanding Amount of the Notes then Outstanding, upon thirty (30) days' prior written notice to each of the Trustee and the Issuer;

     (b)     by the Issuer for cause or upon the sale or other disposition of the Trustee or its trust functions, upon thirty (30) days' prior written notice to each of the Trustee and the Noteholders; or

     (c)     by the Issuer without cause so long as no Event of Default exists or has existed within the last 30 days, upon payment to the Trustee so removed of all money then due to it under the Indenture and appointment of a successor thereto by the Issuer and acceptance thereof by said successor and upon thirty (30) days' prior written notice to each of the Trustee and the Noteholders.

In the event the Trustee (or any successor to the Trustee) is removed, such removal will not become effective until:

     (a)     in the case of removal by the Noteholders, such Noteholders by instrument or concurrent instruments in writing (signed and acknowledged by such Noteholders or their attorneys in fact) filed with the Trustee removed have appointed a successor Trustee or otherwise the Issuer shall have appointed a successor; and

     (b)     the successor Trustee has accepted that appointment.

*Successor Trustee*.   In case at any time the Trustee or any successor to the Trustee resigns, is dissolved, is removed or otherwise is disqualified to act or is incapable of acting, or in case control of the Trustee or of any successor to the Trustee or of its officers is taken over by any public officer or officers, the Issuer may appoint a successor Trustee.  The Issuer will cause notice of the appointment of a successor Trustee to be mailed to the Noteholders at the address of each Noteholder appearing on the Note registration books maintained by the Trustee, as registrar.

Every successor Trustee will be required to meet the following eligibility criteria (which also apply to the initial Trustee):

(a)       will be a bank or trust company in good standing, organized and doing business under the laws of the United States or of a state therein;

(b)       will have a reported capital and surplus of not less than $50,000,000;

(c)       will be authorized under the law to exercise corporate trust powers in the State, be subject to supervision or examination by a federal or state authority; and

(d)       will be an Eligible Lender so long as such designation is necessary to maintain guarantees and federal benefits under the Higher Education Act with respect to the Financed Eligible Loans.

***Merger of the Trustee***.  Any entity into which the Trustee is converted or may be merged or with which it may be consolidated, or any entity resulting from any merger or consolidation to which the Trustee shall be a party, or any entity succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee under the Indenture, provided such entity shall be otherwise qualified and eligible under the Indenture, without the execution or filing of any paper or any further act on the part of any other parties thereto.  The Trustee shall promptly notify the Issuer after the effectiveness of any merger or consolidation as described in the Indenture provisions summarized under this caption.

## Force Majeure

In no event will the Trustee or, except with respect to its obligation to fund the timely payment of principal and interest as due upon Notes, the Issuer be responsible or liable for any failure or delay in the performance of its obligations under the Indenture arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation to the generality of the foregoing, any provision of any present or future law or regulation thereunder, acts of God, flood, war (whether declared or undeclared), terrorism, fire, riot, strikes or work stoppages for any reason, embargo, accidents, national emergencies, natural disasters, epidemics, pandemics, the adoption or imposition of quarantine, shelter-in-place or similar requirements, directives, guidance, or government action, including policies and any other laws, ordinances, regulations or the like which restrict or prohibit the providing of the services contemplated by the Indenture, inability to obtain material, equipment or communications or computer facilities, or the failure of equipment or interruption of communications or computer facilities, and other causes beyond its control whether or not of the same type or kind as specifically named above it being understood that the Issuer will use reasonable efforts, and that the Trustee will use reasonable efforts which are consistent with accepted practices in the banking industry, respectively, to resume performance as soon as practicable under the circumstances.

## Supplemental Indentures

***Supplemental Indentures Not Requiring Consent of Noteholders***.  The Issuer can agree with the Trustee to enter into any indentures supplemental to the Indenture for any of the following purposes without notice to or the consent of Noteholders (except for clause (m) as described below):

(a)       to cure any ambiguity, inconsistency or formal defect or omission in the Indenture or to conform to the offering memorandum related to the initial offering of the Notes;

(b)        to grant to or confer upon the Trustee for the benefit of the Noteholders any additional benefits, rights, remedies, powers or authorities that may lawfully be granted to or conferred upon the Noteholders or the Trustee;

(c)        to subject to the Indenture additional revenues, properties or collateral;

(d)        to modify, amend or supplement the Indenture or any indenture supplemental thereto in such manner as to permit the qualification of the Indenture or any indenture supplemental thereto under the Trust Indenture Act of 1939 or any similar federal statute or to permit the qualification of the Notes for sale under the securities laws of the United States of America or of any of the states of the United States of America, and, if they so determine, to add to the Indenture or any indenture supplemental thereto such other terms, conditions and provisions as may be permitted by said Trust Indenture Act of 1939 or similar federal statute;

(e)        to evidence the appointment of a separate or co-Trustee or a co-registrar or transfer agent or the succession of a new Trustee under the Indenture, or any additional or substitute Guaranty Agency or Servicer;

(f)        to add such provisions to or to amend such provisions of the Indenture as may be necessary or desirable to assure implementation of the Program in conformance with the Higher Education Act if along with such supplemental indenture there is filed a note counsel's opinion addressed to the Issuer and the Trustee to the effect that the addition or amendment of such provisions will not materially impair the existing security of the Noteholders of any outstanding Notes;

(g)        to make any change as may be necessary in order to obtain and maintain for any of the Notes an investment grade rating from a nationally recognized rating service, if along with such supplemental indenture there is filed a note counsel's opinion addressed to the Issuer and the Trustee to the effect that such changes will not materially adversely impact the existing security of the Noteholders of any outstanding Notes;

(h)        to make any changes necessary to comply with or to obtain more favorable treatment under any current or future law, rule or regulation, including, but not limited to, the Higher Education Act or the regulations thereunder;

(i)        to create any additional funds or accounts or subaccounts under the Indenture deemed by the Trustee to be necessary or desirable;

(j)        to amend the Indenture to provide for use of a surety note or other financial guaranty instrument in lieu of cash and/or Investment Securities in all or any portion of the Reserve Fund, so long as such action shall not adversely affect the Ratings of any of the Notes;

(k)        to make Benchmark Replacement Conforming Changes from time to time in connection with the implementation of a Benchmark Replacement (see the caption "DESCRIPTION OF THE NOTES—Benchmark Transition Event" herein);

(l)        to make any other change (other than changes with respect to any matter requiring the satisfaction of a Rating Agency Condition unless such Rating Agency Condition has been satisfied) which based upon an opinion of counsel will not materially adversely impact the Noteholders of any Notes; or

(m)      with the consent of all of the Class B Noteholders, to make any changes to the terms of the Class B Notes provided that such changes to the Class B Notes become effective only after the Class A Notes are no longer outstanding;

provided, however, that nothing in the Indenture provisions described under this caption shall permit, or be construed as permitting, any modification of the trusts, powers, rights, duties, remedies, immunities and privileges of the Trustee without the prior written approval of the Trustee, which approval shall be evidenced by execution of a supplemental indenture.

*Supplemental Indentures Requiring Consent of Noteholders*.  Any amendment of the Indenture other than those listed above or pursuant to a LIBOR Related Amendment must be approved by the Noteholders representing not less than a majority of the Outstanding Amount of the Notes; provided that the changes described below, other than Benchmark Replacement Conforming Changes or a LIBOR Related Amendment, may be made in a supplemental indenture only with the consent of the Noteholders of each affected Note then outstanding:

(a)      an extension of the Maturity Date of the principal of or the interest on any Note;

(b)      a reduction in the principal amount of any Note or the rate of interest thereon;

(c)      a privilege or priority of any Note under the Indenture over any other Note except as otherwise provided in the Indenture;

(d)      a reduction in the principal amount of the Notes required for consent to such supplemental indenture; or

(e)      the creation of any lien other than a lien ratably securing all of the Notes at any time outstanding under the Indenture except as otherwise provided in the Indenture.

Nothing in the Indenture provisions described under this caption shall permit, or be construed as permitting, any modification of the trusts, powers, rights, duties, remedies, immunities and privileges of the Trustee without the prior written approval of the Trustee, which approval shall be evidenced by execution of a supplemental indenture.

*Additional Limitation on Modification of Indenture*.  None of the provisions of the Indenture permit amending the Indenture to provide for the transfer of all or part of the Financed Eligible Loans or the granting of an interest therein to any person other than an eligible lender under the Higher Education Act or a Servicer, unless the Higher Education Act or regulations promulgated thereunder are modified so as to permit the same.

**Trusts Irrevocable**

The trust created by the Indenture is irrevocable until the Notes and interest thereon and all other payment obligations of the Issuer under the Indenture are fully paid or provision is made for their payment as provided in the Indenture.

**Satisfaction of Indenture**

If the Noteholders are paid all the principal of and interest due on their Notes at the times and in the manner stipulated in the Indenture and if all other persons are paid any other amounts payable and secured under the Indenture, then the pledge of the Trust Estate, except the Department SAP Rebate Fund,

will thereupon terminate and be discharged.  The Trustee will execute and deliver to the Issuer instruments to evidence the discharge and satisfaction, and the Trustee will pay all money held by it under the Indenture to the Issuer.

Notes will be considered to have been paid if money for their payment or redemption has been set aside and is being held in trust by the Trustee.  Any outstanding Note will be considered to have been paid if the Note is to be redeemed on any date prior to its stated maturity and notice of redemption has been provided for as provided in the Indenture and on said date there will have been deposited with the Trustee either money or certain non-callable governmental obligations which are unconditionally and fully guaranteed by the United States of America or any agency or instrumentality thereof, the principal of and the interest on which when due will provide money which, together with any money deposited with the Trustee at the time, will be sufficient to pay when due the principal of and interest to become due on the Notes on and prior to the redemption date or stated maturity, as the case may be.

**Optional Release of All Financed Eligible Loans**

The Issuer shall certify to and notify the Trustee in writing, within 15 days after the last Business Day of each Collection Period in which the then outstanding Pool Balance is 12% or less of the initial Pool Balance, of the percentage that the then outstanding Pool Balance bears to the initial Pool Balance.  The Issuer shall have the option to direct the release of all of the Financed Eligible Loans from the lien of the Indenture on the Monthly Distribution Date next succeeding the last day of the Collection Period on which the then outstanding Pool Balance is 10% or less of the initial Pool Balance and on each Monthly Distribution Date thereafter (each, an "Optional Release Date").  To exercise the option described in this paragraph, the Issuer shall deposit in the Collection Fund on or before the Optional Release Date, an amount that is sufficient to redeem all of the Notes, and pay any due and owing Administration Fees (including the amounts allocated for the payment of Program Fees), Servicing Fees, Program Fees, and Trustee Fees attributable to the Notes, as well as any other expenses that may be due at the time or following the payment of the Notes, less any amounts on deposit in the Funds and Accounts (other than the Department SAP Rebate Fund).  Upon exercise of the option to direct the release of all of the Financed Eligible Loans pursuant to this paragraph, the same shall be released from the lien of the Indenture.

## CREDIT ENHANCEMENT

Credit enhancement for the Notes will consist of overcollateralization, excess spread, cash on deposit in the Capitalized Interest Fund and the Reserve Fund and, for the Class A Notes, the subordination of the Class B Notes.  "Excess spread" is created when interest collections received on the Eligible Loans held in the Trust Estate during a Collection Period and related investment earnings exceed the interest on the Notes at the related Note interest rates and certain fees and expenses of the Issuer.  There can be no assurance as to the rate, timing or amount, if any, of excess spread.

As described under the caption "USE OF PROCEEDS" herein, on the Date of Issuance, certain of the proceeds from the sale of the Notes will be deposited by the Issuer to the credit of the Reserve Fund and the Capitalized Interest Fund.  Certain of the remaining proceeds will be used to refinance FFELP Loans presently pledged by the Issuer under the Warehouse Agreement and certain FFELP Loans held unencumbered by the Issuer.  Such refinanced FFELP Loans will be pledged to the Trustee under the Indenture upon such refinancing.  After giving effect to the issuance of the Notes, deposits to the Capitalized Interest Fund and Reserve Fund and the pledge of the Financed Eligible Loans to the Trustee on the Date of Issuance, the parity ratio will be not less than 108.0% of the principal amount of the Class A Notes and not less than 105.5% of the principal amount of all Notes.  The FFELP Loans expected to be refinanced and pledged under the Indenture on the Date of Issuance have been identified and are described herein (as

of the Statistical Cut-Off Date) under the caption "CHARACTERISTICS OF THE FINANCED ELIGIBLE LOANS" herein.

On the Date of Issuance, deposits in the amounts of $6,000,000 and $1,307,534 will be made to the Capitalized Interest Fund and the Reserve Fund, respectively.  See the caption "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES" herein.  The Reserve Fund and Capitalized Interest Fund are intended to enhance the likelihood of timely distributions of interest to the Noteholders and to decrease the likelihood that the Noteholders will experience losses.  To the extent of available funds, the Reserve Fund will be replenished so that amounts on deposit therein do not fall below the Specified Reserve Fund Balance.  Amounts withdrawn from the Capitalized Interest Fund will not be replenished.

The amount of the Financed Eligible Loans to be deposited into the Student Loan Fund on the Date of Issuance, together with the cash to be deposited on the Date of Issuance into the Capitalized Interest Fund and the Reserve Fund will exceed the original principal balance of the Notes to be issued by the Issuer, which excess will represent the initial overcollateralization for the Trust Estate created under the Indenture and a portion of the credit enhancement.

Credit enhancement will not provide protection against all risks of loss and may not guarantee payment to Noteholders of all amounts to which they are entitled.  If losses or shortfalls occur that exceed the amount of the credit enhancement, Noteholders, and particularly the Noteholders of the Class B Notes, will bear their allocable share of deficiencies.  To the extent that the credit enhancement described above is exhausted, the Notes, and particularly the Class B Notes, will bear any risk of loss.

The Class B Notes are subordinate Notes.  The rights of the Noteholders of the Class B Notes to receive payments of interest are subordinated to the rights of the Noteholders of the Class A Notes to receive payments of interest.  Similarly, the rights of the Noteholders of the Class B Notes to receive payments of principal are subordinated to the rights of the Noteholders of the Class A Notes to receive payments of interest and principal.  This subordination is intended to enhance the likelihood of regular receipt by the Noteholders of the Class A Notes of the full amount of the payments of interest and principal due to them and to protect the Noteholders of the Class A Notes against losses.  See the caption "RISK FACTORS— Subordination of the Class B Notes may result in a greater risk of loss for holders of Class B Notes" herein.

## CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

The following is a summary of all material U.S. federal income tax consequences of the purchase, ownership and disposition of the Notes for the investors described below.  This summary is based upon laws, regulations, rulings and decisions currently in effect, all of which are subject to change, which change may be retroactive.  Except where noted, this summary is addressed to Noteholders who are U.S. persons that acquire Notes at original issuance and beneficially own their Notes as "capital assets" (generally, property held for investment) within the meaning of Section 1221 of the Code.  This summary does not purport to be a comprehensive description of all the tax considerations that may be relevant to a particular investor's decision to purchase Notes.  For example, this summary does not deal with individual circumstances of particular investors or all federal tax consequences applicable to all categories of investors, some of which may be subject to special rules, including, but not limited to, partnerships or entities treated as partnerships, dealers in securities or currencies, financial institutions, life insurance companies, persons holding Notes as a part of a hedging, integrated constructive sale or conversion transaction or a straddle, Noteholders whose "functional currency" is not the U.S. dollar, pension plans, foreign investors or subsequent purchasers of the Notes, except as otherwise indicated.  Prospective investors should note that no rulings have been or will be sought from the Service with respect to any aspect of the U.S. federal income tax treatment of the Issuer, the Notes or the Noteholders, including the U.S. federal income tax consequences discussed below, and no assurance can be given that the Service will not take contrary

positions to those discussed below. In addition, this summary does not address tax and withholding considerations that may be applicable to any hedge, constructive sale, straddle or conversion transaction, debt securities that are "contingent payment" debt instruments, alternative minimum taxes, the holding of Notes through entities treated as partnerships for U.S. federal income tax purposes, the Medicare tax on net investment income or the laws of any state, locality or taxing jurisdiction other than the U.S. federal income tax laws. Any discussion of U.S. federal tax issues in this Offering Memorandum (including any attachments or enclosures) is not intended or written by us to be relied upon or used by taxpayers for the purpose of avoiding penalties that may be imposed on taxpayers under the Code. Investors should consult their own tax advisors to determine the federal, state, local and other tax consequences of the purchase, ownership and disposition of Notes.

**Characterization of the Notes**

Based, in part, on the facts set forth herein, additional information and assuming the accuracy of and compliance with certain assumptions, representations and covenants, Kutak Rock LLP will render on the Date of Issuance its opinion to the effect that, for U.S. federal income tax purposes, when issued, the Notes will be characterized as debt if and to the extent beneficially acquired on the Date of Issuance by persons or entities unaffiliated with the Issuer. Unlike a ruling from the Service, such opinion is not binding on the courts or the Service. Therefore, it is possible that the Service could assert that, for purposes of the Code, the transaction contemplated by this Offering Memorandum constitutes a sale of the Financed Eligible Loans (or an interest therein) to the Noteholders or that one or more of the Classes of Notes is an equity interest in the Financed Eligible Loans or that the relationship which will result from this transaction is that of a partnership or an association taxable as a corporation.

If, instead of treating the transaction as creating secured debt, the transaction were treated as creating equity interests in a partnership held by the Noteholders, the resulting partnership would not be subject to U.S. federal income tax. Rather, each Noteholder would be taxed individually on its respective distributive shares of the partnership's income, gain, loss, deductions and credits which could have adverse tax consequences to certain Noteholders. For example, the amount, character and timing of items of income and deduction of the Noteholder could differ if the Notes were determined to constitute partnership interests, rather than indebtedness.

If, alternatively, it were determined that the relationship that will result from this transaction caused the trust arrangement to be classified as an association or characterized as a publicly traded partnership taxable as a corporation, the resulting entity would be subject to U.S. federal income tax at corporate income tax rates on its taxable income, including taxable income derived from the Eligible Loans, which would reduce the amounts available for payment to the Noteholders. Moreover, if the Noteholders were treated as equity holders in such an entity, payments to the Noteholders generally would be treated as dividends for tax purposes to the extent of such entity's accumulated and current earnings and profits.

The Issuer will express in the Indenture its intent that, for U.S. federal income tax purposes, the Notes will be indebtedness. The Issuer, and each Noteholder by accepting its Notes, agrees to treat the Notes as indebtedness for U.S. federal income tax and all applicable state and local income and franchise tax purposes in all tax filings, reports and returns and otherwise, and will not take, or participate in the taking of or permit to be taken, any action that is inconsistent with such tax treatment and tax reporting of the Notes, unless required by applicable law.

In general, the characterization of a transaction as a sale of property or a secured loan, for U.S. federal income tax purposes, is a question of fact, the resolution of which is based upon the economic substance of the transaction, rather than its form or the manner in which it is characterized for state law or other purposes. While the Service and the courts have set forth several factors to be taken into account in

determining whether the substance of a transaction is a sale of property or a secured indebtedness, the primary factor in making this determination is whether the transferee has assumed the risk of loss or other economic burdens relating to the property and has obtained the benefits of ownership thereof. Notwithstanding the foregoing, in some instances, courts have held that a transaction may be characterized as the form chosen by the taxpayer, even if the substance of the transaction does not accord with its form.

The Issuer believes that it has retained the preponderance of the primary benefits and burdens associated with ownership of the Financed Eligible Loans and that as a result, the Noteholders should not be treated as the owners of the Financed Eligible Loans for U.S. federal income tax purposes.  If, however, the Service were successfully to assert that this transaction should be treated as a sale of the Financed Eligible Loans, the Service could further assert that the entity created pursuant to the Indenture, as the owner of the Financed Eligible Loans for U.S. federal income tax purposes, should be deemed engaged in a financial business and, therefore, characterized as a publicly traded partnership taxable as a corporation.

The remainder of the discussion below assumes that the Notes are characterized as debt for U.S. federal income tax purposes.  The opinion of Kutak Rock LLP is not binding on the courts or the Service.  Noteholders are strongly encouraged to consult with their own tax advisors regarding the possibility that the Notes could be treated as other than debt of the Issuer and any resulting consequences to the Noteholder.

The Secretary of Treasury has published final regulations under Section 385 of the Code that address the federal tax treatment of instruments held by parties related to the Issuer as debt or equity.  Pursuant to these regulations, Notes purchased by an investor that is a member of the "expanded group" of the Issuer within the meaning of these regulations or by an investor after this initial offering from an affiliate of the Issuer may be treated as equity under certain circumstances.  Prospective investors are urged to consult their tax advisors regarding the possible effects of these regulations.  Each investor, by its purchase of a Note, whether upon original issuance or subsequent transfer, is deemed to have represented and agreed that it is not part of the "expanded group" of the Issuer within the meaning of Treasury Regulation Section 1.385-1(c)(4) and is not acquiring the Notes with a principal purpose of avoiding the purposes of Treasury Regulation Section 1.385-3.

**Taxation of Interest Income and Original Issue Discount**

If a Note is deemed to be issued with OID, the Code generally requires the current inclusion in gross income of OID on a constant yield basis.  OID is the excess of the "stated redemption price at maturity" of a Note over its "issue price."  Generally, the issue price of a Note should be the initial offering price to the public (other than to bond houses, brokers, or similar persons or organizations acting in the capacity of underwriters, placement agents or wholesalers) at which a substantial amount of the Notes of the same maturity are sold pursuant to the initial offering.  The "stated redemption price at maturity" of a Note includes all payments with respect to the Notes other than "qualified stated interest."  For purposes of computing OID, "qualified stated interest" is stated interest that is unconditionally payable (or that will be constructively received under Section 451 of the Code) at least annually at a single fixed rate, a "qualified floating rate" or an "objective rate" at fixed intervals of one year or less ("qualified stated interest").  Interest is unconditionally payable if reasonable legal remedies exist to compel timely payment or the debt instrument otherwise provides terms and conditions that make late payment or nonpayment sufficiently remote.  With respect to a floating rate debt security, "qualified stated interest" will be determined solely for purposes of calculating the accrual of OID as though the debt security will bear interest in all periods at a fixed rate generally equal to the rate that would be applicable to interest payments on the debt security on its date of issue or, in the case of certain floating rate debt securities, the rate that reflects the yield to maturity that is reasonably expected for the debt security.  Stated interest that is "qualified stated interest"

will be ordinary income when received or accrued by the Noteholders in accordance with their respective methods of tax accounting and the applicable provisions of the Code.

Due to the subordination of the Class B Notes to the Class A Notes and the possibility of interest deferral under the terms of the Class B Notes, it is uncertain whether the stated interest on the Class B Notes will qualify as "qualified stated interest" for purposes of determining whether the Class B Notes are issued with OID.  Absent official guidance on this point, the Issuer does not intend to treat the stated interest on the Class B Notes as other than qualified stated interest solely because of the possibility that interest thereon may be deferred under the terms of the Class B Notes, although it may revise such treatment in the future if it should determine a change to be appropriate.  If the Service were to treat the stated interest payments on the Class B Notes as includible in their "stated redemption price at maturity" because they are not "qualified stated interest," the Class B Notes would be treated as issued with OID (which would include the stated interest payments and the de minimis discount from par at issuance based on their initial offering price to the public).

Discount on a Note at issuance will be treated as de minimis (and therefore OID will be treated as zero) if the excess of the Note's "stated redemption price at maturity" over its issue price is less than 0.25% of the Note's "stated redemption price at maturity" multiplied by the number of years to its maturity, based on the anticipated weighted average life of the Note, calculated using the "prepayment assumption," if any, used in pricing the Note and weighing each payment by reference to the number of full years elapsed from the Date of Issuance prior to the anticipated date of such payment.  For purposes of computing whether any such discount is de minimis, the Issuer will assume a constant prepayment rate of 4% for consolidation loans, 6% for non-consolidation loans and 8% for rehabilitation loans.  No representation is made as to the actual rate at which the Financed Eligible Loans in the Trust Estate will prepay or that the Notes will prepay in accordance with this or any other prepayment assumption.  Absent an election or a requirement to accrue all income from a Note under the OID rules, any de minimis discount on a Note at issuance would be includible in gross income in any taxable year as principal payments are received on the Notes in the proportion that each such principal payment in the taxable year bears to the original principal balance of the Note.

The annual statement regularly furnished to Noteholders for U.S. federal income tax purposes will include information regarding the accrual of payments of principal and interest with respect to the Notes.  Although the Class A-1A Notes will be issued with a de minimis discount from par, the Class A Notes will not be issued with OID based on their initial offering price to the public.  All of the stated interest payable with respect to the Class A Notes will constitute "qualified stated interest" for purposes of the OID provisions of the Code.  Stated interest on the Class A Notes will be includible in gross income when received or accrued by the Class A Noteholders in accordance with their respective methods of tax accounting and the applicable provisions of the Code.  Although the Class B Notes will be issued with a de minimis discount from par, the Class B Notes  will not be issued with OID based on their initial offering price to the public.  Stated interest on the Class B Notes will be includible in gross income when received or accrued by the Class B Noteholders in accordance with their respective methods of tax accounting and the applicable provisions of the Code, unless, as described above, the Class B Notes are treated as issued with OID due to the possibility of interest deferral under the terms of the Class B Notes.  If so treated, the stated interest and the de minimis discount from par at issuance on the Class B Notes would be includible in gross income in accordance with the method under the Code that applies to OID.  The Issuer will supply to the Trustee, at the time and in the manner required by the Code, for further distribution to the Noteholders, and to the extent required by the Code, information with respect to any OID accruing on the Notes, and the Trustee shall have no duty or obligation to determine, verify or confirm any original issue discount information.  References below to "Discount Notes" are to the Class B Notes, if any, that are treated as having been issued with OID.

The Issuer expects that a Noteholder of any Discount Notes will be required to include a daily portion of its OID in gross income for U.S. federal income tax purposes under a constant yield to maturity method before the receipt of cash attributable to such income.  The amount of OID generally includible in gross income is the sum of the "daily portions" of OID with respect to a Discount Note accrued for each day during the taxable year or portion of the taxable year in which the Noteholder holds the Discount Note. Special provisions apply to debt instruments on which payments may be accelerated due to prepayments of other obligations securing those debt instruments.  Under these provisions, the accrual of OID on such debt instruments is based on the present value of the remaining payments on the debt instrument and adjusted by taking into account both the prepayment assumption, if any, used in pricing the debt instrument and the actual prepayment experience.  As a result, the amount of OID on the Discount Notes that would accrue in any given accrual period (a) may increase to take into account (i) principal payments on the Discount Notes in the accrual period that exceed the expected principal payments based on the prepayment assumption and (ii) any increase in the "stated redemption price at maturity" due to any additional principal payments expected as a result of the compounding of deferred interest, if any, on the Discount Notes, and (b) generally may decrease (but not below zero for any period) if (i) the principal payments in the accrual period are slower than the expected principal payments based on the prepayment assumption; and (ii) total OID remaining to be accrued is reduced due to prior principal prepayments.  For these purposes, the Issuer will assume a constant prepayment rate of 4% for consolidation loans, 6% for non-consolidation loans and 8% for rehabilitation loans.  No representation is made as to the actual rate at which the Financed Eligible Loans in the Trust Estate will prepay or that the Discount Notes will prepay in accordance with this or any other prepayment assumption.

In addition, OID that accrues in each year to a Noteholder of a Discount Note is included in the calculation of the distribution requirements of certain regulated investment companies and real estate investment trusts.  Moreover, the accrual of OID in each year may result in an alternative minimum tax liability, additional distribution requirements or other collateral U.S. federal income tax consequences although the Noteholder of such Discount Note has not received cash attributable to such OID in such year.

Noteholders of Discount Notes should consult their own tax advisors as to the amount, if any, calculation and treatment of any OID on, and the tax consequences of the purchase, holding and sale of, Discount Notes and as to the treatment of any OID for state tax purposes.

A purchaser (other than a person who purchases a Note upon issuance at the issue price) who buys a Note for an amount that is less than its "stated redemption price at maturity" will be treated as having purchased such Note at a "market discount," unless the amount of such market discount is less than a de minimis amount specified in the Code.  In general, the market discount rules of the Code treat principal payments and gain on disposition of a debt instrument as ordinary income to the extent of the lesser of (a) the amount of such payment or realized gain; or (b) the market discount which has not previously been included in gross income and is treated as having accrued on the debt instrument at the time of such payment or disposition.  Market discount will be considered to accrue in each accrual period, at the option of the Noteholder of such Note: (i) on the basis of a constant yield method; or (ii) in an amount that bears the same ratio to the total remaining market discount as the stated interest paid in the accrual period bears to the total amount of stated interest remaining to be paid on the Note as of the beginning of the accrual period, in each case, subject to a prepayment assumption.  Although the accrued market discount on debt instruments such as the Notes which are subject to prepayment based on the prepayment of other debt instruments is to be determined under regulations yet to be issued, the legislative history of the market discount provisions of the Code indicates that the same prepayment assumption used to calculate OID should be utilized.  Potential Noteholders should consult their own tax advisors concerning the application of the market discount rules to the Notes and the advisability of making any of the elections allowed under Sections 1276 through 1278 of the Code.

In the event that the Notes are considered to be purchased by a Noteholder at a price greater than their remaining "stated redemption price at maturity", they will be considered to have been purchased at a premium.  The Noteholder may elect to amortize such premium (as an offset to interest income), using a constant yield method, over the remaining term of the Notes.  Special rules apply to determine the amount of premium on a "variable rate debt instrument" and certain other debt instruments.  Potential Noteholders should consult their tax advisors regarding the amortization of bond premium.

The OID regulations permit a Noteholder to elect to accrue all interest, discount (including de minimis market discount or de minimis discount at issuance) and premium in gross income as interest, based on a constant yield method.  If such an election were to be made with respect to a Note acquired with market discount, the Noteholder would be deemed to have made an election to include in gross income currently market discount with respect to all other debt instruments having market discount that such Noteholder acquires during the year of the election or thereafter.  Similarly, a Noteholder that makes this election for a Note acquired at a premium will be deemed to have made an election to amortize bond premium with respect to all debt instruments having amortizable bond premium that such Noteholder owns or acquires.  The election to accrue interest, discount and premium on a constant yield method may only be revoked with the consent of the Service.

Under Public Law 115-97 (sometimes referred to as the Tax Cuts and Jobs Act), the Code was amended to require a Noteholder that uses the accrual method of accounting for tax purposes and reports its net income for financial accounting purposes on certain applicable financial statements to include in taxable income its items of gross income not later than when such items are taken into account as revenue in the financial statement.  This amendment generally does not apply to timing rules for accrued market discount on bonds and the general OID timing rules, as well as the timing rules for OID determined with respect to special debt instruments (contingent payment and variable rate debt instruments, certain hedged debt instruments, and inflation-indexed debt instruments).  Noteholders are urged to consult their tax advisors regarding the application of this amendment and its effect, if any, on the timing of the recognition of income related to the Notes under the Code.

**Sale or Exchange of Notes**

A Noteholder generally will recognize gain or loss on the sale, exchange or retirement of its Notes equal to the difference between the amount realized on the sale, exchange or retirement and the Noteholder's adjusted tax basis in the Notes.  The adjusted tax basis of a Note to a particular Noteholder generally will equal the Noteholder's cost for the Note, increased by any market discount and any OID and gain previously included by such Noteholder in gross income with respect to the Note, and decreased by the amount of bond premium, if any, previously amortized and by the amount of principal payments previously received by such Noteholder with respect to such Note.  Any such gain or loss will be capital gain or loss if the Note was held as a capital asset, except for gain representing accrued interest, accrued market discount not previously included in gross income and in the event of a prepayment or redemption, any not yet accrued OID.  Capital gains or losses will be long-term capital gains or losses if the Note was held for more than one year.  The deductibility of capital losses is subject to certain limitations.

The Indenture permits Noteholders to waive an Event of Default or rescind an acceleration of the Notes in certain circumstances upon a vote of the requisite percentage of the Noteholders.  Any such waiver or rescission, or any amendment of the terms of the Notes, could be treated for U.S. federal income tax purposes as a constructive exchange by a Noteholder for a new Note.  In addition, if the terms of a Note were significantly modified, in certain circumstances, a new debt obligation would be deemed created and exchanged for the prior obligation in a taxable transaction.  Among the modifications which may be treated as significant are those which relate to redemption provisions and, in the case of a nonrecourse obligation, those which involve the substitution of collateral.

The occurrence of a Benchmark Transition Event and the replacement of the current Benchmark for the Notes (One-Month LIBOR) with a Benchmark Replacement, and any associated alteration (such as a Benchmark Replacement Conforming Change), may also be treated as a significant modification of the Notes resulting in a deemed taxable exchange.  The Service has proposed the LIBOR Proposed Regulations concerning certain U.S. federal income tax consequences related to the transition from interbank offered rates (such as LIBOR) to other reference rates in debt instruments.  The LIBOR Proposed Regulations establish a safe harbor under which certain changes to the terms of a debt instrument and associated alterations in connection with the elimination of LIBOR will not be treated as a significant modification of the debt instrument resulting in a deemed exchange of the debt instrument under Section 1001 of the Code. See the caption "DESCRIPTION OF THE NOTES—Benchmark Transition Event" herein.  The Indenture provisions relating to a Benchmark Transition Event are substantially similar to those recommended by the Alternative Reference Rates Committee of the Federal Reserve Bank of New York.  Although the matter is not free from doubt, the Issuer expects that the modifications of the Indenture and any associated alterations (such as the Benchmark Replacement Conforming Changes) in connection with a Benchmark Transition Event and the implementation of the modifications and alterations should comply with the safe harbor in the LIBOR Proposed Regulations.  However, there can be no assurance that each such modification, associated alteration or implementation thereof will comply with the safe harbor.  See the caption "RISK FACTORS—LIBOR is being discontinued as a floating rate benchmark, and various aspects of the discontinuation are uncertain and will affect the financial markets and may also affect the Financed Eligible Loans and the Class A-1B Notes and the Class B Notes" herein.

For U.S. federal income tax purposes, if a deemed exchange occurs as a result of a significant modification of the Notes, a Noteholder could recognize gain or loss, and some or all of the resulting new Notes could be treated as (a) issued with original issue discount or with amortizable bond premium or (b) constituting equity interests in a partnership or a corporation.  Potential Noteholders should consult their tax advisors concerning the circumstances in which the Notes could be deemed significantly modified and reissued and the possible U.S. federal income tax consequences to the Noteholder, including the application of the rules under Section 1001 of the Code.

## Backup Withholding

Certain Noteholders may be subject to U.S. federal backup withholding at the applicable rate determined by statute with respect to interest (including any OID) paid with respect to the Notes if the Noteholders, upon issuance, fail to supply the Trustee or their brokers (or other applicable intermediary) with their taxpayer identification numbers, furnish incorrect taxpayer identification numbers, fail to report interest, dividends or other "reportable payments" (as defined in the Code) properly, or, under certain circumstances, fail to provide the Trustee with a certified statement or certain other applicable documentation, under penalty of perjury, that they are not subject to U.S. federal backup withholding. Information returns will be sent annually to the Service and to each such Noteholder (except certain exempt Noteholders) setting forth the amount of interest paid with respect to the Notes and the amount of tax withheld thereon.

## State, Local or Foreign Taxation

Except as specifically set forth in this Offering Memorandum, the Issuer makes no representations regarding the tax consequences of purchase, ownership or disposition of the Notes under the tax laws of any state, locality or foreign jurisdiction.  Investors considering an investment in the Notes should consult their own tax advisors regarding such tax consequences.

**Tax-Exempt Investors**

In general, an entity which is exempt from U.S. federal income tax under the provisions of Section 501 of the Code is subject to tax on its unrelated business taxable income.  An unrelated trade or business is any trade or business which is not substantially related to the purpose which forms the basis for such entity's exemption.  However, under the provisions of Section 512 of the Code, interest may be excluded from the calculation of unrelated business taxable income unless the obligation which gave rise to such interest is subject to acquisition indebtedness.  Except to the extent any Noteholder incurs acquisition indebtedness with respect to a Note, interest paid or accrued with respect to such Note may be excluded by such tax-exempt Noteholder from the calculation of unrelated business taxable income.  Each potential tax-exempt Noteholder is urged to consult its own tax advisor regarding the application of these provisions.

**Foreign Investors**

A Noteholder which is not a U.S. person ("foreign holder") will not be subject to U.S. federal income tax or withholding tax in respect of interest income (including any OID paid) or gain on the Notes if certain conditions are satisfied, including: (a) the foreign holder provides an appropriate statement, signed under penalties of perjury, identifying the foreign holder as the beneficial owner and stating, among other things, that the foreign holder is not a U.S. person; (b) the foreign holder is not a "10% shareholder" or "related controlled foreign corporation" with respect to the Issuer; and (c) the interest income is not effectively connected with a U.S. trade or business of the Noteholder.  The foregoing exemption does not apply to certain contingent interest.  To the extent these conditions are not met, a 30% withholding tax will apply to interest income on the Notes, unless an income tax treaty reduces or eliminates such tax or the interest is effectively connected with the conduct of a trade or business within the U.S. by such foreign holder.  In the latter case, such foreign holder will be subject to U.S. federal income tax with respect to all income from the Notes at regular rates applicable to U.S. taxpayers, and may be subject to the branch profits tax if it is a corporation.  A "U.S. person" is:  (i) a citizen or resident of the U.S.; (ii) a partnership (or other entity treated as a partnership for U.S. federal tax purposes) or corporation (or other entity treated as a corporation for U.S. federal tax purposes) that is created or organized in or under the laws of the U.S. or any State thereof (including the District of Columbia); (iii) an estate the income of which is subject to U.S. federal income taxation regardless of its source; or (iv) a trust, if a court within the U.S. is able to exercise primary supervision over its administration and one or more U.S. persons have the authority to control all of its substantial decisions.  As noted earlier, in addition to certain other entities, this tax section does not deal with the treatment of partnerships (or entities treated as partnerships for U.S. federal tax purposes) or their members.

Generally, a foreign holder will not be subject to U.S. federal income tax on any amount which constitutes capital gain upon the sale, exchange, retirement or other disposition of a Note unless such foreign holder is an individual present in the U.S. for 183 days or more in the taxable year of the sale, exchange, retirement or other disposition and certain other conditions are met, or unless the gain is effectively connected with the conduct of a trade or business in the U.S. by such foreign holder.  If the gain is effectively connected with the conduct of a trade or business in the U.S. by such foreign holder, such holder will generally be subject to U.S. federal income tax with respect to such gain in the same manner as U.S. holders, as described above, and a foreign holder that is a corporation could be subject to a branch profits tax on such income as well.

**Foreign Account Tax Compliance Act**

In addition to the U.S. income tax, withholding tax and backup withholding tax described above, under the Foreign Account Tax Compliance Act ("FATCA") and related administrative guidance, U.S.

withholding at a rate of 30% generally will be required in certain circumstances on interest payments (including OID) in respect of the Notes held by or through certain foreign financial institutions (including investment funds), unless such institution (a) enters into, and complies with, an agreement with the Service to report, on an annual basis, information with respect to interests in, and accounts maintained by, the institution that are owned by certain U.S. persons and by certain non-U.S. entities that are wholly or partially owned by U.S. persons and to withhold on certain payments or (b) if required under an intergovernmental agreement between the U.S. and an applicable foreign country, reports such information to its local tax authority, which will exchange such information with the U.S. authorities. An intergovernmental agreement between the U.S. and an applicable foreign country, or other guidance, may modify these requirements. Accordingly, the entity through which the Notes are held will affect the determination of whether such withholding is required. Similarly, under FATCA, in certain circumstances interest payments (including OID) on the Notes held by an investor that is a non-financial non-U.S. entity that does not qualify under certain exemptions generally will be subject to withholding at a rate of 30%, unless such entity either (a) certifies that such entity does not have any "substantial United States owners"; or (b) provides certain information regarding the entity's "substantial United States owners," which the Trustee will in turn provide to the Service. Noteholders will not receive additional amounts from the Trust Estate in respect of any amounts withheld. This withholding will apply regardless of whether the payment would otherwise be exempt from U.S. nonresident withholding tax (e.g., under the portfolio interest exemption or as capital gain). Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the U.S. governing FATCA may be subject to different rules. A foreign entity will generally claim an exemption from FATCA withholding, if the exemption is available, by properly filling out and giving to the person making payments to it IRS Form W-8BEN-E, though other W-8 forms or a W-9 form may in certain cases need to be supplied. While existing regulations would also require FATCA withholding on payments of gross proceeds, including the return of principal, from the sale or other disposition, including redemptions, of the Notes, the U.S. Treasury Department and the Service have indicated in proposed regulations their intent to eliminate the FATCA withholding requirement on gross proceeds. The proposed regulations generally (i) provide that "withholdable payments" will not include gross proceeds from the disposition of property that can produce U.S. source dividends or interest, and (ii) state in the preamble that taxpayers may rely on these provisions of the proposed regulations until final regulations are issued.

Noteholders should consult their own tax advisors regarding the application and impact of FATCA, and should consult their bank or broker about the likelihood that payments to it (for credit to the Noteholder) could become subject to FATCA withholding.

### MISSOURI INCOME TAX

Interest on the Notes is exempt from income taxation by the State of Missouri.

### ERISA CONSIDERATIONS

The following summarizes certain aspects of The Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and the Code that may affect a decision by employee benefit plans, tax favored retirement and savings arrangements and other entities in which such plans or arrangements are invested (collectively, the "Plans") to invest in Notes. The following discussion is general in nature and not intended to be a complete discussion of the applicable law pertaining to a Plan's decision to invest and is not intended to be legal advice. In addition, the following discussion is based on the law in effect as of the date of this Offering Memorandum, and neither the Issuer nor the Underwriter have undertaken any obligation to update this summary as a result of any changes in the applicable law or regulations.

ERISA imposes certain fiduciary obligations and prohibited transaction restrictions on employee pension and welfare benefit plans subject to ERISA ("ERISA Plans"). Section 4975 of the Code imposes

substantially similar prohibited transaction restrictions on certain Plans, including tax-qualified retirement plans described in Section 401(a) of the Code and on individual retirement accounts and annuities described in Sections 408(a) and (b) of the Code.  Certain employee benefit plans, such as governmental plans (as defined in Section 3(32) of ERISA), and, if no election has been made under Section 410(d) of the Code, church plans (as defined in Section 3(33) of ERISA) ("Non-ERISA Plans"), are not subject to the requirements set forth in ERISA or the prohibited transaction restrictions under Section 4975 of the Code. However, investment by Non-ERISA Plans may be subject to the provisions of other applicable federal and state law ("Similar Laws").  Any Non-ERISA Plan that is qualified under Section 401(a) and exempt from taxation under Section 501(a) of the Code is, nevertheless, subject to the prohibited transaction rules set forth in Section 503 of the Code.  Further, some Plans, including certain ERISA Plans, may only be permitted to invest in certain types of investments (e.g., the Notes are not a permitted investment for Code Section 403(b) plans).

A Plan fiduciary should consider whether an investment in the Notes satisfies the requirements set forth in Part 4 of Title I of ERISA, including the requirements that (a) the investment satisfy the prudence and diversification standards of ERISA, (b) the investment be in the best interests of the participants and beneficiaries of the Plan and (c) the investment be permissible under the terms of the Plan's investment policies and governing instruments.  In determining whether an investment in the Notes is prudent for ERISA purposes, a Plan fiduciary should consider all relevant facts and circumstances, including, without limitation, the limitations imposed on transferability, whether the investment provides sufficient liquidity in light of the foreseeable needs of the Plan, and whether the investment is reasonably designed, as part of the Plan's portfolio, to further the Plan's purposes, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment.  A fiduciary of a Non-ERISA Plan should consider whether an investment in the Notes satisfies its fiduciary obligations under Similar Laws.

Section 406 of ERISA and Section 4975 of the Code prohibit a broad range of transactions involving assets of Plans with persons ("Parties in Interest" or "Disqualified Persons" as such terms are defined in ERISA and the Code, respectively) who have certain specified relationships to the Plans, unless a statutory, class or administrative exemption is available.  Parties in Interest or Disqualified Persons that participate in a prohibited transaction may be subject to a penalty (or an excise tax) imposed pursuant to Section 502(i) of ERISA or Section 4975 of the Code unless a statutory, class or administrative exemption is available.  Section 502(l) of ERISA requires the Secretary of the U.S. Department of Labor (the "DOL") to assess a civil penalty against a fiduciary who violates any fiduciary responsibility or commits any other violation of part 4 of Title I of ERISA or any other person who knowingly participates in such breach or violation.  If the investment constitutes a prohibited transaction under Section 4975(c) of the Code, an IRA may lose its tax-exempt status.  If the investment constitutes a prohibited transaction under Section 503 of the Code, a Non-ERISA Plan may lose its tax exemption.

The investment by a Plan may, in certain circumstances, cause the Plan's assets to be deemed to include an interest in each of the underlying assets of the entity issuing a security in which the Plan has an investment, such as the Issuer.  Certain transactions may be deemed to constitute prohibited transactions if assets of the Issuer are deemed to be assets of a Plan.  These concepts are discussed in greater detail below.

**Plan Assets Regulation**

The DOL has promulgated a regulation set forth at 29 C.F.R. § 2510.3-101, which has been amended by Congress in Section 3(42) of ERISA (the "Plan Assets Regulation"), concerning whether or not the assets of an ERISA Plan would be deemed to include an interest in the underlying assets of an entity (such as the Issuer) for purposes of the general fiduciary responsibility provisions of ERISA and for the prohibited transaction provisions of ERISA and Section 4975 of the Code, when a Plan acquires an "equity

interest" in such entity.  For purposes of this section, the terms "plan assets" ("Plan Assets") and the "assets of a Plan" have the meaning specified in the Plan Assets Regulation as modified by Section 3(42) of ERISA.

Under the Plan Assets Regulation, the assets of the Issuer would be treated as Plan Assets if a Plan acquires an equity interest in the Issuer and none of the exceptions contained in the Plan Assets Regulation are applicable.  An equity interest is defined under the Plan Assets Regulation as an interest in an entity other than an instrument which is treated as indebtedness under applicable local law and which has no substantial equity features.  If the Notes are treated as having substantial equity features, a Plan (including an entity in which a Plan is invested) that purchases Notes could be treated as having acquired an interest in the assets of the Issuer.  In that event, the purchase, holding, transfer or resale of the Notes could result in a transaction that is prohibited under ERISA or the Code.  While not free from doubt, on the basis of the Notes as described herein, it appears that the Notes at issuance should be treated as debt without substantial equity features for purposes of the Plan Assets Regulation.

In the event that the Notes cannot be treated as indebtedness for purposes of ERISA, under an exception to the Plan Assets Regulation, the assets of a Plan will not include an interest in the assets of an entity, the equity interests of which are acquired by the Plan, if at no time Plans in the aggregate own 25% or more of the value of any class of equity interests in such entity, as calculated under the Plan Assets Regulation and Section 3(42) of ERISA.  Because the availability of this exception depends upon the identity of the Noteholders at any time, there can be no assurance that the Notes will qualify for this exception and that the Issuer's assets will not constitute a Plan Asset subject to ERISA's fiduciary obligations and responsibilities.  Therefore, a Plan should not acquire or hold Notes in reliance upon the availability of this exception under the Plan Assets Regulation.

**Prohibited Transactions**

The acquisition or holding of Notes by or on behalf of a Plan, whether or not the underlying assets are treated as Plan Assets, could give rise to a prohibited transaction if the Issuer or any of its respective affiliates is or becomes a Party in Interest or Disqualified Person with respect to such Plan, or in the event that a Note is purchased in the secondary market by a Plan from a Party in Interest or Disqualified Person with respect to such Plan.  There can be no assurance that the Issuer or any of its respective affiliates will not be or become a Party in Interest or a Disqualified Person with respect to a Plan that acquires Notes.  Any such prohibited transaction could be treated as exempt under ERISA and the Code if the Notes were acquired pursuant to and in accordance with one or more statutory exemptions, individual exemptions or "class exemptions" issued by the DOL.  Such class exemptions include, for example, Prohibited Transaction Class Exemption ("PTCE") 75-1 (an exemption for certain transactions involving employee benefit plans and broker-dealers, reporting dealers and banks), PTCE 84-14 (an exemption for certain transactions determined by an independent qualified professional asset manager), PTCE 90-1 (an exemption for certain transactions involving insurance company pooled separate accounts), PTCE 91-38 (an exemption for certain transactions involving bank collective investment funds), PTCE 95-60 (an exemption for certain transactions involving an insurance company's general account) and PTCE 96-23 (an exemption for certain transactions determined by a qualifying in-house asset manager).

The Underwriter, the Trustee or their affiliates may be the sponsor of, or investment advisor with respect to, one or more Plans.  Because these parties may receive certain benefits in connection with the sale or holding of Notes, the purchase of Notes using plan assets over which any of these parties or their affiliates has investment authority might be deemed to be a violation of a provision of Title I of ERISA or Section 4975 of the Code.  Accordingly, Notes may not be purchased using the assets of any Plan if any of the Underwriter, the Trustee or their affiliates has investment authority for those assets, or is an employer maintaining or contributing to the plan, unless an applicable prohibited transaction exemption is available and such prohibited transaction exemption covers such purchase.

**Purchaser's/Transferee's Representations
and Warranties**

Each purchaser and each transferee of a Note (including the person causing such purchaser or transferee to acquire an interest in the Note, including a Plan's fiduciary, as applicable, in its individual capacity) is deemed to represent and warrant that on each date on which such purchaser or transferee, as applicable, purchases or holds any interest in the Note that (a) it is not a Plan and is not acquiring the Note directly or indirectly for, or on behalf of, a Plan or with Plan Assets or any entity whose underlying assets are deemed to be Plan Assets or otherwise subject to Similar Law; or (b) the acquisition and holding of the Notes by or on behalf of, or with Plan Assets of, any Plan or any entity whose underlying assets are deemed to be Plan Assets is permissible under applicable law, and will not result in any non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 or 503 of the Code by reason of the application of one or more of the following:  PTCE 84-14, PTCE 90-1, PTCE 91-38, PTCE 95-60 or PTCE 96-23, all of the conditions of which shall be met, or, in the case of a purchaser or transferee that is subject to Similar Law, such purchase and holding will not result in a violation of Similar Law or otherwise result in any tax, rescission right or other penalty on the Issuer or the Underwriter, and, in any case, neither the purchase nor holding of such Note will subject the Issuer or the Underwriter to any obligation not affirmatively undertaken in writing.

**Consultation with Counsel**

Any Plan fiduciary or other investor of Plan Assets (including any entity whose underlying assets are deemed to be Plan Assets) considering whether to acquire or hold Notes on behalf of or with Plan Assets of any Plan or that proposes to acquire or hold Notes, should consult with its counsel with respect to the potential applicability of the fiduciary responsibility provisions of ERISA and the prohibited transaction provisions of Section 406 of ERISA and Section 4975 of the Code with respect to the proposed investment and the availability of any prohibited transaction exemption and the accuracy of the representations and warranties above.  A fiduciary or other investor with respect to a Non-ERISA Plan that proposes to acquire or hold Notes should consult with counsel with respect to Similar Laws.

## CERTAIN INVESTMENT COMPANY ACT CONSIDERATIONS

The Issuer is not registered or required to be registered as an "investment company" under the Investment Company Act of 1940, as amended (the "Investment Company Act") pursuant to Section 2(b) of the Investment Company Act.  The Issuer does not rely upon the exclusions from the definition of "investment company" set forth in Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act.  The Issuer does not constitute a "covered fund" for purposes of Section 619 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010), also known as the Volcker Rule.  See the caption "RISK FACTORS—New Rules Could Adversely Affect the Asset-Backed Securities Market and the Value of the Notes" herein.  Since the Issuer has not registered, and does not intend to register, as an investment company under the Investment Company Act, Noteholders will not be afforded protections of the provisions of the Investment Company Act designed to protect investment company investors.

## ADDITIONAL INFORMATION; REPORTS TO NOTEHOLDERS

Monthly financial information concerning the Issuer and the Notes will be made available by the Issuer.  These monthly reports will contain information concerning the Financed Eligible Loans and certain activities of the Issuer during the period since the previous report.  These reports may be found at https://www.mohela.com/DL/common/publicInfo/investorInformation.aspx.    The  website  is  not incorporated into and shall not be deemed to be a part of this Offering Memorandum.

## UNDERWRITING

Subject to the terms and conditions set forth in a Note Purchase Agreement between the Issuer and BofA Securities, Inc. (the "Underwriter"), the Underwriter has agreed to purchase the Notes for a purchase price equal to $196,399,367.45, representing the aggregate principal amount of the Notes less an Underwriter's discount of $1,055,930.00, less net original discount of $44,702.55. After the initial offering, the prices of the Notes may change.

Until the initial distribution of Notes is completed, the rules of the SEC may limit the ability of the Underwriter to bid for and purchase the Notes. As an exception to these rules, the Underwriter is permitted to engage in transactions that stabilize the price of the Notes. These transactions consist of bids of purchase for the purpose of pegging, fixing or maintaining the price of the Notes. Purchases of a security for the purpose of stabilization or to reduce a short position could cause the price of the security to be higher than it might be in the absence of those purchases. Neither the Issuer nor the Underwriter makes any representation or prediction as to the direction or magnitude of any effect that the transactions described above may have on the prices of the Notes. In addition, neither the Issuer nor the Underwriter makes any representation that the Underwriter will engage in these transactions or that these transactions, once commenced, will not be discontinued without notice.

In the ordinary course of their respective businesses, the Underwriter and its affiliates have engaged and may in the future engage in investment banking or commercial banking transactions with the Issuer and may trade in its securities. See the caption "RELATIONSHIPS AMONG FINANCING PARTICIPANTS" herein.

BofA Securities, Inc., as an underwriter of the Notes, has entered into a distribution agreement with its affiliate Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPF&S"). As part of this arrangement, BofA Securities, Inc. may distribute securities to MLPF&S, which may in turn distribute such securities to investors through the financial advisor network of MLPF&S. As part of this arrangement, BofA Securities, Inc. may compensate MLPF&S as a dealer for their selling efforts with respect to the Notes.

During and after the offering, the Underwriter may engage in transactions, including open market purchases and sales, to stabilize the prices of the Notes. The Underwriter, for example, may over-allot the Notes for the account of the underwriting syndicate to create a syndicate short position by accepting orders for more Notes than are to be sold.

In general, over allotment transactions and open market purchases of the Notes for the purpose of stabilization or to reduce a short position could cause the price of a Note to be higher than it might be in the absence of those transactions.

The Underwriter or its affiliates may retain a material percentage of the Notes for their own accounts. The retained Notes may be resold by such Underwriter or such affiliates at any time in one or more negotiated transactions at varying prices to be determined at the time of sale.

The Issuer has agreed to indemnify the Underwriter and, under certain limited circumstances, the Underwriter will indemnify the Issuer, against certain civil liabilities, including liabilities under the Securities Act.

## FINANCIAL ADVISOR

SL Capital Strategies LLC is serving as financial advisor to the Issuer in connection with the issuance of the Notes. Although SL Capital Strategies LLC reviewed and commented on certain legal

documentation, including this Offering Memorandum, SL Capital Strategies LLC is not obligated to undertake, and has not undertaken to make, an independent verification or to assume responsibility for the accuracy, completeness or adequacy of the information contained in this Offering Memorandum or any of the other legal documents, and further, SL Capital Strategies LLC does not assume any responsibility for the information, covenants and representations with respect to the possible impact of any present, pending or future actions taken by any legislative or judicial bodies or Rating Agencies.

## LEGAL PROCEEDINGS

There is no controversy or litigation of any nature now pending or, to the knowledge of the Issuer, threatened to restrain or enjoin the issuance, sale, execution or delivery of the Notes, or in any way contesting or affecting the validity of the Notes, any proceedings of the Issuer taken with respect to the issuance or sale thereof, the pledge or application of any moneys or securities provided for the payment of the Notes or the due existence or powers of the Issuer.

The Issuer may be subject to various claims, lawsuits, and proceedings that arise from time to time.

## LEGAL MATTERS

The Issuer has been represented in connection with certain aspects of the authorization, issuance, offer, sale and delivery of the Notes by its note counsel, Kutak Rock LLP.  Kutak Rock LLP has represented the Issuer as its counsel in connection with the preparation of this Offering Memorandum.  Certain legal matters will be passed upon for the Issuer by its special counsel, Thompson Coburn LLP.  Certain legal matters will be passed on for the Underwriter by Dorsey & Whitney LLP.

## CONTINUING DISCLOSURE

In order to assist the Underwriter in complying with Rule 15c2-12 promulgated by the SEC (the "Rule"), the Issuer will enter into a continuing disclosure agreement with respect to the Notes (a "Continuing Disclosure Agreement") setting forth the undertaking of the Issuer to provide certain annual financial information and operating data, and to provide notices of the occurrence of certain enumerated material events relating to the Notes.  The proposed form of the Continuing Disclosure Agreement is set forth in Appendix C attached hereto.  During the previous five years, the Issuer did not file one notice of rating change and did not timely file three notices of rating changes (all three rating changes occurring on the same date) and did not file notice of its failure to provide the aforementioned information on or before the date specified in its prior continuing disclosure undertakings.

## RELATIONSHIPS AMONG FINANCING PARTICIPANTS

The Underwriter and its affiliates are full service financial institutions engaged in various activities, that may include securities trading, commercial and investment banking, municipal advisory, brokerage and asset management.  In the ordinary course of their respective businesses, the Underwriter and its affiliates have, from time to time, engaged, and may in the future engage, in various financial advisory, investment banking and commercial banking transactions with the Issuer, for which they received or will receive customary fees and expenses.  An affiliate of the Underwriter provides the Warehouse Agreement that allowed the Issuer to temporarily finance certain of the Eligible Loans prior to the transfer from the Warehouse Agreement to the Trustee under the Indenture.

In the ordinary course of their various business activities, the Underwriter and its affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (including bank loans) for their own account and for the accounts of

their customers and may at any time hold long and short positions in such securities and instruments. Such investment and securities activities may involve securities and instruments of the Issuer. The Underwriter and its affiliates may make a market in credit default swaps with respect to municipal securities in the future and may also communicate independent investment recommendations, market color or trading ideas and publish independent research views in respect of the Notes or other offerings of the Issuer.

Counsels to the Issuer with respect to the issuance of the Notes, Kutak Rock LLP and Thompson Coburn LLP, each represent the Trustee and the Underwriter (or their affiliates) in transactions unrelated to the issuance of the Notes.

## RATINGS

It is a condition to the Underwriter's obligation to purchase the Notes that (a) the Class A Notes be assigned the rating of at least "AAA(sf)" by DBRS and at least "AA+(sf)" by S&P and (b) the Class B Notes be assigned the rating of at least "A(sf)" by DBRS and "AA(sf)" by S&P.

On August 5, 2011, S&P lowered the long-term sovereign debt rating of the United States to "AA+" from "AAA," citing its concern with the fiscal, economic, and political challenges the government of the United States was facing. The S&P expected rating is a result of this action. The Notes will be secured by the Trust Estate including the Financed Eligible Loans, which consist of a pool of student loans originated under the FFEL Program. As such, the Financed Eligible Loans are eligible to receive certain federal benefits, such as Special Allowance Payments and interest subsidies, and the Guaranty Agencies for the Financed Eligible Loans receive reinsurance benefits to certain levels for guarantee payments that they make, and other federal benefits.

A securities rating addresses the likelihood of the receipt by owners of the Notes of payments of principal and interest with respect to their Notes from assets in the Trust Estate created under the Indenture. The rating takes into consideration the characteristics of the Financed Eligible Loans, and the structural, legal and tax aspects associated with the rated Notes.

A securities rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning rating organization. Neither the Issuer nor the Underwriter has undertaken any responsibility either to bring to the attention of the holders of the affected Notes any proposed change in or withdrawal of such ratings or to oppose any such proposed revision. Any such change in or withdrawal of the ratings could have an adverse effect on the market price of the affected Notes.

## OTHER MATTERS

The information set forth herein has been obtained from Issuer records and other sources which are considered reliable. There is no guarantee that any of the assumptions or estimates contained herein will ever be realized. All of the summaries of the statutes, documents and resolutions contained in this Offering Memorandum are made subject to all of the provisions of such statutes, documents and resolutions. These summaries do not purport to be complete statements of such provisions, and reference is made to such documents for further information. Reference is made to official documents in all respects. Any statement in this Offering Memorandum involving any matter of opinion, whether or not expressly so stated, is intended as such and not as a representation of fact. No representation is made that any such opinion will actually be borne out. This Offering Memorandum is not to be construed as a contract or agreement between the Issuer or the Underwriter and the purchasers or Noteholders. Prospective purchasers of the Notes are also cautioned that the accuracy of any statistical, demographic or economic projection or analysis

contained herein is not guaranteed and therefore investors are urged to consult their own advisors concerning such projections or analysis.

The Trustee did not participate in the preparation of this Offering Memorandum and makes no representations concerning the Notes, the collateral or any other matter stated in this Offering Memorandum.  The Trustee has no duty or obligation to pay the Notes from its own funds, assets or corporate capital or to make inquiry regarding, or investigate the use of, amounts disbursed from the accounts held under the Indenture.

[Remainder of page intentionally left blank]

## GLOSSARY OF TERMS

Some of the terms used in this Offering Memorandum are defined below.  Other terms are defined elsewhere in this Offering Memorandum.  The Indenture contains the definitions of other terms used in this Offering Memorandum and reference is made to the Indenture for those definitions.

"*Accepted Servicing Procedures*" means, with respect to any Financed Eligible Loan, servicing procedures (including collection procedures) that comply with applicable federal (including but not limited to the Higher Education Act), state and local law and that are in accordance with standards set by the Secretary and the accepted student loan servicing practices of prudent lending institutions that service student loans of the same type in the United States.

"*Administration Fee*" shall mean the monthly fee for administering the duties of the Issuer and/or an administrator under this Indenture, which fee, for each calendar month shall initially be equal to (i) one-twelfth of 0.05% multiplied by (ii) the Pool Balance as of the close of business on the last Business Day of the preceding calendar month and may only be increased upon satisfaction of the Rating Agency Condition.  The Administration Fee shall be payable each Monthly Distribution Date beginning with the November 2021 Monthly Distribution Date.   The Administration Fee shall also include annual reimbursement of any expenses incurred by the Issuer and/or an administrator under the Indenture, which amount shall be payable solely on the Monthly Distribution Date in September of each year beginning in 2022; provided, that the maximum amount of such expense reimbursement payable to the Issuer and/or an administrator under the Indenture during any calendar year shall be limited to $100,000, less the portion of the Expense Cap paid to the Trustee pursuant to clause (ii) of the definition of Trustee Fee during such year.

"*Authorizing Act*" shall mean the Missouri Higher Education Loan Authority Act, Title XI, Chapter 173, Sections 173.350 to 173.445 of the Missouri Revised Statutes, inclusive, as amended, and as the same may be in effect at any given time.

"*Available Funds*" means, with respect to a Monthly Distribution Date, the sum of the following amounts received to the extent not previously distributed: (a) all collections received by any Servicer on the Financed Eligible Loans (including late fees received by any Servicer with respect to the Financed Eligible Loans and payments from any Guaranty Agency received with respect to the Financed Eligible Loans) but net of (i) any collections in respect of principal on the Financed Eligible Loans applied by the Issuer to recall claims with respect to or repurchase Eligible Loans (which Eligible Loans were previously Financed Eligible Loans and, after purchase, will again become Financed Eligible Loans under the Indenture), from the Guaranty Agencies or any Servicer; provided, that such claim recall or repurchase is required by the terms of the Guarantee Agreement (including, for this purpose, any claim recall or repurchase which is "strongly encouraged" by the Department of Education's Common Manual), the related Servicing Agreement or Origination Agreement, as applicable, or such claim recall or repurchase is required by federal law or regulations, including, without limitation, the Higher Education Act and the related regulations; and (ii) amounts required by the Higher Education Act to be paid to the Department (including, but not limited to, any Monthly Consolidation Rebate Fees and any Department SAP Rebate Interest Amounts to be deposited into the Department SAP Rebate Fund or paid directly to the Department) or to be repaid to borrowers (whether or not in the form of a principal reduction of the applicable Financed Eligible Loan), with respect to the Financed Eligible Loans; (b) any Interest Benefit Payments and Special Allowance Payments received by the Trustee or the Issuer with respect to Financed Eligible Loans; (c) all Liquidation Proceeds from any Financed Eligible Loans which became Liquidated Financed Eligible Loans in accordance with the related Servicer's customary servicing procedures, and all other moneys collected with respect to any Liquidated Financed Eligible Loan which was written-off, net of the sum of any amounts expended by the related Servicer in connection with such liquidation and any amounts required by law to be remitted to the obligor on such Liquidated Financed Eligible Loan; (d) the aggregate Purchase Amounts

141

received for Financed Eligible Loans repurchased by a Seller, a Servicer, the Issuer or otherwise released from the lien of the Indenture; (e) the aggregate amounts, if any, received from a Seller or any Servicer as reimbursement of non-guaranteed interest amounts, or lost Interest Benefit Payments and Special Allowance Payments, with respect to the Financed Eligible Loans pursuant to a Student Loan Purchase Agreement or a Servicing Agreement, respectively; (f) other amounts received by a Servicer pursuant to its role as Servicer under the related Servicing Agreement and payable to the Issuer in connection therewith; (g) all interest earned or gain realized from the investment of amounts in any Fund or Account; and (h) any other amounts deposited to the Collection Fund.  "Available Funds" shall be determined pursuant to the terms of this definition by the Issuer and reported to the Trustee.  Amounts described in clauses (a)(i) and (a)(ii) hereof shall be paid by the Trustee upon receipt of a written direction from the Issuer.  The Trustee may conclusively rely on such determinations without further duty to review or examine such information.

"*Backup Servicer*" means the Pennsylvania Higher Education Assistance Agency, and any successor thereto, or any other entity with which the Issuer maintains a Backup Servicing Agreement.

"*Backup Servicing Agreement*" means the Backup Servicing Agreement between the Issuer and the Backup Servicer, as may be amended, supplemented, restated or otherwise modified from time to time, and replacements thereto.

"*Certificate of Insurance*" means any certificate of insurance issued by the Secretary pursuant to Section 428C or Section 429 of the Higher Education Act, Insuring an Eligible Loan.

"*Code*" means the Internal Revenue Code of 1986, as amended from time to time.  Each reference to a section of the Code in the Indenture shall be deemed to include the United States Treasury Regulations, including applicable temporary and proposed regulations, relating to such section which are applicable to the Notes or the use of the proceeds Notes.  A reference to any specific section of the Code shall be deemed also to be a reference to the comparable provisions of any enactment which supersedes or replaces the Code thereunder from time to time.

"*Collection Period*" means, with respect to the first Monthly Distribution Date, the period beginning on the Date of Issuance and ending on October 31, 2021 and with respect to each subsequent Monthly Distribution Date, the Collection Period means the calendar month immediately preceding such Monthly Distribution Date.  With respect to any Monthly Distribution Date, the "related" or the "preceding" Collection Period shall be the Collection Period ending on the last day of the month immediately preceding the month in which such Monthly Distribution Date occurs.

"*Custodian Agreement*" means any custodian agreement entered into by the Issuer and the Trustee with any other custodian or bailee related to the Financed Eligible Loans.

"*Cut-Off Date*" means, with respect to each Financed Eligible Loan, the date as of which receipts upon such Financed Eligible Loan are pledged as part of the Trust Estate, which shall be the date of acquisition by the Trust Estate.

"*DBRS*" means DBRS, Inc., its successors and their assigns.

"*Eligible Lender*" means the Issuer and all other entities which are "eligible lenders," as defined in the Higher Education Act (including, but not limited to, "eligible lender trustees") which have received an eligible lender number or other designation from the Secretary with respect to Eligible Loans made under the Higher Education Act.

"*Eligible Loan*" means any loan made to finance post-secondary education that is made under the Higher Education Act.

"*Event of Bankruptcy*" means (a) the Issuer shall have commenced a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, or shall have made a general assignment for the benefit of creditors, or shall have declared a moratorium with respect to its debts or shall have failed generally to pay its debts as they become due, or shall have taken any action to authorize any of the foregoing; or (b) an involuntary case or other proceeding shall have been commenced against the Issuer seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property provided such action or proceeding is not dismissed within 60 days.

"*Expense Cap*" means, for each year ending June 30, an annual amount equal to $50,000.

"*Financed*" or "*Financing*" refers, when used with respect to Eligible Loans, to Eligible Loans (a) financed or refinanced by the Issuer with balances in the Student Loan Fund or otherwise pledged by the Issuer under the Indenture and constituting a part of the Trust Estate, including, without limitation, the Eligible Loans described in the Indenture, and (b) Eligible Loans substituted or exchanged for Financed Eligible Loans, but does not include Eligible Loans released from the lien of the Indenture to the extent permitted by the Indenture  (unless such released Eligible Loans are substituted or exchanged in the future).

"*Guarantee*" or "*Guaranteed*" means, with respect to an Eligible Loan, the insurance or guarantee by a Guaranty Agency pursuant to such Guaranty Agency's Guarantee Agreement of the maximum percentage of the principal of and accrued interest on such Eligible Loan allowed by the terms of the Higher Education Act with respect to such Eligible Loan at the time it was originated and the coverage of such Eligible Loan by the federal reimbursement contracts, providing, among other things, for reimbursement to such Guaranty Agency for payments made by it on defaulted Eligible Loans insured or guaranteed by such Guaranty Agency of at least the minimum reimbursement allowed by the Higher Education Act with respect to a particular Eligible Loan.

"*Guarantee Agreements*" means a guaranty or lender agreement with any Guaranty Agency, and any amendments thereto.

"*Guaranty Agency*" means any entity authorized to guarantee student loans under the Higher Education Act and with which the Issuer maintains a Guarantee Agreement.

"*Higher Education Act*" means the Higher Education Act of 1965, as amended or supplemented from time to time, or any successor federal act and all regulations, directives, bulletins and guidelines promulgated from time to time thereunder.

"*Highest Priority Notes*" means at any time when Class A Notes are Outstanding, the Class A Notes, and at any time when no Class A Notes are Outstanding, the Class B Notes.

"*Indenture*" means the Indenture of Trust, between the Issuer and the Trustee including all supplements and amendments hereto.

"*Insurance*" or "*Insured*" or "*Insuring*" means, with respect to an Eligible Loan, the insuring by the Secretary (as evidenced by a Certificate of Insurance or other document or certification issued under

the provisions of the Higher Education Act) under the Higher Education Act of all or a portion of the principal of and accrued interest on such Eligible Loan.

"*Interest Benefit Payment*" means an interest payment on Eligible Loans received pursuant to the Higher Education Act and an agreement with the federal government, or any similar payments.

"*Investment Securities*" means:

(a)      direct obligations of, or obligations on which the timely payment of the principal of and interest on which are unconditionally and fully guaranteed by, the United States Treasury having maturities of not more than 365 days;

(b)      interest bearing time or demand deposits, certificates of deposit or other similar banking arrangements with a maturity of 12 months or less with any bank, trust company, national banking association or other depository institution, including those of the Trustee, provided that such depository institution (i) has a rating of "AA-/A-1+" by S&P and (ii) has the required ratings from DBRS corresponding to the duration of such investment set forth in the second to last paragraph of this definition;

(c)      bonds, debentures, notes or other evidences of indebtedness with a maturity of not more than 365 days issued or guaranteed by any of the following agencies: Federal Home Loan Mortgage Corporation; the Federal National Mortgage Association; Federal Home Loan Banks; provided, that such obligation: (i) is rated "AA+" or higher by S&P; and (ii) has the required ratings from DBRS corresponding to the duration of such investment set forth in the second to last paragraph of this definition;

(d)      repurchase agreements and reverse repurchase agreements, other than overnight repurchase agreements and overnight reverse repurchase agreements, with banks, including the Trustee and any of its affiliates, which are members of the Federal Deposit Insurance Corporation or firms which are members of the Securities Investors Protection Corporation, in each case, that: (i) has the required ratings from DBRS corresponding to the duration of such investment set forth in the second to last paragraph of this definition; and (ii) satisfies the S&P rating requirements set forth in the last paragraph of this definition;

(e)      overnight repurchase agreements and overnight reverse repurchase agreements at least 101% collateralized by securities described in subparagraph (a) of this definition and with a counterparty, including the Trustee and any of its affiliates, that: (i) has the required ratings from DBRS corresponding to the duration of such investment set forth in the second to last paragraph of this definition; and (ii) satisfies the S&P rating requirements set forth in the last paragraph of this definition;

(f)      investment agreements or guaranteed investment contracts, which may be entered into by and among the Issuer and/or the Trustee and any bank, bank holding company, corporation or any other financial institution, including the Trustee and any of its affiliates, that: (i) has the required ratings from DBRS corresponding to the duration of such investment set forth in the second to last paragraph of this definition or, in each case. with an insurance company whose claims paying ability is so rated; and (ii) satisfies the S&P rating requirements set forth in the last paragraph of this definition;

(g)      "tax exempt bonds" as defined in Section 150(a)(6) of the Code, other than "specified private activity bonds" as defined in Section 57(a)(5)(C) of the Code, that have a

maturity of not more than 365 days and are rated in the highest category by S&P and has the required ratings from DBRS corresponding to the duration of such investment set forth below and that do not constitute "investment property" within the meaning of Section 148(b)(2) of the Code, provided that the fund has all of its assets invested in obligations of such rating quality;

(h)    commercial paper with a maturity of not more than 365 days, including that of the Trustee and any of its Affiliates, which is rated "A-1+" by S&P and has the required ratings from DBRS corresponding to the duration of such investment set forth in the second to last paragraph of this definition and which matures not more than 90 days after the date of purchase;

(i)    investments in a money market fund that is payable upon demand, including funds for which the Trustee or an Affiliate thereof acts as investment advisor or provides other similar services for a fee; provided, that such investment is rated at least "AAAm" by S&P and has the required ratings from DBRS corresponding to the duration of such investment set forth in the second to last paragraph of this definition; and

(j)    any other investment upon satisfaction of the Rating Agency Condition.

Each Investment Security or the provider of such Investment Security (other than those described in paragraphs (b), (d), (h) and (i) of this definition) shall have the following DBRS long term and or short term ratings corresponding to the duration of such investment:

| **Maximum Maturity** | **Minimum Ratings** |
|---|---|
| 30 days | "A"/"R-1 (middle)" |
| 90 days | "AA"/"R-1 (middle)" |
| 180 days | "AA"/"R-1 (high)" |
| 365 days | "AAA"/"R-1 (high)" |

"*Issuer Order*" means a written order signed in the name of the Issuer by an authorized representative of the Issuer.

"*Joint Sharing Agreement*" means mean any joint sharing agreement that may be entered into by the Issuer in the future with the Trustee and other trustees to properly pay to or from the correct trust estate or indenture amounts which should be reallocated to reflect payments (or liabilities) on the student loans securing each such trust estate or indenture.

"*LIBOR Related Amendment*" means a change to the related interest rates on the Class A-1B Notes and the Class B Notes to the applicable alternative index to LIBOR selected by the Department of Education plus or minus a comparable spread (if the Department of Education chooses to use an alternative index to LIBOR other than the Benchmark Replacement to calculate Special Allowance Payments) and any associated changes that are reasonably necessary to adopt or to implement such rate change, which changes shall become effective upon  either (i) obtaining the consent of the Noteholders representing not less than a majority of the Outstanding Amount of the Class A-1B Notes and the Class B Notes and satisfaction of the Rating Agency Condition, or (ii) obtaining the consent of the Noteholders representing not less than a majority of the Outstanding Amount of each Class of the Notes.  The Trustee is not obligated to enter into any LIBOR Related Amendment that adversely affects its duties or protections without its consent and shall have no liability for entering into a LIBOR Related Amendment.

"*Liquidated Financed Eligible Loan*" means any Financed Eligible Loan liquidated by a Servicer (which shall not include any Financed Eligible Loan on which payments are received from a Guaranty

Agency) or which such Servicer has, after using all reasonable efforts to realize upon such Financed Eligible Loan, determined to charge off.

"*Liquidation Proceeds*" means, with respect to any Liquidated Financed Eligible Loan which became a Liquidated Financed Eligible Loan during the current Collection Period in accordance with the Servicer's customary servicing procedures, the moneys collected in respect of the liquidation thereof from whatever source, other than moneys collected with respect to any Liquidated Financed Eligible Loan which was written off in prior Collection Periods, net of the sum of any amounts expended by such Servicer in connection with such liquidation and any amounts required by law to be remitted to the obligor on such Liquidated Financed Eligible Loan.

"*Monthly Consolidation Rebate Fee*" means the monthly consolidation rebate fee payable to the Department on the Financed Eligible Loans.

"*Note Final Maturity Date*" means, for a Class of Notes or for any Note of such Class, as the context may require, the Class A-1A Maturity Date, the Class A-1B Maturity Date or the Class B Maturity Date, as applicable.

"*Noteholder*" means the Person in whose name a Note is registered in the Note registration books of the Trustee and which initially shall be Cede & Co., as nominee of the initial Clearing Agency.

"*Outstanding*" means, when used in connection with any Note, a Note which has been executed and delivered pursuant to the Indenture which at such time remains unpaid as to principal or interest, excluding Notes which have been replaced and excluding Notes for which provision for payment has been made pursuant to the Indenture.

"*Outstanding Amount*" means, as of any date of determination, the aggregate principal amount of all Notes Outstanding or the applicable Class or Classes of Notes, as the case may be, Outstanding at such date of determination.

"*Person*" means an individual, corporation, partnership, joint venture, association, joint stock company, trust, limited liability company, unincorporated organization or government or agency, or political subdivision thereof, or any other entity recognized from time to time as a legally existing entity.

"*Program Fees*" means any fees and expenses (i) due to the Rating Agencies, (ii) due in connection with any financial or compliance audit of the Program or the Issuer, (iii) due to the Backup Servicer (while the Backup Servicer is acting in the backup servicing capacity) and (iv) any other fees related to the Program.

"*Purchase Amount*" means, with respect to any Financed Eligible Loan, the amount required to prepay in full such Financed Eligible Loan under the terms thereof including all accrued interest thereon and any unamortized premium, it being acknowledged that any accrued and unpaid Interest Benefit Payments or Special Allowance Payments will continue to be payable to the Trustee and constitute part of the Trust Estate.

"*Rating*" means one of the rating categories of each Rating Agency currently rating the Notes.

"*Rating Agency*" means DBRS and S&P or any other rating agency requested by the Issuer to maintain a Rating on any of the Notes.

"*Rating Agency Condition*" means a requirement, with respect to any proposed action, failure to act or other event expressly conditioned thereon in the Indenture that, prior to the effectuation thereof: (a) the Issuer shall have provided prior written notice to each Rating Agency at least 30 calendar days prior to such proposed action, failure to act, or other event specified therein; and (b) the Issuer shall have delivered an Issuer Order to the Trustee dated no less than 30 calendar days subsequent to the date of such written notice stating that, as of the date of such Issuer Order, the Issuer reasonably believes that completion of such proposed action, failure to act or other event will not result in a downgrade to any Rating then assigned to any of the Notes by any Rating Agency or cause such Rating Agency to suspend, withdraw or qualify any such Rating (other than a Rating that is then applicable only to Notes that will no longer be outstanding upon such completion).

"*Realized Loss*" means the excess of the principal balance (including any interest that has been capitalized or had been expected to be capitalized) of any Liquidated Financed Eligible Loan over Liquidation Proceeds with respect to such Financed Eligible Loan to the extent allocable to principal (including any interest that has been capitalized or had been expected to be capitalized).

"*Responsible Officer*" means, when used with respect to the Trustee, any officer within the principal office of the Trustee, including any vice president, assistant vice president, trust officer or any other officer of the Trustee who customarily performs functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such person's knowledge of and familiarity with the particular subject and who shall have direct responsibility for the administration of the Indenture and the other Basic Documents to which it is a party.

"*S&P*" means S&P Global Ratings and its successors and assigns.

"*Secretary*" means the Secretary of the Department or any successor to the pertinent functions thereof under the Higher Education Act.

"*Servicer*" means the Issuer, PHEAA or an affiliate thereof, and any other additional Servicer or successor Servicer with which the Issuer has entered into a Servicing Agreement with respect to the Financed Eligible Loans and for which the Issuer has satisfied the Rating Agency Condition.

"*Servicer Compliance Report*" means (a) any report generated by the Department's Office of the Inspector General, specifically relating to a Servicer, and (b) a third party review of a Servicer in the form of a "System and Organization Control 1 Report" or any replacement of the same, in either case, performed annually by a firm of independent public accountants.

"*Servicing Agreement*" means, collectively, (a) with respect to the Issuer as Servicer, the provisions in the Indenture governing the servicing of the Financed Eligible Loans, and (b) any other servicing agreements with any third party Servicer relating to the Financed Eligible Loans, as such servicing agreements may be amended from time to time.

"*Servicing Fee*" means the monthly fee due to any Servicer (other than the Backup Servicer while acting in the backup servicing capacity) for servicing the Financed Eligible Loans, which fee and expenses for each calendar month shall initially not exceed the greater of (a)(i) one-twelfth of 0.80% multiplied by (ii) the Pool Balance as of the close of business on the last Business Day of the preceding calendar month and may only be increased upon satisfaction of the Rating Agency Condition and (b) the Servicing Fee Floor.

"*Servicing Fee Floor*" means $2.50 per borrower per month, subject to 3% inflation per annum from the Date of Issuance.

"*Special Allowance Payments*" means the special allowance payments authorized to be made by the Secretary by Section 438 of the Higher Education Act, or similar allowances, if any, authorized from time to time by federal law or regulation.

"*Specified Reserve Fund Balance*" means, with respect to any Monthly Distribution Date, the greater of (a)  0.65% of the Pool Balance as of the close of business on the last day of the immediately preceding Collection Period and (b) $201,159; provided that in no event will such balance exceed the sum of the Outstanding Amount of the Notes; and provided further, that such Specified Reserve Fund Balance may be reduced upon satisfaction of the Rating Agency Condition.  The Specified Reserve Fund Balance shall be calculated by the Issuer and certified to the Trustee, upon which certification the Trustee may conclusively rely with no duty to further examine or determine such information.

"*Student Loan Notes*" has the meaning ascribed to such term in the Indenture.

"*Student Loan Purchase Agreement*" means a loan purchase agreement entered into by the Issuer in connection with the purchase by the Issuer of a Financed Eligible Loan, including any such Financed Eligible Loan that was purchased by the Issuer prior to being Financed hereunder.

"*Supplemental Indenture*" means an agreement supplemental hereto executed pursuant to the Indenture.

"*Trust Estate*" has the meaning set forth under the caption "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES—General" herein.

"*Trustee Fee*" shall mean an amount equal to (a) the annual fees of the Trustee as set forth in the Trustee Fee Letter, dated July 29, 2021, a portion of which are payable quarterly beginning on the December 2021 Monthly Distribution Date or such other trustee fee letter as the Issuer may designate prior to a successor Trustee being appointed hereunder, which amount shall not exceed the greater of (i) 0.03% per annum of the outstanding principal amount of the Notes as of the beginning of the period for which such fees are paid and (ii) $1,500 per quarter, and (b) the reasonable expenses and extraordinary expenses of the Trustee or successor Trustee and any indemnities owed to the Trustee; provided, that the maximum amount of such expense reimbursement payable to the Trustee or any successor Trustee during any year (beginning November 25 of each year) shall be limited to the Expense Cap; provided that the Expense Cap shall not apply after and during the continuance of an Event of Default.

"*Warehouse Agreement*" means Revolving Credit and Security Agreement, dated as of December 19, 2018, as amended by that certain First Amendment to Revolving Credit and Security Agreement dated November 6, 2019 and that certain Second Amendment to Revolving Credit and Security Agreement dated December 2, 2020, each among the Issuer, Bank of America, N.A., as the lender, and U.S. Bank National Association, as collateral agent.

# APPENDIX A

# DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM

As of July 1, 2010, FFELP Loans made pursuant to the Higher Education Act were no longer originated, and all new federal student loans are originated solely under the Federal Direct Student Loan Program (the "Direct Loan Program"). However, FFELP Loans originated under the Higher Education Act prior to July 1, 2010 which have been originated or acquired by the Issuer continue to be subject to the provisions of the FFEL Program. The following description of the FFEL Program has been provided solely to explain certain of the provisions of the FFEL Program applicable to the approximately 99.08% in principal amount of the Financed Eligible Loans originated on or after July 1, 1998 and prior to July 1, 2010. Certain additional information about the FFELP Loans which comprise approximately 0.92% in principal amount of the Financed Eligible Loans originated prior to July 1, 1998 is also included. Notwithstanding anything herein to the contrary, after June 30, 2010, no new FFELP Loans (including Consolidation Loans) may be made or insured under the FFEL Program, and no funds are authorized to be appropriated, or may be expended, under the Higher Education Act to make or insure loans under the FFEL Program (including Consolidation Loans) for which the first disbursement is after June 30, 2010, except as expressly authorized by an Act of Congress.

The Higher Education Act provides for several different educational loan programs (collectively, the "Federal Family Education Loan Program" or "FFEL Program," and the loans originated thereunder, "Federal Family Education Loans" or "FFELP Loans"). Under the FFEL Program, state agencies or private nonprofit corporations administering student loan insurance programs ("Guaranty Agencies") are reimbursed for portions of losses sustained in connection with FFELP Loans, and holders of certain loans made under such programs are paid subsidies for owning such FFELP Loans. Certain provisions of the Federal Family Education Loan Program are summarized below. This summary does not purport to be comprehensive or definitive and is qualified in its entirety by reference to the text of the Higher Education Act and the regulations thereunder.

The Higher Education Act has been subject to frequent amendments and federal budgetary legislation, the most significant of which has been the passage of H.R. 4872 (the "Health Care & Education Affordability Reconciliation Act of 2010" or "HCEARA") which terminated originations of FFELP Loans under the FFEL Program after June 30, 2010 such that all new federal student loans originated on and after July 1, 2010 are originated under the Direct Loan Program.

**Federal Family Education Loans**

Several types of loans were authorized as Federal Family Education Loans pursuant to the Federal Family Education Loan Program. These included: (a) loans to students meeting certain financial needs tests with respect to which the federal government makes interest payments available to reduce student interest cost during periods of enrollment ("Subsidized Stafford Loans"); (b) loans to students made without regard to financial need with respect to which the federal government does not make such interest payments ("Unsubsidized Stafford Loans" and, collectively with Subsidized Stafford Loans, "Stafford Loans"); (c) loans to graduate students, professional students, or parents of dependent students ("PLUS Loans"); and (d) loans available to borrowers with certain existing federal educational loans to consolidate repayment of such loans ("Consolidation Loans").

Generally, a FFELP Loan was made only to a United States citizen or permanent resident or otherwise eligible individual under federal regulations who (a) had been accepted for enrollment or was enrolled and was maintaining satisfactory progress at an eligible institution; (b) was carrying at least one-half of the normal full-time academic workload for the course of study the student was pursuing, as

determined by such institution; (c) agreed to notify promptly the holder of the loan of any address change; (d) was not in default on any federal education loans; (e) met the applicable "need" requirements; and (f) had not committed a crime involving fraud or obtaining funds under the Higher Education Act which funds had not been fully repaid. Eligible institutions included higher educational institutions and vocational schools that complied with certain federal regulations. With certain exceptions, an institution with a cohort default rate that was equal to or greater than 25% for each of the three most recent fiscal years for which data was available was not an eligible institution under the Higher Education Act. However, beginning in fiscal year 2012, the threshold was raised from 25% to 30%. In addition, an institution with a cohort default rate that was equal to or greater than 40% for the most recent fiscal year for which data was available is also not an eligible institution under the Higher Education Act.

**Subsidized Stafford Loans**

The Higher Education Act provides for federal (a) insurance or reinsurance of eligible Subsidized Stafford Loans, (b) interest benefit payments for borrowers remitted to eligible lenders with respect to certain eligible Subsidized Stafford Loans, and (c) Special Allowance Payments representing an additional subsidy paid by the Secretary to such holders of eligible Subsidized Stafford Loans.

Subsidized Stafford Loans were eligible for reinsurance under the Higher Education Act if the eligible student to whom the loan was made had been accepted or was enrolled in good standing at an eligible institution of higher education or vocational school and was carrying at least one-half the normal full-time workload at that institution. In connection with eligible Subsidized Stafford Loans there were limits as to the maximum amount which could be borrowed for an academic year and in the aggregate for both undergraduate and graduate/professional study. The Secretary had discretion to raise these limits to accommodate students undertaking specialized training requiring exceptionally high costs of education.

Subject to these limits, Subsidized Stafford Loans were available to borrowers in amounts not exceeding their unmet need for financing as provided in the Higher Education Act.

**Unsubsidized Stafford Loans**

Unsubsidized Stafford Loans were available to students who did not qualify for Subsidized Stafford Loans due to parental and/or student income or assets in excess of permitted amounts. In other respects, the general requirements for Unsubsidized Stafford Loans were essentially the same as those for Subsidized Stafford Loans. The interest rate, the loan fee requirements and the Special Allowance Payment provisions of the Unsubsidized Stafford Loans were the same as the Subsidized Stafford Loans. However, the terms of the Unsubsidized Stafford Loans differ materially from Subsidized Stafford Loans in that the Secretary does not make interest benefit payments and the loan limitations were determined without respect to the expected family contribution. The borrower was required to pay interest from the time such loan was disbursed or capitalize the interest until repayment began.

**PLUS Loan Program**

The Higher Education Act authorized PLUS Loans to be made to graduate students, professional students, or parents of eligible dependent students. Only graduate students, professional students and parents who did not have an adverse credit history were eligible for PLUS Loans. The basic provisions applicable to PLUS Loans were similar to those of Stafford Loans with respect to the involvement of Guaranty Agencies and the Secretary in providing federal reinsurance on the loans. However, PLUS Loans differ significantly from Subsidized Stafford Loans, particularly because federal interest benefit payments are not available under the PLUS Program and Special Allowance Payments are more restricted.

**The Consolidation Loan Program**

The Higher Education Act authorized a program under which certain borrowers were permitted to consolidate their various student loans into a single loan insured and reinsured on a basis similar to Subsidized Stafford Loans.  The authority to make such Consolidation Loans expired on June 30, 2010.  Consolidation Loans were made in an amount sufficient to pay outstanding principal, unpaid interest and late charges on certain federally insured or reinsured student loans incurred under and pursuant to the Federal Family Education Loan Program (other than Parent PLUS Loans) selected by the borrower, as well as loans made pursuant to the Perkins Loan Program, the Health Professions Student Loan Programs and the Direct Loan Program.  Consolidation Loans made pursuant to the Direct Loan Program must conform to the eligibility requirements for Consolidation Loans under the Federal Family Education Loan Program.  The borrowers could have been either in repayment status or in a grace period preceding repayment, but the borrower could not still be in school.  Delinquent or defaulted borrowers were eligible to obtain Consolidation Loans if they agreed to re-enter repayment through loan consolidation.  Borrowers were permitted to add additional loans to a Consolidation Loan during the 180-day period following origination of the Consolidation Loan.  Further, a married couple who agreed to be jointly and severally liable was treated as one borrower for purposes of loan consolidation eligibility.  A Consolidation Loan was federally insured or reinsured only if such loan was made in compliance with the requirements of the Higher Education Act.

The Higher Education Act authorizes the Secretary to offer the borrower a Direct Consolidation Loan with repayment provisions authorized under the Higher Education Act and terms consistent with a Consolidation Loan made pursuant to the FFEL Program.  In addition, the Secretary may offer the borrower of a Consolidation Loan a Direct Consolidation Loan for one of three purposes: (a) providing the borrower with an income contingent repayment plan (or income-based repayment plan as of July 1, 2009) if the borrower's delinquent loan has been submitted to a Guaranty Agency for default aversion (or, as of July 1, 2009, if the loan is already in default); (b) allowing the borrower to participate in a public service loan forgiveness program offered under the Direct Loan Program; or (c) allowing the borrower to use the no accrual of interest for active duty service members benefit offered under the Direct Loan Program for not more than 60 months for loans first disbursed on or after October 1, 2008.  In order to participate in the public service loan forgiveness program, the borrower must not have defaulted on the Direct Loan; must have made 120 monthly payments on the Direct Loan after October 1, 2007 under certain income based repayment plans, a standard 10-year repayment plan for certain Direct Loans, or a certain income contingent repayment plan; and must be employed in a public service job at the time of forgiveness and during the period in which the borrower makes each of his 120 monthly payments.  A public service job is defined broadly and includes working at an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended and restated (the "IRC"), which is exempt from taxation under Section 501(a) of the IRC.  No borrower may, however, receive a reduction of loan obligations under both the public service loan forgiveness program offered under the Direct Loan Program and the following programs: (i) the loan forgiveness program for teachers offered under both the FFEL Program and the Direct Loan Program; (ii) the loan forgiveness program for service in areas of national need offered under the FFEL Program; and (iii) the loan repayment program for civil legal assistance attorneys offered under the FFEL Program.

**Federal Direct Student Loan Program**

The Student Loan Reform Act of 1993 established the Direct Loan Program.  The first loans under the Direct Loan Program were made available for the 1994-1995 academic year.  Under the Direct Loan Program, approved institutions of higher education, or alternative loan originators approved by the United States Department of Education (the "Department of Education"), make loans to students or parents without application to or funding from outside lenders or Guaranty Agencies.  The Department of Education

provides the funds for such loans, and the program provides for a variety of flexible repayment plans, including extended, graduated and income contingent repayment plans, forbearance of payments during periods of national service and consolidation under the Direct Loan Program of existing student loans.  Such consolidation permits borrowers to prepay existing student loans and consolidate them into a Federal Direct Consolidation Loan under the Direct Loan Program.  The Direct Loan Program also provides certain programs under which principal may be forgiven or interest rates may be reduced.  Direct Loan Program repayment plans, other than income contingent plans, must be consistent with the requirements under the Higher Education Act for repayment plans under the FFEL Program.  Due to the enactment of HCEARA, FFELP Loans made pursuant to the Higher Education Act are no longer originated, and as of July 1, 2010 new federal student loans are originated solely under the Direct Loan Program.

**Interest Rates**

*Subsidized and Unsubsidized Stafford Loans*.  Subsidized and Unsubsidized Stafford Loans made on or after October 1, 1998 but before July 1, 2006 which are in in-school, grace and deferment periods bear interest at a rate equivalent to the 91-day T-Bill rate plus 1.70%, with a maximum rate of 8.25%.  Subsidized Stafford Loans and Unsubsidized Stafford Loans made on or after October 1, 1998 but before July 1, 2006 in all other payment periods bear interest at a rate equivalent to the 91-day T-Bill rate plus 2.30%, with a maximum rate of 8.25%.  The rate is adjusted annually on July 1.

Subsidized Stafford Loans disbursed on or after July 1, 2006 and before July 1, 2010 bear interest at progressively lowered rates described below.  Subsidized Stafford Loans made on or after July 1, 2006 but before July 1, 2008 bear interest at a rate equal to 6.80% per annum.  Subsidized Stafford Loans made on or after July 1, 2008 but before July 1, 2009 bear interest at a rate equal to 6.00% per annum.  Subsidized Stafford Loans made on or after July 1, 2009 but before July 1, 2010 bear interest at a rate equal to 5.60% per annum.

Unsubsidized Stafford Loans made on or after July 1, 2006 and before July 1, 2010 bear interest at a rate equal to 6.80% per annum.

*PLUS Loans*.  PLUS Loans made on or after October 1, 1998 but before July 1, 2006 bear interest at a rate equivalent to the 91-day T-Bill rate plus 3.10%, with a maximum rate of 9.00%.  The rate is adjusted annually on July 1.  PLUS Loans made on or after July 1, 2006 and before July 1, 2010 bear interest at a rate equal to 8.50% per annum.

*Consolidation Loans*.  Consolidation Loans for which the application was received by an eligible lender on or after October 1, 1998 and that was disbursed before July 1, 2010 bear interest at a fixed rate equal to the lesser of (a) the weighted average of the interest rates on the loans consolidated, rounded upward to the nearest 1/8 of 1.00%; or (b) 8.25%.  For Consolidation Loans disbursed before July 1, 1994, the applicable interest rate is fixed at the greater of 9% or the weighted average of the interest rates on the loans being consolidated, rounded to the nearest whole percent.  For Consolidation Loans disbursed on or after July 1, 1994, based on applications received by the lender before November 13, 1997, the applicable interest rate is fixed and is based on the weighted average of the interest rates on the loans being consolidated, rounded up to the nearest whole percent.  For Consolidation Loans (which do not include a HEAL loan) on which the application was received by the lender between November 13, 1997 and September 30, 1998, inclusive, the applicable interest rate is variable based on the bond equivalent rate of the 91-day Treasury bills, auctioned at the final auction before the preceding June, plus 3.1% (adjusted annually on July 1).

*Servicemembers Civil Relief Act—6.00% Interest Rate Limitation*.  As of August 14, 2008, FFELP Loans incurred by a servicemember, or by a servicemember and the servicemember's spouse

jointly, before the servicemember enters military service may not bear interest at a rate in excess of 6.00% during the period of military service.

**Loan Disbursements**

The Higher Education Act generally required that Stafford Loans and PLUS Loans made to cover multiple enrollment periods, such as a semester, trimester, or quarter, be disbursed by eligible lenders in at least two separate disbursements.  The Higher Education Act also generally required that the first installment of such loans made to a student who was entering the first year of a program of undergraduate education and who had not previously obtained a FFEL Program loan (a "First FFEL Student") must have been presented by the institution to the student 30 days after the First FFEL Student begins a course of study.  However, certain institutions whose cohort default rate was less than 10% prior to October 1, 2011 and less than 15% on or after October 1, 2011 for each of the three most recent fiscal years for which data was available were permitted to (a) disburse any such loan made in a single installment for any period of enrollment that was not more than a semester, trimester, quarter, or four months; and (b) deliver any such loan that was to be made to a First FFEL Student prior to the end of the 30-day period after the First FFEL Student began his or her course of study at the institution.

**Loan Limits**

A Stafford Loan borrower was permitted to receive a subsidized loan, an unsubsidized loan, or a combination of both for an academic period.  Generally, the maximum amount of Stafford Loans, made prior to July 1, 2007, for an academic year was not permitted to exceed $2,625 for the first year of undergraduate study, $3,500 for the second year of undergraduate study and $5,500 per year for the remainder of undergraduate study.  The maximum amount of Stafford Loans, made on or after July 1, 2007, for an academic year was not permitted to exceed $3,500 for the first year of undergraduate study and $4,500 for the second year of undergraduate study.  The aggregate limit for undergraduate study was $23,000 (excluding PLUS Loans).  Dependent undergraduate students were permitted to receive an additional unsubsidized Stafford Loan of up to $2,000 per academic year, with an aggregate maximum of $31,000.  Independent undergraduate students were permitted to receive an additional Unsubsidized Stafford Loan of up to $6,000 per academic year for the first two years and up to $7,000 per academic year thereafter, with an aggregate maximum of $57,500.  The maximum amount of subsidized loans for an academic year for graduate students was $8,500.  Graduate students were permitted to borrow an additional Unsubsidized Stafford Loan of up to $12,000 per academic year.  The Secretary had discretion to raise these limits by regulation to accommodate highly specialized or exceptionally expensive courses of study.

The total amount of all PLUS Loans that (a) parents were permitted to borrow on behalf of each dependent student, or (b) graduate or professional students were permitted to borrow for any academic year was not permitted to exceed the student's estimated cost of attendance minus other financial assistance for that student as certified by the eligible institution which the student attends.

**Repayment**

*General*.  Repayment of principal on a Stafford Loan does not commence while a student remains a qualified student, but generally begins six months after the date a borrower ceases to pursue at least a half-time course of study (the six-month period is the "Grace Period").  Repayment of interest on an Unsubsidized Stafford Loan begins immediately upon disbursement of the loan; however, the lender may capitalize the interest until repayment of principal is scheduled to begin.  Except for certain borrowers as described below, each loan generally must be scheduled for repayment over a period of not more than 10 years after the commencement of repayment.  The Higher Education Act currently requires minimum annual payments of $600, including principal and interest, unless the borrower and the lender agree to lesser

payments.    Regulations of the Secretary require lenders to offer borrowers standard, graduated, income-sensitive, or, as of July 1, 2009 for certain eligible borrowers, income-based repayment plans.  Use of income-based repayment plans may extend the 10-year maximum term.

Effective July 1, 2009, a new income-based repayment plan became available to certain FFEL Program borrowers and Direct Loan Program borrowers.  To be eligible to participate in the plan, the borrower's annual amount due on loans made to a borrower prior to July 1, 2010 with respect to FFEL Program borrowers and prior to July 1, 2014 with respect to Direct Loan Program borrowers (as calculated under a standard 10-year repayment plan for such loans) must exceed 15% of the result obtained by calculating the amount by which the borrower's adjusted gross income (and the borrower's spouse's adjusted gross income, if applicable) exceeds 150% of the poverty line applicable to the borrower's family size.  With respect to any loan made to a new Direct Loan Program borrower on or after July 1, 2014, the borrower's annual amount due on such loans (as calculated under a standard 10-year repayment plan for such loans) must exceed 10% of the result obtained by calculating the amount by which the borrower's adjusted gross income (and the borrower's spouse's adjusted gross income, if applicable) exceeds 150% of the poverty line applicable to the borrower's family size.  Such a borrower may elect to have his payments limited to the monthly amount of the above described result.  Furthermore, the borrower is permitted to repay his loans over a term greater than 10 years.  The Secretary will repay any outstanding principal and interest on eligible FFEL Program loans and cancel any outstanding principal and interest on eligible Direct Loan Program loans for borrowers who participated in the new income-based repayment plan and, for a period of time prescribed by the Secretary (but not more than 25 years for a borrower whose loan was made prior to July 1, 2010 with respect to FFEL Program loans and prior to July 1, 2014 with respect to Direct Loan Program loans and not more than 20 years for a Direct Loan Program borrower whose loan was made on or after July 1, 2014), have (a) made certain reduced monthly payments under the income-based repayment plan, (b) made certain payments based on a 10-year repayment period when the borrower first made the election to participate in the income-based repayment plan, (c) made certain payments based on a standard 10-year repayment period, (d) made certain payments under an income-contingent repayment plan for certain Direct Loan Program loans, or (e) have been in an economic hardship deferment.

Borrowers of Subsidized Stafford Loans and of the subsidized portion of Consolidation Loans, and borrowers of similar subsidized loans under the Direct Loan Program receive additional benefits under the new income-based repayment program: the Secretary will pay any unpaid interest due on the borrower's subsidized loans for up to three years after the borrower first elects to participate in the new income-based repayment plan (excluding any periods where the borrower has obtained economic hardship deferment).  For both subsidized and unsubsidized loans, interest is capitalized when the borrower either ends his participation in the income-based repayment program or begins making certain payments under the program calculated for those borrowers whose financial hardship has ended.

PLUS Loans enter repayment on the date the last disbursement is made on the loan.  Interest accrues and is due and payable from the date of the first disbursement of the loan.  The first payment is due within 60 days after the loan is fully disbursed, subject to deferral.  For parent borrowers whose loans were first disbursed on or after July 1, 2008, it is possible, upon the request of the parent, to begin repayment on the later of (a) six months and one day after the student for whom the loan is borrowed ceases to carry at least one-half of the normal full-time academic workload (as determined by the school); and (b) if the parent borrower is also a student, six months and one day after the date such parent borrower ceases to carry at least one-half such a workload.  Similarly, graduate and professional student borrowers whose loans were first disbursed on or after July 1, 2008 may begin repayment six months and one day after such student ceases to carry at least one-half the normal full-time academic workload (as determined by the school).  Repayment plans are the same as in the Subsidized and Unsubsidized Stafford Loan Program for all PLUS Loans except those PLUS Loans which are made, insured, or guaranteed on behalf of a dependent student; such excepted PLUS Loans are not eligible for the income-based repayment plan which became effective

A-6

on July 1, 2009.  Furthermore, eligible lenders were permitted to determine for all PLUS Loan borrowers (i) whose loans were first disbursed on or after July 1, 2008 that extenuating circumstances existed if between January 1, 2007 through December 31, 2009, a PLUS Loan applicant (A) was or had been delinquent for 180 days or less on the borrower's residential mortgage loan payments or on medical bills; and (B) did not otherwise have an adverse credit history, as determined by the lender in accordance with the regulations promulgated under the Higher Education Act prior to May 7, 2008; and (ii) whose loans were first disbursed prior to July 1, 2008 that extenuating circumstances existed if between January 1, 2007 through December 31, 2009, a PLUS Loan applicant (A) was or had been delinquent for 180 days or less on the borrower's residential mortgage loan or on medical bills, and (B) was not and had not been delinquent on the repayment of any other debt for more than 89 days during the period.

Consolidation Loans enter repayment on the date the loan is disbursed.  The first payment is due within 60 days after all holders of the loan have discharged the liabilities of the borrower on the loan selected for consolidation.  Consolidation Loans which are not being paid pursuant to income-sensitive repayment plans (or, as of July 1, 2009, income-based repayment plans) must generally be repaid during a period agreed to by the borrower and lender, subject to maximum repayment periods which vary depending upon the principal amount of the borrower's outstanding student loans (but no longer than 30 years for Consolidation Loans made after January 1, 1993).  Consolidation Loans may also be repaid pursuant to the new income-based repayment plan which became effective on July 1, 2009.  However, Consolidation Loans which have been used to repay a PLUS Loan that has been made, insured, or guaranteed on behalf of a dependent student were not eligible for this new income-based repayment plan.

FFEL Program borrowers who accumulate outstanding FFELP Loans on or after October 7, 1998 totaling more than $30,000 were permitted to receive an extended repayment plan, with a fixed annual or graduated payment amount paid over a longer period of time, not to exceed 25 years.  A borrower may accelerate principal payments at any time without penalty.  Once a repayment plan is established, the borrower may annually change the selection of the plan.

***Deferment and Forbearance Periods***.  No principal repayments need to be made during certain periods prescribed by the Higher Education Act ("Deferment Periods") but interest accrues and must be paid.  Generally, Deferment Periods include periods (a) when the borrower has returned to an eligible educational institution on a half-time basis or is pursuing studies pursuant to an approved graduate fellowship or an approved rehabilitation training program for disabled individuals; (b) not in excess of three years while the borrower is seeking and unable to find full-time employment; (c) while the borrower is serving on active duty during a war or other military operation or national emergency, is performing qualifying National Guard duty during a war or other military operation or national emergency, and for 180 days following the borrower's demobilization date for the above described services; (d) during the 13 months following service if the borrower is a member of the National Guard, a member of a reserve component of the military, or a retired member of the military who (i) is called or ordered to active duty, and (ii) is or was enrolled within six months prior to the activation at an eligible educational institution; (e) if the borrower is in active military duty, or is in reserve status and called to active duty; and (f) not in excess of three years for any reason which the lender determines, in accordance with regulations, has caused or will cause the borrower economic hardship.  Deferment periods extend the maximum repayment periods.  Under certain circumstances, a lender may also allow periods of forbearance ("Forbearance") during which the borrower may defer payments because of temporary financial hardship.  The Higher Education Act specifies certain periods during which Forbearance is mandatory.  Mandatory Forbearance periods include, but are not limited to, periods during which the borrower is (A) participating in a medical or dental residency and is not eligible for deferment; (B) serving in a qualified medical or dental internship program or certain national service programs; or (C) determined to have a debt burden of certain federal loans equal to or exceeding 20% of the borrower's gross income.  In other circumstances, Forbearance may be granted at the lender's option.  Forbearance also extends the maximum repayment periods.

**Master Promissory Notes**

Since July 2000, all lenders were required to use a master promissory note (the "MPN") for new Stafford Loans.  Unless otherwise notified by the Secretary, each institution of higher education that participated in the FFEL Program was permitted to use a master promissory note for FFELP Loans.  The MPN permitted a borrower to obtain future loans without the necessity of executing a new promissory note. Borrowers were not, however, required to obtain all of their future loans from their original lender, but if a borrower obtains a loan from a lender which does not presently hold an MPN for that borrower, that borrower was required to execute a new MPN.  A single borrower may have several MPNs evidencing loans to multiple lenders.  If multiple loans have been advanced pursuant to a single MPN, any or all of those loans may be individually sold by the holder of the MPN to one or more different secondary market purchasers.

**Interest Benefit Payments**

The Secretary is to pay interest on Subsidized Stafford Loans while the borrower is a qualified student, during a Grace Period or during certain Deferment Periods.  In addition, Consolidation Loans made after August 10, 1993 that repay only Subsidized Stafford Loans are eligible for Interest Benefit Payments. Consolidation Loans made on or after November 13, 1997, are eligible for Interest Benefit Payments on that portion of the Consolidation Loan that repays subsidized FFELP Loans or similar subsidized loans made under the Direct Loan Program are eligible for interest benefit payments.  The Secretary is required to make interest benefit payments to the holder of Subsidized Stafford Loans in the amount of interest accruing on the unpaid balance thereof prior to the commencement of repayment or during any Deferment Period.  The Higher Education Act provides that the holder of an eligible Subsidized Stafford Loan, or the eligible portions of Consolidation Loans, shall be deemed to have a contractual right against the United States to receive interest benefit payments in accordance with its provisions.

**Special Allowance Payments**

The Higher Education Act provides for Special Allowance Payments to be made by the Secretary to eligible lenders.  The rates for Special Allowance Payments are based on formulas that differ according to the type of loan, the date the loan was first disbursed, the interest rate and the type of funds used to finance such loan (tax-exempt or taxable).  Loans made or purchased with funds obtained by the holder from the issuance of tax-exempt obligations issued prior to October 1, 1993 have an effective minimum rate of return of 9.50%.  Amounts derived from recoveries of principal on loans made prior to October 1, 1993 may only be used to originate or acquire additional loans by a unit of a state or local government, or non-profit entity not owned or controlled by or under common ownership of a for-profit entity and held directly or through any subsidiary, affiliate or trustee, which entity has a total unpaid balance of principal equal to or less than $100,000,000 on loans for which special allowances were paid in the most recent quarterly payment prior to September 30, 2005.  Such entities were permitted to originate or acquire additional loans with amounts derived from recoveries of principal until December 31, 2010.  The Special Allowance Payments payable with respect to student loans acquired or funded with the proceeds of tax-exempt obligations issued after September 30, 1993 are equal to those paid to other lenders.

Public Law 112-74, dated December 23, 2011, amended the Higher Education Act, reflecting financial market conditions, to allow FFELP lenders to make an affirmative election to permanently change the index for Special Allowance Payment calculations on all FFELP Loans in the lender's portfolio (with certain limited exceptions) disbursed after January 1, 2000 from the Three Month Commercial Paper Rate (as hereafter defined) to the One Month LIBOR Rate (as hereafter defined), commencing with the Special Allowance Payment calculations for the calendar quarter beginning on April 1, 2012.  Such election to permanently change the index for Special Allowance Payment calculations must have been made by

April 1, 2012 and must also have waived all contractual, statutory or other legal rights to the Special Allowance Payment calculation formula in effect at the time the loans were first disbursed.  The Department of Education has not indicated what index it will use to calculate Special Allowance Payments presently based upon the One Month LIBOR Rate if the One Month LIBOR Rate is no longer available.  See the caption "RISK FACTORS—LIBOR is being discontinued as a floating rate benchmark, and various aspects of the discontinuation are uncertain and will affect the financial markets and may also affect the Financed Eligible Loans and the Class A-1B Notes and the Class B Notes" in the body of this Offering Memorandum.

Subject to the foregoing, the formulas for Special Allowance Payment rates for Subsidized and Unsubsidized Stafford Loans are summarized in the following chart.  The term "T-Bill" as used in this table and the following table, means the average 91-day treasury bill rate calculated at a "bond equivalent rate" in the manner applied by the Secretary as referred to in Section 438 of the Higher Education Act.  The term "Three Month Commercial Paper Rate" means the 90-day commercial paper index calculated quarterly and based on an average of the daily 90-day commercial paper rates reported in the Federal Reserve's Statistical Release H-15.  The term "One Month LIBOR Rate" means the one-month London Interbank Offered Rate for United States dollars in effect for each of the days in such quarter as compiled and released by Intercontinental Exchange Group (ICE).

| Date of Loans | Annualized SAP Rate |
|---|---|
| On or after October 1, 1992 | T-Bill Rate less Applicable Interest Rate + 3.10% |
| On or after July 1, 1995 | T-Bill Rate less Applicable Interest Rate + 3.10%[1] |
| On or after July 1, 1998 | T-Bill Rate less Applicable Interest Rate + 2.80%[2] |
| On or after January 1, 2000 (and before October 1, 2007) | Three Month Commercial Paper Rate[6] less Applicable Interest Rate + 2.34%[3] |
| On or after October 1, 2007 and before July 1, 2010 if an eligible not-for-profit lender (or an eligible lender trustee on its behalf) is the holder of the loan | Three Month Commercial Paper Rate[6] less Applicable Interest Rate + 1.94%[4] |
| On or after October 1, 2007 and before July 1, 2010 if an eligible lender other than an eligible not-for-profit lender (or an eligible lender trustee on its behalf) is the holder of the loan | Three Month Commercial Paper Rate[6] less Applicable Interest Rate + 1.79%[5] |

[1] Substitute 2.50% in this formula while such loans are in the in-school or grace period.
[2] Substitute 2.20% in this formula while such loans are in the in-school or grace period.
[3] Substitute 1.74% in this formula while such loans are in the in-school or grace period.
[4] Substitute 1.34% in this formula while such loans are in the in-school or grace period.
[5] Substitute 1.19% in this formula while such loans are in the in-school or grace period.
[6] Substitute "One Month LIBOR Rate" for "Three Month Commercial Paper Rate" in this formula where lenders made the affirmative election by no later than April 1, 2012 under Public Law 112-74, dated December 23, 2011, to permanently change the index for Special Allowance Payment calculations for all loans in the lender's portfolio.

The formulas for Special Allowance Payment rates for PLUS Loans are as follows:

| Date of Loans | Annualized SAP Rate |
| --- | --- |
| On or after October 1, 1992 | T-Bill Rate less Applicable Interest Rate + 3.10% |
| On or after January 1, 2000 (and before October 1, 2007) | Three Month Commercial Paper Rate[*] less Applicable Interest Rate +2.64% |
| On or after October 1, 2007 and before July 1, 2010 if an eligible not-for-profit lender (or an eligible lender trustee on its behalf) is the holder of the loan | Three Month Commercial Paper Rate[*] less Applicable Interest Rate + 1.94% |
| On or after October 1, 2007 and before July 1, 2010 if an eligible lender other than an eligible not-for-profit lender (or an eligible lender trustee on its behalf) is the holder of the loan | Three Month Commercial Paper Rate[*] less Applicable Interest Rate + 1.79% |

[*] Substitute "One Month LIBOR Rate" for "Three Month Commercial Paper Rate" in this formula where lenders made the affirmative election by no later than April 1, 2012 under Public Law 112-74, dated December 23, 2011, to permanently change the index for Special Allowance Payment calculations for all loans in the lender's portfolio.

The formulas for Special Allowance Payment rates for Consolidation Loans are as follows:

| Date of Loans | Annualized SAP Rate |
| --- | --- |
| On or after October 1, 1992 | T-Bill Rate less Applicable Interest Rate + 3.10% |
| On or after January 1, 2000 (and before October 1, 2007) | Three Month Commercial Paper Rate[*] less Applicable Interest Rate + 2.64% |
| On or after October 1, 2007 and before July 1, 2010 if an eligible not-for-profit lender (or an eligible lender trustee on its behalf) is the holder of the loan | Three Month Commercial Paper Rate[*] less Applicable Interest Rate + 2.24% |
| On or after October 1, 2007 and before July 1, 2010 if an eligible lender other than an eligible not-for-profit lender (or an eligible lender trustee on its behalf) is the holder of the loan | Three Month Commercial Paper Rate[*] less Applicable Interest Rate + 2.09% |

[*] Substitute "One Month LIBOR Rate" for "Three Month Commercial Paper Rate" in this formula where lenders made the affirmative election by no later than April 1, 2012 under Public Law 112-74, dated December 23, 2011, to permanently change the index for Special Allowance Payment calculations for all loans in the lender's portfolio.

Special allowance payments are generally payable, with respect to variable rate FFELP Loans to which a maximum borrower interest rate applies, only when the maximum borrower interest rate is in effect. The Secretary offsets interest benefit payments and Special Allowance Payments by the amount of origination fees and lender loan fees described under the caption "—Loan Fees" below.

The Higher Education Act provides that a holder of a qualifying loan who is entitled to receive Special Allowance Payments has a contractual right against the United States to receive those payments during the life of the loan.  Receipt of Special Allowance Payments, however, is conditioned on the eligibility of the loan for federal insurance or reinsurance benefits.  Such eligibility may be lost due to violations of federal regulations or Guaranty Agencies' requirements.

The Higher Education Act provides that for FFELP Loans first disbursed prior to April 1, 2006, lenders are entitled to retain interest income in excess of the special allowance support level in instances

when the loan rate exceeds the special allowance support level.  However, lenders are not allowed to retain interest income in excess of the special allowance support level on FFELP Loans disbursed on or after April 1, 2006, and are required to rebate any such "excess interest" to the Secretary on a quarterly basis. This modification effectively limits lenders' returns to the special allowance support level and could require a lender to rebate excess interest accrued but not yet received.

## Loan Fees

*Insurance Premium*.  For loans guaranteed before July 1, 2006, a Guaranty Agency was authorized to charge a premium, or guarantee fee, of up to 1.00% of the principal amount of the loan, which may be deducted proportionately from each installment of the loan.  Generally, Guaranty Agencies had waived this fee since 1999.  For loans guaranteed on or after July 1, 2006 that are first disbursed before July 1, 2010, a federal default fee equal to 1.00% of principal was required to be paid into such Guaranty Agency's Federal Student Loan Reserve Fund (hereinafter defined as the "Federal Fund").

*Origination Fee*.  Lenders were authorized to charge borrowers of Subsidized Stafford Loans and Unsubsidized Stafford Loans an origination fee in an amount not to exceed: 3.00% of the principal amount of the loan for loans disbursed prior to July 1, 2006; 2.00% of the principal amount of the loan for loans disbursed on or after July 1, 2006 and before July 1, 2007; 1.50% of the principal amount of the loan for loans disbursed on or after July 1, 2007 and before August 1, 2008; 1.00% of the principal amount of the loan for loans disbursed on or after August 1, 2008 and before July 1, 2009; and 0.50% of the principal amount of the loan for loans disbursed on or after July 1, 2009 and before July 1, 2010.  The Secretary is authorized to charge borrowers of Direct Loans 4.00% of the principal amount of the loan for loans disbursed prior to February 8, 2006.  A lender was permitted to charge a lesser origination fee to Stafford Loan borrowers so long as the lender did so consistently with respect to all borrowers who resided in or attended school in a particular state.  For borrowers of Direct Loans other than Federal Direct Consolidation Loans and Federal Direct PLUS Loans, the Secretary may charge such borrowers as follows:  3.00% of the principal amount of the loan for loans disbursed on or after February 8, 2006 and before July 1, 2007; 2.50% of the principal amount of the loan for loans disbursed on or after July 1, 2007 and before August 1, 2008; 2.00% of the principal amount of the loan for loans disbursed on or after August 1, 2008 and before July 1, 2009; 1.50% of the principal amount of the loan for loans disbursed on or after July 1, 2009 and before July 1, 2010; and 1.00% of the principal amount of the loan for loans disbursed on or after July 1, 2010. These fees must be deducted proportionately from each installment payment of the loan proceeds prior to payment to the borrower.  The lenders were required to pass the origination fees received under the FFEL Program on to the Secretary.

*Lender Loan Fee*.  The lender of any FFELP Loan was required to pay to the Secretary an additional origination fee equal to 0.50% of the principal amount of the loan for loans first disbursed on or after October 1, 1993, but prior to October 1, 2007.  For all loans first disbursed on or after October 1, 2007 and before July 1, 2010, the lender was required to pay an additional origination fee equal to 1.00% of the principal amount of the loan.

The Secretary collects from the lender or subsequent holder of the loan the maximum origination fee authorized (regardless of whether the lender actually charges the borrower) and the lender loan fee, either through reductions in interest benefit payments or Special Allowance Payments or directly from the lender or holder of the loan.

*Rebate Fee on Consolidation Loans*.  The holder of any Consolidation Loan for which the first disbursement was made on or after October 1, 1993, is required to pay to the Secretary a Monthly Consolidation Rebate Fees equal to .0875% (1.05% per annum) of the principal amount plus accrued unpaid interest on the loan.  However, for Consolidation Loans for which applications were received from

October 1, 1998 to January 31, 1999, inclusive, the Monthly Consolidation Rebate Fees is approximately equal to .0517% (.62% per annum) of the principal amount plus accrued interest on the loan.

**Insurance and Guarantees**

A Guaranty Agency guarantees Federal Family Education Loans made to students or parents of students by eligible lenders.  A Guaranty Agency generally purchases defaulted student loans which it has guaranteed with its reserve fund (as described under the caption "Guaranty Agency Reserves" below).  A Federal Family Education Loan is considered to be in default for purposes of the Higher Education Act when the borrower fails to make an installment payment when due, or to comply with other terms of the loan, and if the failure persists for 270 days in the case of a loan repayable in monthly installments or for 330 days in the case of a loan repayable in less frequent installments.  If the loan is guaranteed by a Guaranty Agency in accordance with the provisions of the Higher Education Act, the Guaranty Agency is to pay the holder a percentage of such amount of the loss subject to a reduction (as described in 20 U.S.C. § 1075(b)) within 90 days of notification of such default.  The default claim package submitted to a Guaranty Agency must include all information and documentation required under the Federal Family Education Loan Program regulations and such Guaranty Agency's policies and procedures.

The Higher Education Act gives the Secretary of Education various oversight powers over the Guaranty Agencies.  These include requiring a Guaranty Agency to maintain its reserve fund at a certain required level and taking various actions relating to a Guaranty Agency if its administrative and financial condition jeopardizes its ability to meet its obligations.

*Federal Insurance*.  The Higher Education Act provides that, subject to compliance with such Act, the full faith and credit of the United States is pledged to the payment of insurance claims and ensures that such reimbursements are not subject to reduction.  In addition, the Higher Education Act provides that if a Guaranty Agency is unable to meet its insurance obligations, holders of loans may submit insurance claims directly to the Secretary until such time as the obligations are transferred to a new Guaranty Agency capable of meeting such obligations or until a successor Guaranty Agency assumes such obligations.  Federal reimbursement and insurance payments for defaulted loans are paid from the student loan insurance fund established under the Higher Education Act.  The Secretary is authorized, to the extent provided in advance by appropriations acts, to issue obligations to the Secretary of the Treasury to provide funds to make such federal payments.

*Guarantees*.  If the loan is guaranteed by a Guaranty Agency in accordance with the provisions of the Higher Education Act, the eligible lender is reimbursed by the Guaranty Agency for a statutorily set percentage (100% for loans first disbursed prior to October 1, 1993, 98% for loans first disbursed on or after October 1, 1993, but  before July 1, 2006, and 97% for loans first disbursed on or after July 1, 2006 but before July 1, 2010) of the unpaid principal balance of the loan plus accrued unpaid interest on any defaulted loan so long as the eligible lender has properly serviced such loan.  Under the Higher Education Act, the Secretary enters into a guarantee agreement and a reinsurance agreement (the "Guarantee Agreements") with each Guaranty Agency which provides for federal reimbursement for amounts paid to eligible lenders by the Guaranty Agency with respect to defaulted loans.

*Guarantee Agreements*.  Pursuant to the Guarantee Agreements, the Secretary is to reimburse a Guaranty Agency for the amounts expended in connection with a claim resulting from the death of a borrower; bankruptcy of a borrower; total and permanent disability of a borrower (including those borrowers who have been determined by the Secretary of Veterans Affairs to be unemployable due to a service-connected condition); inability of a borrower to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, has lasted continuously for at least 60 months, or can be expected to last continuously for at least 60 months;

the death of a student whose parent is the borrower of a PLUS Loan; certain claims by borrowers who are unable to complete the programs in which they are enrolled due to school closure; borrowers whose borrowing eligibility was falsely certified by the eligible institution; or the amount of an unpaid refund due from the school to the lender in the event the school fails to make a required refund.  Such claims are not included in calculating a Guaranty Agency's claims rate experience for federal reimbursement purposes.  Generally, educational loans are non-dischargeable in bankruptcy unless the bankruptcy court determines that the debt will impose an undue hardship on the borrower and the borrower's dependents.  Further, the Secretary is to reimburse a Guaranty Agency for any amounts paid to satisfy claims not resulting from death, bankruptcy, or disability subject to reduction as described below.  See the caption "—Education Loans Generally Not Subject To Discharge in Bankruptcy" below.

The Secretary may terminate Guarantee Agreements if the Secretary determines that termination is necessary to protect the federal financial interest or to ensure the continued availability of loans to student or parent borrowers.  Upon termination of such Guarantee Agreements, the Secretary is authorized to provide the Guaranty Agency with additional advance funds with such restrictions on the use of such funds as is determined appropriate by the Secretary, in order to meet the immediate cash needs of the Guaranty Agency, ensure the uninterrupted payment of claims, or ensure that the Guaranty Agency will make loans as the lender-of-last-resort.

If the Secretary has terminated or is seeking to terminate Guarantee Agreements, or has assumed a Guaranty Agency's functions, notwithstanding any other provision of law: (a) no state court may issue an order affecting the Secretary's actions with respect to that Guaranty Agency; (b) any contract entered into by the Guaranty Agency with respect to the administration of the Guaranty Agency's reserve funds or assets purchased or acquired with reserve funds shall provide that the contract is terminable by the Secretary upon 30 days' notice to the contracting parties if the Secretary determines that such contract includes an impermissible transfer of the reserve funds or assets or is inconsistent with the terms or purposes of the Higher Education Act; and (c) no provision of state law shall apply to the actions of the Secretary in terminating the operations of the Guaranty Agency.  Finally, notwithstanding any other provision of law, the Secretary's liability for any outstanding liabilities of a Guaranty Agency (other than outstanding student loan guarantees under the Higher Education Act), the functions of which the Secretary has assumed, shall not exceed the fair market value of the reserves of the Guaranty Agency, minus any necessary liquidation or other administrative costs.

***Reimbursement***.  The amount of a reimbursement payment on defaulted loans made by the Secretary to a Guaranty Agency is subject to reduction based upon the annual claims rate of the Guaranty Agency calculated to equal the amount of federal reimbursement as a percentage of the original principal amount of originated or guaranteed loans in repayment on the last day of the prior fiscal year.  The claims experience is not accumulated from year to year, but is determined solely on the basis of claims in any one federal fiscal year compared with the original principal amount of loans in repayment at the beginning of that year.  The formula for reimbursement amounts is summarized below:

A-13

| Claims Rate | Guaranty Agency Reinsurance Rate for Loans Made prior to October 1, 1993 | Guaranty Agency Reinsurance Rate for Loans Made Between October 1, 1993 and September 30, 1998 | Guaranty Agency Reinsurance Rate for Loans Made On or After October 1, 1998 and Prior to July 1, 2010[*] |
|---|---|---|---|
| 0% up to 5% | 100% | 98% | 95% |
| 5% up to 9% | 100% of claims up to 5%; and 90% of claims 5% and over | 98% of claims up to 5%; and 88% of claims 5% and over | 95% of claims up to 5% and 85% of claims 5% and over |
| 9% and over | 100% of claims up to 5%; 90% of claims 5% up to 9%; 80% of claims 9% and over | 98% of claims up to 5%; 88% of claims 5% up to 9%; 78% of claims 9% and over | 95% of claims up to 5%, 85% of claims 5% up to 9%; 75% of claims 9% and over |

_____

[*] Student loans made pursuant to the lender-of-last resort program have an amount of reinsurance equal to 100%; student loans transferred by an insolvent Guaranty Agency have an amount of reinsurance ranging from 80% to 100%. The Consolidated Appropriations Act, 2016, Pub. L. 114-113, signed by the President on December 18, 2015 changed the applicable reinsurance percentage for guaranty agencies on default claims in the FFEL program from 95% to 100% if such guaranty agency's "*trigger rate*" is below 5.0%.

The amount of loans guaranteed by a Guaranty Agency which are in repayment for purposes of computing reimbursement payments to a Guaranty Agency means the original principal amount of all loans guaranteed by a Guaranty Agency less: (a) guarantee payments on such loans, (b) the original principal amount of such loans that have been fully repaid, and (c) the original amount of such loans for which the first principal installment payment has not become due.

In addition, the Secretary may withhold reimbursement payments if a Guaranty Agency makes a material misrepresentation or fails to comply with the terms of its agreements with the Secretary or applicable federal law. A supplemental guarantee agreement is subject to annual renegotiation and to termination for cause by the Secretary.

Under the Guarantee Agreements, if a payment by the borrower on a FFELP Loan guaranteed by a Guaranty Agency is received after reimbursement by the Secretary, the Secretary is entitled to receive an equitable share of the borrower's payment. The Secretary's equitable share of the borrower's payment equals the amount remaining after the Guaranty Agency has deducted from such payment: (a) the percentage amount equal to the complement of the reinsurance percentage in effect when payment under the Guarantee Agreement was made with respect to the loan; and (b) as of October 1, 2007, 16% of the borrower's payments (to be used for the Guaranty Agency's Operating Fund (hereinafter defined)). The percentage deduction for use of the borrower's payments for the Guaranty Agency's Operating Fund varied prior to October 1, 2007; from October 1, 2003 through and including September 30, 2007, the percentage in effect was 23% and prior to October 1, 2003, the percentage in effect was 24%. The Higher Education Act further provides that on or after October 1, 2006, a Guaranty Agency may not charge a borrower collection costs in an amount in excess of 18.50% of the outstanding principal and interest of a defaulted loan that is paid off through consolidation by the borrower; provided that the Guaranty Agency must remit to the Secretary a portion of the collection charge equal to 8.50% of the outstanding principal and interest of the defaulted loan. In addition, on or after October 1, 2009, a Guaranty Agency must remit to the Secretary any collection fees on defaulted loans paid off with consolidation proceeds by the borrower which are in excess of 45% of the Guaranty Agency's total collections on defaulted loans in any one federal fiscal year.

*Lender Agreements*.  Pursuant to most typical agreements for guarantee between a Guaranty Agency and the originator of the loan, any eligible holder of a loan insured by such a Guaranty Agency is entitled to reimbursement from such Guaranty Agency, subject to certain limitations, of any proven loss incurred by the holder of the loan resulting from default, death, permanent and total disability, certain medically determinable physical or mental impairment, or bankruptcy of the student borrower at the rate of 100% for loans first disbursed prior to October 1, 1993, 98% for loans first disbursed on or after October 1, 1993, but before July 1, 2006, and 97% for loans in default made on or after July 1, 2006 but prior to July 1, 2010.  Certain holders of loans may receive higher reimbursements from Guaranty Agencies.  For example, lenders of last resort may receive reimbursement at a rate of 100% from Guaranty Agencies.

Guaranty Agencies generally deem default to mean a student borrower's failure to make an installment payment when due or to comply with other terms of a note or agreement under circumstances in which the holder of the loan may reasonably conclude that the student borrower no longer intends to honor the repayment obligation and for which the failure persists for 270 days in the case of a loan payable in monthly installments or for 330 days in the case of a loan payable in less frequent installments.  When a loan becomes at least 60 days past due, the holder is required to request default aversion assistance from the applicable Guaranty Agency in order to attempt to cure the delinquency.  When a loan becomes 240 days past due, the holder is required to make a final demand for payment of the loan by the borrower.  The holder is required to continue collection efforts until the loan is 270 days past due.  At the time of payment of insurance benefits, the holder must assign to the applicable Guaranty Agency all right accruing to the holder under the note evidencing the loan.  The Higher Education Act prohibits a Guaranty Agency from filing a claim for reimbursement with respect to losses prior to 270 days after the loan becomes delinquent with respect to any installment thereon.

Any holder of a loan is required to exercise due care and diligence in the servicing of the loan and to utilize practices which are at least as extensive and forceful as those utilized by financial institutions in the collection of other consumer loans.  If a Guaranty Agency has probable cause to believe that the holder has made misrepresentations or failed to comply with the terms of its agreement for guarantee, the Guaranty Agency may take reasonable action including withholding payments or requiring reimbursement of funds.  The Guaranty Agency may also terminate the agreement for cause upon notice and hearing.

*Rehabilitation of Defaulted Loans*.  Under the Higher Education Act, the Secretary of Education is authorized to enter into an agreement with each Guaranty Agency pursuant to which a Guaranty Agency sells defaulted student loans that are eligible for rehabilitation to an eligible lender.  For a defaulted student loan to be rehabilitated, the borrower must request rehabilitation and the applicable Guaranty Agency must receive an on-time, voluntary, full payment each month for 12 consecutive months.  However, effective July 1, 2006, for a student loan to be eligible for rehabilitation, the applicable Guaranty Agency must receive nine payments made within 20 days of the due date during 10 consecutive months.  Upon rehabilitation, a student loan is eligible for all the benefits under the Higher Education Act for which it would have been eligible had no default occurred.

A Guaranty Agency repays the Secretary an amount equal to 100% of the amount of the principal balance outstanding at the time of the sale of such student loan, multiplied by the reinsurance percentage in effect when payment under the guaranty agreement was made with respect to the student loan, and may charge to the borrower an amount not to exceed 16% of the outstanding principal and interest at the time of the loan sale.  The amount of such repayment is deducted from the amount of federal reimbursement payments for the fiscal year in which such repayment occurs, for purposes of determining the reimbursement rate for that fiscal year.

*Loans Subject To Repurchase*.  The Higher Education Act requires a lender to repurchase student loans from a Guaranty Agency, under certain circumstances, after a Guaranty Agency has paid for the

A-15

student loan through the claim process.  A lender is required to repurchase: (a) a student loan found to be legally unenforceable against the borrower; (b) a student loan for which a bankruptcy claim has been paid if the borrower's bankruptcy is subsequently dismissed by the court or, as a result of the bankruptcy hearing, the student loan is considered non-dischargeable and the borrower remains responsible for repayment of the student loan; (c) a student loan which is subsequently determined not to be in default; or (d) a student loan for which a Guaranty Agency inadvertently paid the claim.

**Guaranty Agency Reserves**

Each Guaranty Agency is required to establish a Federal Fund which, together with any earnings thereon, is deemed to be property of the United States.  Each Guaranty Agency is required to deposit into the Federal Fund any reserve funds plus reinsurance payments received from the Secretary, a certain percentage of default collections equal to the complement of the reinsurance percentage in effect when payment under the Guarantee Agreement was made, insurance premiums, 70% of payments received after October 7, 1998 from the Secretary for administrative cost allowances for loans insured prior to that date, and other receipts as specified in regulations.  A Guaranty Agency is authorized to transfer up to 180 days' cash expenses for normal operating expenses (other than claim payments) from the Federal Fund to the Operating Fund at any time during the first three years after establishment of the fund.  The Federal Fund may be used to pay lender claims and to pay default aversion fees into the Operating Fund.  A Guaranty Agency is also required to establish an operating fund (the "Operating Fund"), which, except for funds transferred from the Federal Fund to meet operating expenses during the first three years after fund establishment, is the property of the Guaranty Agency.  A Guaranty Agency was permitted to deposit into the Operating Fund loan processing and issuance fees equal to 0.40% of the total principal amount of loans insured during the fiscal year for loans originated on or after October 1, 2003 and first disbursed before July 1, 2010, 30% of payments received after October 7, 1998 for the administrative cost allowances for loans insured prior to that date, the account maintenance fee paid by the Secretary for Direct Loan Program loans in the amount of 0.06% of the original principal amount of the outstanding loans insured, any default aversion fee that is paid, the Guaranty Agency's 16% retention on collections of defaulted loans and other receipts as specified in the regulations.  An Operating Fund must be used for application processing, loan disbursement, enrollment and repayment status management, default aversion, collection activities, school and lender training, financial aid awareness and related outreach activities, compliance monitoring, and other student financial aid related activities.  For Subsidized and Unsubsidized Stafford Loans guaranteed on or after July 1, 2006 and first disbursed before July 1, 2010, Guaranty Agencies were required to collect and deposit a federal default fee to the Federal Fund equal to 1.00% of the principal amount of the loan.

The Higher Education Act provides for a recall of reserves from each Federal Fund in certain years, but also provides for certain minimum reserve levels which are protected from recall.  The Secretary is authorized to enter into voluntary, flexible agreements with Guaranty Agencies under which various statutory and regulatory provisions can be waived; provided, however, the Secretary is not authorized to waive, among other items, any deposit of default aversion fees by Guaranty Agencies.  In addition, under the Higher Education Act, the Secretary is prohibited from requiring the return of all of a Guaranty Agency's reserve funds unless the Secretary determines that the return of these funds is in the best interest of the operation of the FFEL Program, or to ensure the proper maintenance of such Guaranty Agency's funds or assets or the orderly termination of the Guaranty Agency's operations and the liquidation of its assets.  The Higher Education Act also authorizes the Secretary to direct a Guaranty Agency to: (a) return to the Secretary all or a portion of its reserve fund which the Secretary determines is not needed to pay for the Guaranty Agency's program fees and contingent liabilities; and (b) cease any activities involving the expenditure, use or transfer of the Guaranty Agency's reserve funds or assets which the Secretary determines is a misapplication, misuse or improper expenditure.

**Lender-of-Last-Resort Program**

The FFEL Program allowed Guaranty Agencies and certain eligible lenders to act as lenders-of-last-resort before July 1, 2010.  A lender-of-last-resort was authorized to receive advances from the Secretary in order to ensure that adequate loan capital exists in order to make loans to students before July 1, 2010.  Students and parents of students who were otherwise unable to obtain FFELP Loans (other than Consolidation Loans) were permitted to apply to receive loans from the state's lenders-of-last-resort before July 1, 2010.

**Education Loans Generally Not Subject To
Discharge in Bankruptcy**

Under the U.S. Bankruptcy Code, educational loans are not generally dischargeable.  Title 11 of the United States Code at Section 523(a)(8)(A)(i)-(ii) provides that a discharge under Section 727, 1141, 1228(a), 1228(b), or 1328(b) of Title 11 of the United States Code does not discharge an individual debtor from any debt for an education benefit overpayment or loan made, insured, or guaranteed by a governmental unit or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend unless excepting such debt from discharge under this section will impose an undue hardship on the debtor and the debtor's dependents.

[THIS PAGE INTENTIONALLY LEFT BLANK]

## APPENDIX B

### WEIGHTED AVERAGE LIVES, EXPECTED MATURITIES AND PERCENTAGES OF ORIGINAL PRINCIPAL REMAINING AT CERTAIN MONTHLY DISTRIBUTION DATES FOR THE NOTES

Prepayments on pools of student loans can be calculated using a variety of models.  Two models are used to calculate prepayments in this Offering Memorandum:  a constant prepayment rate ("CPR") model, and a pricing prepayment curve ("PPC") model.

The CPR model is based on prepayments assumed to occur at a flat, constant prepayment rate.  CPR is stated as an annualized rate and is calculated as the percentage of the loan amount outstanding at the beginning of a period (including accrued interest to be capitalized), after applying scheduled payments, that is prepaid during that period.  The CPR model assumes that student loans will prepay in each month according to the following formula:

Monthly Prepayments = (Principal Balance after scheduled payments) x $(1-(1-CPR)^{1/12})$

Accordingly, monthly prepayments, assuming a $1,000 balance after scheduled payments would be as follows for various levels of CPR:

|  | 0% CPR | 2% CPR | 4% CPR | 6% CPR | 8% CPR |
|---|---|---|---|---|---|
| Monthly Prepayment | $0.00 | $1.68 | $3.40 | $5.14 | $6.92 |

The PPC model is based on a combination of prepayment rates.  In the PPC model, prepayments are calculated as in the CPR model.  For purposes of this Offering Memorandum, 100% PPC implies (a) 4% CPR for consolidation loans, (b) 6% CPR for non-consolidation loans, and (c) 8% CPR for rehabilitation loans.  A rate of "x% PPC" implies the indicated multiple of each such CPR rate for each such loan type.

Neither the CPR model nor the PPC model purports to describe historical prepayment experience or to predict the prepayment rate of any actual student loan pool.  The Financed Eligible Loans will not prepay according to such models, nor will all of the Eligible Loans prepay at the same rate.  Noteholders must make an independent decision regarding the appropriate principal prepayment scenarios to use in making any investment decision.

**Cash Flow Assumptions for Structuring Runs**

The tables below have been prepared based on the assumptions described below (including the assumptions regarding the characteristics and performance of the rep lines, which will differ from the characteristics and performance of the actual pool of Financed Eligible Loans) and should be read in conjunction therewith.  In addition, the diverse characteristics, remaining terms and loan ages of the Financed Eligible Loans could produce slower or faster principal payments than implied by the information in these tables, even if the dispersion of weighted average characteristics, remaining terms and loan ages are the same as the characteristics, remaining terms and loan ages assumed.  Different assumptions will have a material impact on the information presented in this Appendix, and investors should make an independent assessment of the assumptions used herein.

For the purposes of calculating the information presented in the tables in this Appendix, it is assumed, among other things, that:

(a)     the statistical cutoff date for modeling the Financed Eligible Loans is June 30, 2021;

(b)     the Date of Issuance is September 21, 2021;

(c)     the Financed Eligible Loans have an initial principal balance plus accrued interest to be capitalized at issuance of $201,159,098.18 which equates, on a pro-rata basis, to the estimated principal balance plus accrued interest expected to be capitalized on the Date of Issuance;

(d)     all Financed Eligible Loans (as grouped in the "rep lines" described below), with the exception of in-school status loans and in-grace status loans, immediately move to repayment status and immediately capitalize accrued interest expected to be capitalized;

(e)     the Collection Period with respect to a Monthly Distribution Date will be the calendar month preceding such Monthly Distribution Date, with the first period being from the Date of Issuance to October 31, 2021;

(f)     none of the Financed Eligible Loans move into deferment or forbearance status;

(g)     the Financed Eligible Loans that are subsidized Stafford loans or subsidized Consolidation loans and are in-school, grace or deferment status have interest paid (Interest Subsidy Payments) by the U.S. Department of Education quarterly, based on a quarterly calendar accrual period;

(h)     there are government payment delays of 60 days for Interest Subsidy Payments and Special Allowance Payments;

(i)     no delinquencies or defaults occur on any of the Financed Eligible Loans, no repurchases occur, and all borrower payments are collected in full;

(j)     there are no minimum monthly payments from the borrowers;

(k)     index levels for calculation of borrower and government payments and interest rates on the Notes are:

(i)     91-day Treasury bill bond equivalent rate of 0.05%;

(ii)     One-Month LIBOR rate of 0.09%;

(l)     monthly distributions begin on November 25, 2021, and are made monthly on the twenty-fifth day of every month thereafter, whether or not the twenty-fifth is a Business Day;

(m)     the initial par amount of the Class A-1A Notes and the interest rate for the Class A-1A Notes at all times will equal: $15,000,000 and 1.58%, the initial par amount of the Class A-1B Notes and the interest rate for the Class A-1B Notes at all times will equal: $178,000,000 and 0.66% and the initial par amount of the Class B Notes and the interest rate for the Class B Notes at all times will equal $4,500,000 and 1.24%;

(n)      interest accrues on the Class A-1A Notes on a 30/360-day count basis and on the Class A-1B Notes and Class B Notes on an actual/360-day count basis (the initial Interest Accrual Period for the Notes begins on the Date of Issuance and ends on November 24, 2021);

(o)      the Administration Fees to be paid monthly are equal to 1/12 of 0.05% per annum on the outstanding principal balance of the Financed Eligible Loans and assumed to begin November 25, 2021 (the Administrative Fee for first Monthly Distribution Date is based on 40 days assuming a 360-day year);

(p)      the Servicing Fees to be paid monthly beginning on November 25, 2021 are equal to the greater of (1) 1/12 of 0.80% per annum on the outstanding principal balance of the Financed Eligible Loans with no inflation adjustment, and (ii) $2.50 per borrower per month, subject to 3% inflation per annum each January, starting January 2022;

(q)      a Program Fee equal to $100,000 per annum is paid each September beginning September 25, 2022;

(r)      a Trustee Fee equal to 0.03% per annum of the outstanding principal balance of the Financed Eligible Loans is paid each quarter beginning December 25, 2021 based on the outstanding Note balance as of the beginning of the period for which such fees are paid;

(s)      a Monthly Consolidation Rebate Fee equal to 1.05% per annum of the aggregate outstanding principal balance of the Financed Eligible Loans that are Consolidation loans is paid monthly by the Issuer to the Department of Education and no payment delays are assumed;

(t)      the Reserve Fund has an initial balance equal to $1,307,534.14, and at all times a balance equal to the greater of (i) 0.65% of the Pool Balance as of the close of business on the last day of the immediately preceding Collection Period and (ii) $201,159;

(u)      the Capitalized Interest Fund has an initial balance equal to $6,000,000; on the September 2023 Monthly Distribution Date, any amounts remaining in the Capitalized Interest Fund in excess of $4,400,000 shall be transferred to the Collection Fund; on the September 2025 Monthly Distribution Date, any amounts remaining in the Capitalized Interest Fund in excess of $2,400,000 shall be transferred to the Collection Fund; and on the September 2027 Monthly Distribution Date, any amounts remaining in the Capitalized Interest Fund shall be transferred to the Collection Fund and the Capitalized Interest Fund will be closed;

(v)      amounts on deposit in any of the Funds or Accounts are not assumed to be reinvested;

(w)      receipts received on the first of any month are assumed to be available for distribution on the immediately succeeding distribution date;

(x)      prepayments on the Financed Eligible Loans are applied monthly in accordance with CPR or PPC, as described above;

(y)      optional redemption from a sale of Financed Eligible Loans occurs when the outstanding Pool Balance is 10% or less of the initial Pool Balance;

(z)      the Issuer makes no other purchases or originations of Eligible Loans under the Indenture; and

(aa)     the initial pool of Financed Eligible Loans was grouped into 169 representative loans ("rep lines"), which have been created, for modeling purposes, from individual Financed Eligible Loans based on combinations of similar individual Financed Eligible Loans characteristics, which include, but are not limited to, interest rate, loan type, SAP index and applicable margin, repayment status and remaining term.

The tables below have been prepared based on the assumptions described above (including the assumptions regarding the characteristics and performance of the rep lines, which will differ from the characteristics and performance of the actual pool of Financed Eligible Loans) and should be read in conjunction therewith.   In addition, the diverse characteristics, remaining terms and loan ages of the Financed Eligible Loans could produce slower or faster principal payments than implied by the information in these tables, even if the dispersions of weighted average characteristics, remaining terms and loan ages are the same as the characteristics, remaining terms and loan ages assumed.

**Weighted Average Lives and Expected Maturity Dates**
**of the Class A-1A Notes at Various Percentages of the PPC Model[1]**

| | Weighted Average Life (Years) [2] | | | | |
|---|---|---|---|---|---|
| | **0% PPC** | **50% PPC** | **100% PPC** | **150% PPC** | **200% PPC** |
| Class A-1A Notes | 7.53 | 6.66 | 6.08 | 5.42 | 4.86 |

| | Expected Maturity Date | | | | |
|---|---|---|---|---|---|
| | **0% PPC** | **50% PPC** | **100% PPC** | **150% PPC** | **200% PPC** |
| Class A-1A Notes | November 2035 | February 2036 | April 2034 | June 2033 | September 2032 |

---

[1]  Assuming for purposes of this table that, among other things, the optional redemption occurs on the Monthly Distribution Date immediately following the date on which the Pool Balance is less than or equal to 10% of the initial Pool Balance.

[2] The weighted average life of the Class A-1A Notes (assuming a 360-day year consisting of twelve 30-day months) is determined by:  (a) multiplying the amount of each principal payment on the Class A-1A Notes by the number of years from the Date of Issuance to the related Monthly Distribution Date, (b) adding the results, and (c) dividing that sum by the aggregate principal amount of the Class A-1A Notes as of the Date of Issuance.

[Remainder of page intentionally left blank]

**Weighted Average Lives and Expected Maturity Dates**
**of the Class A-1B Notes at Various Percentages of the PPC Model[1]**

**Weighted Average Life (Years) [2]**

|  | 0% PPC | 50% PPC | 100% PPC | 150% PPC | 200% PPC |
|---|---|---|---|---|---|
| Class A-1B Notes | 7.53 | 6.66 | 6.08 | 5.42 | 4.86 |

**Expected Maturity Date**

|  | 0% PPC | 50% PPC | 100% PPC | 150% PPC | 200% PPC |
|---|---|---|---|---|---|
| Class A-1B Notes | November 2035 | February 2035 | April 2034 | June 2033 | September 2032 |

[1]  Assuming for purposes of this table that, among other things, the optional redemption occurs on the Monthly Distribution Date immediately following the date on which the Pool Balance is less than or equal to 10% of the initial Pool Balance.
[2] The weighted average life of the Class A-1B Notes (assuming a 360-day year consisting of twelve 30-day months) is determined by:  (a) multiplying the amount of each principal payment on the Class A-1B Notes by the number of years from the Date of Issuance to the related Monthly Distribution Date, (b) adding the results, and (c) dividing that sum by the aggregate principal amount of the Class A-1B Notes as of the Date of Issuance.

**Weighted Average Lives and Expected Maturity Dates**
**of the Class B Notes at Various Percentages of the PPC Model[1]**

**Weighted Average Life (Years) [2]**

|  | 0% PPC | 50% PPC | 100% PPC | 150% PPC | 200% PPC |
|---|---|---|---|---|---|
| Class B Notes | 14.18 | 13.43 | 12.59 | 11.76 | 11.01 |

**Expected Maturity Date**

|  | 0% PPC | 50% PPC | 100% PPC | 150% PPC | 200% PPC |
|---|---|---|---|---|---|
| Class B Notes | November 2035 | February 2035 | April 2034 | June 2033 | September 2032 |

[1]  Assuming for purposes of this table that, among other things, the optional redemption occurs on the monthly distribution date immediately following the date on which the Pool Balance is less than or equal to 10% of the initial Pool Balance.
[2] The weighted average life of the Class B Notes (assuming a 360-day year consisting of twelve 30-day months) is determined by:  (a) multiplying the amount of each principal payment on the Class B Notes by the number of years from the Date of Issuance to the related Monthly Distribution Date, (b) adding the results, and (c) dividing that sum by the aggregate principal amount of the Class B Notes as of the Date of Issuance.

[Remainder of page intentionally left blank]

**Percentages of Original Principal Amount of the Class A-1A Notes Remaining at Certain Monthly Distribution Dates at Various Percentages of the PPC[*]**

| Dates | 0% PPC | 50% PPC | 100% PPC | 150% PPC | 200% PPC |
|---|---|---|---|---|---|
| Date of Issuance | 100% | 100% | 100% | 100% | 100% |
| September 25, 2022 | 96 | 94 | 92 | 90 | 88 |
| September 25, 2023 | 90 | 86 | 82 | 78 | 75 |
| September 25, 2024 | 84 | 78 | 73 | 68 | 63 |
| September 25, 2025 | 77 | 70 | 64 | 57 | 52 |
| September 25, 2026 | 71 | 63 | 56 | 49 | 43 |
| September 25, 2027 | 62 | 54 | 47 | 40 | 34 |
| September 25, 2028 | 55 | 46 | 40 | 33 | 27 |
| September 25, 2029 | 47 | 38 | 33 | 26 | 21 |
| September 25, 2030 | 39 | 31 | 26 | 20 | 15 |
| September 25, 2031 | 31 | 23 | 20 | 15 | 10 |
| September 25, 2032 | 22 | 16 | 14 | 10 | 0 |
| September 25, 2033 | 14 | 10 | 9 | 0 | 0 |
| September 25, 2034 | 8 | 5 | 0 | 0 | 0 |
| September 25, 2035 | 3 | 0 | 0 | 0 | 0 |
| September 25, 2036 | 0 | 0 | 0 | 0 | 0 |

_____

[*]Assuming for purposes of this table that, among other things, the optional redemption does occur.

**Percentages of Original Principal Amount of the Class A-1B Notes Remaining at Certain Monthly Distribution Dates at Various Percentages of the PPC[*]**

| Dates | 0% PPC | 50% PPC | 100% PPC | 150% PPC | 200% PPC |
|---|---|---|---|---|---|
| Date of Issuance | 100% | 100% | 100% | 100% | 100% |
| September 25, 2022 | 96 | 94 | 92 | 90 | 88 |
| September 25, 2023 | 90 | 86 | 82 | 78 | 75 |
| September 25, 2024 | 84 | 78 | 73 | 68 | 63 |
| September 25, 2025 | 77 | 70 | 64 | 57 | 52 |
| September 25, 2026 | 71 | 63 | 56 | 49 | 43 |
| September 25, 2027 | 62 | 54 | 47 | 40 | 34 |
| September 25, 2028 | 55 | 46 | 40 | 33 | 27 |
| September 25, 2029 | 47 | 38 | 33 | 26 | 21 |
| September 25, 2030 | 39 | 31 | 26 | 20 | 15 |
| September 25, 2031 | 31 | 23 | 20 | 15 | 10 |
| September 25, 2032 | 22 | 16 | 14 | 10 | 0 |
| September 25, 2033 | 14 | 10 | 9 | 0 | 0 |
| September 25, 2034 | 8 | 5 | 0 | 0 | 0 |
| September 25, 2035 | 3 | 0 | 0 | 0 | 0 |
| September 25, 2036 | 0 | 0 | 0 | 0 | 0 |

_____

[*]Assuming for purposes of this table that, among other things, the optional redemption does occur.

**Percentages of Original Principal Amount of the Class B Notes Remaining at Certain Monthly
Distribution Dates at Various Percentages of the PPC**[*]

| Dates | 0% PPC | 50% PPC | 100% PPC | 150% PPC | 200% PPC |
|---|---|---|---|---|---|
| Date of Issuance | 100% | 100% | 100% | 100% | 100% |
| September 25, 2022 | 100 | 100 | 100 | 100 | 100 |
| September 25, 2023 | 100 | 100 | 100 | 100 | 100 |
| September 25, 2024 | 100 | 100 | 100 | 100 | 100 |
| September 25, 2025 | 100 | 100 | 100 | 100 | 100 |
| September 25, 2026 | 100 | 100 | 100 | 100 | 100 |
| September 25, 2027 | 100 | 100 | 100 | 100 | 100 |
| September 25, 2028 | 100 | 100 | 100 | 100 | 100 |
| September 25, 2029 | 100 | 100 | 100 | 100 | 100 |
| September 25, 2030 | 100 | 100 | 100 | 100 | 100 |
| September 25, 2031 | 100 | 100 | 100 | 100 | 100 |
| September 25, 2032 | 100 | 100 | 100 | 100 | 0 |
| September 25, 2033 | 100 | 100 | 100 | 0 | 0 |
| September 25, 2034 | 100 | 100 | 0 | 0 | 0 |
| September 25, 2035 | 100 | 0 | 0 | 0 | 0 |
| September 25, 2036 | 0 | 0 | 0 | 0 | 0 |

_____

[*]Assuming for purposes of this table that, among other things, the optional redemption does occur.

[THIS PAGE INTENTIONALLY LEFT BLANK]

## APPENDIX C

## FORM OF CONTINUING DISCLOSURE AGREEMENT

**THIS CONTINUING DISCLOSURE AGREEMENT** (the "Continuing Disclosure Agreement") is executed and delivered by the Higher Education Loan Authority of the State of Missouri (the "Obligated Person") in connection with the issuance of $197,500,000 aggregate principal amount of its Taxable Student Loan Asset-Backed Notes, Series 2021-3, consisting of its Senior Series 2021-3A-1A Notes, Senior Series 2021-3A-1B and Subordinate Series 2021-3B Notes (collectively, the "Series 2021-3 Notes"). The Series 2021-3 Notes are being issued pursuant to an Indenture of Trust, dated as of September 1, 2021 (the "Indenture"), between the Obligated Person and U.S. Bank National Association, as trustee (the "Trustee"). The Obligated Person undertakes and agrees as follows:

**Section 1.     Purpose of the Continuing Disclosure Agreement**. This Continuing Disclosure Agreement is being executed and delivered by the Obligated Person for the benefit of the Noteholders and beneficial owners of the Series 2021-3 Notes and in order to assist the Underwriter (as defined below) in complying with the Rule (as defined below).

**Section 2.     Definitions**. In addition to the definitions set forth in the Indenture, which apply to any capitalized term used in this Continuing Disclosure Agreement unless otherwise defined in this Section, the following capitalized terms shall have the following meanings:

"*Annual Financial Information*" shall mean any Annual Financial Information provided by the Obligated Person pursuant to, and as described in, Sections 3 and 4 of this Continuing Disclosure Agreement.

"*Disclosure Representative*" shall mean the Treasurer of the Obligated Person or his or her designee, or such other person as the Obligated Person shall designate.

"*Dissemination Agent*" shall mean any Dissemination Agent designated by the Obligated Person.

"*EMMA*" means the Electronic Municipal Market Access facility for municipal securities disclosure of the MSRB.

"*Financial Obligation*" means (a) a debt obligation, (b) a derivative instrument entered into in connection with, or pledged as security or a source of payment for, an existing or planned debt obligation, or (c) a guarantee of either clause (a) or (b) above. The term "Financial Obligation" shall not include municipal securities as to which a final official statement has been provided to the MSRB consistent with the Rule.

"*Listed Event*" shall mean any of the events listed in Section 5(a) of this Continuing Disclosure Agreement.

"*MSRB*" shall mean the Municipal Securities Rulemaking Board, and any successors or assigns, or any other entities or agencies approved under the Rule.

"*Offering Memorandum*" shall mean the Offering Memorandum, dated September 9, 2021, of the Obligated Person with respect to its offering of the Series 2021-3 Notes.

"*Repository*" shall mean, until otherwise designated by the SEC, the Electronic Municipal Market Access website of the MSRB located at http://emma.msrb.org.

"*Rule*" shall mean Rule 15c2-12 adopted by the SEC under the Securities Exchange Act of 1934, as amended, as such rule may be amended from time to time.

"*SEC*" shall mean the United States Securities and Exchange Commission.

"*Underwriter*" means the "participating underwriter" as that term is defined in the Rule, and in relation to the Series 2021-3 Notes, shall mean BofA Securities, Inc. or any successors known to the Obligated Person.

**Section 3.     Provision of Annual Financial Information**.

(a)     The Obligated Person shall, or shall cause the Dissemination Agent to, not later than 180 days after the end of the Obligated Person's fiscal year, commencing with the report of the fiscal year ending June 30, 2021, provide to the Repository, at www.emma.msrb.org, in such electronic format accompanied by such identifying information (the "Prescribed Form") as shall have been prescribed by the MSRB and which shall be in effect on the date of filing of such information, the Annual Financial Information which is consistent with the requirements of Section 4 of this Continuing Disclosure Agreement.

(b)     The Annual Financial Information may be submitted as a single document or as separate documents comprising a package, or by specific cross reference to other documents which have been submitted to the Repository and available to the public on the Repository's website or filed with the SEC. If the document so referenced is a final offering document within the meaning of the Rule, such final offering document must be available from the Repository.  The Obligated Person shall clearly identify each such other document so incorporated by cross-reference.

(c)     If the financial statements of the Obligated Person are audited, the audited financial statements of the Obligated Person must be submitted if and when available but may be submitted separately from the balance of the Annual Financial Information and later than the date required above for the filing of the Annual Financial Information if they are not available by that date.

**Section 4.     Content of Annual Financial Information**.  The Obligated Person's Annual Financial Information shall contain or incorporate by reference the following:

(a)     annual financial statements prepared in accordance with accounting principles generally accepted in the United States of America;

(b)     an update and a discussion of the financial information and operating data in the Offering Memorandum under the heading "HIGHER EDUCATION LOAN AUTHORITY OF THE STATE OF MISSOURI—Members and Staff," "—Previous Financings of the Issuer" and "—Lewis and Clark Discovery Initiative; Scholarship Funding"; and under the heading "CHARACTERISTICS OF THE FINANCED ELIGIBLE LOANS";

(c)     The following Indenture information:

(i)     balances in the Capitalized Interest Fund, the Collection Fund, the Department SAP Rebate Fund and the Reserve Fund; and

(ii)     outstanding principal amount of the Series 2021-3 Notes of each class issued under the Indenture then outstanding; and

(d)　　changes to the Higher Education Act having a special financial impact on the program of the Obligated Person financed by the Series 2021-3 Notes which is not generally experienced in the student loan sector.

**Section 5.　　Reporting of Significant Events**.

(a)　　Pursuant to the provisions of this Section, the Obligated Person shall give, or cause to be given, on behalf of itself and any other persons providing undertakings under the Rule with respect to the Series 2021-3 Notes, notice to the Repository of the occurrence of any of the following events with respect to the Series 2021-3 Notes:

(i)　　principal and interest payment delinquencies;

(ii)　　non-payment related defaults, if material;

(iii)　　unscheduled draws on debt service reserves reflecting financial difficulties;

(iv)　　unscheduled draws on credit enhancements reflecting financial difficulties;

(v)　　substitution of credit or liquidity providers, or their failure to perform;

(vi)　　adverse tax opinions, the issuance by the Internal Revenue Service of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the Series 2021-3 Notes, or other material events affecting the Series 2021-3 Notes;

(vii)　　modifications to rights of Noteholders of the Series 2021-3 Notes, if material;

(viii)　　any call of any Series 2021-3 Notes, if material, and tender offers;

(ix)　　defeasances;

(x)　　release, substitution or sale of property securing repayment of the Series 2021-3 Notes, if material;

(xi)　　rating changes;

(xii)　　bankruptcy, insolvency, receivership, or similar event of the Obligated Person;

(xiii)　　the consummation of a merger, consolidation, or acquisition involving an Obligated Person or the sale of all or substantially all of the assets of the Obligated Person, other than in the ordinary course of business, the entry into a definitive agreement to undertake such an action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms, if material;

(xiv)　　appointment of a successor or additional trustee or the change of name of a trustee, if material;

(xv)　　incurrence of a Financial Obligation of the Obligated Person, if material, or agreement to covenants, events of default, remedies, priority rights, or other similar

terms of a Financial Obligation of the Obligated Person, any of which affect security holders, if material; and

(xvi)    default, event of acceleration, termination event, modification of terms, or other similar events under the terms of a Financial Obligation of the Obligated Person, any of which reflect financial difficulties.

(b)    If the Obligated Person obtains knowledge of the occurrence of a Listed Event, the Obligated Person shall file, in a timely manner not in excess of ten (10) Business Days after the occurrence of the Listed Event, a notice of such occurrence in Prescribed Form with EMMA.

(c)    The Obligated Person shall provide, in a timely manner, to the MSRB in Prescribed Form in accordance with EMMA, notice of any failure of the Obligated Person to timely provide the Annual Financial Information as specified in Section 4 hereof.

(d)    If the Obligated Person changes its fiscal year, it shall provide in Prescribed Form notice of the change of fiscal year to the Trustee and to the MSRB.

**Section 6.       Termination of Reporting Obligation**.  The Obligated Person's obligations under this Continuing Disclosure Agreement shall terminate upon the earliest to occur of (a) the legal defeasance, prior redemption or payment in full of all of the Series 2021-3 Notes; or (b) the date that the Obligated Person shall no longer constitute an  "obligated person" with respect to the Series 2021-3 Notes within the meaning of the Rule (or, if later, the date on which the Obligated Person determines to no longer voluntarily comply with the Rule in the event that the Rule does not apply to the Series 2021-3 Notes at the time).  The Obligated Person shall file a notice of any such termination with the Repository in the Prescribed Form in accordance with EMMA.

**Section 7.       Dissemination Agent**.  The Obligated Person may, from time to time, appoint or engage a Dissemination Agent to assist it in carrying out its obligations under this Continuing Disclosure Agreement, and may discharge any such Dissemination Agent, with or without appointing a successor Dissemination Agent.

**Section 8.       Amendment: Waiver**.  Notwithstanding any other provision of this Continuing Disclosure Agreement, the Obligated Person may amend this Continuing Disclosure Agreement, and any provision of this Continuing Disclosure Agreement may be waived, if such amendment or waiver is consistent with the Rule, as determined by an opinion of counsel experienced in federal securities laws selected by the Obligated Person.  Written notice of any such amendment or waiver shall be provided by the Obligated Person to the MSRB in Prescribed Form in accordance with EMMA, and the next Annual Financial Information shall explain in narrative form the reasons for the amendment and the impact of any change in the type of information being provided.  If any amendment changes the accounting principles to be followed in preparing financial statements, the Annual Financial Information for the year in which the change is made will present a comparison between the financial statement or information prepared on the basis of the new accounting principles and those prepared on the basis of the former accounting principles.

**Section 9.       Additional Information**.  Nothing in this Continuing Disclosure Agreement shall be deemed to prevent the Obligated Person from disseminating any other information, using the means of dissemination set forth in this Continuing Disclosure Agreement or any other means of communication, or including any other information in any Annual Financial Information or notice of occurrence of a Listed Event, in addition to that which is required by this Continuing Disclosure Agreement.  If the Obligated Person chooses to include any information in any Annual Financial Information or notice of occurrence of a Listed Event, in addition to that which is specifically required by this Continuing Disclosure Agreement,

the Obligated Person shall have no obligation under this Continuing Disclosure Agreement to update such information or include it in any future Annual Financial Information or notice of occurrence of a Listed Event.

Section 10.    **Default**.  In the event of a failure of the Obligated Person to comply with any provision of this Continuing Disclosure Agreement, any Noteholder or beneficial owner of the Series 2021-3 Notes may take such actions as may be necessary and appropriate, including seeking mandate or specific performance by court order, to cause the Obligated Person to comply with its obligations under this Continuing Disclosure Agreement.  A default under this Continuing Disclosure Agreement shall not be deemed an Event of Default under the Indenture, and the sole remedy under this Continuing Disclosure Agreement in the event of any failure of the Obligated Person to comply with this Continuing Disclosure Agreement shall be an action to compel performance.

Section 11.    **Beneficiaries**.  This Continuing Disclosure Agreement shall inure solely to the benefit of the Obligated Person, the Dissemination Agent, the Underwriter, the Noteholders and beneficial owners from time to time of the Series 2021-3 Notes and shall create no rights in any other person or entity.

Date: September 21, 2021

HIGHER EDUCATION LOAN AUTHORITY
OF THE STATE OF MISSOURI

By _____
Name _____
Title _____

C-5

[THIS PAGE INTENTIONALLY LEFT BLANK]

Higher Education Loan Authority of the State of Missouri • Taxable Student Loan Asset-Backed Notes, Series 2021-3



Mixed Sources
Product group from well managed
forests, controlled sources and
recycled wood or fibres.

Printed by: ImageMaster, LLC
www.imagemaster.com

# EXHIBIT

# B

**SOLICITATION/CONTRACT/ORDER FOR COMMERCIAL ITEMS**
*OFFEROR TO COMPLETE BLOCKS 12, 17, 23, 24, & 30*

| | | | | 1. REQUISITION NUMBER | | PAGE 1 OF 2 |
|---|---|---|---|---|---|---|

| 2. CONTRACT NO. | 3. AWARD/EFFECTIVE DATE | 4. ORDER NUMBER | 5. SOLICITATION NUMBER | 6. SOLICITATION ISSUE DATE |
|---|---|---|---|---|
| ED-FSA-11-D-0012 | SEP 27, 2011 | | | |

| 7. FOR SOLICITATION INFORMATION CALL: | a. NAME<br>Nicholas Chung<br>nicholas.chung@ed.gov | b. TELEPHONE NUMBER *(No collect calls)*<br>202-377-3635 | 8. OFFER DUE DATE/ LOCAL TIME |
|---|---|---|---|

| 9. ISSUED BY | CODE | FSA-FS2 | 10. THIS ACQUISITON IS |
|---|---|---|---|

United States Department of Education
Federal Student Aid/Mission Support Group
830 First St NE - Suite 91F3
Washington DC 20202

☐ UNRESTRICTED OR   ☐ SET ASIDE:   % FOR:
☐ SMALL BUSINESS   ☐ EMERGING SMALL BUSINESS
☐ HUBZONE SMALL BUSINESS
NAICS:
SIZE STANDARD:   ☐ SERVICE-DISABLED VETERAN- OWNED SMALL BUSINESS   ☐ 8(A)

| 11. DELIVERY FOR FOB DESTINA- TION UNLESS BLOCK IS MARKED<br><br>☐ SEE SCHEDULE | 12. DISCOUNT TERMS<br>Net 30 | 13a.   THIS CONTRACT IS A RATED ORDER UNDER OPAS (15 CFR 700) | 13b. RATING |
|---|---|---|---|
| | | 14. METHOD OF SOLICITATION<br>☐ RFQ   ☐ IFB   ☐ RFP | |

| 15. DELIVER TO | CODE | 16. ADMINISTERED BY | CODE | FSA-FS2 |
|---|---|---|---|---|

United States Department of Education
Federal Student Aid/Mission Support Group
830 First St NE - Suite 91F3
Washington DC 20202

| 17a CONTRACTOR/ OFFEROR | CODE 00032048 | FACILITY CODE | 18a. PAYMENT WILL BE MADE BY | CODE |
|---|---|---|---|---|

MISSOURI HIGHER EDUCATION LOAN AUTHORITY
633 SPIRIT DR
CHESTERFIELD MO 630051243

CAGE:   41YN3
TIN:   431261525        DUNS:   189398138
TELEPHONE NO.

☐ 17b.  CHECK IF REMITTANCE IS DIFFERENT AND PUT SUCH ADDRESS IN OFFER

18b.   SUBMIT INVOICES TO ADDRESS SHOWN IN BLOCK 18a UNLESS BLOCK BELOW IS CHECKED   ☒ SEE ADDENDUM

| 19. ITEM NO. | 20. SCHEDULE OF SUPPLIES/SERVICES | 21. QUANTITY | 22. UNIT | 23. UNIT PRICE | 24. AMOUNT |
|---|---|---|---|---|---|
| Please | see continuation page for line item details. | | | | |

*(Use Reverse and/or Attach Additional Sheets as Necessary)*

| 25. ACCOUNTING AND APPROPRIATION DATA<br>See Schedule | 26. TOTAL AWARD AMOUNT *(For Govt. Use Only)*<br>$0.00 |
|---|---|

| ☒ 27a. SOLICITATION INCORPORATES BY REFERENCE FAR 52.212-1, 52.212-4, FAR 52.212-3 AND 52.212-5 ARE ATTACHED. ADDENDA | ☐ ARE | ☒ ARE NOT ATTACHED |
|---|---|---|
| ☐ 27b. CONTRACT/PURCHASE ORDER INCORPORATES BY REFERENCE FAR 52.212-4, FAR 52.212-5 IS ATTACHED. ADDENDA | ☒ ARE | ☐ ARE NOT ATTACHED |

☐ 28. CONTRACTOR IS REQUIRED TO SIGN THIS DOCUMENT AND RETURN _____ COPIES TO ISSUING OFFICE. CONTRACTOR AGREES TO FURNISH AND DELIVER ALL ITEMS SET FORTH OR OTHERWISE IDENTIFIED ABOVE AND ON ANY ADDITIONAL SHEETS SUBJECT TO THE TERMS AND CONDITIONS SPECIFIED

☐ 29. AWARD OF CONTRACT:  REF. _____ OFFER DATED _____ . YOUR OFFER ON SOLICITATION (BLOCK 5), INCLUDING ANY ADDITIONS OR CHANGES WHICH ARE SET FORTH HEREIN, IS ACCEPTED AS TO ITEMS:

| 30a. SIGNATURE OF OFFEROR/CONTRACTOR | 31a. UNITED STATES OF AMERICA *(SIGNATURE OF CONTRACTING OFFICER)* |
|---|---|

| 30b. NAME AND TITLE OF SIGNER *(Type or print)* | 30c. DATE SIGNED<br>9/27/2011 | 31b. NAME OF CONTRACTING OFFICER *(Type or print)*<br>Mike Whisler<br>mike.whisler@ed.gov | 31c. DATE SIGNED<br>SEP 27, 2011 |
|---|---|---|---|

AUTHORIZED FOR LOCAL REPRODUCTION
PREVIOUS EDITION IS NOT USABLE

STANDARD FORM 1449 (REV. 3/2005)
Prescribed by GSA - FAR (48 CFR) 53.212

| 19. ITEM NO. | 20. SCHEDULE OF SUPPLIES/SERVICES | 21. QUANTITY | 22. UNIT | 23. UNIT PRICE | 24. AMOUNT |
|---|---|---|---|---|---|
| | | | | | |

**32a. QUANTITY IN COLUMN 21 HAS BEEN**

☐ RECEIVED    ☐ INSPECTED    ☐ ACCEPTED, AND CONFORMS TO THE CONTRACT, EXCEPT AS NOTED: _____

| 32b. SIGNATURE OF AUTHORIZED GOVERNMENT REPRESENTATIVE | 32c. DATE | 32d. PRINTED NAME AND TITLE OF AUTHORIZED GOVERNMENT REPRESENTATIVE |
|---|---|---|
| 32e. MAILING ADDRESS OF AUTHORIZED GOVERNMENT REPRESENTATIVE | | 32f. TELPHONE NUMBER OF AUTHORZED GOVERNMENT REPRESENTATIVE |
| | | 32g. E-MAIL OF AUTHORIZED GOVERNMENT REPRESENTATIVE |

| 33. SHIP NUMBER | 34. VOUCHER NUMBER | 35. AMOUNT VERIFIED CORRECT FOR | 36. PAYMENT | | 37. CHECK NUMBER |
|---|---|---|---|---|---|
| ☐ PARTIAL  ☐ FINAL | | | ☐ COMPLETE  ☐ PARTIAL  ☐ FINAL | | |
| 38. S/R ACCOUNT NO. | 39. S/R VOUCHER NUMBER | 40. PAID BY | | | |

| 41a. I CERTIFY THIS ACCOUNT IS CORRECT AND PROPER FOR PAYMENT | | 42a. RECEIVED BY *(Print)* |
|---|---|---|
| 41b. SIGNATURE AND TITLE OF CERTIFYING OFFICER | 41c. DATE | 42b. RECEIVED AT *(Location)* |
| | | 42c. DATE REC'D *(YY/MM/DD)* — 42d. TOTAL CONTAINERS |

**STANDARD FORM 1449** (REV. 3/2005) **BACK**

## A.    ADDENDUM 1 – SF 1449 CONTINUATION PAGE

### A.1    Schedule of Supplies/Services

**For the first 100,000 allocated borrower accounts ONLY, the following pricing shall apply:**

| CLIN | Category | Unit Price | | Min. Order | Max. Order |
|------|----------|-----------:|---|:----:|------------|
| 0001 | Borrowers in In-school Status | $ | 1.150 | 1 | 10 million |
| 0002 | Borrowers in Grace or Current Repayment Status | $ | 2.320 | 1 | 10 million |
| 0003 | Borrowers in Deferment or Forbearance | $ | 2.280 | 1 | 10 million |
| 0004 | Borrowers 31-90 Days Delinquent | $ | 1.780 | 1 | 10 million |
| 0005 | Borrowers 91-150 Days Delinquent | $ | 1.650 | 1 | 10 million |
| 0006 | Borrowers 151-270 Days Delinquent | $ | 1.510 | 1 | 10 million |
| 0007 | Borrowers 270+ Days Delinquent | $ | 0.550 | 1 | 10 million |
| 0008 | On-System Conversion Fees (Per Borrower Account)* | $ | 10.000 | 1 | 10 million |
| 0009 | Incurred Start-Up Costs (Per Entity)** | Up to $300,000 | | 1 | 10 million |

*\*Applies to the first 100,000 borrower accounts each Entity loads onto its system for servicing. Billable only after actual conversion of accounts has occurred. No costs for off-system conversions/transfers shall apply.*

*\*\*Reimbursable ceiling amount for actual, reasonable, allowable, and allocable costs incurred in meeting the Government's stated requirements, in accordance with FAR 31.201. All costs under this category shall be subject to audit, and are only reimbursable after contract award.*

**For all borrower accounts above the first 100,000 allocated accounts, the following pricing shall apply:**

| CLIN | Status | Volume Low | Volume High | Unit Price | | Min. Order | Max. Order |
|------|--------|:----------:|:-----------:|-----------:|---|:----:|------------|
| 0010 | Borrowers in In-school Status | | | $ | 1.050 | 1 | 10 million |
| 0011 | Borrowers in Grace or Current Repayment Status | 1 | 3,000,000 | $ | 2.110 | 1 | 10 million |
| 0012 | | 3,000,001 | UP | $ | 1.900 | 1 | 10 million |
| 0013 | Borrowers in Deferment or Forbearance | 1 | 1,600,000 | $ | 2.070 | 1 | 10 million |
| 0014 | | 1,600,001 | UP | $ | 1.730 | 1 | 10 million |
| 0015 | Borrowers 31-90 Days Delinquent | | | $ | 1.620 | 1 | 10 million |
| 0016 | Borrowers 91-150 Days Delinquent | | | $ | 1.500 | 1 | 10 million |
| 0017 | Borrowers 151-270 | | | $ | 1.370 | 1 | 10 million |

| | | | | | | | |
|------|------------------------|--|--|---|-------|---|------------|
| | Days Delinquent | | | | | | |
| 0018 | Borrowers 270+ Days Delinquent | | | $ | 0.500 | 1 | 10 million |

Entities shall be responsible for the accurate tracking and proper invoicing of its borrower accounts, in accordance with the pricing structure above.

In accordance with Section B.12.N.I4, once two (2) million borrower accounts have been collectively allocated under this contract, pricing for ALL borrower accounts (including the initial 100,000 allocation) shall revert to the pricing found in CLINs 0010 through 0018 above, as applicable.  Pricing provided in CLINs 0001 through 0009 shall no longer apply.

**B.     ADDENDUM 2 – 52.212-4, CONTRACT TERMS AND CONDITIONS—
COMMERCIAL ITEMS (MAR 2009)**

**B.1     52.212-4      Contract Terms And Conditions—Commercial Items (Mar 2009)—
            TAILORED**

(c)(1)  *Changes.* The Contracting Officer may at any time, by written order, and without notice
        to the sureties, if any, make changes within the general scope of this contract in any one
        or more of the following:

          (i)      Description of services to be performed.
          (ii)     Time of performance (i.e., hours of the day, days of the week, etc.).
          (iii)    Place of performance of the services.

    (2)    If any such change causes an increase or decrease in the cost of, or the time
        required for, performance of any part of the work under this contract, whether or
        not changed by the order, the Contracting Officer shall make an equitable
        adjustment in the contract price, the delivery schedule, or both, and shall modify
        the contract.

    (3)    The Contractor must assert its right to an adjustment under this clause within 30
        days from the date of receipt of the written order. However, if the Contracting
        Officer decides that the facts justify it, the Contracting Officer may receive and
        act upon a proposal submitted before final payment of the contract.

    (4)    If the Contractor's proposal includes the cost of property made obsolete or excess
        by the change, the Contracting Officer shall have the right to prescribe the manner
        of the disposition of the property.

(5)     Failure to agree to any adjustment shall be a dispute under the Disputes clause. However,
nothing in this clause shall excuse the Contractor from proceeding with the contract as changed.

**B.2     52.232-18      Availability of Funds (Apr 1984) – TAILORED**

The Government's obligation for performance of this contract is contingent upon the availability
of "Mandatory Funds" under Section 2212(b) of the Health Care and Education Reconciliation
Act of 2010 (Pub.L. 111-152, 124 Stat. 1029), from which payment for contract purposes can be
made. No legal liability on the part of the Government for any payment may arise for
performance under this contract beyond the current expiration of the "Mandatory Funds", and
until the Contractor receives notice of availability, to be confirmed in writing by the Contracting
Officer.

**B.3     52.252-2       Clauses Incorporated By Reference (APR 2010)**

This contract incorporates one or more clauses by reference, with the same force and effect as if
they were given in full text. Upon request, the Contracting Officer will make their full text
available. The full text of a clause may also be accessed electronically at:
https://www.acquisition.gov/Far/

- 52.203-13     Contractor Code of Business Ethics and Conduct (Dec 2008)
- 52.203-14     Display of Hotline Poster(s) (Dec 2007)
- 52.204-10     Reporting Executive Compensation and First Tier Subcontracts Award
                (Jul 2010)
- 52.209-6      Protecting the Government's Interest when Subcontracting with
                Contractors Debarred, Suspended, or Proposed for Debarment (SEP 2006)

- 52.216-18    Ordering (OCT 1995)
  (a)    the effective date of award;  the end of the current period of performance
- 52.216-19    Ordering Limitations (OCT 1995)
  (a)    One Borrower
  (b)(1)  Ten Million Borrowers
  (b)(2)  Ten Million Borrowers
  (b)(3)  Two Days
  (d)    One Day
- 52.216-22    Indefinite Quantity (OCT 1995)
  (d)    the end of the current period of performance
- 52.217-8    Option To Extend Services (NOV 1999)
  ▪    120 days
- 52.217-9    Option to Extend the Term of the Contract (MAR 2000)
  (a)    120 days; 15
  (c)    September 30, 2019
- 52.222-54    Employment Eligibility Verification (Jan 2009)
- 52.224-1    Privacy Act Notification (APR 1984)
- 52.224-2    Privacy Act (APR 1984)
- 52.227-14    Rights in Data—General (DEC 2007)
- 52.237-3    Continuity of Services (JAN 1991)

**B.4    EDAR 3452.202-1    Definitions (MAR 2011)**
(a) The definitions at FAR 2.101 are appended with those contained in Education Department Acquisition Regulations (EDAR) 3402.101.
(b) The EDAR is available via the Internet at http://www.ed.gov/policy/fund/reg/clibrary/edar.html.

**B.5    EDAR 3452.209-71    Conflict of Interest (MAR 2011)**
(a)    (1) The contractor, subcontractor, employee, or consultant, has certified that, to the best of its knowledge and belief, there are no relevant facts or circumstances that could give rise to an organizational or personal conflict of interest (see FAR Subpart 9.5 for organizational conflicts of interest) (or apparent conflict of interest) for the organization or any of its staff, and that the contractor, subcontractor, employee, or consultant has disclosed all such relevant information if such a conflict of interest appears to exist to a reasonable person with knowledge of the relevant facts (or if such a person would question the impartiality of the contractor, subcontractor, employee, or consultant). Conflicts may arise in the following situations:
    (i) Unequal access to information—A potential contractor, subcontractor, employee, or consultant has access to nonpublic information through its performance on a government contract.
    (ii) Biased ground rules—A potential contractor, subcontractor, employee, or consultant has worked, in one government contract, or program, on the basic structure or ground rules of another government contract.

(iii) Impaired objectivity—A potential contractor, subcontractor, employee, or consultant, or member of their immediate family (spouse, parent, or child) has financial or other interests that would impair, or give the appearance of impairing, impartial judgment in the evaluation of government programs, in offering advice or

recommendations to the government, or in providing technical assistance or other services to recipients of Federal funds as part of its contractual responsibility. ''Impaired objectivity'' includes but is not limited to the following situations that would cause a reasonable person with knowledge of the relevant facts to question a person's objectivity:

(A) Financial interests or reasonably foreseeable financial interests in or in connection with products, property, or services that may be purchased by an educational agency, a person, organization, or institution in the course of implementing any program administered by the Department;
(B) Significant connections to teaching methodologies that might require or encourage the use of specific products, property, or services; or
(C) Significant identification with pedagogical or philosophical viewpoints that might require or encourage the use of a specific curriculum, specific products, property, or services.

(2) Offerors must provide the disclosure described above on any actual or potential conflict (or apparent conflict of interest) of interest regardless of their opinion that such a conflict or potential conflict (or apparent conflict of interest) would not impair their objectivity.

(3) In a case in which an actual or potential conflict (or apparent conflict of interest) is disclosed, the Department will take appropriate actions to eliminate or address the actual or potential conflict (or apparent conflict of interest), including but not limited to mitigating or neutralizing the conflict, when appropriate, through such means as ensuring a balance of views, disclosure with the appropriate disclaimers, or by restricting or modifying the work to be performed to

avoid or reduce the conflict. In this clause, the term ''potential conflict'' means reasonably foreseeable conflict of interest.

(b) The contractor, subcontractor, employee, or consultant agrees that if ''impaired objectivity'', or an actual or potential conflict of interest (or apparent conflict of interest) is discovered after the award is made, it will make a full disclosure in writing to the contracting officer. This disclosure shall include a description of actions that the contractor has taken or proposes to take, after consultation with the contracting officer, to avoid, mitigate, or neutralize the actual or potential conflict (or apparent conflict of interest).

(c) Remedies. The Government may terminate this contract for convenience, in whole or in part, if it deems such termination necessary to avoid the appearance of a conflict of interest. If the contractor was aware of a potential conflict of interest prior to award or discovered an actual or potential conflict (or apparent conflict of interest) after award and did not disclose or misrepresented relevant information to the contracting officer, the Government may terminate the contract for default, or pursue such other remedies as may be permitted by law or this contract. These remedies include imprisonment for up to five years for violation of 18 U.S.C. 1001 and fines of up to $5,000 for violation of 31 U.S.C. 3802. Further remedies include suspension or debarment from contracting with the Federal government. The contractor may also

be required to reimburse the Department for costs the Department incurs arising from activities related to conflicts of interest. An example of such costs would be those incurred in processing Freedom of Information Act requests related to a conflict of interest.

(d) In cases where remedies short of termination have been applied, the contractor, subcontractor, employee, or consultant agrees to eliminate the organizational conflict of interest, or mitigate it to the satisfaction of the contracting officer.

(e) The contractor further agrees to insert in any subcontract or consultant agreement hereunder, provisions that conform substantially to the language of this clause, including specific mention of potential remedies and this paragraph (e).

### B.6    EDAR 3452.208-71  Printing (MAR 2011)

Unless otherwise specified in this contract, the contractor shall not engage in, nor subcontract for, any printing (as that term is defined in Title I of the Government Printing and Binding Regulations in effect on the effective date of this contract) in connection with the performance of work under this contract; except that performance involving the duplication of fewer than 5,000 units of any one page, or fewer than 25,000 units in the aggregate of multiple pages, shall not be deemed to be printing. A unit is defined as one side of one sheet, one color only (with black counting as a color), with a maximum image size of 103⁄4 by 141⁄4 inches on a maximum paper size of 11 by 17 inches. Examples of counting the number of units: black plus one additional color on one side of one page counts as two units. Three colors (including black) on two sides of one page count as six units.

### B.7    EDAR 3452.224–70 Release of Information Under the Freedom of Information Act (MAR 2011)

By entering into a contract with the Department of Education, the contractor, without regard to proprietary markings, approves the release of the entire contract and all related modifications and task orders including, but not limited to: (1) Unit prices, including labor rates; (2) Statements of Work/Performance Work Statements generated by the contractor; (3) Performance requirements, including incentives, performance standards, quality levels, and service level agreements; (4) Reports, deliverables, and work products delivered in performance of the contract (including quality of service, performance against requirements/standards/service level agreements); (5) Any and all information, data, software, and related documentation first provided under the contract; (6) Proposals or portions of proposals incorporated by reference; and (7) Other terms and conditions.

### B.8    FSA 27-1      Labeling Of Documents (June 2007)—TAILORED

The Contractor shall not label any data, as defined in the clause at 52.227-14, produced in performance of this contract in a way that would restrict the Government's right to use or release the information.  If applicable, the Contractor shall include a legend that identifies sensitive data that should not be released for security reasons.  Under FAR 52.227-14, Rights in Data-General (or 52.227-15, -16, -17) clause, this data may be used for any public purpose. Deliverables shall not contain vendor-specific logos, mottos, watermarks, or holograms.

The Contractor shall not use, particularly for proposals, U.S. Government logos, such as the U.S. Department of Education or Federal Student Aid.

**B.9    EDAR 3452.227–73 Limitations on The Use Or Disclosure of Government-Furnished Information Marked With Restrictive Legends (MAR 2011)**

(a) For contracts under which data are to be produced, furnished, or acquired, the terms limited rights and restricted rights are defined in the rights in data—general clause (FAR 52.227–14).

(b) Proprietary data, technical data, or computer software provided to the contractor as Government-furnished information (GFI) under this contract may be subject to restrictions on use, modification, reproduction, release, performance, display, or further disclosure.

(1) Proprietary data with legends that serve to restrict disclosure or use of data. The contractor shall use, modify, reproduce, perform, or display proprietary data received from the Government with proprietary or restrictive legends only in the performance of this contract. The contractor shall not, without the express written permission of the party who owns the data, release, or disclose such data or software to any person.

(2) GFI marked with limited or restricted rights legends. The contractor shall use, modify, reproduce, perform, or display technical data received from the Government with limited rights legends or computer software received with restricted rights legends only in the performance of this contract. The contractor shall not, without the express written permission of the party whose name appears in the legend, release or disclose such data or software to any person.

(3) GFI marked with specially negotiated license rights legends. The contractor shall use, modify, reproduce, release, perform, or display proprietary data, technical data, or computer software received from the Government with specially negotiated license legends only as permitted in the license.  Such data or software may not be released or disclosed to other persons unless permitted by the license and, prior to release or disclosure, the intended recipient has completed the use and non-disclosure agreement. The contractor shall modify paragraph (c)(1)(iii) of the use and nondisclosure agreement (3452.227–72) to reflect the recipient's obligations regarding use, modification, reproduction, release, performance, display, and disclosure of the data or software.

(c) Indemnification and creation of third party beneficiary rights.

(1) The contractor agrees to indemnify and hold harmless the Government, its agents, and employees from every claim or liability, including attorneys fees, court costs, and expenses, arising out of, or in any way related to, the misuse or unauthorized modification, reproduction, release, performance, display, or disclosure of proprietary data, technical data, or computer software received from the Government with restrictive legends by the contractor or any person to whom the contractor has released or disclosed such data or software.

(2) The contractor agrees that the party whose name appears on the restrictive legend, in addition to any other rights it may have, is a third party beneficiary who has the right of direct action against the contractor, or any person to whom the contractor has released or disclosed such data or software, for the unauthorized duplication, release, or disclosure of proprietary data, technical data, or computer software subject to restrictive legends.

**B.10    EDAR 3452.227–72 Use and Non-Disclosure Agreement (MAR 2011)**

(a) Except as provided in paragraph (b) of this clause, proprietary data, technical data, or computer software delivered to the

Government with restrictions on use, modification, reproduction, release, performance, display, or disclosure may not be provided to third parties unless the intended recipient completes and signs the use and non-disclosure agreement in paragraph
(c) of this clause prior to release or disclosure of the data.

> (1) The specific conditions under which an intended recipient will be authorized to use, modify, reproduce, release, perform, display, or disclose proprietary data or technical data subject to limited rights, or computer software subject to restricted rights must be stipulated in an attachment to the use and non-disclosure agreement.
> (2) For an intended release, disclosure, or authorized use of proprietary data, technical data, or computer software subject to special license rights, modify paragraph (c)(1)(iv) of this clause to enter the conditions, consistent with the license requirements, governing the recipient's obligations regarding use, modification, reproduction, release, performance, display, or disclosure of the data or software.

(b) The requirement for use and nondisclosure agreements does not apply to Government contractors that require access to a third party's data or software for the performance of a Government contract that contains the 3452.227–73 clause, Limitations on the use or disclosure of Government furnished information marked with restrictive legends.
(c) The prescribed use and non-disclosure agreement is:

**Use and Non-Disclosure Agreement**

The undersigned, Raymond H. Bayer, Jr., an authorized representative of the Missouri Higher Education Loan Authority, (which is hereinafter referred to as the ''recipient'') requests the Government to provide the recipient with proprietary data, technical data, or computer software (hereinafter referred to as ''data'') in which the Government's use, modification, reproduction, release, performance, display, or disclosure rights are restricted. Those data are identified in an attachment to this agreement. In consideration for receiving such data, the recipient agrees to use the data strictly in accordance with this agreement.

(1) The recipient shall—

> (i) Use, modify, reproduce, release, perform, display, or disclose data marked with Small Business Innovative Research (SBIR) data rights legends only for government purposes and shall not do so for any commercial purpose. The recipient shall not release, perform, display, or disclose these data, without the express written permission of the contractor whose name appears in the restrictive legend (the contractor), to any person other than its subcontractors or suppliers, or prospective subcontractors or suppliers, who require these data to submit offers for, or perform, contracts with the recipient. The recipient shall require its subcontractors or suppliers, or prospective subcontractors or suppliers, to sign a use and non-disclosure agreement prior to disclosing or releasing these data to such persons. Such an agreement must be consistent with the terms of this agreement.

> (ii) Use, modify, reproduce, release, perform, display, or disclose proprietary data or technical data marked with limited rights legends only as specified in the attachment to this agreement. Release, performance, display, or disclosure to other persons is not

authorized unless specified in the attachment to this agreement or expressly permitted in writing by the contractor.

(iii) Use computer software marked with restricted rights legends only in performance of contract number ED-FSA-11-D-0012. The recipient shall not, for example, enhance, decompile, disassemble, or reverse engineer the software; time share; or use a computer program with more than one computer at a time. The recipient may not release, perform, display, or disclose such software to others unless expressly permitted in writing by the licensor whose name appears in the restrictive legend.

(iv) Use, modify, reproduce, release, perform, display, or disclose data marked with special license rights legends [To be completed by the contracting officer. See paragraph (a)(2) of this clause. Omit if none of the data requested is marked with special license rights legends].

(2) The recipient agrees to adopt or establish operating procedures and physical security measures designed to protect these data from inadvertent release or disclosure to unauthorized third parties.

(3) The recipient agrees to accept these data ''as is'' without any Government representation as to suitability for intended use or warranty whatsoever. This disclaimer does not affect any obligation the Government may have regarding data specified in a contract for the performance of that contract.

(4) The recipient may enter into any agreement directly with the contractor with respect to the use, modification, reproduction, release, performance, display, or disclosure of these data.

(5) The recipient agrees to indemnify and hold harmless the Government, its agents, and employees from every claim or liability, including attorneys fees, court costs, and expenses arising out of, or in any way related to, the misuse or unauthorized modification, reproduction, release, performance, display, or disclosure of data received from the Government with restrictive legends by the recipient or any person to whom the recipient has released or disclosed the data.

(6) The recipient is executing this agreement for the benefit of the contractor. The contractor is a third party beneficiary of this agreement who, in addition to any other rights it may have, is intended to have the rights of direct action against the recipient or any other person to whom the recipient has released or disclosed the data, to seek damages from any breach of this agreement, or to otherwise enforce this agreement.

(7) The recipient agrees to destroy these data, and all copies of the data in its possession, no later than 30 days after the date shown in paragraph (8) of this agreement, to have all persons to whom it released the data do so by that date, and to notify the contractor that the data have been destroyed.

(8) This agreement shall be effective for the period commencing with the recipient's execution of this agreement and ending upon **September 30, 2019.** The obligations imposed by this agreement shall survive the expiration or termination of the agreement.

*MISSOURI HIGHER EDUCATION LOAN AUTHORITY*
Recipient's Business Name

███████████████████████

Authorized Representative

████████████████████

Representative's Typed Name and Title

9/27/2011
Date

**B.11    FSA 32-1      Invoice Procedures (November 2009)**
The Contractor must submit a physical invoice via mail, fax, or e-mail for this contract in order to be paid for products and/or services rendered.

Federal Student Aid's "designated billing office" is:

US Department of Education
Union Center Plaza
Federal Student Aid Administration
830 First Street, NE - Suite 54B1
Washington, D.C. 20202-0001
E-mail:  InvoiceAdmin@ed.gov
Fax:  202-275-3477

The Contractor shall also simultaneously submit copies of the invoice to the Contracting Officer and one to the Contracting Officer's Representative (COR). The CO and COR should receive copies via the same means as the invoice sent to the Budget Group.

When submitting an invoice via mail, the Contractor shall submit the original invoice AND two copies of the invoice.

At a minimum the following items must be addressed in order for the invoice to be considered "proper" for payment:

(1) Name and Address of the Contractor.
(2) Invoice Number and Invoice Date (Date invoices as close as possible to the date of mailing or transmission). The date and actual submission must occur after receipt, inspection and acceptance of the supplies or services.
(3) The Contract number, contract line item, and if applicable, the order number must be included on the invoice and be correct.

(4) Description, quantity, unit of measure, unit price, and extended price of the item delivered must agree with the contract or order.

(5) Terms of any prompt payment discount offered.

(6) Name, title, and phone number of persons to be notified in event of defective invoice.

(7) The period of time covered by the invoice must include the first and last day of the period.

(8) Totals must be supported by subtotals and subtotals should be supported by detail, (e.g. documentation for categories of labor, hours performed, unit prices) and deliverables provided.

(9) If required by this contract or order, receipts must be provided to support documentation of "other direct costs" (ODCs) or materials.

(10) SPECIAL INSTRUCTIONS FOR FINANCE PAYMENTS:

Invoices for finance payments shall specifically and prominently identify the payment request as follows:

REQUEST FOR FINANCING PAYMENT
Finance payments are not subject to the Prompt Payment Act. Failure to identify the invoice as a request for financing may result in delay of payment. Invoices that are identified as Requests for Finance Payments shall only include the finance payments listed in the contract. Requests for finance payments shall not be combined with other types of invoice payments.

## B.12   ADDITIONAL TERMS AND CONDITIONS

A. **Contract Type**—This contract is for the NATIONAL OPTION. All terms and conditions herein shall apply whether this is a "National Option" or "State Option" award, unless otherwise noted.

**National Option**— Indefinite Delivery/Indefinite Quantity (IDIQ). During the course of the basic ordering period, the IDIQ minimum is $2,532,000, provided that the Contractor is in compliance with the requirements for servicing federally held debt, and the maximum volume for the basic ordering period agreement will be 10 million borrowers. The Optional Ordering Period will have a minimum of $1,000 and a maximum of an additional 10 million borrowers.

B. **Ordering Period**—The ordering period for this contract will be one (1), five (5) year Base Ordering Period, with one (1) Optional Ordering Period through September 30, 2019.

C. **Requirements Deadlines**—The Contractor shall comply with the requirements (as provided in Attachment A-2) for servicing federally held debt no later than July 1, 2014. If applicable, the Contractor shall also comply with the Supplemental Requirements (as provided in Attachment A-6), in accordance with Section B.12.N.14.

D. **Quarterly Compliance Monitoring**—[Reserved]

E. **Annual Compliance Audit**—[Reserved]

F. **Allocation Methodology**—See Attachments A-4 and A-5.

G. **Allocation Metrics**—See Attachments A-4 and A-5.

H. **Performance Incentives/Metrics**—See Attachments A-4 and A-5.

I. **Price Definitions**—See Attachment A-3.

J. **Work Performed Outside the Continental United States**—The Contractor has represented to the Department that it will perform all work required under this Contract within the United States. If, at any time, the Contractor wishes to perform any Contract work outside the United States, the Contractor shall inform the Contracting Officer, in advance and in writing, of its intention and request the Department's approval. The Contractor shall not perform any Contract work outside the United States unless and until it has received the Contracting Officer's explicit, written approval to perform such work. In order to give proper consideration to the Contractor's request, the Department may ask for, and the Contractor shall provide, information relevant to the proposed performance outside the United States, including but not limited to a detailed description of the physical, personnel and management resources to be used and any potential difficulties or constraints in performing in the foreign jurisdiction. The Department may refuse to approve Contract performance outside the United States to the extent that, solely in the Department's judgment, the Contractor has not shown that performance outside the United States would satisfy the Contract requirements and would not impair or degrade performance. Further, the Department may refuse to approve any performance outside the United States for any other reason, or for no reason, except as otherwise required by the laws and treaties of the United States. The Department also may approve performance outside the United States subject to certain conditions, to which conditions the Contractor shall strictly adhere. Neither performance within the United States, nor the Department's refusal to allow performance outside the United States shall ever constitute a change to this Contract or give rise to any entitlement to additional compensation or excuse any failure of performance by the Contractor. Nothing in this clause shall be interpreted to impose any obligation on the Department to allow or to refuse a request for performance of this Contract outside the United States.

K. **Branding/Marketing Material**—Contractors may not solicit or promote other services/products they, or their affiliates, offer while servicing Department of Education borrowers, or Federally held debt. This includes all communication channels and touch points, such as but not limited to: inbound and outbound calls/email, web pages, any mailings specific to the status of their account, direct personal and automated interaction, etc.

Scenarios: (1) if the servicer services Federally and non-Federally held debt and offers combined billing, no marketing envelopes or inserts for other services/products may be issued; (2) if the servicer services Federally and non-Federally held debt and does NOT use combined billing, normal marketing may be provided for non- Federally held debt for other services/products; and (3) if the servicer services Federally and non-Federally held debt and is in personal contact, no marketing for other services/products may be discussed. If a borrower with in-school status seeks information regarding other products or services from the servicer, the borrower shall be directed to their school's Student Financial Assistance Office.

Any exception or ambiguity regarding the above shall be reviewed and approved by the Contracting Officer in advance.

L. **Invoicing and Non-Compliance** – Borrowers whose loans are not being serviced in compliance with the Requirements, Policy and Procedures for servicing federally held debt due to the fault of the servicer (e.g. correct interest calculations, correct balances, interest

determination and calculations, notices sent properly, proper due diligence, etc.), will not be billable to the Government from the initial point of non-compliance. Any funds that have been invoiced for these borrowers and paid shall be returned to the Government via a credit on the next invoice.

M. **Contracting Officer's Representative** – See Section B.15.

N. **Additional Terms:**

1. The Not-for-Profit (NFP) Servicing contracts are for any "eligible" and "qualified" entities (herein referred to as "Entity" or "Entities", unless otherwise noted) in accordance with the Health Care and Education Reconciliation Act of 2010 (Pub.L. 111-152, 124 Stat. 1029) (herein referred to as "HCERA" and/or "SAFRA") to manage all types of Title IV student aid obligations, including, but not limited to, servicing of outstanding debt. The initial task orders may cover servicing of loans under the William D. Ford Federal Direct Loan Program (DL), the Federal Family Education Loan (FFEL) Program, the Federally Insured Student Loan (FISL) Program, and/or Teacher Education Assistance for College and Higher Education (TEACH) Grants that have converted to Federal Direct Unsubsidized Stafford Loans (Entities will not be required to service/track TEACH Grants that are in grant status). National Option contracts are not Requirements contracts.

2. Each Contractor will provide, at a minimum, the services provided within their proposal, including all necessary and appropriate Default Aversion services, in accordance with the pricing identified in Term #3 below.

3. The Government will set and manage the common pricing, including tier structure, below:

**For the first 100,000 allocated borrower accounts ONLY, the following pricing shall apply:**

| Category | Unit Price |
|---|---|
| Borrowers in In-school Status | $    1.150 |
| Borrowers in Grace or Current Repayment Status | $    2.320 |
| Borrowers in Deferment or Forbearance | $    2.280 |
| Borrowers 31-90 Days Delinquent | $    1.780 |
| Borrowers 91-150 Days Delinquent | $    1.650 |
| Borrowers 151-270 Days Delinquent | $    1.510 |
| Borrowers 270+ Days Delinquent | $    0.550 |
| On-System Conversion Fees (Per Borrower Account)* | $  10.000 |
| Incurred Start-Up Costs (Per Entity)** | Up to $300,000 |

*Applies to the first 100,000 borrower accounts each Entity loads onto its system for servicing. Billable only after actual conversion of accounts has occurred. No costs for off-system conversions/transfers shall apply.*

**Reimbursable ceiling amount for actual, reasonable, allowable, and allocable costs incurred in meeting the Government's stated requirements, in accordance with FAR 31.201. All costs under this category shall be subject to audit, and are only reimbursable after contract award.*

**For all borrower accounts above the first 100,000 allocated accounts, the following pricing shall apply:**

| Status | Volume Low | Volume High | Unit Price |
|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| Borrowers in In-school Status | | | $ | 1.050 |
| Borrowers in Grace or Current Repayment Status | 1 | 3,000,000 | $ | 2.110 |
| | 3,000,001 | UP | $ | 1.900 |
| Borrowers in Deferment or Forbearance | 1 | 1,600,000 | $ | 2.070 |
| | 1,600,001 | UP | $ | 1.730 |
| Borrowers 31-90 Days Delinquent | | | $ | 1.620 |
| Borrowers 91-150 Days Delinquent | | | $ | 1.500 |
| Borrowers 151-270 Days Delinquent | | | $ | 1.370 |
| Borrowers 270+ Days Delinquent | | | $ | 0.500 |

Entities shall be responsible for the accurate tracking and proper invoicing of its borrower accounts, in accordance with the pricing structure above.

Out year pricing will follow the methodology described utilizing the subsequent terms. There will be no set declination in pricing at the time of award.

4. The Government has included an escalation methodology based upon the Bureau of Labor Statistics' (BLS) Employment Cost Index (ECI) for Total Compensation, Private Industry, Service Occupations (Not Seasonally Adjusted), to account for significant inflation and/or deflation. When the ECI exceeds 3.0% (plus or minus) in any given year the Government will adjust the established common pricing by any amount in excess of this rate. The calculated rate of escalation will equal the average of the 12-month percent change for the previous four quarters, ending June 30th. This ECI escalation will be applied beginning in September of the same calendar year. Further, this escalation will compound for all remaining years of the Base and Optional Ordering Periods.

For example, ECI rate released in June 2011 is 3.6%. The Government will increase unit pricing by .6% for the contract beginning September 1, 2011 and all remaining years of the Base Ordering Period, as well as the Optional Ordering Period.

A decreasing rate of inflation would follow the same pattern as above. For example, if the ECI decreases by more than 3.0%, then the unit prices for the remaining out-years will also decrease by the percentage in excess of 3.0%. For example, ECI rate released in June 2011 is -4.2%. The Government will decrease unit pricing by 1.2% for the contract period beginning September 1, 2011 and all remaining years of the Base Ordering Period, as well as the Optional Ordering Period.

5. Common pricing includes all supplies, services and other costs to deliver Title IV servicing under this contract, including:
   - Costs for bringing Contractor systems into compliance for handling federally held debt.
   - Costs for legislative, regulatory or policy changes that affect the Federal Family Education Loan (FFEL) Program community but simultaneously satisfy Direct Loan servicing requirements.

- For all other costs, the Department and the Contractor(s) may come to an agreement via change order process or negotiation, as necessary.

6. **National Option**—The Government makes no guarantee to any Contractor that their organization will retain their current loan servicing volume. The Government will provide an initial allocation of 100,000 borrower accounts under this IDIQ contract, in accordance with the Health Care and Education Reconciliation Act of 2010 (Pub.L. 111-152, 124 Stat. 1029) (herein referred to as "HCERA" and/or "SAFRA"). However, the ability of the Contractor to retain and/or increase its allocation volume shall depend on the Contractor's compliance with contractual/regulatory requirements, and performance. In the event of an inability to comply with contractual/regulatory requirements and/or a lack of satisfactory performance, the Government reserves the right to reduce the Contractor's allocation at no additional cost to the Government.

7. The Government reserves the right to periodically review and equitably adjust the rate structure to maintain effectiveness of the services provided (e.g., different volume breaks, different tiers, cost allocations, etc)

8. The Government reserves the right to equitably introduce, eliminate, or modify loan deliverables/status items that are in the best interest of the Government or Borrower. (e.g., In-School Deferments moved into the In-School deliverable; new deferment or forbearance categories; etc).

9. The Government reserves the right to unilaterally shift borrowers in the best interest of the Government or Borrowers, at no additional cost to the Government. It is anticipated that this will be done only with reasonable and prudent cause. This term is not subject to the Disputes and Appeals process provided in FAR Subpart 33.2.

10. The Government retains the unilateral right to resolve split-borrowers as deemed appropriate by the Government, at no additional cost to the Government. This term is not subject to the Disputes and Appeals process provided in FAR Subpart 33.2.

11. The Government reserves the right to periodically review and unilaterally adjust the performance and/or allocations metrics and/or methodology to maintain effectiveness of the services provided.

12. An "eligible" and "qualified" Entity shall only receive the initial 100,000 account allocation once, regardless of future changes, and/or potentially multiple teaming arrangements.

13. **Initial Allocation**—Initial Allocation will be scheduled so that Initial Allocations can be made in an efficient and prudent manner.

    Ongoing allocations (i.e. any allocation subsequent to an Entity's Initial Allocation) shall be managed in accordance with the allocation methodology provided in this agreement.

14. **Performance Measurement/Allocation Methodology** – See Attachment A-4, *"Ongoing Allocation Methodology – v3"* and Attachment A-5, *"SAMPLE ONLY—Ongoing Allocation Metric Calculation (National Option Only) – v3"*.

    a. **National Option Only**—Once an Entity (and its team) has been collectively allocated two (2) million borrowers – that Entity shall also meet the Supplemental Requirements provided in Attachment A-6 at no additional cost to the Government and comply with the TIVAS terms and conditions provided as Attachment A-8, within six (6) months of receiving its two millionth borrower account and shall compete with the other TIVAS for allocation, making it no longer eligible to compete with the other non-TIVAS Entities for allocation. In the event that the Entity does not meet the Supplemental Requirements (provided in Attachment A-6) and the TIVAS terms and conditions (provided in Attachment A-8) within six (6) months of receiving the two millionth borrower account, the Government will reduce that Entity 's allocation volume by 200,000 borrower accounts each month, until the Entity has come into compliance with the Supplemental Requirements in Attachment A-6 and the TIVAS terms and conditions in Attachment A-8. These accounts may not be reinstated even after the Entity has come into compliance with the Supplemental Requirements in Attachment A-6 and the TIVAS terms and conditions in Attachment A-8.

15. **Key Subcontractors**—The Subcontractors listed below (or as specified in the Schedule of this contract) are considered essential for the purposes of determining the Contractor's borrower account allocation and the capability to perform under this contract. Any subcontractor that has a material impact on the ability of the Contractor to perform under this agreement, as well as those for which credit is given for 100,000 borrower account allocation shall be considered Key, and shall be listed below (or as specified in the Schedule of this contract). No credit for 100,000 borrower account allocations shall be given to a subcontractor that is not listed as a Key Subcontractor below. Prior to removing, replacing, or diverting any of the Key Subcontractors, the Contractor shall notify the Contracting Officer (within a reasonable time or no less than 30 days in advance of taking any action) and shall submit justification (including proposed substitutions if necessary) in sufficient detail to permit evaluation of the impact on this contract. The removal, replacement, or diversion of any of the specified Subcontractors may result in a reduction of the Contractor's allocation by up to 100,000 borrower accounts for each Subcontractor that is removed. No diversion shall be made by the Contractor without the written consent of the Contracting Officer; provided, that the Contracting Officer may ratify in writing the change and such ratification shall constitute the consent of the Contracting Officer required by this clause. The Subcontractors listed below (or as specified in the Schedule of this contract) may, with the consent of the contracting parties, be modified from time to time during the course of the contract to either add or delete Subcontractors, as appropriate.

| No. | Key Subcontractor |
|-----|-------------------|
| 1. | Pennsylvania Higher Education Assistance |

| | | Agency (PHEAA) |
|---|---|---|
| **2.** | | [Reserved] |
| **3.** | | [Reserved] |

16. If the Contractor's eligibility and/or qualification status under the Health Care and Education Reconciliation Act of 2010 (Pub.L. 111-152, 124 Stat. 1029) changes at any time after contract award so that it is no longer "eligible" and/or "qualified", the contract shall be automatically terminated at no additional cost to the Government.  This action includes changes to the law that may alter the Contractor's status, funding, and/or other factors that have a material bearing on this contract.

**B.13   52.212-5      Contract Terms And Conditions Required To Implement Statutes Or Executive Orders—Commercial Items (AUG 2011)**

(a) The Contractor shall comply with the following Federal Acquisition Regulation (FAR) clauses, which are incorporated in this contract by reference, to implement provisions of law or Executive orders applicable to acquisitions of commercial items:

(1) 52.222-50, Combating Trafficking in Persons (Feb 2009) (22 U.S.C. 7104(g)).
___ Alternate I (Aug 2007) of 52.222-50 (22 U.S.C. 7104(g)).
(2) 52.233-3, Protest After Award (AUG 1996) (31 U.S.C. 3553).
(3) 52.233-4, Applicable Law for Breach of Contract Claim (OCT 2004) (Pub. L. 108-77, 108-78).

(b) The Contractor shall comply with the FAR clauses in this paragraph (b) that the Contracting Officer has indicated as being incorporated in this contract by reference to implement provisions of law or Executive orders applicable to acquisitions of commercial items:

*[Contracting Officer check as appropriate.]*

___ (1) 52.203-6, Restrictions on Subcontractor Sales to the Government (Sept 2006), with Alternate I (Oct 1995) (41 U.S.C. 253g and 10 U.S.C. 2402).
_X_ (2) 52.203-13, Contractor Code of Business Ethics and Conduct (Apr 2010) (Pub. L. 110-252, Title VI, Chapter 1 (41 U.S.C. 251 note)).
___ (3) 52.203-15, Whistleblower Protections under the American Recovery and Reinvestment Act of 2009 (June 2010) (Section 1553 of Pub. L. 111-5). (Applies to contracts funded by the American Recovery and Reinvestment Act of 2009.)
_X_ (4) 52.204-10, Reporting Executive Compensation and First-Tier Subcontract Awards (Jul 2010) (Pub. L. 109-282) (31 U.S.C. 6101 note).
___ (5) 52.204-11, American Recovery and Reinvestment Act—Reporting Requirements (Jul 2010) (Pub. L. 111-5).
___ (6) 52.209-6, Protecting the Government's Interest When Subcontracting with Contractors Debarred, Suspended, or Proposed for Debarment. (Dec 2010) (31 U.S.C. 6101 note).
___ (7) 52.209-10, Prohibition on Contracting with Inverted Domestic Corporations (section 740 of Division C of Pub. L. 111-117, section 743 of Division D of Pub. L. 111-8, and section 745 of Division D of Pub. L. 110-161).
___ (8) 52.219-3, Notice of Total HUBZone Set-Aside or Sole-Source Award (Jan 2011) (15 U.S.C. 657a).

__ (9) 52.219-4, Notice of Price Evaluation Preference for HUBZone Small Business Concerns (JAN 2011) (if the offeror elects to waive the preference, it shall so indicate in its offer) (15 U.S.C. 657a).

__ (10) [Reserved]

__ (11)(i) 52.219-6, Notice of Total Small Business Set-Aside (June 2003) (15 U.S.C. 644).

__ (ii) Alternate I (Oct 1995) of 52.219-6.

__ (iii) Alternate II (Mar 2004) of 52.219-6.

__ (12)(i) 52.219-7, Notice of Partial Small Business Set-Aside (June 2003) (15 U.S.C. 644).

__ (ii) Alternate I (Oct 1995) of 52.219-7.

__ (iii) Alternate II (Mar 2004) of 52.219-7.

_X_ (13) 52.219-8, Utilization of Small Business Concerns (Jan 2011) (15 U.S.C. 637(d)(2) and (3)).

_X_ (14)(i) 52.219-9, Small Business Subcontracting Plan (Jan 2011) (15 U.S.C. 637(d)(4)).

__ (ii) Alternate I (Oct 2001) of 52.219-9.

__ (iii) Alternate II (Oct 2001) of 52.219-9.

__ (iv) Alternate III (Jul 2010) of 52.219-9.

__ (15) 52.219-14, Limitations on Subcontracting (Dec 1996) (15 U.S.C. 637(a)(14)).

__ (16) 52.219-16, Liquidated Damages—Subcon-tracting Plan (Jan 1999) (15 U.S.C. 637(d)(4)(F)(i)).

__ (17)(i) 52.219-23, Notice of Price Evaluation Adjustment for Small Disadvantaged Business Concerns (OCT 2008) (10 U.S.C. 2323) (if the offeror elects to waive the adjustment, it shall so indicate in its offer).

__ (ii) Alternate I (June 2003) of 52.219-23.

__ (18) 52.219-25, Small Disadvantaged Business Participation Program—Disadvantaged Status and Reporting (Dec 2010) (Pub. L. 103-355, section 7102, and 10 U.S.C. 2323).

__ (19) 52.219-26, Small Disadvantaged Business Participation Program— Incentive Subcontracting (Oct 2000) (Pub. L. 103-355, section 7102, and 10 U.S.C. 2323).

__ (20) 52.219-27, Notice of Total Service-Disabled Veteran-Owned Small Business Set-Aside (May 2004) (15 U.S.C. 657 f).

__ (21) 52.219-28, Post Award Small Business Program Rerepresentation (Apr 2009) (15 U.S.C. 632(a)(2)).

__ (22) 52.219-29 Notice of Total Set-Aside for Economically Disadvantaged Women-Owned Small Business (EDWOSB) Concerns (Apr 2011).

__ (23) 52.219-30 Notice of Total Set-Aside for Women-Owned Small Business (WOSB) Concerns Eligible Under the WOSB Program (Apr 2011).

_X_ (24) 52.222-3, Convict Labor (June 2003) (E.O. 11755).

_X_ (25) 52.222-19, Child Labor—Cooperation with Authorities and Remedies (Jul 2010) (E.O. 13126).

_X_ (26) 52.222-21, Prohibition of Segregated Facilities (Feb 1999).

_X_ (27) 52.222-26, Equal Opportunity (Mar 2007) (E.O. 11246).

_X_ (28) 52.222-35, Equal Opportunity for Veterans (Sep 2010)(38 U.S.C. 4212).

_X_ (29) 52.222-36, Affirmative Action for Workers with Disabilities (Oct 2010) (29 U.S.C. 793).

_X_ (30) 52.222-37, Employment Reports on Veterans (SEP 2010) (38 U.S.C. 4212).

__ (31) 52.222-40, Notification of Employee Rights Under the National Labor Relations Act (Dec 2010) (E.O. 13496).

_X_ (32) 52.222-54, Employment Eligibility Verification (JAN 2009). (Executive Order 12989. (Not applicable to the acquisition of commercially available off-the-shelf items or certain other types of commercial items as prescribed in 22.1803.)

__ (33)(i)  52.223-9, Estimate of Percentage of Recovered Material Content for EPA– Designated Items (May 2008) (42 U.S.C. 6962(c)(3)(A)(ii)). (Not applicable to the acquisition of commercially available off-the-shelf items.)

__ (ii) Alternate I (May 2008) of 52.223-9 (42 U.S.C. 6962(i)(2)(C)). (Not applicable to the acquisition of commercially available off-the-shelf items.)

__ (34) 52.223-15, Energy Efficiency in Energy-Consuming Products (DEC 2007) (42 U.S.C. 8259b).

__ (35)(i)  52.223-16, IEEE 1680 Standard for the Environmental Assessment of Personal Computer Products (DEC 2007) (E.O. 13423).

__ (ii) Alternate I (DEC 2007) of 52.223-16.

__ (36) 52.223-18, Encouraging Contractor Policies to Ban Text Messaging While Driving (AUG 2011) (E.O. 13513).

__ (37) 52.225-1, Buy American Act—Supplies (Feb 2009) (41 U.S.C. 10a-10d).

__ (38)(i)  52.225-3, Buy American Act—Free Trade Agreements—Israeli Trade Act (June 2009) (41 U.S.C. 10a-10d, 19 U.S.C. 3301 note, 19 U.S.C. 2112 note, 19 U.S.C. 3805 note, Pub. L. 108-77, 108-78, 108-286, 108-302, 109-53, 109-169, 109-283, and 110-138).

__ (ii) Alternate I (Jan 2004) of 52.225-3.

__ (iii) Alternate II (Jan 2004) of 52.225-3.

__ (39) 52.225-5, Trade Agreements (AUG 2009) (19 U.S.C. 2501, *et seq*., 19 U.S.C. 3301 note).

_X_ (40) 52.225-13, Restrictions on Certain Foreign Purchases (June 2008) (E.O.'s, proclamations, and statutes administered by the Office of Foreign Assets Control of the Department of the Treasury).

__ (41) 52.226-4, Notice of Disaster or Emergency Area Set-Aside (Nov 2007) (42 U.S.C. 5150).

__ (42) 52.226-5, Restrictions on Subcontracting Outside Disaster or Emergency Area (Nov 2007) (42 U.S.C. 5150).

__ (43) 52.232-29, Terms for Financing of Purchases of Commercial Items (Feb 2002) (41 U.S.C. 255(f), 10 U.S.C. 2307(f)).

__ (44) 52.232-30, Installment Payments for Commercial Items (Oct 1995) (41 U.S.C. 255(f), 10 U.S.C. 2307(f)).

_X_ (45) 52.232-33, Payment by Electronic Funds Transfer—Central Contractor Registration (Oct 2003) (31 U.S.C. 3332).

__ (46) 52.232-34, Payment by Electronic Funds Transfer—Other than Central Contractor Registration (May 1999) (31 U.S.C. 3332).

__ (47) 52.232-36, Payment by Third Party (Feb 2010) (31 U.S.C. 3332).

_X_ (48) 52.239-1, Privacy or Security Safeguards (Aug 1996) (5 U.S.C. 552a).

__ (49)(i)  52.247-64, Preference for Privately Owned U.S.-Flag Commercial Vessels (Feb 2006) (46 U.S.C. Appx. 1241(b) and 10 U.S.C. 2631).

__ (ii) Alternate I (Apr 2003) of 52.247-64.

(c) The Contractor shall comply with the FAR clauses in this paragraph (c), applicable to commercial services, that the Contracting Officer has indicated as being incorporated in this contract by reference to implement provisions of law or Executive orders applicable to acquisitions of commercial items:

[*Contracting Officer check as appropriate.*]

_X_ (1) 52.222-41, Service Contract Act of 1965 (Nov 2007) (41 U.S.C. 351, *et seq.*).

_X_ (2) 52.222-42, Statement of Equivalent Rates for Federal Hires (May 1989) (29 U.S.C. 206 and 41 U.S.C. 351, *et seq.*).

_X_ (3) 52.222-43, Fair Labor Standards Act and Service Contract Act—Price Adjustment (Multiple Year and Option Contracts) (Sep 2009) (29 U.S.C. 206 and 41 U.S.C. 351, *et seq.*).

__ (4) 52.222-44, Fair Labor Standards Act and Service Contract Act—Price Adjustment (Sep 2009) (29 U.S.C. 206 and 41 U.S.C. 351, *et seq.*).

__ (5) 52.222-51, Exemption from Application of the Service Contract Act to Contracts for Maintenance, Calibration, or Repair of Certain Equipment—Requirements (Nov 2007) (41 351, *et seq.*).

__ (6) 52.222-53, Exemption from Application of the Service Contract Act to Contracts for Certain Services—Requirements (Feb 2009) (41 U.S.C. 351, *et seq.*).

__ (7) 52.226-6, Promoting Excess Food Donation to Nonprofit Organizations (Mar 2009) (Pub. L. 110-247).

__ (8) 52.237-11, Accepting and Dispensing of $1 Coin (Sept 2008) (31 U.S.C. 5112(p)(1)).

(d) *Comptroller General Examination of Record.* The Contractor shall comply with the provisions of this paragraph (d) if this contract was awarded using other than sealed bid, is in excess of the simplified acquisition threshold, and does not contain the clause at 52.215-2, Audit and Records—Negotiation.

(1) The Comptroller General of the United States, or an authorized representative of the Comptroller General, shall have access to and right to examine any of the Contractor's directly pertinent records involving transactions related to this contract.

(2) The Contractor shall make available at its offices at all reasonable times the records, materials, and other evidence for examination, audit, or reproduction, until 3 years after final payment under this contract or for any shorter period specified in FAR Subpart 4.7, Contractor Records Retention, of the other clauses of this contract. If this contract is completely or partially terminated, the records relating to the work terminated shall be made available for 3 years after any resulting final termination settlement. Records relating to appeals under the disputes clause or to litigation or the settlement of claims arising under or relating to this contract shall be made available until such appeals, litigation, or claims are finally resolved.

(3) As used in this clause, records include books, documents, accounting procedures and practices, and other data, regardless of type and regardless of form. This does not require the Contractor to create or maintain any record that the Contractor does not maintain in the ordinary course of business or pursuant to a provision of law.

(e)(1) Notwithstanding the requirements of the clauses in paragraphs (a), (b), (c), and (d) of this clause, the Contractor is not required to flow down any FAR clause, other than those in this paragraph (e)(1) in a subcontract for commercial items. Unless otherwise indicated below, the extent of the flow down shall be as required by the clause—

(i) 52.203-13, Contractor Code of Business Ethics and Conduct (Apr 2010) (Pub. L. 110-252, Title VI, Chapter 1 (41 U.S.C. 251 note)).

(ii) 52.219-8, Utilization of Small Business Concerns (Dec 2010)
(15 U.S.C. 637(d)(2) and (3)), in all subcontracts that offer further subcontracting opportunities.
If the subcontract (except subcontracts to small business concerns) exceeds $650,000 ($1.5
million for construction of any public facility), the subcontractor must include 52.219-8 in lower
tier subcontracts that offer subcontracting opportunities.

(iii) [Reserved]

(iv) 52.222-26, Equal Opportunity (Mar 2007) (E.O. 11246).

(v) 52.222-35, Equal Opportunity for Veterans (Sep 2010) (38 U.S.C. 4212).

(vi) 52.222-36, Affirmative Action for Workers with Disabilities (Oct 2010)
(29 U.S.C. 793).

(vii) 52.222-40, Notification of Employee Rights Under the National Labor Relations Act
(Dec 2010) (E.O. 13496). Flow down required in accordance with paragraph (f) of FAR
clause 52.222-40.

(viii) 52.222-41, Service Contract Act of 1965 (Nov 2007) (41 U.S.C. 351, et seq.).

(ix) 52.222-50, Combating Trafficking in Persons (Feb 2009) (22 U.S.C. 7104(g)).
___ Alternate I (Aug 2007) of 52.222-50 (22 U.S.C. 7104(g)).

(x) 52.222-51, Exemption from Application of the Service Contract Act to Contracts for
Maintenance, Calibration, or Repair of Certain Equipment-Requirements (Nov 2007) (41 U.S.C.
351, et seq.).

(xi) 52.222-53, Exemption from Application of the Service Contract Act to Contracts for
Certain Services-Requirements (Feb 2009) (41 U.S.C. 351, et seq.).

(xii) 52.222-54, Employment Eligibility Verification (JAN 2009).

(xiii) 52.226-6, Promoting Excess Food Donation to Nonprofit Organizations (Mar 2009)
(Pub. L. 110-247). Flow down required in accordance with paragraph (e) of FAR clause 52.226-
6.

(xiv) 52.247-64, Preference for Privately Owned U.S.-Flag Commercial Vessels
(Feb 2006) (46 U.S.C. Appx. 1241(b) and 10 U.S.C. 2631). Flow down required in accordance
with paragraph (d) of FAR clause 52.247-64.

(2) While not required, the contractor may include in its subcontracts for commercial items
a minimal number of additional clauses necessary to satisfy its contractual obligations.

## B.14    EDAR 3452.209–70 Conflict of Interest Certification (MAR 2011)

(a)    (1) The contractor, subcontractor, employee, or consultant, by signing the form in this
clause, certifies that, to the best of its knowledge and belief, there are no relevant facts or
circumstances that could give rise to an organizational or personal conflict of interest,
(see FAR Subpart 9.5 for organizational conflicts of interest) (or apparent conflict of
interest), for the organization or any of its staff, and that the contractor, subcontractor,
employee, or consultant has disclosed all such relevant information if such a conflict of
interest appears to exist to a reasonable person with knowledge of the relevant facts (or if
such a person would question the impartiality of the contractor, subcontractor, employee,
or consultant). Conflicts may arise in the following situations:

(i) *Unequal access to information.* A potential contractor, subcontractor,
employee, or consultant has access to nonpublic information through its
performance on a government contract.

(ii) *Biased ground rules.* A potential contractor, subcontractor, employee, or consultant has worked, in one government contract, or program, on the basic structure or ground rules of another government contract.

(iii) *Impaired objectivity.* A potential contractor, subcontractor, employee, or consultant, or member of their immediate family (spouse, parent, or child) has financial or other interests that would impair, or give the appearance of impairing, impartial judgment in the evaluation of government programs, in offering advice or recommendations to the government, or in providing technical assistance or other services to recipients of Federal funds as part of its contractual responsibility. ''*Impaired objectivity*'' includes but is not limited to the following situations that would cause a reasonable person with knowledge of the relevant facts to question a person's objectivity:

> (A) Financial interests or reasonably foreseeable financial interests in or in connection with products, property, or services that may be purchased by an educational agency, a person, organization, or institution in the course of implementing any program administered by the Department;
> (B) Significant connections to teaching methodologies or approaches that might require or encourage the use of specific products, property, or services; or
> (C) Significant identification with pedagogical or philosophical viewpoints that might require or encourage the use of a specific curriculum, specific products, property, or services.

(2) Offerors must provide the disclosure described above on any actual or potential conflict of interest (or apparent conflict of interest) regardless of their opinion that such a conflict or potential conflict (or apparent conflict of interest) would not impair their objectivity.

(3) In a case in which an actual or potential conflict (or apparent conflict of interest) is disclosed, the Department will take appropriate actions to eliminate or address the actual or potential conflict, including but not limited to mitigating or neutralizing the conflict, when appropriate, through such means as ensuring a balance of views, disclosure with the appropriate disclaimers, or by restricting or modifying the work to be performed to avoid or reduce the conflict. In

this clause, the term ''potential conflict'' means reasonably foreseeable conflict of interest.

(b) The contractor, subcontractor, employee, or consultant agrees that if ''impaired objectivity'', or an actual or potential conflict of interest (or apparent conflict of interest) is discovered after the award is made, it will make a full disclosure in writing to the contracting officer. This disclosure shall include a description of actions that the contractor has taken or proposes to take to avoid, mitigate, or neutralize the actual or potential conflict (or apparent conflict of interest).

(c) *Remedies.* The Government may terminate this contract for convenience, in whole or in part, if it deems such termination necessary to avoid the appearance of a conflict of interest. If the contractor was aware of a potential conflict of interest prior to award or discovered an actual or potential conflict after award and did not disclose or misrepresented relevant information to the contracting officer, the Government may terminate the contract for default, or pursue such other remedies as may be permitted by law or this contract. These remedies include imprisonment for up to five years for violation of 18 U.S.C. 1001 and fines of up to $5000 for violation of 31

U.S.C. 3802. Further remedies include suspension or debarment from contracting with the Federal government. The contractor may also be required to reimburse the Department for costs the Department incurs arising from activities related to conflicts of interest. An example of such costs would be those incurred in processing Freedom of Information Act requests related to a conflict of interest.

(d) In cases where remedies short of termination have been applied, the contractor, subcontractor, employee, or consultant agrees to eliminate the organizational conflict of interest, or mitigate it to the satisfaction of the contracting officer.

(e) The contractor further agrees to insert in any subcontract or consultant agreement hereunder, provisions that conform substantially to the language of this clause, including specific mention of potential remedies and this paragraph (e).

(f) *Conflict of Interest Certification.* The offeror, [insert name of offeror], hereby certifies that, to the best of its knowledge and belief, there are no present or currently planned interests (financial, contractual, organizational, or otherwise) relating to the work to be performed under the contract or task order resulting from Request for Proposal No. [insert number] that would create any actual or potential conflict of interest (or apparent conflicts of interest) (including conflicts of interest for immediate family members: spouses, parents, children) that would impinge on its ability to render impartial, technically sound, and objective assistance or advice or result in it being given an unfair competitive advantage. In this clause, the term ''potential conflict'' means reasonably foreseeable conflict of interest. The offeror further certifies that it has and will continue to exercise due diligence in identifying and removing or mitigating, to the Government's satisfaction, such conflict of interest (or apparent conflict of interest).

Offeror's Name _MISSOURI HIGHER EDUCATION LOAN AUTHORITY_

RFP/Contract No. _ED-FSA-11-D-0012_

Signature ▆▆▆▆▆▆▆▆▆▆▆▆▆▆

Title ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

Date _9/29/2011_

## B.15   EDAR 3452.201-70   Contracting Officer's Representative (COR) (MAR 2011)

(a) The Contracting Officer's Representative (COR) is responsible for the technical aspects of the project, technical liaison with the contractor, and any other responsibilities that are specified in the contract. These responsibilities include inspecting all deliverables, including reports, and recommending acceptance or rejection to the contracting officer.

(b) The COR is not authorized to make any commitments or otherwise obligate the Government or authorize any changes that affect the contract price, terms, or conditions. Any contractor requests for changes shall be submitted in writing directly to the contracting officer or through the COR. No such changes shall be made without the written authorization of the contracting officer.

(c) The COR's name and contact information:

Lynn Smith
Federal Student Aid
830 First Street, NE

Suite 63H1
Washington, DC 20202
Email: lynn.smith@ed.gov
Phone: 202.377.3124

(d) The COR may be changed by the Government at any time, but notification of the change, including the name and address of the successor COR, will be provided to the contractor by the contracting officer in writing.

## B.16    EDAR 3452.227–70  Publication and publicity (MAR 2011)

(a) Unless otherwise specified in this contract, the contractor is encouraged to publish and otherwise promote the results of its work under this contract. A copy of each article or work submitted by the contractor for publication shall be promptly sent to the contracting officer's representative. The contractor shall also inform the representative when the article or work is published and furnish a copy in the published form.

(b) The contractor shall acknowledge the support of the Department of Education in publicizing the work under this contract in any medium. This acknowledgement shall read substantially as follows: ''This project has been funded at least in part with Federal funds from the U.S. Department of Education under contract number [Insert number]. The content of this publication does not necessarily reflect the views or policies of the U.S. Department of Education nor does mention of trade names, commercial products, or organizations imply endorsement by the U.S. Government.''

## B.17    EDAR 3452.227–71  Advertising of awards (MAR 2011)

The contractor agrees not to refer to awards issued by, or products or services delivered to, the Department of Education in commercial advertising in such a manner as to state or imply that the product or service provided is endorsed by the Federal government or is considered by the Federal government to be superior to other products or services.

## B.18    EDAR 3452.237–71  Observance of administrative closures (MAR 2011)

(a) The contract schedule identifies all Federal holidays that are observed under this contract. Contractor performance is required
under this contract at all other times, and compensated absences are not extended due to administrative closures of Government facilities and operations due to inclement weather, Presidential decree, or other administrative issuances where Government personnel receive early dismissal instructions.

(b) In cases of contract performance at a Government facility when the facility is closed, the vendor may arrange for performance to continue during the closure at the contractor's site, if appropriate.

**B.19    EDAR 3452.239–72  Department security requirements (MAR 2011)**

(a) The contractor and its subcontractors shall comply with Department security policy requirements as set forth in the "Bidder's Security Package: Security Requirements for Contractors Doing Business with the Department of Education" at http://www.ed.gov/fund/contract/about/bsp.html.

(b) The following are the contractor employee positions required under this contract and their designated risk levels: High Risk (HR): [Specify HR positions.] Moderate Risk (MR): [Specify MR positions.] Low Risk (LR): [Specify LR positions.]

(c) All contractor employees must undergo personnel security screening if they will be employed for 30 days or more, in accordance with Departmental Directive OM:5–101, "Contractor Employee Personnel Security Screenings." The type of screening and the timing of the screening will depend upon the nature of the contractor position, the type of data to be accessed, and the type of information technology (IT) system access required. Personnel security screenings will be commensurate with the risk and magnitude of harm the individual could cause.

(d) The contractor shall—(1) Ensure that all non-U.S. citizen contractor employees are lawful permanent residents of the United States or have appropriate work authorization documents as required by the Department of Homeland Security, Bureau of Immigration and Appeals, to work in the United States. (2) Ensure that no employees are assigned to high risk designated positions prior to a completed preliminary screening. (3) Submit all required personnel security forms to the contracting officer's representative (COR) within 24 hours of an assignment to a Department contract and ensure that the forms are complete. (4) Ensure that no contractor employee is placed in a higher risk position than that for which he or she was previously approved, without the approval of the contracting officer or the COR, the Department personnel security officer, and the Department computer security officer. (5) Ensure that all contractor employees occupying high-risk designated positions submit forms for reinvestigation every five years for the duration of the contract or if there is a break in service to a Department contract of 365 days or more. (6) Report to the COR all instances of individuals seeking to obtain unauthorized access to any departmental IT system, or sensitive but unclassified and/or Privacy Act protected information. (7) Report to the COR any information that raises an issue as to whether a contractor employee's eligibility for continued employment or access to Department IT systems, or sensitive but unclassified and/or Privacy Act protected information, promotes the efficiency of the service or violates the public trust. (8) Withdraw from consideration under the contract any employee receiving an unfavorable adjudication determination. (9) Officially notify each contractor employee if he or she will no longer work on a Department contract.

(10) Abide by the requirements in Departmental Directive OM:5–101, "Contractor Employee Personnel Security Screenings."

(e) Further information including definitions of terms used in this clause and a list of required investigative forms for each risk designation are contained in Departmental Directive OM:5–101, ''Contractor Employee Personnel Security Screenings'' available at the Web site listed in the first paragraph of this clause.

(f) Failure to comply with the contractor personnel security requirements may result in a termination of the contract for default.

**B.20     EDAR 3452.242–71 Notice to the Government of delays (MAR 2011)**

The contractor shall notify the contracting officer of any actual or potential situation, including but not limited to labor disputes, that delays or threatens to delay the timely performance of work under this contract. The contractor shall immediately give written notice thereof, including all relevant information.

**B.21     EDAR 3452.242–73 Accessibility of meetings, conferences, and seminars to persons with disabilities (MAR 2011)**

The contractor shall assure that any meeting, conference, or seminar held pursuant to the contract will meet all applicable standards for accessibility to persons with disabilities pursuant to section 504 of the Rehabilitation Act of 1973, as amended (29 U.S.C. 794) and any implementing regulations of the Department.

## C. STATEMENT OF OBJECTIVES (SOO)

### C.1   General Description Of Scope/Purpose

### C.1.1   Federal Student Aid Background/Overview
Federal Student Aid (FSA), an office of the U.S. Department of Education, plays a central and essential role in America's postsecondary education community.

FSA's core mission is to ensure that all eligible individuals benefit from federal financial assistance—grants, loans and work-study programs—for education beyond high school. The programs that FSA administers comprise the nation's largest source of student aid: each year, FSA provides more than $100 billion in new aid to nearly 14 million postsecondary students and their families. FSA's staff of 1,100 is based in 10 cities, in addition to its Washington, D.C. headquarters.

### C.1.2   Current Need
The Department seeks to contract with "eligible" and "qualified" entities to service Title IV student financial aid, in accordance with Section 2212 of the Health Care and Education Reconciliation Act of 2010 (Pub.L. 111-152, 124 Stat. 1029), which provides that:

"The Secretary shall contract with each eligible not-for-profit servicer to service loans originated under this part, if the servicer—

(I) meets the standards for servicing Federal assets that apply to contracts awarded pursuant to paragraph (1); and

(II) has the capacity to service the applicable loan volume allocation described in subparagraph (B)."

### C.1.3   Objective
Acquire efficient and effective commercial contract services from "eligible" and "qualified" entities to manage all types of Title IV student aid obligations, including, but not limited to, servicing of outstanding debt.

### C.1.4   Constraints

**C.1.4.1** Specific compliance activities for servicing Federally held assets include, but are not limited to the requirements for servicing federally-held debt, as provided herein.

**C.1.4.2** In order to manage the costs associated with such a potentially large portfolio, the service must provide innovative measures to ensure portfolio growth is not the key driver of total cost. Contractor incentives must be based on performing assets, rather than transaction or activity based delinquency incentives. Costs may also be managed through redistribution of customers to self-service options, as approved by the Government. Performance measures will help ensure that the complete service operates as efficiently and effectively as possible and that it is achieving the desired

business outcomes. These measurements will be flexible to allow for regular reviews and revisions as necessary.

**C.1.4.3** The Contractor(s) will be responsible for maintaining a full understanding of all federal and state laws and regulations and FSA requirements and ensuring that all aspects of the service continue to remain in compliance as changes occur.

**For example**, Federal Student Aid anticipates that the McNamara-O'Hara Service Contract Act of 1965 (as provided in Section B.13(c)(1)) will apply to the services performed under this procurement.  At a minimum, the Contractor(s) shall:

(a) Identify the locations in which it anticipates performance to occur;

(b) Identify the appropriate wage determination for each location identified (Prevailing wage determinations can be found using the WDOL website:  http://www.wdol.gov/); and

(c) Within each applicable wage determination, ensure that all appropriate labor categories that the servicer plans to utilize are **properly and accurately** classified within the wage determination, and that these employees are compensated in accordance with the prevailing wage determination.

(d) In the event that the labor category is subject to the Service Contract Act but is not accurately captured in the wage determination for a given location, the Contractor shall follow the process described in FAR Subpart 22.1019 and submit a "Request For Authorization of Additional Classification and Rate" (SF 1444) to the Contracting Officer for a conformance.

The preceding steps provide a high-level example of some steps that may be necessary for adhering to the Service Contract Act, but is not a comprehensive list.

**C.1.4.4** The Contractor(s) will provide a service flexible enough to handle new requirements generated by Congress and respond to legislative mandates and policy changes. Please see Attachment A-1 – *Standards and Relevant Documents* for historical and current representative information.

**C.1.4.5** The Contractor(s) will provide timely (as defined by FSA and Contractor) responses to Office of Inspector General (OIG), General Accounting Office (GAO), budget, data, and management requests.

**C.1.4.6** It is understood and mutually agreed that the Department of Education has exclusive ownership of all information stored, retrieved, modified, and/or archived as part of this service. The Contractor shall have no rights in such information and no rights to such information shall vest on the Contractor by virtue of its performance of this contract. No other party has the right to copy, delete, archive, or transfer such information without the prior express written consent of the Department of Education. The Contractor shall not use such information for any marketing or solicitation

purpose including, but not limited to, commercial advertising, credit offers, or similar campaigns.

**C.2    Attachments/Supplemental Documents**

| Number | Title |
|--------|-------|
| A-1 | Historical and Current Representative Sample of ***Standards and Relevant Documents*** (v2) |
| A-2 | Not-For-Profit (NFP) High-Level Federal Servicer Requirements (Version 6.0) |
| A-3 | Servicing Pricing Definitions |
| A-4 | Ongoing Allocation Methodology – v3 |
| A-5 | SAMPLE ONLY—Ongoing Allocation Metric Calculation (National Option Only) – v3 |
| A-6 | Supplemental Not-For-Profit (NFP) High-Level Federal Servicer Requirements (Version 1.0) |
| A-7 | Wage Determination # WD 005-2309 (Rev. -11) |
| A-8 | TIVAS Terms and Conditions (v2) |

Attachment A-1

## Attachment A-1
### Historical and Current representative sample of *Standards and Relevant Documents* (v2)

*\*Note:  This document is intended to provide a SAMPLE of standards and documents that may be relevant in performance of this contract.  This is not intended to provide a comprehensive or complete list of laws and regulations that may apply.  While it is the intent of the Government to provide current and accurate Uniform Resource Locators (URLs) to the references below, it is the responsibility of the contractor to ensure that it has referenced and complies with the documents provided herein, as applicable.  If the contractor experiences difficulty in accessing any of these documents, the contractor shall notify the Department immediately for assistance.  It is the contractor's responsibility to ensure it complies with all applicable laws and regulations in performance of this agreement, in accordance with the terms of the contract.*

## United States Department of Education Information and Resources
- Title IV Student Aid Programs Regulations (34 CFR Parts 600-694)
  - http://www.access.gpo.gov/nara/cfr/waisidx_04/34cfr600_04.html
- Review of Student Aid Regulations Under Title IV of the Higher Education Act of 1965
  - http://www.ed.gov/offices/ODS/regreview/index.html
- Amendments to the Higher Education Act of 1965
  - http://edlabor.house.gov/education/higher-education/
- Department of Education Priorities
  - http://www.ed.gov/about/priorities.jsp
- Information for Financial Aid Professionals (IFAP) Library
  - http://www.ifap.ed.gov/
- U.S. Department of Education Records Disposition Schedules
  - www.ed.gov/policy/gen/guid/fra/intro-02sch.pdf
- Security Requirements for Contractors Doing Business with the Department of Education
  - www.ed.gov/fund/contract/about/bsp.html

## Applicable Federal Public Laws and Regulations
- Title IV Student Aid Programs Regulations (34 CFR Parts 600-694)
  - http://www.access.gpo.gov/nara/cfr/waisidx_04/34cfr600_04.html
- Review of Student Aid Regulations Under Title IV of the Higher Education Act of 1965
  - http://www.ed.gov/offices/ODS/regreview/index.html
- Amendments to the Higher Education Act of 1965
  - http://edlabor.house.gov/education/higher-education/
- Fair Debt Collection Practices Act
  - http://www.ftc.gov/os/statutes/fdcpajump.htm

Attachment A-1

- Computer Fraud and Abuse Act of 1987
    - http://www.cio.energy.gov/documents/ComputerFraud-AbuseAct.pdf
- Computer Matching and Privacy Protection Act of 1988, as amended
    - http://thomas.loc.gov/cgi-bin/bdquery/z?d100:SN00496:
- Government Paperwork Elimination Act (GPEA)
    - http://www.ed.gov/policy/gen/leg/gpea/index.html
- Section 508 of the Rehabilitation Act of 1973
    - http://www.section508.gov/
- Electronic Signatures in Global and National Commerce Act of 2000 (E-Sign)
    - http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=106_cong_bills&docid=f:s761enr.txt.pdf
- Gramm-Leach-Bliley Act
    - http://www.senate.gov/~banking/conf/

## Standards Resources
- International Organization for Standardization
    - http://www.iso.ch/iso/home.htm
- National Institute of Standards and Technology
    - http://www.nist.gov/
- Software Engineering Institute (SEI) and the Capability Maturity Model (CMM)
    - http://www.sei.cmu.edu/cmmi/
- FIPS PUB 113 – "Computer Data Authentication"
    - http://www.itl.nist.gov/fipspubs/fip113.htm

## Executive Orders and Executive Office Guidance
- Executive Order 13231 - "Critical Infrastructure Protection in the Information Age"
    - http://www.whitehouse.gov/news/releases/2001/10/20011016-12.html
- Executive Order 13228 - "Establishing the Office of Homeland Security and the Homeland Security Council"
    - http://www.whitehouse.gov/news/releases/2001/10/20011008-2.html
- Executive Order 13011 - "Federal Information Technology"
    - http://www.cio.gov/Documents/federal%5Fit%5FJul%5F1996%2Ehtml

## Office of Management and Budget (OMB) Circulars, Memoranda, and Other Guidance on Information Technology
- OMB Circular A-123 – "Internet Control Systems"
    - http://www.whitehouse.gov/omb/circulars/a123/a123.html
- OMB Circular A-127 – "Financial Management Systems"
    - http://www.whitehouse.gov/omb/circulars/a127/a127.html
- OMB Circular A-130 – "Management of Federal Information Resources", Appendix III – "Security of Federal Information Resources"
    - http://www.whitehouse.gov/omb/circulars/a130/a130.html
- NIST Special Publication 800-18 – "Guide for Developing Security Plans for Information Technology Systems"

Attachment A-1

- o http://csrc.nist.gov/publications/nistpubs/800-18-Rev1/sp800-18-Rev1-final.pdf
- OMB Memorandum 97-02 – "Funding Information Systems Investments"
  - o http://www.whitehouse.gov/omb/memoranda/m97-02.html
- OMB Memorandum 97-16 – "Information Technology Architectures"
  - o http://www.whitehouse.gov/omb/memoranda/m97-16.html
- OMB Memorandum 00-15 – "OMB Guidance on Implementing the Electronic Signatures in Global and National Commerce Act"
  - o http://www.whitehouse.gov/omb/memoranda/m00-15.html
- OMB Memorandum 01-08 – "Guidance on Implementing the GISRA"
  - o http://www.whitehouse.gov/omb/memoranda/m01-08.pdf
- OMB Memorandum 01-24 – "Reporting Instructions for the GISRA"
  - o http://www.whitehouse.gov/omb/memoranda/m01-24.pdf
- US General Accounting Office Accounting and Information Management Division (GAO/AIMD) Report 94-115 – "Executive Guide: Improving Mission Performance Through Strategic Information Management and Technology"
  - o http://www.gao.gov/special.pubs/ai94115.pdf
- 1098E – Student Loan Interest Information Reporting
  - o http://www.unclefed.com/Tax-Bulls/1998/not98-07.pdf

**Other**
- IRS Publication 1075 – "Tax Information Security Guidelines for Federal, State, and Local Agencies"
  - o http://www.irs.gov/pub/irs-pdf/p1075.pdf


(End of Attachment A-1)

# Attachment A-2
## Not-For-Profit (NFP) High-Level Federal Servicer Requirements

| | High Level Requirements | Requirement Category |
|---|---|---|
| 1 | The servicer shall have the ability to service FFEL, Direct, and FISL loans as required by statutory and regulatory guidelines. | Processing & Servicing |
| 2 | The servicer shall have the ability to assess charge/fees (i.e. Non Sufficient Funds or late charges). *Note: no charges for other fees on loans in the ED portfolio are to be assessed at this time.* | Processing & Servicing |
| 3 | The servicer shall have the ability to support borrower benefit plans. | Processing & Servicing |
| 4 | The servicer shall process discharge transactions after receiving and reviewing required supporting documentation meeting the required regulatory guidelines and receiving FSA approval. | Processing & Servicing |
| 5 | The servicer shall provide FSA the ability to access account information on FSA accounts that exist on the servicer's system. | Processing & Servicing |
| 6 | The servicer shall provide FSA the ability to access to image information on FSA accounts that exist on the servicer's system. | Processing & Servicing |
| 7 | The servicer shall provide access for FSA to listen to live and/or recorded inbound and outbound calls. | Processing & Servicing |
| 8 | The Servicer shall process government initiated control mail. | Processing & Servicing |
| 9 | The Servicer shall provide repayment plans for all loans types, including plans in existence prior to, and after, the Higher Education Reconciliation Act of 2005 (HERA).  Servicers will also need to implement the Income Contingent Repayment plan. | Processing & Servicing |
| 10 | The servicer shall perform reconciliations of portfolio balances and financial activity. | Financial Reports & Reconciliation |
| 11 | The servicer shall provide accounting reports needed for reconciliations. | Financial Reports & Reconciliation |
| 12 | The servicer shall perform daily, weekly and monthly internal system balancing of all payment activity accepted from all sources (manual and via system interface). | Financial Reports & Reconciliation |
| 13 | The servicer shall create a financial interface between the FSA servicer and FSA Financial Management System (FMS) to provide financial data to FMS on a daily, weekly and monthly basis. | FMS Interface |
| 14 | The servicer shall accurately translate (map) each servicing transaction from the Servicer's subsidiary ledger to FSA's general ledger (FMS). | FMS Interface |

# Attachment A-2
# Not-For-Profit (NFP) High-Level Federal Servicer Requirements

| | | |
|---|---|---|
| 15 | The servicer shall uniquely identify each specific activity (e.g., Collection of Principal, Collection of Interest, etc.) at a transaction level for all loans in the federal portfolio. | Financial Activity and Transactions |
| 16 | The servicer shall provide activity reports needed for reconciliations. | Financial Activity and Transactions |
| 17 | The servicer shall obtain daily deposit information from Treasury systems and shall post payments to the borrower accounts on the same date of receipt. | Financial Activity and Transactions |
| 18 | The servicer shall perform due diligence to research payments held in suspense for the purpose of resolving the unposted items (posting to borrower account, refunding, or escheatment). | Financial Activity and Transactions |
| 19 | The servicer shall manage credit balance accounts, and other payments and accounts requiring a refund; processing payments refunds via interface with FSA's Financial Management System (FMS). | Financial Activity and Transactions |
| 20 | The servicer shall assign and retain the Credit Reform Code (CRC), recording and reporting on all loan related transactions at the CRC level. | Financial Activity and Transactions |
| 21 | The servicer shall incorporate a system of internal controls consistent with federal laws, regulations, policies and authoritative guidance. These laws, regulations, and guidance include, but are not limited to: Federal Financial Management Improvement Act (FFMIA); Federal Managers' Financial Integrity Act (FMFIA); CFO Act; Government Performance and Results Act (GPRA); GAO's Green Book; OMB Circulars A-123, 1-127, and A-130; Joint Financial Management Improvement Program (JFMIP); and Treasury Financial Manual (TFM). | Financial Activity and Transactions |
| 22 | The servicer shall maintain unique standard reporting for loans within each Program (i.e. 08/09 Loan Purchase Program, Puts from 08/09 Participation Program, 09/10 Loan Purchase program, Conduit, Direct Loan, etc.) | Financial Activity and Transactions |
| 23 | The servicer shall develop an interface with Treasury designated services (Treasury Lockbox, Pay.gov, Remittance Express, IPAC, TRS, etc.) and send/receive data via these interfaces. | Treasury - Lockbox/Cashlink/TRS/Pay.go v |
| 24 | The servicer shall require entities making payments on federally held loans (borrowers, lenders, etc) to direct payments to a Treasury designated service.  NOTE: Payments on non-federally held loans can not be directed to a Treasury service. | Treasury - Lockbox/Cashlink/TRS/Pay.go v |
| 25 | The Servicer shall provide support for OMB Circular A-123.  Includes process flows, improper payment reporting, walkthroughs, samples, etc. | Internal Controls & Audits |

## Attachment A-2
## Not-For-Profit (NFP) High-Level Federal Servicer Requirements

| | | |
|---|---|---|
| 26 | The Servicer shall provide data downloads, samples, walkthroughs, process documentation and additional work products to support audits. | Internal Controls & Audits |
| 27 | The servicer shall be responsible for resolving all deficiencies identified during audits and participating in corrective action plans as needed. | Internal Controls & Audits |
| 28 | The Servicer shall provide operational and portfolio reports. | Operational & Portfolio Reporting |
| 29 | The Servicer shall provide support to provide FSA requested ad hoc reports when requested. | Operational & Portfolio Reporting |
| 30 | The servicer shall create an interface between the FSA servicer and NSLDS and provide loan and borrower level information to NSLDS via SAIG on a weekly basis. | NSLDS |
| 31 | The servicer shall accept NSLDS enrollment information and update borrower accounts based on enrollment updates. | NSLDS |
| 32 | The servicer shall resolve NSLDS errors and data conflicts. | NSLDS |
| 33 | The servicer shall create an interface between the FSA servicer and the Total & Permanent Disability System (TPD). | Total & Permanent Disability |
| 34 | The servicer shall accept and review applications from borrowers applying for TPD. | Total & Permanent Disability |
| 35 | The servicer shall resolve any TPD System interface errors and data conflicts. | Total & Permanent Disability |
| 36 | The servicer shall transfer borrowers/loans that qualify for TPD to the TPD system. | Total & Permanent Disability |
| 37 | The servicer shall accept reinstated loans transferred from the TPD System and begin servicing the loans. | Total & Permanent Disability |
| 38 | The servicer shall process all applicable financial transactions when transferring loans to, or receiving loans from, the TPD system. | Total & Permanent Disability |
| 39 | The servicer shall create an interface between the FSA servicer and the Federal Debt Collection System. | Debt Collection |
| 40 | The servicer shall resolve any Debt Collection interface errors and data conflicts. | Debt Collection |
| 41 | The servicer shall transfer defaulted borrowers/loans to the Debt Collection system. | Debt Collection |
| 42 | The servicer shall accept rehabilitated loans transferred from the Debt Collection system and begin servicing the loans. | Debt Collection |

## Attachment A-2
## Not-For-Profit (NFP) High-Level Federal Servicer Requirements

| | | |
|---|---|---|
| 43 | The servicer shall process all applicable financial transactions when transferring loans to, or receiving loans from, the Debt Collection system. | Debt Collection |
| 44 | The servicer shall create an interface between the FSA servicer and the Direct Loan Consolidation System (DLCS). | Consolidation (Payoff interface) |
| 45 | The servicer shall accept and respond to consolidation inquiries via the interface with DLCS (similar to LVC process). | Consolidation (Payoff interface) |
| 46 | The servicer shall accept and process consolidation payoffs via the interface with DLCS. | Consolidation (Payoff interface) |
| 47 | The servicer shall process all applicable financial transactions resulting from consolidation payoffs received. | Consolidation (Payoff interface) |
| 48 | The servicer shall resolve any DLCS interface errors and data conflicts. | Consolidation (Payoff interface) |
| 49 | The servicer shall comply with all federal standards related to records management. (such as citations to pertinent laws, codes and regulations such as 44 U.S.C chapters 21, 29, 31 and 33; Freedom of Information Act (5 U.S.C. 552); Privacy Act (5 U.S.C. 552a); 36 CFR Part 1222 and Part 1228) | Record Retention |
| 50 | The servicer shall provide support for walkthroughs and/or site visits by FSA and/or FSA designees. | Compliance & Monitoring Reviews |
| 51 | The servicer shall support annual program compliance reviews by FSA, or by an agent of FSA | Compliance & Monitoring Reviews |
| 52 | The servicer shall support quarterly monitoring reviews completed by FSA (including providing walkthroughs, procedures, samples, process flows, training materials, etc.). | Compliance & Monitoring Reviews |
| 53 | The servicer shall meet all statutory and legislative requirements. | Other |
| 54 | The servicer shall have the ability to send and receive loan transfers to/from all federal servicers via a common format. | Other |
| 55 | The servicer shall complete all financial transactions, reconciliation, and reporting resulting from transfers to/from all federal servicers. | Other |
| 56 | The servicer shall respond to draft and official cohort default rate (incorrect data) challenges. | Other |
| 57 | The Servicer shall restrict access to FSA held loans being serviced and segregate them from all other loans on their system.  Access must be limited to personnel who have obtained proper clearances and who are specifically authorized to view or perform transactions and services on loans held by FSA. | Security |

# Attachment A-2
## Not-For-Profit (NFP) High-Level Federal Servicer Requirements

| | | |
|---|---|---|
| 58 | The servicer shall provide previous security information from the past three years to include a discussion of security incidents; and audits like SAS 70s, Sarbanes Oxley reviews, independent security assessments, risk assessments, and/or internal reviews along with the applicable remediation plans. | Security |
| 59 | The servicer shall provide existing security documentation like its security organizational structure, its system's boundary, existing security policy, procedures, and plans. | Security |
| 60 | The servicer shall complete personnel background screening requirements:<br><br>a)  All personnel are required to complete a federal background clearance based on their position risk level. Background clearances are submitted on line via Office of Personnel Management (OPM)'s Electronic Questionnaire for Investigations Process (e-Qip). Contractor employees who have undergone appropriate personnel security screening for another federal agency may submit proof of personal security screening for validation. (Attached Security Attachment A –Department of Education's Directive for Contractor Employee Personnel Security Screenings.)<br><br>b)  Preliminary clearances must be completed for high-risk positions prior to working on Federal Student Aid systems or data (This process can take 2-6 weeks). Moderate and low risk positions must submit background clearance paperwork prior to working on Federal Student Aid computer resources.<br><br>c)  Non-U.S. Citizen may be assigned to a High Risk IT (6C) level position, provided: he/she is a Lawful Permanent Resident of the United States and has resided continuously in the United States for a minimum of three (3) years. Non-U.S. Citizens living outside of the United States cannot have the capability to access Federal Student Aid systems or data. | |
| 61 | The servicer shall complete a self-assessment of it's system and facilities based on NIST SP 800-53 controls, identify security deficiencies/gaps, and create a remediation plan for the identified deficiencies. | Security |
| 62 | The servicer shall agree to provide support for all actions required for a formal security authorization and continuous monitoring program as defined by NIST SP 800-37. | Security |

# Attachment A-2
# Not-For-Profit (NFP) High-Level Federal Servicer Requirements

| | | |
|---|---|---|
| 63 | The servicer shall create a project plan that they will follow to develop a NIST SP 800-18 compliant System Security Plan created in the Department of Education format. | Security |
| 64 | The servicer shall bundle the requested information in requirements 57 - 63 above as attachments to a discussion document that provides an overview of how each requirement is met. The cover page for this package will include a self-certification document identifying the system's security posture to include its overall security risk. The cover page shall be signed by the servicer's senior security official and program manager attesting that the information within the package is accurate. | Security |

| Deliverable | Definition |
|---|---|
| Borrowers in In-school Status | Number of unique borrowers (SSNs) with balance not equal to $0.00 who have not separated from school as of the last day of the billing period |
| Borrowers in Grace or Current Repayment Status | Number of unique borrowers (SSNs) with balance not equal to $0.00 who have separated from school and are less than 31 days delinquent and are not in deferment, forbearance, or conditionally discharged as of the last day of the billing period |
| Borrowers in Deferment or Forbearance | Number of unique borrowers (SSNs) with balance not equal to $0.00 who have separated from school, are in deferment or forbearance and who are not conditionally discharged as of the last day of the billing period |
| Borrowers 31-90 Days Delinquent | Number of unique borrowers (SSNs) with balance not equal to $0.00 who have separated from school, are 31 or more days, but less than 91 days delinquent, and who are not conditionally discharged as of the last day of the billing period |
| Borrowers 91-150 Days Delinquent | Number of unique borrowers (SSNs) with balance not equal to $0.00 who have separated from school, are 91 or more days, but less than 151 days delinquent, and who are not conditionally discharged as of the last day of the billing period |
| Borrowers 151-270 Days Delinquent | Number of unique borrowers (SSNs) with balance not equal to $0.00 who have separated from school are 151 or more days, but less than 271 days delinquent, and who are not conditionally discharged as of the last day of the billing period |
| Borrowers 270+ Days Delinquent | Number of unique borrowers (SSNs) with balance not equal to $0.00 who have separated from school and 271 or more days and who are not conditionally discharged as of the last day of the billing period. This may include borrowers over 360 day that are considered in Default Status, but for some reason have not been transferred through no fault of the Servicer. |

NOTES:
1. Common pricing shall apply regardless of program (i.e. Direct Loan, Federal Family Education Loan) or volume serviced, unless otherwise noted in the contract.
2. Reporting is required for the number of borrowers and/or loans and dollar amount of each program, in addition to any other reporting requirements provided in the contract.
3. Borrowers in multiple statuses shall be billed once, in the lowest performing deliverable status. The lowest performing deliverable status is defined as the lowest unit priced deliverable.
4. Borrowers pending discharge, which include, but are not limited to: conditional disability, death, or bankruptcy, shall be, for billing purposes, counted in the deliverable status at the time of the discharge request.
5. "The last day of the billing period" is defined as the last day of the Department of Education's monthly billing period.

Attachment A-4

# Ongoing Allocation Methodology – Version 3

The allocation of ongoing volume will be determined based on the performance of each servicer in relation to the other servicers awarded. While the total number of awarded servicers has not yet been determined, this methodology works with any number of servicers (as shown in examples).

Quarterly metric results will be compiled for each servicer based on various performance factors; five high-level metrics, and some sub-metric categories, have been defined (see below). An average of the quarterly metric results available on July 1 of each year will be used to determine the ranking of each servicer in each of the five high-level metric categories. By combining each servicer's ranking in all categories, each servicer will be given a percentage of the total volume of Federally Held Debt specifically dedicated to the Not-For-Profit (NFP) Servicer contractors pool (if any), to be distributed for the upcoming year. However, the Government makes no guarantee that a contractor under the NFP program will receive more than its initial allocation of 100,000 borrower accounts. The ability of the Contractor to retain and/or increase its allocation volume shall depend on the Contractor's compliance with contractual/regulatory requirements, and performance. In the event of an inability to comply with contractual/regulatory requirements and/or a lack of satisfactory performance, the Government reserves the right to terminate the contract or reduce the Contractor's allocation at no additional cost to the Government.

All metrics will be measured on quarterly basis.   The initial metric results for each servicer will be measured during the first calendar quarter the servicer receives a transfer of loans.  In July of each year, all available quarterly metric results will be averaged together to provide a final metric result in each metric category.  Survey results will be averaged and rounded to the nearest 100th of a point (2 positions right of decimal – e.g. 74.577 = 74.58), other metric results will be rounded to the nearest 100th of a percent (2 positions right of percentage decimal – e.g. 2.056% = 2.06%).

FSA will compare all servicers' metric results in each allocation metric category and determine a ranking for each servicer in that category, with the best ranking in each category receiving the highest possible score and the worst ranking receiving the lowest possible score (highest / lowest values will be determined by the number of servicers eligible for allocation --- Highest score possible will be the total number of servicers selected, lowest score will be 1).

Once a score has been assigned to each servicer in each allocation category, all scores for a servicer will be added together to provide the "Total Yearly Score" for that servicer for the year. Each servicer will have one Total Yearly Score for each year.

**Allocation Metric # 1 – Borrower Surveys** –The survey will measure borrower satisfaction with the servicer and results will be based on a scale of 0 – 100, with 100 representing a perfect score.  FSA or an agent of FSA will conduct surveys.

**Allocation Metric # 2 – FSA Surveys** –Surveys will measure satisfaction of selected FSA staff with the servicer and results will be based on a scale of 0 – 100, with 100 representing a perfect score.  FSA or an agent of FSA will conduct surveys.

**Allocation Metric # 3 – Percent of Borrowers in Current Repayment Status** –  Calculation = (count of borrowers in current repayment status (<=30 days delinquent) at the end of current period) divided by (borrower count of all borrowers in both current and delinquent repayment at end of current period).

Attachment A-4

**Allocation Metric # 4 – Percent of Borrowers > 90 Days Delinquent** –Calculation = (borrower count of borrowers > 90 days delinquent at end of the current period) divided by (borrower count of all borrowers in both current and delinquent repayment at end of current period).

**Allocation Metric # 5 – Delinquency Resolution of Borrowers Delinquent > 180 days** –  Calculation = (count of current borrowers (<=30 days delinquent) at end of period who, in prior calendar quarter end had a delinquency of 180 days or >) divided by (count of borrowers >=180 days delinquent at end of prior quarter).

**Allocation of New Volume of Federally Held Debt**
Each servicer will be assigned an allocation percentage of new volume by dividing that servicer's total yearly score by the combined total yearly scores of all servicers. The resulting percentage will determine each servicer's percentage of new volume of Federally Held Debt.
 The servicer's percentage of new volume will determine the percentage of new borrowers that will be sent to the servicer for servicing (loans for existing borrowers may, to the maximum extent practicable, be sent to the servicer already holding that borrower's other loans).

No entity shall be eligible for an additional allocation until they have been measured on all performance metrics for at least three full calendar quarters.  No borrower accounts shall be included in the allocation pool before at least two not-for-profit servicers are eligible for an additional allocation.  Accordingly, the first allocation of additional volume will not occur before August 2013.

*NOTE: If a servicer is out of compliance (for example, but not limited to, financial management or reporting, security, OMB Circular A-123, Legislative Mandates, Program Compliance, etc.), that servicer's new volume may be re-allocated to one or more other servicers until compliance has been achieved. In addition, that servicer's current account volume may be transferred to another servicer, at the non-compliant servicer's expense.*

Attachment A-5

## <u>SAMPLE ONLY</u> - ONGOING ALLOCATION METRIC CALCULATION - Version 3

## Scenario 1 - 5 NFP Servicers Under Contract Award

Quarterly Scores for all Servicers

| Servicer A | Oct metric results | Dec metric results | Mar metric results | Jun metric results | Yearly Average |
|---|---|---|---|---|---|
| Borrower Survey | 98.00 | 96.00 | 98.00 | 96.00 | 97.00 |
| FSA Survey | 96.00 | 98.00 | 97.00 | 97.00 | 97.00 |
| % of Borrowers in Current Repayment | 78.00% | 63.00% | 74.00% | 65.00% | 70.000% |
| % of Borrowers > 90 Days Delinquent | 1.00% | 1.20% | 0.90% | 1.30% | 1.100% |
| Delinquency Resolution of Borrowers Delinquent > 180 Days | 6.00% | 7.00% | 7.00% | 6.40% | 6.600% |

| Servicer B | Oct metric results | Dec metric results | Mar metric results | Jun metric results | Yearly Average |
|---|---|---|---|---|---|
| Borrower Survey | 98.00 | 96.00 | 92.00 | 94.00 | 95.00 |
| FSA Survey | 95.00 | 92.00 | 91.00 | 91.00 | 92.25 |
| % of Borrowers in Current Repayment | 60.00% | 70.00% | 70.00% | 60.00% | 65.000% |
| % of Borrowers > 90 Days Delinquent | 2.00% | 3.60% | 3.00% | 3.60% | 3.050% |
| Delinquency Resolution of Borrowers Delinquent > 180 Days | 4.00% | 5.05% | 4.00% | 5.60% | 4.660% |

| Servicer C (Servicer Only live for 3 performance periods) | Oct metric results | Dec metric results | Mar metric results | Jun metric results | Yearly Average |
|---|---|---|---|---|---|
| Borrower Survey | N/A | 96.00 | 91.00 | 95.00 | 94.00 |
| FSA Survey | N/A | 92.00 | 95.00 | 92.00 | 93.00 |
| % of Borrowers in Current Repayment | N/A | 74.00% | 72.00% | 66.00% | 70.670% |
| % of Borrowers > 90 Days Delinquent | N/A | 2.40% | 1.80% | 2.60% | 2.270% |
| Delinquency Resolution of Borrowers Delinquent > 180 Days | N/A | 6.00% | 5.00% | 7.00% | 6.000% |

| Servicer D (Servicer Only live for 3 performance periods) | Oct metric results | Dec metric results | Mar metric results | Jun metric results | Yearly Average |
|---|---|---|---|---|---|
| Borrower Survey | N/A | 90.00 | 95.00 | 85.00 | 90.00 |
| FSA Survey | N/A | 97.00 | 98.00 | 90.00 | 95.00 |
| % of Borrowers in Current Repayment | N/A | 62.50% | 60.05% | 59.95% | 60.830% |
| % of Borrowers > 90 Days Delinquent | N/A | 5.05% | 4.50% | 5.10% | 4.880% |
| Delinquency Resolution of Borrowers Delinquent > 180 Days | N/A | 3.60% | 2.00% | 3.60% | 3.070% |

| Servicer E (Servicer Only live for 2 performance periods) NOT ELIGIBLE FOR ALLOCATION | Oct metric results | Dec metric results | Mar metric results | Jun metric results | Yearly Average |
|---|---|---|---|---|---|
| Borrower Survey | N/A | N/A | 90.00 | 90.00 | 90.00 |
| FSA Survey | N/A | N/A | 92.00 | 90.00 | 91.00 |
| % of Borrowers in Current Repayment | N/A | N/A | 61.00% | 64.00% | 62.500% |
| % of Borrowers > 90 Days Delinquent | N/A | N/A | 6.00% | 5.00% | 5.500% |
| Delinquency Resolution of Borrowers Delinquent > 180 Days | N/A | N/A | 3.00% | 1.60% | 2.300% |

Attachment A-5

**FINAL YEARLY METRIC RESULT BY ALLOCATION METRIC**

| | METRIC | Servicers | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| 1 | Borrower Survey | 97.00 | 95.00 | 94.00 | 90.00 |
| 2 | FSA Survey | 97.00 | 92.25 | 93.00 | 95.00 |
| 3 | % of Borrowers in Current Repayment | 70.00% | 65.00% | 70.67% | 60.83% |
| 4 | % of Borrowers > 90 Days Delinquent | 1.10% | 3.05% | 2.27% | 4.88% |
| 5 | Delinquency Resolution of Borrowers Delinquent > 180 Days | 6.60% | 4.66% | 6.00% | 3.07% |

**SERVICER SCORE BY ALLOCATION METRIC**

| | METRIC | Servicers | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| 1 | Borrower Survey | 4.0 | 3.0 | 2.0 | 1.0 |
| 2 | FSA Survey | 4.0 | 1.0 | 2.0 | 3.0 |
| 3 | % of Borrowers in Current Repayment | 3.0 | 2.0 | 4.0 | 1.0 |
| 4 | % of Borrowers > 90 Days Delinquent | 4.0 | 2.0 | 3.0 | 1.0 |
| 5 | Delinquency Resolution of Borrowers Delinquent > 180 Days | 4.0 | 2.0 | 3.0 | 1.0 |

**TOTAL YEARLY SCORE BY SERVICER**

| | Servicers | | | |
|---|---|---|---|---|
| | A | B | C | D |
| AVERAGE SCORE | 19.0 | 10.0 | 14.0 | 7.0 |

**ALLOCATION EACH SERIVER WILL RECEIVE**

| | Total Yearly Score | % of new volume Servicer will receive (Average Score / Current Total) | New borrowers (based on the total new loan) |
|---|---|---|---|
| Servicer A | 50.0 | 31.33% | 1,666,666 |
| Servicer B | 25.0 | 27.78% | 1,666,666 |
| Servicer C | 20.0 | 22.22% | 1,333,300 |
| Servicer D | 15.0 | 16.67% | 1,000,200 |
| Combined Total | 92 | 100.00% | 6,000,000 |

# Attachment A-6
## Supplemental Not-For-Profit (NFP) High-Level Federal Servicer Requirements

| | High Level Requirements | Requirement Category |
|---|---|---|
| 1 | The servicer shall create an interface with the Direct Loan Origination & Disbursement System(s) to accept Direct Loans. | DL Originations |
| 2 | The servicer shall complete all financial transactions, reconciliation, and reporting resulting from receiving Direct Loans. | DL Originations |
| 3 | The servicer shall resolve any Direct Loan origination interface errors and data conflicts. | DL Originations |
| 4 | The servicer shall implement a process to accept loans purchased by ED via a loan transfer file. | Loan Purchases |
| 5 | The servicer shall support all activities required to complete ED loan purchases. | Loan Purchases |
| 6 | The servicer shall complete all financial transactions, reconciliation, and reporting resulting from ED loan purchase process. | Loan Purchases |

```
WD 05-2309 (Rev.-11) was first posted on www.wdol.gov on 06/17/2011
*****************************************************************************
REGISTER OF WAGE DETERMINATIONS UNDER  |    U.S. DEPARTMENT OF LABOR
        THE SERVICE CONTRACT ACT        | EMPLOYMENT STANDARDS ADMINISTRATION
By direction of the Secretary of Labor  |      WAGE AND HOUR DIVISION
                                        |      WASHINGTON D.C.  20210
                                        |
                                        |
                                        |
                                        | Wage Determination No.: 2005-2309
Diane C. Koplewski      Division of     |     Revision No.: 11
Director             Wage Determinations|    Date Of Revision: 06/13/2011
_____|_____
```

States: Illinois, Missouri

Area: Illinois Counties of Alexander, Bond, Calhoun, Clay, Clinton, Effingham,
Fayette, Franklin, Hamilton, Jackson, Jefferson, Jersey, Johnson, Madison,
Marion, Massac, Monroe, Perry, Pope, Pulaski, Randolph, Saline, St Clair,
Union, Washington, Wayne, Williamson
Missouri Counties of Audrain, Boone, Callaway, Clark, Cole, Crawford, Franklin,
 Gasconade, Jefferson, Knox, Lewis, Lincoln, Marion, Monroe, Montgomery, Osage,
 Pike, Ralls, Randolph, Scotland, Shelby, St Charles, St Francois, St Louis,
Ste Genevieve, Warren, Washington

```
               **Fringe Benefits Required Follow the Occupational Listing**
OCCUPATION CODE - TITLE                             FOOTNOTE          RATE
01000 - Administrative Support And Clerical Occupations
   01011 - Accounting Clerk I                                        14.10
   01012 - Accounting Clerk II                                       15.83
   01013 - Accounting Clerk III                                      18.57
   01020 - Administrative Assistant                                  24.14
   01040 - Court Reporter                                            19.05
   01051 - Data Entry Operator I                                     12.22
   01052 - Data Entry Operator II                                    14.40
   01060 - Dispatcher, Motor Vehicle                                 19.05
   01070 - Document Preparation Clerk                                13.51
   01090 - Duplicating Machine Operator                             13.51
   01111 - General Clerk I                                           12.33
   01112 - General Clerk II                                          15.00
   01113 - General Clerk III                                         17.07
   01120 - Housing Referral Assistant                                20.96
   01141 - Messenger Courier                                         11.61
   01191 - Order Clerk I                                             12.99
   01192 - Order Clerk II                                            14.18
   01261 - Personnel Assistant (Employment) I                        16.33
   01262 - Personnel Assistant (Employment) II                       19.05
   01263 - Personnel Assistant (Employment) III                      20.73
   01270 - Production Control Clerk                                  20.73
   01280 - Receptionist                                              15.10
   01290 - Rental Clerk                                              16.06
   01300 - Scheduler, Maintenance                                    15.96
   01311 - Secretary I                                               15.96
   01312 - Secretary II                                              17.85
   01313 - Secretary III                                             20.96
   01320 - Service Order Dispatcher                                  18.12
   01410 - Supply Technician                                         22.39
   01420 - Survey Worker                                             19.05
   01531 - Travel Clerk I                                            11.94
   01532 - Travel Clerk II                                           12.86
   01533 - Travel Clerk III                                          13.72
   01611 - Word Processor I                                          13.51
   01612 - Word Processor II                                         16.06
   01613 - Word Processor III                                        19.05
05000 - Automotive Service Occupations
```

```
 05005 - Automobile Body Repairer, Fiberglass              22.80
 05010 - Automotive  Electrician                           20.59
 05040 - Automotive Glass Installer                        19.74
 05070 - Automotive Worker                                 19.74
 05110 - Mobile Equipment Servicer                         18.01
 05130 - Motor Equipment Metal Mechanic                    21.46
 05160 - Motor Equipment Metal Worker                      19.74
 05190 - Motor Vehicle Mechanic                            20.40
 05220 - Motor Vehicle Mechanic Helper                     16.72
 05250 - Motor Vehicle Upholstery Worker                   18.88
 05280 - Motor Vehicle Wrecker                             19.74
 05310 - Painter, Automotive                               20.59
 05340 - Radiator Repair Specialist                        19.74
 05370 - Tire Repairer                                     15.80
 05400 - Transmission Repair Specialist                    21.46
07000 - Food Preparation And Service Occupations
 07010 - Baker                                             12.77
 07041 - Cook I                                            11.02
 07042 - Cook II                                           12.07
 07070 - Dishwasher                                         8.11
 07130 - Food Service Worker                               10.05
 07210 - Meat Cutter                                       16.34
 07260 - Waiter/Waitress                                    8.69
09000 - Furniture Maintenance And Repair Occupations
 09010 - Electrostatic Spray Painter                       20.56
 09040 - Furniture Handler                                 13.35
 09080 - Furniture Refinisher                              20.56
 09090 - Furniture Refinisher Helper                       16.55
 09110 - Furniture Repairer, Minor                         18.84
 09130 - Upholsterer                                       22.61
11000 - General Services And Support Occupations
 11030 - Cleaner, Vehicles                                 11.74
 11060 - Elevator Operator                                 11.10
 11090 - Gardener                                          16.03
 11122 - Housekeeping Aide                                 11.46
 11150 - Janitor                                           11.46
 11210 - Laborer, Grounds Maintenance                      12.55
 11240 - Maid or Houseman                                   8.62
 11260 - Pruner                                            11.10
 11270 - Tractor Operator                                  15.03
 11330 - Trail Maintenance Worker                          12.55
 11360 - Window Cleaner                                    13.02
12000 - Health Occupations
 12010 - Ambulance Driver                                  17.73
 12011 - Breath Alcohol Technician                         16.55
 12012 - Certified Occupational Therapist Assistant        21.69
 12015 - Certified Physical Therapist Assistant            20.81
 12020 - Dental Assistant                                  16.87
 12025 - Dental Hygienist                                  29.20
 12030 - EKG Technician                                    22.64
 12035 - Electroneurodiagnostic Technologist               22.64
 12040 - Emergency Medical Technician                      19.90
 12071 - Licensed Practical Nurse I                        14.80
 12072 - Licensed Practical Nurse II                       16.55
 12073 - Licensed Practical Nurse III                      18.46
 12100 - Medical Assistant                                 13.28
 12130 - Medical Laboratory Technician                     17.14
 12160 - Medical Record Clerk                              14.89
 12190 - Medical Record Technician                         15.83
 12195 - Medical Transcriptionist                          16.10
 12210 - Nuclear Medicine Technologist                     31.23
 12221 - Nursing Assistant I                               10.22
 12222 - Nursing Assistant II                              11.49
 12223 - Nursing Assistant III                             12.54
 12224 - Nursing Assistant IV                              14.07
```

```
12235 - Optical Dispenser                                     16.07
12236 - Optical Technician                                    15.99
12250 - Pharmacy Technician                                   15.52
12280 - Phlebotomist                                          14.07
12305 - Radiologic Technologist                               25.09
12311 - Registered Nurse I                                    26.36
12312 - Registered Nurse II                                   29.18
12313 - Registered Nurse II, Specialist                       29.18
12314 - Registered Nurse III                                  35.30
12315 - Registered Nurse III, Anesthetist                     35.30
12316 - Registered Nurse IV                                   42.33
12317 - Scheduler (Drug and Alcohol Testing)                  20.03
13000 - Information And Arts Occupations
13011 - Exhibits Specialist I                                 18.31
13012 - Exhibits Specialist II                                22.69
13013 - Exhibits Specialist III                               27.76
13041 - Illustrator I                                         20.80
13042 - Illustrator II                                        25.56
13043 - Illustrator III                                       30.15
13047 - Librarian                                             26.36
13050 - Library Aide/Clerk                                    12.34
13054 - Library Information Technology Systems                23.81
Administrator
13058 - Library Technician                                    14.61
13061 - Media Specialist I                                    17.18
13062 - Media Specialist II                                   19.21
13063 - Media Specialist III                                  21.43
13071 - Photographer I                                        16.71
13072 - Photographer II                                       18.69
13073 - Photographer III                                      23.16
13074 - Photographer IV                                       27.91
13075 - Photographer V                                        33.77
13110 - Video Teleconference Technician                       17.77
14000 - Information Technology Occupations
14041 - Computer Operator I                                   17.04
14042 - Computer Operator II                                  19.06
14043 - Computer Operator III                                 21.26
14044 - Computer Operator IV                                  23.61
14045 - Computer Operator V                                   26.16
14071 - Computer Programmer I                                 22.01
14072 - Computer Programmer II                                26.17
14073 - Computer Programmer III              (see 1)
14074 - Computer Programmer IV               (see 1)
14101 - Computer Systems Analyst I           (see 1)
14102 - Computer Systems Analyst II          (see 1)
14103 - Computer Systems Analyst III         (see 1)
14150 - Peripheral Equipment Operator                         18.26
14160 - Personal Computer Support Technician                  25.31
15000 - Instructional Occupations
15010 - Aircrew Training Devices Instructor (Non-Rated)       34.92
15020 - Aircrew Training Devices Instructor (Rated)           42.25
15030 - Air Crew Training Devices Instructor (Pilot)          50.64
15050 - Computer Based Training Specialist / Instructor       33.63
15060 - Educational Technologist                              28.74
15070 - Flight Instructor (Pilot)                             50.64
15080 - Graphic Artist                                        21.87
15090 - Technical Instructor                                  20.66
15095 - Technical Instructor/Course Developer                 25.27
15110 - Test Proctor                                          16.67
15120 - Tutor                                                 16.67
16000 - Laundry, Dry-Cleaning, Pressing And Related Occupations
16010 - Assembler                                              9.18
16030 - Counter Attendant                                      9.18
16040 - Dry Cleaner                                            11.31
16070 - Finisher, Flatwork, Machine                            9.18
```

```
    16090 - Presser, Hand                                            9.18
    16110 - Presser, Machine, Drycleaning                            9.18
    16130 - Presser, Machine, Shirts                                 9.18
    16160 - Presser, Machine, Wearing Apparel, Laundry               9.18
    16190 - Sewing Machine Operator                                 11.95
    16220 - Tailor                                                  12.63
    16250 - Washer, Machine                                          9.95
19000 - Machine Tool Operation And Repair Occupations
    19010 - Machine-Tool Operator (Tool Room)                       22.05
    19040 - Tool And Die Maker                                      25.72
21000 - Materials Handling And Packing Occupations
    21020 - Forklift Operator                                       19.14
    21030 - Material Coordinator                                    20.64
    21040 - Material Expediter                                      20.64
    21050 - Material Handling Laborer                               19.18
    21071 - Order Filler                                            12.91
    21080 - Production Line Worker (Food Processing)                18.77
    21110 - Shipping Packer                                         13.96
    21130 - Shipping/Receiving Clerk                                13.96
    21140 - Store Worker I                                          11.56
    21150 - Stock Clerk                                             17.04
    21210 - Tools And Parts Attendant                               19.14
    21410 - Warehouse Specialist                                    19.14
23000 - Mechanics And Maintenance And Repair Occupations
    23010 - Aerospace Structural Welder                             26.30
    23021 - Aircraft Mechanic I                                     25.34
    23022 - Aircraft Mechanic II                                    26.30
    23023 - Aircraft Mechanic III                                   27.31
    23040 - Aircraft Mechanic Helper                                19.24
    23050 - Aircraft, Painter                                       24.07
    23060 - Aircraft Servicer                                       21.72
    23080 - Aircraft Worker                                         22.71
    23110 - Appliance Mechanic                                      22.59
    23120 - Bicycle Repairer                                        15.80
    23125 - Cable Splicer                                           26.41
    23130 - Carpenter, Maintenance                                  26.52
    23140 - Carpet Layer                                            22.39
    23160 - Electrician, Maintenance                                30.81
    23181 - Electronics Technician Maintenance I                    24.18
    23182 - Electronics Technician Maintenance II                   25.38
    23183 - Electronics Technician Maintenance III                  26.95
    23260 - Fabric Worker                                           20.13
    23290 - Fire Alarm System Mechanic                              23.21
    23310 - Fire Extinguisher Repairer                              18.57
    23311 - Fuel Distribution System Mechanic                       22.56
    23312 - Fuel Distribution System Operator                       17.91
    23370 - General Maintenance Worker                              20.67
    23380 - Ground Support Equipment Mechanic                       25.34
    23381 - Ground Support Equipment Servicer                       21.72
    23382 - Ground Support Equipment Worker                         22.71
    23391 - Gunsmith I                                              18.57
    23392 - Gunsmith II                                             21.52
    23393 - Gunsmith III                                            23.58
    23410 - Heating, Ventilation And Air-Conditioning               22.39
    Mechanic
    23411 - Heating, Ventilation And Air Contditioning              23.24
    Mechanic (Research Facility)
    23430 - Heavy Equipment Mechanic                                23.21
    23440 - Heavy Equipment Operator                                25.39
    23460 - Instrument Mechanic                                     21.16
    23465 - Laboratory/Shelter Mechanic                             22.59
    23470 - Laborer                                                 17.17
    23510 - Locksmith                                               22.23
    23530 - Machinery Maintenance Mechanic                          27.80
    23550 - Machinist, Maintenance                                  24.17
```

```
23580 - Maintenance Trades Helper                           18.37
23591 - Metrology Technician I                              21.16
23592 - Metrology Technician II                             21.96
23593 - Metrology Technician III                            22.79
23640 - Millwright                                          27.07
23710 - Office Appliance Repairer                           22.23
23760 - Painter, Maintenance                                23.03
23790 - Pipefitter, Maintenance                             30.12
23810 - Plumber, Maintenance                                28.85
23820 - Pneudraulic Systems Mechanic                        23.58
23850 - Rigger                                              23.58
23870 - Scale Mechanic                                      21.52
23890 - Sheet-Metal Worker, Maintenance                     26.55
23910 - Small Engine Mechanic                               21.36
23931 - Telecommunications Mechanic I                       24.81
23932 - Telecommunications Mechanic II                      25.76
23950 - Telephone Lineman                                   23.55
23960 - Welder, Combination, Maintenance                    23.21
23965 - Well Driller                                        23.21
23970 - Woodcraft Worker                                    23.58
23980 - Woodworker                                          18.57
24000 - Personal Needs Occupations
  24570 - Child Care Attendant                               9.61
  24580 - Child Care Center Clerk                           13.39
  24610 - Chore Aide                                         9.28
  24620 - Family Readiness And Support Services             13.20
  Coordinator
  24630 - Homemaker                                         13.20
25000 - Plant And System Operations Occupations
  25010 - Boiler Tender                                     25.70
  25040 - Sewage Plant Operator                             23.34
  25070 - Stationary Engineer                               25.70
  25190 - Ventilation Equipment Tender                      18.44
  25210 - Water Treatment Plant Operator                    23.34
27000 - Protective Service Occupations
  27004 - Alarm Monitor                                     17.23
  27007 - Baggage Inspector                                 12.71
  27008 - Corrections Officer                               18.82
  27010 - Court Security Officer                            22.13
  27030 - Detection Dog Handler                             16.66
  27040 - Detention Officer                                 18.82
  27070 - Firefighter                                       25.67
  27101 - Guard I                                           12.71
  27102 - Guard II                                          16.66
  27131 - Police Officer I                                  22.39
  27132 - Police Officer II                                 24.88
28000 - Recreation Occupations
  28041 - Carnival Equipment Operator                       12.57
  28042 - Carnival Equipment Repairer                       13.41
  28043 - Carnival Equpment Worker                           8.87
  28210 - Gate Attendant/Gate Tender                        13.47
  28310 - Lifeguard                                         11.59
  28350 - Park Attendant (Aide)                             15.07
  28510 - Recreation Aide/Health Facility Attendant         11.00
  28515 - Recreation Specialist                             18.05
  28630 - Sports Official                                   12.00
  28690 - Swimming Pool Operator                            16.53
29000 - Stevedoring/Longshoremen Occupational Services
  29010 - Blocker And Bracer                                23.72
  29020 - Hatch Tender                                      23.72
  29030 - Line Handler                                      23.72
  29041 - Stevedore I                                       22.09
  29042 - Stevedore II                                      24.90
30000 - Technical Occupations
  30010 - Air Traffic Control Specialist, Center (HFO)    (see 2)    35.77
```

```
      30011 - Air Traffic Control Specialist, Station (HFO)  (see 2)        24.66
      30012 - Air Traffic Control Specialist, Terminal (HFO) (see 2)        27.16
      30021 - Archeological Technician I                                    19.36
      30022 - Archeological Technician II                                   21.56
      30023 - Archeological Technician III                                  25.04
      30030 - Cartographic Technician                                       27.52
      30040 - Civil Engineering Technician                                  22.72
      30061 - Drafter/CAD Operator I                                        19.36
      30062 - Drafter/CAD Operator II                                       21.56
      30063 - Drafter/CAD Operator III                                      24.15
      30064 - Drafter/CAD Operator IV                                       29.71
      30081 - Engineering Technician I                                      17.67
      30082 - Engineering Technician II                                     19.83
      30083 - Engineering Technician III                                    22.18
      30084 - Engineering Technician IV                                     27.48
      30085 - Engineering Technician V                                      33.62
      30086 - Engineering Technician VI                                     40.68
      30090 - Environmental Technician                                      22.06
      30210 - Laboratory Technician                                         20.55
      30240 - Mathematical Technician                                       26.82
      30361 - Paralegal/Legal Assistant I                                   20.04
      30362 - Paralegal/Legal Assistant II                                  24.86
      30363 - Paralegal/Legal Assistant III                                 30.37
      30364 - Paralegal/Legal Assistant IV                                  36.75
      30390 - Photo-Optics Technician                                       26.82
      30461 - Technical Writer I                                            23.51
      30462 - Technical Writer II                                           28.76
      30463 - Technical Writer III                                          34.79
      30491 - Unexploded Ordnance (UXO) Technician I                        22.74
      30492 - Unexploded Ordnance (UXO) Technician II                       27.51
      30493 - Unexploded Ordnance (UXO) Technician III                      32.97
      30494 - Unexploded (UXO) Safety Escort                                22.74
      30495 - Unexploded (UXO) Sweep Personnel                             22.74
      30620 - Weather Observer, Combined Upper Air Or         (see 2)       24.15
      Surface Programs
      30621 - Weather Observer, Senior                        (see 2)       26.82
   31000 - Transportation/Mobile Equipment Operation Occupations
      31020 - Bus Aide                                                      12.28
      31030 - Bus Driver                                                    16.52
      31043 - Driver Courier                                                15.43
      31260 - Parking and Lot Attendant                                      9.85
      31290 - Shuttle Bus Driver                                            16.94
      31310 - Taxi Driver                                                   11.23
      31361 - Truckdriver, Light                                            16.94
      31362 - Truckdriver, Medium                                           17.97
      31363 - Truckdriver, Heavy                                            20.79
      31364 - Truckdriver, Tractor-Trailer                                  20.79
   99000 - Miscellaneous Occupations
      99030 - Cashier                                                        8.79
      99050 - Desk Clerk                                                     9.86
      99095 - Embalmer                                                      24.71
      99251 - Laboratory Animal Caretaker I                                 10.84
      99252 - Laboratory Animal Caretaker II                                11.89
      99310 - Mortician                                                     30.54
      99410 - Pest Controller                                               16.01
      99510 - Photofinishing Worker                                         13.06
      99710 - Recycling Laborer                                             18.45
      99711 - Recycling Specialist                                          22.00
      99730 - Refuse Collector                                              16.24
      99810 - Sales Clerk                                                   12.95
      99820 - School Crossing Guard                                          9.90
      99830 - Survey Party Chief                                            20.39
      99831 - Surveying Aide                                                13.53
      99832 - Surveying Technician                                          18.54
      99840 - Vending Machine Attendant                                     12.95
```

```
99841 - Vending Machine Repairer                              15.14
99842 - Vending Machine Repairer Helper                      12.95
```

---

ALL OCCUPATIONS LISTED ABOVE RECEIVE THE FOLLOWING BENEFITS:

HEALTH & WELFARE: $3.59 per hour or $143.60 per week or $622.27 per month

VACATION: 2 weeks paid vacation after 1 year of service with a contractor or successor; 3 weeks after 8 years, and 4 weeks after 15 years.  Length of service includes the whole span of continuous service with the present contractor or successor, wherever employed, and with the predecessor contractors in the performance of similar work at the same Federal facility.  (Reg. 29 CFR 4.173)

HOLIDAYS: A minimum of ten paid holidays per year, New Year's Day, Martin Luther King Jr's Birthday, Washington's Birthday, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans' Day, Thanksgiving Day, and Christmas Day.  (A contractor may substitute for any of the named holidays another day off with pay in accordance with a plan communicated to the employees involved.)  (See 29 CFR 4174)


THE OCCUPATIONS WHICH HAVE NUMBERED FOOTNOTES IN PARENTHESES RECEIVE THE FOLLOWING:

1)  COMPUTER EMPLOYEES:  Under the SCA at section 8(b), this wage determination does not apply to any employee who individually qualifies as a bona fide executive, administrative, or professional employee as defined in 29 C.F.R. Part 541.  Because most Computer System Analysts and Computer Programmers who are compensated at a rate not less than $27.63 (or on a salary or fee basis at a rate not less than $455 per week) an hour would likely qualify as exempt computer professionals, (29 C.F.R. 541. 400) wage rates may not be listed on this wage determination for all occupations within those job families.  In addition, because this wage determination may not list a wage rate for some or all occupations within those job families if the survey data indicates that the prevailing wage rate for the occupation equals or exceeds $27.63 per hour conformances may be necessary for certain nonexempt employees.  For example, if an individual employee is nonexempt but nevertheless performs duties within the scope of one of the Computer Systems Analyst or Computer Programmer occupations for which this wage determination does not specify an SCA wage rate, then the wage rate for that employee must be conformed in accordance with the conformance procedures described in the conformance note included on this wage determination.

Additionally, because job titles vary widely and change quickly in the computer industry, job titles are not determinative of the application of the computer professional exemption.  Therefore, the exemption applies only to computer employees who satisfy the compensation requirements and whose primary duty consists of:
    (1) The application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software or system functional specifications;
    (2) The design, development, documentation, analysis, creation, testing or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;
    (3) The design, documentation, testing, creation or modification of computer programs related to machine operating systems; or
    (4) A combination of the aforementioned duties, the performance of which requires the same level of skills.  (29 C.F.R. 541.400).

2)  AIR TRAFFIC CONTROLLERS AND WEATHER OBSERVERS - NIGHT PAY & SUNDAY PAY:  If you work at night as part of a regular tour of duty, you will earn a night differential and receive an additional 10% of basic pay for any hours worked between 6pm and 6am.  If you are a full-time employed (40 hours a week) and Sunday is part of your

regularly scheduled workweek, you are paid at your rate of basic pay plus a Sunday premium of 25% of your basic rate for each hour of Sunday work which is not overtime (i.e. occasional work on Sunday outside the normal tour of duty is considered overtime work).


HAZARDOUS PAY DIFFERENTIAL: An 8 percent differential is applicable to employees employed in a position that represents a high degree of hazard when working with or in close proximity to ordinance, explosives, and incendiary materials.  This includes work such as screening, blending, dying, mixing, and pressing of sensitive ordance, explosives, and pyrotechnic compositions such as lead azide, black powder and photoflash powder.  All dry-house activities involving propellants or explosives.
  Demilitarization, modification, renovation, demolition, and maintenance operations on sensitive ordnance, explosives and incendiary materials.  All operations involving regrading and cleaning of artillery ranges.

A 4 percent differential is applicable to employees employed in a position that represents a low degree of hazard when working with, or in close proximity to ordance, (or employees possibly adjacent to) explosives and incendiary materials which involves potential injury such as laceration of hands, face, or arms of the employee engaged in the operation,  irritation of the skin, minor burns and the like; minimal damage to immediate or adjacent work area or equipment being used. All operations involving, unloading, storage, and hauling of ordance, explosive, and incendiary ordnance material other than small arms ammunition.  These differentials are only applicable to work that has been specifically designated by the agency for ordance, explosives, and incendiary material differential pay.

** UNIFORM ALLOWANCE **

If employees are required to wear uniforms in the performance of this contract (either by the terms of the Government contract, by the employer, by the state or local law, etc.), the cost of furnishing such uniforms and maintaining (by laundering or dry cleaning) such uniforms is an expense that may not be borne by an employee where such cost reduces the hourly rate below that required by the wage determination. The Department of Labor will accept payment in accordance with the following standards as compliance:

The contractor or subcontractor is required to furnish all employees with an adequate number of uniforms without cost or to reimburse employees for the actual cost of the uniforms.  In addition, where uniform cleaning and maintenance is made the responsibility of the employee, all contractors and subcontractors subject to this wage determination shall (in the absence of a bona fide collective bargaining agreement providing for a different amount, or the furnishing of contrary affirmative proof as to the actual cost), reimburse all employees for such cleaning and maintenance at a rate of $3.35 per week (or $.67 cents per day).  However, in those instances where the uniforms furnished are made of "wash and wear" materials, may be routinely washed and dried with other personal garments, and do not require any special treatment such as dry cleaning, daily washing, or commercial laundering in order to meet the cleanliness or appearance standards set by the terms of the Government contract, by the contractor, by law, or by the nature of the work, there is no requirement that employees be reimbursed for uniform maintenance costs.

The duties of employees under job titles listed are those described in the "Service Contract Act Directory of Occupations", Fifth Edition, April 2006, unless otherwise indicated. Copies of the Directory are available on the Internet. A links to the Directory may be found on the WHD home page at http://www.dol.gov/esa/whd/ or through the Wage Determinations On-Line (WDOL) Web site at http://wdol.gov/.

REQUEST FOR AUTHORIZATION OF ADDITIONAL CLASSIFICATION AND WAGE RATE {Standard Form 1444 (SF 1444)}

Conformance Process:

The contracting officer shall require that any class of service employee which is

not listed herein and which is to be employed under the contract (i.e., the work to
be performed is not performed by any classification listed in the wage
determination), be classified by the contractor so as to provide a reasonable
relationship (i.e., appropriate level of skill comparison) between such unlisted
classifications and the classifications listed in the wage determination.  Such
conformed classes of employees shall be paid the monetary wages and furnished the
fringe benefits as are determined.  Such conforming process shall be initiated by
the contractor prior to the performance of contract work by such unlisted class(es)
of employees.  The conformed classification, wage rate, and/or fringe benefits shall
be retroactive to the commencement date of the contract. {See Section 4.6 (C)(vi)}
When multiple wage determinations are included in a contract, a separate SF 1444
should be prepared for each wage determination to which a class(es) is to be
conformed.

The process for preparing a conformance request is as follows:

1) When preparing the bid, the contractor identifies the need for a conformed
occupation(s) and computes a proposed rate(s).

2) After contract award, the contractor prepares a written report listing in order
proposed classification title(s), a Federal grade equivalency (FGE) for each
proposed classification(s), job description(s), and rationale for proposed wage
rate(s), including information regarding the agreement or disagreement of the
authorized representative of the employees involved, or where there is no authorized
representative, the employees themselves.  This report should be submitted to the
contracting officer no later than 30 days after such unlisted class(es) of employees
performs any contract work.

3) The contracting officer reviews the proposed action and promptly submits a report
of the action, together with the agency's recommendations and pertinent
information including the position of the contractor and the employees, to the Wage
and Hour Division, Employment Standards Administration, U.S. Department of Labor,
for review.  (See section 4.6(b)(2) of Regulations 29 CFR Part 4).

4) Within 30 days of receipt, the Wage and Hour Division approves, modifies, or
disapproves the action via transmittal to the agency contracting officer, or
notifies the contracting officer that additional time will be required to process
the request.

5) The contracting officer transmits the Wage and Hour decision to the contractor.

6) The contractor informs the affected employees.

Information required by the Regulations must be submitted on SF 1444 or bond paper.

When preparing a conformance request, the "Service Contract Act Directory of
Occupations" (the Directory) should be used to compare job definitions to insure
that duties requested are not performed by a classification already listed in the
wage determination.  Remember, it is not the job title, but the required tasks that
determine whether a class is included in an established wage determination.
Conformances may not be used to artificially split, combine, or subdivide
classifications listed in the wage determination.

Attachment A-8:  TIVAS Terms and Conditions (v2)

*In accordance with Section B.12.N.14 of the contract, once two (2) million borrower accounts have been collectively allocated under this contract, the following terms within this document shall apply.  Unless otherwise noted herein, all other terms and conditions of the contract shall remain in full force and effect:*

## A. TIVAS Pricing Terms:

1.  The following pricing replaces the pricing model provided in Section B.12.N.3.  All pricing, including set pricing for the first 100,000 allocated borrower accounts, shall convert to the pricing below.  CLINS 0001-0009 established in A.1 shall no longer apply.

    The Government will set and manage the common pricing, including tier structure, below:

| Status | Volume Low | Volume High | Unit Price |
|---|---|---|---|
| Borrowers in In-school Status | N/A | N/A | $ 1.050 |
| Borrowers in Grace or Current Repayment Status | 1 | 3,000,000 | $ 2.110 |
| | 3,000,001 | UP | $ 1.900 |
| Borrowers in Deferment or Forbearance | 1 | 1,600,000 | $ 2.070 |
| | 1,600,001 | UP | $ 1.730 |
| Borrowers 31-90 Days Delinquent | N/A | N/A | $ 1.620 |
| Borrowers 91-150 Days Delinquent | N/A | N/A | $ 1.500 |
| Borrowers 151-270 Days Delinquent | N/A | N/A | $ 1.370 |
| Borrowers 270+ Days Delinquent | N/A | N/A | $ 0.500 |

    Out year pricing will follow the methodology described utilizing the subsequent terms.  There will be no set declination in pricing at the time of award.

2.  The contractor shall implement an interface with the Student Loan origination and disbursement system, in accordance with Attachment A-6.

Attachment A-8:  TIVAS Terms and Conditions (v2)

## B. TIVAS Ongoing Allocation Methodology

*The following allocation methodology shall replace the previous version provided as Attachment A-4, in its entirety:*

The allocation of ongoing volume will be determined based on the performance of each servicer in relation to the other servicers awarded. While the total number of awarded servicers has not yet been determined, this methodology works with any number of servicers (as shown in examples).

Quarterly scores will be compiled for each servicer based on various performance factors; five high-level metrics, and some sub-metric categories, have been defined (see below). An average of the quarterly scores available on July 1 of each year will be used to determine the ranking of each servicer in each of the five high-level metric categories. By combining each servicer's ranking in all categories, each servicer will be given a percentage of the total new volume of Federally Held Debt to be distributed for the upcoming year.

Servicers will be informed of their allocation percentage of new volume by July 15 of each year. This allocation will become effective on August 15 of each year. The first ongoing allocation will be provided by August 15, 2010.

The allocation of ongoing volume will be determined based on the following factors:

1. Percentage of "In Repayment" Portfolio Dollars that go into default (that are 361+ days delinquent within the current quarter) – Measured as a percentage of the servicer's current Federally held portfolio
   a. Percentage at Public Schools
   b. Percentage at Private Schools
   c. Percentage at Proprietary Schools
2. Percentage of unique "In Repayment" Portfolio borrowers that go into default (that are 361+ days delinquent within the current quarter) – Measured as a percentage of the servicer's current Federally held portfolio
   a. Percentage at Public Schools
   b. Percentage at Private Schools
   c. Percentage at Proprietary Schools
3. Borrower Surveys
   a. In School Borrowers
   b. In Grace Borrowers
   c. In Repayment Borrowers
4. School Surveys
   a. Public Schools
   b. Private Schools
   c. Proprietary Schools
5. Survey of FSA personnel

Attachment A-8: TIVAS Terms and Conditions (v2)

**Allocation Metric # 1** - to be measured Quarterly (calendar quarters beginning with October 1, 2009). Calculation = (Total Dollar Amount that are 361+ days delinquent within the current quarter) DIVIDED BY (Total Dollar Amount that are in Repayment and 0 to 360 days delinquent plus the Total Dollar Amount that are 361 + days only within the current quarter). All available quarterly scores in each category (1a, 1b, 1c) will be averaged together on July 1 of each year to calculate the Final Score for this allocation metric."

**Allocation Metric # 2** - to be measured Quarterly (calendar quarters beginning with October 1, 2009). Calculation = (Total Count of Borrowers that are 361+ days delinquent within the current quarter) DIVIDED BY (Total Count of Borrowers that are in Repayment and 0 to 360 days delinquent plus the Total Count of Borrowers that are 361+ days only within the current quarter). All available quarterly scores in each category (2a,2b, 2c) will be averaged together on July 1 of each year to calculate the Final Score for this allocation metric."

**Allocation Metric # 3** – Surveys will be conducted quarterly of borrowers in each category (In School, In Grace, and In Repayment). The survey will measure borrower satisfaction with the servicer and results will be based on a scale of 0 – 100%, with 100% representing a perfect score. FSA, or an agent of FSA will conduct surveys. All available quarterly scores in each category (3a, 3b, 3c) will be averaged together on July 1 of each year to calculate the Final Score for this allocation metric.

**Allocation Metric # 4** – Surveys will be conducted quarterly of schools in each category (Public, Private, and Proprietary). The survey will measure school satisfaction with the servicer and results will be based on a scale of 0 – 100%, with 100% representing a perfect score. FSA, or an agent of FSA will conduct surveys. All available quarterly scores in each category (4a, 4b, 4c) will be averaged together on July 1 of each year to calculate the Final Score for this allocation metric.

**Allocation Metric # 5** – Surveys will be conducted quarterly of FSA personnel. The survey will measure FSA satisfaction with the servicer and results will be based on a scale of 0 – 100%, with 100% representing a perfect score. FSA, or an agent of FSA will conduct surveys. All available quarterly scores will be averaged together on July 1 of each year to calculate the Final Score for this allocation metric.

# Allocation Metric Score Comparison Among Servicers

The above calculation will result in a set of 5 scores for each servicer, one score in each metric category (1-Defaulted borrower dollars, 2-Defaulted borrower count, 3-Borrower Survey, 4-School Survey, 5-FSA Survey).

FSA will compare all servicers' scores in each allocation metric category and provide a ranking for each servicer in that category, with the best score in each category receiving the highest possible value and the worst score receiving the lowest possible value (highest / lowest values will be determined by the number of servicers selected --- Highest score possible will be the total number of servicers selected, lowest score will be 1).

Attachment A-8: TIVAS Terms and Conditions (v2)

Once a ranking value has been assigned to each servicer in each allocation category, all scores for a servicer will be added together to provide the "Total Score" for that servicer for the year. Each servicer will have one Total Score for each year.

# Allocation of New Volume of Federally Held Debt

Each servicer will be assigned an allocation of new volume by dividing that servicer's total score by the combined total scores of all servicers. The resulting percentage will determine each servicer's percentage of new volume of Federally Held Debt.

**The servicer's percentage of new volume will determine the percentage of new borrowers that will be sent to the servicer for servicing (loans for existing borrowers may, to the maximum extent practicable, be sent to the servicer already holding that borrower's other loans).**

NOTE: If a servicer is out of compliance (for example, but not limited to, financial management or reporting, security, OMB Circular A-123, Legislative Mandates, Program Compliance, etc.), that servicer's new volume may be re-allocated to one or more other servicers until compliance has been achieved. In addition, that servicer's current account volume may be transferred to another servicer, at the non-compliant servicer's expense.

Attachment A-8:  TIVAS Terms and Conditions (v2)

## C.  SAMPLE - ONGOING ALLOCATION METRIC CALCULATION

*The following sample allocation metric calculation shall replace the previous version provided as Attachment A-5, in its entirety:*

### Scenario 10 - 2 Servicers selected

FINAL SCORE BY ALLOCATION METRIC

|  | METRIC | Servicers | |
|---|---|---|---|
|  |  | 1 | 2 |
| 1 | Defaulted borrower count | 1.10% | 2.20% |
| 2 | Defaulted borrower amount | 6.60% | 5.50% |
| 3 | Borrower Survey | 97.00% | 95.00% |
| 4 | School Survey | 89.00% | 90.00% |
| 5 | FSA Survey | 97.00% | 95.00% |

SERVICER RANKING BY ALLOCATION METRIC

|  | METRIC | Servicers | |
|---|---|---|---|
|  |  | 1 | 2 |
| 1 | Defaulted borrower count | 2.0 | 1.0 |
| 2 | Defaulted borrower amount | 1.0 | 2.0 |
| 3 | Borrower Survey | 2.0 | 1.0 |
| 4 | School Survey | 1.0 | 2.0 |
| 5 | FSA Survey | 2.0 | 1.0 |

TOTAL SCORE BY SERVICER

|  | Servicers | |
|---|---|---|
|  | 1 | 2 |
| TOTAL SCORE | 8.0 | 7.0 |

ALLOCATION EACH SERIVER WILL RECEIVE

|  | Total Score | % of new volume Servicer will receive (Total Score / Combined Total) | New borrowers (based on 4M total new loans) |
|---|---|---|---|
| Servicer 1 | 8.0 | 53.33% | 2,200,000 |
| Servicer 2 | 7.0 | 46.67% | 2,800,000 |
| Combined Total | 15 | 101.00% | 5,000,000 |

# EXHIBIT

# C

| **SOLICITATION/CONTRACT/ORDER FOR COMMERCIAL ITEMS** _OFFEROR TO COMPLETE BLOCKS 12, 17, 23, 24, & 30_ | | | 1. REQUISITION NUMBER | | PAGE 1 OF 141 |

| 2. CONTRACT NO. 91003120D0002 | 3. AWARD/EFFECTIVE DATE JUN 23, 2020 | 4. ORDER NUMBER | 5. SOLICITATION NUMBER | 6. SOLICITATION ISSUE DATE |
|---|---|---|---|---|

| 7. FOR SOLICITATION INFORMATION CALL: | a. NAME Hilbert Caesar Hilbert.Caesar@ed.gov | b. TELEPHONE NUMBER (No collect calls) 202-377-3654 | 8. OFFER DUE DATE/ LOCAL TIME |

**9. ISSUED BY**  CODE  FSA-ACQ

US Department of Education
FSA - Acquisitions, 830 First St NE - Suite 91F3
Washington DC 20202

**10. THIS ACQUISITION IS** ☐ UNRESTRICTED OR ☐ SET ASIDE: _____ % FOR:

☐ SMALL BUSINESS
☐ HUBZONE SMALL BUSINESS
☐ SERVICE-DISABLED VETERAN-OWNED SMALL BUSINESS
☐ WOMEN-OWNED SMALL BUSINESS (WOSB) ELIGIBLE UNDER THE WOMEN-OWNED SMALL BUSINESS PROGRAM
☐ EDWOSB
☐ 8 (A)

NAICS: 522320
SIZE STANDARD:

| 11. DELIVERY FOR FOB DESTINATION UNLESS BLOCK IS MARKED ☐ SEE SCHEDULE | 12. DISCOUNT TERMS Net 30 | 13a. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 700) | 13b. RATING |
|---|---|---|---|
| | | 14. METHOD OF SOLICITATION ☐ RFQ ☐ IFB ☐ RFP | |

| 15. DELIVER TO  CODE FSA-COO FSA CHIEF OPERATING OFFICER 830 First Street, NE WASHINGTON DC 20202 | 16. ADMINISTERED BY  CODE FSA-ACQ US Department of Education FSA - Acquisitions, 830 First St NE - Suite 91F3 Washington DC 20202 |
|---|---|

| 17a CONTRACTOR/ OFFEROR CODE 00032048  FACILITY CODE MISSOURI HIGHER EDUCATION LOAN AUTHORITY 633 SPIRIT DR CHESTERFIELD MO 63005 | 18a. PAYMENT WILL BE MADE BY  CODE FSA-BUD Budget Group/Invoice Admin US Department of Education/FSA/CFO/BG/FSAA 830 First Street, NE, Suite 54B1 Washington DC 20202-0001 |
|---|---|

CAGE: 41YN3
TIN: 431261525   DUNS: 189396138
TELEPHONE NO.

☐ 17b. CHECK IF REMITTANCE IS DIFFERENT AND PUT SUCH ADDRESS IN OFFER

18b. SUBMIT INVOICES TO ADDRESS SHOWN IN BLOCK 18a UNLESS BLOCK BELOW IS CHECKED ☒ SEE ADDENDUM

| 19. ITEM NO. | 20. SCHEDULE OF SUPPLIES/SERVICES | 21. QUANTITY | 22. UNIT | 23. UNIT PRICE | 24. AMOUNT |
|---|---|---|---|---|---|
| Please | see continuation page for line item details. | | | | |
| | _(Use Reverse and/or Attach Additional Sheets as Necessary)_ | | | | |

| 25. ACCOUNTING AND APPROPRIATION DATA See Schedule | 26. TOTAL AWARD AMOUNT (For Govt. Use Only) $0.00 |
|---|---|

☐ 27a. SOLICITATION INCORPORATES BY REFERENCE FAR 52.212-1, 52.212-4. FAR 52.212-3 AND 52.212-5 ARE ATTACHED. ADDENDA ☐ ARE ☐ ARE NOT ATTACHED

☐ 27b. CONTRACT/PURCHASE ORDER INCORPORATES BY REFERENCE FAR 52.212-4. FAR 52.212-5 IS ATTACHED. ADDENDA ☒ ARE ☐ ARE NOT ATTACHED

☒ 28. CONTRACTOR IS REQUIRED TO SIGN THIS DOCUMENT AND RETURN 1 COPIES TO ISSUING OFFICE. CONTRACTOR AGREES TO FURNISH AND DELIVER ALL ITEMS SET FORTH OR OTHERWISE IDENTIFIED ABOVE AND ON ANY ADDITIONAL SHEETS SUBJECT TO THE TERMS AND CONDITIONS SPECIFIED

☒ 29. AWARD OF CONTRACT: REF. _____ OFFER DATED JUN 23, 2020 . YOUR OFFER ON SOLICITATION (BLOCK 5), INCLUDING ANY ADDITIONS OR CHANGES WHICH ARE SET FORTH HEREIN, IS ACCEPTED AS TO ITEMS:

| 30a. SIGNATURE OF OFFEROR/CONTRACTOR _Raymond H Bayer Jr._ | 31a. UNITED STATES OF AMERICA (SIGNATURE OF CONTRACTING OFFICER) Soo Kang Digitally signed by Soo Kang Date: 2020.06.23 19:07:05 -04'00' |
|---|---|
| 30b. NAME AND TITLE OF SIGNER (Type or print) Raymond H. Bayer Jr Executive Director | 30c. DATE SIGNED 6-22-20 | 31b. NAME OF CONTRACTING OFFICER (Type or print) Soo Kang 202-377-3798 soo.kang@ed.gov | 31c. DATE SIGNED JUN 23, 2020 |

AUTHORIZED FOR LOCAL REPRODUCTION
PREVIOUS EDITION IS NOT USABLE

STANDARD FORM 1449 (REV. 2/2012)
Prescribed by GSA - FAR (48 CFR) 53.212

| 19.<br>ITEM NO. | 20.<br>SCHEDULE OF SUPPLIES/SERVICES | 21.<br>QUANTITY | 22.<br>UNIT | 23.<br>UNIT PRICE | 24.<br>AMOUNT |
|---|---|---|---|---|---|
| | | | | | |

**32a. QUANTITY IN COLUMN 21 HAS BEEN**

☐ RECEIVED        ☐ INSPECTED        ☐ ACCEPTED, AND CONFORMS TO THE CONTRACT, EXCEPT AS NOTED: _____

| 32b. SIGNATURE OF AUTHORIZED GOVERNMENT REPRESENTATIVE | 32c. DATE | 32d. PRINTED NAME AND TITLE OF AUTHORIZED GOVERNMENT REPRESENTATIVE |
|---|---|---|
| 32e. MAILING ADDRESS OF AUTHORIZED GOVERNMENT REPRESENTATIVE | | 32f. TELPHONE NUMBER OF AUTHORZED GOVERNMENT REPRESENTATIVE |
| | | 32g. E-MAIL OF AUTHORIZED GOVERNMENT REPRESENTATIVE |

| 33. SHIP NUMBER | 34. VOUCHER NUMBER | 35. AMOUNT VERIFIED CORRECT FOR | 36. PAYMENT | | 37. CHECK NUMBER |
|---|---|---|---|---|---|
| PARTIAL    FINAL | | | ☐ COMPLETE   ☐ PARTIAL   ☐ FINAL | | |
| 38. S/R ACCOUNT NO. | 39. S/R VOUCHER NUMBER | 40. PAID BY | | | |

| 41a. I CERTIFY THIS ACCOUNT IS CORRECT AND PROPER FOR PAYMENT | | 42a. RECEIVED BY      *(Print)* |
|---|---|---|
| 41b. SIGNATURE AND TITLE OF CERTIFYING OFFICER | 41c. DATE | |
| | | 42b. RECEIVED AT      *(Location)* |
| | | 42c. DATE REC'D      *(YY/MM/DD)*    |    42d. TOTAL CONTAINERS |

**STANDARD FORM 1449** (REV. 2/2012)  **BACK**

91003120D0002

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

**SECTION B - SUPPLIES OR SERVICES AND PRICES/COSTS**

**1.0     CONSIDERATION AND PAYMENT**

This is an Indefinite Delivery/Indefinite Quantity (IDIQ) contract that will be used to provide commercial services for the U.S. Department of Education (ED), Office of Federal Student Aid (FSA).

**Firm-Fixed Price:** Individual Task Orders against this IDIQ Contract shall be awarded on a Firm-Fixed Price basis.

**Initial Task Order:** The first Task Order to be awarded against this IDIQ contract shall be an "Initial Task Order" for implementation support. The Contractor shall use the Initial Task Order to complete all tasks necessary to "Go-Live" and become performance-ready to include, but not limited to, personnel security clearances, achieving the Authorization to Operate (ATO), capacity planning, training, Inter-System Testing (IST), etc.

**Minimum Contract Guarantee:** During the contract period, the Government shall place orders totaling a minimum of $1,500,000.00. This reflects the contract minimum for the entire period of performance, including any options.

**Maximum Contract Guarantee:** The contract maximum for the entire period of performance, including any options, shall be for the placement of orders totaling a maximum of $1,700,000,000.00.  This reflects the contract maximum for the entire period of performance, including any options.

**2.0     COMMON PRICING**

The following tables reflect the Common Pricing that shall apply to all individual Task Orders issued against this IDIQ contract.

**Special Note to BPO Providers:**

1.  Common Pricing shall be fixed regardless of the duration of any individual task performed by a BPO Provider within each operating element identified under Contact Center Support or Back-Office Processing (e.g. Inbound/Outbound Calls, Chat Sessions, SMS/Text Exchanges, Manual Email Exchanges, Eligibility Processing tasks, Origination and Disbursement Processing tasks, etc.).

2.  The Common Pricing established for all Inbound and Outbound Calls under Contact Center Support is predicated on a tiered approach based on a "Monthly Volume/Tier Range". The price per Call, in any given month, shall decrease once the BPO Provider has reached the ceiling for any given "Monthly Volume/Tier Range". Thereafter, the price per Call shall be invoiced at the next highest "Monthly Volume/Tier Range" common price, up to the established ceiling for that tier. Once the established ceiling for that tier is reached, any individual Calls above that tier ceiling shall be invoiced at the common price applicable to

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

the highest tier range, for the remainder of that month. Please see below for an illustration:

**Example 1 (Inbound Calls):**  If the BPO Provider receives 850,000 Inbound Calls in a given month, this would be the calculation applied for invoicing purposes under the tiered model approach:

| Monthly Volume/Tier Range - Inbound Calls | Common Price Calculation | Invoice Amount |
|---|---|---|
| 1 – 266,667 | 266,667 x $4.99* | $1,330,668.33 |
| 266,668 – 666,667 | 400,000 x $4.89* | $1,956,000.00 |
| 666,668+ | 183,333 x $4.79* | $878,165.07 |

Total Monthly Volume for Inbound Calls:  850,000.00

Total Monthly Invoice Amount for Inbound Calls:  $4,164,833.40

**Example 2 (Outbound Calls – with Customer):**  If the BPO Provider receives 850,000 Outbound Calls – with Customer in a given month, this would be the calculation applied for invoicing purposes under the tiered model:

| Monthly Volume/Tier Range - Outbound Calls – with Customer | Common Price Calculation | Invoice Amount |
|---|---|---|
| 1 – 60,250 | 60,250 x $4.99* | $300,647.50 |
| 60,251 – 150,000 | 89,750 x $4.89* | $438,877.50 |
| 150,001+ | 700,000 x $4.79* | $3,353,000.00 |

Total Monthly Volume for Outbound Calls – with Customer:  850,000.00

Total Monthly Invoice Amount for Outbound Calls – with Customer:  $4,092,525.00

**\*The pricing used is for illustration purposes only and does not reflect the actual common price for each Inbound or Outbound – with Customer Call.**

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

| Operating Elements | Pricing Model | Tier (if applicable) | Monthly Volume / Tier Range | Base Ordering Period - Three (3) years | | | Optional Ordering Period - Three (3) years | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 |
| **CONTACT CENTER SUPPORT** | | | | | | | | | |
| **Contact Center Support (6AM-11PM/7)** | | | | | | | | | |
| Inbound Calls | Tiered price per call | 1 | 1 – 266,667 | $ 4.24 | $ 4.37 | $ 4.50 | $ 4.63 | $ 4.77 | $ 4.91 |
| Inbound Calls | Tiered price per call | 2 | 266,668 – 666,667 | $ 4.15 | $ 4.28 | $ 4.41 | $ 4.54 | $ 4.68 | $ 4.82 |
| Inbound Calls | Tiered price per call | 3 | 666,668+ | $ 4.07 | $ 4.19 | $ 4.32 | $ 4.45 | $ 4.58 | $ 4.72 |
| Outbound Calls - with Customer | Tiered price per call | 1 | 1 – 60,250 | $ 4.24 | $ 4.37 | $ 4.50 | $ 4.63 | $ 4.77 | $ 4.91 |
| Outbound Calls - with Customer | Tiered price per call | 2 | 60,251 – 150,000 | $ 4.15 | $ 4.28 | $ 4.41 | $ 4.54 | $ 4.68 | $ 4.82 |
| Outbound Calls - with Customer | Tiered price per call | 3 | 150,001+ | $ 4.07 | $ 4.19 | $ 4.32 | $ 4.45 | $ 4.58 | $ 4.72 |
| Outbound Calls - Default - with 3rd Party or Entity | Price per call | N/A | Single price for one call | $ 0.30 | $ 0.31 | $ 0.32 | $ 0.33 | $ 0.34 | $ 0.35 |
| Inbound Calls - Default | Tiered price per call | 1 | 1 – 266,667 | $ 4.24 | $ 4.37 | $ 4.50 | $ 4.63 | $ 4.77 | $ 4.91 |
| Inbound Calls - Default | Tiered price per call | 2 | 266,668 – 666,667 | $ 4.15 | $ 4.28 | $ 4.41 | $ 4.54 | $ 4.68 | $ 4.82 |
| Inbound Calls - Default | Tiered price per call | 3 | 666,668+ | $ 4.07 | $ 4.19 | $ 4.32 | $ 4.45 | $ 4.58 | $ 4.72 |
| Outbound Calls - Default - with Customer | Tiered price per call | 1 | 1 – 60,250 | $ 4.24 | $ 4.37 | $ 4.50 | $ 4.63 | $ 4.77 | $ 4.91 |
| Outbound Calls - Default - with Customer | Tiered price per call | 2 | 60,251 – 150,000 | $ 4.15 | $ 4.28 | $ 4.41 | $ 4.54 | $ 4.68 | $ 4.82 |
| Outbound Calls - Default - with Customer | Tiered price per call | 3 | 150,001+ | $ 4.07 | $ 4.19 | $ 4.32 | $ 4.45 | $ 4.58 | $ 4.72 |
| Outbound Calls - Default - with 3rd Party or Entity | Price per call | N/A | Single price for one call | $ 0.30 | $ 0.31 | $ 0.32 | $ 0.33 | $ 0.34 | $ 0.35 |
| Chat Sessions | Price per chat conversation | N/A | Single price for one task | $ 4.24 | $ 4.37 | $ 4.50 | $ 4.63 | $ 4.77 | $ 4.91 |
| Inbound Social Media Inquiries | Price per exchange | N/A | Single price for one task | $ 0.30 | $ 0.31 | $ 0.32 | $ 0.33 | $ 0.34 | $ 0.35 |
| SMS/Texts Exchanges | Price per SMS/text conversation | N/A | Single price for one task | $ 0.30 | $ 0.31 | $ 0.32 | $ 0.33 | $ 0.34 | $ 0.35 |
| Manual Email Exchanges | Price per manual email exchange w/ optional tier | N/A | Single price for one task | $ 4.84 | $ 4.99 | $ 5.14 | $ 5.29 | $ 5.45 | $ 5.62 |
| Outbound Mail Responses | Price per response | N/A | Single price for one task | $ 6.06 | $ 6.24 | $ 6.43 | $ 6.62 | $ 6.82 | $ 7.02 |
| Other Contact Center Support | Price per interaction | N/A | Single price for one task | $ 6.06 | $ 6.24 | $ 6.43 | $ 6.62 | $ 6.82 | $ 7.02 |

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

| Operating Elements | Pricing Model | Annual Volume / Tier Range | Base Ordering Period - Three (3) years | | | Optional Ordering Period - Three (3) years | | |
|---|---|---|---|---|---|---|---|---|
| | | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 |
| **BACK-OFFICE PROCESSING - PAGE 1** | | | | | | | | |
| *Eligibility Processing* | | | | | | | | |
| Processing FAFSA Applications | Price per task | Single price for one task | $ 7.22 | $ 7.44 | $ 7.66 | $ 7.89 | $ 8.13 | $ 8.37 |
| Processing FAFSA Corrections | Price per task | Single price for one task | $ 7.22 | $ 7.44 | $ 7.66 | $ 7.89 | $ 8.13 | $ 8.37 |
| Student Aid Report (SAR) Correction Forms | Price per task | Single price for one task | $ 3.61 | $ 3.72 | $ 3.83 | $ 3.94 | $ 4.06 | $ 4.19 |
| Processing Signature Pages | Price per task | Single price for one task | $ 2.17 | $ 2.23 | $ 2.30 | $ 2.37 | $ 2.44 | $ 2.51 |
| Other eligibility tasks | Price per task | Single price for one task | $ 7.22 | $ 7.44 | $ 7.66 | $ 7.89 | $ 8.13 | $ 8.37 |
| **Origination and Disbursement Processing** | | | | | | | | |
| *Applicant Support Services* | | | | | | | | |
| PLUS Loan Adverse Credit Determination Appeals | Price per task | Single price for one task | $ 86.65 | $ 89.24 | $ 91.92 | $ 94.68 | $ 97.52 | $ 100.45 |
| *School Support Services* | | | | | | | | |
| Comingled Account Research and Resolution | Price per task | Single price for one task | $ 346.58 | $ 356.98 | $ 367.69 | $ 378.72 | $ 390.08 | $ 401.78 |
| Ancillary Services Support -Paper MPN and Endorser Addenda Processing | Price per task | Single price for one task | $ 346.58 | $ 356.98 | $ 367.69 | $ 378.72 | $ 390.08 | $ 401.78 |
| Reconciliation and Close-Out Activities | Price per task | Single price for one task | $ 346.58 | $ 356.98 | $ 367.69 | $ 378.72 | $ 390.08 | $ 401.78 |
| Fiscal Operations Report and Application to Participate (FISAP) Support | Price per task | Single price for one task | $ 346.58 | $ 356.98 | $ 367.69 | $ 378.72 | $ 390.08 | $ 401.78 |
| Subsidized Usage Limit Applies Inquiry Research | Price per task | Single price for one task | $ 346.58 | $ 356.98 | $ 367.69 | $ 378.72 | $ 390.08 | $ 401.78 |
| Return of Title IV (R2T4) Support | Price per task | Single price for one task | $ 346.58 | $ 356.98 | $ 367.69 | $ 378.72 | $ 390.08 | $ 401.78 |
| *Campus Based Support* | | | | | | | | |
| Campus Based Pre and Post-Funds Closeout Outreach | Price per task | Single price for one task | $ 346.58 | $ 356.98 | $ 367.69 | $ 378.72 | $ 390.08 | $ 401.78 |
| Campus Based Canceling Award Years and Available Balances Outreach | Price per task | Single price for one task | $ 346.58 | $ 356.98 | $ 367.69 | $ 378.72 | $ 390.08 | $ 401.78 |
| Other origination and disbursement tasks | Price per task | Single price for one task | $ 173.29 | $ 178.49 | $ 183.84 | $ 189.36 | $ 195.04 | $ 200.89 |
| **Life of Loan & Grant Processing** | | | | | | | | |
| *Repayment Plan and Recertifications Processing* | | | | | | | | |
| Repayment Plan Processing (non-IDR) | Price per task | Single price for one task | $ 3.61 | $ 3.72 | $ 3.83 | $ 3.94 | $ 4.06 | $ 4.19 |
| Income-Driven Repayment (IDR) Plan Processing | Price per task | Single price for one task | $ 10.83 | $ 11.16 | $ 11.49 | $ 11.83 | $ 12.19 | $ 12.56 |
| Income-Driven Repayment (IDR) Plan Annual Recertifications | Price per task | Single price for one task | $ 10.83 | $ 11.16 | $ 11.49 | $ 11.83 | $ 12.19 | $ 12.56 |
| Other Repayment Plan and Recertification Processing | Price per task | Single price for one task | $ 10.83 | $ 11.16 | $ 11.49 | $ 11.83 | $ 12.19 | $ 12.56 |
| *Military Benefits Review and Application Processing* | | | | | | | | |
| Conducting Account Review and Application of Benefit | Price per task | Single price for one task | $ 3.61 | $ 3.72 | $ 3.83 | $ 3.94 | $ 4.06 | $ 4.19 |
| *TEACH Grant Processing* | | | | | | | | |
| TEACH Grant Manual Adjustments | Price per task | Single price for one task | $ 7.22 | $ 7.44 | $ 7.66 | $ 7.89 | $ 8.13 | $ 8.37 |
| TEACH Certification Applications-Reviewed/Approved | Price per task | Single price for one task | $ 5.78 | $ 5.95 | $ 6.13 | $ 6.31 | $ 6.50 | $ 6.70 |
| TEACH Certification Applications-Reviewed/Denied | Price per task | Single price for one task | $ 5.78 | $ 5.95 | $ 6.13 | $ 6.31 | $ 6.50 | $ 6.70 |
| Other TEACH Grant Processing | Price per task | Single price for one task | $ 7.22 | $ 7.44 | $ 7.66 | $ 7.89 | $ 8.13 | $ 8.37 |
| *PSLF/TEPSLF Processing* | | | | | | | | |
| Employment Certification Form Processing | Price per task | Single price for one task | $ 7.22 | $ 7.44 | $ 7.66 | $ 7.89 | $ 8.13 | $ 8.37 |
| Application Processing -Approved | Price per task | Single price for one task | $ 64.98 | $ 66.93 | $ 68.94 | $ 71.01 | $ 73.14 | $ 75.33 |
| Application Processing - Denied/Ineligible | Price per task | Single price for one task | $ 64.98 | $ 66.93 | $ 68.94 | $ 71.01 | $ 73.14 | $ 75.33 |
| PSLF/TEPSLF Reconsideration | Price per task | Single price for one task | $ 10.83 | $ 11.16 | $ 11.49 | $ 11.83 | $ 12.19 | $ 12.56 |
| Manual Payment Counting | Price per task | Single price for one task | $ 57.76 | $ 59.50 | $ 61.28 | $ 63.12 | $ 65.01 | $ 66.96 |
| Other PSLF/TEPSLF Processing Tasks | Price per task | Single price for one task | $ 7.22 | $ 7.44 | $ 7.66 | $ 7.89 | $ 8.13 | $ 8.37 |
| *Deferment Processing* | | | | | | | | |
| Deferments Processing | Price per task | Single price for one task | $ 3.61 | $ 3.72 | $ 3.83 | $ 3.94 | $ 4.06 | $ 4.19 |
| *Forbearance Processing* | | | | | | | | |
| Forbearances Processing | Price per task | Single price for one task | $ 2.17 | $ 2.23 | $ 2.30 | $ 2.37 | $ 2.44 | $ 2.51 |
| *Discharge Processing (Intake, review, follow-up, and post-determination processing)* | | | | | | | | |
| Discharge Processing | Price per task | Single price for one task | $ 10.83 | $ 11.16 | $ 11.49 | $ 11.83 | $ 12.19 | $ 12.56 |

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

| Operating Elements | Pricing Model | Annual Volume / Tier Range | Base Ordering Period - Three (3) years | | | Optional Ordering Period - Three (3) years | | |
|---|---|---|---|---|---|---|---|---|
| | | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 |
| **BACK-OFFICE PROCESSING - PAGE 2** | | | | | | | | |
| *Bankruptcy Processing Support* | | | | | | | | |
| Timely filing proof of claims | Price per task | Single price for one task | $ 7.22 | $ 7.44 | $ 7.66 | $ 7.89 | $ 8.13 | $ 8.37 |
| Timely review of repayment plans and escalating to FSA | Price per task | Single price for one task | $ 10.83 | $ 11.16 | $ 11.49 | $ 11.83 | $ 12.19 | $ 12.56 |
| Other Bankruptcy Support Processing | Price per task | Single price for one task | $ 7.22 | $ 7.44 | $ 7.66 | $ 7.89 | $ 8.13 | $ 8.37 |
| *Total & Permanent Disability (TPD) Discharge Processing* | | | | | | | | |
| TPD Application Processing -Approved | Price per task | Single price for one task | $ 14.44 | $ 14.87 | $ 15.32 | $ 15.78 | $ 16.25 | $ 16.74 |
| TPD Application Processing -Denied | Price per task | Single price for one task | $ 14.44 | $ 14.87 | $ 15.32 | $ 15.78 | $ 16.25 | $ 16.74 |
| TPD Annual Monitoring - Approved | Price per task | Single price for one task | $ 7.22 | $ 7.44 | $ 7.66 | $ 7.89 | $ 8.13 | $ 8.37 |
| TPD Annual Monitoring - Denied | Price per task | Single price for one task | $ 7.22 | $ 7.44 | $ 7.66 | $ 7.89 | $ 8.13 | $ 8.37 |
| Other TPD Processing | Price per task | Single price for one task | $ 7.22 | $ 7.44 | $ 7.66 | $ 7.89 | $ 8.13 | $ 8.37 |
| *Borrower Defense Processing* | | | | | | | | |
| Borrower Defense Application Processing (Intake, review, and follow-up) | Price per task | Single price for one task | $ 14.44 | $ 14.87 | $ 15.32 | $ 15.78 | $ 16.25 | $ 16.74 |
| Borrower Defense Requests for Reconsideration Processing (Intake, review, and follow-up) | Price per task | Single price for one task | $ 14.44 | $ 14.87 | $ 15.32 | $ 15.78 | $ 16.25 | $ 16.74 |
| Discharge Request (Post-determination Processing) | Price per task | Single price for one task | $ 7.22 | $ 7.44 | $ 7.66 | $ 7.89 | $ 8.13 | $ 8.37 |
| Other Borrower Defense Processing Tasks | Price per task | Single price for one task | $ 7.22 | $ 7.44 | $ 7.66 | $ 7.89 | $ 8.13 | $ 8.37 |
| *Cohort Default Rate (CDR) Appeals Processing* | | | | | | | | |
| CDR Appeal Review/Research and escalation | Price per task | Single price for one task | $ 64.98 | $ 66.93 | $ 68.94 | $ 71.01 | $ 73.14 | $ 75.33 |
| CDR Appeal Response | Price per task | Single price for one task | $ 21.66 | $ 22.31 | $ 22.98 | $ 23.67 | $ 24.38 | $ 25.11 |
| Other Cohort Default Rate Processing | Price per task | Single price for one task | $ 7.22 | $ 7.44 | $ 7.66 | $ 7.89 | $ 8.13 | $ 8.37 |
| *Fair Credit Reporting Act (FCRA) Credit Dispute Processing* | | | | | | | | |
| Responding to Disputes (E-Oscar, Trade, and Direct) | Price per task | Single price for one task | $ 21.66 | $ 22.31 | $ 22.98 | $ 23.67 | $ 24.38 | $ 25.11 |
| *OIG Fraud Referral Case Management and Resolution Processing* | | | | | | | | |
| Complete intake referrals | Price per task | Single price for one task | $ 3.61 | $ 3.72 | $ 3.83 | $ 3.94 | $ 4.06 | $ 4.19 |
| Research Fraud referrals | Price per task | Single price for one task | $ 346.58 | $ 356.98 | $ 367.69 | $ 378.72 | $ 390.08 | $ 401.78 |
| Initial Risk Tier Determination | Price per task | Single price for one task | $ 606.52 | $ 624.71 | $ 643.45 | $ 662.76 | $ 682.64 | $ 703.12 |
| Initiate and execute final referral disposition | Price per task | Single price for one task | $ 21.66 | $ 22.31 | $ 22.98 | $ 23.67 | $ 24.38 | $ 25.11 |
| Other OIG Fraud Referral Processing | Price per task | Single price for one task | $ 173.29 | $ 178.49 | $ 183.84 | $ 189.36 | $ 195.04 | $ 200.89 |
| *Feedback Center & Ombudsman Group Case Management and Resolution Processing* | | | | | | | | |
| Feedback/Dispute Non-Call Case Intake, Screening, and Assignment | Price per task | Single price for one task | $ 2.17 | $ 2.23 | $ 2.30 | $ 2.37 | $ 2.44 | $ 2.51 |
| Feedback/Dispute Case Research and Escalation | Price per task | Single price for one task | $ 43.32 | $ 44.62 | $ 45.96 | $ 47.34 | $ 48.76 | $ 50.22 |
| Feedback/Dispute Case Closure | Price per task | Single price for one task | $ 21.66 | $ 22.31 | $ 22.98 | $ 23.67 | $ 24.38 | $ 25.11 |
| Other Feedback Center & Ombudsman Processing | Price per task | Single price for one task | $ 7.22 | $ 7.44 | $ 7.66 | $ 7.89 | $ 8.13 | $ 8.37 |
| *Collection/Default Activities Processing* | | | | | | | | |
| Administrative Wage Garnishment (AWG) | Price per task | Single price for one task | $ 25.27 | $ 26.03 | $ 26.81 | $ 27.61 | $ 28.44 | $ 29.30 |
| Treasury Offset/Federal Salary Offset | Price per task | Single price for one task | $ 21.66 | $ 22.31 | $ 22.98 | $ 23.67 | $ 24.38 | $ 25.11 |
| Litigation Referrals | Price per task | Single price for one task | $ 43.32 | $ 44.62 | $ 45.96 | $ 47.34 | $ 48.76 | $ 50.22 |
| Loan Rehabilitation | Price per task | Single price for one task | $ 32.49 | $ 33.47 | $ 34.47 | $ 35.50 | $ 36.57 | $ 37.67 |
| Title IV Reinstatement | Price per task | Single price for one task | $ 7.22 | $ 7.44 | $ 7.66 | $ 7.89 | $ 8.13 | $ 8.37 |
| Other Collection/Default Activities | Price per task | Single price for one task | $ 7.22 | $ 7.44 | $ 7.66 | $ 7.89 | $ 8.13 | $ 8.37 |
| *Miscellaneous Life of Loan & Grant Processing* | | | | | | | | |
| Account Research and Response for Disputes/Escalations | Price per task | Single price for one task | $ 43.32 | $ 44.62 | $ 45.96 | $ 47.34 | $ 48.76 | $ 50.22 |
| Account Research and Escalations | Price per task | Single price for one task | $ 21.66 | $ 22.31 | $ 22.98 | $ 23.67 | $ 24.38 | $ 25.11 |
| Reviewing and Responding to Control Mail | Price per task | Single price for one task | $ 43.32 | $ 44.62 | $ 45.96 | $ 47.34 | $ 48.76 | $ 50.22 |
| Responding to General Correspondence/Requests for Information | Price per task | Single price for one task | $ 7.22 | $ 7.44 | $ 7.66 | $ 7.89 | $ 8.13 | $ 8.37 |
| NSLDS/Enrollment Reporting Updates and Changes | Price per task | Single price for one task | $ 7.22 | $ 7.44 | $ 7.66 | $ 7.89 | $ 8.13 | $ 8.37 |
| Payment Exception and Refund Processing | Price per task | Single price for one task | $ 7.22 | $ 7.44 | $ 7.66 | $ 7.89 | $ 8.13 | $ 8.37 |
| Account Status Change and Manual Adjustments | Price per task | Single price for one task | $ 7.22 | $ 7.44 | $ 7.66 | $ 7.89 | $ 8.13 | $ 8.37 |
| Manual Skip Tracing | Price per task | Single price for one task | $ 7.22 | $ 7.44 | $ 7.66 | $ 7.89 | $ 8.13 | $ 8.37 |
| Other Life of Loan & Grant Processing | Price per task | Single price for one task | $ 7.22 | $ 7.44 | $ 7.66 | $ 7.89 | $ 8.13 | $ 8.37 |

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

## 2.1   COMMON PRICING TASK DESCRIPTIONS

| Task | Description |
|------|-------------|
| **CONTACT CENTER SUPPORT** | |
| **Contact Center Support (6AM-11PM/7)** | |
| Inbound Calls | Phone calls initiated by a customer, partner, or 3rd party that is fielded by a BPO. |
| Outbound Calls - with Customer | Initiated and connected calls as part of an outbound campaign that result in contact with the borrower. |
| Outbound Calls - with 3rd Party or Entity | Initiated and connected calls as part of an outbound campaign that result in a call with a third party/entity. |
| Inbound Calls - Default | Phone calls related to default recovery initiated by a customer, partner, or 3rd party that is fielded by a BPO. |
| Outbound Calls - Default - with Customer | Initiated and connected calls related to default recovery as part of an outbound campaign that result in contact with the borrower. |
| Outbound Calls - Default - with 3rd Party or Entity | Initiated and connected calls related to default recovery as part of an outbound campaign that result in a call with a third party/entity. |
| Chat Sessions | Live Agent Chats initiated by customers, partners, or 3rd parties that are routed to and fielded by a BPO. |
| Inbound Social Media Inquiries | Customer, Partner, and 3rd party comments or questions on social media that are routed to and fielded by a BPO. |
| SMS/Texts Exchanges | Customer, Partner, and 3rd party comments or questions initiated via SMS that are routed to and fielded by a BPO. |
| Manual Email Exchanges | Email correspondence completed by BPOs in response to a customer or partner inquiry. |
| Outbound Mail Responses | Manual mail correspondence completed by BPOs in response to a customer or partner inquiry. |
| Other Contact Center Support | This includes other Contact Center Support activities not included in the above list. |
| **BACK-OFFICE PROCESSING** | |
| **Eligibility Processing** | |
| Processing FAFSA Applications | Processing applications received. This includes reviewing for completeness, ensuring data is entered in a valid format, and submitting the application for transmission or rejection. |
| Processing FAFSA Corrections | Processing applications corrections. This includes reviewing for completeness, ensuring data is entered in a valid format, and submitting the application for transmission or rejection. |
| Student Aid Report (SAR) Correction Forms | Processing changes and/or corrections to SAR data. This includes reviewing for completeness, ensuring data is entered in a valid format, and submitting the application for transmission or rejection. |
| Processing Signature Pages | Processing signature pages received. This includes reviewing documents (applications, correction applications, SARs, and signature pages) to ensure signatures are valid and meet FSA's requirements. |

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

| Other eligibility tasks | This includes other Eligibility task activities not included in the above list. |
|---|---|
| **Origination and Disbursement Processing** | |
| *Applicant Support Services* | |
| PLUS Loan Adverse Credit Determination Appeals | Perform processing in support of the credit appeal process for reconsideration and due to extenuating circumstances.<br>• PLUS Reconsideration Appeal<br>• PLUS Appeal due to Extenuating Circumstance |
| *School Support Services* | |
| Comingled Account Research and Resolution | Performing comingled research and resolving account issues. |
| Ancillary Services Support -Paper MPN and Endorser Addenda Processing | Paper MPN and Endorser Addenda processing (Review, inspection, and acceptance or rejection). |
| Reconciliation and Close-Out Activities | Support of reconciliation activities for each program between school records and the information on the origination and disbursement system to include school monitoring, school account statement, and assistance in resolving discrepancies. Year-end completion of reconciliation activities and processing for each program with a goal of zero ending cash balance for the year. |
| Fiscal Operations Report and Application to Participate (FISAP) Support | Assisting schools in completing and submitting the FISAP funding for the upcoming year and reporting expenditures from the prior year. Support for Money Flow and Changes of Affiliation outreach. |
| Subsidized Usage Limit Applies Inquiry Research | Assist and respond to schools with SULA related issues involving both the origination and disbursement system reporting and NSLDS reporting. |
| Return of Title IV (R2T4) Support | Support to schools of the R2T4 process, to include but not limited to, technical and operational support. |
| Campus Based Support | Campus-Based Pre-and Post-Funds Closeout Outreach.<br>Campus-Based Canceling Award Years and Available Balances Outreach. |
| Campus Based Pre- and Post-Funds Closeout Outreach | Pre-Funds Closeout Outreach:  FSA generates a report comparing the G5 drawdown amount to reported school FISAP data. Schools that have a "potential" Unprocessed Deobligation (UD) will receive 3 outreaches from Customer Service for schools to review their reported expenditures and make adjustments as needed before Close-out which is generated in February.<br><br>Post-Funds Closeout Outreach:  FSA generates a UD report for schools that need outreach based on balances owed to the department (UD). Customer Service conducts 3 outreaches as well. |

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

| | |
|---|---|
| Campus Based Canceling Award Years and Available Balances Outreach | FSA generates a report for schools that have available balances in the canceling award year. Four (4) outreaches are conducted throughout the year starting in December, March, July, and September. For example:  AY2014-2015 is canceling for Campus-Based on September 30, 2020. Schools are requested to reconcile and if determined valid; schools should draw down the funds in G5 or if not then confirm if funds should be reduced. |
| Other origination and disbursement tasks | This includes other Origination and Disbursement Task activities not included in the above list. |
| **Life of Loan & Grant Processing** | |
| *Repayment Plan and Recertifications Processing* | |
| Repayment Plan Processing (non-IDR) | Processing a manual request to change the borrower repayment plan from one plan to a non-IDR plan (e.g. standard, consolidated standard, graduated, alternative, etc.). |
| Income-Driven Repayment (IDR) Plan Processing | Processing a manual application for IDR (e.g. ICR, IBR, PAYE, REPAYE, NEW IBR, ISR, etc.). |
| Income-Driven Repayment (IDR) Plan Annual Recertifications | Processing a manual application for IDR Recertification. |
| Other Repayment Plan and Recertification Processing | This includes other Repayment Plan and Recertification Processing activities not included in the above list. |
| *Military Benefits Review and Application Processing* | Manually reviewing an application, servicing history, recipient records, supporting documentation, and other available data to apply Servicemembers Civil Relief Act (SCRA) Interest Rate Cap, 0% interest caps, HEROES Act waivers and other associated benefits. **NOTE:**  Military related deferments are to be captured under "Deferment Processing." Moreover, discharge due to a service-connected disability is captured under "Total & Permanent Disability Discharge." |
| Conducting Account Review and Application of Benefit | Reviewing an application, recipient records, supporting documentation, available date and/or service-related documents to determine qualifications for military-related benefits. Applying benefits (e.g. interest rate change) to the account. |
| *TEACH Grant Processing* | |
| TEACH Grant Manual Adjustments | Manually reviewing servicing histories, recipient records, and other available data to adjustments TEACH Grant service obligations and/or years of qualifying service. |
| TEACH Certification Applications- Reviewed/Approved | Reviewing a TEACH Grant certification of service application that is approved. |
| TEACH Certification Applications- Reviewed/Denied | Reviewing a TEACH Grant certification of service application that is denied. |
| Other TEACH Grant Processing | This includes other TEACH Grant Processing activities not included in the above list. |
| *Public Service Loan Forgiveness and Temporary Expanded Public Service Loan Forgiveness (PSLF/TEPSLF) Processing* | |
| Employment Certification Form Processing | Reviewing an application and other supporting information to decide on qualifying employment. May require escalation to FSA as needed. |

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

| Application Processing -Approved | Reviewing an application, recipient records, supporting documentation, reviewing qualifying payments and employment, escalating to FSA for final decision and applying determination. |
|---|---|
| Application Processing - Denied/Ineligible | Reviewing an application, recipient records, supporting documentation, reviewing qualifying payments and employment, and escalating to FSA as needed or applying determination. |
| PSLF/TEPSLF Reconsideration | Reviewing requests for reconsideration, drafting dispute summary as needed, and/or escalating to FSA as needed. |
| Manual Payment Counting | Reviewing past borrower payments and financial histories, and other supporting information, to determine whether a payment is qualifying for PSLF purposes. |
| Other PSLF/TEPSLF Processing Tasks | This includes other PSLF/TEPSLF Processing activities not included in the above list. |
| **Deferment Processing** | |
| Deferments Processing | Reviewing an application, recipient records, supporting documentation, and other available data to make a deferment determination for one of the available deferment types authorized under the Higher Education Act and regulations thereof. |
| **Forbearance Processing** | |
| Forbearances Processing | Reviewing an application, recipient records, supporting documentation, and other available data to make a deferment determination for one of the available forbearance types authorized under the Higher Education Act and regulations thereof. |
| **Discharge Processing (Intake, review, follow-up, and post-determination processing)** | |
| Discharge Processing | Reviewing an application, recipient records, supporting documentation, and other available data (e.g. servicing histories, school records, non-ED data, etc.) to perform a pre-determination and apply FSA's final determination for any of the discharge categories authorized under the Higher Education Act and regulations thereof. |
| **Bankruptcy Processing Support** | Supporting bankruptcy processing by timely filing proof of claims and reviewing court-ordered repayment plans. |
| Timely filing proof of claims | Completing a bankruptcy proof of claim form and submitting to federal court for filing. |
| Timely review of repayment plans and escalating to FSA | Reviewing bankruptcy repayment plans/orders to identify the objectionable language and/or applying details of an order. Escalating to FSA as needed. |
| Other Bankruptcy Support Processing | This includes other Bankruptcy Support Processing activities not included in the above list. |
| **Total & Permanent Disability Discharge Processing** | Reviewing an application for Discharge due to Total and Permanent Disability, performing a pre-determination, applying FSA's final determination, and performing on-going monitoring as needed. |
| TPD Application Processing - Approved | Processing a manual application/matched application for TPD Discharge – Approved |
| TPD Application Processing - Denied | Processing a manual application/matched application for TPD Discharge – Denied |

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

| | |
|---|---|
| TPD Annual Monitoring - Approved | Manually reviewing annual income documentation from TPD applicants who are undergoing their 3-year monitoring and approving. |
| TPD Annual Monitoring - Denied | Manually reviewing annual income documentation from TPD applicants who are undergoing their 3-year monitoring and denying. |
| Other TPD Processing | This includes other TPD Processing activities not included in the above list. |
| *Borrower Defense Processing* | |
| Borrower Defense Application Processing (Intake, review, and follow-up) | All activities necessary to ensure the case creation, reviewing case details, following up with parties as needed, applying forbearance, and assigning the case to the appropriate party. **Note:** After a borrower defense claim is submitted or created; the Contractor will review the claim for completeness and accuracy prior to sending to FSA for review of the borrower defense claim. |
| Borrower Defense Requests for Reconsideration Processing (Intake, review, and follow-up) | All activities necessary to ensure the case creation, reviewing case details, following up with parties as needed, applying forbearance, and assigning the case to the appropriate party. **Note:** In addition to reviewing this can include, drafting summary of issue as needed, and/or escalating to FSA as needed. |
| Discharge Request (Post-determination Processing) | Post-determination processing is the phase of the lifecycle when a determination or decision is made on the application or a "Request for Reconsideration" and then the decision needs to be processed. This includes processing a stop forbearance, processing of interest credit requests, refund requests, and providing school notification.<br><br>Interest Credit Request:  Review each loan and calculate the interest credit amount based on calculation from FSA. Apply the interest adjustment transaction on the servicing system.  Annotate the borrower account with information on why the interest credit was applied. Update the system with the interest credit request status and interest amount, date, and calculation information. Upload notices/documentation related to the interest credit to the system.<br><br>Refund Request:  Review each loan and determine if a refund must be applied to the loan based on the information in the system. Apply for the refund (if applicable) to the loan on the servicing system and annotate the servicing system on why the refund has occurred. Update the system with the refund request status, amount, date, and all notices sent to the borrower. |
| Other Borrower Defense Processing Tasks | This includes other Borrower Defense Processing Task activities not included in the above list. |
| *Cohort Default Rate (CDR) Appeals Processing* | |
| CDR Appeal Review/Research and escalation | Review CDR appeals received, research issues presented and data, summarize findings, and escalate to FSA as needed. |
| CDR Appeal Response | Drafting CDR response as needed. |

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

| Other Cohort Default Rate Processing | This includes other Cohort Default Rate Processing activities not included in the above list. |
|---|---|
| **Fair Credit Reporting Act (FCRA) Credit Dispute Processing** | |
| Responding to Disputes (E-Oscar, Trade, and Direct) | Reviewing, researching, and responding to disputes submitted by borrowers to Credit Reporting Agencies (CRA's), ACDV's, Trade block lifts, and direct disputes received under applicable FCRA regulations and submitting manual adjustments. |
| **Office of Inspector General (OIG) Fraud Referral Case Management and Resolution Processing** | |
| Complete intake referrals | Complete intake of referrals received from the OIG. |
| Research Fraud referrals | Research fraud referrals received from the OIG, including collecting additional data from FSA stakeholder offices, systems, or schools. |
| Initial Risk Tier Determination | Analyze referrals to determine initial risk tier designation. |
| Initiate and execute final referral disposition | Initiate and execute final disposition of referrals in coordination with FSA stakeholder offices. |
| Other OIG Fraud Referral Processing | Analyze fraud referrals to identify process and control improvements to prevent or detect fraud. |
| **Feedback Center & Ombudsman Group Case Management and Resolution Processing** | |
| Feedback/Dispute Non-Call Case Intake, Screening, and Assignment | All activities necessary to ensure the case creation and assignment to the appropriate parties. |
| Feedback/Dispute Case Research and Escalation | All activities necessary to contact appropriate parties; compile and evaluate information relevant to the case; execute contacts to complainants; negotiate acceptable resolutions; craft and send outgoing messages; determine whether subsequent contacts require case re-work. |
| Feedback/Dispute Case Closure | All activities necessary to properly document steps taken to resolve the matter; update the case record in the system with accurate data concerning case topic, resolution type, and outcome, and closing date. |
| Other Feedback Center & Ombudsman Processing | This includes other Feedback Center & Ombudsman Processing activities not included in the above list. |
| **Collection/Default Activities Processing** | |
| Administrative Wage Garnishment (AWG) | Identify candidates for garnishment (non-payers, not working toward resolution), locate employer and verify employment, process employer certification forms, initiate due process notice (cause DMCS system to send notice), establish voluntary repayment agreements with borrowers who respond to notice, draft hearing responses to borrowers who request a hearing in response to notice, monitor accounts for events that require suspension of AWG (bankruptcy, etc.), respond to inquiries from employers and borrowers, notify employers when payment in full is imminent, send stop garnishment notices (fax), and issue refunds. |
| Treasury Offset/Federal Salary Offset | Establish voluntary repayment agreements with borrowers who respond to notice, draft hearing responses to borrowers who request a hearing in response to notice, respond to calls from borrowers who have been offset, respond to hardship claims, and issue refunds. |

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

| | |
|---|---|
| Litigation Referrals | Identify candidates for litigation, prepare litigation package, support reconciliation with DOJ, update accounts to conform with terms of judgment, prepare release and satisfaction of judgment packages, and notify DOJ of discharge requests. |
| Loan Rehabilitation | Counsel borrowers on benefits and requirements of the program, review borrower financial docs and calculate monthly payment amount, send rehabilitation agreement letter to borrower, and review signed rehabilitation agreement for acceptability. |
| Title IV Reinstatement | Counsel borrowers on TIV requirements, monitor accounts for reinstatement eligibility, send reinstatement letter, and update NSLDS status. |
| Other Collection/Default Activities | Establish reasonable and affordable repayment agreements, incarceration verifications, and manual CAIVRS updates. |
| ***Miscellaneous Life of Loan & Grant Processing*** | |
| Account Research and Response for Disputes/Escalations | Reviewing escalated inquiries, drafting correspondence as needed. |
| Account Research and Escalations | Reviewing escalated inquiries and escalating to FSA as needed. |
| Reviewing and Responding to Control Mail | Reviewing, preparing, and responding to control correspondence. Control correspondence includes items sent to Federal Student Aid from the White House, Members of Congress, State Attorneys General, the Department of Education's Office of Inspector General, and other high Government officials.  In addition, FSA may at its discretion designate other items as a control mail item. |
| Responding to General Correspondence/Requests for Information | Manual responses to customer correspondence/requests when needed (e.g. sending documents, histories, addressing questions, etc.) |
| NSLDS/Enrollment Reporting Updates and Changes | Manually reviewing and adjusting NSLDS and/or enrollment reporting as needed. |
| Payment Exception and Refund Processing | Payment research and Reapplication of payments and/or refund processing. |
| Account Status Change and Manual Adjustments | Reviewing accounts to perform manual adjustments as needed (e.g. repayment and billing adjustments, conversion to repayment, adjusting account status, removing and/or reapplying borrower benefits, name change/SSN merge, et cetera). |
| Manual Skip Tracing | Performing skip tracing activities to locate and verify a customer's address, telephone number, or other contact details. |
| Other Life of Loan & Grant Processing | This includes other Life of Loan & Grant Processing activities not included in the above list. |

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

## SECTION C - DESCRIPTION/SPECIFICATIONS/STATEMENT OF WORK

### 1.0    PURPOSE

The purpose of this Common Performance Work Statement (PWS) is to define the scope of work to be performed and the Common Performance Standards to be achieved by contractors as part of the U.S. Department of Education, Office of Federal Student Aid (FSA), Next Generation Financial Services Environment, Business Process Operations Program (Next Gen BPO).

### 2.0    BACKGROUND

Next Gen BPO is a component of the Next Gen initiative and supports FSA's overall strategic goal to provide a more efficient and effective customer experience to the students, parents, and borrowers FSA serves.

FSA intends to accomplish its goal by contracting with vendors who will execute contact center operations and back-office processing activities encompassing the full student aid lifecycle, from disbursement to payoff, in a manner consistent with leading financial services providers and other industry leaders recognized for their customer service to:

- Deliver efficient and effective customer and partner experiences;
- Improve customer outcomes, overall portfolio performance, and compliance with consumer protection standards; and
- Establish greater operational flexibility and reduce operational complexity.

Next Gen BPO Providers will provide personnel to operate under FSA's single brand, provide an enhanced level of service beyond today's environment, and support operations across the entire lifecycle of student aid.

**Description of Services**

The services contemplated under this NexGen BPO multiple award Indefinite Delivery Indefinite Quantity (IDIQ) Contract include the personnel and equipment, utilizing the provided environment and tools required to execute the following support services: **Contact Center Support** and **Back-Office Processing.**

**Contact Center Support includes but is not limited to:** Inbound/Outbound Calls, Chat Sessions, Inbound Social Media Inquiries, SMS/Texts Exchanges, Manual Email Exchanges, Outbound Mail Responses, and Other Contact Center Support.

**Back-Office Processing includes but is not limited to:** Eligibility Processing, Origination and Disbursement Processing, Applicant Support Services, School Support Services, Campus Based Support, Life of Loan & Grant Processing, Repayment Plan and Recertifications Processing, Military Benefits Review and Application Processing, Teacher Education Assistance for College and Higher Education (TEACH) Grant Processing, Public Service Loan Forgiveness and Temporary Expanded Public Service Loan Forgiveness (PSLF/TEPSLF) Processing, Deferment Processing, Forbearance Processing, Discharge Processing (Intake, review, follow-up, and post-

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

determination processing), Bankruptcy Processing Support, Total & Permanent Disability Discharge Processing, Borrower Defense Processing, Cohort Default Rate (CDR) Appeals Processing, Fair Credit Reporting Agency (FCRA) Credit Dispute Processing, Office of Inspector General (OIG) Fraud Referral Case Management and Resolution Processing, Feedback Center & Ombudsman Group Case Management and Resolution Processing, Collection/Default Activities Processing, and Miscellaneous Life of Loan & Grant Processing.

## 3.0   CONTRACT INFORMATION

**Contract Type:** Firm-Fixed Price IDIQ Contract.

**Period of Performance:** Performance of this contract shall be for a Base Ordering Period of three years and an Optional Ordering Period of three years.

**Table 1 – Next Gen BPO Period of Performance**

| Period of Performance | Duration |
|---|---|
| Base Ordering Period: June 23, 2020 through June 22, 2023 | 3 years (36 Months) |
| Optional Ordering Period: June 23, 2023 through June 22, 2026 | 3 years (36 Months) |
| **Total (if Optional Ordering Period is exercised)** | **6 years (72 months)** |

**Place of Performance**:  Performance shall be performed at Contractor managed facilities within 48 contiguous states or the District of Columbia unless specifically authorized by FSA.

**Observance of Federal Holidays:** Deliverables due on a Saturday, Sunday, or the following Federal holidays shall be due on the following business day.

| Federal Holidays | | |
|---|---|---|
| 1 | New Year's Day | January 1 |
| 2 | Martin Luther King's Birthday | 3rd Monday in January |
| 3 | President's Day | 3rd Monday in February |
| 4 | Memorial Day | Last Monday in May |
| 5 | Independence Day | July 4 |
| 6 | Labor Day | 1st Monday in September |
| 7 | Columbus Day | 2nd Monday in October |
| 8 | Veterans Day | November 11 |
| 9 | Thanksgiving Day | 4th Thursday in November |
| 10 | Christmas Day | December 25 |

## 4.0   SCOPE OF WORK, REQUIREMENTS, AND MILESTONES

## 4.1   CUSTOMER EXPERIENCE FOCUS

Next Gen BPO Providers shall prioritize customer and partner needs and preferences by meeting or exceeding FSA's Common Performance Standards to deliver an improved experience throughout the lifecycle of student aid. Next Gen BPO Providers shall use the Training and

Knowledge Management solution and associated tools provided by FSA, another Next Gen Solution, and/or another designated vendor to ensure a standardized and consistent approach across all contact centers. **Note:** Additional context on the current and future state tasks can be found in the following attachments:  Attachment 2 – Current State Customer Tasks, Attachment 3 – Current State Partner Tasks, and Attachment 4 – Top Customer Pain Points.

Next Gen BPO Providers shall:

**4.1.1** Provide personnel that is training-certified to respond to all customer and partner inquiries across the lifecycle of student aid,

**4.1.2** Provide personnel across customer and partner channels to deliver an experience that is consistent with or better than the FSA Common Performance Standards, and

**4.1.3** Collaborate with FSA, other designated vendors, and Next Gen partners to establish, prioritize, and deploy new functionality and associated training to meet customer and partner needs and create operational efficiencies.

## 4.2    GENERAL OPERATING REQUIREMENTS:

In addition to the customer experience focused requirements described above, FSA has identified the following general operating requirements needed to support Next Gen BPO.

### 4.2.1    Managing Expansion Activities, Site Visits, On-site Examinations, Off-site Monitoring, and Capacity

**4.2.1.1**  Next Gen BPO Providers shall be responsible for any expansion activities associated with their performance under this IDIQ and any resulting task orders.

    **4.2.1.1.1** Next Gen BPO Providers shall seek and obtain approval from FSA prior to relocation of contact center facilities.

    **4.2.1.1.2** Next Gen BPO Providers shall provide a relocation plan describing approach for continued operations.

    **4.2.1.1.3** Next Gen BPO Providers shall ensure there is no degradation of services to inquiries or activities during any relocation or expansion activities.

**4.2.1.2**  Next Gen BPO Providers shall support regularly scheduled site visits, on-site examinations, and off-site monitoring and allow full access into all contract related facilities (including data centers or other support locations), at any time during normal operating hours, to FSA employees or persons designated by FSA.

    **4.2.1.2.1** Next Gen BPO Providers shall provide all logistical support including, but not limited to agenda preparation, facility preparation, action item tracking and detailed meeting minutes.

**4.2.1.3** FSA may provide on-site monitors (2 to 4-person teams) at Next Gen BPO locations to offer continuous engagement opportunities designed to improve the Customer and Partner Experience through proactive engagement, monitoring, and oversight. Designated on-site monitors may serve as a primary point of contact for matters associated with specified functional areas. Refer to Section H-5 for a definition of "Functional Area."

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

**4.2.1.3.1** Next Gen BPO providers shall ensure access to facilities to accommodate on-site monitors as well as provide access to dedicated space, conference rooms, and internet and telephone connectivity with associated technical support.

**4.2.1.4** Next Gen BPO Providers shall ensure successful implementation, operation, and management of the IDIQ and subsequent task order requirements.

**4.2.1.5** Next Gen BPO Providers shall provide sufficient capacity to support projected call volumes, workload estimates, and call routing to meet or exceed FSA's Common Performance Standards.

### 4.2.2   Hours of Operation

Table 2 below provides the required hours of operation for the FSA Next Gen BPO Contact Centers. FSA expects all interaction channels to be available during "Standard Hours of Operation" as permitted by law. Any changes to the hours of operation will be done through the issuance of a Task Order identifying the change and the impacted functional areas.

**Table 2 – Next Gen BPO Hours of Operation**

| Category | Operating Status |
|---|---|
| Standard Hours of Operation: | Contractor shall be prepared to establish and maintain operations 6 AM to 11 PM Eastern Standard Time, 7 days/week, excluding Federal holidays. |

### 4.2.3   Language Requirement

Contact center support shall be provided in English and Spanish for all hours and days of operation. Other language needs will be supported by another Next Gen partner or an existing or new FSA solution. Contact center support shall include inbound and outbound inquiries across multiple channels (e.g., phone, email, chat, social media, SMS/text, fax, mail). English and Spanish support shall be provided for back-office processing tasks as well.

### 4.2.4   Performance Management

Next Gen BPO Providers shall adhere to FSA's Common Performance Standards and shall implement performance management mechanisms that will enable improved and ongoing achievement of these metrics. FSA will utilize a Traffic Light methodology to support Next Gen BPO Performance Management and to document achievement of the established Service Level Agreement (SLA). Traffic Light Scorecards and/or reports will be used to document Next Gen BPO Providers' performance. Performance will be evaluated monthly and evaluations will be utilized to determine the future allocation of work and accounts to Next Gen BPO Providers. Common Performance Standards consist of two (2) tiers of Service Level Agreement Metrics ("SLA Metrics") as shown in Tables 3 and 4 below. **Note:** Tier-1 SLA Metrics include the most critical performance metrics, as determined by FSA. Tier-2 SLA Metrics cover a broader set of performance metrics to track performance and progress toward desired Next Gen BPO outcomes. The assessment methodology for each metric (e.g., description of each metric, how it is measured, etc.) shall be provided and finalized post award.

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

Next Gen BPO Providers shall:

**4.2.4.1** Develop and execute a strategy to manage assigned customers and newly allocated customers.

**4.2.4.2** Develop and utilize monitoring and protocols to ensure compliance with Common Performance Standards, consistent customer experiences, and information accuracy for all calls and tasks.

**4.2.4.3** Deliver and monitor ongoing training and coaching to ensure accurate, consistent information for customers and partners in a manner that ensures attainment of SLA Metrics, without sacrificing customer experience or quality.

**4.2.4.4** Provide and support regular and ad hoc operational reports in a timely manner that detail performance by functional area.

**4.2.4.5** Participate in ongoing reviews of operational reports that detail performance by functional area.

**Table 3** (Tier 1) and **Table 4** (Tier 2) establish the required performance metrics and associated targets that will be used by FSA to measure vendor performance against the Next Gen vision and goals. Next Gen BPO Providers shall be expected to meet the required targets established for each SLA Metric during contract performance.

Next Gen BPO Providers' performance will be evaluated on a monthly basis using the Traffic Light Scorecard and/or reports to determine if each provider's performance status/level is Green, Yellow, or Red. **Note:** Metrics and associated targets will be measured, tracked and reported more frequently (e.g. daily and weekly).

- **Green:** Next Gen BPO Providers whose performance is at or above the established SLAs. This is defined as vendors who are meeting all Tier-1 SLA Metrics and/or missing no more than five (5) Tier-2 SLA Metrics. These providers will keep their assigned accounts and work and will also be assigned an equitable share of new accounts and work.
- **Yellow:** Next Gen BPO Providers whose performance is below established SLAs, but within the established tolerance. This is defined as providers who are missing no more than two (2) Tier-1 SLA Metrics and/or missing no more than five (5) Tier-2 SLA Metrics. These providers will keep their assigned accounts and work but may not receive new accounts and work.
- **Red:** Next Gen BPO Providers whose performance is below established SLAs and below the established tolerance will require urgent action. This is defined as providers who are missing more than two (2) Tier-1 SLA Metrics and/or more than five (5) Tier-2 SLA Metrics. These providers will not receive new accounts and work, and depending on the severity and demonstrated capacity of the providers, Next Gen BPO Providers may see a portion of their existing accounts and work reallocated to other Next Gen BPO Providers whose performance is at or above the established SLA Metrics.
- **Default Under the Traffic Light Scorecard:** Next Gen BPO Providers are required to maintain Green status for nine (9) months out of every twelve (12) month period in which the provider has any task orders evaluated under the SLAs. Next Gen BPO

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

Providers operating at Yellow or Red status for four (4) months or more in any twelve-(12) month period may have their contract terminated for default in accordance with FAR 52.249-8. Further, any Next Gen BPO Providers operating at Red status for three (3) or more consecutive months may have their contract terminated for default in accordance with FAR 52.249-8. A twelve-month period may span across multiple task orders issued under this contract. These provisions assert the circumstance in which a Next Gen BPO Provider may be terminated for default for failing to meet SLAs monitored by the Traffic Light Scorecard. They do not waive or modify any other governmental right or remedy under this contract or at law.

**Table 3 – Next Gen BPO Tier 1 Performance Metrics**

| Tier 1 Performance Metric | Description | Frequency | Targets |
|---|---|---|---|
| Customer Satisfaction Score | Customer Survey results as measured by FSA and/or designated solution. | Monthly | Average Score of 85% |
| Speed of Answer Service Level | The time it takes for an agent to answer a call once it has been offered out of the IVR. | Monthly | 80% in 20 sec 100% in 60 sec |
| Abandon Rate of Inbound Calls | The percentage of calls that are terminated by the caller once offered out of the IVR to be answered by an agent. | Monthly | 2% or less of calls offered to CSRs |
| Processing FAFSA Applications and Corrections | The time it takes to process FAFSA Applications and Corrections once received. | Monthly | Within 7 Business Days of Receipt |
| Processing SAR Corrections | The time it takes to process SAR Corrections once received. | Monthly | Within 4 Business Days of Receipt |
| Processing Signature Pages | The time it takes to process signature pages once received. | Monthly | Within 3 Business Days of Receipt |
| Feedback/Dispute - General Inquiry and Complaint Case Closure/Resolution | The time it takes for General Inquiry and Complaint cases to complete all case analysis activities, respond to the customer, and close the case. This excludes cases requiring additional information. | Monthly | Within 5 Business Days of Receipt |
| Feedback/Dispute - Research Case Closure | The time it takes to complete all case analysis activities, respond | Monthly | 75% within 50 days; |

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

| | | | |
|---|---|---|---|
| | to the customer, and close the case for Dispute/Research cases. | | 90% within 90 days |
| Review and Resolution of Unprocessed Title IV Aid Batches (Pell Grant, IASG, TEACH Grant and Direct Loan Origination and Disbursement) | The time it takes to review and resolve unprocessed batches from identification (School batches received that are unprocessed batches will be reviewed each business day). | Monthly | Within 3 Business Days of Receipt |
| Review and Resolution of PLUS Loan Adverse Credit Determination Appeals | The time it takes to review and resolve PLUS Loan Adverse Credit Determinations. | Monthly | Within 7 Business Days of Receipt |
| Processing of Incoming Paper MPNs and Endorser Addendum (EA) Mail | The time it takes to process Incoming Paper Master Promissory Notes (MPN) and Endorser Addendums (EA). (All paper MPNs and EAs received that pass the visual review are scanned and imaged). | Monthly | Within 1 Business Days of Receipt |
| IDR application processing (new & recertification) | The time it takes to review a request for placement on an IDR plan or review recertification of income documentation. | Monthly | Within 7 Business Days of Receipt |
| PSLF Employer Certification Requests | The time it takes to complete a combined PSLF form identified as an PSLF Employer Certification Request by applying the appropriate update to the borrower's account or responding to borrower with complete answer to inquiry. | Monthly | Within 7 Business Days of Receipt |
| PSLF Associated Manual Payment Counting | The time it takes to perform a manual count of PSLF qualifying payments following a review of a combined PSLF Form (e.g. Employer Certification or Application for Forgiveness) in cases where payment histories are readily available. | Monthly | Within 14 Business Days of Receipt |
| PSLF Forgiveness Application processed | The time it takes to review a combined PSLF Form identified as a request for forgiveness and initially approve the application for forgiveness, reject the application for forgiveness, or | Monthly | Within 14 Business Days of Receipt |

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

| | | | |
|---|---|---|---|
| | request additional needed information. | | |
| TEACH Certification Request processed | The time it takes to review a request for certification and apply the certification, reject the certification, or request additional needed information. | Monthly | Within 3 Business Days of Receipt |
| New Borrower Defense Applications Submitted to FSA for Review | The time it takes to review the claim for completeness and accuracy (after a borrower defense claim is submitted or created), prior to sending to FSA for review of the borrower defense claim. | Monthly | 50% within 20 days 75% within 30 days |
| Borrower Defense Outreach – During Intake | The time it takes to create a task and perform the outreach for the case to request missing information on the application or documentation, if outreach to a customer is required. If customer is not reached on first attempt, outreach follow up is every 5 calendar days. | Monthly | 100% every 5 Days |
| TPD Application Process (Initial Review and Pre-Determination) | The time it takes to process TPD Applications, including initial review and pre-determination. | Monthly | Within 3 Business Days of Receipt |
| Deferment Application processing | The time it takes to review a request for deferment and apply the deferment, reject the deferment, or request additional needed information. | Monthly | Within 3 Business Days of Receipt |
| Forbearance Application processing | The time it takes to review a request for forbearance and apply the forbearance, reject the forbearance, or request additional needed information. | Monthly | Within 3 Business Days of Receipt |
| Quality Monitoring | The percentage of interactions that received a passing score on a monthly basis. | Monthly | 95% of interactions reviewed must receive a passing score. |
| First-contact resolution rates | The percentage of contacts that reach a Next Gen BPO agent and are resolved on the first attempt. | Monthly | 85% of all interactions |

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

| Back-Office Task processing accuracy (correctly performed first time) | The accuracy of tasks that were subject to quality assurance; measures the percentage of tasks that were performed correctly the first time. | Monthly | 95% of all tasks sampled must be performed correctly |
|---|---|---|---|

**Table 4 – Next Gen BPO Tier 2 Performance Metrics**

| Tier 2 Performance Metric | Description | Frequency | Targets |
|---|---|---|---|
| Average response time (chat) | The initial offered chat to the agent and the time it takes to make the first acknowledgement of chat. | Monthly | 80% in 20 sec 100% in 60 sec |
| Average turnaround time for Email | The time it takes an agent to respond to an e-mail correspondence. | Monthly | Within 2 Business Days of Receipt |
| Average turnaround time for Social Media | The time it takes an agent to respond to assigned social media correspondence. | Monthly | 80% in 15 min |
| Average turnaround time for SMS | The time it takes an agent to respond to assigned SMS correspondence. | Monthly | 80% in 15 min |
| Sending Draft Control Mail to FSA | The time it takes to send draft control mail to FSA upon receipt. | Monthly | Within 2 Business Days of Receipt |
| Modifying Draft Control Mail Upon Rejection | The time it takes to modify draft control mail upon notification of rejection. | Monthly | Within 2 Business Days of Receipt |
| Feedback/Dispute - Inquires/Complaints Escalation to FSA | The time it takes to escalate an inquiry/complaint to FSA. | Monthly | Within 5 Business Days of Receipt |
| Feedback/Dispute - Initial Outreach to Inquiries/Complaints | The time it takes to perform initial outreach for inquires/complaints. | Monthly | Within 4 Business Days of Receipt |
| Feedback/Dispute - Updating Inquiries/Complaints and Research Case Last Outreach. | The percentage of cases on which outreach has been performed in 15 days or less. | Monthly | 100% every 15 Days |

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

| Resolution of Commingled Data Incidents | The time it takes to resolve commingled data incidents. | Monthly | Within 21 Business Days of Receipt |
|---|---|---|---|
| Refund Processing (Identification and Submission) | The time it takes to process refunds, from identification to submission. | Monthly | Within 10 Business Days of Request |
| Initial Response to Administrative Wage Garnishments (AWG), Treasury Offset Program (TOP), and Federal Salary Offset (FSO) Hearing or Request for Review | The time it takes to draft the initial response and send to FSA for review. | Monthly | Within 3 Business Days of Receipt |
| Draft-Responses for AWG, TOP, and FSA Hearing or Request for Review | The time it takes to draft a response or request for review for AWG, TOP, and FSA. | Monthly | Within 10 Business Days of Receipt |
| Draft-Revisions for AWG, TOP, and FSA Hearing or Request for Review | The time it takes to draft a revision or request for review for AWG, TOP, and FSA. | Monthly | Within 2 Business Days of Receipt |
| Discharge Application Processing – Pre-FSA Determination | The time it takes to review a request for discharge and provide a servicer pre-determination to FSA, deny the request, or request additional needed information. | Monthly | Within 15 Business Days of Receipt |
| Non-control mail (General Correspondence) response time | The time it takes to respond to general correspondence. | Monthly | Within 5 Business Days of Receipt |
| Accounts brought current after Right Party Contact (using 14-day window) | The percentage of accounts that are brought current after Right Party Contact and are no longer delinquent after interaction. | Monthly | 90% of delinquent accounts no longer delinquent after interaction |

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

### 4.2.5   Established Environment and Tools

Next Gen BPO Providers shall operate within the boundaries of the FSA established environment.

**4.2.5.1**  Next Gen BPO Providers shall utilize the enabling systems and tools (e.g., Customer Relationship Management (CRM), core processing platform, Contact Center Technical Backbone, Workflow Management, printing, mailing, and imaging) provided by another designated vendor, or an existing FSA solution, as approved by FSA. BPO Providers shall not use or store data outside approved solutions. BPO Providers shall be provided access to data and other solutions as necessary to execute designated functions.

**4.2.5.2**  Next Gen BPO Providers shall utilize the incident tracking solution provided by another designated vendor or an existing FSA solution, as approved by FSA, to identify issues such as, but not limited to**:**

**4.2.5.2.1** Website/mobile application issues

**4.2.5.2.2** System processing issues (i.e. abends, delays, etc.)

**4.2.5.2.3** Credit check escalations that require real-time updates

**4.2.5.2.4** Any corrections to the financial and portfolio processing requirements (e.g., misapplied payments, missing payments, etc.)

**4.2.5.2.5** Any manual errors caused by Next Gen BPO agents processing

incorrectly

**4.2.5.2.6**  Any interface reporting issues (e.g., Common Origination and Disbursement (COD)

**4.2.5.2.7** National Student Loan Data System (NSLDS) issues that were not caused by the Next Gen BPO agent processing incorrectly.

**4.2.5.3** Next Gen BPO Providers shall:

**4.2.5.3.1**  Ensure that all personnel are trained on systems and associated tools provided by FSA and/or other Next Gen Solutions. This includes use of telephony and technical backbone solution(s) provided or approved by FSA

**4.2.5.3.2** Collaborate with and provide feedback to FSA, Next Gen partners, and/or other designated vendors to improve systems and tools

**4.2.5.3.3** Use only FSA-approved systems and associated tools and ensure that data is not stored outside such tools without FSA's permission.

**4.2.5.3.4** Ensure that operations across all sites are secure and capable of providing customer and partner support within an ATO-approved environment

### 4.2.6   Desktop Environment

Next Gen BPO Providers shall adhere to the general operating environment shown in Figure 1, Next Generation Financial Services Next Gen BPO Desktop Environment ("BPO Desktop Diagram"). Additional information on Next Gen BPO desktop applications can be found in

Attachment 8 – Draft DCC CCP Enablement Guide. Figure 1 represents the high-level architecture under which Next Gen BPO personnel shall work. In addition, Next Gen BPO Providers shall:

**4.2.6.1** Maintain the logical and physical segregation of ED/FSA data from all non-ED/FSA data with all sites, data centers, and operating environment. This means complete segregation of all data including, but not limited to, security monitoring, logging, and reporting as these functions may capture FSA data. For additional context, the Next Gen BPO Provider shall refer to Attachment 5 – Security Technical Requirements

**4.2.6.2** Meet the stated security requirements included in Section 5.0 Information Resources Program Elements (IRPE) Standard Work Statement Elements for all proposed desktop authentication mechanisms

**4.2.6.3** Ensure that solutions using cloud-based Software as a Service (SaaS) are FedRAMP approved or FedRAMP ready

**4.2.6.4** Adhere to ATO requirements for all on-premises/on-site software deployed on FedRAMP approved/ready infrastructure

**4.2.6.5** Ensure that desktops are enabled to connect to other FSA systems, Next Gen partner systems and/or systems of other designated vendors

**4.2.6.6** Meet all technical and security requirements, including but not limited to, formal configuration and change management, as described in Section 5.0 Information Resources Program Elements (IRPE) Standard Work Statement Elements

**4.2.6.7** Ensure that access to the public internet is secured and meets FSA security requirements. Connection to the public Internet and/or other external connections shall be through a Managed Trusted Internet Protocol Services (MTIPS) connection. MTIPS connections shall be provided by FSA

**4.2.6.8** Collaborate with FSA, Next Gen partners, and/or other designated vendors to establish and maintain required data and telephony connections (e.g. MTIPS and Multiprotocol Label Switching (MPLS)).

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

**Figure 1 – Dedicated BPO Desktop Environment**



### 4.2.7 Services within the United States of America

All Next Gen BPO services shall be performed within the 48 contiguous states or the District of Columbia unless specifically authorized by FSA.

### 4.2.8 Continuity of Operations / Disaster Recovery

Next Gen BPO Providers shall have an adequate plan and approach for maintaining continuity of operations in the event of a natural disaster or other event that impacts service to regular operations. This plan must be actively tested to ensure a smooth transition if needed. Reference Section F-4 - FSA Local Clause 37-2 (Continuation of Mission Critical Contractor Services – OCT 2012) for additional requirements related to Continuity of Operations/Disaster Recovery.

### 4.2.9 Records Retention

Next Gen BPO Providers shall adhere to federal, departmental, and FSA requirements, policies, and guidelines on retention of records for all correspondence and information handled by the Next Gen BPO team.

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

### 4.2.10  Written Standards Guide

Next Gen BPO Providers shall adhere to the written standards guidance in Attachment 7 – Department of Education and FSA Style Guide for Written Communication for all written correspondence.

## 4.3    PROGRAM REQUIREMENTS - CONTACT CENTER SUPPORT

Next Gen BPO Providers shall provide contact center support in responding to and resolving inbound customer and partner inquiries across the entire student aid lifecycle for FSA's entire portfolio and the execution of outbound outreach, as directed by FSA. Contact center support shall be provided in English and Spanish. Other language needs will be supported by another Next Gen solution or existing FSA solution.

Contact center support shall also include inbound and outbound inquiries across multiple channels (e.g., phone, email, chat, social media, SMS/text, fax, mail). This includes support currently provided by multiple FSA call centers supporting the entire student aid lifecycle , including but not limited to, FSA Information Center (FSAIC), Student Loan Support Center, Default Resolution Group, FSA Ombudsman Group, FSA Feedback Center, Borrower Defense Customer Support, COD School Relations Center, Existing Loan Servicers, and Private Collection Agencies (PCAs).

Table 5 shown below provides a list of FSA's current contact centers. For additional context regarding the support to be provided, Next Gen BPO Providers shall refer to Attachment 1 - Existing FSA Contact Centers (Non-Exhaustive), Attachment 2 - Current State Customer Tasks, and Attachment 3 – Current State Partner Tasks. FSA will coordinate with Next Gen BPO Providers and Next Gen partners to develop and deliver a comprehensive set of binding requirements, associated knowledge articles, and process documentation to be provided post-award.

**Table 5 – FSA Legacy Contact Centers**

| Contact Center Name |
| --- |
| Federal Student Aid Information Center |
| Student Loan Support Center |
| Public Service Loan Forgiveness |
| Borrower Defense Customer Support |
| Default Resolution Group |
| Federal Student Aid Ombudsman Group |
| Federal Student Aid Feedback System |
| Private collection agencies |
| Existing Loan Servicer Contact Centers |
| Foreign Schools Participation Division |
| CPS/SAIG Technical Support and the TFA Support Center |
| National Student Loan Data System (NSLDS) |
| School Eligibility Service Group |
| Total and Permanent Disability Discharge and Veterans Disability Discharge |
| eZ-Audit |
| COD School Relations Center |
| G5 Hotline |
| Health Education Assistance Loan (HEAL) Program for Lenders and Lender Servicers |

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

### 4.3.1 Contact Center Support Types

The Next Gen BPO Provider shall have operational and technical capability to support a wide range of customer and partner service and support activities, and case management work types, including but not limited to the types of activities listed below:

**4.3.1.1** General information inquiries

**4.3.1.2** Inquiries on specific programs, processes/procedures, applications, and services

**4.3.1.3** Form inputs, updates, completions, corrections, and submittals updating

**4.3.1.4** Application, resources (e.g. FSA ID), services, and help desk support

**4.3.1.5** Information delivery via outbound service

**4.3.1.6** Complaint inquiries

**4.3.1.7** Congressional inquiries

**4.3.1.8** Public comments

**4.3.1.9** Customer surveys/feedback

**4.3.1.10** Referrals

**4.3.1.11** Fulfillment requests

**4.3.1.12** Customer screening inquiries which may include eligibility screening

**4.3.1.13** Scheduling follow-up contacts

**4.3.1.14** Inquiries on news or special/current events impacting Title IV program

**4.3.1.15** Case Management (This work type refers to instances where an immediate response is not available or appropriate, where information or research is needed, or where resolution may require business protocol defined in the Next Gen BPO Provider's individual task order.)

### 4.3.2 Lifecycle of Student aid

Next Gen BPO Providers shall provide and maintain personnel capable of addressing all inquiries from customers and partners (e.g. schools), across the full lifecycle of student aid.



**Figure 2 – Student Aid Lifecycle**

**4.3.2.1 Awareness, Application, and Eligibility:** Next Gen BPO Providers shall provide and maintain personnel capable of addressing the inquiries from customers and partners to support the contact center, website and system tasks related to awareness (e.g. FSAIC), Application and Eligibility as outlined in Attachment 2 – Current State Customer Tasks and Attachment 3 - Current State Partner Tasks.

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

**4.3.2.2 Origination and Disbursement:** Next Gen BPO Providers shall provide and maintain personnel capable of addressing the inquiries from customers and partners to support the contact center, website, and system tasks related to Origination and Disbursement (e.g. Student Loan Support Center) as outlined in Attachment 2 – Current State Customer Tasks and Attachment 3 - Current State Partner Tasks.

**4.3.2.3 Processing and Servicing:** Next Gen BPO Providers shall provide and maintain personnel capable of addressing the inquiries from customers and partners to support the contact center, website, and system tasks related to the lifecycle of processing and servicing for grants and loans; specialty programs (e.g. Public Service Loan Forgiveness (PSLF), Teacher Education Assistance for College and Higher Education (TEACH), Total and Permanent Disability (TPD), Borrower Defense (BD), Perkins, and Health Education Assistance Loan (HEAL) Program, etc.), and specialty claims (e.g. discharge) as outlined in Attachment 2 – Current State Customer Tasks, Attachment 3 - Current State Partner Tasks, and Attachment 6 – Life of the Loan Servicing Intended State.

**4.3.2.4 Recovery:** Next Gen BPO Providers shall provide and maintain personnel capable of addressing the inquiries from customers and partners to support the contact center, website, and system tasks related to recovery servicing efforts for grants and loans as outlined in Attachment 2 – Current State Customer Tasks, Attachment 3 - Current State Partner Tasks, Attachment 6 – Life of the Loan Servicing Intended State, and Attachment 9 – Additional Current State Technical Constraints.

**4.3.2.5 Feedback, Dispute, and Escalation:** Next Gen BPO Providers shall provide and maintain personnel capable of addressing the inquiries from customers and partners to support the contact center, website, and system tasks related feedback, disputes, escalation, and helpdesk support as outlined in Attachment 2 – Current State Customer Tasks, Attachment 3 - Current State Partner Tasks, Attachment 6 – Life of the Loan Servicing Intended State, and Attachment 9 – Additional Current State Technical Constraints.

### 4.3.3   Tailored Outreach

Next Gen BPO Providers shall provide tailored customer assistance to increase the likelihood that borrowers will not default. To meet this requirement, Next Gen BPO Providers shall:

**4.3.3.1** Successfully execute any outreach campaigns, as directed or independently on behalf of FSA, adhering to FSA's guidance and oversight. This may be accomplished by activities that include, but are not limited to: making targeted outbound calls to assist customers with resolving loan management/payment issues, executing outbound call campaigns, frequent outbound calls, early engagement for delinquent borrowers or borrowers at risk of delinquency or default, skip tracing, etc. Next Gen BPO Providers should refer to Attachment 6 – Life of the Loan Servicing Intended State for additional context. FSA will coordinate with Next Gen BPO Providers and Next Gen Partners post-award to define at-risk borrowers.

**4.3.3.2** Provide feedback to FSA and designated Next Gen partners and/or other designated vendors to improve overall campaign strategy and results.

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

### 4.3.4  Trainers

Next Gen BPO Providers shall provide personnel ("trainers") to be trained by FSA and/or another designed vendor. These trainers will then coordinate onboarding and refresher training for their own personnel.

### 4.3.5  Development and Maintenance of Material

Next Gen BPO Providers shall regularly contribute to the development and maintenance of contact scripts, training materials, and training curriculum as coordinated by FSA and/or another designated vendor, and provide proactive feedback relating to insights generated from customer contacts.

### 4.3.6  Contact Center Operations

Next Gen BPO Providers shall execute contact center operations while within the FSA environment boundaries outlined in Section 4.2.5. Next Gen BPO Providers may not use or keep data in any other solutions other than those provided unless authorized by FSA. This includes:

**4.3.6.1** Training personnel on the systems and tools provided by Next Gen partners, legacy vendors, other vendor as designated by FSA, or existing FSA solutions.

**4.3.6.2** Training personnel on the appropriate use of FSA data and ensure data is not kept on or used by any unapproved solution.

### 4.3.7  Validating Customer and Partner Information

Next Gen BPO Providers shall continuously update customer and partner data when direct engagement occurs (e.g., phone calls, email, chat, etc.) or through routine outreach, asking customers and partners to update their data (e.g., contact information, communication preferences, change in circumstances).

## 4.4     PROGRAM REQUIREMENTS - STUDENT AID BACK-OFFICE PROCESSING

Next Gen BPO Providers shall execute back-office activities that cannot or have not yet been automated within other relevant solutions, across the full lifecycle of student aid, as assigned. A list of current-state contact centers, with audiences served and topics addressed, can be referenced in Attachment 1 – Existing FSA Contact Centers (Non-Exhaustive) to provide additional context regarding the processing to be provided. Additionally, Next Gen BPO Providers should refer to Attachment 2 – Current State Customer Tasks, Attachment 3 - Current State Partner Tasks, Attachment 6 – Life of the Loan Servicing Intended State, and Attachment 9 – Additional Current State Technical Constraints for a list of processes to be supported. FSA will coordinate with Next Gen BPO Providers and Next Gen partners to develop and deliver a comprehensive set of binding requirements, associated knowledge articles, and process documentation post-award.

### 4.4.1  Application and Eligibility

Next Gen BPO Providers shall execute eligibility determination and support other back-office, exception, and manual activities, as assigned by FSA, especially those that cannot be automated within other relevant solutions.

**4.4.1.1** Next Gen BPO Providers shall leverage FSA-designated processing platform(s) to provide processing capabilities. This includes, but is not limited to, review, validation, and processing associated with aid applications, and requests for various borrower, trading partners, and FSA manual activities.

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

**4.4.1.2** Next Gen BPO Providers shall provide capabilities for FSA to review, grant, and resubmit aid eligibility applications deemed ineligible that require additional manual intervention with, but not limited to, Department of Defense, Department of Justice, Department of Homeland Security, Social Security Administration and Incarcerated applicants.

**4.4.1.3** Next Gen BPO Providers shall provide capabilities to process paper aid applications (e.g., age limit and incarceration restrictions).

**4.4.1.4** Next Gen BPO Providers shall provide capabilities to support and submit applications for re-processing as instructed by Department of Education (ED).

**4.4.1.5** Next Gen BPO Providers shall provide support for school and trading partner interfaces (e.g., EdExpress, Participation Management, SAIG enrollment).

**4.4.1.6** Next Gen BPO Providers shall provide support to resolve student identity conflicts.

**4.4.2   Origination and Disbursement**

Next Gen BPO Providers shall provide support to customers and partners for Origination and Disbursement Processing for the Direct Loans, Title IV Grant Programs (i.e. Pell, TEACH, etc.), including but not limited to, Origination and Disbursement data submittal issues, Program funding issues, Program funds to disbursement reconciliations, Subsidized Usage Limit (SULA) escalations, Grant overpayment processing, and borrower credit appeals. For the purposes of Origination and Disbursement help desk support, customer interactions are classified as Tier I, which is the initial support level responsible for customer issues. Interactions with schools, FSA, and trading partners are classified as Tier II, which is a more in-depth level of support than Tier I. **Note:** Tier I and Tier II support should not be confused with Tier 1 and 2 SLA Metrics.

**4.4.3   Life of Loan Servicing**

Next Gen BPO Providers shall provide processing capabilities leveraging FSA-designated processing systems(s)/solutions—from another designated vendor, or an existing FSA solution—across the entire lifecycle of student aid. Next Gen BPO will need to integrate seamlessly with existing and future solutions provided by FSA or other vendors, across the entire lifecycle of student aid. Those solutions include existing legacy solutions such as core servicing/processing platforms and Next Gen solutions, such as the Digital and Customer Care Solution (DCC) which includes the FSA-branded Digital platform, Customer Relationship Management (CRM), Contact Center Technical Backbone, Command Center, Digital Marketing, Customer Outreach and Communications, Workflow Management, and other enabling technologies and services. Future solutions may include the Partner Participation and Oversight (PPO) Solution, FSA-designated processing platform(s), Identity and Access Management (IAM), Analytics, and other enabling technologies and services associated with each solution. Back-office processing activities will include, but are not limited to, review, validation, and processing associated with enrollment, applications, and requests for various grant and loan programs and loan status adjustments such as, but not limited to:

**4.4.3.1** All repayment plan processing (e.g., income-driven repayment) across all loan types and statuses, including application and eligibility review, income checks and payment calculations, and annual recertification activities

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

**4.4.3.2** Processing associated with military service members, including requests for deferment and forbearance, Servicemembers Civil Relief Act (SCRA) benefits, and hostile pay benefits

**4.4.3.3** School and customer enrollment processing, including manual entry of hard-copy applications

**4.4.3.4** Deferment and forbearance application processing

**4.4.3.5** Specialty Programs (e.g., TEACH, TPD, PSLF, Perkins, Pell) and Title IV reinstatement processing

**4.4.3.6** Specialty Claims processing including but not limited to cancellation, forgiveness (e.g. PLSF, Teacher Loan Forgiveness), and discharge based on bankruptcy, total and permanent disability, school closure, borrower defense, false certification, unpaid refund, and disaster discharge

**4.4.3.7** Support rehabilitation processing, Title IV eligibility reinstatement, certification for Administrative Wage Garnishment (AWG) and Treasury Offset Program (TOP), litigation referral preparation, and other related processing functions

## 4.4.4   Consumer Financial Protection

Next Gen BPO Providers shall ensure and maintain compliance with federal consumer protection laws and regulations (e.g., the Fair Credit Reporting Act, the Fair Debt Collections Practices Act, the Truth in Lending Act, etc.), including the timely completion of processes related to these laws and regulations. Next Gen BPO Providers shall review, investigate, and process error and dispute resolutions, including but not limited to:

**4.4.4.1** Direct and indirect credit bureau disputes filed by customers or initiated by the credit bureaus, within timelines established by law

**4.4.4.2** Account maintenance, including manual correction of errors identified through data integrity scans

## 4.4.5   Supported Formats

Next Gen BPO Providers shall be equipped to process data in any format (e.g., print, digital) as needed.

**4.4.5.1** Unless approved by FSA, Next Gen BPO Providers shall not implement separate imaging, printing, and/or mailing solutions in the execution of back-office processing tasks. Refer to Section 4.2.5 for further details regarding established environment and tools.

## 4.5   NON-FUNCTIONAL REQUIREMENTS

In addition to the functional requirements described above, FSA has identified the following non-functional capabilities needed to support Next Gen BPO. FSA will coordinate with Next Gen BPO Providers and Next Gen partners to develop and deliver a comprehensive set of binding requirements, associated knowledge articles, and process documentation to be provided post-award.

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

### 4.5.1   Customer Experience Focus

Next Gen BPO Providers shall prioritize customer needs and preferences by meeting or exceeding the Next Gen BPO Common Performance Standards outlined in Section 4.2.4 Performance Management to deliver an improved customer experience throughout the lifecycle of student aid.

> **4.5.1.1** Next Gen BPO Providers shall work with FSA, Next Gen Partners and/or other designated vendors to establish, prioritize, and deploy new functionality and training to achieve FSA Next Gen goals and objectives.

### 4.5.2   Responsive and Collaborative Partnership with FSA and Designated Partners

Next Gen BPO Providers shall maintain a productive partnership with FSA, designated vendors, and Next Gen Partners such as, but not limited to, the DCC Command Center, who will engage with the Next Gen BPO Providers on behalf of and based on direction from FSA. Next Gen BPO Providers shall:

> **4.5.2.1** Perform work as distributed to them by the designated Next Gen partner(s), based on rules and standards defined by FSA. BPO Providers shall only perform work for functional areas authorized as part of a Task Order.

> **4.5.2.2** Contribute to common agent training and materials (e.g., knowledge resources/articles, contact scripts, agent desktop guides, curriculum content), ensuring that customer/partner-facing instructions and resolution steps as well as back-office processing procedures are accurate, effective, and efficient. This shall include establishing recurring review and feedback sessions with FSA and/or the designated Next Gen partner(s).

> **4.5.2.3** Respond and adhere to any communications from FSA and/or the designated Next Gen partner(s), including but not limited to, requests for staffing capacity, updates on policy/procedure changes, and requests for input.

> **4.5.2.4** Provide feedback to support the continuous improvement of agent materials, training, as well as front-end client applications and back-end systems, which may be operated by different Next Gen partners, FSA, legacy vendors, or other vendors as designated by FSA. This shall include engaging with FSA and/or the designated Next Gen Partner(s) to suggest process improvement and/or changes.

### 4.5.3   Contact Center and Back-Office Processing Allocations

Assignment of new work and tasks will follow Fair Opportunity Allocations as outlined in Section H, Special Contract Requirements (see H5 and H9). Next Gen BPO Providers shall adhere to the following allocation methodology for customer/partner inquiries and back-office processing tasks across the lifecycle of student aid:

- Prior to disbursement or in the event a customer cannot be identified, customer inquiries and/or back-office processing tasks will be randomly distributed to any one of the Next Gen BPO Providers.

- After disbursement, and if a customer can be identified, the customer's inquiry and/or back-office processing tasks will be allocated to a primary Next Gen BPO Provider assigned to the customer's account. Otherwise, if the customer cannot be identified, the inquiry will be randomly distributed to any one of the Next Gen BPO Providers.

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

- Any time a Next Gen BPO Provider's real-time contact-center-hold time exceeds established thresholds, FSA may redirect customer inquiries to available contact center agents at another Next Gen BPO Provider to ensure customers continuously receive efficient and effective customer service. In such cases, the customer's account will remain assigned to its primary Next Gen BPO Provider.

- Contact center and/or back-office processing tasks from schools and/or trading partners may be randomly distributed to any one of the Next Gen BPO Providers who are meeting performance metrics (i.e. green status) to ensure that schools and trading partners receive efficient and effective customer service.

- FSA reserves the right to assign calls or tasks to other Next Gen BPO Providers to ensure efficient and effective customer service.

To ensure work and tasks assigned are completed/handled Next Gen BPO Providers shall:

**4.5.3.1** Support and work all customer inquiries and/or back-office processing tasks, including those distributed prior to disbursement or in the event a customer cannot be identified, and provide general student loan information to customers and/or partners that cannot be identified using systems, associated tools, and resources provided by FSA or Next Gen partners to effectively answer questions.

**4.5.3.2** Support all customers and partners, allocated or randomly distributed, by providing detailed information to address all inquiries and/or back-office processing tasks within the established Service Level Metrics.

**4.5.3.3** Ensure staffing levels support volume forecasts provided by FSA and/or Next Gen partners to consistently meet or exceed FSA's Common Performance Standards.

**4.5.3.4** Provide services to schools, trading partners, and to new and existing customers, including unexpected volume from customers that cannot be identified.

**4.5.3.5** Support additional volume that is rerouted when other Next Gen BPO Providers' service levels do not meet FSA's Common Performance Standards.

## 4.5.4   Trained Personnel

Next Gen BPO Providers shall ensure personnel are trained on systems and associated tools, program topics, and content provided by and/or approved by FSA or Next Gen partners, and are aware of pertinent changes in laws, regulations, programs, or FSA's Common Performance Standards. **Note:** Development of training content and material is expected to be done in coordination with FSA and/or designated Next Gen solutions. Next Gen BPO Providers shall:

**4.5.4.1** Engage with FSA and/or designated Next Gen solution providers to develop a train-the-trainer approach, covering all pertinent changes in laws, regulations, programs, and FSA's Common Performance Standards.

**4.5.4.2** Monitor changes in regulations and laws for compliance, and deploy new processes, procedures, and enhancements to all impacted associates as directed by FSA and/or designated Next Gen solutions.

**4.5.4.3** Execute, monitor, and reinforce performance through ongoing training and development as needed to achieve FSA's Common Performance Standards and desired outcomes.

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

### 4.5.5   Quality Assurance

Next Gen BPO Providers shall establish and maintain an internal quality management system, including documented policies/procedures to ensure that performance metrics are met on an ongoing basis. Additionally, FSA, or designated Next Gen partners, will provide broader quality control/assurance across the enterprise.

To meet this requirement, Next Gen BPO Providers shall:

**4.5.5.1** Establish and utilize a quality management system that includes overall quality management, documented policies and procedures, quality planning, quality assurance, quality control, risk identification, and risk remediation.

**4.5.5.2** Provide a quality control team that monitors back-office functions and calls according to the Common Performance Standards. The team should monitor, identify, assess, report, and escalate risks, and implement corrective actions to address process deficiencies.

**4.5.5.3** Utilize approved quality assurance scorecards to monitor the performance of the contact center and back-office tasks assigned/worked against FSA's established quality baseline to identify quality issues, report deficiencies, and identify opportunities for improvement.

**4.5.5.4** Regularly review all policies, procedures, work guides, and processes for accuracy and consistency and communicate and deliver changes to internal staff.

**4.5.5.5** Review and collaborate on surveys, feedback, and Quality Assurance from FSA and Next Gen partners on a regular basis.

### 4.5.6   Integration

Next Gen BPO Providers shall integrate with Next Gen partners, FSA-designated system(s), or existing FSA solutions, as necessary, to execute required functions. Systems/tools shall include features which enable FSA, other government agencies, and designated third parties to interface or exchange with it, as necessary. To meet this requirement Next Gen BPO Providers shall:

**4.5.6.1** Establish and maintain network connectivity, as required by FSA, to access FSA systems and Next Gen partner systems and associated tools.

**4.5.6.2** Collaborate with FSA and Next Gen partners to implement reliable, redundant network connections that ensure availability of system access to perform work and tasks assigned.

**4.5.6.3** Participate in Contact Center testing to ensure systems and associated tools are functional prior to commencing operational activities, and provide feedback to improve processes, where applicable.

**4.5.6.4** Next Gen BPO Providers shall also care for broad integration needs including, but not limited to, exchanging and harmonizing business rules for workflows, providing development and test environments, and collaborating with FSA and other Next Gen partners to resolve integration issues which arise. To meet this requirement, Next Gen BPO Providers shall:

**4.5.6.4.1** Collaborate with FSA and Next Gen partners to contribute to the

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

establishment of workflows to support the broader Next Gen vision.

**4.5.6.4.2** Support integration requirements across the complete Next Gen Initiative.

**4.5.6.4.3** Provide development and test environments to participate in any required testing.

**4.5.6.4.4** Collaborate with FSA and Next Gen partners to identify, communicate, and resolve issues related to connectivity.

**4.5.7   Adherence to and Monitoring for Changes in Laws and Regulations**

Next Gen BPO Providers shall adhere to all Federal rules, laws, regulations, agency guidelines or court mandates applicable to FSA operations. To meet this requirement, Next Gen BPO Providers shall:

**4.5.7.1** Establish a process for monitoring new or pending changes to applicable laws and regulations, and then proactively partner with FSA or designated Next Gen partners to determine the implications to technical design and/or operational procedures and policies.

**4.5.7.2** Ensure policies, standards, procedures, and work guides comply with applicable laws, regulations, and industry standards.

**4.5.7.3** Collaborate with FSA and Next Gen partners to create a shared understanding of laws and regulations, with interpretation and implications to customer experience.

**4.5.8   Cybersecurity, Hosting and Middleware:**

Next Gen BPO Providers shall meet all requirements related to Cybersecurity, physical security, hosting, and middleware in order to receive an Authority to Operate (ATO) and become performance ready. Next Gen BPO Providers should reference Attachment 5 – Security Technical Requirements for additional details. To meet this requirement, Next Gen BPO Providers shall:

**4.5.8.1** Include robust cybersecurity protections and features to protect customer data.

**4.5.8.2** Comply with the conditions in the FSA's Security Technical Requirements in order to receive an ATO, for any technology equipment or infrastructure maintained by the Next Gen BPO Providers, including any devices, thin clients/laptops/desktops, software, network, supporting servers, middleware, and infrastructure, etc., that contains, transmits, or processes FSA data, the provider shall ensure compliance with the conditions of FSA's Security Technical Requirements. For example, the vendor may be required to implement and maintain IT equipment to provide access to external connections.

**4.5.8.3** Meet Federal Information Security Management Act (FISMA), NIST standards, and all cybersecurity regulations and mandates, including Presidential Executive Order (EO) 13800 - Strengthening the Cybersecurity of Federal Networks and Critical Infrastructure, to Identify, Protect, Detect, Respond, and Recover.

**4.5.8.4** Ensure that all development and management tools, including project management, version control, code repositories, monitoring, and cybersecurity, etc., are identified in the technical solution and in the system security boundary. **Note:** Any technology equipment and infrastructure must meet the FISMA and/or FedRAMP requirements and will require an assessment and ATO for the IT components within

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

the Next Gen BPO security boundary. The technology equipment and infrastructure shall be secure and may not be hosted in a multi-tenant environment.

**4.5.8.5** Ensure that FSA data, in all forms, is isolated and segregated from any other customers.

**4.5.8.6** Special Notice – Section 6103

Next Gen BPO Providers are hereby placed on notice that compliance with the security requirements that are provided in IRS 1075 Publication (See Publication 1075, Tax Information Security Guidelines for Federal, State and Local Agencies) may be applicable to the Next Gen BPO solution. Regarding this Special Notice, any future changes will be managed through FSA's Change Management Process.

**4.5.9   Financial Accuracy and Compliance**

Next Gen BPO Providers shall support FSA, Next Gen partners and/or legacy vendors (or other vendors as designated by FSA) as necessary to ensure the compliance and accuracy of financial transactions and reporting. To comply with this requirement, Next Gen BPO Providers shall:

**4.5.9.1** Deploy robust internal controls to ensure compliance and accuracy of financial transactions and reporting.

**4.5.9.2** Perform risk reviews and quality control monitoring consistent with Common Performance Standards, to serve as a first line of defense for all account transactions resulting from assigned tasks and work.

**4.5.9.3** Support account clean-up efforts by updating customer accounts as necessary to ensure transactions are accurate.

**4.5.9.4** Provide robust internal controls and audit support.

**4.5.10   Additional Current State Technical Constraints:**

In addition to security and financial requirements, Next Gen BPO Providers also must understand other categories of current state technical constraints where relevant (e.g., processing, websites, and communications). FSA will coordinate with Next Gen BPO Providers and Next Gen partners to develop and deliver a comprehensive set of binding requirements, associated knowledge articles, and process documentation to be provided post- award.

- These constraints are derived from existing laws, regulations, agency guidance, and business rules, and will change based on acts of Congress, updates to Federal regulatory and non-regulatory guidance, and FSA goals.

- Lifecycle of student aid functions (e.g., application processing, repayment, consolidation, deferment, forbearance, specialty claims, default collections) impact Next Gen BPO, among other existing and future Next Gen solutions, and often relate to multiple constraints.

- Specialty Programs (e.g., Public Service Loan Forgiveness (PSLF), Teacher Education Assistance for College and Higher Education (TEACH), Total and Permanent Disability (TPD), Perkins, Pell) and Specialty Claims (e.g., discharge, forgiveness) require special handling as well as specific and unique processing rules that impact

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

the Solution, along with other existing and future solutions, and often relate to multiple constraints.

To comply with the above requirement, Next Gen BPO Providers shall:

**4.5.10.1** Scale, train, develop, and deploy personnel and processes necessary to support the lifecycle of student aid to become performance ready as functional areas become available.

## 5.0  INFORMATION RESOURCES PROGRAM ELEMENTS (IRPE) STANDARD WORK STATEMENT ELEMENTS

## 5.1  ARCHITECTURE

### 5.1.1  Data Center Operations Collaboration and Support

For software application(s) that are hosted in the FSA data center(s) or in another facility that connects with the FSA data center(s) through government provided networks or telecommunication services, coordination is required when adding/changing/modifying that application. The contractor shall coordinate all changes it wishes to make with all FSA IT operations and services that will be impacted by the proposed change.

### 5.1.2  Contractor Support of FSA Technology Refreshment and Evergreening

FSA requires regularly scheduled and periodic upgrades of the underlying infrastructure, support software, and enabling frameworks to (at minimum) N-1 versions (where N is the latest version and N-1 is the second latest version) as part of its standard technology refreshment program (evergreening).

Evergreening of SaaS, PaaS, and/or IaaS Solutions: The Contractor performing integration services for FSA in connection with FISMA-approved cloud computing services (SaaS, PaaS, IaaS) shall ensure the infrastructure, support software, and enabling components and frameworks are maintained to (at minimum) N-1 versions as part of a standard technology refreshment program (evergreening).

Evergreening of Infrastructure and COTS Software: The Contractor shall support evergreening activities, including infrastructure and software upgrades and patches led by FSA's infrastructure and middleware vendors. The Contractor shall regularly support planning and scheduling, impact analysis, changes to the application, and testing, as needed.

Evergreening of Applications and Enabling Components and Frameworks: The vendor is responsible for maintaining the application code and its underlying frameworks at the N-1 version to ensure that functionality and application design are optimized, maintenance is cost efficient, and the enabling technology remains under support by third party vendors (e.g. IBM, Oracle, or Microsoft).

## 5.2  ACCESS

### 5.2.1  Access Management Requirement

The contractor shall comply with the controls for access management contained in the current versions and revisions of:  National Institute of Standards and Technology (NIST), SP-800-53, Recommended Security Controls for Federal Information Systems and Organizations; and NIST-

SP-800-53A, Guide for Assessing the Security Controls in Federal Information Systems and Organizations, Building Effective Security Assessment Plans.

Note: FSA prohibits contractors from granting access to FSA systems without approval by the Department.

### 5.2.2   Access Control and Authentication Requirement

The contractor shall comply with FSA access control and authentication policy and practice, and shall meet the Identity Assurance Level 3 and Authenticator Assurance Level 3 requirements cited in NIST SP 800-63-3/A/B/C (equivalent to LOA4 authentication requirement cited in NIST 800-63-2 and OMB Memorandum M-04-04.

If contractor proposes use of its corporate tokens to meet FSA's requirements, contractor shall demonstrate to FSA that without exception it can achieve IAL3 and AAL3 authentication and meet all FSA requirements.

All privileged, administrative, Tier 4 suitability and those users with access to ED or FSA data must be issued ED approved PIV authenticators.  All other users performing functions on behalf of ED or FSA (Tier 2 suitability) must meet IAL 2, AAL 2, and FAL 2. If applicable, end users of the vendors' solution shall be provided IAL 2, AAL 2, and FAL 2 standard capabilities with the ability to issue up to IAL 3, AAL 3, and FAL 3 authenticators.

### 5.2.3   Use of PIV and PIV-I Cards for Access to FSA Information Resources

There are two different situations in which PIV cards are used to gain access to FSA networks, applications and data.

- PIV cards used with internally hosted solutions (such as the FSA Next Generation Data Center)
- PIV-I cards used with externally hosted solutions (such as a contractor's facility)

See the IRPE Appendix B (see below) for more details on PIV and PIV-I Card requirements.

### 5.2.4   Contractor ED Network Access

Contractor must establish an ED user account and be issued a PIV card and a soft or hard token as Government-furnished Equipment (GFE) in order to access ED network through the following websites:

- Citrix environment can be accessed **remotely** from https://gotowork.ed.gov/vpn/index.html and http://anywhere.ed.gov/
- Citrix environment can be accessed **internally** on the ED network from http://citrix.ed.gov using the "ED Standard Desktop" link.

For a contractor using a Government Furnished Equipment (GFE) Laptop, the preferred method for remote access is Aventail Virtual Private Network (VPN) connection. Aventail VPN Connection client will be automatically pushed to each GFE laptop to enable ED users to utilize this service offering. The Aventail VPN Connection client allows users to connect to the ED network from remote locations and provides an access experience very similar to that available to onsite users at ED locations.

**Note:** To use this feature, a contractor must be using a GFE laptop with the Aventail VPN Connection client installed and must be outside of the ED wired network.

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

## 5.3    SECURITY

### 5.3.1    Compliance with Department's Information Technology Resources Policy

The contractor shall comply with the information security and privacy policies that support the Department's mission, goals, and objectives as defined in the Department of Education's Administrative Communications System (ACS) OCIO 3-112 (Handbook for Information Assurance Security Policy Cybersecurity, and to any U.S. Department of Education Instructions on Information Assurance and/or Cybersecurity) and in supporting policies, standards, and procedures. See Attachment No. 17

### 5.3.2    Federal Information Security Management Act Requirement

The contractor shall comply with all Federal Statutes, Standards and Guidelines for Security such as: Federal Information Security Act (FISMA) (2002), Computer Security Act (1987), Privacy Act (1974), FIPS Pub 199, FIPS Pub 200, FIPS Pub 140-2, NIST SP 800-34, NIST SP 800-18, NIST SP 800-30, NIST SP 800-37, NIST Pub 800-47, NIST SP 800-50, NIST SP 800-53, NIST SP 800-88, NIST SP 800-137, Office of Management and Budget (OMB) Circular A-130, OMB Circular A-123 and Department of Education and Federal Student Aid policies.

The Contractor shall ensure compliance with the Federal Information Security Management Act (FISMA) by authoring FISMA artifacts and responding to FISMA-related data calls. Specifically, the Contractor shall:

1. Provide technical strategy, guidance, and consultative advice, to FSA data centers regarding facility security, network security, and operating system security.
2. Support FSA data centers management of Secure Sockets Layer (SSL) certificates and schedule for renewals.
3. Support security testing and evaluation of FSA's applications that interface with the contractor's scope and deliverables.
4. Support remediation of security-related issues in FSA's applications that are impacted by contractor's scope and deliverables.
5. Support handling security incidents related to FSA's applications that are impacted by contractor's scope and deliverables.
6. Support Records Management Practises in compliance with the Records Act within the contractors scope and deliverables.

## 5.4    REQUIREMENTS

### 5.4.1    Authorization to Operate (ATO) Requirement

The Contractor shall certify that the delivered solution complies or will comply with the security authorization processes as outlined in National Institute of Standards and Technology Special Publication NIST-SP-800-37 entitled Guide for Applying the Risk Management Framework to Federal Information Systems: A Security Lifecycle Approach, and supporting OCIO policies, standards, and procedures. In accordance with the identified risk rating, the solution shall satisfy the appropriate security controls as defined in Federal Information Processing Standards FIPS 200 and National Institute of Standards and Technology NIST-SP 800-53 entitled Recommended Security Controls for Federal Information Systems and Organizations.

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

### 5.4.2   Continuous Monitoring and Reporting Requirements

Contractor shall provide POA&M updates in accordance with requirements and the schedule set forth in FSA guidance. Reference: NIST 800-53 control CA-5.  Deliverable Plan of Action & Milestones (POA&M) Update.

Contractor shall provide a Continuous Monitoring Plan that complies with current NIST and Department guidance.

Contractor shall provide authenticated vulnerability scan and asset discovery reports, on a regular basis, as per FSA guidance. Scan results shall be managed and mitigated in Plans of Action and Milestones (POA&Ms) and submitted together with the POA&M submission. Reference: NIST 800-53 control RA-5.

Contractor shall review and update the System Security Plan [as required by FSA guidance due to major changes or an annual basis, whichever occurs first] to ensure the plan is current and accurately described implemented system controls and reflects changes to the contractor system and its environment of operation. The System Security Plan must be in accordance with NIST 800-18, Revision 1, Guide for Developing Security Plans. Reference: NIST 800-53 control PL-2.

Contractor shall provide an annual update to the contingency plan completed in accordance with NIST 800-34, Contingency Planning Guide. Reference: NIST 800-53 control CP-2.

Contractor shall conduct and provide the results of the quarterly review and validation of system users' accounts to ensure the continued need for system access.  The user certification and authorization documents will illustrate the organization establishes, activates, modifies, reviews, disables, and removes information system accounts in accordance with documented account management procedures. Reference: NIST 800-53 control AC-2.

Contractor shall provide a well-defined, documented, and up-to-date System(s) Baseline Configuration Standard Document specification to which the information system is built. Any changes should be reflected as needed due to any changes in the Baseline Configuration. Reference: NIST 800-53 control CM-2.

Contractor shall establish and document mandatory configuration settings for information technology products employed within the information system that reflect the most restrictive mode consistent with operational requirements. Changes should be reflected on a regular schedule based on FSA guidance. Configuration settings are the configurable security-related parameters of information technology products that compose the information system.  Systems should be configured in agreement with FSA technical guidelines, NIST guidelines, Center for Internet Security guidelines (Level 1), or industry best practice guidelines in hardening their systems, as deemed appropriate by the Authorizing Official.  System configuration settings will be updated or reviewed on an annual basis. Reference: NIST 800-53 control CM-6.

Contractor shall provide the capability to transfer, in a machine-readable format or interconnection, all data necessary to support the common-schema for the OMB mandated Continuous Diagnostics and Monitoring program on at regular schedule based on FSA guidance. Datasets will be normalized and may include data elements relating to hardware assets, software assets, vulnerabilities, and system configurations.  Reference: OMB M-14-03 and DHS CDM.

Contractor shall provide the external IP space used to support FSA and enter into an agreement with the Department and DHS to allow them to conduct weekly Health and Hygiene uncredentialed scanning.

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

Contractor shall provide monthly, not later than the 2nd day of the month, CyberScope reports for all systems that support FSA.  The report will be in National Institute of Standards and Technology (NIST) Security Content Automation Protocol (SCAP) format.

### 5.4.3   Cryptographic Protection Acceptance Criteria Requirement

The Contractor shall present evidence (e.g., NIST certificate for the specific product and module) that the products it utilizes provide cryptographic protections using modules that comply with FIPS PUB 140-2 standards.

### 5.4.4   Contractor Release of COTS Configuration and Custom Application Source Code to Government

SaaS, PaaS, and/or IaaS Solutions, and/or systems hosted externally to the FSA Data Center. The Contractor performing integration services for FSA in connection with FISMA-approved cloud computing services (SaaS, PaaS, IaaS) will acquire for FSA any and all licenses and subscriptions necessary to meet FSA's requirements for the use of such cloud services as specified in the contract. Such licenses and subscriptions shall be transferred by the Contractor to FSA upon acquisition and managed in compliance with FSA 27-2.

**COTS Licenses:** For all COTS software authorized to be procured by the Contractor in performance of the contract, the Contractor will acquire for FSA any and all licenses necessary to meet FSA's requirements, as specified in the contract, for the operation of the system. Such licenses shall be transferred by the Contractor to FSA upon acquisition and managed in compliance with FSA 27-2.

**COTS Configuration:** The Contractor shall submit all COTS configuration information (including documentation) to FSA Task Manager or appointed Project Manager, as well as the Contracting Officer. For all COTS software configurations established and managed by the Contractor, including software configuration performed in connection with FISMA-approved cloud computing services, the contractor will provide documentation of complete COTS configuration necessary to support FSA requirements, for the continued, unrestricted use of such configurations.

**Customized Software:** In the event the Contractor creates custom source code in performance of the contract, the Contractor shall submit all source code and development artifacts (including documentation) to FSA Task Manager or appointed Project Manager, as well as the Contracting Officer. FSA requires the Contractor to provide documented source code for any custom (e.g. not commercially available or commoditized) application code created by the Contractor (or Subcontractor/s) in the performance of the contract, including all custom application source code developed specifically for FSA, and any custom code developed to support COTS integration, as authorized in accordance with FAR 52.227-14- RIGHTS IN DATA – GENERAL. Source code includes custom code developed by the Contractor to deliver its full scope of services from its propriety internal operations to any FSA data store or application, including computer telecommunication interfaces (CTI), IVR data, transactions, and scripts, and Web service call scripts and results. The code and development artifacts shall be made available upon request to support audit and/or independent quality assurance efforts, integration, test, or other life-cycle activities. The Contractor shall provide complete instructions for setting up an independent developer environment, as well as complete instructions that can used to deploy the software to production. FSA should be able to perform an independent, clean build, deploy to a development environment, and have a fully working version of the software that can be traced in a debugger.

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

### 5.4.5   Test Management Requirement

The contractor shall comply with standards for test management within the Lifecycle Management Methodology.  Refer to the Enterprise Test Management Standards for additional information.

https://studentaid.ed.gov/sa/sites/default/files/fsawg/static/gw/docs/ciolibrary/FSA_Enterprise_Test_Management_Standards.pdf

### 5.4.6   Performance Testing Requirement

Externally Hosted Solutions: For externally hosted solutions (such as a contractor's facility or located in the cloud, the Contractor shall conduct performance testing of their responsible areas, and shall provide data, scenarios, volumes, support of performance testing activities, and capacity estimates, including trending of performance data, and test results.  The Contractor shall resolve issues identified during performance testing activities. The Contractor shall support the testing of any interfacing application. The Contractor shall provide a document summarizing the changes associated with architecture and design of the system to support capacity planning and optimization of the performance profile of the solution.

NDGC Hosted Solutions: For internally hosted solutions (such as the FSA Next Generation Data Center), the Contractor shall support FSA independent performance testing of solutions by providing data, scenarios, volumes, support of performance testing activities, and capacity estimates, including trending of performance data. The Contractor shall resolve issues identified during performance testing activities. The Contractor shall support the testing of any interfacing application. The Contractor shall provide a document summarizing the changes associated with architecture and design of the system to support capacity planning and optimization of the performance profile of the solution.

### 5.4.7   Intersystem Testing Support Requirement

The contractor shall conduct and support intersystem testing between its area of responsibility and other entities that do business with Federal Student Aid.  The contractor shall provide resources, interface control documents, test data, and test cases/scenarios in support of intersystem testing. Federal Student Aid has a weekly maintenance window to facilitate scheduled testing.

### 5.4.8   Defect Management & Reporting Requirement

The contractor shall document defects found during testing in accordance with FSA's Enterprise Test Management Standards. The contractor shall resolve issues identified during all phases of testing and provide defect resolution report or documentation to FSA.

### 5.4.9   Configuration Management Requirement

The contractor shall develop a configuration management plan, for all systems in development and production, in accordance with the standards defined within the Lifecycle Management Methodology.  Refer to the Lifecycle Management Methodology section of the Federal Student Aid Technology Office IT Standards Library for additional information.

https://studentaid.ed.gov/about/contracting-info/it-standards

### 5.4.10  Compliance with Independent Verification and Validation (IV&V)

This contract is subject to Independent Verification and Validation (IV&V) and the contractor shall support Federal Student Aid IV&V activities.  The contractor shall furnish Federal Student Aid information that may include, but is not limited to, project management, technical, quality control, and quality assurance work products that are explicit deliverables under the contract.

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

Refer to the Federal Student Aid Independent Verification and Validation Handbook for additional information.

### 5.4.11  Contractor Employee Security Clearance Monitoring

Contractor shall comply with service level agreement measurements to facilitate prompt and effective processing of security clearance for contractor employees. See "Service Level Agreements for Contractor Employee Clearance Monitoring" in IRPE Appendix A (see below).

### 5.4.12  Capacity Collaboration Requirement

The contractor shall collaboratively and actively participate in FSA information technology resources capacity reviews and provide information to support: usage of current capacity; forecasting for infrastructure resources including telecommunications; current and new systems to meet Federal Student Aid's business needs.

### 5.4.13  Capacity Planning Requirement

The contractor shall proactively, for all new and existing Information Technology Resources which they create and/or support, produce written capacity planning reports and recommendations at periodic intervals, as stipulated by the Department. The reports and recommendations shall holistically evaluate requirements and trends for Information Technology Resources in order to produce a forecast and recommendations with specific sizes, quantities, types and timing.

The contractor shall support the data center capacity planning schedule and process providing input relative to the performance of the application/tool and its supporting infrastructure, including but not limited to system response time and/or latency, system capacity, storage requirements, utilization, performance, etc.

### 5.4.14  Capacity Management Requirement

The contractor shall, for all Information Technology Resources that they support, holistically monitor and manage capacity to ensure that information technology resources are being operated within minimum and maximum thresholds, as agreed to by the Department.

The contractor shall produce written capacity management reports at periodic intervals, as agreed to by the Department, which summarize actions taken since the last report as well as prescriptive recommendations which minimize the cost and maximize efficiency.

### 5.4.15  Data Migration Plan Requirement

The contractor shall provide a Data Migration Plan for solutions that involve the movement, creation, modification, or decommissioning of operations data supporting any Federal Student Aid information system in alignment with the approved federal records schedule and in compliance with the Records Act.  Refer to the Lifecycle Management Methodology section of the Federal Student Aid Technology Office IT Standards Library for additional information.

https://studentaid.ed.gov/about/contracting-info/it-standards

### 5.4.16  Data Segregation

Contractor shall maintain a segregation of FSA data from all non-FSA data within their infrastructure, both in storage and during the transmission of the data. This is also a requirement for Trusted Internet Connections (TIC), Managed Trusted Internet Protocol Services (MTIPS), and Domain Name System Security Extensions (DNSSEC).

- Physical Separation

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

- Contractor shall provide and maintain a physically segregated network based upon the FSA defined landing zones documented in the FSA Network Operating Standards and the function of systems operating in the FSA environment.
- Contractor shall ensure separate hardware for each landing zone to include, but not limited to network devices, routers, switches, firewalls, and load balancers.
- Contractor shall ensure virtual machines exist on physically separate equipment for each landing zone including virtual routers and switches.
- Logical Separation
  - FSA data and transactions on mainframes shall be hosted in separate partitions that do not share resources with other IT users of the mainframe.
- Monitoring and reporting segregation
  - Contractor shall provide a quarterly report that identifies systems by name and IP address to identify potential problems in maintaining segregation of systems.
  - Contractor shall monthly monitor, track, and report on physical segregation to ensure it is maintained.
  - Contractor shall follow an FSA approved process for changes to network configurations.
  - Contractor shall provide a report to validate that moves, additions, and changes have been appropriately requested and implemented.
  - Contractor shall use the change management process to identify potential security gaps in segregation maintenance and shall report status and findings quarterly.

### 5.4.17  Data Management Documentation Requirement

The contractor shall provide detailed file layouts for all production data files, loads, and extracts comprising or supporting any Federal Student Aid information system per the guidance provided in the Federal Student Aid Data Standardization Policies and Procedures.  Additionally, the contractor shall include detailed source target mapping, conceptual (where applicable), logical and physical data models, and detailed data dictionaries for all production database structures per the guidance provided in Federal Student Aid Data Model Standards and Guidelines, Registration Policies and Procedures, and Federal Student Aid Enterprise Data Dictionary Standards.

### 5.4.18  Network Management Requirement

The contractor shall request all telecommunications requirements and changes through the Federal Student Aid Enterprise Change Management (ECM) process.  All communication changes, new or existing, shall conform to Federal Student Aid Security standards and shall undergo security reviews.  All applications and infrastructure residing in or connecting to an FSA data center shall be IPV6 compatible and compliant.

### 5.4.19  Incident and Problem Management Requirement

The contractor shall use the FSA data center services and the Department of Education Help Desk to report all incidents.  "All incidents" includes those occurring inside the FSA data center environment, and also those incidents occurring in contractor's applications outside the FSA data center environment.  The contractor shall assist immediately in timely notification, escalation and resolution of any incidents that impact application degradation or outages until service is restored. Additionally, the contractor shall collaboratively participate in identifying the root cause of incidents, developing solutions to resolve the issues and implementing and testing any corrective

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

actions.  The Contractor shall provide FSA and the FSA data center support and input into root cause analysis in areas relevant to FSA systems impacted by the contractor's scope.

### 5.4.20  Information Technology Resources Retirement

When an Information Resource reaches the end of its lifecycle, and access to the resource by all users has been terminated, data resident on the resources shall be protected and transferred to the Government in a usable form prior to final payment, or after 120 days after resource retirement, whichever comes first, so it is available for future use, and other assets shall be disposed of in accordance with NIST publication 800-88.

## 5.5    TRANSITION

### 5.5.1    Transition Support

To ensure a smooth transition, the Contractor shall submit a Phase-In Plan as a part of its technical proposal in accordance with the Contract. The government will provide existing contract phase-out plans, if available and requested, to the proposing contractors to assist their efforts.

The Contractor shall also establish and implement plans for an orderly phase-out of the contracted operations at the termination of this Contract. The Contractor shall submit a Phase-out Plan to the CO for evaluation and approval six-months after contract start. The Contractor's phase-out procedures shall not disrupt or adversely impact the day-to-day conduct of Government business. The Contractor shall provide the CO with the copies of changes and revisions for review and approval prior to implementation.

### 5.5.2    Transition Support (Phase-In)

The Contractor shall develop comprehensive procedures for phasing in contractor performance to the level prescribed and within the time allowed under the terms of this contract.

The period between Contract award date and Contract start date will constitute the phase-in period. During the phase-in period, the Contractor shall prepare to assume full responsibility for all areas of operation in accordance with the terms and conditions of this contract.  The Contractor shall take all actions necessary for a smooth transition of the contracted operations.

This period will be approximately 120 calendar days in duration.  The Government will make all facilities and equipment accessible to the Contractor during the phase-in period. During the last 60 days of the phase-in period, the Contractor's management personnel will be permitted to observe any on-going operations, as approved by the CO.

During the phase-in period, the Contractor shall at a minimum:

- Establish a Contractor's Project Management Office to coordinate phase-in tasks and be the single point of contact for the Government during the phase-in.
- Recruit and hire necessary personnel.
- Obtain all required certifications and clearances, including personnel security clearances
- Participate in development of joint inventories and sign for Government furnished property/equipment/information.
- Develop and submit any required deliverables.
- Attend post-award meetings as required
- Accomplish necessary training to support the O&M functions.

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

### 5.5.3   Transition Support (Phase-Out)

The Contractor shall develop a Phase-Out Plan to affect a smooth and orderly transfer of contract responsibility to a successor.  The plan shall fully describe how the Contractor shall, at a minimum, approach the following issues: employee notification; retention of key personnel; turn-over of work-in-progress, inventories, and Government property; removal of Contractor property; data and information transfer; and any other actions required to ensure continuity of operations.

The Contractor's Phase-Out Plan shall, at a minimum, require an inventory by the incumbent and the Government before conduct of a joint inventory between the incumbent and the successor.  The Plan shall, at a minimum, also include: reconciliation of all property accounts, requisitions, and work-in-progress; turn-in of excess property; clean-up of Contractor work areas; provision for training of the successor's personnel on Government furnished information systems used in performance of this contract, specialized equipment, utilities systems, and ongoing work that the successor would be required to complete; and, security debriefings in accordance with FSA security procedures for incumbent personnel holding security clearances.

Sixty calendar days prior to the completion of this contract (to include option periods); an observation period shall occur, at which time management personnel of the incoming workforce may observe operations and performance methods of the incumbent contractor.  This will allow for orderly turnover of facilities, equipment, and records and will help to ensure continuity of service.  The Contractor shall not defer any requirements for the purpose of avoiding responsibility or of transferring such responsibility to the succeeding contractor.  The Contractor shall fully cooperate with the succeeding contractor and the Government so as not to interfere with their work or duties.

### 5.6   OPERATIONS

### 5.6.1   Compliance with FSA Approved Technology Standards and Products

The FSA Technology Standards and Products Guide documents FSA's enterprise technology standards and products that should be used in FSA solutions. Existing software standards should be used to prevent duplication, redundancy, and incompatibility, and to lower costs and reduce technical complexity. If business or technical requirements require functionality or capabilities that do not exist or are redundant with an existing standard, the Contractor shall seek approval for adoption of a new standard and/or request an exception from the FSA Engineering Review Board (ERB). Refer to the FSA Technology Standards and Products Guide for additional information:

*https://studentaid.ed.gov/sa/sites/default/files/fsawg/static/gw/docs/ciolibrary/Technology_Standards_and_Products_Guide.pdf*

### 5.6.2   Governance & Review Boards Compliance and Support Requirement

The contractor shall coordinate changes to the technology baseline in conjunction with the Department's investment management, enterprise architecture, enterprise change management, release management, and standards governance review board processes, such as: Federal Student Aid Investment Review Board (IRB), Engineering Review Board (ERB), and Enterprise Change Control Board (ECCB), and program specific change management boards and others as required.

https://studentaid.ed.gov/sa/about/contracting-info/it-standards

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

### 5.6.3   Audits & Reviews Compliance and Support Requirement

The contractor shall provide information and assistance to support periodic project and system specific auditing activities that Federal Student Aid conducts such as IV&V, QA, and LMM compliance and audits. The contractor shall maintain traceability of configuration items, including baselines and builds, to support all the functions of the Lifecycle Management Methodology, Change Management and Configuration Management processes.

On a periodic basis but no less frequently than annually, the Government will conduct quality assurance reviews to reduce the likelihood of risk causes and establish a basis of confidence that the contractor meets the quality and performance requirements of the contract.  Government Contractor quality assurance at the source encompasses one or more of the following based on defined risk:

- Process Reviews: Reviews to determine the suitability, adequacy, and effectiveness of the process to achieve product outputs that meet contract requirements.
- System Assessments/Audits: Systematic, independent assessments and audits of the various elements of the contractual quality management system impacting process or product quality.
- Management and program reviews and meetings: Maintains open channels of communication.

Contractor shall comply with these reviews by providing the Government access to its physical facilities, its quality management system and other relevant documentation as well as allowing for onsite meetings/interviews with its key technical and management personnel as needed. Government reserves the right to add other quality assurance surveillance methods as required on routine, periodic, and/or random basis at no additional cost.

### 5.6.4   Compliance and Support Requirement on External Studies or Investigations

Notwithstanding other terms of this contract, the Contractor shall accommodate the Department in providing information related to contract performance; respond to requests for information and data calls; and respond inquiries from other Federal entities, all of which have been transmitted through the contract officer, including but not limited to:  Congress; Comptroller General; Office of Management and Budget; Office of the Inspector General; and General Accounting Office (GAO).  Such requests may also take the form of a Departmental program or Technology Office inspection, validation, or audit.  The contractor shall furnish the requested information within the time constraints of the request.

### 5.6.5   Compliance with FSA Lifecycle Management Methodology

The contractor shall comply with the FSA's governance model (which is the FSA Lifecycle Management Methodology, abbreviated as LMM) which defines the control level activities, including all management and technical stage gates, and a minimum set of documentation requirements to successfully oversee a program or project, or the development and implementation, operating support and disposal of a solution. FSA's LMM is flexible and accommodates agile (see page 13 of the LMM Process Guide).

Refer to the Lifecycle Management Methodology section of the Federal Student Aid Technology Office IT Standards Library for additional information.

https://studentaid.ed.gov/about/contracting-info/it-standards

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

https://studentaid.ed.gov/sa/sites/default/files/fsawg/static/gw/docs/ciolibrary/LMM_Process_Guide.pdf

If the contractor proposes use of their own methodology, the contractor shall provide a Lifecycle Management Methodology (LMM) Compliance Matrix that details how their Systems Development Lifecycle (SDLC), activities and deliverables/work products trace to the Lifecycle Management Methodology Stages, Core Deliverables and Stage Gate Entry/Exit Criteria.

Any expectations or assumptions requiring exemptions or modifications specific to the acquisition being conducted on any Federal Student Aid standards must be included in the proposal and explicitly accepted by Federal Student Aid at the time of award.

The contractor shall deliver LMM documentation and deliverables in a format prescribed by the FSA LMM templates and exemplars. Depending upon the specific needs of each task order or contract modification however, the FSA program office and contractor, in conjunction with guidance from the LMM SME, may agree to modify these templates on a mod by mod basis. If the contractor proposes use of their own template or a different deliverable format, the contractor shall provide a matrix that details how the content in their deliverable maps to the content required by the LMM template(s).

### 5.6.6    Collaboration Requirement on Testing & Change Management

The contractor shall collaborate with FSA's Test Manager, the other contractors, and other project team members as needed to facilitate the success of activities.

The contractor shall collaborate with all service providers who use the change management tool and who are required to use change management and configuration management processes and all data center Information Technology Infrastructure Library (ITIL) Service Support and Service Delivery processes.

### 5.6.7    Collaboration with All Other Participants in Performance of Contract Requirements to FSA

The contractor shall collaborate with FSA Technology Office Services, Business Units, and Other Contractor support staff in the holistic delivery of required services and results to FSA.

### 5.6.8    Configuration & Change Management Traceability Requirements

The Contractor shall ensure that all FSA Enterprise Configuration and Change Management transactions that involve the system(s) are supported, processed, and managed efficiently. Refer to the Lifecycle Management Methodology section of the Federal Student Aid Technology Office IT Standards Library for additional information.

https://studentaid.ed.gov/about/contracting-info/it-standards

### 5.6.9    Release Management Requirements

The contractor shall coordinate all changes to approaches and processes used to implement changes to Federal Student Aid IT operations and services hosted at FSA data centers, or in another facility that connects with the FSA data centers through government provided networks or telecommunication services. The contractor shall follow the FSA Enterprise Change Management (ECM) processes to ensure all changes are coordinated, reviewed, and approved through Federal Student Aid organizational areas. As part of this process, the contractor shall provide input into, and collaborate with, the FSA Service Management process, where applicable. The contractor shall participate in system or production readiness reviews prior to release of any production changes.

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

The contractor shall support testing of any changes that touch a system the contractor supports or is within the contractor's area of responsibility. The contractor shall perform changes and maintenance of existing systems, releases, implementation of new systems, and decommissioning or termination of systems during the FSA Weekly Maintenance Window, where applicable.

### 5.6.10 Systems Development, Operations, and Maintenance

The Contractor shall adhere to the approved program lifecycle management process for systems development, maintenance and operations of all systems including those developed to facilitate the processing and transmission of government information (such as a call center or IVRU interconnecting with another separate system serving FSA's mission.) In accordance with the FSA Lifecycle management Methodology (LMM), which shall be used unless a specific alternative process is completely documented in writing and is then approved by FSA. Refer to the FSA Technology Office IT Standards Library for additional information at http://studentaid.ed.gov/about/contracting-info/it-standards.

## 5.7    DELIVERABLES

All Deliverables in Table 6 below shall be provided electronically whenever possible. Electronic delivery via e-mail shall be acceptable, with the deliverable files in both Acrobat.pdf and a current Microsoft Office format suitable for the report (e.g. Word, Excel, etc.) unless FSA requests a different format. Deliverables shall be submitted to the Contracting Officer, COR, and Program Manager, and/or other representatives as designated by FSA.

The Government shall review each deliverable and provide written notice of acceptance or rejection within seven (7) business days upon receipt. Upon notice of formal written rejection from FSA's CO, the Contractor shall address all comments/ changes and submit a revised deliverable within five (5) business days if the changes can be easily addressed and understood by both the Government and Contractor. If the deliverable is rejected and/or must be altered to significantly change the deliverable, the Contractor will have seven (7) business days to resubmit from date of the Government's notice. The Government shall review the deliverable to determine that:

- It addresses the government's requirement as stated in this PWS
- It is organized appropriately and written clearly and free of grammatical errors
- It is formatted in both Microsoft (MS) Word or Adobe Acrobat or other acceptable format such as MS Excel or MS PowerPoint
- It adheres to industry (e.g., PMI PMP®), government (e.g., FISMA, NIST), and FSA standards, guidance, and regulations (e.g., Lifecycle Management Methodology (LMM), Management's IT assessments as a function of security authorization, formerly certification and accreditation from FSA Technology Office), as applicable and related to documentation content, format, quality, and contractual terms.

A deliverable is deemed complete upon FSA's approval. Next Gen BPO Providers shall furnish deliverables specified herein in accordance with the delivery schedule and requirements, to the delivery point(s) specified in the table below. The vendor and FSA shall work together to establish and/or finalize Acceptance Criteria within 20 business days post award.

For deliverables 21 – 27, Next Gen BPO Providers shall support the production of the following operational reports/work products, using the tools and systems provided by FSA, an existing FSA solution, and/or Next Gen partners for FSA's review and comment. The vendor and FSA shall work together to establish the frequency for all deliverables. FSA will work with Next Gen BPO

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

Providers post-award to define due dates for all operational reports/work products and will collaborate with vendors to identify other supplementation work products to support Common Performance Standards and achieve overarching Next Gen goals.

**Table 6 – FSA Deliverable Table**

| # | Deliverable | Description | Due Date and Frequency | *Acceptance Criteria |
|---|---|---|---|---|
| *FSA Deliverable Table* | | | | |
| 1 | Project Kick-off Meeting | Kick-off meeting to begin discussions on detailed requirements and the project schedule. • Presentation • Meeting Minutes | Within five (5) business days of award | • Project kick-off is scheduled.  • Project kick-off materials are defined with stakeholders including roles/responsibilities, project milestones, third-party dependencies, current action items, risks, known roadblocks, team contact information, meeting cadence, and high-level solution or scope overview.  • Presentation materials delivered.  • Minutes due one (1) business day after Project Kick-off Meeting. |
| 2 | Project Management Plan | Detailed project management plan and project schedule for the complete contract scope. Includes Scope Management Plan, Cost Management Plan, Risk Management Plan, | Three (3) weeks after award and redelivered every month thereafter. | • Draft Project Management Plan delivered to FSA within five (5) business days of award.  • Final project plan and project schedule, including full project |

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

| | | Quality Management Plan, Resource Management Plan, Schedule Management Plan, Communication Management Plan, Performance Management Plan, and Performance Monitoring Plan. | | scope, cost, risk, quality, resources, schedule, communication, and performance management plans, as well as performance monitoring plans, are delivered to FSA three weeks after award and redelivered every thirty (30) days thereafter with appropriate updates |
|---|---|---|---|---|
| 3 | Status Meetings and Status Reports | Status report on progress, performance metrics, schedule, incidents, action and issue log, and risk log/risk register. | Daily/Weekly – Standard day/time for reports and meetings to be determined but reports due one (1) business day prior to the weekly status meeting. Minutes due one (1) business day after weekly status meeting | • Meeting requests received.

• Presentation materials, weekly status report, containing progress, performance metrics, schedule, incidents, action and issue log, and risk log, is delivered to FSA. at least one (1) business prior to scheduled meetings.

• Meeting minutes delivered one (1) business day following each meeting.

• All open and closed action items with corresponding due dates and owners, project risks, and corresponding severities with mitigation strategies are documented and delivered weekly. |

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

| 4 | Requirements Management Plan | Defines how requirements will be elicited, structured, and prioritized; how requirements will be recorded; how requirements will be modified; and how requirements will be traced and reconciled. | Initial plan to cover all operational functionality at least five (5) business days prior to Requirements Stage gate and annually thereafter; Updated for each release.<br><br>Final version for each release delivered prior to Requirements Stage Gate | • Requirements Management Plan delivered that outlines the overall approach to requirement definitions and that contains all details necessary to effectively structure, prioritize, and record requirements for each release; and to trace and reconcile changes to those requirements.<br><br>• Updated requirements plan with specific release requirement changes is delivered to FSA prior to the Requirements Stage Gate of each release. |
| --- | --- | --- | --- | --- |
| 5 | Requirements Documents | High-Level Requirements<br><br>Requirements Traceability Matrix mapped to test cases. | Initial plan to cover all operational functionality at least five (5) business days prior to Requirements Stage gate and annually thereafter; Final version for each release delivered prior to Requirements Stage Gate | • High-level operational requirements are captured and shared with FSA prior to the Requirements Stage Gate and annually thereafter.<br><br>• Each requirement is mapped to test case(s) for traceability.<br><br>• Requirements Traceability Matrix is updated and delivered for each release prior to the Requirements Stage Gate. |
| 6 | Integrated Master Project Schedule | Planned dates to start and complete tasks and | Within five (5) business days of award; updated and | • Master project schedule is maintained and sent to |

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

| | | milestones, including work to be done by FSA as well as any vendors participating in the project. | redelivered weekly thereafter. | FSA on a weekly basis and includes changes to dates, tasks, and milestones, as well as dependencies on FSA and other partners.<br><br>• Integrated Master Project Schedule shows:<br>   o  Work to be done by FSA<br>   o  Work to be done by Vendors |
|---|---|---|---|---|
| 7 | Solution Architecture and Detailed Design Document | Combines both a high-level and detailed view of the solution architecture.<br>• Includes description and diagrams of infrastructure, network, telecommunications, security, data, desktop, and other equipment<br>• Addresses all Technical Quality Control (TQC) factors and sub-factors identified as applicable and in scope<br>• Includes mitigation strategies for all risks identified in the Technical Quality Control reviews<br>• Includes Interface Control Documents | Draft due fifteen (15) business days prior to Design Stage gate and annually thereafter<br><br>Final version for each release delivered at least five (5) business days prior to Design Stage Gate | • Overall Solution Architecture and Detailed Design Document that addresses all applicable Technical Quality Control (TQC) factors is delivered to FSA a minimum of five (5) business days prior to the first Design Stage Gate and includes:<br><br>   o  A solution description and diagram of the infrastructure, network, security, data, desktop, and other equipment, conveying the installation and configuration detail necessary to |

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

| | | (ICDs) to document all interfaces<br>• Conveys detail necessary to support critical design reviews before installation and configuration | | support design reviews.<br>o Interface Control Documents (ICDs) documenting all interfaces.<br>o Mitigation strategy for any risks identified prior to the TQC Review.<br><br>• Overall Solution Architecture and Detailed Design Document is updated and delivered to FSA after the initial approval and annually thereafter.<br><br>• Overall Solution Architecture and Detailed Design Document is updated with changes specific for a release. |
|---|---|---|---|---|
| 8 | Master Test Plan | Details high level and overall test planning and test management. Master Test Plan includes objectives for the security control assessment and procedures for testing each control. Includes, but is not limited to, the following types of testing: Network, Telephony, User Acceptance, Inter- | Initial test plan to cover full system functionality at least ten (10) days prior to Test Readiness Review<br>Final version for each release delivered prior to Test Readiness Review | TBD |

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

| | | system, and Performance | | |
|---|---|---|---|---|
| 9 | Testing Documentation | Testing documentation for all testing activities completed (e.g. test scenarios, cases, and scripts; summary reports; and QA/QC records). | Drafts due per release schedule; final version for each release delivered prior to Test Readiness Review. | TBD |
| 10 | Implementation Documentation | • Management Plan<br>• Training Plan<br>• Standard Operating Procedures<br>• Configuration Management Plan (plan should focus on call center security, network, telecommunications, data, desktops, and equipment configuration)<br>• Transition Management Plan (plan should include contract and/or of call center operations transition) | Prior to receiving Authorization to Operate. Updates to system documentation as system changes necessitate; minimally reviewed and updated annually. | TBD |
| 11 | Lessons Learned Reports | All aspects of the project or project stage are analyzed, and results and opportunities for improvement are documented | Within two (2) weeks after each update to call center changes, such as desktop software upgrades | TBD |
| 12 | System Security and Privacy Documentation | Privacy Artifacts:<br>• Privacy Threshold Analysis (PTA)<br>• Privacy Impact Assessment (PIA)<br>• System of Records Notice (SORN) | Prior to receiving Authority to Operate | TBD |

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

| | | | |
|---|---|---|---|
| | | External Data Exchange Artifacts:<br>• Memorandum(s) of Understanding (MOUs)<br>• Computer Matching Agreement(s)<br>• Interconnection Security<br><br>Agreement(s) (ISA) Continuity of Services Artifacts:<br>• Business Impact Assessment (BIA)<br>• IT Contingency Plan (Includes Test Plan)<br>• Disaster Recovery Plan<br><br>System Security Documentation Artifacts:<br>• Data Sensitivity Worksheet<br>• System Authorization Boundary<br>• System Security Plan (SSP)<br>• Incident Response Plan (IRP)<br>• Breach Notification Policy and Response Plan<br><br>Security Risk Assessment Artifacts:<br>• Security Assessment Plan<br>• System Security Documentation Checklists | |

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

|  |  |  |  |  |
|---|---|---|---|---|
|  |  | • Security Assessment Report • Plans of Actions and Milestones (POAMs) • Data Retention Schedule |  |  |
| 13 | Security Documentation Post-ATO | Property Management Plan • FISMA Metrics Report • Annual Self-Assessment (if not in OSA program) • Incident Response Test Plan and Test Report • Contingency Test Plan and Test Report • Standard Operation Procedures • Equipment Retirement Plan • Equipment Disposal Plan | Updated as changes occur or directed by FSA | TBD |
| 14 | Transition Support (Phase-Out) | Phase-Out Plan | Six (6) months after award; updated manually. | TBD |
| 15 | Security Reports | All sub-reports shall follow the standard formats as required in the Information Resources Program Elements (IRPE).<br><br>• CyberScope Report • Clearance and Suitability Report • Application Access Report • Staffing Change Report • Recertification of User Access and | Monthly; day to be determined. | TBD |

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

|  |  | Authenticator Activation |  |  |
|---|---|---|---|---|
| 16 | Contractor PIV and PIV-I Card Deliverable | Monthly Vendor Employee Report (FSA 39-5 deliverable) | First business day after the close of each month | TBD |
| 17 | Technology Business Management (TBM) Data Report | Completed TBM Data Report Template in accordance with the instructions in the annual A-11 OMB Circular on the Budget Submission Requirement, specifically in the section containing the Capital Planning and Investment Control (CPIC) for IT Investments | Quarterly | TBD |
| 18 | Small Business Participation Plan (SBPP) | Completed SBPP submitted in accordance with FAR 52.219-9 | Annually | Submit Individual Subcontracting Report (ISR) through electronic Subcontracting Reporting System (eSRS) within 30 days of the close of each reporting period. |
| 19 | Continuation of Mission Critical Services Plan | Describes processes and procedures to ensure continued availability of services under contract. Any alternate site used as part of Disaster Recovery shall be fully operational within **48 hours** of a declared disaster. The Next Gen BPO Providers shall identify in the Plan | No later than sixty (60) calendar days after award; maintain and update as necessary | In accordance with FSA 37.2 Continuation of Mission Critical Contractor Services |

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

| | | | | |
|---|---|---|---|---|
| | | the provisions made for the acquisition of mission critical personnel and resources, if necessary, for continuity of operations for up to 30 days or until normal operations can be resumed. | | |
| 20 | NIST Cost Capabilities Report | Completed NIST Cost Capabilities Report Template. Percentage of total cost associated with each selected NIST Capabilities Cost. The total of the percentages must be 100% of the Security and Compliance Cost Tower in the TBM Data Report deliverables. | Two (2) weeks after award. Every six (6) months in August and February thereafter | TBD |
| 21 | Contact Type Reporting | Detailed reporting on contact type inquiries | Daily/Weekly/Monthly – Standard day/time for reports to be determined. FSA to provide systems/data to support reporting. | TBD |
| 22 | Customer Satisfaction Survey Result | Results from Customer Service Satisfaction Surveys | Daily/Weekly/Monthly – Standard day/time for reports to be determined. FSA to provide systems/data to support reporting. | TBD |
| 23 | Workload Distribution Reporting | Reporting detailing the distribution of work and accounts. | Daily/Weekly/Monthly – Standard day/time | TBD |

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

| | | | for reports to be determined.<br><br>FSA to provide systems/data to support reporting. | |
|---|---|---|---|---|
| 24 | Efficiency and Effectiveness Performance Reporting | Reporting for Next Gen BPOs to include Average Handle Time, Hold Time, Average Speed to Answer, Abandon Rate, etc. | Daily/Weekly/Monthly – Standard day/time for reports to be determined.<br><br>FSA to provide systems/data to support reporting. | TBD |
| 25 | Quality Reporting | Reporting detailing First Contact Resolution, Accounts brought current after RPC, Back-office task quality reporting, etc. | Daily/Weekly/Monthly – Standard day/time for reports to be determined.<br><br>FSA to provide systems/data to support reporting. | TBD |
| 26 | Forecasts Analysis | Analysis of Call Center and Back-Office Forecasts. | Daily/Weekly/Monthly – Standard day/time for reports to be determined.<br><br>FSA to provide systems/data to support reporting. | TBD |
| 27 | Campaign and Strategy Plans | Analysis and detailed campaign plans that include outreach strategy, audience, goals, and success measures. | Daily/Weekly/Monthly – Standard day/time for reports to be determined.<br><br>FSA to provide systems/data to support reporting. | TBD |

**\*Note:** The BPO Provider and FSA shall work together to establish and/or finalize Acceptance Criteria for all deliverables within twenty (20) business days of award.

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

**IRPE Appendix A: Service Level Agreements for Contractor Employee Vetting Monitoring**

| SLA # | Objective | Measurement | Standard/Period (w/disincentive (if applicable) | Notes |
|---|---|---|---|---|
| 1 | Timely e-QIP submission. Submit e-QIP form to the COR/ISSO within 24 hours of a contractor employee's assignment to a Department contract and ensure that the forms are accurate and complete (reference EDARS 3452.239-72). (Time frame may change based upon Departmental policy) | Send a confirmation email to the FSA CO/COR/ISSO and Program Management by 5:00PM of the due date that certifies the success of complete, accurate, and timely forms submission | 95% complete, accurate, and timely submissions over monthly period<br><br>Period – Monthly Metric<br><br>Disincentive - $5,000 per 6C, $2,500 per 5C, and $500 per 1C over the standard in the reporting period | Example: For a contractor employee reporting for duty Monday, August 17, 2020, e-QIP initiation must be received by 5:00PM of Tuesday, August 18, 2020. |
| 2 | Timely resolution of e-QIP information deficiencies.  If any information on e-QIP forms is not complete or the submission is returned for any reason, the contractor must resubmit the forms to the COR/ISSO within 7 (reference OM: 5-101) business days or the contractor | Send a confirmation email to the FSA CO/COR/ISSO and Program Management by 5:00PM of the due date that certifies the success of timely e-QIP form re-submission or the removal of the contract employee from the contract | 99% complete, accurate, and timely   re-submission over monthly period<br><br>Period – Monthly Metric<br><br>Disincentive - $5,000 per 6C, $2,500 per 5C, and $500 per 1C over | |

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

| | | the standard in the reporting period | |
|---|---|---|---|
| | employee must be removed from the contract | | |
| 3 | Security Monitoring - When vetting information is returned with status, background investigation type and date, monitor contractor employee vetting and employment status under the contract to ensure reinvestigations are submitted 30 calendar days prior to expiration, departed employees are identified and removed, and any security changes are annotated. | A consolidated report of all employees in the format shown below will be submitted to the COR and ISSO (copy to the CO) within 5 business days following each three month period of performance for identification of changes over the last quarter (new employees, employees in the vetting process (and status), change in risk level (5C/6C), and resubmittals for employees 30 calendar days prior to the investigation expiration and departed employees). | 95% complete and accurate over quarterly period<br><br>Period – Quarterly Metric<br><br>Disincentive - $1,000 per error over the standard in the reporting period | Submittal of quarterly report does not replace timely requests for e-QIP for new employees, monitoring status of reinvestigation requests, requesting reinvestigation 30 days before expiration, or notification that an employee has departed.  COR will spot check quarterly and submit annually to the Extended Workforce Vetting Office for a 100% validation when requested. |
| 4 | Timely Submittal of Reinvestigation Requests.  EDARS 3452.239-72 requires contractor employees in High Risk 6 (C) positions to submit security packages for re-investigation every five years.  Once a contractor | A confirmation email to the FSA CO/COR/ISSO and Program Management 30 calendar days prior to the investigation expiration date that certifies the success of complete, accurate, and timely | 95% complete, accurate, and timely submission over quarter<br><br>Period – Quarterly Metric<br><br>Disincentive - $1,000 per error | |

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

| | employee is deemed fit to perform work, a determination and expiration date will be provided back to the contractor for tracking. Contractors must submit re-investigation packages to e-QIP 30 calendar days prior to investigation expiration. | form re-submissions. | over the standard in the reporting period | |
|---|---|---|---|---|

## IRPE Appendix B: Personal Identity Verification (PIV) Card Requirements

There are two different situations in which PIV cards are used to gain access to FSA networks, applications and data.

- PIV cards used with internally hosted solutions (such as the FSA Next Generation Data Center)
- PIV-I cards used with externally hosted solutions (such as a contractor's facility)

The following two sections detail the requirements for these two situations.

1. **PIV Card for Internally Hosted Solutions**

2. **Requirements for Personal Identity Verification Credential (PIV card) for U.S. Department of Education (ED) Educate Network and Federal Student Aid (FSA) Data Center (NGDC/VDC) Access**

**General Requirement:** All contractors accessing ED and FSA networks and/or data centers (Next Generation Data Center (NGDC) and Virtual Data Center (VDC)) who are classified as Privileged Users (PU) are required to use government furnished Personal Identity Verification (PIV) cards for authentication and access.

**Note:** FSA prohibits contractors from granting access to FSA systems without approval by the Department.

**Definitions:**

- A Privileged User is defined as a user of an Information System with more authority and access than a general user. For example: users with root access, database administrator,

application administrator, network administrator, system administrator, information assurance manager, information assurance officer. (See "Example Privileged User Roles and Job Functions (All Environments)" for additional examples of Privileged Users).

- A <u>PIV card</u> is an identity card that is issued by Federal government and is fully conformant with Federal PIV standards (i.e., Federal Information Processing Standard (FIPS 201-2)). PIV card credential is a Level of Assurance 4 (LOA4) as defined in OMB Memorandum 04-04 and NIST SP 800-63-2 or Identity Assurance Level 3 (IAL3) and Authenticator Assurance Level 3 (AAL3) as defined in NIST SP 800-63-3.

**Reporting Requirement:** Although PIV cards are issued and managed by FSA, the Contractor shall still provide a monthly PIV Card report to FSA including:

- Number of privileged users with PIV cards disabled in the last 30 days.
- Number of privileged users with PIV cards enabled in the last 30 days.
- Total number of privileged users with PIV cards.

**PIV Card Readers:** PIV Card Readers shall comply with the requirements specified in NIST SP800-96 and conform to the [ISO7816] standard for the card-to-reader interface. These readers shall conform to the Personal Computer/Smart Card (PC/SC) Specification [PCSC] for the reader-to-host system interface in general desktop computing environment.

**How PIV Cards are issued:** FSA issues PIV cards according to the following criteria:

a) If there are 25 or fewer employees performing duties as privileged user at the place of performance; AND the place of performance is located within 2.5 hours of the Department of Education Headquarters or Regional Office by motor vehicle: The individual will be required to travel to a Department of Education Headquarters or Regional Office.

b) If the number of privileged users in a place of performance exceeds 25 persons, or the place of performance exceeds a 2.5-hour trip by motor vehicle, then an ED representative will travel to the vendor's place of performance to issue the PIV card.

FSA will not provide PIV card readers.

**Additional Instructions:**

Please ensure the following information is addressed in technical and cost proposals:

- Total number of privileged users
- A list of the user roles being considered as privileged
- A list of user roles being excluded
- Contractor / Subcontractor company name(s)
- Number of privileged users at place of performance
- Resource(s) being accessed, including location
- Current method of accessing the resource

**<u>Examples of Privileged User Roles and Job Functions (All Environments):</u>**

**Database Administrator:**

- Installing and upgrading the database server and application tools

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

- Allocating system storage and planning future storage requirements for the database system
- Modifying the database schema, as necessary, from information given by application developers
- Enrolling users and maintaining system security
- Controlling and monitoring user access to the database
- Monitoring and optimizing the performance of the database
- Maintaining archived data
- Backing up and restoring databases

**Application Administrator:**

- Perform application tuning, configuration, monitoring, and administration.
- Plan and manage application software upgrades.
- Analyze custom administrative software requests and present solutions.
- Optimize application performance.
- Perform daily monitoring and capacity planning for enterprise information systems.

**System Administrator:**

- Analyzing system logs and identifying potential issues with computer systems.
- Introducing and integrating new technologies into existing data center environments.
- Performing routine audit of systems and software.
- Applying operating system updates, patches, and configuration changes.
- Installing and configuring new hardware and software.
- Adding, removing, or updating user account information, resetting passwords, etc.
- Responsible for documenting the configuration of the system.
- Troubleshooting any reported problems.
- System performance tuning.
- Ensuring that the network infrastructure is up and running.
- Configuring, adding, and deleting file systems.

**Network Administrator:**

- Install and support LANs, WANs, network segments, Internet, and intranet systems.
- Install and maintain network hardware and software.
- Analyze and isolate issues.
- Monitor networks to ensure security and availability to specific users.
- Evaluate and modify system's performance.
- Maintain integrity of the network, server deployment, and security.
- Deploy networks and network equipment.
- Perform network address assignment.
- Enter routing protocols and routing table configuration.
- Enter configuration of authentication and authorization of directory services.
- Maintain network servers such as file servers, VPN gateways, and intrusion detection systems.

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

- Administer servers, desktop computers, printers, routers, switches, firewalls, phones, personal digital assistants, smartphones, software deployment, security updates and patches.

**Information Assurance Manager/Officer:**

- Perform security tool administration providing risk analysis of the following:
  - Vulnerability scanners
  - Security event logging & monitoring analyzers
  - Intrusion Detection/Prevention System (IDS/IPS) and firewall logs
  - Performs system and network security audits
  - Anti-virus products and central console
- Perform the day to day operations, management and administration to protect the integrity, confidentiality, and availability of information assets and technology infrastructures of the organization:
  - IDS/IPS/Firewalls
  - Anti-virus
  - Event log analysis
  - Access the system or infrastructure to perform threat, vulnerability, and risk assessments
  - Access the system or infrastructure to manage/perform security audits
  - Access the system or infrastructure to perform or assist with investigations
  - Access the system or infrastructure to coordinates the handling and resolution of incidents of security breach
- Day-to-day operations and maintenance of computer facilities and IT resources including network support, server support, desk top support, and telecommunications services

**PIV-I Card for Externally Hosted Solutions**

**Requirements for Personal Identity Verification Interoperable (PIV-I card) Credential for Access to Federal Student Aid (FSA) Partner-Hosted Solutions**

**General Requirement:** The Contractor shall ensure that all Privileged Users who work on IT resources and applications containing or accessing FSA's data utilize the PIV-I cards that their organization secure. The Contractor shall provide PIV-I cards, provide card readers, and require Privileged Users to use the PIV-I card for authentication and access to IT resources and applications containing or accessing FSA's data satisfying an Identity Assurance Level (IAL3) and Authentication Assurance Level 3 (AAL3) as defined in NIST SP 800-63-3 (Level of Assurance 4 (LOA4) as defined in OMB Memorandum 04-04 and NIST 800-63-2).

There are approved and trusted 3rd Party vendors that can be contracted to provide card issuance services. The complete list of approved PIV-I vendors is available at https://www.idmanagement.gov/trust-services/

**Note:** FSA prohibits contractors from granting access to FSA systems without approval by the Department.

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

**Definitions:**

- A Privileged User is defined as a user of an Information System with more authority and access than a general user. For example: users with root access, database administrator, application administrator, network administrator, system administrator, information assurance manager, information assurance officer. (See "Example Privileged User Roles and Job Functions (All Environments)" for additional examples of Privileged Users).
- A PIV Interoperable (PIV-I) Card is an identity card that meets the PIV technical specifications to work with PIV infrastructure elements, such as card readers, and is issued in a manner that allows Federal government relying parties to trust the card. Non-Federally Issued (NFI) identity cards must conform to the NIST technical specifications for a PIV Card as defined in NIST SP 800-73 and FIPS 201-2 and meet the cryptographic requirements of FIPS 140 and NIST SP 800-78. Please refer to the latest version of "Personal Identity Verification Interoperability for Non-Federal Issuers" at http://www.idmanagement.gov/ for additional information. In order to ensure this conformance, NFIs should refer to the General Services Administration (GSA) Approved Products List (APL) (See FPKI - Approved PIV-I Credential Entities) available at www.idmanagement.gov.

**PIV-I Card Issuance Requirement:**

- The Contractor shall not issue the PIV-I card to the Privileged Users of the FSA system until after FSA has approved access for these users.

**Reporting Requirement:** The Contractor shall provide a monthly PIV-I Card report to FSA including:

- Number of privileged users with PIV-I cards disabled in the last 30 days.
- Number of privileged users with PIV-I cards enabled in the last 30 days.
- Total number of privileged users with PIV-I cards.

**PIV/PIV-I Card Readers:** The Contractor shall provide PIV/PIV-I compatible Card Readers that comply with the requirements specified in NIST SP800-96 and conform to the [ISO7816] standard for the card-to-reader interface. These readers shall conform to the Personal Computer/Smart Card (PC/SC) Specification [PCSC] for the reader-to-host system interface in general desktop computing environment.

**Note:** The Contractor is advised to design procurement procedures and technical implementation for compliant system for Privileged Users (IAL3 and AAL3 per NIST SP 800-63-3 or LOA4 per OMB M-04-04 and NIST SP 800-63-2) in such a way that they can be expanded in the near future to include the Non-Privileged, general user population (your employees, contractors, and partners).

**Examples of Technical Implementation of Compliant System using PIV/PIV-I Credentials:**

**Small Organization with a Windows domain, some Linux servers, and an Oracle database**

The small organization can comply directly with the mandate by securing each component of the infrastructure using features that are native to the platform.  To secure the Windows domain, the organization could enable leverage Windows smart card login from the PIV-I card by binding the PIV-I to their Active Directory and eliminating the user password. This approach is known as

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

"user-based enforcement." To secure the Linux domain, the organization may rely on the SSH keys contained within the PIV-I card and use a smart card compatible SSH client (such as "openssh" or "Putty-CAC"). To secure the Oracle database, the administrative users may be moved from passwords to certificate login, again relying on the SSL certificate within the PIV-I card to authenticate the admin user to the database. This example of a "direct solution" is the most inexpensive and expedient way to comply with these requirements.

**Large Enterprise with Complex Legacy Systems**

For a large organization with complex legacy systems, a better solution may be to deploy a privileged identity management tool. The tool functions as a "password vault" and allows for secure storage (and rotation of) the passwords used to perform privileged system access. The tool provides extensive logging and auditing capabilities to analyze anomalous access. This approach can be more expensive to implement but provides a path that may be simpler for a large system with extensive legacy applications and components, which make it impractical to individually secure each component using its extant capabilities.

<u>**Examples of Privileged User Roles and Job Functions (All Environments)**</u>

**Database Administrator:**

- Installing and upgrading the database server and application tools.
- Allocating system storage and planning future storage requirements for the database system.
- Modifying the database schema, as necessary, from information given by application developers.
- Enrolling users and maintaining system security.
- Controlling and monitoring user access to the database.
- Monitoring and optimizing the performance of the database.
- Maintaining archived data.
- Backing up and restoring databases.

**Application Administrator:**

- Perform application tuning, configuration, monitoring, and administration.
- Plan and manage application software upgrades.
- Analyze custom administrative software requests and present solutions.
- Optimize application performance.
- Perform daily monitoring and capacity planning for enterprise information systems.

**System Administrator:**

- Analyzing system logs and identifying potential issues with computer systems.
- Introducing and integrating new technologies into existing data center environments.
- Performing routine audit of systems and software.
- Applying operating system updates, patches, and configuration changes.
- Installing and configuring new hardware and software.
- Adding, removing, or updating user account information, resetting passwords, etc.
- Responsible for documenting the configuration of the system.
- Troubleshooting any reported problems.

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

- System performance tuning.
- Ensuring that the network infrastructure is up and running.
- Configuring, adding, and deleting file systems.

**Network Administrator:**

- Install and support LANs, WANs, network segments, Internet, and intranet systems.
- Install and maintain network hardware and software.
- Analyze and isolate issues.
- Monitor networks to ensure security and availability to specific users.
- Evaluate and modify system's performance.
- Maintain integrity of the network, server deployment, and security.
- Deploy networks and network equipment.
- Perform network address assignment.
- Enter routing protocols and routing table configuration.
- Enter configuration of authentication and authorization of directory services.
- Maintain network servers such as file servers, VPN gateways, and intrusion detection systems.
- Administer servers, desktop computers, printers, routers, switches, firewalls, phones, personal digital assistants, smartphones, software deployment, security updates and patches.

**Information Assurance Manager/Officer:**

- Perform security tool administration providing risk analysis of the following:
  - Vulnerability scanners
  - Security event logging & monitoring analyzers
  - Intrusion Detection/Prevention System (IDS/IPS) and firewall logs
  - Performs system and network security audits
  - Anti-virus products and central console
- Perform the day to day operations, management and administration to protect the integrity, confidentiality, and availability of information assets and technology infrastructures of the organization:
  - IDS/IPS/Firewalls
  - Anti-virus
  - Event log analysis
  - Access the system or infrastructure to perform threat, vulnerability, and risk assessments
  - Access the system or infrastructure to manage/perform security audits
  - Access the system or infrastructure to perform or assist with investigations
  - Access the system or infrastructure to coordinates the handling and resolution of incidents of security breach
- Day-to-day operations and maintenance of computer facilities and IT resources including network support, server support, desk top support, and telecommunications services

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

**Additional Technical Requirements and References:**

Please review the PIV Interoperable column and see Section J – Attachments for a list of applicable PIV-I references.

| | Technical Requirements | PIV | PIV - Interoperable |
|---|---|:---:|:---:|
| **Trust** | Identity Assurance<br>• Level of Assurance 4<br>• Identity Assurance Level 3 (draft NIST SP 800-63-3) | ● | ● |
| | Authenticator Assurance<br>• Level of Assurance 4<br>• Authenticator Assurance Level | ● | ● |
| | Sustainability Assurance<br>• Favorable Adjudicated National Agency<br>Check with Inquiries (minimum) or other Tier 1 Investigation | ● | |
| | PIV policy object identifier on PIV Authentication Certificates | ● | |
| | PIV-I Equivalent policy object identifier on PIV-I Authentication Certificates | | ● |
| | PIV Content Signing object signing certificate | ● | |
| | PIV-I Content Signing equivalent object signing certificate | | ● |
| | Card stock certified | ● | ● |
| | PIV Application Identifier (AID) | ● | ● |
| | Command edge and NIST SP 800-85 conformant | ● | ● |
| **Credential Edge** | NIST SP 800-73-4 conformant GUID present in the CHUID | ● | ● |
| | RFC 4122 conformant UUID required in the GUID data element of the CHUID | ● | ● |
| | RFC 4122 conformant UUID present in the Authentication Certificates | ● | ● |

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

## SECTION D - PACKAGING AND MARKING

## D-1    FSA 27-1 Labeling of Documents (JUN 2007)

The Contractor shall not label any data produced in performance of this contract in a way that would restrict the Government's right to use or release the information, unless limited or restricted rights, as define by 52.227-14, Rights in Data-General, were agreed upon and the contract explicitly delineates the data that are subject to limited or restricted rights.  If applicable, the Contractor shall include a legend that identifies sensitive data that should not be released for security reasons.   Deliverables shall not contain vendor-specific logos, mottos, watermarks, or holograms.

The Contractor shall not use, particularly for proposals, U.S. Government logos, such as the U.S. Department of Education or Federal Student Aid.

(End of Clause)

## SECTION E - INSPECTION AND ACCEPTANCE

## E-1    52.246-4 Inspection of Services – Fixed Price (AUG 1996)


## SECTION F - DELIVERIES OR PERFORMANCE

**F-1    52.242-15 Stop Work Order (AUG 1989)**
**F-2    52.242-17 Government Delay of Work (APR 1984)**
**F-3    52.247-55 F.O.B. Point for Delivery of Government-Furnished Property (JUN 2003)**

## F-4    FSA 37-2 CONTINUATION OF MISSION CRITICAL CONTRACTOR SERVICES (OCT 2012)

(a)  Definition. As used in this clause—

   (1) Mission Critical Contractor System or Other Services are defined as a system or other services that have a material impact on the accomplishment of the Federal Student Aid mission.

(b) The services under this contract are vital to the mission of the Department of Education (ED). The Contractor shall be responsible for the availability of all systems operated, or other services performed by the Contractor for ED, regardless of location.  This clause applies to all or any part of the contract that includes services that directly support the agency's mission.

(c) The Contractor shall provide, implement, and maintain a Continuation of Mission Critical Services Plan (also referred to as Contingency Plan, or "The Plan") for continuing performance of services no matter the circumstances. The Plan shall describe the processes and procedures that will be followed to ensure continued availability of services under this contract. Any alternate site used as part of Disaster Recovery shall be fully operational within **48 hours** of a declared disaster.

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

The Contractor shall identify in the Plan the provisions made for the acquisition of mission critical personnel and resources, if necessary, for continuity of operations for up to 30 days or until normal operations can be resumed.

(d) The offeror shall provide with its offer a written preliminary plan describing how it will continue to perform the contractor services listed in Section C - DESCRIPTION/SPECIFICATIONS/STATEMENT OF WORK.

(e) Within **60 days** after contract award, the Contractor shall submit its Plan for approval, which shall be consistent with and further detail the approach contained in the offeror's proposal. The Plan, as approved by the Contracting Officer, shall be incorporated into the contract as a compliance document. The Plan must, at a minimum, address:

1. Name of company's officer overall responsible for the maintenance, management, exercising and execution of the Plan;
2. Plans and procedures;
3. Identification of mission critical functions;
4. The time lapse associated with the initiation of the acquisition of mission critical personnel and resources and their actual availability on site;
5. Delegations of authority, planned order of succession, and cross-training to ensure personnel are available to provide services and make key decisions;
6. Proposed alternate operating facilities, interoperable, connectivity and emergency communications approach;
7. Critical records or data storage procedures;
8. Protection of human capital;
9. Testing approach for annual tests;
10. Training plan;
11. Delegation of control and direction;
12. Reconstitution and resuming normal operations plans; and
13. Schedule for periodic review and revisions of Plan.

(f) The Contractor shall maintain and update its Plan as necessary and adhere to its requirements throughout the contract term.  The Contractor shall not materially alter the Plan without the Contracting Officer's written consent.

(g) As directed by the Contracting Officer, the Contractor shall participate and collaborate with ED and its contractors in training events, exercises, and drills associated with Government efforts to test the effectiveness of continuity of operations procedures and practices with internal and external entities. Results of the exercises shall be delivered to the Contracting Officer or other designated representative within **30 days** after the exercise.

(h) In the event the Contractor anticipates not being able to perform any of the mission critical contractor services identified in the paragraph above, the Contractor shall notify the Contracting Officer or other designated representative immediately and use its best efforts to cooperate with the Government in the Government's efforts to maintain the continuity of operations.  In no way

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

does (h) relieve the contractor of financial responsibility in meeting the contract terms and conditions.

(i) The Government reserves the right to use Federal employees of other agencies or support from other parties or to enter into new contracts for mission critical contractor services. Any new contracting efforts would be conducted in accordance with OFPP letter, "Emergency Acquisitions" May 2011 and FAR Part 18, respectively, or any other subsequent emergency guidance issued.

(j) The Contractor shall include the substance of this clause, including this paragraph (j), in subcontracts for the mission critical services.

(End of clause)

## F-5   FSA 37-3 Disruption of Mission Critical Contractor System or Other Services (SEP 2012)

(a) Definition. As used in this clause—

(1) Mission Critical Contractor System or Other Services - are defined as a system or other services that have a material impact on the accomplishment of the Federal Student Aid mission.

(b) The contractor is required to coordinate all changes to mission critical contractor systems or other services used to implement Federal Student Aid IT operations and services with the individual(s) identified in (c) at least five business days prior to the changes, absent exigent circumstances. Emergency changes require immediate notification of the individual(s) identified in (c) as soon as the charge requirement is known, but prior to the change. If the continuity of such systems or services is disrupted as a consequence of the Contractor's failure to adequately coordinate these changes with FSA, the Contractor may be subject to contractual remedies available to the government pursuant to the terms of the contract or as authorized by law.

(c) The Contractor shall contact the following individuals to coordinate all changes to mission critical contractor systems or services:

Contracting Officer and Contracting Officer's Representative

(End of Clause)

## SECTION G - CONTRACT ADMINISTRATION DATA

## G-1   FSA 32-3, Invoice and Contract Financing Requests Submission – Invoice Processing Platform (December 2017)

(a) Payments shall be rendered in accordance with the identified payment schedule(s).

(b) The contractor shall submit invoices electronically in the web-based system, Invoice Processing Platform (IPP) that can be accessed at: http://www.ipp.gov/. All submitted invoices must be accompanied by supporting documentation in accordance with the

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

contract's terms and conditions. The supporting documentation shall be submitted in the following formats: Adobe Acrobat (pdf), Microsoft Word (doc), Pictures (jpeg), Microsoft Excel (excel), or Microsoft Outlook message (msg). The invoice processing platform limits 25 attachments per invoice at 10 MB per attachment.

(c)  If the supporting documentation contains Personally Identifiable Information (PII) or Sensitive Unclassified Information, this information shall be sent to the Contracting Officer's Representative (COR), encrypted and/or password protected by email external to the IPP system.

(d) If the Contractor does not have an IPP account that was established by either the Department of Education or another Government agency, the Contractor will need to go to www.IPP.gov and select "Vendors Enroll Now" and complete enrollment.

(e) The Contractor must ensure that the "Accounts Receivable POC" Section of its SAM registration is accurate and up-to-date.

(f) Upon completion of enrollment and within ten (10) business days of the Contractor entering or updating the "Accounts Receivable POC" information within the Contractor's SAM registration, the Contractor's Designated Primary Administrator will receive an email from the IPP Customer Support Team containing the Contractor's Designated Primary Administrator's IPP username. Within 24 hours of receiving the initial email, the Contractor's Designated Primary Administrator will receive a second email containing their IPP password. Once both emails have been received, the Contractor's Designated Primary Administrator must log into IPP and complete the registration process.

(g) The Contractor's Designated Primary Administrator will be authorized to further designate other administrators under the Contractor's IPP account who may submit invoices on behalf of the Contractor.

(h) In the event that an invoice is rejected in IPP, the contractor shall make the necessary corrections and resubmit the invoice by means of IPP. Any questions, concerns, or issues regarding the use of IPP should be directed to IPP Customer Support Team, as identified at http://www.ipp.gov/

(End of clause)

## G-2    FSA 43-1 Change Request Modifications (NOV 2013)

This contract includes one or more Contract Line Item Numbers (CLINS) that will be used to fund Change Requests (CR). A CR may take the form of either a contract modification or other written documentation of the change. All CRs will be issued by a numerical sequence and date (CR95, 11/20/13) and further provide indication of the CLIN that provides an appropriation to fund the CR. In the event a CR is issued via written communication other than an SF-30 contract modification, the Contracting Officer will issue an SF-30 unilateral contract modification that summarizes all CR changes. Change request modifications issued on a more frequent basis are

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

solely at the discretion of the Contracting Officer. CR summary modifications are for administrative convenience and confer no extra rights to the parties to the contract.

(End of Clause)

## SECTION H - SPECIAL CONTRACT REQUIREMENTS

### H-1    Rights To Ensure Third Party Operation And Maintenance Of Solution

The Government shall have unlimited rights to any and all work, materials, object and source code, information, etc. necessary to ensure an independent third party could assume responsibility for operating and maintaining the solution (defined as everything necessary to successfully execute the objectives and requirements under this contract) without intervention by the contractor. It is understood that in regards to third-party commercial off-the-shelf (COTS) (includes Software as a Service subscriptions) licenses identified below, contractor will transfer the license to the Government upon delivery of the system in which COTS software forms part of the solution. The contractor will also deliver all modifications and customizations and documentation pertaining thereto as well as documentation detailing all configurations made for the solution. The Government acknowledges that it may only assume the rights afforded under those COTS software license agreements.

| Software Name | Current version used by solution | Term (perpetual or term) (Note: If term, note expiration) | Basis of license (e.g.; seat, user, etc.) | Software Vendor Name | Deliverable in which incorporated |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |

The contractor is required to include as deliverables all work, materials, information, etc. necessary to accomplish this objective. Where the Government has not specified a deliverable that is necessary for an independent third party to operate and maintain the solution without the assistance of the contractor, the contractor notes such deliverable below.

| Deliverable Name | Delivery Date |
|---|---|
|  |  |
|  |  |

The Government may order additional deliverables per FAR 52.227-16, ADDITIONAL DATA REQUIREMENTS, upon discovery of inadvertently omitted deliverables. The contractor cannot use paragraph (b) of FAR 52.227-16 to withhold limited rights data or restricted computer software that is properly deliverable under this clause.

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

This clause shall prevail over any terms and condition, caveat or assumption incorporated into this contract that is contrary to this objective.

(End of Clause)

## H-2    Testing Approach

FSA will leverage the vendor's test plan in executing its oversight and ensuring proper testing of the solution is occurring. FSA shall have access to all testing materials (e.g. scripts, testing results, etc.) for review and feedback and shall be given the capability to oversee testing in person or remotely. FSA shall have the ability to conduct side-by-side user acceptance testing with the vendor to reduce cycle times.

(End of Clause)

## H-3    Technology Business Management (TBM) Data Report

The TBM Data Report template (hereafter referred to as "report") is included as Attachment No. 23 to the contract. This Office of Management and Budget (OMB) required report shall be a quarterly deliverable under this contract. The contractor shall complete all pertinent fields of the report and provide timely delivery consistent with the instructions contained in the annual A-11 OMB Circular on the Budget Submission Requirement, specifically in the section containing the annual OMB Guidance on the Capital Planning and Investment Control (CPIC) submission requirements for Information Technology (IT) investments. The specific deliverable descriptions for the IT Towers and sub-towers and Cost Pools are found in Attachment No. 24, titled TBM Taxonomy Version 3.0.

The contractor shall review the informational materials and select the IT Towers and Cost Pools that pertain to their particular contract. Not all of the IT Towers nor all of the Cost Pools may apply to this contract. The contractor shall enter the percent (%) of total cost associated with each selected IT Tower and Cost Pool. The total of the percentages must be 100%. The contractor shall ignore the first IT Cost Pool for Internal Labor. FSA will determine that percentage and adjust the remainder of the Cost Pool percentages in order to sum the percentages to 100%.

In addition, after FSA receives this deliverable it will calculate the actual amounts using the percentages and actual total IT cost of the investment. FSA will provide the vendor the Security and Compliance actual costs so that the vendor can calculate the Cyber BDR Costs Percentages by NIST Categories deliverable.

OMB requires that the total of the IT Towers equal the total of the IT Cost Pools equal the total of the Lifecycle Cost table in the investment's business case.

(End of Clause)

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

**H-4    FSA 04-2 Records Management Requirements (NOV 2018)**

This clause applies to all contractors and subcontractors whose employees create, receive, access, or use Federal records, as defined in Title 36 Code of Federal Regulations Chapter XII Subchapter B - RECORDS MANAGEMENT (Parts 1220 - 1240), regardless of the medium in which the record exists.

1.1 Definitions

"Federal record" as defined in 44 U.S.C. § 3301, includes all recorded information, regardless of form or characteristics, made or received by a Federal agency under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency or its legitimate successor as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the United States Government or because of the informational value of data in them.

The term Federal record:
1. Includes Federal Student Aid, Department of Education records.
2. Does not include personal materials.
3. Applies to records created, received, or maintained by Contractors pursuant to their Federal Student Aid contract.
4. May include deliverables and documentation associated with deliverables.

1.2 Requirements

1.  Contractor shall comply with all applicable records management laws and regulations, as well as National Archives and Records Administration (NARA) records policies, including but not limited to the Federal Records Act (44 U.S.C. chapters. 21, 29, 31, 33), NARA regulations at 36 CFR Chapter XII Subchapter B, and those policies associated with the safeguarding of records covered by the Privacy Act of 1974 (5 U.S.C. 552a). These policies include the preservation of all records, regardless of form or characteristics, mode of transmission, or state of completion.
2.  In accordance with 36 CFR 1222.32, all data created for Government use and delivered to, or falling under the legal control of, the Government are Federal records subject to the provisions of 44 U.S.C. chapters 21, 29, 31, and 33, the Freedom of Information Act (FOIA) (5 U.S.C. 552), as amended, and the Privacy Act of 1974 (5 U.S.C. 552a), as amended and must be managed and scheduled for disposition only as permitted by statute or regulation.
3.  In accordance with 36 CFR 1222.32, Contractor shall maintain all records created for Government use or created in the course of performing the contract and/or delivered to, or under the legal control of the Government and must be managed in accordance with Federal law. Electronic records and associated metadata must be accompanied by sufficient technical documentation to permit understanding and use of the records and data.
4.  Federal Student Aid and its contractors are responsible for preventing the alienation or unauthorized destruction of records, including all forms of mutilation. Records may not be removed from the legal custody of Federal Student Aid or destroyed except for in

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

accordance with the provisions of the agency records schedules and with the written concurrence of the Head of the Contracting Activity. Willful and unlawful destruction, damage or alienation of Federal records is subject to the fines and penalties imposed by 18 U.S.C. 2701. In the event of any unlawful or accidental removal, defacing, alteration, or destruction of records, Contractor must report to Federal Student Aid. The agency must report promptly to NARA in accordance with 36 CFR 1230.

5. The Contractor shall immediately notify the appropriate Contracting Officer upon discovery of any inadvertent or unauthorized disclosures of information, data, documentary materials, records or equipment. Disclosure of non-public information is limited to authorized personnel with a need-to-know as described in the contract. The Contractor shall ensure that the appropriate personnel, administrative, technical, and physical safeguards are established to ensure the security and confidentiality of this information, data, documentary material, records and/or equipment is properly protected. The Contractor shall not remove material from Government facilities or systems, or facilities or systems operated or maintained on the Government's behalf, without the express written permission of the Head of the Contracting Activity. When information, data, documentary material, records and/or equipment is no longer required, it shall be returned to Federal Student Aid control or the Contractor must hold it until otherwise directed. Items returned to the Government shall be hand-carried, mailed, emailed, or securely electronically transmitted to the Contracting Officer or address prescribed in the contract. Destruction of records is EXPRESSLY PROHIBITED unless in accordance with Paragraph (4).

6. The Contractor is required to obtain the Contracting Officer's approval prior to engaging in any contractual relationship (sub-contractor) in support of this contract requiring the disclosure to the subcontractor of information, documentary material and/or records generated under, or relating to, the performance of this contract. The Contractor (and any sub-contractor) is required to abide by Government and Federal Student Aid guidance for protecting sensitive, proprietary information, classified, and controlled unclassified information.

7. The Contractor shall only use Government IT equipment for purposes specifically tied to or authorized by the contract and in accordance with Federal Student Aid policy.

8. The Contractor shall not create or maintain any records containing any non-public Federal Student Aid information that are not specifically tied to or authorized by the contract.

9. The Contractor shall not retain, use, sell, or disseminate copies of any deliverable that contains information covered by the Privacy Act of 1974 or that which is generally protected from public disclosure by an exemption to the Freedom of Information Act.

10. The Federal Student Aid possesses the rights to all data and records produced and delivered as part of this contract in accordance with the contract's data rights clauses and related agreements incorporated into the contract.

11. Contracts for system design and development on behalf of FSA, contracts to maintain systems on behalf of FSA or vendors using propriety systems to store federal records created on behalf of FSA must meet the requirements of  36 CFR Part 1236, Subpart B  and Subpart C (1236.10§ 1236.12, 1236.14, 1236.22, 1236.24, 1236.26, and 1236.28 for the storage of federal records in electronic format). (Detailed requirements are attached if this contract requires system design and development.)  The creation and use of electronic records in Vendor managed systems must be according to Federal regulations and FSA processes to ensure that recordkeeping functionality is developed for information systems

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

managing electronic records including an approved federal record schedule and adherence to the schedule.  New systems must determine retention periods at initiation, validate these during use changes, and implement authorized disposition instructions for system data and documentation.  Contractors must adhere to the approved record schedule, with confirmed approval from FSA to destroy records per the schedule in a NARA compliant manner.  Until a schedule is approved, all records must be retained indefinitely.

12. All Contractor employees assigned to this contract who create, work with or otherwise handle records are required to take Federal Student Aid, Department of Education provided records management training. The Contractor is responsible for confirming training has been completed by applicable individuals as follows:

a. All contractor personnel with Education email accounts or access to Education IT networks or networks with Education data *must* complete records management training within 60 days of employment and must complete annual refresher training.

b. All contractor personnel that create, receive, access, or use Federal records on behalf of the agency, regardless of whether those individuals have Education email accounts or IT network access.

c. Annual training must be completed within 60 days of receiving the training materials.

d. Attestation that all applicable staff have completed training may be sent by email to the COR with a cc: to the contracting officer, from an official authorized to communicate on behalf of the legal entity

1.3 Flow down of requirements to subcontractors

1. The Contractor shall incorporate the substance of this clause, its terms, and requirements including this paragraph, in all subcontracts for which permission is granted under paragraph 1.2.6 above.

2. The Contractor is responsible for compliance by the Subcontractor.

(End of Clause)

## H-5    Task Orders and Assignment of Accounts and Work under this IDIQ

FSA will implement Next Gen BPO through the issuance of Task Orders. These Task Orders will be priced under the common pricing of the IDIQ contract.

### Next Gen BPO Initial and Ramp-up Task Orders:

FSA will issue identical "Initial Task Orders" to all Next Gen BPO Providers under common pricing that will satisfy the minimum order under this IDIQ contract. The Initial Task Orders will require vendors to engage in activities necessary to achieve Authorization to Operate (ATO) and "Go-Live." Such activities will include but are not limited to capacity planning, a training needs assessment, requirements review and refinement, and participation in integration and design sessions. Moreover, vendors shall engage in the following activities:

- Ensuring that adequate staffing is cleared through security,
- Ensuring staff have completed the requisite training; and

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

- Ensuring that systems and facilities are operational, meet all security requirements, and can allow the vendors to perform activities to be assigned.

Vendors shall be considered "Performance-ready" when they have received an ATO, have an adequate staff with the required clearances, have facilities and systems necessary to perform work within the Next Gen Environment, and have staff that are Training-Certified. No Next Gen BPO Provider will be eligible for any type of Task Order that includes tasks under a Functional Area for which that vendor is not Performance-ready.

All Next Gen BPO Providers shall submit their application for ATO within four (4) months of the award of this IDIQ contract. FSA cannot process all ATO applications at the same time and will utilize the following objective methodology to determine which applications are handled first:

- FSA will triage ATO applications into "high quality" and "low quality" applications. "High quality" applications are those that upon initial review appear likely to be sufficient for an ATO. "Low quality" applications are those that upon initial review appear to have deficiencies that will hinder ATO. FSA will process ATOs beginning with the first received "high quality" application through the last received "high quality" application; then the first received "low quality" application through the last received "low quality" application.

FSA will collaborate with vendors to develop initial training needs, ongoing training plans, and a training schedule. FSA will establish the training necessary to support each Functional Area in the lifecycle of student financing. Vendors shall complete training modules as they become available. Once complete, vendors shall demonstrate proficiency through assessments administered by FSA and/or another Next Gen component. To be "Training-Certified" for any Functional Area, vendors shall complete the required training modules and pass the associated assessment(s) for that Functional Area. FSA will determine the minimum passing scores required to ensure the quality of service provided to FSA's customers and partners.

"Functional Areas" will align with the existing lines of business (e.g. primary audience served, primary topics addressed, etc.) outlined in Attachment No. 1 - Existing FSA Contact Centers (Non-Exhaustive). Each existing line of business will be treated as a distinct Functional Area that Performance-ready Vendors will assume over time.

Next Gen's functionality to support the various phases of the lifecycle of student financing will be enabled through iterative releases. Next Gen may not immediately support all Functional Areas and additional Functional Areas may be introduced based upon changing requirements in the lifecycle of student financing. The releases will align with the development, integration, and "Go-Live" schedules of other Next Gen components, FSA-designated processing systems, or existing legacy solutions.

FSA will begin issuing "Ramp-up Task Orders" when there are enough Performance-ready Next Gen BPO Providers for adequate competition in a Functional Area. These Task Orders will allow Next Gen BPO Providers to begin performing tasks under one or more Functional Areas in which they are Performance Ready before becoming Performance-ready in all Functional Areas. However, failing to become Performance-ready under one or more Functional Areas will result in that vendor being less competitive for Competitive Task Orders in Steady-State.

"Adequate Competition" in a Functional Area will be determined at FSA's discretion, based upon information gathered during Next Gen BPO Ramp-up as well as overall Next Gen operational goals and concerns. "Adequate Competition" may require additional vendors beyond the absolute

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

minimum required to ensure continued quality service. At a minimum, adequate competition will mean two or more vendors. As new Next Gen BPO Providers become Performance-ready, FSA will issue task orders to those vendors based on need in the order in which they became Performance-ready. Ramp-up Task Orders will have a common ending date in order to bring Next Gen BPO into Steady-State operations.

**Next Gen BPO Steady-State Task Orders:**

Steady-State Task Orders will have a common period of performance. FSA may issue Non-competitive Task Orders or award Competitive Task Orders.

"Non-competitive Task Orders" are those issued to each Next Gen BPO Provider for every Functional Area in which that vendor is Performance-ready.

Next Gen BPO Providers shall compete for "Competitive Task Orders" based on two factors: Performance-readiness across all Functional Areas and past performance in meeting or exceeding the Common Performance Standards across all Functional Areas exclusive to this contract. FSA will rank all Next Gen BPO Providers based upon their past performance and Performance-readiness. Performance-readiness in more Functional Areas significantly outweighs past performance in ranking Next Gen BPO Providers. FSA will award task orders necessary to meet its needs based upon the relative ranking of each Next Gen BPO Provider starting with the highest ranked. Maintaining Green Traffic Light Scorecard status is not a guarantee of receiving a competitive task order.

**Next Gen BPO Ramp-down Task Orders:**

In instances where a Next Gen BPO Provider must begin an orderly transfer of all its accounts it will be issued a non-competitive "Ramp-down" Task Order. Ramp-down task orders are for the purpose of winding down a Next Gen BPO Provider's business with FSA. Ramp-down task orders will provide for all tasks necessary to service the Next Gen BPO Provider's accounts until those accounts can be transferred. Next Gen BPO Providers will not be eligible for new accounts or work.

**Assignment of New Accounts and Work under Task Orders:**

Next Gen BPO Providers who have been issued a Ramp-up, Non-competitive, or Competitive Task Order are eligible to receive work and accounts under those task orders. "Work" consists of pre-disbursement tasks that are assigned on an ad hoc basis across the pool of eligible Task Order holders. "Accounts" are post-disbursement borrower accounts that are assigned to eligible Next Gen BPO Providers. When an account is assigned to a Next Gen BPO Provider, that vendor shall perform all servicing tasks under this contract for that account across the lifecycle of student financing

Next Gen BPO Providers shall be assigned new accounts and work under relevant task orders based upon their Traffic Light Scorecard status (i.e. "Green," "Yellow," or "Red"). Next Gen BPO Providers in Green status shall be assigned an equal portion of new accounts and work. All Next Gen BPO Providers in their first month of performing tasks evaluated under the Traffic Light Scorecard shall be treated as if they are in Green status.

Only Next Gen BPO Providers in Green status shall be assigned new accounts or work, except in instances where there are either no Next Gen BPO Providers in a Green status or the Next Gen BPO Providers in Green status do not have the capacity to manage new accounts or work. In such

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

instances, FSA will rank all vendors not in Green status according to the prior month's Traffic Light Scorecard. Non-Green vendors, in order of ranking, necessary to meet the capacity shortfall will be assigned new accounts and work as if those vendors were in Green status. The need for capacity beyond what Green status Next Gen BPO Providers can provide and the relative rankings of non-Green Next Gen BPO Providers will be re-evaluated monthly.

**Assignment of Legacy Accounts under Task Orders:**

FSA will assign Legacy Accounts to eligible Next Gen BPO Providers with Task Orders under which the vendor may receive accounts. Legacy Accounts will be assigned as such Legacy Accounts are transferred to FSA-designated processing systems. "Legacy Accounts" are borrower accounts that were serviced under a prior FSA servicing contact. Legacy Accounts will be assigned to provide each Next Gen BPO Provider with a roughly equal share of legacy accounts once all Legacy Accounts have been transferred to FSA. However, FSA cannot guarantee that each Next Gen BPO Provider will ultimately have an equal share of legacy accounts. Further, Next Gen BPO Providers not in Green status shall not be assigned Legacy Accounts, except in instances of insufficient capacity as described under "Assignment of New Accounts and Work under Task Orders."

(End of Clause)


**H-6 Task Order**

(a)  Task Orders for Next Gen BPO will be placed five (5) or more business days prior to the beginning of the period of performance, to the maximum extent practicable. However, in some instances, circumstances may require a rapid response and events may be initiated quickly. In such case, the Contractor shall provide the service in a timely manner to maximum extent practicable.

(b)  A Task Order will be issued by the Contracting Officer. Task Orders will be issued by e-mail. In addition to any other data that may be called for in the contract, the following information shall be specified in each Task Order:

(1)  Effective date of the Task Order;
(2)  Task Order number;
(3)  Contract number;
(4)   Government points of contact information (e.g., Government Program Manager, COR or CO);
(5)  Period of performance;
(6)  Statement of Need;
(7)  List of Government furnished material, if applicable; and
(8)  Task Order pricing arrangement including accounting and appropriation data.

(c)  Fixed Price task orders shall include the total fixed price, schedule of deliverables and payment schedule.

(End of clause)

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

**H-7     Renegotiation of Common Pricing and Performance Metrics**

The common pricing established in this IDIQ will apply to all Task Orders. FSA is committed to establishing pricing that is fair and reasonable for vendors and the Government. As a result, FSA may adjust the common pricing and performance metrics established at the time of contract award based on the following methodology:

- Sixty calendar (60) days before the conclusion of any Task Order with a commonly ending period of performance under this IDIQ, FSA will issue a data call to all Next Gen BPO Providers to establish whether new common pricing and performance metrics should be established. This excludes the Initial Task Order for Next Gen BPO implementation. FSA will evaluate the new common pricing for fair and reasonableness. If FSA determines that an adjustment in common pricing and/or performance metrics is necessary, a bilateral modification will be issued against each IDIQ contract to incorporate the revised common pricing and/or performance metrics. Pricing adjustments to existing Contract Line Item Numbers (CLINs) will not exceed plus or minus two (2) percent during any given review period. Pricing for any new CLINs will be determined as necessary and will not be subject to the 2 percent adjustment threshold. Additional or future Task Orders to continue providing contact center and back office processing support with a commonly ending period of performance will be issued under the new common pricing.
- Next Gen BPO Providers who refuse to accept a bilateral modification to this IDIQ contract to implement the revised common pricing and metrics will be ineligible for future task orders under this IDIQ except for a Ramp-down task order. In such instances, the Ramp-down Task Order will be priced under the pricing last agreed to by FSA and the Next Gen BPO Provider.

(End of Clause)

**H-8     Escalation of Common Pricing**

FSA will apply a standard escalation methodology to common pricing established under any resultant IDIQ award. The following escalation methodology is based upon the Bureau of Labor Statistics' (BLS) Employment Cost Index (ECI) for Total Compensation, Private Industry, Service Occupations (Not Seasonally Adjusted); and accounts for significant inflation and/or deflation:

- When the ECI exceeds three (3) percent (plus or minus) in any given year, the Government will adjust the established common pricing by any amount above this rate. The calculated rate of escalation will equal the average of the 12-month percent change for the previous four quarters, ending June 30th. This ECI escalation will be applied beginning in September of the same calendar year. Further, this escalation will compound for all remaining years of the Base and Optional Ordering Periods. For example, if the ECI rate released in June 20XX is 3.6%. The Government will increase unit pricing by 0.6% for the contract beginning September 1, 20XX and all remaining years of the Base Ordering Period, as well as the Optional Ordering Period. FSA will issue a bilateral modification against each IDIQ contract award to incorporate the new common pricing.

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

- A decreasing rate of inflation would follow the same pattern as above. For example, if the ECI decreases by more than 3.0%, then the unit prices for the remaining out-years will also decrease by the percentage above (3.0%). For example, if the ECI rate released in June 20XX is -4.2%., the Government will decrease unit pricing by 1.2% for the contract period beginning September 1, 20XX and all remaining years of the Base Ordering Period, as well as the Optional Ordering Period.

(End of Clause)

## H-9   FSA 16.505 Fair Opportunity Provisions – Specialized Performance Terms (JUL 2015)

(1) Fair opportunity.

(i) For orders under designated multiple-award contracts each awardee will be provided fair opportunity based upon measured performance on task orders awarded.

(ii)The contracting officer shall provide each awardee a fair opportunity to be considered for additional work, or task orders, over the guaranteed minimum task order amount as follows:

(A) The contract will specify performance metrics and procedures that will provide each awardee a fair opportunity to be considered for additional work, or task orders, during task order performance based upon the awardee's performance when measured against its competitors performing similar task orders.

(B) The fair opportunity to perform will be the mechanism for awarding additional work, or task orders above the base award amount each performance period. Each awardee has a fair opportunity to compete for additional work or Task Orders based upon the measured performance.

(C) The contract will measure performance for fair opportunity based upon the following procedures and performance metrics:

(1) Task Orders. This IDIQ contemplates Initial Task Orders, Ramp-up Task Orders, Non-competitive Task Orders, Competitive Task Orders, and Ramp-down Task Orders. All Task Orders will be priced under the common pricing.

(a) Initial Task Orders. Each Next Gen BPO IDIQ holder shall be issued an identical initial task order. The Initial Task Order shall fulfill the minimum order under this IDIQ.

(b) Ramp-Up Task Orders. Next Gen BPO Providers that have become Performance-ready may be issued Ramp-up Task Orders based upon FSA's need. Becoming Performance-ready (including ATO triage) will be the fair opportunity for vendors to compete for Ramp-up Task Orders. FSA will issue ramp-up task orders as needed to vendors in the order they have become Performance-ready for the Functional Area addressed by the Task Order.

(c) <u>Non-competitive Task Orders</u>. Non-competitive Task Orders are those that are issued to all Performance-ready Next Gen BPO Providers at the same time for the same duration.

(d) <u>Competitive Task Orders</u>. Next Gen BPO Providers shall compete for Competitive Task Orders based on two factors:  Performance-readiness across all Functional Areas and past performance in meeting or exceeding the common metrics across all Functional Areas under this contract. FSA will rank all Next Gen BPO Providers based upon their past performance and Performance-readiness. FSA will award task orders necessary to meet its needs based upon the relative ranking of each Next Gen BPO Provider starting with the highest ranked. Maintaining Green Traffic Light Scorecard status is not a guarantee of receiving a Competitive Task Order. Performance-readiness in all Functional Areas significantly outweighs past performance in ranking Next Gen BPO Providers.

(e) <u>Ramp-down Task Orders</u>. Ramp-down Task Orders will be issued in instances where a Next Gen BPO Provider must conduct an orderly transfer of all its accounts to other vendors. Next Gen BPO Providers with a Ramp-down Task Order shall not be eligible for new accounts or work.

(2) Tasks. Fair opportunity to compete for more work under a Ramp-up, Non-competitive, or Competitive Task Order will be based upon the vendor's success in meeting the common metrics under this IDIQ as described below.

(a) <u>Assignment of New Accounts and Work under Task Orders</u>:

Next Gen BPO Providers who have been issued a Ramp-up, Non-competitive, or Competitive Task Order are eligible to receive work and accounts under those task orders. "Work" consists of pre-disbursement tasks that are assigned on an ad hoc basis across the pool of eligible Task Order holders. "Accounts" are post-disbursement borrower accounts that are assigned to eligible Next Gen BPO Providers. When an account is assigned to a Next Gen BPO Provider, that vendor shall perform all servicing tasks under this contract for that account across the student finance lifecycle.

Next Gen BPO Providers shall be assigned new accounts and work under relevant task orders based upon their Traffic Light Scorecard status (i.e. "Green," "Yellow," or "Red"). Next Gen BPO Providers in Green status shall be assigned an equal portion of new accounts and work. Next Gen BPO Providers in their first month of performing tasks evaluated under the Traffic Light Scorecard, shall be treated as if they are in Green status.

Next Gen BPO Providers not in Green status shall not be assigned new accounts or work, except in instances where there are either no Next Gen BPO Providers in a Green status or the Next Gen BPO Providers in Green status do not have the capacity to manage new accounts or work. In such instances, FSA will rank all vendors not in Green status according to the prior month's Traffic Light Scorecard. A number of the top ranked non-green vendors necessary to meet the capacity shortfall will be assigned new accounts and work as if those vendors were in Green

Status. The need for capacity beyond what Green status Next Gen BPO Providers can provide and the relative rankings of non-Green Next Gen BPO Providers will be re-evaluated monthly.

(b) Assignment of Legacy Accounts under Task Orders:

FSA will assign Legacy Accounts to eligible Next Gen BPO Providers with relevant Task Order as such Legacy Accounts are transferred to FSA-designated processing system(s). "Legacy Accounts" are borrower accounts that were serviced under a prior FSA servicing contact. Legacy Accounts will be assigned to provide each Next Gen BPO Provider with a roughly equal share of legacy accounts once all Legacy Accounts have been transferred to FSA. However, FSA cannot guarantee that each Next Gen BPO Provider will ultimately have an equal share of legacy accounts. Further, Next Gen BPO Providers not in Green status shall not be assigned Legacy Accounts, except in instances of insufficient capacity as described under "Assignment of New Accounts and Work under Task Orders."

(D) If the order does not exceed the simplified acquisition threshold, the contracting officer need not contact each of the multiple awardees under the contract before selecting an order awardee if the contracting officer has information available to ensure that each awardee is provided a fair opportunity to be considered for each order. The competition requirements in FAR Part 6 and the policies in Subpart 15.3 do not apply to the ordering process.

(End of clause)

## H-10   FSA 31-1 Contractor Travel Expenses (APR 2013)

Local travel is not an authorized direct expense under this contract. Local travel is defined as travel within a 50-mile radius of the official duty station; and includes such things as regular commuting to and from the place of employment; parking, mileage, and fuel expenses; and any other items that are incidental to local travel.

Other-than-local Contractor travel may be required in performance of this contract. The Contractor shall secure authorization to travel in writing from the Contracting Officer prior to incurrence of any costs associated with other-than-local travel. Costs incurred by contractor personnel on authorized travel will be considered allowable for payment as long as the costs are reasonable and consistent with FAR Subpart 31.205-46, as follows:

I.     Costs for per diem, lodging, and incidental expenses are allowable up to the extent such costs are actual costs and do not exceed the maximum daily travel limitations effective for the city and fiscal year, as identified in the Federal Travel Regulations at http://www.gsa.gov/portal/content/104877. The costs shall be downward adjusted when travel does not take an entire day.

II.    Costs for airfare are limited to the lowest price available to the Contractor during normal business hours unless such airfare would require travel during unreasonable hours, via circuitous routing, that is not reasonably adequate to meet the traveler's medical or physical needs or that would result in unreasonable costs that would not be

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

offset by travel savings. In order for travel costs to be allowable in the above circumstances, the basis of the exception must be documented and justified.

All receipts for any travel cost incurrence, above $75, are submitted as supporting documentation, and travel expenses include the following:

a. Date and place of the travel (city, town, or other similar destination);
b. Purpose of the trip; and,
c. Name of the person who incurred the expenses, and the relationship of that person to the Contractor.

(End of Clause)

## H-11   FSA 39-5 Monthly Vendor Employee Report (AUG 2017)

The Monthly Vendor Employee Report template (hereafter referred to as "report") is included in Section J as Attachment No. 13. This report is a monthly deliverable under this contract. The contractor shall complete all fields of the report and provide timely delivery consistent with the instructions contained in the report.

(End of Clause)

## H-12   Subcontracting with Disabled and Severely Disabled Individuals

The government has preference for companies who employ disabled and severely disabled individuals and allow such individuals to support FSA remotely. Persons with blindness and other disabilities provide a ready source of capable labor. The AbilityOne Program is the largest source of employment for people who are blind or have significant disabilities in the United States. More than 550 nonprofit organizations employ these individuals and provide quality products and services to the Federal Government at a fair market price. They offer call center and helpdesk services with customer satisfaction scores and productivity levels that rival commercial call centers. These services are offered on your site, their site, or from "At-Home" agents. In addition, you may find they are able to fill many of your other service needs for this contract. We strongly encourage you to subcontract with an AbilityOne organization, or another organization that employees disabled and severely disabled individuals for at least a portion of your call center, helpdesk and other service needs.

(End of Clause)

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

**H-13   FSA Security and Compliance Costs by NIST Cost Capabilities Data Report**

The Security and Compliance Costs by NIST Cost Capabilities Data Report template (hereafter referred to as "report") is included as Attachment No. 25. This Office of Management and Budget (OMB) required report shall be delivered after contract award and then every six months in August and February, thereafter. The contractor shall complete all pertinent fields of the report and provide timely delivery consistent with this instruction.

The contractor shall review the informational materials in Attachment "26 – FSA IT Investments NIST Mapping" and select the NIST Cost Categories that pertain to their particular contract. Not all of the NIST Cost Categories may apply to this contract. The contractor shall enter the percent (%) of total cost associated with each selected NIST Capabilities Cost. The total of the percentages must be 100% of the Security and Compliance Cost Tower in the TBM Data Report deliverable.

(End of Clause)

**SECTION I – CONTRACT CLAUSES**

**I-1      52.252-2 Clauses Incorporated by Reference (FEB 1998)**

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available. Also, the full text of a clause may be accessed electronically at this/these address(es): https://www.acquisition.gov/far/

(End of Clause)

| | |
|---|---|
| **I-2** | **52.202-1 Definitions (NOV 2013)** |
| **I-3** | **52.203-3 Gratuities (APR 1984)** |
| **I-4** | **52.203-12 Limitation on Payments to Influence Certain Federal Transactions (OCT 2010)** |
| **I-5** | **52.203-14 Display of Hotline Poster(s) (OCT 2015)** |
| **I-6** | **52.203-17 Contractor Employee Whistleblower Right and Requirement to Inform Employees of Whistleblower Rights (APR 2014)** |
| **I-7** | **52.204-4 Printed or Copied Double-Sided on Postconsumer Fiber Content Paper (MAY 2011)** |
| **I-8** | **52.204-9 Personal Identity Verification of Contractor Personnel (JAN 2011)** |
| **I-9** | **52.204-13 System for Award Management Maintenance (OCT 2018)** |
| **I-10** | **52.204-14 Service Contract Reporting Requirements (OCT 2016)** |
| **I-11** | **52.209-6 Protecting the Government's Interest When Subcontracting with Contractor's Debarred, Suspended, or Proposed for Debarment (OCT 2015)** |
| **I-12** | **52.215-8 Order of Precedence – Uniform Contract Format (OCT 1997)** |
| **I-13** | **52.223-6 Drug Free Workplace (MAY 2001)** |
| **I-14** | **52.224-1 Privacy Act Notification (APR 1984)** |
| **I-15** | **52.224-2 Privacy Act (APR 1984)** |
| **I-16** | **52.227-3 Patent Indemnity (APR 1984)** |

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

**I-17    52.227-14 Rights in Data – General (MAY 2014) & Alternate II (DEC 2007)**
**I-18    52.227-16 – Additional Data Requirements (JUN 1987)**
**I-19    52.229-3 Federal, State, and Local Taxes (FEB 2013)**
**I-20    52.232-1 Payments (APR 1984)**
**I-21    52.232-8 Discounts for Prompt Payment (FEB 2002)**
**I-22    52.232-9 Limitation on Withholding of Payments (APR 1984)**
**I-23    52.232-11 Extras (APR 1984)**
**I-24    52.232-17 Interest (MAY 2014)**
**I-25    52.232-18 Availability of Funds (APR 1984)**
**I-26    52.232-23 Assignment of Claims (MAY 2014)**
**I-27    52.232-25 Prompt Payment (JAN 2017)**
**I-28    52.232-39 Unenforceability of Unauthorized Obligations (JUN 2013)**
**I-29    52.232-40 Providing Accelerated Payments to Small Business Subcontractors (DEC 2013)**
**I-30    52.233-1 Disputes (Alternate I) (DEC 1991)**
**I-31    52.237-3 Continuity of Services (JAN 1991)**
**I-32    52.242-13 Bankruptcy (JUL 1995)**
**I-33    52.243-1 Changes - Fixed Price (Alternate I) (APR 1984)**
**I-34    52.245-1 Government Property (Alternate I) (APR 2012)**
**I-35    52.245-9 Use and Charges (APR 2012)**
**I-36    52.246-25 Limitation of Liability – Services (FEB 1997)**
**I-37    52.249-2 Termination for Convenience of the Government (Fixed-Price) (APR 2012)**
**I-38    52.249-8 Default (Fixed-Price Supply and Service) (APR 1984)**
**I-39    52.253-1 Computer Generated Forms (JAN 1991)**

**I-40    52.204-21 Basic Safeguarding of Covered Contractor Information Systems (JUN 2016)**

(a) Definitions. As used in this clause—

"Covered contractor information system" means an information system that is owned or operated by a contractor that processes, stores, or transmits Federal contract information.

"Federal contract information" means information, not intended for public release, that is provided by or generated for the Government under a contract to develop or deliver a product or service to the Government, but not including information provided by the Government to the public (such as on public Web sites) or simple transactional information, such as necessary to process payments.

"Information" means any communication or representation of knowledge such as facts, data, or opinions, in any medium or form, including textual, numerical, graphic, cartographic, narrative, or audiovisual (Committee on National Security Systems Instruction (CNSSI) 4009).

"Information system" means a discrete set of information resources organized for the collection, processing, maintenance, use, sharing, dissemination, or disposition of information (44 U.S.C. 3502).

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

"Safeguarding" means measures or controls that are prescribed to protect information systems.

(b) Safeguarding requirements and procedures.

(1) The Contractor shall apply the following basic safeguarding requirements and procedures to protect covered contractor information systems. Requirements and procedures for basic safeguarding of covered contractor information systems shall include, at a minimum, the following security controls:

(i) Limit information system access to authorized users, processes acting on behalf of authorized users, or devices (including other information systems).
(ii) Limit information system access to the types of transactions and functions that authorized users are permitted to execute.
(iii) Verify and control/limit connections to and use of external information systems.
(iv) Control information posted or processed on publicly accessible information systems.
(v) Identify information system users, processes acting on behalf of users, or devices.
(vi) Authenticate (or verify) the identities of those users, processes, or devices, as a prerequisite to allowing access to organizational information systems.
(vii) Sanitize or destroy information system media containing Federal Contract Information before disposal or release for reuse.
(viii) Limit physical access to organizational information systems, equipment, and the respective operating environments to authorized individuals.
(ix) Escort visitors and monitor visitor activity; maintain audit logs of physical access; and control and manage physical access devices.
(x) Monitor, control, and protect organizational communications (i.e., information transmitted or received by organizational information systems) at the external boundaries and key internal boundaries of the information systems.
(xi) Implement subnetworks for publicly accessible system components that are physically or logically separated from internal networks.
(xii) Identify, report, and correct information and information system flaws in a timely manner.
(xiii) Provide protection from malicious code at appropriate locations within organizational information systems.
(xiv) Update malicious code protection mechanisms when new releases are available.
(xv) Perform periodic scans of the information system and real-time scans of files from external sources as files are downloaded, opened, or executed.

(2) Other requirements. This clause does not relieve the Contractor of any other specific safeguarding requirements specified by Federal agencies and departments relating to covered contractor information systems generally or other Federal safeguarding requirements for controlled unclassified information (CUI) as established by Executive Order 13556.
(c) Subcontracts. The Contractor shall include the substance of this clause, including this paragraph (c), in subcontracts under this contract (including subcontracts for the acquisition of commercial items, other than commercially available off-the-shelf items), in which the subcontractor may have Federal contract information residing in or transiting through its information system.

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

(End of clause)

## I-41   FAR 52.204-25 Prohibition on Contracting for Certain Telecommunications and Video Surveillance Services or Equipment (AUG 2019)

(a) *Definitions.* As used in this clause—

"Covered foreign country" means The People's Republic of China.

"Covered telecommunications equipment or services" means–

(1) Telecommunications equipment produced by Huawei Technologies Company or ZTE Corporation (or any subsidiary or affiliate of such entities);

(2) For the purpose of public safety, security of Government facilities, physical security surveillance of critical infrastructure, and other national security purposes, video surveillance and telecommunications equipment produced by Hytera Communications Corporation, Hangzhou Hikvision Digital Technology Company, or Dahua Technology Company (or any subsidiary or affiliate of such entities);

(3) Telecommunications or video surveillance services provided by such entities or using such equipment; or

(4) Telecommunications or video surveillance equipment or services produced or provided by an entity that the Secretary of Defense, in consultation with the Director of National Intelligence or the Director of the Federal Bureau of Investigation, reasonably believes to be an entity owned or controlled by, or otherwise connected to, the government of a covered foreign country.

"Critical technology" means–

(1) Defense articles or defense services included on the United States Munitions List set forth in the International Traffic in Arms Regulations under subchapter M of chapter I of title 22, Code of Federal Regulations;

(2) Items included on the Commerce Control List set forth in Supplement No. 1 to part 774 of the Export Administration Regulations under subchapter C of chapter VII of title 15, Code of Federal Regulations, and controlled-

(i) Pursuant to multilateral regimes, including for reasons relating to national security, chemical and biological weapons proliferation, nuclear nonproliferation, or missile technology; or

(ii) For reasons relating to regional stability or surreptitious listening;

(3) Specially designed and prepared nuclear equipment, parts and components, materials, software, and technology covered by part 810 of title 10, Code of Federal Regulations (relating to assistance to foreign atomic energy activities);

(4) Nuclear facilities, equipment, and material covered by part 110 of title 10, Code of Federal Regulations (relating to export and import of nuclear equipment and material);

(5) Select agents and toxins covered by part 331 of title 7, Code of Federal Regulations, part 121 of title 9 of such Code, or part 73 of title 42 of such Code; or

(6) Emerging and foundational technologies controlled pursuant to section 1758 of the Export Control Reform Act of 2018 (50 U.S.C. 4817).

"Substantial or essential component" means any component necessary for the proper function or performance of a piece of equipment, system, or service.

(b) *Prohibition.* Section 889(a)(1)(A) of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (Pub. L. 115-232) prohibits the head of an executive agency on or after August 13, 2019, from procuring or obtaining, or extending or renewing a contract to procure or

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

obtain, any equipment, system, or service that uses covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system. The Contractor is prohibited from providing to the Government any equipment, system, or service that uses covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system, unless an exception at paragraph (c) of this clause applies or the covered telecommunication equipment or services are covered by a waiver described in Federal Acquisition Regulation **4.2104**.

(c) *Exceptions*. This clause does not prohibit contractors from providing—

(1) A service that connects to the facilities of a third-party, such as backhaul, roaming, or interconnection arrangements; or

(2) Telecommunications equipment that cannot route or redirect user data traffic or permit visibility into any user data or packets that such equipment transmits or otherwise handles.

(d) Reporting requirement. (1) In the event the Contractor identifies covered telecommunications equipment or services used as a substantial or essential component of any system, or as critical technology as part of any system, during contract performance, or the Contractor is notified of such by a subcontractor at any tier or by any other source, the Contractor shall report the information in paragraph (d)(2) of this clause to the Contracting Officer, unless elsewhere in this contract are established procedures for reporting the information; in the case of the Department of Defense, the Contractor shall report to the website at **https://dibnet.dod.mil**. For indefinite delivery contracts, the Contractor shall report to the Contracting Officer for the indefinite delivery contract and the Contracting Officer(s) for any affected order or, in the case of the Department of Defense, identify both the indefinite delivery contract and any affected orders in the report provided at **https://dibnet.dod.mil**.

(2) The Contractor shall report the following information pursuant to paragraph (d)(1) of this clause

(i) Within one business day from the date of such identification or notification: the contract number; the order number(s), if applicable; supplier name; supplier unique entity identifier (if known); supplier Commercial and Government Entity (CAGE) code (if known); brand; model number (original equipment manufacturer number, manufacturer part number, or wholesaler number); item description; and any readily available information about mitigation actions undertaken or recommended.

(ii) Within 10 business days of submitting the information in paragraph (d)(2)(i) of this clause: any further available information about mitigation actions undertaken or recommended. In addition, the Contractor shall describe the efforts it undertook to prevent use or submission of covered telecommunications equipment or services, and any additional efforts that will be incorporated to prevent future use or submission of covered telecommunications equipment or services.

(e) *Subcontracts*. The Contractor shall insert the substance of this clause, including this paragraph (e), in all subcontracts and other contractual instruments, including subcontracts for the acquisition of commercial items.

(End of clause)

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

## I-42   FAR 52.212-4 Contract Terms and Conditions-Commercial Items (OCT 2018)

(a) *Inspection/Acceptance*. The Contractor shall only tender for acceptance those items that conform to the requirements of this contract. The Government reserves the right to inspect or test any supplies or services that have been tendered for acceptance. The Government may require repair or replacement of nonconforming supplies or reperformance of nonconforming services at no increase in contract price. If repair/replacement or reperformance will not correct the defects or is not possible, the Government may seek an equitable price reduction or adequate consideration for acceptance of nonconforming supplies or services. The Government must exercise its post-acceptance rights-

(1) Within a reasonable time after the defect was discovered or should have been discovered; and

(2) Before any substantial change occurs in the condition of the item, unless the change is due to the defect in the item.

(b) *Assignment*. The Contractor or its assignee may assign its rights to receive payment due as a result of performance of this contract to a bank, trust company, or other financing institution, including any Federal lending agency in accordance with the Assignment of Claims Act (31 U.S.C. 3727). However, when a third party makes payment (*e.g.,* use of the Governmentwide commercial purchase card), the Contractor may not assign its rights to receive payment under this contract.

(c) *Changes*. Changes in the terms and conditions of this contract may be made only by written agreement of the parties.

(d) *Disputes*. This contract is subject to 41 U.S.C. chapter 71, Contract Disputes. Failure of the parties to this contract to reach agreement on any request for equitable adjustment, claim, appeal or action arising under or relating to this contract shall be a dispute to be resolved in accordance with the clause at FAR 52.233-1, Disputes, which is incorporated herein by reference. The Contractor shall proceed diligently with performance of this contract, pending final resolution of any dispute arising under the contract.

(e) *Definitions*. The clause at FAR 52.202-1, Definitions, is incorporated herein by reference.

(f) *Excusable delays*. The Contractor shall be liable for default unless nonperformance is caused by an occurrence beyond the reasonable control of the Contractor and without its fault or negligence such as, acts of God or the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, unusually severe weather, and delays of common carriers. The Contractor shall notify the Contracting Officer in writing as soon as it is reasonably possible after the commencement of any excusable delay, setting forth the full particulars in connection therewith, shall remedy such occurrence with all reasonable dispatch, and shall promptly give written notice to the Contracting Officer of the cessation of such occurrence.

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

(g) Invoice.

(1) The Contractor shall submit an original invoice and three copies (or electronic invoice, if authorized) to the address designated in the contract to receive invoices. An invoice must include-

(i) Name and address of the Contractor;

(ii) Invoice date and number;

(iii) Contract number, line item number and, if applicable, the order number;

(iv) Description, quantity, unit of measure, unit price and extended price of the items delivered;

(v) Shipping number and date of shipment, including the bill of lading number and weight of shipment if shipped on Government bill of lading;

(vi) Terms of any discount for prompt payment offered;

(vii) Name and address of official to whom payment is to be sent;

(viii) Name, title, and phone number of person to notify in event of defective invoice; and

(ix) Taxpayer Identification Number (TIN). The Contractor shall include its TIN on the invoice only if required elsewhere in this contract.

(x) Electronic funds transfer (EFT) banking information.

(A) The Contractor shall include EFT banking information on the invoice only if required elsewhere in this contract.

(B) If EFT banking information is not required to be on the invoice, in order for the invoice to be a proper invoice, the Contractor shall have submitted correct EFT banking information in accordance with the applicable solicitation provision, contract clause (*e.g.,* 52.232-33, Payment by Electronic Funds Transfer-System for Award Management, or 52.232-34, Payment by Electronic Funds Transfer-Other Than System for Award Management), or applicable agency procedures.

(C) EFT banking information is not required if the Government waived the requirement to pay by EFT.

(2) Invoices will be handled in accordance with the Prompt Payment Act (31 U.S.C.3903) and Office of Management and Budget (OMB) prompt payment regulations at 5 CFR Part 1315.

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

(h) *Patent indemnity*. The Contractor shall indemnify the Government and its officers, employees and agents against liability, including costs, for actual or alleged direct or contributory infringement of, or inducement to infringe, any United States or foreign patent, trademark or copyright, arising out of the performance of this contract, provided the Contractor is reasonably notified of such claims and proceedings.

(i) Payment. -

(1) *Items accepted*. Payment shall be made for items accepted by the Government that have been delivered to the delivery destinations set forth in this contract.

(2) *Prompt payment*. The Government will make payment in accordance with the Prompt Payment Act (31 U.S.C.3903) and prompt payment regulations at 5 CFR Part 1315.

(3) *Electronic Funds Transfer (EFT)*. If the Government makes payment by EFT, see 52.212-5(b) for the appropriate EFT clause.

(4) *Discount*. In connection with any discount offered for early payment, time shall be computed from the date of the invoice. For the purpose of computing the discount earned, payment shall be considered to have been made on the date which appears on the payment check or the specified payment date if an electronic funds transfer payment is made.

(5) *Overpayments*. If the Contractor becomes aware of a duplicate contract financing or invoice payment or that the Government has otherwise overpaid on a contract financing or invoice payment, the Contractor shall-

(i) Remit the overpayment amount to the payment office cited in the contract along with a description of the overpayment including the-

(A) Circumstances of the overpayment (*e.g.*, duplicate payment, erroneous payment, liquidation errors, date(s) of overpayment);

(B) Affected contract number and delivery order number, if applicable;

(C) Affected line item or subline item, if applicable; and

(D) Contractor point of contact.

(ii) Provide a copy of the remittance and supporting documentation to the Contracting Officer.

(6) *Interest*.

(i) All amounts that become payable by the Contractor to the Government under this contract shall bear simple interest from the date due until paid unless paid within 30 days of becoming due. The interest rate shall be the interest rate established by the Secretary of the Treasury as provided in 41 U.S.C. 7109, which is applicable to the period in which the amount becomes due, as provided

in (i)(6)(v) of this clause, and then at the rate applicable for each six-month period as fixed by the Secretary until the amount is paid.

(ii) The Government may issue a demand for payment to the Contractor upon finding a debt is due under the contract.

(iii) *Final decisions*. The Contracting Officer will issue a final decision as required by 33.211 if–

(A)The Contracting Officer and the Contractor are unable to reach agreement on the existence or amount of a debt within 30 days;

(B) The Contractor fails to liquidate a debt previously demanded by the Contracting Officer within the timeline specified in the demand for payment unless the amounts were not repaid because the Contractor has requested an installment payment agreement; or

(C) The Contractor requests a deferment of collection on a debt previously demanded by the Contracting Officer (see 32.607-2).

(iv) If a demand for payment was previously issued for the debt, the demand for payment included in the final decision shall identify the same due date as the original demand for payment.

(v) Amounts shall be due at the earliest of the following dates:

(A) The date fixed under this contract.

(B) The date of the first written demand for payment, including any demand for payment resulting from a default termination.

(vi) The interest charge shall be computed for the actual number of calendar days involved beginning on the due date and ending on-

(A) The date on which the designated office receives payment from the Contractor;

(B) The date of issuance of a Government check to the Contractor from which an amount otherwise payable has been withheld as a credit against the contract debt; or

(C) The date on which an amount withheld and applied to the contract debt would otherwise have become payable to the Contractor.

(vii) The interest charge made under this clause may be reduced under the procedures prescribed in 32.608-2 of the Federal Acquisition Regulation in effect on the date of this contract.

(j) *Risk of loss*. Unless the contract specifically provides otherwise, risk of loss or damage to the supplies provided under this contract shall remain with the Contractor until, and shall pass to the Government upon:

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

(1) Delivery of the supplies to a carrier, if transportation is f.o.b. origin; or

(2) Delivery of the supplies to the Government at the destination specified in the contract, if transportation is f.o.b. destination.

(k) *Taxes*. The contract price includes all applicable Federal, State, and local taxes and duties.

(l) *Termination for the Government's convenience*. The Government reserves the right to terminate this contract, or any part hereof, for its sole convenience. In the event of such termination, the Contractor shall immediately stop all work hereunder and shall immediately cause any and all of its suppliers and subcontractors to cease work. Subject to the terms of this contract, the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination. The Contractor shall not be required to comply with the cost accounting standards or contract cost principles for this purpose. This paragraph does not give the Government any right to audit the Contractor's records. The Contractor shall not be paid for any work performed or costs incurred which reasonably could have been avoided.

(m) *Termination for cause*. The Government may terminate this contract, or any part hereof, for cause in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance. In the event of termination for cause, the Government shall not be liable to the Contractor for any amount for supplies or services not accepted, and the Contractor shall be liable to the Government for any and all rights and remedies provided by law. If it is determined that the Government improperly terminated this contract for default, such termination shall be deemed a termination for convenience.

(n) *Title*. Unless specified elsewhere in this contract, title to items furnished under this contract shall pass to the Government upon acceptance, regardless of when or where the Government takes physical possession.

(o) *Warranty*. The Contractor warrants and implies that the items delivered hereunder are merchantable and fit for use for the particular purpose described in this contract.

(p) *Limitation of liability*. Except as otherwise provided by an express warranty, the Contractor will not be liable to the Government for consequential damages resulting from any defect or deficiencies in accepted items.

(q) *Other compliances*. The Contractor shall comply with all applicable Federal, State and local laws, executive orders, rules and regulations applicable to its performance under this contract.

(r) *Compliance with laws unique to Government contracts.* The Contractor agrees to comply with 31 U.S.C. 1352 relating to limitations on the use of appropriated funds to influence certain Federal contracts; 18 U.S.C. 431 relating to officials not to benefit; 40 U.S.C. chapter 37, Contract Work Hours and Safety Standards; 41 U.S.C. chapter 87, Kickbacks; 41 U.S.C. 4712 and 10

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

U.S.C. 2409 relating to whistleblower protections; 49 U.S.C. 40118, Fly American; and 41 U.S.C. chapter 21 relating to procurement integrity.

(s) *Order of precedence*. Any inconsistencies in this solicitation or contract shall be resolved by giving precedence in the following order:

  (1) The schedule of supplies/services.

  (2) The Assignments, Disputes, Payments, Invoice, Other Compliances, Compliance with Laws Unique to Government Contracts, and Unauthorized Obligations paragraphs of this clause;

  (3) The clause at 52.212-5.

  (4) Addenda to this solicitation or contract, including any license agreements for computer software.

  (5) Solicitation provisions if this is a solicitation.

  (6) Other paragraphs of this clause.

  (7) The Standard Form 1449.

  (8) Other documents, exhibits, and attachments.

  (9) The specification.

(t) [Reserved]

(u) Unauthorized Obligations.

  (1) Except as stated in paragraph (u)(2) of this clause, when any supply or service acquired under this contract is subject to any End User License Agreement (EULA), Terms of Service (TOS), or similar legal instrument or agreement, that includes any clause requiring the Government to indemnify the Contractor or any person or entity for damages, costs, fees, or any other loss or liability that would create an Anti-Deficiency Act violation (31 U.S.C. 1341), the following shall govern:

    (i) Any such clause is unenforceable against the Government.

    (ii) Neither the Government nor any Government authorized end user shall be deemed to have agreed to such clause by virtue of it appearing in the EULA, TOS, or similar legal instrument or agreement. If the EULA, TOS, or similar legal instrument or agreement is invoked through an "I agree" click box or other comparable mechanism (e.g., "click-wrap" or "browse-wrap" agreements), execution does not bind the Government or any Government authorized end user to such clause.

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

(iii)Any such clause is deemed to be stricken from the EULA, TOS, or similar legal instrument or agreement.

(2) Paragraph (u)(1) of this clause does not apply to indemnification by the Government that is expressly authorized by statute and specifically authorized under applicable agency regulations and procedures.

(v) Incorporation by reference. The Contractor's representations and certifications, including those completed electronically via the System for Award Management (SAM), are incorporated by reference into the contract.

(End of clause)

### I-43    FAR 52.212-5 Contract Terms and Conditions Required to Implement Statutes or Executive Orders-Commercial Items (MAR 2020)

(a) The Contractor shall comply with the following Federal Acquisition Regulation (FAR) clauses, which are incorporated in this contract by reference, to implement provisions of law or Executive orders applicable to acquisitions of commercial items:

(1) 52.203-19, Prohibition on Requiring Certain Internal Confidentiality Agreements or Statements (JAN 2017) (section 743 of Division E, Title VII, of the Consolidated and Further Continuing Appropriations Act, 2015 (Pub. L. 113-235) and its successor provisions in subsequent appropriations acts (and as extended in continuing resolutions)).

(2) 52.204-23, Prohibition on Contracting for Hardware, Software, and Services Developed or Provided by Kaspersky Lab and Other Covered Entities (JUL 2018) (Section 1634 of Pub. L. 115-91).

(3) 52.204-25, Prohibition on Contracting for Certain Telecommunications and Video Surveillance Services or Equipment. (AUG 2019) (Section 889(a)(1)(A) of Pub. L. 115-232).

(4) 52.209-10, Prohibition on Contracting with Inverted Domestic Corporations (NOV 2015).

(5) 52.233-3, Protest After Award (AUG 1996) (31 U.S.C. 3553).

(6) 52.233-4, Applicable Law for Breach of Contract Claim (OCT 2004) (Public Laws 108-77 and 108-78 (19 U.S.C. 3805note)).

(b) The Contractor shall comply with the FAR clauses in this paragraph (b) that the Contracting Officer has indicated as being incorporated in this contract by reference to implement provisions of law or Executive orders applicable to acquisitions of commercial items:

_x_ (1) 52.203-6, Restrictions on Subcontractor Sales to the Government (SEP 2006), with Alternate I (OCT 1995) (41 U.S.C. 4704 and 10 U.S.C. 2402).

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

_x_ (2) 52.203-13, Contractor Code of Business Ethics and Conduct (OCT 2015) (41 U.S.C. 3509)).

__ (3) 52.203-15, Whistleblower Protections under the American Recovery and Reinvestment Act of 2009 (JUN 2010) (Section 1553 of Pub. L. 111-5). (Applies to contracts funded by the American Recovery and Reinvestment Act of 2009.)

_x_ (4) 52.204-10, Reporting Executive Compensation and First-Tier Subcontract Awards (OCT 2018) (Pub. L. 109-282) (31 U.S.C. 6101 note).

__ (5) [Reserved].

__ (6) 52.204-14, Service Contract Reporting Requirements (OCT 2016) (Pub. L. 111-117, section 743 of Div. C).

__ (7) 52.204-15, Service Contract Reporting Requirements for Indefinite-Delivery Contracts (OCT 2016) (Pub. L. 111-117, section 743 of Div. C).

__ (8) 52.209-6, Protecting the Government's Interest When Subcontracting with Contractors Debarred, Suspended, or Proposed for Debarment. (OCT 2015) (31 U.S.C. 6101note).

_x_ (9) 52.209-9, Updates of Publicly Available Information Regarding Responsibility Matters (OCT 2018) (41 U.S.C. 2313).

__ (10) [Reserved].

__ (11) (i) 52.219-3, Notice of HUBZone Set-Aside or Sole-Source Award (MAR 2020) (15 U.S.C.657a).

__ (ii) Alternate I (MAR 2020) of 52.219-3.

__ (12) (i) 52.219-4, Notice of Price Evaluation Preference for HUBZone Small Business Concerns (MAR 2020) (if the offeror elects to waive the preference, it shall so indicate in its offer) (15 U.S.C. 657a).

__ (ii) Alternate I (MAR 2020) of 52.219-4.

__ (13) [Reserved]

__ (14) (i) 52.219-6, Notice of Total Small Business Set-Aside (MAR 2020) (15 U.S.C.644).

__ (ii) Alternate I (MAR 2020).

__ (15) (i) 52.219-7, Notice of Partial Small Business Set-Aside (MAR 2020) (15 U.S.C. 644).

__ (ii) Alternate I (MAR 2020) of 52.219-7.

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

_x_ (16) 52.219-8, Utilization of Small Business Concerns (Oct 2018) (15 U.S.C. 637(d)(2) and (3)).

_x_ (17) (i) 52.219-9, Small Business Subcontracting Plan (Mar 2020) (15 U.S.C. 637(d)(4)).

__ (ii) Alternate I (Nov 2016) of 52.219-9.

__ (iii) Alternate II (Nov 2016) of 52.219-9.

__ (iv) Alternate III (Mar 2020) of 52.219-9.

__ (v) Alternate IV (Aug 2018) of 52.219-9

__ (18) 52.219-13, Notice of Set-Aside of Orders (Mar 2020) (15 U.S.C. 644(r)).

__ (19) 52.219-14, Limitations on Subcontracting (Mar 2020) (15 U.S.C.637(a)(14)).

_x_ (20) 52.219-16, Liquidated Damages-Subcontracting Plan (Jan 1999) (15 U.S.C. 637(d)(4)(F)(i)).

__ (21) 52.219-27, Notice of Service-Disabled Veteran-Owned Small Business Set-Aside (Mar 2020) (15 U.S.C. 657f).

__ (22) (i) 52.219-28, Post Award Small Business Program Rerepresentation (Mar 2020) (15 U.S.C. 632(a)(2)).

    (ii) Alternate I (MAR 2020) of 52.219-28.

__ (23) 52.219-29, Notice of Set-Aside for, or Sole Source Award to, Economically Disadvantaged Women-Owned Small Business Concerns (Mar 2020) (15 U.S.C. 637(m)).

__ (24) 52.219-30, Notice of Set-Aside for, or Sole Source Award to, Women-Owned Small Business Concerns Eligible Under the Women-Owned Small Business Program (Mar 2020) (15 U.S.C. 637(m)).

__ (25) 52.219-32, Orders Issued Directly Under Small Business Reserves (MAR 2020) (15 U.S.C. 644(r)).

__ (26) 52.219-33, Nonmanufacturer Rule (Mar 2020) (15 U.S.C. 637(a)(17)).

_x_ (27) 52.222-3, Convict Labor (Jun 2003) (E.O.11755).

__ (28) 52.222-19, Child Labor-Cooperation with Authorities and Remedies (Jan 2020) (E.O.13126).

_x_ (29) 52.222-21, Prohibition of Segregated Facilities (Apr 2015).

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

_x_ (30) (i) 52.222-26, Equal Opportunity (SEP 2016) (E.O.11246).

__ (ii) Alternate I (FEB 1999) of 52.222-26.

__ (31) (i) 52.222-35, Equal Opportunity for Veterans (Oct 2015) (38 U.S.C. 4212).

__ (ii) Alternate I (JUL 2014) of 52.222-35.

__ (32) (i) 52.222-36, Equal Opportunity for Workers with Disabilities (JUL 2014) (29 U.S.C.793).

__ (ii) Alternate I (JUL 2014) of 52.222-36.

_x_ (33) 52.222-37, Employment Reports on Veterans (FEB 2016) (38 U.S.C. 4212).

_x_ (34) 52.222-40, Notification of Employee Rights Under the National Labor Relations Act (DEC 2010) (E.O. 13496).

_x_ (35) (i) 52.222-50, Combating Trafficking in Persons (JAN 2019) (22 U.S.C. chapter 78 and E.O. 13627).

__ (ii) Alternate I (MAR 2015) of 52.222-50 (22 U.S.C. chapter78 and E.O. 13627).

_x_ (36) 52.222-54, Employment Eligibility Verification (OCT 2015). (Executive Order 12989). (Not applicable to the acquisition of commercially available off-the-shelf items or certain other types of commercial items as prescribed in 22.1803.)

__ (37) (i) 52.223-9, Estimate of Percentage of Recovered Material Content for EPA–Designated Items (May 2008) (42 U.S.C. 6962(c)(3)(A)(ii)). (Not applicable to the acquisition of commercially available off-the-shelf items.)

__ (ii) Alternate I (MAY 2008) of 52.223-9 (42 U.S.C. 6962(i)(2)(C)). (Not applicable to the acquisition of commercially available off-the-shelf items.)

__ (38) 52.223-11, Ozone-Depleting Substances and High Global Warming Potential Hydrofluorocarbons (Jun 2016) (E.O. 13693).

__ (39) 52.223-12, Maintenance, Service, Repair, or Disposal of Refrigeration Equipment and Air Conditioners (JUN 2016) (E.O. 13693).

__ (40) (i) 52.223-13, Acquisition of EPEAT®-Registered Imaging Equipment (JUN 2014) (E.O.s 13423 and 13514).

__ (ii) Alternate I (OCT 2015) of 52.223-13.

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

__ (41) (i) 52.223-14, Acquisition of EPEAT®-Registered Televisions (JUN 2014) (E.O.s 13423 and 13514).

__ (ii) Alternate I (Jun 2014) of 52.223-14.

__ (42) 52.223-15, Energy Efficiency in Energy-Consuming Products (DEC 2007) (42 U.S.C. 8259b).

__ (43) (i) 52.223-16, Acquisition of EPEAT®-Registered Personal Computer Products (OCT 2015) (E.O.s 13423 and 13514).

__ (ii) Alternate I (JUN 2014) of 52.223-16.

_x_ (44) 52.223-18, Encouraging Contractor Policies to Ban Text Messaging While Driving (AUG 2011) (E.O. 13513).

__ (45) 52.223-20, Aerosols (JUN 2016) (E.O. 13693).

__ (46) 52.223-21, Foams (Jun 2016) (E.O. 13693).

_x_ (47) (i) 52.224-3 Privacy Training (Jan 2017) (5 U.S.C. 552 a).

__ (ii) Alternate I (JAN 2017) of 52.224-3.

__ (48) 52.225-1, Buy American-Supplies (May 2014) (41 U.S.C. chapter 83).

__ (49) (i) 52.225-3, Buy American-Free Trade Agreements-Israeli Trade Act (MAY 2014) (41 U.S.C. chapter 83, 19 U.S.C. 3301 note, 19 U.S.C. 2112 note, 19 U.S.C. 3805 note, 19 U.S.C. 4001 note, Pub. L. 103-182, 108-77, 108-78, 108-286, 108-302, 109-53, 109-169, 109-283, 110-138, 112-41, 112-42, and 112-43.

   __ (ii) Alternate I (MAY 2014) of 52.225-3.

   __ (iii) Alternate II (MAY 2014) of 52.225-3.

   __ (iv) Alternate III (MAY 2014) of 52.225-3.

__ (50) 52.225-5, Trade Agreements (OCT 2019) (19 U.S.C. 2501, *et seq*., 19 U.S.C. 3301 note).

_x_ (51) 52.225-13, Restrictions on Certain Foreign Purchases (JUN 2008) (E.O.'s, proclamations, and statutes administered by the Office of Foreign Assets Control of the Department of the Treasury).

__ (52) 52.225-26, Contractors Performing Private Security Functions Outside the United States (Oct 2016) (Section 862, as amended, of the National Defense Authorization Act for Fiscal Year 2008; 10 U.S.C. 2302 Note).

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

__ (53) 52.226-4, Notice of Disaster or Emergency Area Set-Aside (Nov 2007) (42 U.S.C. 5150).

__ (54) 52.226-5, Restrictions on Subcontracting Outside Disaster or Emergency Area (Nov 2007) (42 U.S.C. 5150).

__ (55) 52.232-29, Terms for Financing of Purchases of Commercial Items (FEB 2002) (41 U.S.C.4505, 10 U.S.C.2307(f)).

__ (56) 52.232-30, Installment Payments for Commercial Items (Jan 2017) (41 U.S.C.4505, 10 U.S.C.2307(f)).

_x_ (57) 52.232-33, Payment by Electronic Funds Transfer-System for Award Management (OCT 2018) (31 U.S.C. 3332).

__ (58) 52.232-34, Payment by Electronic Funds Transfer-Other than System for Award Management (Jul 2013) (31 U.S.C.3332).

__ (59) 52.232-36, Payment by Third Party (MAY 2014) (31 U.S.C.3332).

_x_ (60) 52.239-1, Privacy or Security Safeguards (AUG 1996) (5 U.S.C. 552a).

__ (61) 52.242-5, Payments to Small Business Subcontractors (JAN 2017) (15 U.S.C. 637(d)(13)).

__ (62) (i) 52.247-64, Preference for Privately Owned U.S.-Flag Commercial Vessels (FEB 2006) (46 U.S.C. Appx. 1241(b) and 10 U.S.C. 2631).

   __ (ii) Alternate I (APR 2003) of 52.247-64.

   __ (iii) Alternate II (FEB 2006) of 52.247-64.

(c) The Contractor shall comply with the FAR clauses in this paragraph (c), applicable to commercial services, that the Contracting Officer has indicated as being incorporated in this contract by reference to implement provisions of law or Executive orders applicable to acquisitions of commercial items:

_x_ (1) 52.222-17, Nondisplacement of Qualified Workers (MAY 2014)(E.O. 13495).

_x_ (2) 52.222-41, Service Contract Labor Standards (AUG 2018) (41 U.S.C. chapter 67).

__ (3) 52.222-42, Statement of Equivalent Rates for Federal Hires (MAY 2014) (29 U.S.C. 206 and 41 U.S.C. chapter 67).

_x_ (4) 52.222-43, Fair Labor Standards Act and Service Contract Labor Standards-Price Adjustment (Multiple Year and Option Contracts) (AUG 2018) (29 U.S.C. 206 and 41 U.S.C. chapter 67).

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

__ (5) 52.222-44, Fair Labor Standards Act and Service Contract Labor Standards-Price Adjustment (May 2014) (29 U.S.C. 206 and 41 U.S.C. chapter 67).

__ (6) 52.222-51, Exemption from Application of the Service Contract Labor Standards to Contracts for Maintenance, Calibration, or Repair of Certain Equipment-Requirements (May 2014) (41 U.S.C. chapter 67).

__ (7) 52.222-53, Exemption from Application of the Service Contract Labor Standards to Contracts for Certain Services-Requirements (MAY 2014) (41 U.S.C. chapter 67).

_x_ (8) 52.222-55, Minimum Wages Under Executive Order 13658 (DEC 2015).

_x_ (9) 52.222-62, Paid Sick Leave Under Executive Order 13706 (JAN 2017) (E.O. 13706).

__ (10) 52.226-6, Promoting Excess Food Donation to Nonprofit Organizations (MAY 2014) (42 U.S.C. 1792).

(d) *Comptroller General Examination of Record*. The Contractor shall comply with the provisions of this paragraph (d) if this contract was awarded using other than sealed bid, is in excess of the simplified acquisition threshold, and does not contain the clause at 52.215-2, Audit and Records-Negotiation.

   (1) The Comptroller General of the United States, or an authorized representative of the Comptroller General, shall have access to and right to examine any of the Contractor's directly pertinent records involving transactions related to this contract.

   (2) The Contractor shall make available at its offices at all reasonable times the records, materials, and other evidence for examination, audit, or reproduction, until 3 years after final payment under this contract or for any shorter period specified in FAR subpart  4.7, Contractor Records Retention, of the other clauses of this contract. If this contract is completely or partially terminated, the records relating to the work terminated shall be made available for 3 years after any resulting final termination settlement. Records relating to appeals under the disputes clause or to litigation or the settlement of claims arising under or relating to this contract shall be made available until such appeals, litigation, or claims are finally resolved.

   (3) As used in this clause, records include books, documents, accounting procedures and practices, and other data, regardless of type and regardless of form. This does not require the Contractor to create or maintain any record that the Contractor does not maintain in the ordinary course of business or pursuant to a provision of law.

(e) (1) Notwithstanding the requirements of the clauses in paragraphs (a), (b), (c), and (d) of this clause, the Contractor is not required to flow down any FAR clause, other than those in this paragraph (e)(1) in a subcontract for commercial items. Unless otherwise indicated below, the extent of the flow down shall be as required by the clause-

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

(i) 52.203-13, Contractor Code of Business Ethics and Conduct (Oct 2015) (41 U.S.C. 3509).

(ii) 52.203-19, Prohibition on Requiring Certain Internal Confidentiality Agreements or Statements (Jan 2017) (section 743 of Division E, Title VII, of the Consolidated and Further Continuing Appropriations Act, 2015 (Pub. L. 113-235) and its successor provisions in subsequent appropriations acts (and as extended in continuing resolutions)).

(iii) 52.204-23, Prohibition on Contracting for Hardware, Software, and Services Developed or Provided by Kaspersky Lab and Other Covered Entities (Jul 2018) (Section 1634 of Pub. L. 115-91).

(iv) 52.204-25, Prohibition on Contracting for Certain Telecommunications and Video Surveillance Services or Equipment. (Aug 2019) (Section 889(a)(1)(A) of Pub. L. 115-232).

(v) 52.219-8, Utilization of Small Business Concerns (Oct 2018) (15 U.S.C.637(d)(2) and (3)), in all subcontracts that offer further subcontracting opportunities. If the subcontract (except subcontracts to small business concerns) exceeds $700,000 ($1.5 million for construction of any public facility), the subcontractor must include 52.219-8 in lower tier subcontracts that offer subcontracting opportunities.

(vi) 52.222-17, Nondisplacement of Qualified Workers (May 2014) (E.O. 13495). Flow down required in accordance with paragraph (l) of FAR clause 52.222-17.

(vii) 52.222-21, Prohibition of Segregated Facilities (Apr 2015).

(viii) 52.222-26, Equal Opportunity (Sep 2015) (E.O.11246).

(ix) 52.222-35, Equal Opportunity for Veterans (Oct 2015) (38 U.S.C.4212).

(x) 52.222-36, Equal Opportunity for Workers with Disabilities (Jul 2014) (29 U.S.C.793).

(xi) 52.222-37, Employment Reports on Veterans (Feb 2016) (38 U.S.C.4212)

(xii) 52.222-40, Notification of Employee Rights Under the National Labor Relations Act (Dec 2010) (E.O. 13496). Flow down required in accordance with paragraph (f) of FAR clause 52.222-40.

(xiii) 52.222-41, Service Contract Labor Standards (Aug 2018) (41 U.S.C. chapter 67).

(xiv) (A) 52.222-50, Combating Trafficking in Persons (Jan 2019) (22 U.S.C. chapter 78 and E.O 13627).

(B) Alternate I (Mar 2015) of 52.222-50(22 U.S.C. chapter 78 and E.O 13627).

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

(xv) 52.222-51, Exemption from Application of the Service Contract Labor Standards to Contracts for Maintenance, Calibration, or Repair of Certain Equipment-Requirements (May 2014) (41 U.S.C. chapter 67).

(xvi) 52.222-53, Exemption from Application of the Service Contract Labor Standards to Contracts for Certain Services-Requirements (MAY 2014) (41 U.S.C. chapter 67).

(xvii) 52.222-54, Employment Eligibility Verification (OCT 2015) (E.O. 12989).

(xviii) 52.222-55, Minimum Wages Under Executive Order 13658 (DEC 2015).

(xix) 52.222-62, Paid Sick Leave Under Executive Order 13706 (JAN 2017) (E.O. 13706).

(xx) (A) 52.224-3, Privacy Training (Jan 2017) (5 U.S.C. 552a).

(B) Alternate I (JAN 2017) of 52.224-3.

(xxi) 52.225-26, Contractors Performing Private Security Functions Outside the United States (OCT 2016) (Section 862, as amended, of the National Defense Authorization Act for Fiscal Year 2008; 10 U.S.C. 2302 Note).

(xxii) 52.226-6, Promoting Excess Food Donation to Nonprofit Organizations (MAY 2014) (42 U.S.C. 1792). Flow down required in accordance with paragraph (e) of FAR clause 52.226-6.

(xxiii) 52.247-64, Preference for Privately Owned U.S.-Flag Commercial Vessels (FEB 2006) (46 U.S.C. Appx.1241(b) and 10 U.S.C.2631). Flow down required in accordance with paragraph (d) of FAR clause 52.247-64.

(2) While not required, the Contractor may include in its subcontracts for commercial items a minimal number of additional clauses necessary to satisfy its contractual obligations.

(End of clause)

**I-44    52.216-18 Ordering (OCT 1995)**

(a) Any supplies and services to be furnished under this contract shall be ordered by issuance of delivery orders or task orders by the individuals or activities designated in the Schedule. Such orders may be issued from date of award through three (3) years after award, plus any optional ordering periods exercised, plus any extension of services.

(b) All delivery orders or task orders are subject to the terms and conditions of this contract. In the event of conflict between a delivery order or task order and this contract, the contract shall control.

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

(c) If mailed, a delivery order or task order is considered "issued" when the Government deposits the order in the mail. Orders may be issued orally, by facsimile, or by electronic commerce methods only if authorized in the Schedule.

(End of Clause)

### I-45    52.216-19 Order Limitations (OCT 1995)

(a) Minimum order. When the Government requires supplies or services covered by this contract in an amount of less than $1,500,000.00, the Government is not obligated to purchase, nor is the Contractor obligated to furnish, those supplies or services under the contract.
(b) Maximum order. The Contractor is not obligated to honor --
(1) Any order for a single item in excess of $1,700,000,000.00;
(2) Any order for a combination of items in excess of $1,700,000,000.00; or
(3) A series of orders from the same ordering office within **2,190** days that together call for quantities exceeding the limitation in subparagraph (b)(1) or (2) of this section.
(c) If this is a requirements contract (i.e., includes the Requirements clause at subsection 52.216-21 of the Federal Acquisition Regulation (FAR)), the Government is not required to order a part of any one requirement from the Contractor if that requirement exceeds the maximum-order limitations in paragraph (b) of this section.

(d) Notwithstanding paragraphs (b) and (c) of this section, the Contractor shall honor any order exceeding the maximum order limitations in paragraph (b), unless that order (or orders) is returned to the ordering office within **One (1)** days after issuance, with written notice stating the Contractor's intent not to ship the item (or items) called for and the reasons. Upon receiving this notice, the Government may acquire the supplies or services from another source.

(End of Clause)

### I-46    52.216-22 Indefinite Quantity (OCT 1995)

(a) This is an indefinite-quantity contract for the supplies or services specified, and effective for the period stated, in the Schedule. The quantities of supplies and services specified in the Schedule are estimates only and are not purchased by this contract.

(b) Delivery or performance shall be made only as authorized by orders issued in accordance with the Ordering clause. The Contractor shall furnish to the Government, when and if ordered, the supplies or services specified in the Schedule up to and including the quantity designated in the Schedule as the "maximum." The Government shall order at least the quantity of supplies or services designated in the Schedule as the "minimum."

(c) Except for any limitations on quantities in the Order Limitations clause or in the Schedule, there is no limit on the number of orders that may be issued. The Government may issue orders requiring delivery to multiple destinations or performance at multiple locations.

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

(d) Any order issued during the effective period of this contract and not completed within that period shall be completed by the Contractor within the time specified in the order. The contract shall govern the Contractor's and Government's rights and obligations with respect to that order to the same extent as if the order were completed during the contract's effective period; provided, that the Contractor shall not be required to make any deliveries under this contract after 2 years from the expiration of the IDIQ.

(End of Clause)

### I-47    52.217-8 Option to Extend Services (NOV 1999)

The Government may require continued performance of any services within the limits and at the rates specified in the contract. These rates may be adjusted only as a result of revisions to prevailing labor rates provided by the Secretary of Labor. The option provision may be exercised more than once, but the total extension of performance hereunder shall not exceed 6 months. The Contracting Officer may exercise the option by written notice to the Contractor within **15 days** before the end of the contract period of performance.

(End of Clause)

### I-48    52.217-9 Option to Extend the Term of the Contract (MAR 2000)

(a) The Government may extend the term of this contract by written notice to the Contractor within **15 days** before the end of the contract period of performance; provided that the Government gives the Contractor a preliminary written notice of its intent to extend at least **30 days** before the contract expires. The preliminary notice does not commit the Government to an extension.

(b) If the Government exercises this option, the extended contract shall be considered to include this option clause.

(c) The total duration of this contract, including the exercise of any options under this clause, shall not exceed **6 years and 6 months**.

(End of Clause)

### I-49    52.219-28 Post-Award Small Business Program Representation (MAY 2020)

(a) *Definitions*. As used in this clause—

*Long-term contract* means a contract of more than five years in duration, including options. However, the term does not include contracts that exceed five years in duration because the period of performance has been extended for a cumulative period not to exceed six months under the clause at 52.217-8, Option to Extend Services, or other appropriate authority.

*Small business concern* means a concern, including its affiliates, that is independently owned and operated, not dominant in the field of operation in which it is bidding on Government contracts,

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

and qualified as a small business under the criteria in 13 CFR part 121 and the size standard in paragraph (d) of this clause. Such a concern is "not dominant in its field of operation" when it does not exercise a controlling or major influence on a national basis in a kind of business activity in which a number of business concerns are primarily engaged. In determining whether dominance exists, consideration shall be given to all appropriate factors, including volume of business, number of employees, financial resources, competitive status or position, ownership or control of materials, processes, patents, license agreements, facilities, sales territory, and nature of business activity.

(b) If the Contractor represented that it was any of the small business concerns identified in 19.000(a)(3) prior to award of this contract, the Contractor shall represent its size and socioeconomic status according to paragraph (f) of this clause or, if applicable, paragraph (h) of this clause, upon occurrence of any of the following:

(1) Within 30 days after execution of a novation agreement or within 30 days after modification of the contract to include this clause, if the novation agreement was executed prior to inclusion of this clause in the contract.

(2) Within 30 days after a merger or acquisition that does not require a novation or within 30 days after modification of the contract to include this clause, if the merger or acquisition occurred prior to inclusion of this clause in the contract.

(3) For long-term contracts-

(i) Within 60 to 120 days prior to the end of the fifth year of the contract; and

(ii) Within 60 to 120 days prior to the date specified in the contract for exercising any option thereafter.

(c) If the Contractor represented that it was any of the small business concerns identified in 19.000(a)(3) prior to award of this contract, the Contractor shall rerepresent its size and socioeconomic status according to paragraph (f) of this clause or, if applicable, paragraph (h) of this clause, when the Contracting Officer explicitly requires it for an order issued under a multiple-award contract.

(d) The Contractor shall rerepresent its size status in accordance with the size standard in effect at the time of this rerepresentation that corresponds to the North American Industry Classification System (NAICS) code(s) assigned to this contract. The small business size standard corresponding to this NAICS code(s) can be found at https://www.sba.gov/document/support--table-size-standards.

(e) The small business size standard for a Contractor providing a product which it does not manufacture itself, for a contract other than a construction or service contract, is 500 employees.

(f) Except as provided in paragraph (h) of this clause, the Contractor shall make the representation(s) required by paragraph (b) and (c) of this clause by validating or updating all its

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

representations in the Representations and Certifications section of the System for Award Management (SAM) and its other data in SAM, as necessary, to ensure that they reflect the Contractor's current status. The Contractor shall notify the contracting office in writing within the timeframes specified in paragraph (b) of this clause, or with its offer for an order (see paragraph (c) of this clause), that the data have been validated or updated, and provide the date of the validation or update.

(g) If the Contractor represented that it was other than a small business concern prior to award of this contract, the Contractor may, but is not required to, take the actions required by paragraphs (f) or (h) of this clause.

(h) If the Contractor does not have representations and certifications in SAM, or does not have a representation in SAM for the NAICS code applicable to this contract, the Contractor is required to complete the following representation and submit it to the contracting office, along with the contract number and the date on which the representation was completed:

(1) The Contractor represents that it □ is, □ is not a small business concern under NAICS Code _____ assigned to contract number _____.

(2) [ *Complete only if the Contractor represented itself as a small business concern in paragraph (h)(1) of this clause.*] The Contractor represents that it □ is, □ is not, a small disadvantaged business concern as defined in 13 CFR 124.1002.

(3) [ *Complete only if the Contractor represented itself as a small business concern in paragraph (h)(1) of this clause.*] The Contractor represents that it □ is, □ is not a women-owned small business concern.

(4) Women-owned small business (WOSB) concern eligible under the WOSB Program. [*Complete only if the Contractor represented itself as a women-owned small business concern in paragraph (h)(3) of this clause.*] The Contractor represents that—

(i) It □ is, □ is not a WOSB concern eligible under the WOSB Program, has provided all the required documents to the WOSB Repository, and no change in circumstances or adverse decisions have been issued that affects its eligibility; and

(ii) It □ is, □ is not a joint venture that complies with the requirements of 13 CFR part 127, and the representation in paragraph (h)(4)(i) of this clause is accurate for each WOSB concern eligible under the WOSB Program participating in the joint venture. *[The Contractor shall enter the name or names of the WOSB concern eligible under the WOSB Program and other small businesses that are participating in the joint venture:_____.]* Each WOSB concern eligible under the WOSB Program participating in the joint venture shall submit a separate signed copy of the WOSB representation.

(5) Economically disadvantaged women-owned small business (EDWOSB) concern. [*Complete only if the Contractor represented itself as a women-owned small business concern eligible under the WOSB Program in (h)(4) of this clause.* ] The Contractor represents that—

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

(i) It □ is, □ is not an EDWOSB concern eligible under the WOSB Program, has provided all the required documents to the WOSB Repository, and no change in circumstances or adverse decisions have been issued that affects its eligibility; and

(ii) It □ is, □ is not a joint venture that complies with the requirements of 13 CFR part 127, and the representation in paragraph (h)(5)(i) of this clause is accurate for each EDWOSB concern participating in the joint venture. [The Contractor shall enter the name or names of the EDWOSB concern and other small businesses that are participating in the joint venture: _____.] Each EDWOSB concern participating in the joint venture shall submit a separate signed copy of the EDWOSB representation.

(6) [ *Complete only if the Contractor represented itself as a small business concern in paragraph (h)(1) of this clause.*] The Contractor represents that it □ is, □ is not a veteran-owned small business concern.

(7) [ *Complete only if the Contractor represented itself as a veteran-owned small business concern in paragraph (h)(6) of this clause.*] The Contractor represents that it □ is, □ is not a service-disabled veteran-owned small business concern.

(8) [ *Complete only if the Contractor represented itself as a small business concern in paragraph (h)(1) of this clause.*] The Contractor represents that—

(i) It □ is, □ is not a HUBZone small business concern listed, on the date of this representation, on the List of Qualified HUBZone Small Business Concerns maintained by the Small Business Administration, and no material changes in ownership and control, principal office, or HUBZone employee percentage have occurred since it was certified in accordance with 13 CFR part 126; and

(ii) It □ is, □ is not a HUBZone joint venture that complies with the requirements of 13 CFR part 126, and the representation in paragraph (h)(8)(i) of this clause is accurate for each HUBZone small business concern participating in the HUBZone joint venture. *[The Contractor shall enter the names of each of the HUBZone small business concerns participating in the HUBZone joint venture: _____.]* Each HUBZone small business concern participating in the HUBZone joint venture shall submit a separate signed copy of the HUBZone representation.

[*Contractor to sign and date and insert authorized signer's name and title.*]

(End of clause)

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

**I-50     52.222-35 Equal Opportunity Veterans (OCT 2015)**

(a) *Definitions*. As used in this clause--

"Active duty wartime or campaign badge veteran," "Armed Forces service medal veteran," "disabled veteran," "protected veteran," "qualified disabled veteran,' and "recently separated veteran" have the meanings given at FAR 22.1301.

(b) *Equal opportunity clause*. The Contractor shall abide by the requirements of the equal opportunity clause at 41 CFR 60-300.5(a), as of March 24, 2014. This clause prohibits discrimination against qualified protected veterans and requires affirmative action by the Contractor to employ and advance in employment qualified protected veterans.

(c) Subcontracts. The Contractor shall insert the terms of this clause in subcontracts of $150,000 or more unless exempted by rules, regulations, or orders of the Secretary of Labor. The Contractor shall act as specified by the Director, Office of Federal Contract Compliance Programs, to enforce the terms, including action for noncompliance. Such necessary changes in language may be made as shall be appropriate of identify properly the parties and their undertakings.

(End of Clause)

**I-51     52.222-36 Equal Opportunity for Workers with Disabilities (JUL 2014)**

(a) *Equal opportunity clause.* The Contractor shall abide by the requirements of the equal opportunity clause at 41 CFR 60.741.5(a), as of March 24, 2014. This clause prohibits discrimination against qualified individuals on the basis of disability and requires affirmative action by the Contractor to employ and advance in employment qualified individuals with disabilities.

(b) *Subcontracts.* The Contractor shall include the terms of this clause in every subcontract or purchase order in excess of $15,000 unless exempted by rules, regulations, or orders of the Secretary, so that such provisions will be binding upon each subcontractor or vendor. The Contractor shall act as specified by the Director, Office of Federal Contract Compliance Programs of the U.S. Department of Labor, to enforce the terms, including action for noncompliance. Such necessary changes in language may be made as shall be appropriate to identify properly the parties and their undertakings.

(End of Clause)

**I-52     52.239-70 Access to contractor and subcontractor information systems and related resources in carrying out privacy and information security inspections (DEVIATION)**

(a) *Privacy and security inspections*. In accordance with the terms of this contract and as authorized by law, the Government carries out a program of privacy and information security

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

inspections. Such inspections may be undertaken for various purposes, including but not limited to:

(1) Examination of the security of federal information systems or of contractor information systems that process, store or transmit Government data, Government-related data, or controlled unclassified information, or which provide security protection for such systems (including vulnerability testing);

(2) Information Technology security reviews;

(3) Investigation and audit of administrative, technical, and physical safeguards taken to protect against threats and hazards to the integrity, confidentiality, and availability of Government data, Government-related data, or controlled unclassified information, or to the function of computer systems operated on behalf of the Government;

(4) Review of contractor policies, procedures and practices for handling Government data, Government-related data, controlled unclassified information and other sensitive data;

(5) Investigation of incidents involving actual or suspected improper releases of information (including cyber security incident response and reporting);

(6) Conduct of forensic analyses, investigation of computer crime, or the preservation of evidence of computer crime; or

(7) Review of the contractor's performance for compliance with the terms and conditions in the contract governing privacy and the security of information and information systems.

(b) *Requirement to provide access to information systems and related resources*. The contractor shall afford the Government, any Federal agency and its subcomponents including the Office of Inspector General, the Comptroller General of the United States, and their authorized third-party representatives, full and timely access to contractor information systems and related resources to the extent required to carry out privacy and information security inspections. The contractor resources to which Government inspectors shall have access shall include the contractor's installations, facilities, infrastructure, data centers, equipment (including but not limited to all servers, computing devices, and portable media), operations, documentation (whether in electronic, paper, or other forms) including full and complete certification and accreditation records, databases, and personnel used in the performance of this contract.

In the case of security audits, access shall be provided to all systems, components, network devices, virtualized devices, and the like, for the purposes of evaluating the security postures and controls implemented to prevent unauthorized access, modification, or destruction to Government data and systems. In addition, the contractor shall provide the Government the following information upon request:

(1) any or all user-ids;

(2) any or all system and/or database administrator passwords used for the operation and maintenance of the system or environment, and

(3) security credentials, encryption keys, security algorithms, and the like;

to the extent needed to allow unfettered access to conduct a security audit or other privacy or information security inspection specified by the Government. The contractor shall also provide the Government access to all user passwords and all password files to the extent necessary to validate the contractor's password policy. The contractor agrees to provide user ids and

passwords regardless of whether the user is a Federal employee or not, so long as the user works in support of a Government contract or may have access to Government data or Government related data.

In addition to providing such access, the contractor agrees to fully cooperate with the Government in its conduct of privacy and information security inspections. That cooperation shall include, among other things, timely and complete production of data, metadata, information, and records, and making employees of the contractor available for interview upon request. Cooperation also includes allowing the Government to make reproductions or copies of information and equipment, including, if necessary, collecting a machine or system image capture.

What constitutes "timely" access for purposes of compliance with this clause will depend on the circumstances surrounding the inspection being performed, the urgency of the matter under inspection, the procedures governing the inspection, logistical considerations, and other factors. In some cases, such as when investigating an on-going cyber security breach, access may be required within minutes of the Government's request. In other cases, access provided by the contractor within a few days of a request may be acceptable. In the event of an information security incident, including, but not limited to, incidents involving the loss or potential loss of Personally Identifiable information in physical or electronic form, the contractor must respond (as required by other provisions of this contract, Departmental Directive OM: 6-107 "External Breach Notification Policy and Plan" and Handbook OCIO-14 "Handbook for Information Security Incident Response and Reporting Procedures" within specified time frames. Access to the contractor and subcontractor's information systems under this clause shall be provided when, and as necessary, to meet any applicable information security incident response times.

(c) *Access to subcontractor information systems and related resources and clause flow-down.* Access shall also be provided to information systems and related resources of subcontractors at any tier that are providing information technology which requires security of information technology, and/or is designing, developing, or operating a system of records using commercial information technology services or support services. The fact that an information system is owned or operated by a subcontractor shall not excuse the prime contractor from ensuring full and timely access to such information systems and related resources to the extent necessary to conduct privacy and information security inspections under this contract or as authorized by law. The contractor shall ensure that it retains operational and configurational control over any information system (whether operated by the contractor or a subcontractor) as needed to conduct privacy and information security inspections.

The Contractor shall include the substance of this clause, including this paragraph (c), in all subcontracts, including subcontracts for commercial items.

(d) *Cost of compliance.* The aforementioned access and cooperation shall be provided by the contractor at no additional cost to the Government. However, if a Government inspection unduly delays the contractor's performance of the contract, the Contracting Officer may grant a contractor's request for a non-compensable delay, as appropriate and provided the contractor submits information adequate to support the request.

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

(e) *Access to information systems where a cloud or a co-mingled data environment is used.* When the contractor will perform all or part of the work using commercial cloud computing services (whether directly or through a subcontract), or where Government data, Government related data or controlled unclassified information will be comingled with non-Government data, the contractor shall ensure that appropriate measures and controls are in place to allow Government inspectors to search the information systems and access information needed to conduct required privacy and information security inspections. The contractor may choose to create (at no cost to the Government) a segregated data space where inspections may take place without undue interference with non-Government data. However, the fact that Government data and non-Government data is co-mingled in the contractor's information system shall not excuse the contractor from affording the Government full and timely access and cooperation as needed to conduct privacy and information security inspections.

The Government shall protect against the unauthorized use or release of information obtained from the Contractor (or derived from information obtained from the Contractor) under this clause that includes Contractor proprietary information. To the extent practicable, the Contractor shall identify and mark proprietary information. In making an authorized release of such information, the Government will implement appropriate procedures to minimize the Contractor proprietary information that is included in such authorized release, seeking to include only that information that is necessary for the authorized purpose(s) for which the information is being released

(f) *Miscellaneous.* The access obligations under this clause will survive the expiration or termination of this contract, and this term is not to be less than 3 years following the final disposition and close out of the contract.

(g) *Remedies for breach.* A breach of the obligations or restrictions set forth in this clause may subject the Contractor to a Termination for Default, in addition to any other appropriate remedies under the contract.

(h) *Relation to other requirements.* The requirements of this clause are in addition to those required by any other inspection or audit clause of this contract. To the extent that requirements imposed by Federal law, regulation, Executive Orders, Office of Management and Budget (OMB) guidance, or standards promulgated by the National Institute of Standards and Technology (NIST) are in direct and irreconcilable conflict with the requirements of this clause, those other requirements, standards, laws, or regulations shall take precedence.

In conducting its security testing the Government intends to follow *NIST Special Publication 800-115 Technical Guide to Information Security Testing and Assessment* and other appropriate testing and assessment standards. Further, the Contractor agrees to negotiate in good faith rules of engagement and other supplementary agreements to govern specific privacy and information security inspections, with the goal of ensuring access necessary to conduct such inspections while protecting the contractor's property and other interests. Any such rules of engagement and supplementary agreements are incorporated into this contract to the extent not inconsistent with the terms of this clause.

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

(End of Clause)

## I-53   3452.201-70 Contracting Officer's Representative (COR) (MAR 2011)

(a) The Contracting Officer's Representative (COR) is responsible for the technical aspects of the project, technical liaison with the contractor, and any other responsibilities that are specified in the contract. These responsibilities include inspecting all deliverables, including reports, and recommending acceptance or rejection to the contracting officer.

(b) The COR is not authorized to make any commitments or otherwise obligate the Government or authorize any changes that affect the contract price, terms, or conditions. Any contractor requests for changes shall be submitted in writing directly to the contracting officer or through the COR. No such changes shall be made without the written authorization of the contracting officer.

The COR's name and contact information:

**Mr. Mark Wise**
Information Technology Specialist
Dept. of Education, Federal Student Aid
Office: (202) 377-3142
Mobile: (202) 280-9501
Email: Mark.Wise@ed.gov

(d) The COR may be changed by the Government at any time, but notification of the change, including the name and address of the successor COR, will be provided to the contractor by the contracting officer in writing.

(End of Clause)

## I-54   3452.202-1 Definitions – Department of Education (MAR 2011)

(a) The definitions at FAR 2.101 are appended with those contained in Education Department Acquisition Regulations (EDAR) 3402.101.

(b) The EDAR is available via the Internet at
https://www2.ed.gov/policy/fund/reg/clibrary/edar.html

(End of Clause)

## I-55   3452.208-71 Printing (MAR 2011)

Unless otherwise specified in this contract, the contractor shall not engage in, nor subcontract for, any printing (as that term is defined in Title I of the Government Printing and Binding Regulations in effect on the effective date of this contract) in connection with the performance of work under this contract; except that performance involving the duplication of fewer than 5,000 units of any one page, or fewer than 25,000 units in the aggregate of multiple pages, shall not be deemed to be

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

printing. A unit is defined as one side of one sheet, one color only (with black counting as a color), with a maximum image size of 103/4by 141/4inches on a maximum paper size of 11 by 17 inches. Examples of counting the number of units: black plus one additional color on one side of one page counts as two units. Three colors (including black) on two sides of one page count as six units.

(End of Clause)

**I-56    3452.224-70 Release of Information under the Freedom of Information Act (MAR 2011)**

By entering into a contract with the Department of Education, the contractor, without regard to proprietary markings, approves the release of the entire contract and all related modifications and task orders including, but not limited to:

(1) Unit prices, including labor rates;

(2) Statements of Work/Performance Work Statements generated by the contractor;

(3) Performance requirements, including incentives, performance standards, quality levels, and service level agreements;

(4) Reports, deliverables, and work products delivered in performance of the contract (including quality of service, performance against requirements/standards/service level agreements);

(5) Any and all information, data, software, and related documentation first provided under the contract;

(6) Proposals or portions of proposals incorporated by reference; and

(7) Other terms and conditions.

(End of Clause)

**I-57    3452.209-71 Conflict of Interest (MAR 2011)**

(a)(1) The contractor, subcontractor, employee, or consultant, has certified that, to the best of its knowledge and belief, there are no relevant facts or circumstances that could give rise to an organizational or personal conflict of interest ( *see* FAR Subpart 9.5 for organizational conflicts of interest) (or apparent conflict of interest) for the organization or any of its staff, and that the contractor, subcontractor, employee, or consultant has disclosed all such relevant information if such a conflict of interest appears to exist to a reasonable person with knowledge of the relevant facts (or if such a person would question the impartiality of the contractor, subcontractor, employee, or consultant). Conflicts may arise in the following situations:

(i) *Unequal access to information* —A potential contractor, subcontractor, employee, or consultant has access to non-public information through its performance on a government contract.

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

(ii) *Biased ground rules* —A potential contractor, subcontractor, employee, or consultant has worked, in one government contract, or program, on the basic structure or ground rules of another government contract.

(iii) *Impaired objectivity* —A potential contractor, subcontractor, employee, or consultant, or member of their immediate family (spouse, parent, or child) has financial or other interests that would impair, or give the appearance of impairing, impartial judgment in the evaluation of government programs, in offering advice or recommendations to the government, or in providing technical assistance or other services to recipients of Federal funds as part of its contractual responsibility. "Impaired objectivity" includes but is not limited to the following situations that would cause a reasonable person with knowledge of the relevant facts to question a person's objectivity:

(A) Financial interests or reasonably foreseeable financial interests in or in connection with products, property, or services that may be purchased by an educational agency, a person, organization, or institution in the course of implementing any program administered by the Department;

(B) Significant connections to teaching methodologies that might require or encourage the use of specific products, property, or services; or

(C) Significant identification with pedagogical or philosophical viewpoints that might require or encourage the use of a specific curriculum, specific products, property, or services.

(2) Offerors must provide the disclosure described above on any actual or potential conflict (or apparent conflict of interest) of interest regardless of their opinion that such a conflict or potential conflict (or apparent conflict of interest) would not impair their objectivity.

(3) In a case in which an actual or potential conflict (or apparent conflict of interest) is disclosed, the Department will take appropriate actions to eliminate or address the actual or potential conflict (or apparent conflict of interest), including but not limited to mitigating or neutralizing the conflict, when appropriate, through such means as ensuring a balance of views, disclosure with the appropriate disclaimers, or by restricting or modifying the work to be performed to avoid or reduce the conflict. In this clause, the term "potential conflict" means reasonably foreseeable conflict of interest.

(b) The contractor, subcontractor, employee, or consultant agrees that if "impaired objectivity", or an actual or potential conflict of interest (or apparent conflict of interest) is discovered after the award is made, it will make a full disclosure in writing to the contracting officer. This disclosure shall include a description of actions that the contractor has taken or proposes to take, after consultation with the contracting officer, to avoid, mitigate, or neutralize the actual or potential conflict (or apparent conflict of interest).

(c) *Remedies.* The Government may terminate this contract for convenience, in whole or in part, if it deems such termination necessary to avoid the appearance of a conflict of interest. If the contractor was aware of a potential conflict of interest prior to award or discovered an actual or

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

potential conflict (or apparent conflict of interest) after award and did not disclose or misrepresented relevant information to the contracting officer, the Government may terminate the contract for default, or pursue such other remedies as may be permitted by law or this contract. These remedies include imprisonment for up to five years for violation of 18 U.S.C. 1001 and fines of up to $5,000 for violation of 31 U.S.C. 3802. Further remedies include suspension or debarment from contracting with the Federal government. The contractor may also be required to reimburse the Department for costs the Department incurs arising from activities related to conflicts of interest. An example of such costs would be those incurred in processing Freedom of Information Act requests related to a conflict of interest.

(d) In cases where remedies short of termination have been applied, the contractor, subcontractor, employee, or consultant agrees to eliminate the organizational conflict of interest or mitigate it to the satisfaction of the contracting officer.

(e) The contractor further agrees to insert in any subcontract or consultant agreement hereunder, provisions that conform substantially to the language of this clause, including specific mention of potential remedies and this paragraph (e).

(End of Clause)

**I-58    3452.227-70 Publication and Publicity (MAR 2011)**

(a) Unless otherwise specified in this contract, the contractor is encouraged to publish and otherwise promote the results of its work under this contract. A copy of each article or work submitted by the contractor for publication shall be promptly sent to the contracting officer's representative. The contractor shall also inform the representative when the article or work is published and furnish a copy in the published form.

(b) The contractor shall acknowledge the support of the Department of Education in publicizing the work under this contract in any medium. This acknowledgement shall read substantially as follows:

"This project has been funded at least in part with Federal funds from the U.S. Department of Education under contract number [Insert number]. The content of this publication does not necessarily reflect the views or policies of the U.S. Department of Education nor does mention of trade names, commercial products, or organizations imply endorsement by the U.S. Government."

(End of Clause)

**I-59    3452.227-71 Advertising of Awards (MAR 2011)**

The contractor agrees not to refer to awards issued by, or products or services delivered to, the Department of Education in commercial advertising in such a manner as to state or imply that the product or service provided is endorsed by the Federal government or is considered by the Federal government to be superior to other products or services.

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

(End of Clause)

## I-60    3452.227-72 Use and Non-Disclosure Agreement (MAR 2011)

a) Except as provided in paragraph (b) of this clause, proprietary data, technical data, or computer software delivered to the Government with restrictions on use, modification, reproduction, release, performance, display, or disclosure may not be provided to third parties unless the intended recipient completes and signs the use and non-disclosure agreement in paragraph (c) of this clause prior to release or disclosure of the data.

(1) The specific conditions under which an intended recipient will be authorized to use, modify, reproduce, release, perform, display, or disclose proprietary data or technical data subject to limited rights, or computer software subject to restricted rights must be stipulated in an Attachment to the use and non-disclosure agreement.

(2) For an intended release, disclosure, or authorized use of proprietary data, technical data, or computer software subject to special license rights, modify paragraph (c)(1)(iv) of this clause to enter the conditions, consistent with the license requirements, governing the recipient's obligations regarding use, modification, reproduction, release, performance, display, or disclosure of the data or software.

(b) The requirement for use and non-disclosure agreements does not apply to Government contractors that require access to a third party's data or software for the performance of a Government contract that contains the 3452.227–73 clause, Limitations on the use or disclosure of Government-furnished information marked with restrictive legends.

(c) The prescribed use and non-disclosure agreement is:

Use and Non-Disclosure Agreement

The undersigned, *[Insert Name],* an authorized representative of the *[Insert Company Name],* (which is hereinafter referred to as the "recipient") requests the Government to provide the recipient with proprietary data, technical data, or computer software (hereinafter referred to as "data") in which the Government's use, modification, reproduction, release, performance, display, or disclosure rights are restricted. Those data are identified in an Attachment to this agreement. In consideration for receiving such data, the recipient agrees to use the data strictly in accordance with this agreement.

(1) The recipient shall—

(i) Use, modify, reproduce, release, perform, display, or disclose data marked with Small Business Innovative Research (SBIR) data rights legends only for government purposes and shall not do so for any commercial purpose. The recipient shall not release, perform, display, or disclose these data, without the express written permission of the contractor whose name appears in the restrictive legend (the contractor), to any person other than its subcontractors or suppliers, or prospective subcontractors or suppliers, who require these data to submit offers for, or perform, contracts with

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

the recipient. The recipient shall require its subcontractors or suppliers, or prospective subcontractors or suppliers, to sign a use and non-disclosure agreement prior to disclosing or releasing these data to such persons. Such an agreement must be consistent with the terms of this agreement.

(ii) Use, modify, reproduce, release, perform, display, or disclose proprietary data or technical data marked with limited rights legends only as specified in the Attachment to this agreement. Release, performance, display, or disclosure to other persons is not authorized unless specified in the Attachment to this agreement or expressly permitted in writing by the contractor.

(iii) Use computer software marked with restricted rights legends only in performance of contract number *[insert contract number(s)]*. The recipient shall not, for example, enhance, decompile, disassemble, or reverse engineer the software; time share; or use a computer program with more than one computer at a time. The recipient may not release, perform, display, or disclose such software to others unless expressly permitted in writing by the licensor whose name appears in the restrictive legend.

(iv) Use, modify, reproduce, release, perform, display, or disclose data marked with special license rights legends [To be completed by the contracting officer. *See* paragraph (a)(2) of this clause. Omit if none of the data requested is marked with special license rights legends].

(2) The recipient agrees to adopt or establish operating procedures and physical security measures designed to protect these data from inadvertent release or disclosure to unauthorized third parties.

(3) The recipient agrees to accept these data "as is" without any Government representation as to suitability for intended use or warranty whatsoever. This disclaimer does not affect any obligation the Government may have regarding data specified in a contract for the performance of that contract.

(4) The recipient may enter into any agreement directly with the contractor with respect to the use, modification, reproduction, release, performance, display, or disclosure of these data.

(5) The recipient agrees to indemnify and hold harmless the Government, its agents, and employees from every claim or liability, including attorneys fees, court costs, and expenses arising out of, or in any way related to, the misuse or unauthorized modification, reproduction, release, performance, display, or disclosure of data received from the Government with restrictive legends by the recipient or any person to whom the recipient has released or disclosed the data.

(6) The recipient is executing this agreement for the benefit of the contractor. The contractor is a third party beneficiary of this agreement who, in addition to any other rights it may have, is intended to have the rights of direct action against the recipient or any other person to whom the recipient has released or disclosed the data, to seek damages from any breach of this agreement, or to otherwise enforce this agreement.

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

(7) The recipient agrees to destroy these data, and all copies of the data in its possession, no later than 30 days after the date shown in paragraph (8) of this agreement, to have all persons to whom it released the data do so by that date, and to notify the contractor that the data have been destroyed.

(8) This agreement shall be effective for the period commencing with the recipient's execution of this agreement and ending upon *[Insert Date]*. The obligations imposed by this agreement shall survive the expiration or termination of the agreement.

[Insert business name.]
Recipient's Business Name
[Have representative sign.]
Authorized Representative
[Insert date.]
Date
[Insert name and title.]
Representative's Typed Name and Title

(End of Clause)

### I-61    3452.227-73 Limitations on the Use or Disclosure of Government-Furnished Information Marked with Restrictive Legends (MAR 2011)

(a) For contracts under which data are to be produced, furnished, or acquired, the terms *limited rights* and *restricted rights* are defined in the rights in data—general clause (FAR 52.227–14).

(b) Proprietary data, technical data, or computer software provided to the contractor as Government-furnished information (GFI) under this contract may be subject to restrictions on use, modification, reproduction, release, performance, display, or further disclosure.

(1) *Proprietary data with legends that serve to restrict disclosure or use of data.* The contractor shall use, modify, reproduce, perform, or display proprietary data received from the Government with proprietary or restrictive legends only in the performance of this contract. The contractor shall not, without the express written permission of the party who owns the data, release, or disclose such data or software to any person.

(2) *GFI marked with limited or restricted rights legends.* The contractor shall use, modify, reproduce, perform, or display technical data received from the Government with limited rights legends or computer software received with restricted rights legends only in the performance of this contract. The contractor shall not, without the express written permission of the party whose name appears in the legend, release or disclose such data or software to any person.

(3) *GFI marked with specially negotiated license rights legends.* The contractor shall use, modify, reproduce, release, perform, or display proprietary data, technical data, or computer software received from the Government with specially negotiated license legends only as permitted in the license. Such data or software may not be released or disclosed to other persons unless permitted by the license and, prior to release or disclosure, the intended recipient has completed the use and

Attachment Page

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

non-disclosure agreement. The contractor shall modify paragraph (c)(1)(iii) of the use and non-disclosure agreement (3452.227–72) to reflect the recipient's obligations regarding use, modification, reproduction, release, performance, display, and disclosure of the data or software.

(c) Indemnification and creation of third-party beneficiary rights.

(1) The contractor agrees to indemnify and hold harmless the Government, its agents, and employees from every claim or liability, including attorney's fees, court costs, and expenses, arising out of, or in any way related to, the misuse or unauthorized modification, reproduction, release, performance, display, or disclosure of proprietary data, technical data, or computer software received from the Government with restrictive legends by the contractor or any person to whom the contractor has released or disclosed such data or software.

(2) The contractor agrees that the party whose name appears on the restrictive legend, in addition to any other rights it may have, is a third party beneficiary who has the right of direct action against the contractor, or any person to whom the contractor has released or disclosed such data or software, for the unauthorized duplication, release, or disclosure of proprietary data, technical data, or computer software subject to restrictive legends.

(End of Clause)

**I-62   3452.237-71 Observance of Administrative Closures MAR 2011)**

(a) The contract schedule identifies all Federal holidays that are observed under this contract. Contractor performance is required under this contract at all other times, and compensated absences are not extended due to administrative closures of Government facilities and operations due to inclement weather, Presidential decree, or other administrative issuances where Government personnel receive early dismissal instructions.

(b) In cases of contract performance at a Government facility when the facility is closed, the vendor may arrange for performance to continue during the closure at the contractor's site, if appropriate.

(End of Clause)

**I-63     3452.239–72 Department Security Requirements (DEVIATION) (DEC 2019)**

(a) The contractor and its subcontractors shall comply with Department of Education personnel, cyber, and privacy, security policy requirements as set forth in "Security Requirements for Contractors Doing Business with the Department of Education" at http://www.ed.gov/fund/contract/about/bsp.html.

(b) Contractor employees who will have access to proprietary or sensitive ED information including "Controlled Unclassified Information" as defined in 32 CFR Part 2002, or ED IT

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

systems, systems maintained on behalf of ED, ED facilities or space, and/or perform duties in a school or in a location where children are present, must undergo a personnel security screening and a favorable determination and are subject to reinvestigation as described in the "Contractor Vetting Security Requirements." Compliance with these "Contractor Vetting Security Requirements," as amended, is required.

(c) The type of security investigation required to commence work on an ED contract is dictated by the position designation determination assigned by ED. All ED contractor positions are designated commensurate with their position risk/sensitivity, in accordance with Title 5 Code of Federal Regulations (5 CFR 731.106) and OPM's Position Designation Tool (PDT) located at: https://pdt.nbis.mil/. The position designation determines the risk level and the corresponding level of background investigations required.

(d) The contractor shall comply with all contractor position designations established by ED.

(e) The following are the contractor employee positions required under this contract and their designated risk levels:

**High Risk (HR):** 6C Positions (Knowledge Manager, Systems Administration, Configuration Manager, Program Manager)

**Moderate Risk (MR):** 5C Positions (General Office or Accounting Clerk, Tester, Business Analyst, Customer Service Representative)

**Low Risk (LR):** N/A

(f) For performance-based contracts where ED has not identified required labor categories for contractor positions, ED considers the risk sensitivity of the services to be performed and the access to ED facilities and systems that will be required during performance, to determine the uniform contractor position risk level designation for all contractor employees who will be providing services under the contract. The uniform contractor position risk level designation applicable to this performance-based contract is: N/A

(g) Only U.S. citizens will be eligible for employment on contracts requiring a Moderate Risk/Public Trust, High Risk/Public Trust, or a National Security designation.

(h) Permanent resident aliens may be eligible for employment on contracts requiring Low Risk/ Public Trust access.

(i) An approved waiver, in accordance with "Contractor Vetting Security Requirements" is required for any exception to the requirements of paragraphs (g) and (h) above.

(j) The Contractor shall-

(1) Comply with the Principal Office (PO) processing requirements for personnel security screening,

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

(2) Ensure that no contractor employee is placed in a higher risk position than for which he or she is approved,

(3) Ensure contractor employees submit required security forms for reinvestigation in accordance with the timeframes set forth in the "Contractor Vetting Security Requirements,"

(4) Report to the COR any information (i.e., personal conduct, criminal conduct, financial difficulties, etc.) that would raise a concern about the suitability of a contractor or whether a contractor employee's continued employment would promote the efficiency of the service or violate the public trust,

(5) Protect sensitive and Privacy Act-protected, including "Controlled Unclassified Information" as defined in 32 CFR Part 2002, from unauthorized access, use or misuse by its contractor employees, prevent unauthorized access by others, and report any instances of unauthorized access, use or misuse to the COR,

(6) Report to the COR within two business days any removal of a contractor employee from a contract; or within one business day if removed for cause,

(7) Return a PIV ID to the COR within seven business days of the contractor employee's departure,

(8) Report to COR of any job activities that contractor employee has brought to their attention that they believe could result in a change in the contractor employee's position or the need for increased security access; and

(9) Ensure that any ED information processed, stored, or transmitted by the contractor will not be used or redistributed except as specified in the contract.

(k) Performance of this contract will [x] will not [ ] involve access to ED IT systems and/or systems maintained on behalf of ED. For contracts that require access to ED IT systems and/or systems maintained on behalf of ED, the Information Security Categorization applicable to each security objective has been determined to be:

Confidentiality: [ ] Low [x] Moderate [] High
Integrity: [ ] Low [x] Moderate [ ] High
Availability: [ ] Low [x] Moderate [ ] High
Overall Risk Level: [ ] Low [x] Moderate [ ] High

(l) Performance of this contract [x] does involve [ ]  does not involve Personally Identifiable information (PII) or "Controlled Unclassified Information" as defined in 32 CFR Part 2002. The Confidentiality Impact Level of such information has been determined to be:

 [ ] Not Applicable [ ] Low [ ] Moderate [ ] High

 (m) Failure to comply with any of the personnel, privacy, and cyber security requirements may result in a termination of the contract for default or cause.

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

(End of Clause)

**I-64    3452.242-71 Notice to the Government of Delays (MAR 2011)**

The contractor shall notify the contracting officer of any actual or potential situation, including but not limited to labor disputes, that delays or threatens to delay the timely performance of work under this contract. The contractor shall immediately give written notice thereof, including all relevant information.

(End of Clause)

**I-65    3452.242-73 Accessibility of Meetings, Conferences and Seminars to Persons with Disabilities (MAR 2011)**

The contractor shall assure that any meeting, conference, or seminar held pursuant to the contract will meet all applicable standards for accessibility to persons with disabilities pursuant to section 504 of the Rehabilitation Act of 1973, as amended (29 U.S.C. 794) and any implementing regulations of the Department.

(End of Clause)

**I-66    FSA 9-1 Annual Submittal of Financial Audit Statements (FEB 2015)**

Contractors shall submit a copy of their current Financial Audit Statement to the Contracting Officer 60 days prior to the end of the current period of performance (or annually for multiple year contracts).  This information will be a factor in assessing responsibility prior to exercising options or issuing new task orders, as applicable.

(End of Clause)

**I-67    FSA 19-2 Subcontract Reporting and Achievements (APR 2014)**

The contractor shall submit timely and accurate subcontract reporting, which will be a factor used in assessing contractor past performance. In addition, contractors are advised that achievements related to subcontracting plans can and may be used as part of responsibility determinations under future procurements.

(End of Clause)

**I-68    FSA 22-2 Service Contract Act and Fair Labor Standard Act Requirements in Escalated Contracts, Information for Offerors (JAN 2013)**

The Service Contract Act applies to this contract. This clause applies to both contracts that are subject to area prevailing wage determinations and contracts subject to Contractor collective bargaining agreements. The Government has determined that both or either of the following is applicable:

1. The contract will be performance-based and payment to the contractor will be a percentage based upon actual performance, and/or

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

2. The contract is issued will be issued on a firm-fixed-price basis, the Government anticipates a mix of exempt and non-exempt personnel during performance of the contract, and escalation is provided for in the contract

The contract addresses:

1. Any price escalation of the fixed contract line item prices of the base and optional periods of performance or ordering periods, including but limited to, built-in economic price adjustment or other alternative pricing method, as appropriate;

2. Any increases or decreases made to:

   a. Wage Determinations and Conforming Wage Determinations that the Contractor may request of the Department of Labor that occur with the exercise of options or that occur as a result of time triggers identified in the Service Contract Act; or,
   b. Comply with an amendment to the Fair Labor Standards Act of 1938 that is enacted subsequent to award of this contract, affects the minimum wage, and becomes applicable to this contract under law.

Such changes will be cared for through escalations already identified in the contract, and no claim shall be made by the Contractor or the Government as a result of increases or decreases in Wage Determinations, or changes to the minimum wage. This clause does not relieve the Contractor of its responsibility to pay a covered employee wages consistent with the Service Contract Act and Fair Labor Standards Act in the event the escalation does not cover the total amount of the increase.

(End of Clause)

## I-69   FSA 25-1 Prohibitions on Contract Performance Outside of the United States (MAY 2017)

The Contractor has represented to the Department that it will perform all work required under this Contract including all work subcontracted to or otherwise performed by other parties, within the United States.  If, at any time, the Contractor wishes to perform any Contract work outside the United States, the Contractor shall inform the Contracting Officer, in advance and in writing, of its intention and request the Department's approval.  The Contractor shall not perform any Contract work outside the United States unless and until it has received the Contracting Officer's explicit, written approval to perform such work. In order to give proper consideration to the Contractor's request, the Department may ask for, and the Contractor shall provide, information relevant to the proposed performance outside the United States, including but not limited to a detailed description of the physical, personnel and management resources to be used and any potential difficulties or constraints in performing in the foreign jurisdiction.  The Department may refuse to approve Contract performance outside the United States to the extent that, solely in the Department's judgment, the Contractor has not shown that performance outside the United States would satisfy the Contract requirements and would not impair or degrade performance.  Further, the Department may refuse to approve any performance outside the United States for any other reason, or for no reason, except as otherwise required by the laws and treaties of the United States.  The Department may approve performance outside the United States subject to certain conditions, to which conditions the Contractor shall strictly adhere.  Neither performance within the United States, nor

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

the Department's refusal to allow performance outside the United States shall ever constitute a change to this Contract or give rise to any entitlement to additional compensation or excuse any failure of performance by the Contractor.  Nothing in this clause shall be interpreted to impose any obligation on the Department to allow or to refuse a request for performance of this Contract outside the United States.

(End of clause)

## I-70    FSA 27-2 Contractor Use of Government Commercial Software (MAR 2014)

This clause applies to all commercial software that is–
   a) provided by the Government to the contractor for performance of the contract;
   b) purchased, licensed, or maintained by the contractor and is directly reimbursed by the Government; or
   c) purchased or licensed by the contractor in the name of a Government department, agency or office.

Software provided by the Government will be supplied by the FSA Software Asset Management Team via the Contracting Officer (CO) or Contracting Officer's Representative (COR).

The contractor performing work on behalf of the FSA shall not:
   a) Install, reproduce, distribute, transmit, or otherwise use software for which the Department lacks the appropriate license, unless such software is properly licensed and used in accordance with Departmental policy and the applicable license.  If the contractor becomes aware of the reproduction, distribution, or use of unauthorized software, the contractor will notify their COR who in turn will notify the FSA Software Asset Management Team.  All use above the licensed entitlement will be removed or purchased by the contractor.
   b) Install, reproduce, or use any software upgrade on a computer that does not already have resident the original, licensed version of the software.
   c) Loan, distribute, or transmit Department software to any third party, unless the employee or contractor is expressly authorized to do so by the COR and the applicable license.

If the contractor performing work on behalf of FSA has any question concerning entitlement for use of any software, they have the responsibility to seek clarification, via the COR, of the Software Asset Management Team.

The terms of this clause apply to all contractors and their employees performing work on behalf of the Government and accessing or using Government software assets from any off-site or remote work location.  For example, this includes all telework locations, use of non-Government equipment while performing Government work, and/or use of any/all devices for this purpose that have the ability to connect/access any Government network or software product.

The contractor shall hold the Government harmless for any noncompliance with this clause or the licenses under which the software is provided.  The contractor will be responsible for paying all damages, penalties, extra license fee or any other expense associated with their noncompliance without reimbursement or compensation from the Government.

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

The contractor shall report annually by March 31, or more frequently if requested by the Contracting Officer, the following:

- Software product name
- Software version number
- User name
- Workstation owner, as applicable
- Server name, as applicable
- Metrics required by license *(e.g., the names of actual users if license is named user base.)*

The contractor is subject to audits by the Government or the software manufacturer at the contractor's location to ensure it is complying with this clause and licenses.

The contractor shall remove the software immediately from their machines and certify to the Contracting Officer its removal and the destruction or return of all documentation when any of the following occurs:

1) Contact under which software is required ends without renewal;
2) The software license's term ends without renewal;
3) The software license is terminated by manufacturer for cause; or
4) The software is no longer required for performance of contract.

For named user-based or client-based licenses, the contractor will report within 30 days the addition, replacement, or termination of access of any specific named-user or the addition, transfer or removal of software from client machines. Such report will contain the name of the former client as well as the new client, as applicable.

For server or core-based licenses, the contractor will report within 30 days the addition, transfer or removal of software from servers. Such report will contain the name of the former server as well as the new server, as applicable.

(End of clause)

**I-71    FSA 39-3 FSA Section 508 and Electronic and Information Technology Accessibility Standards Compliance (SEP 2016)**

(a) The performance of this contract is subject to the requirements of Section 508 of the Rehabilitation Act of 1973 (29 U.S.C. 794d), and the Architectural and Transportation Barriers Compliance Board Electronic and Information Technology (EIT) Accessibility Standards (36 CFR Part 1194).

(b) Section 508 establishes requirements for electronic and information technology developed, maintained, procured, or used by the Federal government. Section 508 requires Federal electronic and information technology, including that provided by a Government contractor, to be accessible to people with disabilities, including employees and members of the public. All EIT services performed under this contract shall meet the standards identified at 36 CFR Part 1194 (http://www.ecfr.gov/cgi-bin/text-idx?tpl=/ecfrbrowse/Title36/36cfr1194_main_02.tpl).

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

(c) Members of the public with disabilities that are seeking information or services from the contractor shall have access to and use of information and data maintained and provided to the public under this contract that is comparable to the access to and use of information and data by members of the public who are not individuals with disabilities.  The contractor's Website, and any documents or other forms of communication that may be viewed by the public via the Website, shall remain current with manners of assistive technology utilized by the public for accessing such information.  In order to maintain an accessible Website and documents or other forms of communication, the contractor shall ensure that the public can access required information in a variety of ways, which do not have to rely on a single sense or ability of the user.

(End of Clause)

**I-72    FSA 39-4 Remedies for Contractor's Violation of System Security Requirements (MAY 2017)**

a) *General*.  The information systems accessed, supported, and maintained under this contract contains personally identifiable information (PII).  In order to protect those systems and PII, the contractor is required by the terms of this contract to comply with the Department of Education security policy requirements and to implement privacy and security safeguards.  A failure by the contractor to comply with those requirements that results in, or contributes to, a breach of an information system and to the improper disclosure of PII therein could negatively impact millions of student borrowers and their families, as well as many other individuals and entities.  Such a breach could give rise to claims by third parties against the Department and the Department may incur significant additional costs and expenses.  Depending on the number of systems and individuals affected and the sensitivity and amount of  PII data involved in the breach, the Department's liability, costs and expenses may include the following, among others: 1) costs of investigation of the system breach and its impact, 2) expenses related to notification of affected individuals, 3) costs of providing data breach protection services to affected individuals, 4) liability for financial and other losses suffered by third parties as a consequence of the fraudulent, negligent or other misuse of PII obtained as a result of the breach, and 5) expenses to restore Department systems to a state that ensures the present and future integrity, security and availability of PII.

b) *Definitions*.  All terms used in this provision such as breach, personally identifiable information (PII) have the same definition as used by the Department of Education's Administrative Communications System Directive OM: 6-107 External Breach Notification Policy and Plan (3/25/2016).

c) *Breach Response*.  The contractor agrees that in the event of any actual or suspected breach of any system accessed, supported, and maintained under this contract and which contains or may contain PII, the contractor shall immediately, and in no event later than one hour of discovery, report the breach to the individuals identified in OCIO-14 Handbook for Information Security Incident Response and Reporting Procedures, contracting officer, the Contracting Officer's Technical Representative (COTR), and the Department's Privacy Advocate *(**privacyadvocate@ed.gov**),* and furnish a copy of the message to the contracting officer.  The contractor is responsible for positively verifying that notification

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

is received and acknowledged by at least one of the foregoing Government parties. The contractor further agrees to provide the Department the resources necessary to support the Department in its implementation of appropriate information security incident response and reporting procedures and external breach notification policies and plans.

d) *Notice to Affected Individuals.* If the contractor fails to comply with Department security policy requirements or fails to implement required privacy and security safeguards, in accordance with FSA's instructions and only if and as approved in advance and in writing by the Department, the contractor agrees to prepare and send a notice to all individuals affected by a breach, at no additional cost to the Department. The method of such notification may include letters to affected individuals sent by first class mail, electronic means, or publication of a general notice, as approved by the Department. At minimum, that notification should include:

1) a brief description of how the breach occurred;
2) a description of the types of personal information involved in the breach;
3) a statement as to whether the information was encrypted or protected by other means;
4) steps an individual may take to protect themselves;
5) what the agency is doing, if anything, to investigate the breach, to mitigate losses, and to protect against any further breaches; and
6) point of contact information identifying who affected individuals may contact for further information.

e) *Remedies for Violations.* If the contractor fails to comply with Department security policy requirements or fails to implement required privacy and security safeguards, and if that failure results in, or contributes to, a breach of an information systems and the improper disclosure of PII, the contractor agrees to take all reasonable measures necessary to correct and mitigate the violation and to remedy any resulting harm suffered by the Department and any others. The contractor agrees to take such action promptly, as directed by the Contracting Officer, and at no additional cost to the Department. The contractor agrees that such measures shall include, at a minimum, the following:

1) the contractor shall provide data breach protection services, including identity theft and credit protection, to all affected individuals for a period of no less than 18 months from the date of discovery of the breach. Those services shall include at a minimum: a) one year of credit monitoring services consisting of automatic daily monitoring of at least 3 relevant credit bureau reports; b) data breach analysis; c) fraud resolution services, including writing dispute letters, initiating fraud alerts and credit freezes, to assist affected individuals to bring matters to resolution; d) three years of identity theft insurance with up to $1,000,000.00 coverage at $0 deductible; and e) necessary legal expenses the subjects may incur to repair falsified or damaged credit records, histories, or financial affairs;
2) the contractor shall reimburse the Department for all its costs and expenses resulting from the breach, including but not limited to: a) costs of investigation of the system breach and its impact, b) expenses related to notification of affected individuals, c) costs of providing data breach protection services to affected

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

individuals, d) expenses to restore Department systems to a state that ensures the present and future integrity, security and availability of PII;

3) the contractor shall indemnify and hold harmless the Department for any and all third party claims, suits, demands, actions, causes of action, damages, set-offs, liens, Attachments, debts, expenses, judgments, and any other liabilities of any kind or nature arising out of or related to the breach.  This includes but is not limited to indemnification for any liability for financial and other losses suffered by third parties as a consequence of the fraudulent, negligent or other misuse of PII obtained as a result of the breach.

f)  *Right to Withhold Contract Payments and Set-Off.*  If the contractor fails to notify the affected individuals or fails to provide the data breach protection services as provided in paragraphs (d) and (e)(1) of this clause, the contractor agrees to have the Department withhold the sum of **$922.21** per affected individual **(up to 10,000 individuals) or $907.19 (over 10,000 individuals)** from any payment due the contractor under this contract, or to set-off that sum from any other Government contract.  That withholding or set-off shall continue until the contractor has complied with the requirements in paragraphs (d) and (e)(1) of this clause.  Should the Department elect to provide and/or procure notification or data breach protection services in response to a breach, the contractor will be responsible for reimbursing the Department for those expenses.

g)  *Flow-Down to Subcontractors.*  The contractor agrees to incorporate into subcontracts at all tiers any term or condition necessary to ensure compliance with the requirements of this clause, including by contractor and subcontractor personnel.  Further, the contractor acknowledges and agrees that a breach of an information system caused by subcontractor personnel will be attributed to the contractor for purposes of application of this clause.

*Reservation of Government Rights.*  Nothing in this clause is intended or shall be interpreted to waive or to limit in any way the right of the Department to pursue claims and recover damages and other remedies for the contractor's violation of the terms of this contract, including system security requirements.

(End of Clause)

## I-73    FSA 39-6 Security Protocol for Reporting Contract Employee Departure from a Contract (SEP 2017)

As part of Federal Student Aid's security protocol, the contractor is required to provide timely notification of a contractor or subcontractor employee's departure from the contract. All notifications of an employee's departure are considered timely when the Contracting Officer, Contracting Officer's Representative and the Information System Security Officer are notified by the end of the business day of a contractor employee's departure. All notifications shall be in the form of an encrypted email with a subject line of "Employee Departure". The encrypted email shall include the following information:

- Employee Last Name, First Name, Middle Name
- eQIP number, if available
- Contract number

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

- List of systems to which the employee had access, and any associated user IDs, if available
- Termination date

The completion of this timely notification does not relieve the contractor of the inclusion of the same information in the monthly report in the format identified in FSA 39-5.

The content of this clause shall flow down to all subcontracts awarded under this contract.

(End of Clause)

**I-74     FSA 39-7 (Revision 1) Contractor Security Responsibilities (AUG 2018)**

1) The Person Handle number (formerly referred to as "unique identification number"), referenced in paragraph 3) below, will be fully implemented by November 1, 2018; therefore prior to November 1, 2018, the contractor employee responsible for security may not receive the individual contractor employee's Person Handle number. However, where the Person Handle Number is provided, the contractor must provide the number on the monthly vendor employee report per paragraph 6).

2) The contractor shall ensure that no contractor employee is granted access to the Department's confidential and/or personally identifiable information (PII), and/or system(s) that permit access to the aforementioned data, until the contractor employee has completed the required security training and receives written access approval from the government's Information System Security Officer (ISSO). If the employee requires access to multiple systems, approval must come from each system's ISSO before receiving access to that system.

3) The written approval provided the contractor by the ISSO shall identify the contractor employee/applicant, the system/platform for which access is being granted, whether privileged (6c) or non-privileged (5c) access is granted, and the Person Handle number (formerly referred to as "unique identification number") assigned to the contractor employee. The written notification may include multiple contractor employees, but each contractor employee shall be listed separately, including the aforementioned information relevant to the access approval of each individual listed.

4) All contractor employees must complete the required security training as a prerequisite to accessing the Department's confidential and/or PII data, and/or system(s), and must complete required training annually thereafter.  The contractor's employee responsible for security shall promptly forward a copy of the completion certificate (training completed within 12 months of the date of access approval will suffice) or other equivalent proof of completion to both the Contracting Officer's Representative (COR) and the ISSO(s). Access will not be granted until proof of completion is received.

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

5) If the ISSO does not grant access to the contractor employee within 20 calendar days of submitting all required documents for a security investigation and the proof of security training completion, the contractor's employee responsible for security shall contact the COR and ISSO(s) to ascertain the status of the approval.

6) The contractor's employee responsible for security shall maintain a separate copy of the aforementioned written authorization and proof of security training completion for each individual contractor employee granted access, as evidence that access has been granted.  The PersonHandle shall also be included as reference to each employee in the monthly vendor report required under FSA Local Clause 39-5, Monthly Vendor Employee Report.  Each system/location receiving separate access approval will be listed separately on the Monthly Vendor Employee Report.

(End of Clause)

**I-75   FSA 39-8 Supplemental Instructions to EDAR 3452.239-72, Department Security Requirements (OCT 2020)**

EDAR 3452.239-72, Department Security Requirements, paragraph (j)(1) is supplemented by the following:

(j)(1)(a) Contractors will submit their Background Investigation Requests electronically. Upload the documents into Electronic Questionnaires for Investigation Process (E-QIP) and release the Investigation Request Packet to the COR in E-QIP.

(b) Send an electronic copy of the completed coversheet to your contract COR and system ISSO(s). If contractors require a blank coversheet, please contact the COR. When transmitting the cover sheet, please use the following subject in the header of the Microsoft Outlook Message:

> Subject:  [Name of Prime Contractor-Company Name (Name of Sub-Contractor-Company Name, if applicable)]: [Background Investigation (BI) Type]
> [BI Level] [Date of Submission] [Name of Company Official Responsible for Background applications]

(c) Please ensure that each coversheet is encrypted and password protected with a unique password.  **Do not** send the password with the coversheet; instead send a separate email with the exact same subject line with the password in the body of the email.  The password should include upper and lower case letters, numbers and special characters.

***(d) Other than entering the requested data, do not modify the cover sheet format, structure or any other part of the spreadsheet. Any such change may result in the return of the cover sheet and background investigation paperwork for corrections and delay the processing of the packages.***

(e) Do not submit System Access Requests (SARs) with the background investigation paperwork.  SARs are to be submitted to the Information System Security Officer (ISSO) that is

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

responsible for your system.  Please contact the ISSO(s) for specific information regarding the delivery (email, etc.) of the System Access Requests.

(f) Contact FSAPersonnelSecurity@ED.gov or your assigned Personnel Security Specialist or by phone (202-377-3400) with questions.

(End Clause)

## I-76    FSA 42-1 Post Award Evaluation of Contractor Performance (JUL 2012)

Interim and final evaluations of contractor performance will be prepared on this contract in accordance with FAR 42.15.  The system utilized to record past performance evaluations is the Contractor Performance Assessment Reporting System (CPARS), which is a feeder system for the Past Performance Information Retrieval System (PPIRS).  The Contractor shall designate a CPARS Representative to administer evaluations for the Contractor.  The Representative shall be responsible for reviewing and commenting on proposed ratings and remarks for all assessments forwarded by the Contracting Officer.  The first Interim CPAR report shall be assessed after 12 months of contract performance, with Interim reports assessed every 12 months thereafter.  If the award value is over the Simplified Acquisition Threshold, and the period of performance is shorter than 12 months, the evaluation shall be assessed at the completion of work.  The Contractor will be permitted thirty (30) days to review the evaluation and to submit additional information or a rebutting statement in CPARS.  If the Contractor does not comment during the review period, the report shall be finalized after (30) days.  The Final contract performance evaluation will be prepared at the time of completion of work.  Any disagreement between the parties regarding an evaluation will be referred to the next higher level above the Contracting Officer, whose decision will be final.  Copies of the evaluation, contractor responses, and review comments, if any, will be retained as part of the contract file, and will be used to support future award decisions.  Copies of completed evaluations can be obtained in CPARS and PPIRS.

(End of Clause)

## I-77    FSA 45-1 Special Contract Requirements For Government Furnished Property – Two Factor Authentication Tokens (TFA) (JUN 2015)

In addition to the requirements of FAR 52.245-1(b) - Government Property, the contractor shall:

a) Ensure the contractor's Government Property Manager or designee shall sign a distribution letter provide by the Contracting Officer upon receipt of Government Property;

b) Comply with instructions on how to register the tokens using the Federal Student Aid Two Factor Authentication Token For FSA User Handout distributed with the tokens;

c) Seek immediate assistance with any challenges encountered with FSA CITRIX and TFA and immediately report any security or other incidents by telephone or email to the helpdesk at: 1-877-603-4188 or ed.customer.service@ed.gov and;

d) Provide a Property Management Plan to the Contracting Officer within 5 business days of receipt of the Government Furnished Property.  Among other requirement

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

required under FAR 52.245-1(b) the Property Management Plan must contain at minimum the following:

- ▪ Description on how the contractor will establish and maintain an auditable record of the token assignment to its employees by individual name and token Serial Number (AVT+9 digits);
- ▪ Method by which the contractor shall ensure that the serial number label on the back of each token remains legible and secure to the device.
- ▪ Security and management process for the physical devices as well as changes in assignment.

e) Upon written notification from the Contracting Officer, the contractor shall affirm its understanding and compliance with the Government's requirement for quarterly re-certification of user access and token activation.  In the event of any reported security breach, the Government shall immediately disable or deactivate contractor access to its network without prior notice.

f) Soft Tokens can be used instead of hard tokens.  The soft token is an app that runs on the user's mobile device.  After downloading and registering the free Symantec VIP Access app on a phone or tablet, a user simply opens the app and a One-Time Password (OTP) is automatically generated similar to a hard token.  Use of a soft token is optional, however users who have a compatible mobile device are encouraged to transition to a soft token.  There is no requirement to maintain property records on soft tokens.

g) **Contact Information**.  For additional information on TFA or the use of a soft token, contact the TFA Support Center at 800/330-5947, option 2 (TDD/TTY 800/511-5806) or by email at TFASupport@ed.gov.

(End of clause)

## SECTION J – LIST OF ATTACHMENTS

| Attachment | Title |
|---|---|
| 01 | Existing FSA Contact Centers (Non-exhaustive) |
| 02 | Current State Customer Tasks |
| 03 | Current State Partner Tasks |
| 04 | Top Customer Pain Points |
| 05 | Security Technical Requirements |
| 06 | Life of the Loan Servicing Intended State |
| 07 | Department of Education and FSA Style Guide for Written Communication |
| 08 | Draft DCC CCP Enablement Guide |
| 09 | Additional Current State Technical Constraints |

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0002

| 10 | Attachments to Additional Current State Technical Constraints<br>*(Includes WinZip files with multiple subfolders and additional WinZip files that supplement Attachment 09)* |
|----|----|
| 11 | Finance Technical Requirements |
| 12 | FSA 04-2 Universal Electronic Records Management Requirements |
| 13 | FSA 39-5 Monthly Vendor Reporting Deliverable Template (August 2018) |
| 14 | As Is Updated |
| 15 | OMB Guidance for BY20 Submission Requirements |
| 16 | Cybersecurity Policy |
| 17 | Information Assurance (IA)/Cybersecurity Handbook |
| 18 | Federal Identity, Credentialing, and Access Management Personal Identity Verification Interoperable (PIV-I) Test Plan |
| 19 | Personal Identity Verification Interoperability (PIV-I) for Issuers |
| 20 | Personal Identity Verification Interoperable (PIV-I) Certification Process |
| 21 | Federal Identity, Credentialing, and Access Management Personal Identity Verification Interoperable (PIV-I) Frequently Asked Questions (FAQ) |
| 22 | X.509 Certificate Policy for the Federal Bridge Certification Authority (FBCA) |
| 23 | TBM Data Report Template |
| 24 | TBM Taxonomy Version 3.0 |
| 25 | NIST Cost Capabilities Report Template |
| 26 | FSA IT Investments NIST Mapping |

**SCHEDULE Continued**

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | Invoicing Address: | | | | |
| | Budget Group/Invoice Admin<br>US Department of Education/FSA/CFO/BG/FSAA<br>830 First Street, NE, Suite 54B1<br>Washington DC 20202-0001 | | | | |

# EXHIBIT

# D

# Overview of how the Pandemic-connected Discharge process will work

FSA (not federal servicers/DMCS) will determine which borrowers are eligible for a Pandemic-connected discharge.

FSA will provide instructions on how borrowers can request the discharge, and FSA will manage the intake of those requests and determination of which borrowers will be eligible and for how much.

FSA will provide periodic lists of eligible borrowers to loan servicers.  FSA will also provide a total discharge amount, per borrower that the servicer will discharge as part of that discharge request.

FSA will also provide which loans the discharge can be applied to and the which loans the discharge should be applied to first, then second, etc (FSA makes the determination of which loans are eligible for discharge and in what order, not servicers, based on FSA's hierarchy for Pandemic-connected discharges).  The list of loans provided may or may not include all the borrower's loans being serviced by the servicer (some loans may not be eligible or not currently eligible for various reasons).

Servicers will apply the discharge to the loans in the order FSA has provided until the total discharge amount has been reached or until all loans have been paid in full.  Servicers will apply the discharge first to the first eligible loan – applying the discharge first to outstanding interest and then to outstanding principal.   If the first eligible loan is paid in full and the total discharge amount has not been used up, the servicer would then apply the discharge to the second eligible loan – apply to outstanding interest first, then to principal.  And so forth until the total discharge amount has been used or all of the borrower's loans have been paid in full.

Servicers will NOT apply Pandemic-connected discharges to any borrower's loan unless instructed to do so by FSA (a discharge can only be applied if the loan is included in the discharge request file).

Servicers will NOT modify the order which loans are discharged.

FC

# EXHIBIT

# E

# Business Operations Change Request Form

**As Of:  9/2/2022 11:12:22AM**

| Administrative Information | | |
|---|---|---|

**CR:**  6391          **Drafted:**  8/22/2022 11:59:54AM          **Submitted:**    8/24/2022  2:23:13PM

**Title:**    LD - Servicer Discharge Request Process

**Sponsor:**    Mark La Via                    **Business Analyst:**    Denise Merchant

**Anticipated Implementation Date:**      09/23/2022                                                *EMERGENCY*

| Change Request Details |
|---|

**Reason (Business Need):**

FSA needs to implement a process to request large volumes of Pandemic-connected borrower discharges that allow FSA to provide the requests to the needed vendors.  The process will allow for Pandemic-connected discharges to be provided which provide the information needed for the vendor to process the discharge (per FSA instructions) and respond to FSA on the results.

**Description (Requirements):**

Requirements
1.   Servicers should first read the Pandemic-connected Discharge Overview document to understand the overall concept of how this discharge will work prior to attempting to understand the requirements.
2.   The servicer shall receive and accept discharge request file(s) from FSA.
a.   The file will be provided to the servicer via email with encrypted attachment.  Each servicer shall provide the email address(es) to receive the file.
i.   Multiple emails may be sent to support larger files (if needed).  Password to use will be provided by FSA.
b.   The file will be a 'flat/text' file with a header record and detail records.  The header record will include a 'Discharge Request' identifier that will describe the type of discharge requests is in the file.
i.   Current type of discharge requests included in this process is the GD01 (Pandemic-connected discharge), additional request types/formats may be added to the process via future change requests.
c.   The file will be provided twice per month – approximately the 5th and 20th of each month.

3.   The servicer shall provide an email confirming receipt of each discharge request file.  The email confirmation shall be sent to TivasReports@ed.gov, frank.curran@ed.gov, mark.lavia@ed.gov and other email addresses as requested by FSA.
a.   FSA will follow up with the vendor if confirmation has not been provided within 1 business day after the file was sent.

4.   The servicer shall process Pandemic connected discharge requests (GD01) as follows:

a.   The GD01 discharge requests will be received in the discharge request file with "GD01" in the header record discharge request identifier field.
i.   See GD01_FileLayout.docx.
b.   The servicer shall annotate the borrower's account immediately upon receipt of a discharge request to inform customer service representatives that a Pandemic-connected discharge has been requested for this borrower.
i.   This will also document on the borrowers account when the request was received for historical/audit purposes.
c.   The servicer shall identify the total amount of discharge and list of loans (and the order of the loans) from the discharge request file.
d.   The servicer shall apply the discharge with an effective date of 03/13/2020 and a unique identifier/transaction within the servicing system.
i.   If the loan being discharged has a disbursement date after the effective date listed above, the servicer shall use the disbursement date as the effective date (i.e. consolidation loan originated after the effective date listed above).
ii.   If the discharge of the loan on the effective date results in the loan being overpaid/credit balance, that overpayment shall be applied to other unpaid loans/debts at the servicer or, if no other unpaid loans/debts remain after the total discharge has been applied to the borrower, refund the remainder of the payment(s) to the borrower.
e.   The discharge amount shall be applied to the loans in the order they were provided by FSA – first apply the discharge to the first loan (first to interest, then to principal), if any of the total discharge amount remains after applying to the first loan is

paid in full (interest and principal), then apply the discharge to the second loan, and so forth.

i.    The discharge shall be applied to each loan so that it discharges interest first then principal.

ii.    Servicers shall ONLY discharge loans they have been provided in the discharge request file (the discharge request file MAY NOT contain all of the borrowers loans at the servicer).

iii.    Servicers are NOT to process any borrower request to 'reallocate' their discharged amounts to other loans.

iv.    See examples in file GD01_examples.docx.

f.    Once the discharge process for the borrower has been completed, the servicer shall send a Pandemic-connected Discharge Notification to the borrower within 7 calendar days after completion.

i.    See file GD_Notice.docx for the Pandemic-connected Discharge Notification notice text/format to be used.

ii.    Notices shall be sent via the borrower's selected communication method (email/postal).  If any email is returned undeliverable the notice shall be resent via postal mail.

iii.    The servicer shall store a copy of the Pandemic-connected discharge notice in the borrower's imaging records (and transfer that copy to another servicer if the loan is later transferred to another servicer).

g.    The servicer shall annotate on the borrower's account once the discharge has been applied indicating the total amount of discharge across all loans the borrower has received.

i.    If the total amount of discharge is later increased/decreased for any reason a new annotation shall be added identifying the new discharged amount (and reason why if the total was increased/decreased).

h.    Pandemic-connected Discharges shall be reported by the servicer to NSLDS as follows:

i.    The servicer shall report the Discharge (AO) record type with a discharge type code ('GD01') indicating a Pandemic-connected Discharge effective on the date of discharge, and if approval was  for full or partial discharge.

ii.    The servicer shall report "PF – Paid in Full GD–Pandemic-Connected Discharge" in the Code for Loan Status (AH record) field effective on the date of discharge approval for loans that are paid in full as a result of applying the discharge.

i.    Pandemic-connected discharges shall be reported by the servicer to FMS as follows:

i.    The servicer shall report using the write-off transaction with a new reason code of (1132).  If any servicer/DMCS does not currently report discharge reason codes to FMS, the alternative process of reporting shall be described in the servicer's impact analysis and approved by FSA.

j.    Pandemic-connected discharges shall not be reported to COD.  These discharges are being treated similar to forgiveness (no restoration of eligibility).

k.    Loans receiving Pandemic-connected discharges shall be reported to Credit Reporting Agencies following METRO2 guidelines.  In general:

i.    If the loan is not fully discharged/forgiven (balance remains), reduce the Current Balance to reflect the amount remaining after the discharge was applied.

ii.    If the loan is fully discharged/forgiven (loan is paid in full/$0.00 after discharge applied), Report Account Status Code 13, Payment Rating 0, Current Balance 0 and Amount Past Due 0 to indicate a paid/closed account, along with the appropriate Date Closed.

l.    If the servicer receives a future closed school, COVID or borrower defense discharge request on a loan that previously received a Pandemic-connected discharge, the servicer shall:

i.    Remove the Pandemic-connected discharge prior to applying the other discharge type.  Once the Pandemic-connected discharge type is removed, the servicer shall then apply the other discharge request. If the other discharge type does not fully discharge the loan, the Pandemic-connected discharge should be reapplied to that loan (only to that loan) up to the amount that was previously applied (no more).

ii.    The servicer shall update NSLDS, FMS and all other reports to reflect the removal of the Pandemic-connected discharge.

iii.    The servicer shall update the next Pandemic-connected discharge response file sent to FSA to indicate the change to the Pandemic-connected discharge amount applied to the borrower.

iv.    Note: The removal of the Pandemic-connected discharge MAY result in FSA requesting additional future discharge request for the amount of the Pandemic-connected discharge removed.

v.    Other discharge types will not require removal of the Pandemic-connected discharge (FSA may request some minimal volume of exceptions in unique situations as needed).

vi.    Servicers shall continue this process (of removivgn the Pandemic-connected discharge if CSD, BD, or COVID discharge is received) until FSA instructs servicers to no longer remove the Pandemic-connected l discharge.  FSA will provide at least 30 days written notice prior to ending this practice.

m.    The servicer shall apply any FSA requested adjustments to any Pandemic-connected discharge(s) upon request.

n.    The servicer shall not create/send 1099 forms for Pandemic-connected discharges.

o.    If the servicer receives downward adjustments to loans that previously rec'd the GD01, the servicer shall reduce the amount of the GD01 if needed so the discharge is not larger than the adjusted balance of the loan (and report that reduction in the response file) as needed.

p.    If the servicer received upward adjustments or additional disbursements on a loan the that previously received a GD01, the servicer shall NOT increase the amount of the GD01 discharge unless a new discharge request is provided by FSA.


5.    The servicer shall apply all discharges within 15 calendar days from receipt of the file.

bocm00051186

6.   The servicer shall provide a weekly, cumulative 'response' file to all GD01 requests.

a.   The response file shall combine responses to all prior GD01 requests (from all dates) within one file.

b.   The weekly file shall follow the file layout found in GD01_ResponseFile.xlsx.

c.   The file shall be provided via email with an encrypted attachment to tivasreports@ed.gov, frank.curran@ed.gov, and mark.lavia@ed.gov (and other addresses as requested by FSA).

i.   Subject of emails should be "GD01_" followed by the servicer 3 digit code (i.e. GD01_578 for Aidvantage).

ii.   If response files are too large for email limits – the file shall be broken into multiple files and submitted via multiple emails with encrypted attachment of the file(s).

d.   The response file shall be provided every Monday by 8pm ET.  Note: If Monday is a federal holiday, provide on the next business day by 8pm ET.

e.   The response file shall be named as follows:  GD01_500_1of1 where the "500" is the servicer's 3 digit code and "1of1" includes the file number and total number of files (1of1 for a single file, 1of2 and 2of2,etc would be the file names if multiple files are sent)


7.   The servicer shall update the sending/receipt and processing of the EA27 transfer file to include the new discharge type (17) for a Pandemic-connected discharge that has been applied to an account.

a.   If transferring a loan where a Pandemic-connected discharge has been applied, include 17 as the specialty claim type in record 04.  Include the date of file from the request in the Specialty Status Notification Date field, and "V" in the specialty claim processing cod field.  Note: Other information about the discharge shall be available in the annotations and servicing history records sent upon transfer.


8.   The service shall support all requests for information relating to FSA monitoring or auditing of this discharge process.

**Does this change require a new network connection
 (Secure File Transfer Protocol is mandatory for all new connections)?**   No

**IST Anticipated?**   No


| FSA Service/System/Area Impacted |
|---|

*Communications - Notification Only*
DMCS
*Enterprise Risk Management*
*Enterprise Security - Notification Only*
*Policy,Implement&Oversight (PIO)-Notifica*
*Vendor Oversight – Notification Only*
AidVantage
EdFinancial
Great Lakes
MOHELA
MOHELA - PSLF
MOHELA - TEACH
Nelnet
OSLA
Perkins
*PHEAA*
TPD

**Validation - Artifacts and Corresponding Requirement IDs (Required for Services)**
    The servicer shall provide the following validation artifacts for approval by FSA prior to implementation/use of the Pandemic-connected discharge:
1.   List of email addresses the request files will need to be sent to once implemented.
2.   Sample screenshots from testing region displaying discharges applied to borrower's loans (3 borrowers).  The screen shots should provide before & after displays of the loans and be labeled to show:  The principal/interest balances prior to discharge and after, the effective date of the discharge, the annotations on the account, and the discharge transaction.
3.   One test sample of the post discharge email and one sample of the postal mail that will be sent to borrowers after application of the discharge.
4.   A sample of the response file created from a testing region.

**Artifacts Due Date:** 09/19/2022         **BU Reviewer:**   Frank Curran

# EXHIBIT

# F

# <u>Federal Servicing Examples of GD01 discharges</u>

## Example #1:  Full discharge of all loans

Servicer has 3 loans (A, B, and C) for borrower 123123123:
- Loan A = $3500 prin, $100 int
- Loan B = $2000 prin, $50 int
- Loan C = $1250 prin, $40 int

FSA sends a discharge request (GD01) on 08/01/2022 for borrower 123123123 and provides a total discharge amount of $10,000 and loan listing 3 loans in this order: Loan B, Loan A, Loan C

  Servicer first applies the discharge to Loan B (first in list from FSA).  Servicer applies first to interest ($50) then to principal ($2000).
   The total discharge remaining after that is $7,950 ($10,000 - $2050) so the servicer then applies to the next loan in the list – Loan A.  Applies first to interest ($100) then to principal ($3500).
   The total discharge remaining after that is $4,350 ($7950 - $3600) so the servicer then applied to the next loan in the list – Loan C.  Applies first to interest ($40) then to principal ($1250).
  No other loans are in the list to be discharge so this discharge is complete. Total discharge amount is $6,940.00.
  *Servicer would respond in response file with:*
*Change Indicator = Y*
*Borrower SSN = 123123123*
*Status of discharge = DC*
*Total Discharge Amount = $6,940.00 (00694000 when formatted for file)*
*Date of most recent discharge request = 08/01/2022 (08012022)*

## Example #2:  Less than full discharge of all loans

Servicer has 3 loans (A, B, and C) for borrower 987987987:
- Loan A = $3500 prin, $100 int
- Loan B = $2000 prin, $50 int
- Loan C = $8000 prin, $200 int

FSA sends a discharge request (GD01) on 08/01/2022 for borrower 987987987 and provides a total discharge amount of $10,000 and loan listing 3 loans in this order: Loan B, Loan A, Loan C

Servicer first applies the discharge to Loan B (first in list from FSA).  Servicer applies first to interest ($50) then to principal ($2000).

The total discharge remaining after that is $7,950 ($10,000 - $2050) so the servicer then applies to the next loan in the list – Loan A.  Applies first to interest ($100) then to principal ($3500).

The total discharge remaining after that is $4,350 ($7950 - $3600) so the servicer then applied to the next loan in the list – Loan C.  Applies first to interest ($200) then to principal ($4150).  Only $4150 is applied to principal because that is all that remains of the total discharge amount.  Therefore, Loan C is not completely paid off.

The total amount of discharge has been applied, so this discharge is complete.  Total discharge amount is $10,000.00.

*Servicer would respond in response file with:*
*Change Indicator = Y*
*Borrower SSN = 987987987*
*Status of discharge = DC*
*Total Discharge Amount = $10,000.00 (01000000 when formatted for file)*
*Date of most recent discharge request = 08/01/2022 (08012022)*

## Example #3:  Servicer has loans NOT on the list sent by FSA

Servicer has 3 loans (A, B, and C) for borrower 654654654:
- Loan A = $3500 prin, $100 int
- Loan B = $2000 prin, $50 int
- Loan C = $1250 prin, $40 int
- Loan D = $3000 prin, $120 int

FSA sends a discharge request (GD01) on 08/01/2022 for borrower 654654654 and provides a total discharge amount of $10,000 and loan listing 3 loans in this order: Loan B, Loan A, Loan C [Note:  Loan D is NOT included in the file sent by FSA]

Servicer first applies the discharge to Loan B (first in list from FSA).  Servicer applies first to interest ($50) then to principal ($2000).

The total discharge remaining after that is $7,950 ($10,000 - $2050) so the servicer then applies to the next loan in the list – Loan A.  Applies first to interest ($100) then to principal ($3500).

The total discharge remaining after that is $4,350 ($7950 - $3600) so the servicer then applied to the next loan in the list – Loan C.  Applies first to interest ($40) then to principal ($1250).

No other loans are in the list to be discharge so this discharge is complete. Total discharge amount is $6,940.00.   Loan D was NOT included in the discharge request file, so the servicer would NOT apply any discharge to that loan.

*Servicer would respond in response file with:*

2

*Change Indicator = Y*
*Borrower SSN = 654654654*
*Status of discharge = DC*
*Total Discharge Amount = $6,940.00 (00694000 when formatted for file)*
*Date of most recent discharge request = 08/01/2022 (08012022)*

## Example #4:  Full discharge of all loans, but later another discharge type approved on one of the loans

Servicer has 3 loans (A, B, and C) for borrower 123123123:
- Loan A = $3500 prin, $100 int
- Loan B = $2000 prin, $50 int
- Loan C = $1250 prin, $40 int

FSA sends a discharge request (GD01) on 08/01/2022 for borrower 123123123 and provides a total discharge amount of $10,000 and loan listing 3 loans in this order: Loan B, Loan A, Loan C

  Servicer first applies the discharge to Loan B (first in list from FSA).  Servicer applies first to interest ($50) then to principal ($2000).
  The total discharge remaining after that is $7,950 ($10,000 - $2050) so the servicer then applies to the next loan in the list – Loan A.  Applies first to interest ($100) then to principal ($3500).
  The total discharge remaining after that is $4,350 ($7950 - $3600) so the servicer then applied to the next loan in the list – Loan C.  Applies first to interest ($40) then to principal ($1250).
  No other loans are in the list to be discharge so this discharge is complete. Total discharge amount is $6,940.00.
  *Servicer would respond in response file with:*
*Change Indicator = Y*
*Borrower SSN = 123123123*
*Status of discharge = DC*
*Total Discharge Amount = $6,940.00 (00694000 when formatted for file)*
*Date of most recent discharge request = 08/01/2022 (08012022)*

*Note everything to this point is the same as example #1.*

On 9/1/2022 FSA provides the servicer with a Closed School Discharge request on Loan B.
  The servicer would reverse off the GD01 discharge from Loan B and then apply the Closed School discharge to Loan B.  The total discharged for GD01 is now reduced to $4,890.00.
  *Servicer would respond in response file with:*
*Change Indicator = Y*

3

FC080322

*Borrower SSN = 123123123*
*Status of discharge = DC*
*Total Discharge Amount = $4,890.00 (00489000 when formatted for file)*
*Date of most recent discharge request = 08/01/2022 (08012022) – remains 8/1/22*
*as that is the most recent Pandemic-connected discharge request*

## Example #5:  No loans to be discharged at the servicer

Servicer has 3 loans (A, B, and C) for borrower 321321321 but none of them
currently have balances (were recently discharged):
- Loan A = $0 prin, $0 int
- Loan B = $0 prin, $0 int
- Loan C = $0 prin, $0 int


FSA sends a discharge request (GD01) on 08/01/2022 for borrower 321321321 and
provides a total discharge amount of $10,000 and loan listing 3 loans in this order:
Loan B, Loan A, Loan C

Servicer reviews the loans provided by FSA and finds no balance remain to be
discharged (prior discharges are no reversed to apply GD01 discharges).

Since no loans provided have balances to be discharged the total discharge amount
is $0.00.
  *Servicer would respond in response file with:*
*Change Indicator = Y*
*Borrower SSN = 321321321*
*Status of discharge = DX (if no loans discharged use DX status and $0 amount)*
*Total Discharge Amount = $0.00 (00000000 when formatted for file)*
*Date of most recent discharge request = 08/01/2022 (08012022)*

4

# EXHIBIT

# G

# Change Request 6391 (Pandemic-connected Discharge) - Q & A

| # | Date Sent | Servicer | Requirement/reference to | Question/Comment | FSA Response 8/30/22 |
|---|-----------|----------|--------------------------|------------------|---------------------|
| 1 | 8/25/2022 | NELNET | 2. The servicer shall receive and accept discharge request file(s) from FSA. a. The file will be provided to the servicer via email with encrypted attachment.  Each servicer shall provide the email address(es) to receive the file. | Could SFTP be used rather than email? It would be a more secure and reduce the amount of borrower information being emailed. | Not at this time.  We may consider changes in the future. |
| 2 | 8/25/2022 | NELNET | a. The file will be provided to the servicer via email with encrypted attachment.  Each servicer shall provide the email address(es) to receive the file. | Is there a cut off date for borrowers apply?  Please confirm if you utilize IRS data the borrower does not have to apply? | Not related to the CR/processing of the discharge.  Information related to this will be posted to FSA website. |
| 3 | 8/25/2022 | NELNET | a. The file will be provided to the servicer via email with encrypted attachment.  Each servicer shall provide the email address(es) to receive the file. | •Will there be a record identifier added to differentiate between the header record and detail records or should we assume the first record is the header and subsequent record are details? •If the file is split due to it being too big, would each of the file include a header record? If so, would the total amount of discharge on the header record match the discharges within each file? | No additional record, the first row of the file is the header file. Following rows are detail records.  If files are split there will NOT be additional header records.  The cumulative record counter number of the additional files will be the next sequential number from the prior file. |
| 4 | 8/25/2022 | NELNET | b. The servicer shall annotate the borrower's account immediately upon receipt of a discharge request to inform customer service representatives that a Pandemic-connected discharge has been requested for this borrower. | Meant to indicate that information should be available in the system so that a CSR can determine if a borrower's Pandemic-connected discharge request has been received, or are they describing a more pro-active approach, where it should be clearly indicated to the CSR when the borrower's account has been pulled up, that the information has been received. | Unclear what is being asked.   The account should include an annotation on the account so the CSR would be able to know a discharge request has been received when reviewing the account in response to borrower inquiry. |
| 5 | 8/25/2022 | NELNET | iii. Servicers are NOT to process any borrower request to 'reallocate' their discharged amounts to other loans. iv. See examples in file GD01_examples.docx. | We would like to request scripting for borrowers requesting different allocation. | FSA can provide suggested responses for this question.  Ben Fenwick will provide once available. |
| 6 | 8/25/2022 | NELNET | 4b: The servicer shall annotate the borrower's account immediately upon receipt of a discharge request to inform customer service representatives that a Pandemic-connected discharge has been requested for this borrower. | Meant to indicate that information should be available in the system so that a CSR can determine if a borrower's Pandemic-connected discharge request has been received, or are they describing a more pro-active approach, where it should be clearly indicated to the CSR when the borrower's account has been pulled up, that the information has been received. | duplicate question |
| 7 | 8/25/2022 | NELNET | f. Once the discharge process for the borrower has been completed, the servicer shall send a Pandemic-connected Discharge Notification to the borrower within 7 calendar days after completion.i. See file GD_Notice.docx for the Pandemic-connected Discharge Notification notice text/format to be used. ii. Notices shall be sent via the borrower's selected communication method (email/postal).  If any email is returned undeliverable the notice shall be resent via postal mail. iii. The servicer shall store a copy of the Pandemic-connected discharge notice in the borrower's imaging records (and transfer that copy to another servicer if the loan is later transferred to another servicer). | i. See file GD_Notice.docx for the Pandemic-connected Discharge Notification notice text/format to be used. Is this the final, approved copy, or will we receive final, approved copy from FSA later? ii. Notices shall be sent via the borrower's selected communication method (email/postal). If any email is returned undeliverable the notice shall be resent via postal mail. Is eCorr acceptable for the email (mail generated to personal email account advising borrower to log in to Nelnet.com to view full content of letter as a PDF) or does it need to be a fully contented email with no requirement to log in to view the communication? | FSA is providing an updated version (final) of the notice on 8/30/22.   Yes.  E-CORR is an acceptable communication delivery method. |

| | | | | | |
|---|---|---|---|---|---|
| 8 | 8/25/2022 | NELNET | Disclosure comment - Soon, due to the resumption of student loan payments after December 31, 2022, we will send you an updated disclosure.  This disclosure will outline your current student loan balance, monthly payment amount, and payment schedule for each remaining loan based on your current repayment plan. This disclosure will also state when your next payment is due. | For borrowers in IDR, we assume they will not need to be recalculated, as their payments are based on income (PFH) or balance at the time they entered IDR (perm-standard). We request an additional block for communication that states why they would not be disclosed (but can request to recalculate based on income)? | Servicers are not required to redisclose borrowers who are not in repayment due to this discharge.  If a borrower is currently in repayment, they should receive a disclosure. |
| 9 | 8/25/2022 | NELNET | i. Reverse off the Pandemic-connected discharge prior to applying the other discharge type.  Once the Pandemic-connected discharge type is removed, the servicer shall then apply the other discharge request. | IF we know it's pending BD, ACSD or COVIDdischarge can we pend GD01? | If another discharge that is already approved will fully discharge a loan that a GD01 has been requested for, the discharge of that loan can be skipped (since the loan will be fully discharged via the other discharge type).  The servicer should not need to pend the GD01. |
| 10 | 8/25/2022 | NELNET | o. If the servicer receives downward adjustments to loans that previously rec'd the GD01, the servicer shall reduce the amount of the GD01 if needed so the discharge is not larger than the adjusted balance of the loan (and report that reduction in the response file) as needed. | Are these Post Discharge adjustments coming from FSA or from COD? This information is needed to provide a solution? | They could come from either source listed or be related to consolidation adjustments. |
| 11 | 8/25/2022 | NELNET | p. If the servicer received upward adjustments or additional disbursements on a loan that previously received a GD01, the servicer shall NOT increase the amount of the GD01 discharge unless a new discharge request is provided by FSA. | Are these Post Discharge adjustments coming from FSA or from COD? This information is needed to provide a solution? | They could come from either source listed or be related to consolidation adjustments. |
| 12 | 8/25/2022 | NELNET | o. If the servicer receives downward adjustments to loans that previously rec'd the GD01, the servicer shall reduce the amount of the GD01 if needed so the discharge is not larger than the adjusted balance of the loan (and report that reduction in the response file) as needed. p. If the servicer received upward adjustments or additional disbursements on a loan that previously received a GD01, the servicer shall NOT increase the amount of the GD01 discharge unless a new discharge request is provided by FSA. | If the adjsutment is from in the past prior will we get a new GD01? | Possibly, but not always.  The updated GD01 total discharge amount is reported back to FSA and FSA will then re-evaluate to determine if additional GD01 requests will be made. |
| 13 | 8/25/2022 | NELNET | d. The response file shall be provided every Monday by 8pm ET.  Note: If Monday is a federal holiday, provide on the next business day by 8pm ET. | Is there any consideration of this not being a cumulative file? | Not at this time. |
| 14 | 8/25/2022 | NELNET | e. The response file shall be named as follows: GD01_500_1of1 where the "500" is the servicer's 3 digit code and "1of1" includes the file number and total number of files (1of1 for a single file, 1of2 and 2of2,etc would be the file names if multiple files are sent) | Could SFTP be used rather than email? It would be a more secure and reduce the amount of borrower information being emailed. | Not at this time. |
| 15 | 8/25/2022 | NELNET | e. The response file shall be named as follows: GD01_500_1of1 where the "500" is the servicer's 3 digit code and "1of1" includes the file number and total number of files (1of1 for a single file, 1of2 and 2of2,etc would be the file names if multiple files are sent) | •If the file is split because it is too big, do we include header for each file or do we only include the header on the first file? | duplicate question |
| 16 | 8/25/2022 | NELNET | TPD | TPD is included as impacted, but there is no mention of TPD borrowers.  Can you provide information for this population? If a borrower has applied, but is not approved would they be in our files? If a borrower is been approved by FSA and Nelnet TPD has the loan I assume they would not be eligible. Additional information for our team and TPD CSRs would be appreciate. | If a borrower with an eligible loan held by TPD (582) is identified as needing a discharge it will be provided under the 582 servicer code for processing. |
| 17 | 8/25/2022 | Aidvantage | Overview | What is FSA's hierarchy for Pandemic-connected discharges? Can we see this? | Not related to the CR/processing of the discharge.  Information related to this will be posted to FSA website. |

| 18 | 8/25/2022 | Aidvantage | 4b | Can FSA define what specific timeframe "immediately" is? | ASAP but within 2 business days at most. |
|---|---|---|---|---|---|
| 19 | 8/25/2022 | Aidvantage | 4f | Notification letter<br>It requires a total amount/limit (see below) – is that the Borrower Discharge Amount field from the discharge file?<br>As your current student loan balance is $XX,XXX.XX and is below $XX,XXX.XX, we have provided full debt relief on your federal loans<br><br>This is written in response to someone filling out the attestation form.  Will there be a different letter for the automatic discharges (ones where FSA already has income)? | Please see updated version of notice. If questions exist based on updated notice, please resubmit. |
| 20 | 8/25/2022 | Aidvantage | 4f | If a customer has a bad email and address, does FSA want them added to our regeneration table? Meaning, when good information is loaded to the system the notice would be automatically generated? | Yes |
| 21 | 8/25/2022 | Aidvantage | 4d | In order to recognize payments made after 8/24/22 to be applied to remaining loans or refunded to customer, the servicer will have to use the loan balance from 8/24/22 to determine the discharge amount (vs the balance on the day the discharge file is being processed).  Can you confirm? | Please see updated version of CR (updated effective date). If questions exist after reading, please resubmit. |
| 22 | 8/25/2022 | Aidvantage | 4 | When will the automatic discharges be processed by FSA?  Will that volume to servicers be staggered? | Discharge requests will be created by FSA as quickly as possible (automatic or via attestation).  Borrowers will be provided to Servicers in the file format provided as the become available for discharge.  No specific staggering of volumes will occur. |
| 23 | 8/25/2022 | Aidvantage | 4 | Will there be an appeal process for borrowers if they disagree with the amount? | Borrowers with concerns about the application of discharge shall be answered based on information found on studentaid.gov. If the answer is not clear to the servicer, the servicer shall send the question to FSAVendorManagementTeam@ed.gov seeking clarification. |
| 24 | 8/25/2022 | Aidvantage | 4 | Will there be a process for customer to request a higher discharge amount after initial discharge applied?  Ex: Customer had pre-covid balance of $10K, paid $4K between 3/13/20 and 8/24/22, gets discharge (either auto or through attestation) for $6K remaining balance.  They then realize they could request refund of $4K they paid during FORC.  Can they be re-evaluated for additional discharge?  If so, what will that process be? | Borrowers with concerns about the application of discharge shall be answered based on information found on studentaid.gov. If the answer is not clear to the servicer, the servicer shall send the question to FSAVendorManagementTeam@ed.gov seeking clarification. |
| 25 | 8/25/2022 | Aidvantage | 4 | Will we get background on determination FSA is using for the discharge amounts/loans?  If not, where should we direct customers when they call us questioning it (letter has the servicer contact info and not FSA)? | Borrowers with concerns about the application of discharge shall be answered based on information found on studentaid.gov. If the answer is not clear to the servicer, the servicer shall send the question to FSAVendorManagementTeam@ed.gov seeking clarification. |
| 26 | 8/25/2022 | Aidvantage | 7 | We don't transfer paid in full loans as part of the serial TIVAS/NFP transfers, PSLF or TPD.  Can we confirm the assumption that Req 7 will only apply to partially discharged loans? | The requirement applies to any borrowers transferred, but generally it will only apply to partially discharged loans.  At present PIF loans are typically not included in transfers….if they are included for any reason going forward this information should also be included. |
| 27 | 8/25/2022 | Aidvantage | 2 | Can FSA provide the volume of borrowers getting $10K vs. $20K forgiveness (borrower level files ideal, but aggregate numbers will allow us to make informed assumptions in call and staffing forecasts) | Not at this time. |
| 28 | 8/25/2022 | Aidvantage | Misc. | Row 10 on attachment 2 - is FSA including what they think the borrowers balance is or how much forgiveness the borrower is eligible for? | Please see updated version of notice. If questions exist based on updated notice, please resubmit. |

| 29 | 8/25/2022 | Aidvantage | Misc. | What's the timeline of the process (communications = early Sept., files to ADVS = ?, other milestones) | Upon implementation of the CR, FSA will provide as much advance notice as possible as to when the first file will be delivered. |
| 30 | 8/25/2022 | Aidvantage | Pell grants | If a there is a Pell Overpayment on a person's account, will their debt meet forgiveness criteria?  How will it be handled?  What are the talking points for any inquiry made by the borrower? | Questions about eligibility should be directed to FSA's website. |
| 31 | 8/25/2022 | Aidvantage | Pell grants | Will there be special letters sent to borrowers who have Pell Overpayments? | No unique notices are planned for borrowers with Pell overpayments. |
| 32 | 8/25/2022 | Aidvantage | Pell grants | Can FSA clarify eligibility for Pell Grant discharge? (IE, if the borrower ever had a Pell Grant, would they get $20k forgiveness?) | Not related to the CR/processing of the discharge.  Information related to this is posted to FSA website. |
| 33 | 8/25/2022 | Aidvantage | Refunds | If the borrower does not request a refund prior to completing the discharge app., do we automatically refund payments made 3/14/2020-discharge date?  Or does the borrower have to ask for refund? | Please see updated version of CR (updated effective date). If questions exist after reading, please resubmit. |
| 34 | 8/25/2022 | Aidvantage | Fresh start | Fresh Start- can the borrower request the discharge prior to transferring to the servicer or the borrower has to complete the process at DMCS, transfer then be discharged? | If a discharge request for a loan is received and the servicer is currently servicing the loan, the discharge should be processed. |
| 35 | 8/25/2022 | ECSI | Hierarchy | 1. Can FSA elaborate on the "hierarchy for Pandemic-connected discharges" mentioned in the Overview document?  What logic will be used to select which of a borrower's loans will be forgiven first? | Not related to the CR/processing of the discharge.  Information related to this will be posted to FSA website. |
| 36 | 8/25/2022 | ECSI | Intake of loans | 2. How does FSA want ECSI to handle loan assignments/intakes in Pending Acceptance status on or before 8/24/2022? | Assuming 'assignments/intakes' are incoming Perkins Loans…. This should have no impact on the acceptance/intake of loans by ECSI. |
| 37 | 8/25/2022 | ECSI | Eligibility | 3. At what point are Perkins assignments not eligible for the Pandemic connected discharge? | FSA will determine which loans are eligible and provide eligible loans to the servicer to be discharged, so ECSI will not be determining which loans are eligible. |
| 38 | 8/25/2022 | ECSI | 4 | 4. If ECSI receives a Pandemic connected discharge on a loan one of the following statuses, does ECSI apply the Pandemic connected discharge or ignore the request?<br>a. Bankruptcy<br>b. TPD<br>c. Based on employment or volunteer service | The discharge should be applied in each of the circumstances. |
| 39 | 8/25/2022 | ECSI | 4 i i | 5. Req. 4.i.i. Please provide a FMS GL Summary File example of this requirement. | This requirement does not alter the format of the GL summary.  A sample of the GL summary with this transaction/reason code is not currently available.<br><br>ECSI should send summary write-off transactions to FSA's general ledger (FMS) in the FMS GL Summary File layout, in accordance with the latest FMS GL Summary File Data Field Definitions (DFD) and File Layout. Note: The new write-off type being introduced in this CR, should generally be processed to FMS no different than any other write-off types (e.g., DEATH, TPD VA, etc.). The servicer will need to place the appropriate reason code for this write-off type (i.e., 1132) in Field Number 13 of the FMS SUMGL File.<br><br>If additional info is needed let us know. |
| 40 | 8/25/2022 | ECSI | 4 I | 6. Req. 4.I. What is a COVID discharge? | ECSI does not receive covid discharges…that portion of the requirement can be ignored by ECSI. |

| 41 | 8/25/2022 | ECSI | 4 p | 7. Req. 4.p. If a borrower receives an upward adjustment that creates a positive outstanding balance on a previous $0.00 balance, will FSA provide a letter template to notify the borrower? | ECSI should use the ad hoc process to create the text needed for this situation. |
|---|---|---|---|---|---|
| 42 | 8/25/2022 | ECSI | 4 l | 8. Req. 6.a. ECSI has an email limitation of 10mg.  If the cumulative 'response' file exceeds this size limit, please create a file naming convention for this anticipated limitation. | The naming convention has been provided for response files.  If request files need to be split they will follow a similar file naming convention (if 2 files needed...GD01_529_1of2 for first file then GD01_529_2of2 for the second file) |
| 43 | 8/25/2022 | ECSI | 7 | 9. Req. 7 ECSI assumes this requirement does not apply to Perkins loans.  If that is incorrect, please clarify a situation or provide examples for ECSI to transfer a loan previously discharged as a Pandemic connected. | Agreed, no impact to ECSI |
| 44 | 8/25/2022 | DMCS | Timing | 1)When does loan cancellation end? | There is no set end date at this time. |
| 45 | 8/25/2022 | DMCS | 2 | 2)Requirement #2:<br>a.Can we utilize MoveIT for the file exchange?<br>b.Confirm the GD01 request file is NOT cumulative; each file will represent a new set of borrowers with discharges to apply.<br>c.If more than one GD01 request is received for a borrower:<br>i.How will a subsequent request be differentiated from the original request?<br>ii.Will the 'Borrower Discharge Amount' be a cumulative approved discharge amount?<br>iii.What is the expectation if the subsequent GD01 request doesn't include the same Award IDs provided in the original request?<br>iv.Is a new notice to be sent to the borrower for a subsequent request?<br>v.How are subsequent requests reported on the response file?<br>d.Will grant overpayment debts (POVRs) be included on the GD01 discharge requests?<br>e.If the SSN/Award ID combination doesn't exist for the SSN provided:<br>i.What is reported as the 'Status of Pandemic-connected Discharge Request'?<br>ii.Do we bypass that Award ID and attempt to process other Award IDs for the borrower, or do we reject all Award IDs for the borrower?<br>f.If the SSN/Award ID combination exists for the SSN provided, but the debt is transferred, what do we report as the 'Status of Pandemic-connected Discharge Request'?<br>g.Are there any conditions that should prevent us from applying the discharge (e.g., borrower or debt with DOJ)? | 2a - No<br>2b - Correct, the request file is NOT cumulative<br>2c(i) - Only one borrower request will be sent per file.  Additional requests will be sent in separate files with a different date of file.  So multiple requests for the same borrower would have separate date of file.<br>2c(ii) The Borrower Discharge Amount is the amount FSA is authorizing the servicer to apply to the borrower's loans per the discharge request. It may/may not be the total amount the borrower is eligible for.<br>2c(iii) The discharge should be applied to the loans in the request in the order provided (and only to those loans in the request).<br>2c(iv) Yes - a new notice should be sent if additional discharge requests are processed.<br>2d - No.<br>2e(i) - If no discharge is applied the status would be DX and total amount discharged = $0.<br>2e(ii) - Yes, apply the award to the remaining awards.<br>2f - Report DX  and total discharged amount = $0 if you no longer servicer the loan.<br>2g - No conditions other than those listed in the requirements. |
| 46 | 8/25/2022 | DMCS | 4 b | 3)Requirement #4b: What date is annotated on the borrower's account, the date provided in the GD01 request file (e.g., Detail Record 'Date of File')? | Indicate the date of the request file. |
| 47 | 8/25/2022 | DMCS | 4 d | 4)Requirement #4d:<br>a.Confirm we're to follow our 'normal' overpayment refund process which requires a borrower address to be validated/updated within the last 90 days.<br>b.Is FSA collecting address information that they can share with us as part of the file (to assist in refund processing).<br>c.Confirm that the notice should be sent within 7 days of completing the process of the discharge, including the completion of the required refunds/reallocations. | 4a - Yes follow current validation procedures.<br>4b - No.<br>4c - Notice shall be sent within 7 days of when the discharge transaction is completed….the discharge should be considered complete once all discharge applications for the borrower have been completed (even if notification, refunds, etc are still pending) |
| 48 | 8/25/2022 | DMCS | 4 e | 5)Requirement #4e: If the debt has a fee balance, is that paid first? | No.  The discharge should not be applied to fee balances at all, it should only apply to interest and principal.<br>   If a debt has $0 principal and interest as a result of this discharge but a fee balance remains, the fee balance should be adjusted to $0 (not discharged). |

| 49 | 8/25/2022 | DMCS | Notice | 6)Requirement #4f - Notices:<br>a.The conditional notice text and the 'Loan Adjustment' table refers to 'current balance'. Since this notice is generated after the discharge request, the word 'current' isn't clear:<br>i.What balance is reported in the 'current balance' fields, the balance just prior to processing the discharge?<br>ii.Once 'current balance' is defined, can the notice be modified to reflect the clarification?<br>b.All the conditional text paragraphs reference a limit (e.g., below or above $xx,xxx.xx). Is this a constant value of $10,000.00 or is it a variable amount? If variable, where do we obtain the information?<br>c.Conditional notice text B –<br>i.Similar to other refund notices on DMCS, can the wording be updated to "you may be owed a refund"?<br>ii.The exact amount of the refund may not be available, is the refund amount required to be included on the notice?<br>d.The conditional notice text C and D reference sending a disclosure. DMCS does not currently send disclosures.<br>i.Confirm that sending a disclosure is not a new requirement for DMCS.<br>ii.Can revised text relevant to DMCS be provided?<br>e.Does the 'Loan Adjustment' table include all the borrower's (non-transferred) debts, or only the debts provided on the GD01 Request file.<br>f.Reference is made to including the borrower's imaging records in the transfer to another servicer. DMCS only sends the image file as part of the transfer to TPD. Confirmation needed that the EA80 process is not being added to the rehab and recall transfer processes. | Please see updated version of notice. If questions exist based on updated notice, please resubmit. |
| 50 | 8/25/2022 | DMCS | 4 g | 7)Requirement #4g: When referring to the increase/decrease, is this an FSA-provided increase/decrease to the amount of the GD01 discharge or is this an increase/decrease to the balance of loan discharged via a GD01 discharge? If it's an FS-provided change to the amount of the discharge:<br>a.How are changes to prior GD01 requests communicated?<br>b.For the borrower annotation, how is that communicated to DMCS? | 7 - This requirement is referring to a change to the GD01/discharge amount.<br>7a - A GD01 discharge change may be the result of a new GD01 discharge request, another type of discharge being applied or as a result of an adjustment to the account that decreases the GD01 as a result of the adjustment.<br>7b - Unclear what is being asked.  If any changes to the GD01 amount occurs, the annotation indicating that change should be added. |
| 51 | 8/25/2022 | DMCS | 4 j | 8)Requirement #4j: The only updates DMCS sends to COD is for POVR debts (on a weekly basis). What change is being requested for DMCS reporting to COD? | 8 - The requirements indicates not to send GD01 discharges to COD.  If DMCS doesn't typically send discharges to COD there is no change needed. |
| 52 | 8/25/2022 | DMCS | 4 l | 9)Requirement #4l:<br>a.DMCS does not process 'COVID' discharges.<br>b.Confirm that the process of reversing a previously received a GD01 discharge also applies to standard death discharges, automatic death discharge (received via the DSC file), and LHN requests (VA discharge or TPD) when the effective is prior to the effective date of the Pandemic-connected discharge? | 9a - Understood.<br>9b - If effective dates are prior to the GD01 then yes, the other discharge should be applied and the GD01 reversed/updated. |
| 53 | 8/25/2022 | DMCS | 4 m | 10)Requirement #4m:<br>a.How will the reversal requests be sent?<br>b.What 'Status of Pandemic-connected Discharge Request' is used for a GD01 reversal? | 10a - Reversal should be rare exceptions and will be sent via email from FSA.<br>10b - If a reversal is done to a previously applied GD01 - the status sent should be DC and the change indicator should be Y in the first response file to indicate that change. |
| 54 | 8/25/2022 | DMCS | 4 p | 11)Requirement #4p: Confirm that DMCS is still to process the upward adjustment, and that this requirement is just instructing us not to apply an additional GD01 discharge to bring the balance back to zero. | 11 - That is correct - the adjustment should still be applied. |
| 55 | 8/25/2022 | DMCS | 7 | 12)Requirement #7: Clarification needed on 'annotations and servicing history records sent upon transfer'. DMCS does not send servicing histories at the time of transfer. | 12 - Understood that DMCS does not send servicing histories and will not implement that portion of the requirement (just indicate that in IA). |

| 56 | 8/25/2022 | DMCS | Transfers | 13)How does the receipt of a GD01 request impact other in-process pending transfer requests (e.g., consolidation, LHN (TPD) transfer, rehab, recall)? | 13 - The discharge shall be processed if the loan is still being serviced.  The result may be that the consolidation/rehab/transfer doesn't need to occur or it is only for the remaining balance. |
|----|-----------|------|-----------|--------|--------|
| 57 | 8/25/2022 | DMCS | Adjustments | 14)Should a GD01 discharge be adjusted if a transaction posts after the GD01 discharge and creates an outstanding positive or negative balance (e.g., NSF, suspense transaction, reversed transaction)? If so, provide guidance on how to adjust the debt on which the transaction was applied as well as any other of the borrower's debts that received the full/partial GD01 discharge. | 14 - The instruction is provided in 4o and 4p in relation to adjustments. |
| 58 | 8/25/2022 | DMCS | Pell grants | In addition, Maximus has the following questions related to loan forgiveness and Pell Grants.<br>•How will FSA be identifying Pell Grant recipients and eligibility for loan forgiveness? For example, if a borrower received a Pell Grant in any amount and at any time since the program's inception in 1972, will their eligibility threshold increase to up to $20,000 in forgiveness on loans with a current balance? | 15 - Not related to the CR/processing of the discharge. Information related to this will be posted to FSA website. |
| 59 | 8/25/2022 | DMCS | Pell grants | How will FSA handle grant over-payment debts (POVR)? Are these debts part of the loan forgiveness program? (similar question as related to requirement 2D above) | 16 - POVR are not eligible for this discharge |
| 60 | 8/26/2022 | Edfinancial | Eligibility | Will eligibility be determined at the borrower or benefitting student level? For example, if a borrower has multiple PLUS loans with different benefitting students. | Not related to the CR/processing of the discharge.  Information related to this will be posted to FSA website. |
| 61 | 8/26/2022 | Edfinancial | Reconciliations | FSA currently sends a reconciliation report for COVID discharge which reconciles the COVID discharges sent to services and was is reported in FMS. Is FSA intending to issue a similar report for the Pandemic-connected discharges? Edfinancial will need to include the impact of such a report in our IA. | No, a similar report is not planned at this time. |
| 62 | 8/26/2022 | Edfinancial | Notice | The letter template provided to servicers includes the Loan Award ID, which contains the borrower's SSN. For privacy purposes, is it acceptable to mask the SSN within the Loan Award ID field? | Yes |
| 63 | 8/26/2022 | Edfinancial | Request file | Can FSA confirm the discharge file will only include the Loan Award IDs, and not the loan balance at the time of FSA's determination? | Correct - the total amount of discharge the servicer can apply will be provided at the borrower level, not per loan. |
| 64 | 8/26/2022 | Edfinancial | 4b | Requirement 4.b "the servicer shall annotate the borrower's account immediately upon receipt of a discharge request." What is FSA's definition of "immediate" in this scenario? | ASAP but within 2 business days at most. |
| 65 | 8/26/2022 | Edfinancial | Refund processing | Edfinancial has seen a significant increase in refund requests as a result of the 8/24 announcement. Refunds can be time consuming to process. There is a possibility a discharge request will be received for a borrower that still has a pending refund, which will impact the borrower's outstanding loan balance. How would FSA like servicers to handle this scenario? | Outstanding financial processing such as refund requests should be completed prior to processing the discharge request. |
| 66 | 8/26/2022 | Edfinancial | Refund processing | As this announcement is generating a significant volume of refund requests, is FSA able to assist in expediting the refund process? | FSA is evaluating how best to inform borrowers about refunds. |

| 67 | 8/26/2022 | Edfinancial | Eligibility | For borrowers with multiple servicers, how will FSA determine the discharge amount sent to each servicer? Will servicers need to collaborate to determine how much must be applied across all eligible loans? For example, a borrower has loans A-D. Edfinancial services loans A and B. Nelnet services loans C and D. FSA indicates in the discharge file the loan order in which the discharge shall be applied is C, B, A, and D. Nelnet will need to apply first to loan C, but cannot apply the remainder to loan D until Edfinancial has the opportunity to apply the remaining amount to loans B and A. | Servicer will not need to collaborate. Servicers should process what they are provided.  FSA will make the eligibility determination for borrowers/loans. |
| 68 | 8/26/2022 | Edfinancial | Eligibility | Can FSA provide insight into how they will determine if a loan is eligible for discharge, and how the loan hierarchy will be determined? | No.  Not related to the CR/processing of the discharge. Information related to this will be posted to FSA website. |
| 69 | 8/26/2022 | Edfinancial | Request file | Has FSA determined cap on the number of borrowers or loans a servicer will be provided per file? The volume of borrowers received will significantly impact our ability to meet the 15-day deadline. | There is no planned maximum/cap. |
| 70 | 8/26/2022 | Edfinancial | Notice | Requirement 4.f indicates the Pandemic-connected Discharge Notification must be sent within 7 calendar days of the discharge being processed. The letter template provided to servicers includes conditional text in the scenario the borrower has a remaining balance after the discharge is processed which includes the loan balance. If payments made after the effective date of the discharge (8/24/22) must be reallocated across the remaining loans, this will impact the new loan balance on the remaining loans. Payment reallocation is a time consuming process. In addition, to meet the 15-day deadline to process the discharge requests, Edfinancial may need to prioritize the discharge processing over payment reallocation. Our concern is the payments cannot be reallocated prior to the notification going out to borrowers. Is FSA willing to extend the deadline to send the discharge notification in scenarios where payments must be reallocated, or edit the letter template to indicate the balance may change after payments have been reallocated? | No - notifications shall be sent within 7 calendar days of completing the discharge…..the discharge should be considered complete once all discharge applications for the borrower have been completed (even if refunds are still pending) |
| 71 | 8/26/2022 | Edfinancial | Notice | Requirement 4.f.iii indicates a copy of the discharge notification sent to borrowers must be retained in imaging. Edfinancial does not currently receive a copy of any system letters sent to borrowers. This servicing system limitation has been noted in other CRs as well. Must servicers retain an exact copy of the letter sent to the borrower, or is an example of the system letter sufficient? | Exact copies per borrower shall be retained. |
| 72 | 8/26/2022 | Edfinancial | Adjustments | Is there ever a scenario where a servicer can proactively apply a newly available discharge amount to the remaining eligible loans?<br>For example, the borrower has loans A-C. FSA indicates the borrower is eligible for $10,000 in discharge, applied in the order A, B, C. Loan A is $9,000 so the full loan is discharged, and the remaining amount is applied to Loan B. Two weeks late a downward adjustment is received on Loan A, and now only $5,000 is needed to fully discharge Loan A. Can the servicer use the newly available $4,000 of discharge amount to decrease loans B and C? | No, the servicer can not use that amount after discharge.  The servicer shall provide an update in the response file based on the adjustment showing that (in your example) the total discharged has been decreased.  The loan's discharge amount would also be updated in NSLDS.  FSA will then re-evaluate the borrower's eligibility and other unpaid loans (at all servicers) to determine if additional GD01 discharge requests should be sent out (and to who for how much). |

| 73 | 8/26/2022 | Aidvantage | Requirement 4.F. Once the discharge process for the borrower has been completed, the servicer shall send a Pandemic-connected Discharge Notification to the borrower within 7 calendar days after completion.(CR 6391 Loan Forgiveness Servicer Notices Att 5). | Can FSA please confirm if servicers are to assume there will be no more extensions to the payment pause and return to normal disclosure procedures disclosing to borrowers 45 days before 12/31/2022 Payment Pause End Date? And for the letter in Req. 4.F we should use CONDITIONAL TEXT D if the discharge does not pay the loans in full? | Please see updated version of notice. If questions exist based on updated notice, please resubmit. |
| 74 | 8/26/2022 | Great Lakes | Notice | Items #47 and #70 in the Q&A indicate that "the discharge should be considered complete once all discharge applications for the borrower have been completed (even if refunds are still pending)".  Pending refunds could be applied to other open loans or rejected by Treasury.  The refund amount is included in the letter.  Given that refunds are still pending can the amount be excluded from the letter and use similar language to what is being used for the Borrower Defense letter? | Please see updated version of notice. If questions exist based on updated notice, please resubmit. |
| 75 | 8/26/2022 | Great Lakes | Exclusion of some loans for processing | As is the process with Borrower Defense processing, can FSA confirm if servicers should not process pandemic discharges for the following scenarios: borrower never at servicer, borrower has been transferred to another servicer, all loans on file are paid by claim, all loans on file zeroed out by COD/Consolidation adjustments. | This is correct.  Loans previously transferred, pif by other discharges or cancelled/adjusted to $0 via COD should not have the discharge applied. |
| 76 | 8/26/2022 | Great Lakes | Reversals | In the pandemic discharge requirements it talks about reversing a pandemic discharge for processing Borrower Defense, closed school, or COVID discharges. The requirements indicate servicers should remove the pandemic discharge and apply the BD/CSD/COVID discharges. COVID relief and BD/CSD applied to Consolidation loans can be partial discharges (not all underlying loans). If we remove the pandemic discharge and apply a BD/CSD/COVID partial discharge, we could be opening up a previously paid loan or increasing a loan balance, depending on the amounts involved.  The requirements indicate to not go back and re-apply the pandemic discharge. Can FSA confirm this is the desired outcome? | Requirement 4 I(i) will be updated to read as follows:<br>  i.Reverse off the Pandemic-connected discharge prior to applying the other discharge type.  Once the Pandemic-connected discharge type is removed, the servicer shall then apply the other discharge request.  If the other discharge type does not fully discharge the loan, the Pandemic-connected discharge should be reapplied to that loan (only to that loan) up to the amount that was previously applied (no more). |
| 77 | 8/26/2022 | Great Lakes | Refunds | If we process a discharge for less than the amount approved because it pays the loan in full, the borrower then asks for their payments made from 3/13/20 – 8/24/22 returned, will FSA know to send a follow-up forgiveness approval to account for the increase in balance?  Or are refunds requested post discharge unaffected by the pandemic-connected discharge. | Please see updated version of CR (updated effective date). If questions exist after reading, please resubmit. |
| 78 | 8/27/2022 | MOHELA | 4.d | If still in a period of 0% interest, can the write off be processed as of the effective loan add date to the COMPASS system instead of 8/24/22?  The PBO and IRB would be the same but would eliminate any pre-conversion adjustments unless there is a payment to be refunded | If the loan has no payments, interest accrual, or other financial activities after the effective loan add date in the CR…it is acceptable to use the loan add date if no impact to the pbo/interest that is discharged. |
| 79 | 8/27/2022 | MOHELA | General | In coordination with CR 6385, does the borrower have to state the refund is due to COVID? | The borrower does not have to state the refund request is specifically due to covid. |
| 80 | 8/27/2022 | MOHELA | General | Can payments made on/after 3/13/2020 be refunded if the borrower only states they want their payments back due to forgiveness? | Please see updated version of CR (updated effective date). If questions exist after reading, please resubmit. |

| 81 | 8/27/2022 | MOHELA | 4.l.vi | If FSA previously included a loan on a discharge request list and the loan was not discharged due to hierarchy, when a different discharge causes us to reverse the Pandemic-connected discharge, should we refer back to the initial request file and continue down hierarchy of eligible loans? Or should we send the update about the reversal in our response file and FSA will provide any further instructions? | No you should not refer back to the original request (FSA may have used those funds for a discharge at another servicer).  Send the updated information/discharged amount in the response, FSA will re-evaluate and send a new discharge request if needed. |
|----|-----------|--------|--------|---|---|
| 82 | 8/27/2022 | MOHELA | General | When does FSA anticipate it will stop sending the discharge files? | Unable to answer at this time.  Likely about 60 days after the end of the request/application period. |
| 83 | 8/27/2022 | MOHELA | 4.e | Should the borrower's repayment schedule be recalculated if their account is not paid in full? | Yes, unless other CRs (such as R2R) require you to keep the payment amount the same. |
| 84 | 8/28/2022 | MOHELA | 4.d | What about the timing of a second or third disbursement  (e.g. 1st disbursement was 7/10/2022, 2nd disbursement was 8/25/2022. Loans are identified by the 1st disbursement and award ID. Will FSA take this into consideration when providing the hierarchy? | FSA will provide the servicers with the loans to discharge.  FSA will manage the identification/hierarchy to be used. |
| 85 | 8/28/2022 | MOHELA | 4.d | Direct Loan funds that are returned within 120 days of the disbursement by the school or the borrower, for any reason, are treated as a partial or full cancellation, with the appropriate adjustment of the loan fee and interest. This is a specific financial transaction, is FSA expecting the originations fees to be adjusted with the discharge transaction? | No - this is a discharge and should be applied to principal and interest.  Origination fees should not be adjusted due to this discharge. |
| 86 | 8/28/2022 | NELNET | Request file | Will there be a situation where we need to apply to more than 25 award IDs? Will the file accommodate this? | The request file supports up to 25 loans.  If additional loans need discharging FSA will later provide an additional request file for that borrower. |
| 87 | 8/28/2022 | NELNET | How will we know what amount that they are qualifying for? Should the amount listed here be the $10K, $20K, or the Discharge Amount listed in the received File? oCONDITIONAL TEXT A (Loans Paid in Full, no refund is due) As your current student loan balance is $XX,XXX.XX and is below $XX,XXX.XX, we have provided full debt relief on your federal loans (e.g., Direct, FFEL, and Perkins) that ED determined met the standards for debt relief.  As a result, your student loan balance has been paid in full and you do not owe any balance on your federal loan account serviced by us. Can FSA consider removing the refund amount in this letter? This will take longer to calculate. The letter could be simplified to say that a refund will be issued to the borrower. CONDITIONAL TEXT B (Loans Paid in Full, refund is due) This was asked by DMCS in the Q&A that came out this afternoon, but I think it is an important question to make sure we let FSA know how we would like this changed as well. What is the difference between these 2 sets of conditional text? When would each be utilized? Conditional Text C and Conditional Text D | | Please see updated version of notice. If questions exist based on updated notice, please resubmit. |

| | | | | | |
|---|---|---|---|---|---|
| 88 | 8/30/2022 | Great Lakes | Refund | Due to the large volumes of refunds, could we send refunds that borrowers are requesting to the borrower rather than the remitter? The processing of refunds to the remitter takes extra time due to validating the remitter, remitter addresses, backup proof of the remitter, etc. that could be eliminated if refunds be returned to the borrower. This would be similar to the Borrower Defense refunds. | Yes, refunds may be sent to the borrower. |
| 89 | 8/30/2022 | NN-TPD | TPD | TPD assumes that the borrowers have been evaluated prior to being provided on the roster to apply the forgiveness amounts. Therefore, if a borrower has an Award ID provided on a TIVAS/NFP roster to apply the forgiveness and has an Award ID included on a TPD/582 roster to apply the forgiveness, we are under the assumption, that we can apply up to the full $10K/$20K to the TPD loans. Or is it an accurate assumption to say that borrowers should not be split between a TIVAS/NFP roster and a TPD/582 roster?  If so, then this question is irrelevant. | If a borrower has been approved for a TPD discharge that hasn't been applied yet and the loan is also received in a request file for a pandemic-connected discharge, the TPD discharge should be applied prior to the pandemic-connected discharge. |
| 90 | 8/30/2022 | NN-TPD | TPD | TPD assumes that transfers to TPD from another ED Servicer will be paused while the forgiveness transactions are being applied by the current ED servicer. If this is not an accurate assumption, how will these be handled? | Transfer to TPD will not be paused.  Loans will continue to be sent to TPD. If the servicer processes a pandemic-connected discharge the loan prior to the transfer to TPD, the loan will not be transferred if fully discharged. |
| 91 | 8/30/2022 | NN-TPD | TPD | TPD assumes if a borrower is approved for a TPD discharge after 08/24/2022, that all ED held loans will have had their forgiveness amounts applied by their loan holders. If this is accurate, how will TPD determine what loans are eligible to be included in the borrower's TPD discharge if NSLDS is not yet updated to reflect the applied forgiveness? | TPD should evaluate using the current information available on NSDLS in relation to TPD determinations. |
| 92 | 8/30/2022 | NN-TPD | TPD | Are commercial loans eligible if they were ED held assets as of 07/01/2022 or 08/24/2022?  TPD assumes if a borrower is approved for a TPD discharge prior to 07/01/22, and a commercial loan is transferred to TPD/582, these Award IDs will be provided on an upcoming TPD/582 roster if it is expected to forgive these loans. | If the loan has been transferred to TPD and is eligible, that loan will be included in discharge requests sent to NN-582.  If a loan is deemed eligible at a non-federal held servicer the discharge will follow the non-federally held process (still in development). |
| 93 | 8/31/2022 | ESCI | Refunds | A non-default Perkins loan was loaded to our loan servicing system as part of assignment/intake process on 1/1/2020.  The borrower only has one Perkins loan, not multiple.  The borrower immediately began to make monthly payments on the loan and continued to make payments during the pandemic.  On 11/1/2022, FSA requests ESCI to apply a pandemic connected discharge to the borrower's loan with an effective date of 3/13/2020.  Would FSA want ESCI to refund each payment the borrower made between 3/13/2020 and 11/1/2022? | No, you do not just refund all payments after 3/13/2020 in that situation. It would depend on the various circumstances.  ESCI would need to consider the amount of discharge FSA provided and the balance on that loan as of 3/13/2020.  If the full balance of the loan as of 3/13/2020 is being fully discharged, then the payments after 3/13/2020 would be refunded to the borrower.  But if the balance on the loan as of 3/13/20 was higher than the amount provided for discharge, then ESCI would need to apply the discharge amount effective 3/13/2020 (as if it happened on 3/13/20)....that would leave a balance on the loan as of 3/13/20 that is different than it previously was.  ESCI would then need to reapply any payments after 3/13/2020 based on the new principal/interest balance on the loan after discharge (not immediately refund all those payments).  If the payments after 3/13/20 are more than the balance the borrower would get a refund of the difference, but if they were not enough to pay off the new remaining balance after discharge they would just be applied to that balance (reducing it) and the borrower would not get a refund. |
| 94 | 8/31/2022 | Great Lakes | Transfers | Transfers: As is the case with Borrower Defense, should servicers complete the manual research of payments possibly made at a prior servicer? If a loan for pandemic discharge was transferred in from another servicer after the effective date of 3/13/20, should the current servicer reach out to the prior servicer to verify if any payments were made after the effective date and prior to the transfer? Also, the new servicer wouldn't be able to post the discharge prior to the transfer date. Can FSA please provide guidance for this scenario? | Servicers receive the servicing history for transferred loans and should be using that information to determine the appropriate balance to discharge and if there are any payments to be refunded (they should not require prior servicer to identify that info specific to this discharge process).  If the servicer must use the "load date" as the effective date on the servicing system, that is acceptable as long as it is the same result as if it was applied effective on 3/13/2020. |

| | | | | | |
|---|---|---|---|---|---|
| 95 | 8/31/2022 | Great Lakes | Refunds | Paid in Full/Refunds: Will borrowers who made payments since 3/13/20 that paid their loans in full be included in the forgiveness? If they request forgiveness, without asking us to return the payments, will they be approved? This will help us figure out refund volume and if the forgiveness process needs to handle paid in full loans. | At this point, loans that are currently PIF will not receive a discharge.  If a borrower requests a refund of payments made after 3/13/2020 on loans that are currently PIF the servicer should provide the refund (creating a balance on the previously PIF loan). Servicers should inform the borrower this will create a new/increased balance due the refunds whenever possible (i.e. if speaking with the borrower).  If the borrower has additional eligibility amounts remaining, the previously PIF loan (now with a balance) will be evaluated for eligibility at that point. |
| 96 | 8/31/2022 | DMCS | Processing discharge | 1)Confirm the following assumptions:<br>a.A GD01 request should not be processed against debts no longer on DMCS (e.g., consolidated, rehabilitated, recalled, transferred to TPD, or transferred to the bankruptcy servicer).<br>b.DMCS will not issue refunds for debts no longer on DMCS (e.g., consolidated, rehabilitated, recalled, transferred to TPD, or transferred to the bankruptcy servicer).<br>c.If the Placement Effective Date (Date of Last Service) of the most recent placement of the loan on DMCS is after 3/13/2020, then apply the GD01 discharge as of the Placement Effective Date. | 1a - Correct.<br><br>1b - Correct.<br><br>1c - You may use the placement/load date of the loan as the effective date on system but you must ensure it has the same effect as if discharge was applied to the balance as of 3/13/2020. |
| 97 | 8/31/2022 | DMCS | Notice | 2)The CR indicates the effective date of the discharge is now 3/13/2020 and we're to refund any credit balance created as of 3/13/2020. The notice (conditional text B), however, indicates the borrower is due a refund for payments made after 8/24/2022. Will the notice language be modified to reflect the 3/13/2020 GD01 discharge effective date? If not, further clarification is needed on the effective date and the payments eligible for a refund. | FSA is updating the notice (again) and the new updates should address these concerns.  If issues exist after reviewing new notice (to be sent 8/31 or soon after) let us know. |
| 98 | 8/31/2022 | DMCS | Notice | 3)Notices:<br>a.Is the loan table provided only for Conditional Text C (or D)?<br>b.DMCS may have fee balances remaining on the loans. To give the borrower a correct 'Total Balance Remaining', can the table be modified to include a column for the 'Pre-discharge Fee Balance' and a 'Current Fee Balance'?<br>c.The notice text references viewing a current student loan balance by 'logging into your account on StudentAid.gov.' The current DMCS balance is not available on StudentAid.gov. Can the text be modified to just refer to the DMCS borrower site for balance information?<br>d.Can Conditional Text C be updated to include language to request the borrower contact DMCS to either validate their address or to provide an updated address so that a refund can be processed? | FSA is updating the notice (again) and the new updates should address these concerns.  If issues exist after reviewing new notice (to be sent 8/31 or soon after) let us know. |
| 99 | 8/31/2022 | ECSI | History information | Req 4.d.ii. Lack of payment history on Perkins intake/assignment and DMCS Rehabbed loans loaded to our loan servicing system after 3/13/2020. | For loans intake from schools - determine the balance to be discharged and provide any refunds you are aware of/have history for.<br><br>For DMS rehabbed loans, reach out to DMCS to get the DMCS history information needed for the loan(s). |
| 100 | 8/31/2022 | ECSI | Effective Date | Req. 4.d.ii If a borrower was loaded to our loan servicing system in June 2022, is the effective discharge date still March 2020? | If the servicer must use the "load date" as the effective date on the servicing system, that is acceptable as long as it is the same result as if it was applied effective on 3/13/2020. |

| | | | | | |
|---|---|---|---|---|---|
| 101 | 8/31/2022 | ECSI | NSLDS reporting | CR in General: Concerned about timing of NSLDS reporting of intakes/assignments. | Question not clear.  If concern is about borrowers getting all the discharge eligibility they should, servicers should understand FSA will continually re-evaluate borrowers if they have additional eligibility amounts remaining.  So if additional loans are reported to NSDLS (as you suggest) they will be included in the re-evaluation. |
| 102 | 8/31/2022 | Aidvantage | PIF acct | On a PIF if we reinstate the balance will FSA know automatically that there could be a forgiveness scenario? Or would FSA rely on the servicer to share this information? | FSA  will continually re-evaluate borrowers if they have additional eligibility amounts remaining, the previously PIF loan (now with a balance) will be evaluated for eligibility at that point. |
| 103 | 8/31/2022 | Aidvantage | PIF acct | In the incoming forgiveness file, will you be providing loans that paid off since 3/13/20 that you want us to refund and apply discharge? | No |
| 104 | 8/31/2022 | Aidvantage | refunds | Can FSA provide direction on how to handle outstanding refund requests received through today 8/31/22? | Servicers should continue to process any existing and new requests for immediate refunds. |
| 105 | 8/31/2022 | Aidvantage | refunds | Can FSA confirm they want us to instruct CSRs to stop accepting refund requests effective today 8/31/22? We will await written direction before we make this change. | Servicers should tell borrowers refunds will be issued once the pandemic discharge is applied.  Would a borrower not want to wait, the refund request should be processed. |
| 106 | 9/1/2022 | Great Lakes | refunds | For loans paid in full by a 3rd party private consolidation (i.e., SOFI, their bank), where the borrower is requesting a payment be refunded to the 3rd party, can FSA provide guidance how these should be handled?   These are not borrower payments, but rather consolidation payment that paid the loan in full.  The borrowers may be requesting those payoffs be sent back to the consolidator which opens the balance to allow for discharge. Should Servicers allow for this scenario to happen? | No, the servicer should not refund consolidation payments rec'd due to borrower requests in this situation. |
| 107 | | | | | |
| 108 | | | | | |
| 109 | | | | | |
| 110 | | | | | |
| 111 | | | | | |
| 112 | | | | | |

# EXHIBIT
# H

*Saturday activity to be included in the following week

| Borrower Refund Volume | | |
|---|---|---|
| Date (week ending) | Borrower Requested Volume | Refund Processed Volume |
| 3/4/2022 | 83 | 83 |
| 3/11/2022 | 49 | 49 |
| 3/18/2022 | 26 | 26 |
| 3/25/2022 | 55 | 55 |
| 4/1/2022 | 55 | 55 |
| 4/8/2022 | 49 | 49 |
| 4/15/2022 | 42 | 42 |
| 4/22/2022 | 33 | 33 |
| 4/29/2022 | 27 | 27 |
| 5/6/2022 | 155 | 155 |
| 5/13/2022 | 37 | 37 |
| 5/20/2022 | 59 | 59 |
| 5/27/2022 | 39 | 39 |
| 6/3/2022 | 66 | 66 |
| 6/10/2022 | 61 | 61 |
| 6/17/2022 | 41 | 41 |
| 6/24/2022 | 63 | 63 |
| 7/1/2022 | 32 | 32 |
| 7/8/2022 | 43 | 43 |
| 7/15/2022 | 70 | 70 |
| 7/22/2022 | 88 | 88 |
| 7/29/2022 | 47 | 47 |
| 8/5/2022 | 79 | 79 |
| 8/12/2022 | 93 | 93 |
| 8/19/2022 | 100 | 100 |
| 8/26/2022 | 5,403 | 1,241 |
| 9/2/2022 | 7,700 | 712 |
| 9/9/2022 | | |
| 9/16/2022 | | |
| 9/23/2022 | | |
| 9/30/2022 | | |
| 10/7/2022 | | |
| 10/14/2022 | | |
| 10/21/2022 | | |
| 10/28/2022 | | |
| 11/4/2022 | | |
| 11/11/2022 | | |
| 11/18/2022 | | |
| 11/25/2022 | | |
| 12/2/2022 | | |
| 12/9/2022 | | |
| 12/16/2022 | | |
| 12/23/2022 | | |
| 12/30/2022 | | |
| 1/6/2023 | | |
| 1/13/2023 | | |
| 1/20/2023 | | |
| 1/27/2023 | | |

# EXHIBIT

# I

| From: | Martinelli, Nicholas |
|---|---|
| To: | Johnson, Taylor - x3489; POC Change Request; Andre Barbosa; Hines, Carmen; Reed, Folake; Elvis Taylor; Lowe, Eddie; Cornwall, Alan |
| Cc: | Whittington, Rochelle; Jenkins, Lateata; Brown, Taris; Grp.FC-CR; FSAAdminCORteam; Brown, Nicole; FSAVendorManagementTeam; Merchant, Denise |
| Subject: | RE: CR 6391 IA & CP |
| Date: | Thursday, September 1, 2022 8:40:35 PM |

Taylor,

Good Evening.

Please confirm receipt.

FSA is responding to the MOHELA IA and CP.

FSA is requiring all servicers have an initial discharge capability fully operational 10/1. Review your approach and proposal and provide updates reflecting the new implementation date of 10/1 NLT 10am EST tomorrow, 9/2.  Servicers are encouraged to use a phased approach to fully implement the change request.

Additionally, FSA is responding to the MOHELA assumptions.

MOHELA Assumptions

•       Requirement 4f. MOHELA assumes that FSA will perform all up-front outreach around this discharge and that if MOHELA is required to perform any outreach outside of requirement 4f, this CR will be revised or an additional CR will be issued.

•       MOHELA assumes that if additional reporting, outside of NSLDS, is required for Pandemic-connected discharge, this CR will be revised or an additional CR will be issued. **Noted reporting requirements will be in accordance with this CR or existing contractual requirements.**

•       FSA agrees to indemnify and hold harmless MOHELA and each of its directors, officers, agents, employees, and members, from any and all claims, actions, damages, suits, liabilities, obligations, costs, fees, charges, and other expenses that may be asserted by a third party against MOHELA as a result of processing Pandemic-connected discharges, as long as said discharges are processed according to the requirements of this CR and in accordance with the FSA discharge request file.  **Assumption must be removed.  FSA cannot indemnify MOHELA.**

•       Req. 8: MOHELA assumes that FSA will provide advance notification and detailed requirements for monitoring and auditing of this discharge process. **Noted**

•       MOHELA plans to use the LIS file to request information for borrowers transferred to us. **MOHELA should not use the LIS file.**

•       MOHELA reserves the right to submit a revised analysis with an updated level of effort should any additional requirements or details be added to this CR. **Noted**

•       MOHELA reserves the right to submit a revised analysis with an updated level of effort should any assumptions be incorrect and result in a change of approach. **Noted**

V/R,

Nick Martinelli

202-826-4929

**From:** Johnson, Taylor - x3489 <TaylorJ@MOHELA.com>
**Sent:** Wednesday, August 31, 2022 9:01 PM
**To:** POC Change Request <POCChangeRequest@ed.gov>; Barbosa, Andre <Andre.Barbosa@ed.gov>; Martinelli, Nicholas <Nicholas.Martinelli@ed.gov>; Hines, Carmen <Carmen.Hines@ed.gov>; Reed, Folake <Folake.Reed@ed.gov>; Taylor, Elvis <Elvis.Taylor@ed.gov>; Lowe, Eddie <Eddie.Lowe@ed.gov>; Cornwall, Alan <Alan.Cornwall@ed.gov>
**Cc:** Whittington, Rochelle <Rochelle.Whittington@ed.gov>; Jenkins, Lateata <Lateata.Jenkins@ed.gov>; Brown, Taris <taris.brown@ed.gov>; Grp.FC-CR <grp.fc-cr@MOHELA.com>; FSAAdminCORteam <FSAAdminCORteam@ed.gov>; Brown, Nicole <Nicole.Brown@ed.gov>; FSAVendorManagementTeam <FSAVendorManagementTeam@ed.gov>; Merchant, Denise <Denise.Merchant@ed.gov>
**Subject:** CR 6391 IA & CP

> **CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Good evening,

Attached you will find MOHELA's Impact Analysis and Cost Proposal for FSA Change Request 6391 – LD – Servicer Discharge Request Process.

Please let us know if you have any questions or need additional information.

Thank you,

**Taylor Johnson**
Federal Contract Compliance Analyst | MOHELA
633 Spirit Drive | Chesterfield MO 63005
Phone: 636.733.3700 x3489
taylorj@mohela.com

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
The information in this email is confidential and may be legally privileged. If you have received this email in error please notify the sender immediately. MOHELA reserves the right to record all email sent to and from this address and may, at its sole discretion, archive, monitor and/or review said email. MOHELA does not accept responsibility for any loss or damage arising from the use of this email or attachments. Any views or opinions expressed in this email are solely those of the author and do not necessarily represent those of MOHELA.
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *