**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| STATE OF NEBRASKA, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 4:22-CV-1040-HEA |
| v. | ) | |
| | ) | |
| JOSEPH R. BIDEN, JR., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

Introduction ........................................................................................................................ 1

Background ......................................................................................................................... 3

I.      The Federal Student Loan Programs .................................................................... 3

II.     The HEROES Act .................................................................................................. 5

III.    The COVID-19 Pandemic ...................................................................................... 6

IV.     The Targeted One-Time Pandemic Loan Discharge Plan .................................... 7

V.      This Lawsuit .......................................................................................................... 9

Legal Standard .................................................................................................................. 9

Argument ......................................................................................................................... 10

I.      Relief Against The President Is Improper. .......................................................... 10

II.     The Court Lacks Jurisdiction. ............................................................................. 10

        A.      Plaintiffs Have No Standing to Pursue Declaratory and Injunctive Relief
                Based on a Purported "Incentive to Consolidate." ................................. 11

        B.      The Court Lacks Jurisdiction Over Dispute Arising Out Of Loan
                Servicers' Federal Contracts. ................................................................. 13

        C.      Plaintiffs' Other Claimed Injuries Are Neither Concrete nor Imminent. ............ 16

III.    Plaintiffs Have Failed To Establish A Likelihood Of Success On The Merits. ............... 19

        A.      The HEROES Act Authorizes the Targeted Student-Loan Debt Relief. ............... 19

                1.      The HEROES Act Authorizes the Secretary to Modify Provisions
                        Regarding Loan Discharge Authorities .................................... 20

                2.      The Loan Discharges Apply to a Proper Subset of Affected
                        Borrowers ................................................................................. 22

                3.      The Secretary Reasonably Determined That Discharge Was
                        Needed to Reduce Delinquency and Default Risk Among Lower
                        Income Borrowers ..................................................................... 24

        B.      The Major Questions Doctrine Does Not Undermine the Clear Statutory
                Authorization Provided by the HEROES Act. .......................................... 29

i

      C.      The Policy Is Not Arbitrary and Capricious ......................................... 35

IV.    Plaintiffs Have Failed To Establish Any Irreparable Harm. ............................... 40

V.     The Balance Of Equities And Public Interest Weigh Against Injunctive Relief ............. 43

VI.    Any Relief Should Be Appropriately Limited .................................................. 44

Conclusion ................................................................................................................ 45

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Adventist Health Sys./SunBelt, Inc. v. HHS*,
  17 F.4th 793 (8th Cir. 2021) ..................................................................................... 35

*Air Courier Conf. of Am. v. APWU AFL-CIO*,
  498 U.S. 517 (1991) .................................................................................................. 16

*Air Transp. Ass'n of Am., Inc. v. Export-Import Bank of the United States*,
  840 F. Supp. 2d 327 (D.D.C. 2012) .......................................................................... 41

*Ala. Ass'n of Realtors v. HHS*,
  141 S. Ct. 2485 (2021) ......................................................................................... 30, 32

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*,
  458 U.S. 592 (1982) .................................................................................................. 16

*Am. Sch. of Magnetic Healing v. McAnnulty*,
  187 U.S. 94 (1902) .................................................................................................... 20

*Anselma Crossing, L.P. v. USPS*,
  637 F.3d 238 (3d Cir. 2011) ................................................................................. 13-14

*Arizona v. Biden*,
  40 F.4th 375 (6th Cir. 2022) ............................................................................... 19, 45

*Bd. of Governors of the Fed. Rsrv. Sys. v. MCorp Fin., Inc.*,
  502 U.S. 32 (1991) .................................................................................................... 20

*Cal. Ass'n of Private Postsecondary Schs. v. DeVos*,
  344 F. Supp. 3d 158 (D.D.C. 2018) ..................................................................... 41, 42

*California v. Azar*,
  950 F.3d 1067 (9th Cir. 2020) .................................................................................. 38

*Calvillo Manriquez v. DeVos*,
  345 F. Supp. 3d 1077 (N.D. Cal. 2018) .................................................................... 36

*Cellco P'ship v. FCC*,
  357 F.3d 88 (D.C. Cir. 2004) .................................................................................... 38

*Cheema v. U.S. Citizen & Immig. Servs.*,
  No. 4:21-cv-3209, 2021 WL 4553039 (D. Neb. Oct. 5, 2021) ................................. 40

iii

*City of Clarkson Valley v. Mineta*,
   No. 4:04-cv-00301-RWS, 2008 WL 11512303 (E.D. Mo. Apr. 22, 2008) ............................ 17

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983) .......................................................................................................... 11

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ........................................................................................................ 15

*Coal. for Common Sense in Gov't Procurement v. United States*,
   576 F. Supp. 2d. 162 (D.D.C. 2008) .............................................................................. 42

*Cornish v. Dudas*,
   540 F. Supp. 2d 61 (D.D.C. 2008) ................................................................................. 43

*Couteau Props. Co. v. Dep't of Interior*,
   53 F.3d 1466 (8th Cir. 1995) .......................................................................................... 42

*Dalton v. Specter*,
   511 U.S. 462 (1994) ........................................................................................................ 10

*Dataphase Sys. Inc. v. C.L. Sys.*,
   640 F.2d 109 (8th Cir. 1981) .......................................................................................... 10

*Dep't of Commerce v. New York*,
   139 S. Ct. 2551 (2019) ............................................................................................. 36, 37

*DISH Network Serv. LLC v. Laducer*,
   725 F.3d 877 (8th Cir. 2013) .......................................................................................... 41

*DHS v. Regents of the Univ. of Calif.*,
   140 S. Ct. 1891, 1909 (2020) .................................................................................... 37, 40

*Dykes v. MOHELA*,
   No. 4:21-CV-00083-RWS, 2021 WL 3206691 (E.D. Mo. July 29, 2021) ........................ 13

*El Paso Cnty., Texas v. Trump*,
   982 F.3d 332 (5th Cir. 2020) .......................................................................................... 18

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ................................................................................................... 35, 38

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ................................................................................................... 31, 33

*Florida Power & Light Co. v. Lorion*,

470 U.S. 729 (1985) ........................................................................................ 36

*Florida v. Mellon*,
273 U.S. 12 (1927) .......................................................................................... 17

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ........................................................................................ 10

*Frost v. Sioux City*,
920 F.3d 1158 (8th Cir. 2019) ....................................................................... 11

*Georgia v. President*,
46 F.4th 1283 (11th Cir. 2022) ....................................................................... 45

*Gerber Prods. Co. v. Perdue*,
254 F. Supp. 3d 74 (D.D.C. 2017) ................................................................. 12

*Gill v. Whitford*,
138 S. Ct. 1916 (2018) .................................................................................... 44

*Goff v. Harper*,
60 F.3d 518 (8th Cir. 1995) ........................................................................... 10

*Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*,
512 F.3d 1112 (9th Cir. 2008) ....................................................................... 43

*Goodin v. U.S. Postal Inspection Serv.*,
444 F.3d 998 (8th Cir. 2006) ......................................................................... 14

*Gov't of Manitoba v. Bernhardt*,
923 F.3d 173 (D.C. Cir. 2019) ....................................................................... 17

*In re Subpoena Duces Tecum*,
156 F.3d 1279 (D.C. Cir. 1998) ................................................................. 36-37

*Ingersoll-Rand Co. v. United States*,
780 F.2d 74 (D.C. Cir. 1985) ......................................................................... 14

*Iowa Voter All. v. Black Hawk Cnty.*,
515 F. Supp. 3d 980 (N.D. Iowa 2021) ......................................................... 11

*Kronholm v. FDIC*,
915 F.2d 1171 (8th Cir. 1990) ....................................................................... 10

*Leedom v. Kyne*,
358 U.S. 184 (1958) ........................................................................................ 20

v

*Lexmark Int'l Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2019) ................................................................................. 16

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
   140 S. Ct. 2367 (2020) ....................................................................... 34, 35

*Lockheed Martin Corp. v. Def. Contract Audit Agency*,
   397 F. Supp. 2d 659 (D. Md. 2005) ....................................................... 15

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) ................................................................................. 44

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
   567 U.S. 209 (2012) ................................................................................. 16

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ................................................................................... 24

*Missouri v. Biden*,
   142 S. Ct. 647 (2022) ....................................................................... 31, 35

*Missourians for Fiscal Accountability v. Klahr*,
   830 F.3d 789 (8th Cir. 2016) ................................................................. 13

*Morehouse Enters., LLC v. ATF*,
   No. 3:22-cv-116, 2022 WL 3597299 (D.N.D. Aug. 23, 2022) ......... 41-42

*N. Air Cargo v. U.S. Postal Service*,
   756 F. Supp. 2d 116 (D.D.C. 2010) ....................................................... 42

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
   138 S. Ct. 617 (2018) .............................................................................. 34

*Newdow v. Roberts*,
   603 F.3d 1002 (D.C. Cir. 2010) ............................................................ 10

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................................ 43

*Org. for Competitive Markets v. USDA*,
   912 F.3d 455 (8th Cir. 2018) ................................................................. 35

*Packard Elevator v. ICC*,
   782 F.2d 112 (8th Cir. 1986) ................................................................. 41

*Pennsylvania v. Kleppe*,

533 F.2d 668 (D.C. Cir. 1976) ............................................................... 19

*Philadelphia v. Sessions*,
    280 F. Supp. 3d 579 (E.D. Pa. 2017) ............................................... 39

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
    374 F.3d 1251 (D.C. Cir. 2004) .................................................... 35-36

*RMI Titanium Co. v. Wesitnghouse Elec. Corp.*,
    78 F.3d 1125 (6th Cir. 1996) ........................................................... 14

*S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*,
    696 F.3d 771 (8th Cir. 2012) ........................................................... 40

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ......................................................................... 15

*St. Louis Effort for AIDS v. Huff*,
    782 F.3d 1016 (8th Cir. 2015) ......................................................... 44

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 84 (1998) ........................................................................... 10

*Student Loan Mktg. Ass'n v. Riley*,
    907 F. Supp. 464 (D.D.C. 1995) ....................................................... 3

*Tex. Health Choice, L.C. v. OPM*,
    400 F.3d 895 (Fed. Cir. 2005) ......................................................... 14

*Todd Const., LP v. United States*,
    656 F.3d 1306 (Fed. Cir. 2011) ....................................................... 14

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021) ..................................................................... 11

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018) ..................................................................... 45

*Tumey v. Mycroft AI, Inc.*,
    27 F.4th 657 (8th Cir. 2022) ........................................................... 40

*U.S. Postal Serv. v. Gregory*,
    534 U.S. 1 (2001) ............................................................................. 37

*United States v. J&E Salvage Co.*,
    55 F.3d 985 (4th Cir 1995) .............................................................. 14

vii

*United States v. Richardson*,
   418 U.S. 166 (1974) ............................................................................ 17

*Utility Air Regul. Grp. v. EPA*,
   573 U.S. 302 (2014) ............................................................................ 30

*Virginia ex rel. Cuccinelli v. Sebelius*,
   656 F.3d 253 (4th Cir. 2011) ............................................................. 17

*West Virginia v. EPA*,
   142 S. Ct. 2587 (2022) .............................................................. *passim*

*Winter v. Nat. Res. Def. Council*,
   555 U.S. 7 (2008) ................................................................................ 9,

*WorldCom, Inc. v. FCC*,
   238 F.3d 449 (D.C. Cir. 2001) ........................................................... 38

*Wyoming v. Oklahoma*,
   502 U.S. 437 (1992) ............................................................................ 17

*Wyoming v. U.S. Dep't of Interior*,
   674 F.3d 1220 (10th Cir. 2012) ......................................................... 18

*XY Planning Network, LLC v. SEC*,
   963 F.3d 244 (2d Cir. 2020) ........................................................ 12, 16

## **Statutes**

20 U.S.C. § 1070 .................................................................................... 1, 3

20 U.S.C. § 1071 ....................................................................................... 3

20 U.S.C. § 1078-10 ................................................................................. 4

20 U.S.C. § 1078-11 ................................................................................. 4

20 U.S.C. § 1078 ....................................................................................... 4

20 U.S.C. § 1080(b) .................................................................................. 4

20 U.S.C. § 1082 ................................................................................. 4, 33

20 U.S.C. § 1087-4 .................................................................................... 3

20 U.S.C. § 1087 ................................................................................... 3, 4

20 U.S.C. § 1087aa ............................................................................................ 3

20 U.S.C. § 1087dd .......................................................................................... 33

20 U.S.C. § 1087e .............................................................................................. 4

20 U.S.C. § 1087ii .............................................................................................. 3

20 U.S.C. § 1087j ............................................................................................... 4

20 U.S.C. § 1087*ll* ............................................................................................ 3

20 U.S.C. § 1098bb ....................................................................................... *passim*

20 U.S.C. § 1098e .............................................................................................. 4

20 U.S.C. § 1098ee(2) ............................................................................... 5, 21, 22

20 U.S.C. § 3441 ................................................................................................ 4

20 U.S.C. § 3471 ................................................................................................ 4

28 U.S.C. § 1346(a)(2) ..................................................................................... 14

41 U.S.C. § 7103(a) .......................................................................................... 14

41 U.S.C. § 7104 .............................................................................................. 14

American Rescue Plan Act of 2021,
    Pub. L. No. 117-2, 135 Stat. 4 (2021)...................................................... 35

Coronavirus Aid, Relief, and Economic Security Act,
    Pub. L. 116-136, 134. Stat. 281 (2020)..................................................... 6-7

Higher Education Relief Opportunities for Students Act of 2003 ("HEROES Act"),
    Pub. L. 108-76, 117 Stat. 904 (2003) (codified at 20 U.S.C. §§ 1098aa-1098ee)...................... 5

**<u>Administrative & Executive Materials</u>**

34 C.F.R. § 30.70(a)(2) .................................................................................... 33

34 C.F.R. § 682.210 ........................................................................................... 4

34 C.F.R. § 682.211 ........................................................................................... 4

34 C.F.R. § 682.409 ........................................................................................... 4

34 C.F.R. § 685.204 .............................................................................................. 4

34 C.F.R. § 685.205 .............................................................................................. 4

34 C.F.R. § 685.219 .............................................................................................. 4

34 C.F.R. § 685.220 .............................................................................................. 4

34 C.F.R. § 685.222(d)(2) ..................................................................................... 4

34 C.F.R. Part 682, App. D ................................................................................... 3

*Continuation of the National Emergency Concerning the Coronavirus Disease 2019 (COVID-19) Pandemic* (Notice of Feb 18, 2022),
    87 Fed. Reg. 10289 (Feb. 23, 2022) .............................................................. 23

*Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*,
    85 Fed. Reg. 15,337 (Mar. 18, 2020)............................................................... 6

U.S. Dep't of Educ., *Federal Student Aid Programs (Student Assistance General Provisions, Federal Perkins Loan Program, William D. Ford Federal Direct Loan Program, and Federal Work Study Programs*,
    85 Fed. Reg. 79,856 (Dec. 11, 2020)....................................................... 6, 7, 21

U.S. Dep't of Educ., Office of the General Counsel, *The Secretary's Legal Authority for Debt Cancellation* (Aug. 23, 2022) ("ED Legal Authority Memo"),
    87 Fed. Reg. 52,943 (Aug. 30, 2022)..................................................... 6, 39

x

**Introduction**

In Title IV of the Higher Education Act of 1965, as amended ("HEA"), Congress charged the Department of Education with "assist[ing] in making available the benefits of postsecondary education to eligible students" through the provision of federal financial aid.   20 U.S.C. § 1070(a). The HEA has long vested the Department with broad authority to manage the federal student financial aid programs, to determine the terms and conditions upon which borrowers are required to repay their student loans to the Department, and to discharge or modify loan obligations in a wide variety of circumstances.   In 2003, Congress added to that authority by enacting the Higher Education Relief Opportunities for Students Act of 2003 ("HEROES Act").   The HEROES Act authorizes the Secretary of Education to waive or modify the terms of student loans administered by the Department to ameliorate the economic effects of war or national emergency.

COVID-19 is such an emergency.   In response to the novel coronavirus, then-President Donald Trump declared a national emergency in March 2020.   Then-Secretary Betsy DeVos proceeded to invoke the HEROES Act almost immediately to provide relief to individuals with Department-held students loans—pausing repayment obligations and suspending interest accrual. As the state of emergency has persisted, the Secretary of Education, across presidential administrations, has deemed it necessary to invoke the HEROES Act to provide broad relief to federal student loan borrowers on multiple separate occasions.

This action pertains to the most recent invocation of the HEROES Act in August 2022. As the Nation focuses on emerging from the pandemic, Secretary of Education Miguel Cardona has determined that the loan repayment pause initiated by his predecessor should come to an end. But because economically vulnerable borrowers face a high risk of delinquency and default as a

1

result of the pandemic—a risk that is particularly acute when payments resume—the Secretary has invoked the HEROES Act to provide targeted student loan cancellation so that affected individuals will not be worse off with respect to their student loans because of the COVID-19 pandemic and associated national emergency.   Six states now bring suit, seeking to enjoin implementation of the Secretary's order, asserting that the loan cancellation exceeds the Secretary's authority.   But Plaintiffs are incorrect: the Secretary's decision, based on thorough economic analysis and targeted in response to the COVID-19 national emergency, fits comfortably within the Secretary's HEROES Act authority.

At the outset, this case must be dismissed for lack of standing.   Many of Plaintiffs' claims turn on the theory that the states will be better off economically if more students remain in debt, because they make profits from administering debt obligations.   Those theories fail to describe any concrete injury traceable to the Department's loan relief policy.   And Plaintiffs' more abstract theories regarding impacts on state revenue streams are far too speculative to support standing. For similar reasons, Plaintiffs have not demonstrated that they will be irreparably harmed absent preliminary relief, as their feared future economic losses are neither certain nor great.

On the merits, the Department's action is authorized by the HEROES Act.   The Department has responded to the COVID-19 crisis by suspending payments on Department-held loans for more than two years, pursuant to the same HEROES Act provision relied upon here. Now, as the payment pause draws to a close, the Secretary has determined, consistent with that authority, to provide a measure of student loan forgiveness to Americans at risk of student loan delinquency and default to ensure that they will not be made worse off with respect to their student loans by the pandemic as they resume making payments on their loans.   The Secretary's

2

determination satisfies each element of the statutory text.   There is no basis to depart from that text, as the Secretary's authority to manage the federal student loan programs is well-established and long-standing.   And because the Secretary applied the relevant statutory factors and supplied a reasoned basis for his determination, the action is not arbitrary and capricious.   Plaintiffs' claims pursuant to the Administrative Procedure Act ("APA") are thus not likely to succeed.   Nor does the public interest support a nationwide injunction that would delay necessary relief to millions of federal student loan borrowers on the basis of incidental harms allegedly suffered by six states from the alleged downstream effects of the policy.   The Court should deny Plaintiffs' motion.

## Background

### I.     The Federal Student Loan Programs

The Secretary of Education ("Secretary") is charged with carrying out certain student loan programs under Title IV of the HEA, 20 U.S.C. § 1070 *et seq*.   Foremost among these is the William D. Ford Federal Direct Loan Program, which allows students to apply for and receive Direct Loans from the federal government to pay for their educational expenses, including tuition and living expenses.   20 U.S.C. § 1087*ll*.   Title IV also includes other programs, such as the Federal Family Education Loan ("FFEL") Program, *id*. §§ 1071-1087-4, and the Perkins Loan Program, *id*. §§ 1087aa-1087ii, although no new loans are authorized under either program.   *See id*. § 1087(a)(1) (no new FFEL loans after July 1, 2010); *id*. § 1087aa(b)(2) (no new Perkins loans after September 30, 2017).   The FFEL Program allowed "financial institutions [to] make low-interest loans to students or their families, which are guaranteed by state or non-profit guaranty agencies that are reinsured by the United States, through the Department of Education."   *Student Loan Mktg. Ass'n v. Riley*, 907 F. Supp. 464, 467 (D.D.C. 1995).   Over time, the Department has

3

come to own some FFEL loans previously held by private lenders, such that FFEL loans can now be held by either the Department or a private lender, depending on the circumstance.  *E.g.*, 20 U.S.C. § 1078(c)(8); 20 U.S.C. § 1080(b); 34 C.F.R. § 682.409.   Federal student loan borrowers may generally consolidate their federal student loans into a Direct Consolidation Loan, although limitations exist on borrowers' ability to consolidate an existing FFEL Consolidation loan into a new Direct Consolidation loan.   *See* 34 C.F.R. § 685.220.

The HEA delegates significant authority to the Secretary to administer the Department's portfolio of more than 43 million federal student loans, *see* 20 U.S.C. §§ 1082, 3441, 3471, including the authority to "compromise, waive, or release" any "right, title, claim, lien, or demand" acquired in the Secretary's performance of his vested "functions, powers, and duties" to administer federal student loans, *id.* § 1082(a)(6).   The relevant statutory and regulatory framework also provides federal student loan borrowers significant opportunities, in varied circumstances, to postpone, defer, or reduce their repayment of federal student loans.   *See, e.g.*, 20 U.S.C. §§ 1098e; 1087e(d)(1);  1078(b)(9)(A)(v)  (authorizing  income-driven  and  income-contingent repayment plans for borrowers to reduce their monthly payments); 34 C.F.R. §§ 682.210; 682.211; 685.204; 685.205 (providing for periods of deferment or forbearance).   There are also multiple programs that allow student loan borrowers to obtain forgiveness or discharge of their federal student loan debt in diverse situations.   *See, e.g.*,  20  U.S.C.  §§ 1087j;  1078-10  (full-time teachers); 20 U.S.C. § 1078-11 (individuals working in designated "areas of national need"); 34 C.F.R. § 685.219 (Public Service Loan Forgiveness); 20 U.S.C. §§ 1087e(h); 1087(c)(1) (schools engaging in misconduct, providing false certification of eligibility, or closing).

4

## II.     The HEROES Act

The HEROES Act, Pub. L. 108-76, 117 Stat. 904 (2003) (codified at 20 U.S.C. §§ 1098aa-1098ee), authorizes the Secretary to take broad and decisive action with respect to the federal student financial aid programs in times of national emergency.  Specifically, it provides that, "notwithstanding any other provision of law," the Secretary may "waive or modify any statutory or regulatory provision applicable to" the federal student financial aid programs "as the Secretary deems necessary in connection with a . . . national emergency to" accomplish certain statutory goals.  20 U.S.C. § 1098bb(a)(1).  As relevant here, the Secretary may provide such waivers "as necessary to ensure" that (1) covered Title IV financial aid recipients "are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals," and (2) administrative requirements placed on such covered individuals are "minimized . . . to ease the burden on such students and avoid inadvertent, technical violations or defaults."  *Id*. § 1098bb(a)(2).  The Act defines the covered population of "affected individual[s]" broadly to encompass any individual who, as relevant here, either "resides or is employed in an area that is declared a disaster area by any Federal, State, or local official in connection with a national emergency," or "suffered direct economic hardship as a direct result of a [national emergency] as determined by the Secretary."  *Id*. § 1098ee(2).

The Act exempts any exercise of the Secretary's authority from certain otherwise applicable procedural requirements, including notice-and-comment rulemaking under the APA. *See id*. § 1098bb(b)(1), (d).  And the statute explicitly states that the Secretary "is not required to exercise the waiver or modification authority under this section on a case-by-case basis."  *Id*. § 1098bb(b)(3).  Historically, the Department has exercised this authority to provide categorical

5

relief to borrowers in connection with national emergencies.   *See* U.S. Dep't of Justice, Office of Legal Counsel, *Use of the HEROES Act of 2003 to Cancel the Principal Amounts of Student Loans*, 2022 WL 3975075, at *4-5 (Aug. 23, 2022) ("OLC Opinion"); U.S. Dep't of Educ., Office of the General Counsel, *The Secretary's Legal Authority for Debt Cancellation* (Aug. 23, 2022), *available at* 87 Fed. Reg. 52,943 ("ED Legal Authority Memo").

## III.    The COVID-19 Pandemic

In March 2020, then-President Trump declared a national emergency to contain and combat COVID-19.   *See* 85 Fed. Reg. 15,337 (Mar. 18, 2020).   That declaration remains in effect, and the federal government has declared every state, the District of Columbia, and the territories to be disaster areas affected by COVID-19.   *See* Federal Emergency Management Agency, COVID-19 Disaster Declarations, https://perma.cc/B7KA-W4KD.   Over the past two and a half years, COVID-19 has killed more than 1 million Americans, *see* Centers for Disease Control and Prevention, COVID Data Tracker (Oct. 6, 2022), https://perma.cc/5ERQ-4XQW, and has caused significant disruptions to all aspects of American life.   Even now, COVID-19 is killing more than 300 Americans and causing thousands more hospitalizations every day.   *Id*.

In response to the pandemic and the myriad economic difficulties it has imposed, the federal government has taken several significant actions to provide relief to federal student loan borrowers with Department-held loans.   On March 20, 2020, the Secretary invoked the HEROES Act to pause repayment obligations and suspend interest accrual on Department-held student loans. *See* 85 Fed. Reg. 79,856, 79,857 (Dec. 11, 2020).   Shortly thereafter, Congress enacted legislation directing the Secretary to suspend all payments on any Title IV loans held by the Department, and apply a zero percent interest rate to all such loans, through September 2020.   Pub. L. 116-136,

6

§ 3513, 134 Stat. 281 (2020).    These protections were extended by both the Trump Administration

and the Biden Administration and remain in effect today pursuant to invocations of the Secretary's

HEROES Act authority.    *See, e.g.*, 85 Fed. Reg. 79,856, 79,857 (Dec. 11, 2020); Federal Student

Aid ("FSA"), Fiscal Year 2020 Annual Report 38 (Nov. 16, 2020), https://perma.cc/9ZM7-HWZP

("FSA Report"); Memo from Secretary Cardona to Chief Operating Officer ("COO") Cordray

("Decision Memo"), Ex. B to Decl. of James Kvaal ("Kvaal Decl.").[1]    As a result, federal student

loan borrowers with Department-held loans have not been required to make payments on those

loans for more than two and a half years.    On August 24, 2022, the Secretary announced that he

would use his authority under the HEROES Act to extend the payment pause and zero percent

interest protections one final time, through December 31, 2022.    *See* U.S. Dep't of Educ., *Biden-*

*Harris Administration Announces Final Student Loan Pause Extension Through December 31 and*

*Targeted Debt Cancellation to Smooth Transition to Repayment*, https://perma.cc/AP3Q-3V6C.

## IV.    The Targeted One-Time Pandemic Loan Discharge Plan

To address the financial harms caused by the pandemic and ensure a smooth transition back

to repayment status after this long, pandemic-induced payment pause, the Secretary further

announced he would use his authority under the HEROES Act to provide targeted one-time debt

relief to federal student loan borrowers affected by the pandemic.    *Id*.    Designed to "address the

financial harms of the pandemic" by providing relief to "borrowers at highest risk of delinquencies

or default once payments resume," the Department's plan will make up to $10,000 in student loan

debt relief available to eligible borrowers making less than $125,000 (or married couples making

less than $250,000).    *Id*.    Such borrowers who received a Pell Grant to attend college are eligible

---

[1] The Kvaal Declaration is attached as Exhibit 1.

to receive up to $20,000 in loan relief.   *Id*.

This loan forgiveness program is based on the Secretary's determination that such measures are necessary to ensure that "borrowers subject to the payment pause are not placed in a worse position financially by the COVID-19 national emergency as they restart payments." Decision Memo.   The Secretary recognized that while the payment pause had "delivered substantial relief to millions of loan borrowers," additional steps are needed to address the "heightened risk of loan delinquency and default" that many borrowers face upon reentering repayment and to ensure that such borrowers are not "in a worse position financially due to the pandemic with regard to their ability to repay their loans."   *Id*.   That determination was based on, among other things, an economic analysis finding that discharging $10,000 in federal student loan debt (and $20,000 for Pell Grant recipients) for borrowers making less than $125,000 (or households making less than $250,000) would reduce the likelihood of delinquency and default for borrowers transitioning back to repayment and ensure that such borrowers are not made worse off by the COVID-19 pandemic.   *See generally* Rationale for Pandemic-Connected Loan Discharge Program ("Supporting Analysis"), included with Ex. A to Kvaal Decl.

As part of its ongoing implementation of the announced loan cancellation plan, the Department has published additional information on its website, including a "What Do I Need to Know?" and "Frequently Asked Questions" page for borrowers.   *See* U.S. Dep't of Educ., Federal Student Aid, *One-Time Student Debt Relief*, https://perma.cc/JND5-THCZ ("FAQs").   That page describes the types of federal student loans that are eligible for one-time debt relief, including Direct Loans, FFEL and Perkins loans held by the Department, and most defaulted loans.   *Id*.   As for privately-held FFEL loans, the Department announced on September 29, 2022 that, as of that

date, "borrowers with federal student loans not held by ED cannot obtain one-time debt relief by consolidating those loans into Direct Loans."   *Id*; *see also* Kvaal Decl. ¶ 4.

Over the next several weeks, the Department will be taking steps to implement the debt relief plan, potentially including continuing to communicate with servicers regarding implementation, sending emails notifying borrowers eligible for automatic relief of their eligibility and the option to opt out, communicating with borrowers and other interested parties concerning debt relief, conducting testing of the application form with members of the general public before the application form is fully launched (including sending emails inviting members of the public to participate in such testing), and announcing and opening the application form.   *See* Kvaal Decl. ¶ 5   The Department will not discharge any student loan debt under the debt relief plan prior to October 23, 2022.   *Id*.

## V.     **This Lawsuit**

On September 29, 2022, Plaintiffs initiated this action and moved for a temporary restraining order and a preliminary injunction.   ECF Nos. 1, 3, 4.   Plaintiffs seek a nationwide injunction against implementation of the Department's loan relief policy.   Mem. in Supp. of Mots. for TRO & Prelim. Inj. ("PI Br."), ECF No. 5.   They claim it exceeds the Department's statutory authority, is arbitrary and capricious, and contravenes the separation of powers.

## <u>Legal Standard</u>

"A preliminary injunction is an extraordinary remedy never awarded as of right."   *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008).   The Court weighs four factors: threat of irreparable harm to the movant; the balance between the movant's harm and the harm that granting the injunction would cause to other parties; the movant's likelihood of success on the merits; and

the public interest.   *Dataphase Sys. Inc. v. C.L. Sys.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc). "The burden of proving that a preliminary injunction should be issued rests entirely with the movant."   *Goff v. Harper*, 60 F.3d 518, 520 (8th Cir. 1995).

<u>Argument</u>

## I.      Relief Against The President Is Improper.

As a preliminary matter, the President is an improper defendant in this case, which purports to challenge "final agency action" under the APA.   *See* PI Br. at 35.   Plaintiffs do not challenge any Presidential action, and even if they did, it is well established that "the President's actions [are] not reviewable under the APA, because the President is not an 'agency' within the meaning of the APA."   *Dalton v. Specter*, 511 U.S. 462, 469 (1994).   Nor is any declaratory or injunctive relief proper against the President in his official capacity: "With regard to the President, courts do not have jurisdiction to enjoin him and have never submitted the President to declaratory relief." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010); *see also Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992) ("[I]n general, 'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.'").

## II.     The Court Lacks Jurisdiction.

"Subject-matter jurisdiction is a threshold requirement which must be assured in every federal case."   *Kronholm v. FDIC*, 915 F.2d 1171, 1174 (8th Cir. 1990).   Plaintiffs bear the burden of proving it, including the "irreducible constitutional minimum of standing," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 84, 102 (1998)—*i.e.*, "(i) that [plaintiff] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendants; and (iii) that the injury would likely be redressed by judicial relief."

10

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).   They cannot do so here.

**A.    Plaintiffs Have No Standing to Pursue Declaratory and Injunctive Relief Based on a Purported "Incentive to Consolidate."**

Plaintiffs' primary claimed harm is that the challenged policy "has created an enormous incentive to consolidate FFELP loans not held by the Department . . . into [Direct] loans."   PI Br. at 14.   They claim that this "incentive to consolidate" is causing harm "in at least five ways."   *Id*. The details of those supposed harms are beside the point, because no such incentive exists.   The day before Plaintiffs filed this suit, the Department directed its vendor to update the Department's website to state that "[a]s of Sept. 29, 2022, borrowers with federal student loans not held by ED cannot obtain one-time debt relief by consolidating those loans into Direct Loans."   FAQs.[2]   The prospect of receiving one-time debt relief thus cannot now logically serve as an incentive for anybody to consolidate privately-held FFEL loans into Direct Loans.   Because Plaintiffs seek only prospective relief, they must articulate an ongoing injury.   *See City of Los Angeles v. Lyons*, 461 U.S. 95 (1983); *see also Iowa Voter All. v. Black Hawk Cnty.*, 515 F. Supp. 3d 980, 993 (N.D. Iowa 2021) (plaintiffs seeking declaratory and injunctive relief "cannot rely on 'past injuries alone . . . to establish standing'" (quoting *Frost v. Sioux City*, 920 F.3d 1158, 1162 (8th Cir. 2019))). The lack of an ongoing incentive to consolidate manifestly defeats this claim to standing.

Even if Plaintiffs could identify an ongoing incentive to consolidate, the financial harms that allegedly could result from consolidation are speculative and not traceable to the Department's conduct.   For example, Plaintiffs assert that consolidation of an FFEL loan into a Direct Loan harms FFEL loan holders like MOHELA to the extent that it "results in the prepayment and

---

[2] *See* Kvaal Decl. ¶ 4 & Exs. D-F to Kvaal Decl.

immediate elimination of many of those FFELP loans."  PI Br. at 14.  But FFEL loan holders

have no legal entitlement to a loan portfolio of any particular size or any guaranteed amount of

revenue.  Rather, the size and return on that portfolio will necessarily fluctuate from day to day

for a host of reasons, including as student loan borrowers pay down their loans; seek to defer,

reduce, or forbear their repayment obligations under various regulatory avenues; obtain outright

forgiveness and cancellation through other statutory avenues; and apply for consolidation for

independent reasons other than the challenged policy.  *See supra* p. 4.  In light of these realities,

the link between the specific loan discharge policy challenged here and the alleged financial harms

to the FFEL loan holders within the states is too attenuated to support standing.  *See XY Planning*

*Network, LLC v. SEC*, 963 F.3d 244, 252-53 (2d Cir. 2020).

      The same is true with respect to Plaintiffs' related theories that the Department's loan relief

policy will "lower prices available in the secondary market for" FFEL loans, reduce profits to

FFEL loan servicers, or cause harm to entities that invest in student-loan based security markets.

*See* PI Br. at 16-17.  Plaintiffs describe a possible reduction to inherently uncertain sources of

revenue, which could depend at any given moment on many factors other than the challenged

agency action.  These theories fail because "[u]ncertainty and speculation cannot hold together

the chain to connect the challenged acts to the asserted particularized injury."  *Gerber Prods. Co.*

*v. Perdue*, 254 F. Supp. 3d 74, 82 (D.D.C. 2017).  Indeed, while Plaintiffs contend that "[l]eft

alone," FFEL loans "will continue to generate millions of dollars per year in interest payments,"

PI Br. at 15, the bond issuance they cite recognizes the existence of significantly more uncertainty.

*See* ECF No. 5-1 at 55("For a variety of economic, social and other reasons all the payments that

are actually due on Financed Eligible Loans may not be made or may not be made in a timely

fashion.").   The incidental effect of the Department's one-time loan relief announcement on this fundamentally uncertain source of revenue creates no threat of "concrete and particularized" injury sufficient to confer standing.   *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 794 (8th Cir. 2016).

### B.   The Court Lacks Jurisdiction Over Disputes Arising Out of Loan Servicers' Federal Contracts.

Plaintiffs next claim that "state entities like MOHELA that service federally held student debt face the imminent loss of revenue in their role as servicers of [Direct] loans."   PI Br. at 19. This theory fails for several reasons.   First, Missouri has not met its burden to show that it can rely on harms allegedly suffered by MOHELA.   MOHELA can sue and be sued in its own name and retains financial independence from the state; indeed, "the vast majority of MOHELA's funds are segregated from state funds and controlled exclusively by MOHELA."   *Dykes v. MOHELA*, 2021 WL 3206691, at *4 (E.D. Mo. July 29, 2021) (finding that MOHELA was not an "arm of the state" for purposes of 11th Amendment sovereign immunity).   Because MOHELA is a "self-sustaining and financially independent agency," *id.*, its claimed financial harms are not attributable to the state in which it operates and cannot establish standing here.

Second, Plaintiffs cannot invoke this Court's jurisdiction for injuries allegedly arising out of contractual relationships between the Department and servicers like MOHELA.   Instead, exclusive jurisdiction over such disputes lies in the Court of Federal Claims ("CFC") pursuant to the Contract Disputes Act ("CDA"), which "applies to any express or implied contract entered into by an executive agency for the procurement of property, services, construction, repair, or the disposal of personal property."   *Anselma Crossing, L.P. v. USPS*, 637 F.3d 238, 240 (3d Cir.

2011); *see also* 28 U.S.C. § 1346(a)(2) ("the district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States").   The CDA is broad, encompassing "all claims and disputes, whether arising under or relating to the contract."   *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1135 (6th Cir. 1996); *see also Todd Const., LP v. United States*, 656 F.3d 1306, 1312 (Fed. Cir. 2011) (a claim need only have "some relationship to the terms or performance of a government contract"). "The CDA exclusively governs Government contracts and Government contract disputes," and, "[w]hen the [CDA] applies, it provides the exclusive mechanism for dispute resolution."   *Tex. Health Choice, L.C. v. OPM*, 400 F.3d 895, 898-99 (Fed. Cir. 2005); *see also, e.g.*, *Goodin v. U.S. Postal Inspection Serv.*, 444 F.3d 998, 1000-01 (8th Cir. 2006).[3]

In assessing whether a claim is subject to CDA preclusion, the "plaintiff's title or characterization of its claims is not controlling," *RMI Titanium*, 78 F.3d at 1136, and a party cannot evade the CDA by "recasting claims . . . as some statutory or regulatory violation."   *United States v. J&E Salvage Co.*, 55 F.3d 985, 988 (4th Cir 1995); *accord Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 77 (D.C. Cir. 1985).   Here, Plaintiffs claim that entities like MOHELA will lose revenue "in their role as servicers of [Direct] loans," relying on contractual provisions governing compensation to contend that they will "lose the revenue from servicing" federally held loans.   PI Br. at 19-20.   Even if the states have not pled a breach of contract claim, their contention is that the Department's loan discharge policy will deprive loan servicers of compensation that is governed by federal contracts.   If they are correct, and any loan servicer is actually entitled to

---

[3] Under the CDA, claims that arise out of federal contracts must first be decided by a contracting officer, *see* 41 U.S.C. § 7103(a), and a contractor may contest the decision of the contracting officer either by appealing to a board of contract appeals or filing suit in the CFC, *see id*. § 7104.

additional compensation, then the loan servicer could pursue remedies through the CDA.   As MOHELA's contract expressly provides, to the extent that MOHELA claims any "equitable adjustment" to its compensation under the contract, that dispute is to be resolved in accordance with the CDA and, in the meantime, MOHELA "shall proceed diligently with performance of this contract, pending final resolution of" the dispute.   ECF No. 5-1 at 350.   But there is no basis for injunctive relief, and Plaintiffs cannot assert a "disguised contract action[]" in federal district court to seek redress for harm that is "fundamentally about [a] specific government contract[] and how [it is] administered."   *Lockheed Martin Corp. v. Def. Contract Audit Agency*, 397 F. Supp. 2d 659, 665 (D. Md. 2005) (dismissing claims under the APA for declaratory and injunctive relief).

Third, to the extent Plaintiffs' claims on behalf of Direct Loan servicers are not subject to the CDA, their theory of standing is too speculative and attenuated to support standing.   Entities like MOHELA cannot claim a "legally protected interest," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)—above and beyond the compensation specified in their federal contracts—in any particular amount of income from servicing federal Direct Loans.   A federal loan servicer's loan portfolio is determined by contract, and the number of loans in that portfolio, and corresponding revenue to the servicer, is uncertain.   *See* ECF No. 5-1 at 211 (MOHELA contract specifying that the government "reserves the right to periodically review and equitably adjust the rate structure" and "unilaterally shift borrowers" to other servicers).   And new Direct Loans are issuing every day, increasing the pool of debt available for MOHELA to service.   The Department's challenged policy might reduce MOHELA's portfolio, or the financial flexibility it provides could create increased demand for Direct Loans.   Plaintiff can only speculate about a "possible future injury," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013), that is too attenuated from the instant

15

agency action to support standing, *see XY Planning Network, LLC*, 963 F.3d at 252-53.

Finally, Plaintiffs cannot establish that their alleged interests in maximizing the proceeds of their loan servicing operation "fall within the zone of interests protected by" the HEROES Act. *See Lexmark Int'l Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2019). That statute concerns the Secretary of Education's authority to modify or waive applicable requirements to provide relief to federal student loan borrowers in connection with a national emergency. True, the zone of interests test is not "especially demanding" in the APA context. *Id.* at 130. But extending it here to allow states to block loan relief that Congress determined the Secretary should be able to provide swiftly and decisively in times of national emergency, based on the purported financial effect such loan relief might have on state entities that allegedly profit from the existence of conditions the Secretary has found necessary to modify, is a bridge too far. The interests Plaintiffs claim "are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012); *see Air Courier Conf. of Am. v. APWU, AFL-CIO*, 498 U.S. 517, 525-26 (1991) (finding that claimed interest in employment opportunities was not within the zone of interests of a statute concerned only with "the receipt of necessary revenues" for the employing agency).

**C.     Plaintiffs' Other Claimed Injuries Are Neither Concrete nor Imminent.**

Plaintiffs also allege other proprietary, sovereign, and quasi-sovereign interests. None is sufficient to support standing. To begin, a "State does not have standing as *parens patriae* to bring an action against the Federal Government." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 610 n.16 (1982). This means that Plaintiffs cannot base their standing on purported

harms to the "well-being of [their] residents" or "public employees," in the form of allegedly limited "educational opportunities" or availability of pension funds.  PI Br. at 23-24; *see, e.g.*, *City of Clarkson Valley v. Mineta*, 2008 WL 11512303, at *5 (E.D. Mo. Apr. 22, 2008) ("[S]tates lack the 'power to enforce (citizens') rights in respect of their relations to the federal government. In that field it is the United States, and not the state, which represents (the citizens) as *parens patriae*.'"); *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179-83 (D.C. Cir. 2019).   And Missouri's vague claim of harm to its "regulatory scheme for accomplishing its constitutional prerogatives," PI Br. at 23, is not cognizable.   The loan forgiveness policy has no effect on the state's ability to enforce, administer, or interpret its own laws.   *Cf., e.g.*, *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 269 (4th Cir. 2011) ("[O]nly when a federal law interferes with a state's exercise of its sovereign 'power to create *and enforce* a legal code' does it inflict on the state the requisite injury-in-fact").   Allowing state standing to challenge federal policies based on such vague and amorphous interests would eviscerate Article III's careful limitations and enable states to treat the federal courts as "an open forum for the resolution of political or ideological disputes." *United States v. Richardson*, 418 U.S. 166, 192 (1974) (Powell, J., concurring).

For their part, Nebraska, Iowa, Kansas, and South Carolina (the latter three having not even attempted to claim any other kind of injury) attempt to assert a threat of "imminent harm[]" in the form of "lost tax revenue."   PI Br. at 18, 20.   But a state may sue the United States only if it has suffered a "direct injury" from the federal government.   *Florida v. Mellon*, 273 U.S. 12, 18 (1927). The case law generally "denie[s] standing to States where the claim was that actions taken by United States Government agencies had injured a State's economy and thereby caused a decline in general tax revenue."   *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992).   The Supreme Court

17

found standing in *Wyoming*, but only because there was "unrebutted evidence" of a loss of "hundreds of thousands of dollars in severance taxes" as a direct result of the challenged Oklahoma law.  *See Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1234-35 (10th Cir. 2012) (summarizing Supreme Court's decision and noting that "merely speculative" "assertions of future lost tax revenues" are insufficient to establish standing).

Here, the Plaintiff states project that they may lose some unspecified amount of future income tax revenues based on the following attenuated chain of reasoning: federal student loan discharges are not taxable under existing federal law between December 31, 2020 and January 1, 2026; the states have chosen to adopt this definition of taxable income in their own state tax codes; the states do plan to tax discharges that occur after January 1, 2026 (but apparently will not amend their codes to tax such discharges before that date); the states will lose tax revenue to the extent that the total amount of loan discharges they currently project to occur after January 1, 2026 is reduced at all prior to that date.  *See* PI Br. at 21-22.   But the "amount of outstanding loan debt," *id*., that will be available for those states to tax in 2026 will fluctuate a great deal between now and then; it may increase as the result of additional student loan borrowing and rising tuition costs, or it may decrease for any number of reasons as borrowers pay down their loan debt or receive measures of loan forgiveness through unrelated channels.

In short, these states' claims of "future lost tax revenues are merely speculative," and fall well short of the bare minimum "direct link between the state's status as a . . . recipient of revenues and the . . . administrative action being challenged" that might support standing.  *Wyoming*, 674 F.3d at 1234-35; *see also El Paso Cnty., Texas v. Trump*, 982 F.3d 332, 339 (5th Cir. 2020) ("We conclude that a county's loss of general tax revenues as an indirect result of federal policy is not a

18

cognizable injury in fact."); *Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976) ("[T]he unavoidable economic repercussions of virtually all federal policies . . . suggest to us that impairment of state tax revenues should not, in general, be recognized as sufficient injury in fact to support state standing.").   And in any event, they result from the states' own decisions about how to tax federal loan discharges—not the federal loan discharge policy itself.

* * *

At bottom, Plaintiffs seek to challenge a program for providing loan relief to third parties not before the Court, based on speculative claims of downstream incidental economic effects on certain state economies.   Allowing standing based on such "indirect fiscal burdens" resulting from a federal policy "would make a mockery . . . of the constitutional requirement of case or controversy."  *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) (Sutton, J., concurring).

## III.   Plaintiffs Have Failed To Establish A Likelihood Of Success On The Merits.

### A.   The HEROES Act Authorizes the Targeted Student-Loan Debt Relief.

Most fundamentally, Plaintiffs are unlikely to succeed on the merits of their claims because, in deciding to grant the one-time discharge of student loan debts challenged here, the Secretary validly invoked authority granted to him by Congress through the HEROES Act.   As explained *supra* pp. 5-6, in order to achieve certain objectives, that Act empowers the Secretary to provide substantial relief to federal student loan borrowers in connection with, as relevant here, a national emergency.   *See, e.g.*, 20 U.S.C. § 1098bb(a)(1).   The Secretary invoked this authority in his August 24, 2022 memorandum to the FSA COO Richard Cordray, explaining that "many borrowers will be at heightened risk of loan delinquency and default" and "experience challenges in the transition" as loan payments resume following the pandemic.   Decision Memo at 1.

Because these problems "could offset the benefits provided" previously under the HEROES Act and "leave borrowers worse off than they were before the pandemic," the Secretary concluded that "[a]dditional steps are needed to address these challenges and reduce the likelihood of" such harms. *Id*. Accordingly, "to ensure that borrowers subject to the payment pause are not placed in a worse position financially by the COVID-19 national emergency as they restart payments," the Secretary exercised his authority to modify certain statutory and regulatory provisions so that those borrowers at the most serious risk—determined by the Secretary to be borrowers with individual incomes under $125,000 or household incomes under $250,000 during the tax years 2020 or 2021—would have their loans discharged by $10,000 in the standard case, and by $20,000 if the borrower previously received a Pell Grant. *Id*. That action falls squarely within the bounds Congress authorized, rendering Plaintiffs unlikely to succeed on the merits of their statutory authority claims.[4]

> 1.   The HEROES Act Authorizes the Secretary to Modify Provisions Regarding Loan Discharge Authorities.

As a threshold matter, the HEROES Act authorizes the type of relief that the Secretary

---

[4] Plaintiffs purport to challenge the Secretary's statutory authority pursuant to both the APA and a "separation-of-powers" claim. *See* Compl. ¶ 142–158. As the complaint acknowledges, those claims are virtually indistinguishable in their substance. *See id.* ¶ 156 ("By exceeding their statutory authority, Defendants have also violated the constitutional separation of powers."). For this reason, Defendants' arguments concerning the Secretary's statutory authority apply with equal force as to the merits of both of those claims. But for the sake of completeness, Defendants note here that Plaintiffs' "separation-of-powers" claim is actually an *ultra vires* claim. *See id.* ¶ 148. Such claims cannot be brought where an APA claim is available, and in any event are subject to a higher standard of review. *See, e.g.*, *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902); *Leedom v. Kyne*, 358 U.S. 184 (1958); *Bd. of Governors of the Fed. Rsrv. Sys. v. MCorp Fin., Inc*., 502 U.S. 32, 43 (1991). So, whether for lack of a valid cause of action, or for all the reasons stated herein, the Court should find that Plaintiffs are unlikely to succeed on the merits of their *ultra vires* claim.

found appropriate here: a modification of statutory and regulatory provisions relating to the discharge of student loan obligations.   The Act provides that, "[n]otwithstanding any other provision of law, unless enacted with specific reference to" Section 1098bb, the Secretary may "waive or modify *any* statutory or regulatory provision applicable to" the federal student loan programs.   20 U.S.C. § 1098bb(a)(1) (emphasis added).   The Secretary's action, taken for the benefit of a class found to be at risk due to their status as individuals affected by a national emergency, is consistent with the past applications of the HEROES Act; indeed, the same authority has been used to implement the payment pause throughout the pandemic.   *See supra* pp. 6-7. And the action falls squarely within the Secretary's discretion to "modify" student loan requirements as necessary to fulfill the purposes of the HEROES Act.   *See* 20 U.S.C. §§ 1098bb(a)(1), (2).

It is not clear whether Plaintiffs actually dispute this conclusion.   Plaintiffs' filings try to draw a distinction between "some discharge of student loan debt," which they seem to accept might be possible under the HEROES Act, and "Mass Debt Cancellation," which they oppose.   *See* PI Br. at 3; Compl. ¶ 11.   But Plaintiffs fail to articulate any line between authority the Secretary may exercise and what he may not do.   That failure is telling and demonstrates that they are not likely to prevail on this point.   Moreover, the Secretary's action here provides for only "some discharge" of debt, in amounts and manners consistent with the stated objectives of the HEROES Act; it cannot be described fairly (or accurately) as a boundless "Mass Debt Cancellation."

To the extent that Plaintiffs believe *any* discharge of student loan debt is outside the Secretary's HEROES Act authority, that position is unsupported.   In particular, Plaintiffs have not explained how a provision that unmistakably authorizes the Secretary to "waive or modify any

21

statutory or regulatory provision applicable to" federal student loan programs "[n]otwithstanding any other provision of law" save only for provisions "enacted with specific reference to this section," 20 U.S.C. § 1098bb(a)(1), can be read to withhold that authority for provisions governing the discharge of federal student loans without cross-referencing the HEROES Act.

2.   <u>The Loan Discharges Apply to a Proper Subset of Affected Borrowers.</u>

The HEROES Act also authorizes the Secretary to modify discharge authority for a subset of the class of federal student loan borrowers at issue here—borrowers with outstanding debt during the COVID-19 pandemic.   Again, the Act requires that the Secretary exercise his waiver and modification authority on behalf of borrowers who are "affected individuals."   20 U.S.C. § 1098bb(a)(2).   There are several statutorily defined categories of "affected individuals," *see id.* § 1098ee(2), but here, given the profound depth and sweep of the COVID-19 pandemic, the vast majority of federal student loan borrowers qualify by virtue of where they live and work:   Each of the States, the District of Columbia, and all five permanently populated United States territories have been designated as disaster areas due to the COVID-19 pandemic, and so any borrower who "resides or is employed in" one of those areas falls within the HEROES Act's definition of an "affected individual."   *Id.* § 1098ee(2)(C).

Borrowers may also qualify as "affected individuals" if they have "suffered direct economic hardship as a direct result of a war or other military operation or national emergency, as determined by the Secretary," a condition that can be satisfied even for individuals outside the United States.   *Id.* § 1098ee(2)(D).   For each of the invocations of HEROES Act authority during the current national emergency (including the invocation challenged here, *see* Decision Memo), the Secretary of Education has determined that all borrowers of direct federal loans qualify as

22

"affected individuals."   As confirmed by the President's latest continuation of the national emergency concerning COVID-19, *see* 87 Fed. Reg. 10289 (Feb. 18, 2022), the pandemic is an ongoing national emergency that, after more than two years, has left no aspect of daily life untouched.   It has killed more than a million Americans; sickened millions more; crippled untold numbers of private businesses; disrupted global supply chains for even ordinary goods; contributed to inflation; and fueled instability worldwide.   Given the well-established, widespread economic hardship that all have endured during the pandemic, both within the United States and outside of it, the Secretary could reasonably determine that federal student loan borrowers also qualify as "affected individuals" based on direct economic hardships suffered from the COVID-19 pandemic.

Plaintiffs contend that the Secretary has authorized relief for too broad a class, complaining that the Secretary failed to exclude "people who have lived abroad during the pandemic" from obtaining relief, and has not "tried to restrict [loan discharges] to borrowers who have suffered" financially from the pandemic.   PI Br. at 33.   But as already explained, the statute did not require the Secretary to restrict loan discharges in the manner Plaintiffs suggest.   And even if there were some overbreadth to the Secretary's action, that would not justify the injunctive relief that Plaintiffs seek, which would cover the *entire* program.   Nevertheless, the HEROES Act does not require the sort of perfectly tailored relief that Plaintiffs posit.   Indeed, Congress anticipated— and rejected—Plaintiffs' overbreadth objections, expressly providing that "[t]he Secretary is not required to exercise the waiver or modification authority [provided by the Act] on a case-by-case basis."   20 U.S.C. § 1098bb(b)(3).   By authorizing the Secretary to utilize categorical rules, Congress accepted that there would be some degree of imprecision in the allocation of relief.   *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 39 (2011).   The HEROES Act simply does

not allow for the kind of overbreadth challenge Plaintiffs attempt to assert here.

### 3.   The Secretary Reasonably Determined That Discharge Was Needed to Reduce Delinquency and Default Risk Among Lower Income Borrowers.

It was also reasonable for the Secretary to determine that, in addition to other pandemic-related relief, the specific targeted loan discharges at issue here "may be necessary to ensure that" borrowers in the lowest income sets of affected individuals "are not placed in a worse position financially in relation to" their federal student loans "because of their status as affected individuals."   Decision Memo; *see also* 20 U.S.C. § 1098bb(2)(A).   That judgment was informed by a careful study of the Department's past experience in roughly analogous circumstances, of administrative data collected by the Department, and of other research published by federal agencies and independent experts in the areas of consumer debt and student financial aid.   *See generally* Supporting Analysis.

The Secretary considered evidence that borrowers face a heightened risk of delinquency and default as their loans are placed back into repayment following long periods of forbearance, and that this risk is particularly acute with respect to lower-income borrowers and Pell Grant recipients.   *Id*. at 2.   Historically, the Department has found that, when borrowers affected by natural disasters have received payment pauses similar to the one currently in effect due to the COVID-19 pandemic, those borrowers' transitions back into repayment have been correlated with "documented spikes in student loan defaults."   *Id*.   In particular, recent administrative data compiled following Hurricanes Maria, Harvey, and Irma and the northern California wildfires in late 2017 showed that borrowers involved in those disasters who had received a payment pause like the one provided during the COVID-19 pandemic were almost twelve times more likely to default on their repayment obligations in the calendar year following the end of that forbearance

than they had been in the calendar year before the regional disaster was declared. *Id*. The data also revealed that Pell Grant recipients were especially vulnerable following the end of forbearance. *Id*.

Informed by the Department's past experience in analogous circumstances, the Secretary also considered evidence concerning the current economic conditions facing borrowers as they prepare to enter repayment at the end of the year. *Id*. That evidence included survey data showing that higher percentages of lower-income borrowers expect to have greater difficulty making full payments after the pandemic than they had before it. *Id*. And though self-reported, those expectations were supported by the research findings of other government agencies. For example, researchers at the Consumer Financial Protection Bureau found that, even as most student loans have remained in forbearance throughout the pandemic and many borrowers have benefited from other pandemic-related economic support, delinquency on non-student loan debt among student loan borrowers has already returned to pre-pandemic levels. *Id*. at 3. Similarly, after comparing credit report data for student loan borrowers subject to the payment pause and those whose loans remained in repayment, researchers at the Federal Reserve Bank of New York concluded that, absent additional relief alongside the end of the payment pause, borrowers will likely experience delinquencies on federal student loan debt at higher levels than before the pandemic. *Id*. Finally, the Secretary evaluated evidence that recent pandemic-induced inflationary pressures have diminished the financial well-being of many households, particularly those with lower incomes. *Id*. Based on all the evidence presented to him, the Secretary found that, absent action to reduce the threat of delinquency and default, student loan borrowers at lower income levels face serious risks that, as they exit the pandemic and their loans go back into

repayment, they will promptly be placed in a worse financial position with respect to their student loans—*i.e.*, facing an immediate risk of delinquency of default that did not exist prior to the pandemic—than they would have been in the absence of the COVID-19 pandemic.   *Id*.

In light of this, the Secretary reasonably concluded that discharging a limited measure of student loan debt for affected borrowers would mitigate the heightened risk of delinquency and default.   The evidence reviewed by the Secretary revealed that targeted discharges would reduce borrowers' total liabilities and monthly payment burdens, contributing to increased rates of repayment success and to greater overall financial well-being.   *Id*. at 4.   And an analysis of the Department's administrative data showed that the specific proposal presented to the Secretary— providing a maximum benefit of $10,000 to borrowers below the individual and household income caps of $125,000 and $250,000, and a maximum of $20,000 to borrowers below those caps who previously received a Pell Grant—would be sufficient to reduce the median borrowers' monthly payments by 38%, permitting many of the most vulnerable borrowers to enter repayment with significantly reduced monthly payments.   *Id*. at 6.   The evidence before the Secretary supported his determination that setting certain discharge amounts would address the risk of heightened delinquency and default rates facing affected borrowers as a result of the pandemic.   *Id*.

The Secretary's chosen income eligibility levels are supported by other considerations. As the Secretary recognized, "not all borrowers are equally at risk of" delinquency and default. *Id*.   In particular, in the year before the pandemic, incomes above the $125,000 individual income cutoff that the Secretary adopted were correlated with a substantial reduction in the rate of inconsistent payments reported by borrowers as compared to incomes below the cutoff.   *Id*. Reinforcing the reasonability of the Secretary's chosen cutoff, data considered by the Secretary

shows that borrowers in the $100,000–$125,000 income bracket also experienced greater difficulty before the pandemic in repaying loans than did borrowers above $125,000.  *Id.* at 9.  And borrowers with incomes below $125,000 were substantially more likely to report financial insecurity, to have experienced a period of unemployment, to have suffered educational harms during the pandemic, and to otherwise have been disproportionately impacted over the course of the pandemic.  *Id.*  And as to Pell recipients, who are disproportionately low-income, generally come from families without significant wealth or resources, and already face substantially higher risks of default and delinquency than other student loan borrowers, the Secretary's selection of the $125,000 cutoff was clearly supported:   At that income level, 99% of Pell recipients would qualify for relief.  *Id.* at 11.

In view of this substantial evidence that additional relief is needed to ensure that the most vulnerable subset of borrowers currently receiving the benefit of the payment pause are not at substantial risk of becoming delinquent or defaulting on their loan obligations when payments resume, the Secretary reasonably concluded that it was necessary and appropriate to order a limited, one-time discharge of student loan debt for those borrowers.   None of Plaintiffs' arguments undermine that determination of necessity.

Although Plaintiffs contend that the Secretary failed to "show[]" that the one-time loan discharges are necessary in connection with the COVID-19 pandemic, PI Br. at 31, the Secretary was under no obligation to "show" his work before ordering relief pursuant to the HEROES Act. *See* 20 U.S.C. § 1098bb(b)(1)–(2), (d) (providing that, notwithstanding the procedural requirements of the APA and other statutes, the Secretary need only publish a notice setting forth the waivers or modifications deemed necessary to achieve the purposes of the Act); *see also id.*

27

§ 1098bb(b)(3) (providing that the Secretary is not required to act on a case-by-case basis).   Nor can the above analysis be considered a post-hoc litigation rationale, since it was contained within the recommendation memo presented to the Secretary before he made his decision.   And as the above discussion makes clear, the Secretary did make a reasoned decision based on evidence and careful analysis.   In light of that analysis, Plaintiffs' argument that the Secretary's decision can only be explained as a political pretext given the waning of the COVID-19 pandemic, *see* PI Br. at 31, holds no water.   *See also infra* pp. 37.

Plaintiffs' arguments fail because they mistake the nature and basis of the action at issue here.   The Secretary's decision did not turn, as Plaintiffs appear to believe, on the ordinary burdens of student loan debt.   Nor was the Secretary's decision based solely on the *current* state of the pandemic.   Rather, the Secretary was concerned about the cumulative economic effects of the pandemic, particularly those effects on lower-income borrowers, and how a return to "normal" would impact those borrowers' ability to successfully restart their loan payments.   Decision Memo.   As discussed above, the Secretary appreciated that many borrowers have benefited substantially from the payment pause during the pandemic—indeed, that was the point of the pause.   But the relevant data showed that many borrowers, particularly those earning individual incomes below $125,000, continue to be in more precarious financial straits than they had been before the pandemic.   Supporting Analysis.   And the data also showed that substantial numbers of those borrowers would likely fall into delinquency or default when payments restart at the conclusion of the pandemic.   *Id*.   Based on this information, the Secretary determined that borrowers would face new and significant challenges, imposed by the pandemic, as their loans enter repayment following the pandemic, and would be at a higher risk of delinquency or default

than they were before the pandemic. *Id.* Thus, he determined that it was necessary to adopt measures to smooth the transition into repayment for many lower income individuals and families, with the goal of ensuring that these individuals were not ultimately left worse off with respect to their student loan obligations following the pandemic than they were entering it.

*   *   *

In short, with authorization by clear statutory text, the Secretary reasonably determined that many lower-income borrowers will be at heightened risk of delinquency and default following the conclusion of the pandemic-induced multi-year pause on federal student loan payments, and that additional relief measures were necessary to mitigate that risk.   The Secretary further determined that a one-time, limited measure of loan discharge would suffice to ensure that those borrowers will not be in a worse place financially with respect to their student loans as a result of the COVID-19 pandemic.   While Plaintiffs may disagree with the Secretary's decision as a policy matter, Congress vested the Secretary—not these Plaintiffs—with authority to determine when and how special relief measures should be provided to federal student loan borrowers affected by extraordinary circumstances such as the COVID-19 pandemic.   This Court should not disturb that congressional grant of authority.

### B.    The Major Questions Doctrine Does Not Undermine the Clear Statutory Authorization Provided by the HEROES Act.

In an attempt to dodge the plain text of the HEROES Act, Plaintiffs invoke the major questions doctrine.   *See* PI Br. 26–30.   In a few extraordinary cases, the Supreme Court has required "clear congressional authorization" for sweeping agency action where, "under more 'ordinary' circumstances," a "merely plausible textual basis" for that action might suffice under standard principles of statutory interpretation.   *West Virginia v. EPA*, 142 S. Ct. 2587, 2609

(2022); *see also Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021) ("We expect Congress to speak clearly when authorizing an agency to exercise powers of 'vast economic and political significance.'").   This is not such an extraordinary case.

That is not to deny that this is a case of economic and political significance, *cf.* PI Br. at 26–28; many cases challenging national policies are.   Still, not every agency action of economic and political significance triggers the major questions doctrine.   Rather, the hallmark of a "major questions case" is a marked incongruence between the agency action at issue and the history, purpose, or context of the statute that purportedly authorizes it.   Thus, the Supreme Court has invalidated agency action that advanced "novel reading[s]" of longstanding statutes, *West Virginia*, 142 S. Ct. at 2605, in order to claim "extravagant statutory power over the national economy," *id.* at 2609, and made "decisions of vast economic and political significance," *id.* at 2605, without firm indication that Congress intended it to exercise that authority.   *See also Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (requiring clear congressional authorization "[w]hen an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,'" and where the challenged action would "bring about an enormous and transformative expansion in . . . regulatory authority").

This case bears none of these features.   For one thing, the Secretary's action is consistent with and proportional to the clearly apparent purposes of the HEROES Act.   The Act's central provision, Section 1098bb, is all about getting student-loan-related relief to affected borrowers in "response to military contingencies and national emergencies."   20 U.S.C. § 1098bb.   It is unsurprising, then, that the Secretary relied on that provision to grant relief to federal student loan borrowers facing harm from the COVID-19 pandemic.   Decision Memo.   For another, this case

30

involves the disbursement of a federal benefit, not the kind of regulation of private parties that have previously triggered the doctrine.   And it should come as no shock that the relief that the Secretary has ordered under the Act is substantial and broad-based.   The scope of the Secretary's action matches the scope of the COVID-19 emergency.   To the extent that pre-pandemic actions under the Act tended to be narrower than the broad-based relief provided during the pandemic, that difference simply reflects a greater magnitude of need, not any understanding of the limits of the HEROES Act during its first 17 years of existence.  *See Missouri v. Biden*, 142 S. Ct. 647, 653 (2022) (upholding agency action that went "further than what the Secretary has done in the past" to achieve statutory objective, in part because the agency had "never had to address an infection problem of [the] scale and scope [of COVID-19] before").

Moreover, there is nothing "cryptic," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000), or "ancillary," *West Virginia*, 142 S. Ct. at 2605, about the Act's provisions, which operate together, through unambiguous language, to give the Secretary maximum flexibility to prevent affected borrowers from suffering financially with respect to their financial assistance as a result of an emergency.   *See, e.g.*, 20 U.S.C. § 1098bb(a)(1) (providing waiver and modification authority "[n]otwithstanding any other provision of law, unless enacted with specific reference to this section"); *id.* §§ 1098bb(b)(1), (d) (waiving certain procedural requirements); *id.* § 1098bb(b)(3) (clarifying that the Secretary need not exercise waiver or modification authority "on a case-by-case basis").   Moreover, student-debt relief measures provided under the Act, particularly the payment pause, were among the first interventions made following the March 2020 outbreak of the novel coronavirus; they remain among the best-known interventions made during the COVID-19 pandemic; and their legality has never been questioned.

31

All of that distinguishes this case from *West Virginia*, which Plaintiffs cite repeatedly. The Court found there that the agency action at issue involved the use of what the Court described as a "little-used backwater" provision of the Clean Air Act to impose a 10% energy rate hike, permanently shut down many power plants, inflict a $1 trillion loss to GDP, and require a complete reorganization of American energy infrastructure. *Id.* at 2604. In that context, the Court concluded that some "skepticism" of the agency's position might have been warranted. *Id.* at 2614. But nothing of the sort is justified here, where the Secretary has granted a limited measure of debt relief to certain borrowers affected by the COVID-19 pandemic pursuant to the central provision of a statute whose entire purpose is the provision of substantial loan-related relief to at-risk borrowers during a national emergency.

Sometimes, the Supreme Court also looks to whether the challenged action is within the agency's traditional field of expertise in determining whether the major questions doctrine applies. *See West Virginia*, 142 S. Ct. at 2612–13 ("When an agency has no comparative expertise in making certain policy judgments, we have said, Congress presumably would not task it with doing so."). Here again, this factor shows that the doctrine does not apply. The Secretary of Education is in the business of administering the federal student financial aid programs and, in myriad circumstances, providing appropriate relief from federal student loan repayment obligations *See supra* pp. 3-4. And the Secretary's action is limited to providing relief within the confines of the programs he administers—he has not purported to use HEROES Act authority in a manner that would expand the jurisdiction of his Department. This too distinguishes this case from major questions cases where agencies exercised authority in unaccustomed areas. *See, e.g.*, *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489 ("The moratorium intrudes into an area that is the particular domain

of state law: the landlord- tenant relationship."); *Brown & Williamson*, 529 U.S. at 159-60

("Congress has . . . squarely rejected proposals to give the FDA jurisdiction over tobacco.").

Finally, the Secretary's use of HEROES Act authority to discharge some measure of

student loan debt in appropriate cases cannot fairly be characterized as an "unheralded power" or

an otherwise improper transformation of the Secretary's authority beyond what Congress intended.

*Cf.* PI Br. at 28–30. Congress has vested the Secretary with extensive authority to reduce or

eliminate borrowers' debt obligations under the federal student loan programs. This authority,

which dates back nearly six decades to the enactment of the HEA in 1965, is foundational to the

Secretary's power to administer the federal student loan programs. The statute granted the

Secretary the fundamental legal power to "compromise, waive, or release" any "right, title, claim,

lien, or demand" acquired in the Secretary's performance of his vested "functions, powers, and

duties" to administer federal student loans. 20 U.S.C. § 1082(a)(6); *see also, e.g.*, 20 U.S.C. §

1087dd(g)(1). Pursuant to this broad authority, the Secretary regularly "releases" student loan

debts owed to the Department by federal student loan borrowers on terms that he determines, and

he may do so at substantial amounts. *See, e.g.*, 34 C.F.R. § 30.70 (a)(2); *id.* Part 682, App. D

(waiving right to refuse to pay claims to guaranty agencies and lenders where they violated certain

regulations and would not qualify for payment); *Education Department Approves $5.8 Billion*

*Group Discharge to Cancel all Remaining Loans for 560,000 Borrowers Who Attended Corinthian*

(June 1, 2022), https://perma.cc/MTW6-XABV; *Secretary DeVos Cancels Student Loans, Resets*

*Pell Eligibility, and Extends Closed School Discharge Period for Students Impacted by Dream*

*Center School Closures* (Nov. 8, 2019), https://perma.cc/FRT6-WAWS. That Congress long ago

granted the Secretary authority to discharge debts owed to his Department, together with the

33

unambiguous language of the HEROES Act, undermines Plaintiffs' contention that Congress withheld authority to modify loan discharge provisions under the HEROES Act.  *See* PI Br. at 30.

But even if the major questions doctrine did apply in this case, that would not rescue Plaintiffs' claims.  In granting the Secretary broad discretion to waive or modify provisions of the legal regime governing federal student loan programs, Congress did not "use oblique or elliptical language," nor provide a potentially broad delegation "through 'modest words,' 'vague terms,' or 'subtle devices.'"  *West Virginia*, 142 S. Ct. at 2609.  Indeed, it would have been hard for Congress to more clearly express its intent to provide the Secretary, during a national emergency, with maximum flexibility to provide appropriate student loan relief to borrowers facing extraordinary and unforeseen circumstances.  If there could have been any question whether Congress, in fact, meant to empower the Secretary to waive or modify *any* statutory or regulatory provision applicable to federal student loan programs, Congress eliminated all doubt by granting that authority "[n]otwithstanding any other provision of law, unless enacted with specific reference to" the HEROES Act.  20 U.S.C. § 1098bb(a)(1).  And it cannot be said that Congress could not have foreseen that the Secretary might discharge student loans under the HEROES Act: In apparent anticipation of that outcome, it created a "Special Rule for Discharges in 2021 Through 2025," making student loan discharges tax-free in pandemic-related relief legislation.  *See* American Rescue Plan Act of 2021, § 9675, Pub. L. No. 117-2, 135 Stat. 4 (Mar. 11, 2021).

The analysis of an agency's statutory authority "begins with the statutory text"—and, when the text is clear, it "ends there as well."  *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 631 (2018).  Courts may not "impos[e] limits on an agency's discretion that are not supported by the text." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2381

(2020).   And because the Secretary here can point to "'clear congressional authorization' for the power [he] claims," his exercise of that authority survives whatever degree of "skepticism" may be counseled by the major questions doctrine.   *West Virginia*, 142 S. Ct. at 2609.

### C.   The Policy Is Not Arbitrary and Capricious.

Agency action must be upheld in the face of an arbitrary and capricious challenge so long as the agency "articulate[s] a satisfactory explanation for the action including a rational connection between the facts found and the choice made." *Little Sisters of the Poor*, 140 S. Ct. at 2383 (citation omitted).   Under this deferential standard, "a court is not to substitute its judgment for that of the agency," and should uphold even a decision of "less than ideal clarity if the agency's path may reasonably be discerned." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (citations omitted); *see also, e.g.*, *Org. for Competitive Markets v. USDA*, 912 F.3d 455, 459 (8th Cir. 2018) (under APA's "highly deferential standard," so long as "an agency's determination is supportable on any rational basis, we must uphold it").

The Department's loan relief policy easily meets this standard.   As discussed in detail above, *see supra* Sec. III.A.3, the policy reflects the Secretary's reasoned determination that the specified amount of loan cancellation is necessary "to ensure that borrowers subject to the payment pause are not placed in a worse position financially by the COVID-19 national emergency as they restart payments."   Decision Memo.   That determination, falling within the agency's "sphere of expertise," is entitled to "particular[]" deference. *Adventist Health Sys./SunBelt, Inc. v. HHS*, 17 F.4th 793, 803 (8th Cir. 2021).   The Department's policy falls well within "a zone of reasonableness," *Missouri*, 142 S. Ct. at 654, and Plaintiffs' "policy disagreement[s]" are no basis to set aside agency action under the APA's deferential standard, *Pub. Citizen, Inc. v. Nat'l Highway*

*Traffic Safety Admin.*, 374 F.3d 1251, 1263 (D.C. Cir. 2004).

Many of Plaintiffs' arguments reflect the fact they filed the instant motions for emergency relief concurrent with initiating their lawsuit, which was obviously before the Department could compile and certify an administrative record in this case. When certified, that record will form the basis for the Court's review of Plaintiffs' arbitrary-and-capricious arguments. *See Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) ("The task of the reviewing court is to apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court.") At this preliminary stage, however, the decisional documents attached to this brief are sufficient to establish Plaintiffs are not likely to succeed on their claims—premised on legally irrelevant political statements—that the policy was based on "factors which Congress has not intended [the Department] to consider," PI Br. at 38; that it was based on an "impermissible '*post hoc* rationalization," *id*., or that it was "impermissibly pretextual," *id*. at 39. *Cf. Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019) ("[A] court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons."); *see Calvillo Manriquez v. DeVos*, 345 F. Supp. 3d 1077, 1103-04 (N.D. Cal. 2018) (finding that plaintiff was unlikely to succeed on arbitrary and capricious claim based on agency submissions prior to the filing of certified administrative record).

As established above, the Department has followed the HEROES Act to the letter in adopting the loan cancellation policy, analyzing each factor set forth in that statute and grounding its ultimate conclusion in the need to ensure student loan borrowers impacted by the COVID-19 pandemic are not made worse off in their ability to repay their student loans by the pandemic. What matters is what the agency considered and based its decision on, *e.g., In re Subpoena Duces*

*Tecum*, 156 F.3d 1279 (D.C. Cir. 1998)—not stray statements in "press briefing[s]" from unnamed "senior administration official[s]." PI Br. at 11, 38. The relevant decisional documents make no mention of "narrow[ing] the racial wealth gap" or "promot[ing] equity," *id*. at 38, and even if they did, such an incidental effect is not prohibited by the HEROES Act, so long as it is in connection with waivers/modifications deemed necessary to make sure affected borrowers in the aggregate are not made worse off by COVID 19. Plaintiffs' "*post hoc* rationalization" argument is also meritless—as the Kvaal Declaration shows, the Department set forth the basis for its decision in documents issued before or contemporaneously with the policy. *See DHS v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891, 1909 (2020).

Nor is there any basis for Plaintiffs' claim of pretext, which is inconsistent with the "presumption of regularity [that] attaches to the actions of Government agencies." *U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001). The rationale for the policy—to help reduce the risk that borrowers impacted by the pandemic fall into delinquency and default as they transition from a long period of forbearance—is entirely consistent with the notion that the pandemic's impact on daily life is currently winding down. That the policy is consistent with one of "the President's policy goals," PI Br. at 39, is both unsurprising and legally insignificant. "Agency policymaking is not a 'rarified technocratic process, unaffected by political considerations or the presence of Presidential power," and there would be nothing problematic even if an agency action were "informed by unstated considerations" of, among other things, "politics, the legislative process, public relations, [and] interest group relations." *Dep't of Commerce*, 139 S. Ct. at 2573.

Further, the "broad scope" of the Department's policy is not arbitrary. PI Br. at 40. The HEROES Act allows the Secretary to take action necessary to provide student loan related support

37

for any borrower living in an emergency area or directly affected by a national emergency.   And in conferring that broad authority within the federal student loan programs the Secretary administers, it expressly disclaims any need for the Secretary to provide such relief on a case-by-case basis.   Clearly, then, Congress intended the Secretary to have extensive discretion.   *Cf. Cellco P'ship v. FCC*, 357 F.3d 88, 97 (D.C. Cir. 2004) (authority to act as "necessary" should not be "give[n] an unwarranted rigidity" when the broader context indicates that Congress intended to confer broad authority).   The Department's analysis supports the Secretary's determination that providing the amount of loan relief selected to individuals under certain income thresholds would facilitate a significant reduction in the number of defaults and delinquencies by affected borrowers, thus ensuring that such borrowers are not made worse off by the pandemic.   *See supra* Sec. III.A.3.   Such "predictive judgments within the scope of [the Department]'s expertise" are entitled to "substantial deference," *California v. Azar*, 950 F.3d 1067, 1101 (9th Cir. 2020), and the APA does not require agencies to employ perfect precision when determining the contours of their programs.   *See WorldCom, Inc. v. FCC*, 238 F.3d 449, 461-62 (D.C. Cir. 2001) (agency "is not required to identify the optimal threshold with pinpoint precision.   It is only required to identify the standard and explain its relationship to the underlying regulatory concerns.").

Plaintiffs next contend that the Department "failed to properly analyze the reversal of its prior position."   PI Br. at 40.   They acknowledge, however, that the Department "explained why it changed its legal position that it could not grant categorical debt cancellation under the HEROES Act."   *Id*.   Agencies are permitted to change course so long as "the new policy is permissible under the statute, . . . there are good reasons for it, and . . . the agency believes it to be better, which the conscious change of course adequately indicates."   *Fox Television Stations*, 556 U.S. at 515.

38

The Department's 2022 Legal Authority Memo satisfies this standard with respect to the Department's legal interpretation of the HEROES Act, and Plaintiffs do not contend otherwise. That memo does not reflect a "change in course" with respect to the Department's assessment of any "underlying factual predicates." *See* PI Br. at 40. The Department's prior position was reflected in a legal document authored by the Department's Office of the General Counsel. That memo did not make any factual findings, and its conclusion is stated in absolute legal terms. *See* U.S. Dep't of Educ., Office of the General Counsel, Memorandum to Betsy DeVos at 8 (Jan. 12, 2021), https://perma.cc/GNE9-ZDBK (opining that Secretary would not have authority for "blanket or mass cancellation" of student loan debts, "whether due to the COVID-19 pandemic or for any other reason"). As noted above, the Department has now reconsidered that legal conclusion because it "read[s] in purported limitations on the scope of relief that may be afforded that are contrary to the clear text of the [HEROES] Act." ED Legal Authority Memo, *see* 87 Fed. Reg. at 52,945. The APA requires nothing more. *See, e.g.*, *Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 620 (E.D. Pa. 2017) (an agency's "departure from prior practice" is only arbitrary and capricious as an "unexplained inconsistency" where it "had an explicit rule in place, only to later issue the opposite rule with limited or no explanation").

Finally, Plaintiffs contend that the Department "failed to consider the reliance interests of Plaintiff States." PI Br. at 40. As discussed above, however, the states do not have any cognizable interest in the Department's decision to relieve certain federal student loan borrowers of their obligation to repay certain outstanding loan debts to the Department. *See supra* Sec. II. Nor does the HEROES Act impose any requirement that the Department consider downstream economic effects on states. This case involves the Department's discretionary decision about how

to allocate federal benefits—not any regulation of the Plaintiff states.   Whatever incidental effects that decision might have on these third parties are not the kind of "serious reliance interests" that the Department was required to consider.   *Cf. Regents*, 140 S. Ct. at 1914 (agency was required to at least consider potential reliance interests where it reversed a five-year-old policy on which directly affected recipients could have relied to "enroll[] in degree programs, embark[] on careers, start[] businesses, purchase[] homes, and even marr[y] and [have] children").

## IV.   Plaintiffs Have Failed To Establish Any Irreparable Harm.

"The movant must show that irreparable injury is *likely* in the absence of an injunction, not merely a possibility of irreparable harm before a decision on the merits can be rendered."   *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665 (8th Cir. 2022).   "To succeed in demonstrating a threat of irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief."   *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 778 (8th Cir. 2012).   Plaintiffs have failed to meet this burden.

As discussed, Plaintiffs lack any cognizable interest in challenging the Department's choice to forgive certain amounts of loan debt owed to it by federal student loan borrowers.   They have not shown *any* concrete injury, much less the imminent threat of irreparable injury required to warrant preliminary injunctive relief.   *See Cheema v. U.S. Citizen & Immig. Servs.*, 2021 WL 4553039, at *9 (D. Neb. Oct. 5, 2021) (where a plaintiff "fail[s] to show enough of an injury even to confer standing," it is "axiomatic . . . that the plaintiff hasn't shown *irreparable* harm").   Indeed, Plaintiffs' main claimed harm—alleged "ongoing financial injuries," PI Br. at 42—are not occurring because the Department has already taken action to remove the alleged "overwhelming present incentive to consolidate," *id.*, upon which this claimed injury rests.   *See supra* pp. 11-12.

40

More broadly, the harms that Plaintiffs describe consist almost entirely of the type of economic losses, *see, e.g.*, PI Br. at 42-43 (describing "ongoing financial injuries," "imminent financial harms," "compliance costs," and "financial health harms"), that courts have often held are "not . . . irreparable injury," *e.g.*, *DISH Network Serv. LLC v. Laducer*, 725 F.3d 877, 882 (8th Cir. 2013).[5]   Plaintiffs emphasize that unrecoverable economic losses—*e.g.*, because the United States enjoys sovereign immunity from certain damages actions—can sometimes constitute irreparable injury.  PI Br. at 42-43.  But Plaintiffs must still show that such claimed economic losses are both "certain and great."  *Packard Elevator v. ICC*, 782 F.2d 112, 115 (8th Cir. 1986). A contrary rule would "effectively eliminate the irreparable harm requirement" in any suit "against a defendant with sovereign immunity."  *Air Transp. Ass'n of Am., Inc. v. Export-Import Bank of the United States*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012); *see also Cal. Ass'n of Private Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 170-71 (D.D.C. 2018) ("*CAPPS*") ("irreparable injury requires damages to a business 'above and beyond a simple diminution in profits' . . . even where the United States is a defendant" (citation omitted)).

Plaintiffs do not meet this standard.  As discussed above, to the extent Missouri can even claim injury to MOHELA as injury to the state, a remedy is available in the CFC for claimed losses arising from MOHELA's servicing of Direct Loans.  *See supra* pp. 13-15.  The routine "compliance costs" Plaintiffs allege MOHELA is incurring to "implement the Mass Debt Cancellation," PI Br. at 43, are not irreparable harm.  *See, e.g., Morehouse Enters., LLC v. ATF*,

---

[5] Plaintiffs also reference allegedly irreparable harm to "Missouri's and Arkansas's quasi-sovereign interests in higher education."  PI Br. at 43.  These interests are not cognizable for the reasons discussed above, *see supra* pp 16-17, and Plaintiffs' vague reference to the states' interest in "higher education" falls well short of carrying their burden to establish irreparable harm.

2022 WL 3597299, at *12 (D.N.D. Aug. 23, 2022) ("[U]ncertainty because of a new federal regulation certainly does not constitute irreparable harm, and 'ordinary compliance costs are typically insufficient to constitute irreparable harm.'"); *CAPPS*, 344 F. Supp. 3d at 171 (similar).

Even were that not the case, Plaintiffs' claimed economic losses reflect speculative assumptions about future revenue streams; not an imminent threat of losing income that they have any legal entitlement to receive.[6]  *See Couteau Props. Co. v. Dep't of Interior*, 53 F.3d 1466, 1484 (8th Cir. 1995) ("hypothetical threats of future harm"—dependent on a "number of . . . contingencies tak[ing] place"—are "too distant and speculative to warrant preliminary relief"). Plaintiffs' projected loss of "income," "servicing income," and "interest income," PI Br. at 42, constitute, at most, a potential "diminution in profits," which is insufficient to demonstrate irreparable harm.  *CAPPS*, 344 F. Supp. 3d at 171.  Plaintiffs never quantify those hypothesized losses, but they plainly do not threaten the "overall economic health" of the Plaintiff states or any of the businesses whose interests they purport to represent.  *N. Air Cargo v. U.S. Postal Service*, 756 F. Supp. 2d 116, 125 (D.D.C. 2010); *see also Coal. for Common Sense in Gov't Procurement v. United States*, 576 F. Supp. 2d 162, 168 (D.D.C. 2008) ("To successfully shoehorn potential economic loss into a showing of irreparable harm, a plaintiff must establish that the economic harm is so severe as to cause extreme hardship to the business or threaten its very existence."). Even if Plaintiffs were able to prove such losses, injunctive relief would be an ill-suited remedy.

Indeed, borrowers with Department-held loans have been subject to a payment pause for more than two and a half years—and eligible private FFEL borrowers who consolidated into

---

[6] This is especially true of the claim that certain states will be deprived of "future tax revenue" after 2026, PI Br. at 42, a speculative and unsupported assertion that falls well short of establishing a concrete injury, much less an irreparable one.  *See supra* pp. 17-18.

Department-held loans would have been eligible to receive this benefit the entire time.   No states,

loan holders, or loan servicers ever sued to enjoin the payment pause, even though those measures

provided an incentive for FFEL borrowers to consolidate.   Plaintiffs can hardly claim now that

any peripheral economic harms they are allegedly suffering due to a risk that private FFEL loans

will be consolidated into Direct Loans are irreparable sufficient to warrant extraordinary relief.

**V.      The Balance Of Equities And Public Interest Weigh Against Injunctive Relief.**

The balance of the equities and the public interest—factors that merge when the

government is the opposing party—weigh strongly in the Government's favor.   *See Nken v.*

*Holder*, 556 U.S. 418, 435 (2009).   Congress determined that it is in the public interest for the

Secretary to act swiftly to protect student loan borrowers in times of national emergencies, and

Plaintiffs' claimed injuries pale in comparison to these significant countervailing considerations.

The Secretary's decision to help millions of student loan borrowers smoothly exit the

COVID-19 pandemic pause and to guard against the associated concrete and imminent risks of

default and delinquency is in the public interest.   It also reflects Congress's judgment that the

Secretary should be able to react nimbly to protect student loan borrowers in times of national

emergency.   *See Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d 1112, 1126

(9th Cir. 2008) (concluding that "our consideration of the public interest is constrained in this case,

for . . . responsible public officials . . . have already considered that interest"); *Cornish v. Dudas*,

540 F. Supp. 2d 61, 65 (D.D.C. 2008) ("There is inherent harm to an agency in preventing it from

enforcing regulations that Congress found it in the public interest to direct that agency develop.").

In the HEROES Act, Congress granted the Secretary broad discretion: in times of emergency, he

may "waive or modify" any federal student loan provision.   20 U.S.C. § 1098bb(a)(1).   Congress

43

also granted the Secretary the ability to move quickly: he may act without notice-and-comment rulemaking and enact class-wide relief. *Id.* § 1098bb(b), (d). Accordingly, the HEROES Act manifests a determination by Congress that the public interest is served when the Secretary has discretion to protect student loan borrowers in times of national emergency.

Plaintiffs' uncertain alleged financial injuries should not tip the scales against millions of student loan borrowers, who, economic researchers and the Secretary conclude, will be at increased risk of default on their student loans when repayment restarts. Some of the most prominent consequences of such default include wage garnishment, credit report damage, and the withholding of federal benefits. FSA, *Student Loan Delinquency and Default*, https://perma.cc/9T5Y-7Q9L.[7] Accordingly, the Secretary concluded that aiding these borrowers is in the public interest, and Congress, through the HEROES Act, concluded it is in the public interest to move swiftly towards that goal. A preliminary injunction enjoining the Secretary from doing so harms the public interests identified by the Secretary and by Congress.

## VI.   Any Relief Should Be Appropriately Limited.

If the Court were to disagree with Defendants' argument, any relief ordered should be no broader than necessary to remedy any demonstrated irreparable harm by particular plaintiffs in this case. *See, e.g.*, *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994); *St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1022-23 (8th Cir. 2015) ("[A] preliminary injunction must be narrowly tailored to remedy only the specific harms shown by the plaintiff, rather than to enjoin all possible breaches of the law."). Plaintiffs'

---

[7] Plaintiffs do not attempt to argue that their financial interests outweigh those of the borrowers.

44

requested nationwide relief is inconsistent with this principle and inappropriate here.  *See, e.g.*, *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring) (noting that nationwide injunctions "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch"); *Arizona*, 40 F.4th at 396 (Sutton, J., concurring) ("nationwide injunctions" or "universal remedies" improperly "permit[] district courts to order the government to act or refrain from acting towards nonparties in the case"); *Georgia v. President*, 46 F.4th 1283, 1303 (11th Cir. 2022) (noting "nationwide injunctions push against the boundaries of judicial power, and very often impede the proper functioning of our federal court system").   Thus, if the Court determines that any Plaintiff is entitled to relief—and it should not— then it should tailor that relief narrowly, limiting it to only those Plaintiff states that are able to demonstrate a sufficient irreparable injury, and only as to any individual loans held or serviced by entities in such states.

## Conclusion

For the foregoing reasons, the Court should deny Plaintiffs' motion for preliminary injunction.

Dated: October 7, 2022                                  Respectfully submitted,

                                                        BRIAN M. BOYNTON
                                                        Principal Deputy Assistant Attorney General

                                                        BRIAN D. NETTER
                                                        Deputy Assistant Attorney General

                                                        MARCIA BERMAN
                                                        Assistant Branch Director

*/s/ R. Charlie Merritt*
R. CHARLIE MERRITT (VA Bar # 89400)
CODY T. KNAPP
SAMUEL REBO
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
(202) 616-8098
robert.c.merritt@usdoj.gov

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on October 7, 2022, a copy of the foregoing was filed electronically using this Court's CM/ECF system, and therefore served on all parties of record.

 *s/ R. Charlie Merritt*
R. Charlie Merritt
Trial Attorney