**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| STATE OF NEBRASKA, et al., | |
| *Plaintiffs*, | |
| v. | No. 4:22-cv-01040 |
| JOSEPH R. BIDEN, Jr., et al., | |
| *Defendants*. | |

**PLAINTIFF STATES' REPLY MEMORANDUM
IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION**

Just months before a critical midterm election—while the Administration was admitting the COVID-19 pandemic is over—Defendants announced the Mass Debt Cancellation.  It admittedly will wipe out roughly a half trillion of the $1.6 trillion in outstanding student loan debt and eliminate all remaining debt for approximately 20 million borrowers (around 45 percent of the 43 million total borrowers).  This extravagant exercise of agency authority is remarkably aggressive—and profoundly unlawful.  Defendants' legal arguments do nothing to dispel that conclusion.  If anything, their filings confirm it.

Defendants' attempts to discard the major-questions doctrine serve only to reinforce its role here.  They concede that this is "a case of economic and political significance," Opp'n 30, and do not dispute that Congress has repeatedly declined to enact legislation that would have achieved the mass debt discharge brought about by the Cancellation.  They also broadly assert that the HEROES Act empowers them to cancel enormous amounts of student loan debt for borrowers anywhere in the world—the sort of sweeping and consequential claim that calls for application of the doctrine.  Their technical reasons why the doctrine should not apply in this case don't come close to overriding the clear evidence it does.

After more than a month of smoke and mirrors shrouding the internal agency machinations

1

of the Cancellation, Defendants have finally disclosed their supposed rationale for the program. Were there any doubt of the Cancellation's unlawfulness before, there isn't now.  Defendants' Rationale Memo, which the Secretary approved early the same morning it was completed, does not address key statutory elements of the HEROES Act, does not consider a single alternative to erasing billions in debt, and does not even attempt to justify central eligibility requirements contributing to the Cancellation's breathtaking scope.

If that weren't bad enough, on the day this case was filed, Defendants attempted to eliminate the consolidation pathway for borrowers with privately held FFELP loans to attain eligibility for the Cancellation.  But that purported change finds no support in the Secretary's authorization for the HEROES Act waiver and thus is unlawful.  Even if that were a valid change, it arbitrarily divides borrowers with privately held FFELP loans into two groups: those who applied for consolidation before September 29, and those who did not.  There is no reasoned explanation for such a line.  Such arbitrary agency action cannot stand.

## ARGUMENT

**I.**     **Plaintiffs Are Likely To Succeed On The Merits Of Their Claims.**

**A.**     **Plaintiffs Have Standing.**

**1.**     **Plaintiffs Are Still Facing Ongoing And Imminent Financial Harm From Consolidation, And Immediate Relief Is Needed.**

Defendants (at 11) dismiss Plaintiffs' harms from the consolidation of privately held FFELP loans, but those harms are still at issue.  On September 29, the day Plaintiffs filed this suit, Defendants' website purports to have ended that consolidation as a pathway to eligibility, while confirming that those who applied before that date remain eligible.  Campbell Decl. Ex. E, at 6.[1]

---

[1] Though Defendants say (at 11) that they directed their vendor to update the website the day before this case commenced, the change was not publicly implemented until the following day.

Defendants made this change to avoid lawsuits like this one because entities holding and investing in FFELP loans (which MOHELA, ASLA, and NIC all do) have been "widely seen, both inside and outside the administration, as presenting the greatest legal risk" to the Cancellation.  Michael Stratford, *Biden Administration Scales Back Student Debt Relief for Millions Amid Legal Concerns*, Politico (Sept. 29, 2022), https://tinyurl.com/2hexr9cf.  But this attempt to insulate themselves from suit is not permitted under the Secretary's authorization of the HEROES Act waiver.  That authorization directs cancellation for "borrowers with outstanding Direct Loans." Doc. 27-1, at 27.  Once a privately held FFELP loan is consolidated, it becomes part of a large Direct Loan, Campbell Decl. Ex. F, at 1–2, which is eligible for the Cancellation under the terms of the Secretary's authorization.  Defendants' attempt to close the consolidation pathway is thus unauthorized.[2]  *See* 20 U.S.C. § 1098bb(a)(1) (providing that only the Secretary "may waive or modify" statutory or regulatory provisions); *id.* § 1098bb(a)(2) (same).  Because that pathway has not been lawfully closed, Plaintiffs are still at risk of ongoing harms from consolidation.

Even if the Department had legitimately closed the consolidation pathway (and it has not), Plaintiffs are still experiencing consolidation harms.  According to the Department's website, borrowers with FFELP loans "who have *applied* to consolidate into the [DLP] prior to Sept. 29, 2022, are [still] eligible."  Campbell Decl. Ex. E, at 6 (emphasis added).  Because consolidation takes time, *see* Campbell Decl. Ex. F, at 3 (directing borrowers "to continue making payments on [the original] loans until your consolidation servicer tells you" to stop); Talent Decl. Ex. G, at 7 (noting that loan cancellation may occur faster than consolidation), the ongoing processing of those

---

[2] The only way Defendants can avoid this conclusion is to argue that no consolidated loans are approved by the waiver authorization, but to do that would admit that their decision to include consolidated loans if the application was filed before September 29 is unauthorized.

consolidations continues to harm Plaintiffs.  A preliminary injunction pausing the Cancellation, including consolidations made in reliance on it, would stop the ongoing harm.

Such an injunction would also ensure that Defendants do not change their website again to resume advertising the consolidation pathway.  This remains a real risk, for the Department says it is currently "assessing whether there are alternative pathways to provide relief to borrowers with federal student loans not held by [the Department], including FFEL Program loans."  Campbell Decl. Ex. E, at 6–7.

In addition, a preliminary injunction preventing Defendants from discharging debt pre-serves the opportunity for a permanent injunction remedying at least some of the harms already inflicted by the widespread Department-induced consolidation.  For example, a permanent injunction might order the Department to direct borrowers who recently consolidated a FFELP loan to pay the entity that held the prior FFELP loan the part of the interest attributable to that loan. This would restore the income streams that Plaintiffs were receiving.  Other options are also available—such as an injunction directing the Department to allow borrowers who detrimentally relied on Defendants' unlawful consolidation promises to undo their decision.  *See* Campbell Decl. Ex. F, at 1 (outlining the "cons" of consolidation).  But if the Department begins erasing debt now, it is unlikely that these avenues for relief through a permanent injunction will remain.  For all these reasons, Plaintiffs' consolidation harms remain relevant and establish their standing to sue.

Defendants also argue (at 11) that even if these harms remain, they "are speculative and not traceable to the Department's conduct."  This ignores, among other things, ASLA's evidence showing the marked increase in consolidation of its FFELP loans that occurred in the month following the August 24 Cancellation announcement.  Williams Decl. ¶¶ 6–7.  This drastic shift is inexplicable by anything other than the Cancellation.  Such a "predictable effect of Government

4

action on the decisions of third parties" is more than sufficient to establish standing.  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019).

Defendants specifically contend (at 12–13) that any adverse effects from the Cancellation on holders and servicers of FFELP loans (like ASLA and MOHELA) or investors in securities backed by those loans (like NIC) are too "[u]ncertain[]" because of other market risks.  But Defendants do not deny that the Cancellation injects a new and specific market disruption that contributes directly to Plaintiffs' harms.  That "causal connection" is enough to establish standing.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

## 2.    Missouri Has Standing To Vindicate The Harms That MOHELA Is Facing As A Servicer Of Federal Loans.

Defendants' four attempts (at 13–16) to dismiss MOHELA's interests fail.  *First*, Defendants argue (at 13) that Missouri cannot "rely on harms allegedly suffered by MOHELA" because (1) MOHELA is supposedly separate from the State and (2) its "financial harms" do not affect the State.  This argument is baseless.  To start, the case Defendants cite—*Dykes v. MOHELA*, No. 4:21-CV-00083-RWS, 2021 WL 3206691 (E.D. Mo. July 29, 2021)—analyzes whether MOHELA is entitled to sovereign immunity, *see id.* at *2–4, which is a "distinct jurisdictional requirement[]" from standing, *Duit Constr. Co. v. Bennett*, 796 F.3d 938, 940 (8th Cir. 2015).  Therefore, *Dykes*, which conflicts with other courts who have addressed the sovereign immunity issue, *see Dykes*, 2021 WL 3206691, at *4 n.3, does not directly address whether the Cancellation inflicts a concrete harm on Missouri.

Regardless, Missouri law squarely disproves Defendants' suggestion that MOHELA is separate from the State.  MOHELA is a "*public* instrumentality and body corporate"; it performs "an essential *public* function"; and its board is comprised of public officials and people appointed by the governor.  Mo. Rev. Stat. § 173.360 (emphases added).  In addition, MOHELA is part of,

and must report to, the Department of Higher Education and Workforce Development. *Id.*
§ 173.445. Given this, even *Dykes* recognized that Missouri "exercises significant political and
operational control over MOHELA." 2021 WL 3206691, at *3. And other courts have similarly
said that "Missouri statutes unambiguously dictate MOHELA to be an arm of the state of Missouri"
and place it under "significant oversight" of the State. *Gowens v. Capella Univ., Inc.*, No. 4:19-
CV-362-CLM, 2020 WL 10180669, at *2–3 (N.D. Ala. June 1, 2020) (quotations omitted).
MOHELA is thus a state agency, and as such, Missouri can vindicate harms to it. *See Missouri v.
Biden*, 576 F. Supp. 3d 622, 630 (E.D. Mo. 2021) (noting that Missouri had standing based on
contracts between its Department of Health and Senior Services and the federal government).

It is equally plain that financial harms to MOHELA directly affect the State. By statute,
Missouri authorizes MOHELA to engage in loan servicing, among other revenue-producing
activities, to fulfill the "essential public function[s]" of (1) ensuring "that all eligible postsecondary
education students have access to student loans that are guaranteed or insured" and (2) supporting
the State's public institutions of higher education. Mo. Rev. Stat. § 173.360. Because the
Cancellation threatens imminent harm to MOHELA's income as a servicer of DLP loans (among
other injuries), it reduces MOHELA's resources to perform these essential education-advancing
functions for Missouri. That unquestionably harms the State.

*Second*, despite what Defendants say, the Contract Disputes Act (CDA) and Tucker Act do
not require that this case be filed in the Court of Federal Claims. As Defendants concede (at 14),
Plaintiffs have not "pled a breach of contract claim." Nor is MOHELA seeking "'equitable
adjustment' to its compensation under the contract." Opp'n 15. Rather, Plaintiffs are challenging
a new agency rule under the APA. It is well established that "the proper method" to "challenge
the validity of a regulation"—even one that affects federal contracting and procurement—"is to

6

bring an action in federal district court under the [APA]." *Southfork Sys., Inc. v. United States*, 141 F.3d 1124, 1135 (Fed. Cir. 1998).  The Court of Federal Claims thus "does not have jurisdiction to review the validity of regulations pursuant to the [APA]." *Boeing Co. v. United States*, --- Fed. Cl. ----, 2022 WL 4364180, at *4 (Fed. Cl. Sept. 21, 2022) (collecting cases).  Defendants' seeming recognition that challenges to the Secretary's actions under the HEROES Act are cognizable under the APA, *see* Opp'n 20 n.4, thus undermines its argument that the States' challenge falls within the CDA.  It is also telling that the federal government has repeatedly raised this CDA argument in defending against the many challenges to the COVID-19 vaccine mandate on federal contractors, yet no court that Plaintiffs are aware of (including this one) has accepted that argument.  *See Missouri*, 576 F. Supp. 3d at 629–31 (finding jurisdiction without discussing the CDA); *Brnovich v. Biden*, 562 F. Supp. 3d 123, 147 (D. Ariz. 2022) (finding that claims invoking "the Constitution and the laws of the United States" are outside the CDA).

*Third*, the financial harm to Missouri through MOHELA is not speculative or attenuated.  It is concrete and direct—and *enormous*.  As of June 30, 2022, MOHELA was "servicing 5.2 million federal [student loan] accounts" with a collective principal equaling $148.2 billion.  MOHELA Fiscal Year 2022 Financial Statements at 4, available at https://tinyurl.com/2p9xkya8 (last visited Oct. 11, 2022).  During fiscal year 2022, MOHELA's servicing fees for those federal loans was $88.9 million, and its fees for call center and customer relation support was $5.1 million.  *Id.*  This revenue is a function of the number of accounts MOHELA services, *see* Talent Decl. Ex. B, at 3–4, 15–16, as Plaintiffs have already said, PI Mem. 19, and Defendants do not deny.  Nearly half of all borrowers, as Defendants admit, will have "their entire remaining balance discharged" under the Cancellation.  Campbell Decl. Ex. G, at 1; *accord* Congressional Budget Office Letter on Student Loan Cancellation (Sept. 26, 2022), https://tinyurl.com/2p95x8kk ("45 percent of income-

eligible borrowers will have their entire outstanding debt cancelled."). Given that many borrowers have more than one account, *see* Talent Decl. Ex. F, a conservative estimate is that MOHELA stands to lose half of the DLP accounts it services. That equates to the loss of tens of millions of dollars per year in revenue used to fulfill MOHELA's "essential public function" of advancing education in the State. Mo. Rev. Stat. § 173.360. Such injury plainly confers standing.

*Fourth*, Defendants contend (at 16) that MOHELA's interests as a servicer of student loans is outside the zone of interests of the HEROES Act. Yet a plaintiff must simply show that its interests are "*arguably* within the zone of interests to be … regulated by the statute" the agency invokes. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (citation omitted). The HEROES Act requires the Secretary "to ensure that" his waiver minimizes "administrative requirements placed on affected individuals" while maintaining "the integrity of the student financial assistance programs." 20 U.S.C. § 1098bb(a)(2)(B). MOHELA's operations as a loan servicer directly implicate these administrative requirements and the ongoing integrity of the student financial assistance programs. More broadly, the Title IV student loan programs within which the HEROES Act operates, *see id.* § 1098bb(a)(1), presuppose the existence of servicers like MOHELA, *see id.* § 1087f (permitting contracts with third parties for loan servicing). Servicers are so integral that "[t]he Secretary shall obtain the advice of and recommendations from" them when proposing regulations affecting those programs. *Id.* § 1098a(a)(1).

Defendants also suggest that allowing this suit conflicts with the HEROES Act's purposes because Congress sought to authorize "swift[] and decisive[]" action "in time of national emergency." Opp'n 16. But the Act's congressional findings—the best source for discerning its purpose, *see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 131 (2014)—focus only on affording relief to those serving in the "military" for "our nation's defense." 20 U.S.C.

§ 1098aa(b)(1)–(6).  They do not mention decisive responses to all national emergencies.  There is nothing about this suit "inconsistent with the purposes" of the Act.  *Patchak*, 567 U.S. at 225.

### 3. Plaintiffs Have Standing To Protect Against The Loss Of Tax Revenue.

Defendants argue (at 18) that the loss of tax revenue to Nebraska, Iowa, Kansas, and South Carolina is too speculative and attenuated.  Not so.  It is undeniable that those States do not currently tax student loan discharge and that their laws will result in them starting to do so at the end of 2025.  *See* PI Mem. 21.  Also, Defendants do not dispute (nor could they) that the Cancellation—by forcing immediate elimination of roughly a half trillion of the 1.6 trillion in outstanding student loan debt—*will* reduce at least to some degree the amount of loan discharges after 2025.

Defendants argue only that Plaintiffs do not know the amount by which tax revenue will fall.  That doesn't matter because a loss of any amount of money is an Article III injury.  *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017).  Even so, Plaintiffs have cited a recent GAO study to estimate that the value of student loans discharged between 2026 and 2030 would be at least $16.6 billion without the Cancellation but that the Cancellation would reduce that amount between 30 and 60 percent.  *See* PI Mem. 21–22.  That suffices for standing because the Cancellation is "the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents."  *Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021), *rev'd on other grounds* 142 S. Ct. 2528 (2022) (*Texas MPP Case*).

Defendants' standing arguments overlook the distinction between the "loss of specific tax revenues," which clearly gives rise to standing, and a "decline in general tax revenues," which gives courts greater pause.  *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992).  Because the government plaintiffs in *El Paso County v. Texas*, 982 F.3d 332, 339 (5th Cir. 2020), and *Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976), complained of a decline in general tax revenues, Defendants' reliance on those cases (at 18–19) is misplaced.

9

Defendants also argue (at 19) that Plaintiffs' tax harm is not traceable to the Cancellation because it "result[s] from the states' own" tax laws.  Though Plaintiffs "could avoid financial loss" by "changing state law," they cannot "avoid injury altogether" because forcing States to exercise their "power to create and enforce a legal code" is an injury and "the possibility that a plaintiff could avoid [one] injury by incurring [another] does not negate standing."  *Texas v. United States*, 809 F.3d 134, 156–57 (5th Cir. 2015) (*Texas DAPA Case*) (citations omitted); *see also FEC v. Cruz*, 142 S. Ct. 1638, 1647 (2022) (explaining that an injury from unlawful action is "fairly traceable to such [action], even if the injury could be described in some sense as willingly incurred").  To illustrate the point, Plaintiffs have legitimate goals in linking state taxable income to federal taxable income—for example, ease of administration for taxpayers and revenue officers—and compelling them to undo that will frustrate those purposes.  Defendants' insinuation that Plaintiffs lack standing because they could change their laws also suffers from a broader flaw: "treating the availability of changing state law as a bar to standing would deprive states of judicial recourse for many *bona fide* harms"—after all, "states could offset almost any financial loss by raising taxes or fees."  *Texas DAPA Case*, 809 F.3d at 157.  The existence of these kinds of alternatives does not mean Plaintiffs lack standing.  *Id.*

### 4.    Plaintiffs Are Experiencing Sovereign And Quasi-Sovereign Injuries.

Defendants insist (at 16–17) that Plaintiffs cannot raise sovereign and quasi-sovereign injuries.  But their argument ignores the difference between a State bringing *parens patriae* suits to advance "purely third-party interests" (the interests of their citizens), which is not permitted, and a State asserting its own "sovereign and quasi-sovereign interests" against "the United States and its agents," which is allowed.  *Kentucky v. Biden*, 23 F.4th 585, 596–99 (6th Cir. 2022). Because Plaintiffs are doing the latter, their sovereign and quasi-sovereign injuries are cognizable.

Defendants offer no other reason barring Missouri and Arkansas from raising their quasi-sovereign interests in higher education or Nebraska from asserting its interests in the well-being of its public-employee pensioners. *See Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 50 n.17 (1986) (affirming a State's "judicially cognizable" sovereign interests in its relationship with its public employees). Plaintiffs' sovereign and quasi-sovereign injuries are thus sufficient to establish Article III standing.

### B.   Plaintiffs' APA Claims Are Likely To Succeed.

Aside from issues of standing addressed above, Defendants do not contest any of the prerequisites to claims under the APA, such as the presence of "final agency action" or the lack of another "adequate remedy." 5 U.S.C. § 704. So once the Court concludes that Plaintiffs have standing, it can proceed to the APA claims.

### 1.   The Cancellation Exceeds Defendants' Statutory Authority And Violates The Constitution.

Defendants say (at 34) that analyzing an agency's statutory authority begins and ends with the statutory text. Equally relevant, however, is "whether Congress in fact meant to confer the power the agency has asserted." *West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022) (citation omitted). "In the ordinary case," that question "has no great effect on the appropriate analysis." *Id.* But the Cancellation is "no everyday exercise of federal power." *NFIB v. OSHA*, 142 S. Ct. 661, 665 (2022) (per curiam) (quotation marks omitted). It is an extravagant power grab, and so "this is a major questions case." *West Virginia*, 142 S. Ct. at 2610.

### a.   The Major-Questions Doctrine Applies.

Defendants either admit or silently accept that most of the major-questions factors are satisfied here. Most notably, they explicitly concede that this is "a case of economic and political significance." Opp'n 30. And they do not dispute that Congress has "conspicuously and repeat-

11

edly declined to enact" legislation that would have achieved the mass debt discharge brought about by the Cancellation. *West Virginia*, 142 S. Ct. at 2610. These factors alone are enough to invoke the major-questions doctrine because courts "presume that Congress does not delegate its authority to settle or amend major social and economic policy decisions." *Id.* at 2613 (citation omitted).

Defendants' main argument is that "the hallmark of a 'major questions case' is a marked incongruence between the agency action at issue and the history, purpose, *or* context of the statute that purportedly authorizes it." Opp'n 30 (emphasis added). That uncited assertion is suspect. The Supreme Court just said that the major-questions doctrine applies based on "the history and breadth of the authority that the agency has asserted, and the economic and political significance of that assertion." *West Virginia*, 142 S. Ct. at 2608 (cleaned up). Because Defendants recognize that they have never before used the HEROES Act in this way, *see* Opp'n 31 (recognizing that prior actions were "narrower"), and that the Cancellation is of "economic and political significance," *id.* at 30, the doctrine applies under the standards the Court has announced.

But even under Defendants' standard, a review of the three factors they identify—history, purpose, and context—confirms the doctrine's role here. Beginning with history, the HEROES Act has never been used to cancel student loan debt, particularly not en mass like the Cancellation does. Turning to purpose, the congressional findings, discussed above, focus exclusively on helping individuals serving in the "military" for "our nation's defense"—they don't say anything about cancelling debt for nearly all borrowers. 20 U.S.C. § 1098aa(b)(1)–(6); *see also* Pub. L. No. 110-93 § 1(1), 121 Stat. 999 (2007) (making the Act permanent and stating that it "addresses the unique situations that active duty military personnel and other affected individuals may face"). And as for context, the Act exempts from standard notice-and-comment rulemaking the waivers issued under it. *See* 20 U.S.C. § 1098bb(b)(1). Yet a decision wiping out roughly a half trillion dollars

in debt needs more (not less) "test[ing] via exposure to diverse public comment." *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005). All these "marked incongruences" involving history, purpose, and context confirm that the major-questions doctrine applies even under Defendants' view.

Defendants suggest (at 30–31) that the major-questions doctrine does not apply because this case involves federal services and benefits rather than the "regulation of private parties." But Defendants cite no case saying that the doctrine is inapplicable just because the government is providing services or benefits. In fact, courts of appeals have not hesitated to apply the major-questions doctrine to the COVID-19 vaccine mandate on federal contractors, even though that mandate applies only to organizations serving the government. *See, e.g.*, *Kentucky*, 23 F.4th at 606–08; *Georgia v. President of the United States*, 46 F.4th 1283, 1295–96 (11th Cir. 2022).

Defendants also contend (at 33) that the Cancellation "cannot fairly be characterized as an 'unheralded power'" under the HEROES Act. But their support for this argument is to cite other provisions in the HEA—not the HEROES Act. Nowhere do Defendants claim that the HEROES Act has ever been used to discharge debt.

Finally, "the sheer scope of the [Department's] claimed authority" confirms that the major-questions doctrine applies. *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021). For instance, Defendants say (at 22–23) that the class of "affected individuals" who the Department may grant relief includes every "borrower who 'resides or is employed in'" the United States and even those who live "abroad." And they suggest that they could discharge all borrowers' "entire loan amount" if necessary to "mitigate the risk that delinquency and default rates will rise." Doc. 27-1, at 14. These statements belie Defendants' assertion (at 21 and 32) that the Mass Debt Cancellation is "limited." The actual power claimed is basically unlimited.

13

*See* Opp'n 31 (saying the Act "give[s] the Secretary maximum flexibility" to cancel debt).  Courts must greet such "assertions of extravagant statutory power" with the skepticism that the major-questions doctrine demands.  *West Virginia*, 142 S. Ct. at 2609 (quotation marks omitted).

### b. Defendants Lack Clear Congressional Authorization For The Cancellation.

The HEROES Act does not authorize the Cancellation—much less clearly so.  *See West Virginia*, 142 S. Ct. at 2609 (requiring "something more than a merely plausible textual basis"). Defendants' expansive reading of the Act would empower them to erase around a half trillion dollars in student loans based on (1) a strained link to the COVID-19 pandemic, (2) a sweeping view of "affected individuals," and (3) no showing approximating "necessity."  A proper reading of the statutory text on these three points undermines Defendants' far-reaching position.

*First*, Defendants must show that borrowers are facing "a worse position financially in relation to [their] financial assistance *because of*" the COVID-19 pandemic.  20 U.S.C. § 1098bb(a)(2)(A) (emphasis added).  Defendants' arguments effectively treat this language as incorporating but-for causation, *see Bostock v. Clayton County*, 140 S. Ct. 1731, 1739 (2020), and thus enveloping any event or condition that arguably grows out of the COVID-19 emergency even years after it began.  Because "the consequences of an act go forward to eternity," *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 266 n.10 (1992) (citation omitted), such an interpretation would produce absurd results, by permitting the mass elimination of even more loan debt many years from now.  *See United States v. X-Citement Video, Inc.*, 513 U.S. 64, 69 (1994) (counseling against absurd interpretations).  Read correctly, the statute demands proximate or direct causation, which means that the national emergency must be the "cause that directly produces" the need for relief. *Proximate Cause*, Black's Law Dictionary (11th ed. 2019); *see, e.g.*, *Holmes*, 503 U.S. at 265–68 (interpreting the phrase "by reason of" in the federal RICO statute to require proximate causation).

Confirming this reading is the HEROES Act provision that defines "affected individual" to mean an individual who "suffered *direct* economic hardship as a *direct* result of a … national emergency."  20 U.S.C. § 1098ee(2)(D) (emphasis added).

Also confirming this interpretation is the requirement that a HEROES Act waiver must be "in connection with a … national emergency."  *Id.* § 1098bb(a)(1).  Emergencies are temporary, which suggests that actions responding to them must also be.  Limiting the Secretary's authority to proximate or direct causation does that.  It permits, for example, a payment pause during the emergency but does not allow new relief after the emergency has abated.  Defendants' reading of the Act would permit such belated granting of new relief.  That sort of unbounded power is inconsistent with the limited reason that the HEROES Act grants authority in the first place.[3]

Under a proper reading of the Act, most of the factors and data that Defendants cite to support their supposed concerns for borrowers are irrelevant because they are too far removed from the COVID-19 emergency.  For instance, Defendants discuss statistics on repayment rates "in the year *before* the pandemic," Opp'n 26–27 (emphasis added), "the current economic conditions facing borrowers," *id.* at 25, subjective data based on "borrowers' recollections of past repayment success and expectations for future repayment capacity," Doc. 27-1, at 12, and the "rise of inflation" that they admit was at least partially caused by "other factors" besides the pandemic, *id.* at 12.  These factors and considerations are not tied directly to the COVID-19 pandemic, so Defendants cannot use them to justify the Cancellation.

---

[3] Defendants criticize Plaintiffs (at 21) for their lack of clarity on whether the HEROES Act may ever allow the Secretary to discharge some student loan debt.  That's beside the point, as the OSHA COVID-19 vaccine mandate case illustrates.  The Supreme Court there noted that even if OSHA could issue "targeted regulations" requiring a COVID-19 vaccine where the disease "poses a special danger," that did not justify an across-the-board mandate.  *NFIB*, 142 S. Ct. at 665–66.  What's at issue here is not remotely targeted to any specific group of borrowers, so it fails just like the OSHA mandate did.  Whether the Act would ever allow debt discharge is not dispositive.

*Second*, Defendants' construction of the term "affected individual" is boundless.  In this context, they interpret (at 22–23) a person who "resides or is employed in an area that is declared a disaster area" to include everyone in the country, 20 U.S.C. § 1098ee(2)(C), and an individual who has "suffered direct economic hardship as a direct result of a … national emergency" to encompass everyone in the world, *id.* § 1098ee(2)(D).  But the term "disaster area" connotes the physical destruction of infrastructure.  *See Disaster Area*, Black's Law Dictionary (11th ed. 2019) ("A region officially declared to have suffered a catastrophic emergency, *such as a flood or hurricane*.") (emphasis added).  That Congress enacted the HEROES Act in the wake of 9/11, an event in which the disaster areas consisted of localities physically destroyed by terrorist attacks, further supports this reading.  Defendants ignore this understanding of the phrase "disaster area" in their quest to cram the ramifications of a worldwide pandemic into this provision.  Similarly, Defendants have not shown that Congress intended the phrase "suffered direct economic hardship as a direct result of a … national emergency" to sweep in everyone in the world without even an explanation, much less a showing, in the Rationale Memo.  For these reasons, a proper reading of "affected individual" does not authorize Defendants' actions.

*Third*, the HEROES Act waiver must be "*necessary* to ensure that recipients of student financial assistance … are not placed in a worse position in relation to that financial assistance." 20 U.S.C. § 1098bb(a)(2)(A) (emphasis added).  Defendants have not made this showing.

Starting with the amount of cancellation per person ($10,000 or $20,000), Defendants have not argued—much less shown—that these amounts are necessary to avoid financial harm to borrowers.  Defendants say the Cancellation will reduce loan payments for 23 million borrowers by $200 to $300 per month.  Doc. 27-1, at 14–15.  But nothing in their analysis claims that such a monthly reduction is necessary to ensure borrowers do not fall into a worse position.  *See id.*

16

The same is true of the income cutoffs, particularly the $250,000 cutoff for households. Defendants cite data indicating that people who make less than $125,000 per year fare marginally worse on some metrics of financial health than those who earn more. *See* Doc. 27-1, at 16–19. Yet they do not explain how those statistics show that it is necessary to cancel debt for people in households earning up to $250,000 annually. Straining mightily on this point, Defendants implausibly refer to people in those households—the top seven to eight percent of all earners, *see Household Income Percentiles*, DQYDJ, https://tinyurl.com/vrks5mps (last visited Oct. 11, 2022)—as within "the most vulnerable subset of borrowers." Opp'n 27. No one believes, and Defendants never explicitly say, that cancelling those people's loans is necessary to protect their financial position in connection with their loans.

In short, Defendants' argument that they are acting within the HEROES Act depends on at least three interpretive miscues—misreading "because of," enlarging "affected individuals," and downplaying "necessary to ensure." Through this flawed interpretation, Defendants are effectively seeking a pass from this Court, insisting that they have limitless discretion to do whatever they please with student loan debt. The implications of their interpretation are staggering. Just a few months ago, President Biden began "considering whether to declare a national climate emergency." Tony Room et al., *Biden Eyes Climate Emergency Declaration*, Washington Post (July 18, 2022), https://tinyurl.com/2p9apzkd. If he does that (or declares some other sweeping emergency, such as an inflation or recession emergency), Defendants' position would empower them to issue another mass debt cancellation, whether because of that emergency, the ending of that emergency, or their views about the economic implications of that emergency. A proper reading of the HEROES Act does not provide such unchecked authority.

## 2.     The Cancellation Is Arbitrary and Capricious.

Now that Defendants have disclosed their agency memoranda, *see* Doc. 27-1, and tried to change the Cancellation to avoid judicial review, the arbitrariness of their actions is even clearer.

To begin, Defendants' agency memoranda belie their defense (at 38) of their policy reversal.   "[W]hen an agency rescinds a prior policy its reasoned analysis must consider the alternatives that are within the ambit of the existing policy."  *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020) (cleaned up).  Defendants are switching from their policy of forbearance to the Cancellation, so they must consider alternatives.  But the agency memoranda evaluated only mass cancellation; no alternatives were mentioned, even though plenty are available.  For instance, the Department could have (1) continued forbearance, (2) lengthened repayment periods while re-amortizing loans to decrease monthly payments comparable to much of the reductions anticipated under the Cancellation, or (3) improved marketing for its IDR payment plans.  *See* Doc. 27-1 at 13–15.  Even within the realm of discharge options, a percentage-of-total-principal discharge per borrower—rather than a flat amount—would make far more sense given Defendants' goal of reducing borrowers' monthly payments to avoid delinquency and default.  *Id.*  Yet the Department did not consider that option either.  Because all those alternatives (and more) are within the ambit of the Department's existing policy, the failure to consider them is enough, by itself, to "render[] [Defendants'] decision arbitrary and capricious." *Regents*, 140 S. Ct. at 1913.  It is the height of unreasonableness to rush to the most drastic option— the mass elimination of debt—when numerous other alternatives could have alleviated Defendants' professed concerns about borrower delinquency and default.

Defendants argue that they have "followed the HEROES Act to the letter" by "analyzing each factor set forth in that statute."  Opp'n 36.  Yet their agency memoranda show that they "failed to consider … important aspect[s]" of the statute.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State*

18

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). For example, while Defendants assert authority under 20 U.S.C. § 1098bb(a)(2)(A), which empowers the Department to assist "affected individuals," Opp'n 22, nowhere in the agency memoranda does the Department acknowledge that its power is limited to helping those individuals—much less explain why all included borrowers qualify as such. That glaring analytical hole confirms Defendants have acted arbitrarily. *See State Farm*, 463 U.S. at 43. Though Defendants now argue through counsel that "the Secretary could reasonably determine that" all borrowers "qualify as 'affected individuals,'" Opp'n 23, this Court "may not accept . . . counsel's *post hoc* rationalization." *State Farm*, 463 U.S. at 50. "[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Id.*

Defendants try to defend the "broad scope" of the Cancellation by arguing that they need not "employ perfect precision." Opp'n 37–38. But this is not a case of mild imprecision. Defendants have wholly failed to justify the arbitrary lines drawn. A key example is that neither the agency memoranda nor the legal arguments of counsel offer any explanation—much less the required reasonable explanation, *see FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021)—for the $250,000 household income cutoff. While the Rationale Memo discusses the supposed financial frailty of people who make between $100,000 and $125,000 per year, *see* Doc. 27-1, at 16–19, Defendants do not explain how that justifies cancelling loans for households earning up to $250,000 annually. This failure to address such a central eligibility requirement of the Cancellation—one that drives its broad scope—cannot survive review.

Defendants deny that their HEROES Act justification is pretext, Opp'n 37, asserting that the Secretary's "judgment was informed by a careful study" of Rationale Memo, *id.* at 24. But their own documents undermine that claim. The Rationale Memo is dated August 24. *See* Doc. 27-1, at 10. Yet the Secretary's first memorandum stating that he "determined to exercise [his]

19

discretion under the HEROES Act" was signed at 9:25 am on August 24.  *Id.* at 24–25.  Given this, it is inconceivable that the Secretary "carefully studied" the Rationale Memo.  "We are [thus] presented … with an explanation for agency action that is incongruent with what the record reveals about the … decisionmaking process."  *Dep't of Com.*, 139 S. Ct. at 2575.  Such arbitrary agency action must be set aside.

What's more, Defendants' ill-conceived efforts to avoid judicial oversight—namely, their attempted September 29 change on FFELP consolidation—is the icing on the arbitrariness cake. According to the Department, borrowers with privately held FFELP loans may become eligible if they applied for consolidation before September 29, but not if they take that same step later. Campbell Decl. Ex. E, at 6.  Nothing in the agency memoranda attempts to justify this arbitrary distinction or explain how it is consistent with the Secretary's authorization of the waiver.  *See* Doc. 27-1, at 27 (failing to mention this attempted consolidation change in the waiver authorization).  Nor is there any reasonable explanation for this distinction.

Defendants also say (at 39–40) that they did not need to consider Plaintiffs' reliance interests because they are not cognizable and are merely incidental.  The premise is not true because, as the standing analysis shows, Plaintiffs' interests are cognizable and significant.  And the interests of States whose public entities hold and service student loans—not to mention make investments, operate educational systems, and implement tax programs all intertwined with the student loan market—are anything but incidental.  In any event, no matter how strong these interests are, *Regents* "required" the Department "to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns."  *Id.* at 1915.  Defendants concede they did not do that, and so acted arbitrarily.  *See id.*

Finally, in an apparent attempt to avoid arbitrary-and-capricious review altogether, Defendants argue (at 27) that the Secretary has "no obligation to 'show' his work before ordering relief pursuant to the HEROES Act."  Though the Act, if it applies, frees the Secretary from standard notice-and-comment rulemaking, 20 U.S.C. § 1098bb(b)(1), he must still publish the waiver in the Federal Register, *id.* § 1098bb(b)(2).  And because agency action under a HEROES Act waiver is reviewable under the APA—a point Defendants do not deny—Defendants must comply with the "reasoned explanation requirement of administrative law." *Dep't of Com.*, 139 S. Ct. at 2575.

## C.  Plaintiffs' Ultra-Vires Separation-of-Powers Claim Is Likely to Succeed.

Plaintiffs are also likely to prevail on their ultra-vires separation-of-powers claim.  There is "an implied private right of action directly under the Constitution to challenge [unconstitutional] governmental action" by the federal government.  *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).  In particular, plaintiffs may bring equitable causes of action against federal officials for "actions [that] are ultra vires [their] authority" or in violation of the Constitution.  *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689–90 (1949).  Thus, "judicial review is available" for Plaintiffs' ultra-vires separation-of-powers claim "even if a statutory cause of action" under the APA "is lacking."  *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 190 (D.C. Cir. 2006); *see also Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327–28 (D.C. Cir. 1996) (discussing *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902), and explaining that the APA did not "repeal the review of *ultra vires* actions").  Defendants appear to concede this.  Opp'n 20 n.4.  Not only may Plaintiffs pursue this claim, they are likely to prevail on it because, as explained above, the Cancellation exceeds Defendants' statutory and constitutional authority.

II.     **The Remaining Factors Support Plaintiffs.**

A.     **Plaintiffs Face Irreparable Harms.**

All injuries discussed under the standing argument are irreparable.  Defendants respond that Missouri's harms through MOHELA's work as a federal-loan servicer do not qualify because they are neither "certain" nor "great."  Opp'n 41.  Defendants are wrong to insist on certainty because the Supreme Court's "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely*"—not certain—to occur.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  Regardless, the financial harm facing MOHELA as a federal-loan servicer is both certain and great.  As explained above, the Cancellation will close roughly half of the DLP accounts MOHELA services, resulting in the loss of tens of millions in annual revenue that will undermine MOHELA's ability to achieve its education-related purposes. This harm is irreparable since Defendants have sovereign immunity against damages claims.

The harms to Missouri, Arkansas, and Nebraska from FFELP loan consolidations are likewise irreparable.  As already discussed, Defendants' attempt to close borrowers' consolidation pathway to eligibility is unauthorized; thus, the threat of ongoing injury remains.  In addition, an immediate injunction stopping the Cancellation—including consolidations made in reliance on it—would pause consolidations that have yet to process and ensure the Department cannot change its website to resume advertising the consolidation pathway.  This is necessary because Plaintiffs' consolidation harms cannot be completely unwound once they occur.

Also irreparable is the impending loss of tax revenue to Nebraska, Iowa, Kansas, and South Carolina.  Once Defendants discharge hundreds of billions of dollars in untaxed loan debt, that potential tax revenue will be lost for good.  Tellingly, the Supreme Court "enjoin[ed] enforcement of the Act" in *Wyoming*, 502 U.S. at 461, which indicates that it deemed the lost tax revenue there

to be irreparable.  And courts throughout the country have repeatedly said that the federal government's "loss of tax revenue" is an "irreparable harm."  *See, e.g.*, *United States v. Palmetto Precast Inc.*, No. 3:19-CV-03098-JMC, 2021 WL 3758058, at *2 (D.S.C. Aug. 25, 2021); *United States v. Plastic Surgery Assocs. of New York*, No. 17 CIV. 204 (KMK), 2019 WL 7878030, at *1 (S.D.N.Y. Dec. 20, 2019).

### B.   The Balance Of Harms And The Public Interest Favor The Plaintiffs.

Defendants argue (at 43) that the balance of harms and public interest tip their way because "it is in the public interest for the Secretary … to protect student loan borrowers" through the Cancellation.  This ignores that the Department's student-loan forbearance is still in place, no borrower will be harmed while it remains, and the Secretary could extend it.  In the short term, which is what matters for preliminary injunction analysis, the 23 million borrowers who will still have balances after the Cancellation are better off with continued forbearance rather than the Cancellation because it's preferable to have no payment instead of a reduced payment.  Add to this Plaintiffs' irreparable harms and the lack of any "public interest in the perpetuation of unlawful agency action," *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016), and it is clear the balance of harms and public interest weigh decidedly in Plaintiffs' favor.

### III.   An Injunction Enjoining The Entire Cancellation Program Is Proper.

"[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."  *Nat'l Min. Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (citation omitted).  Indeed, the APA itself—which permits courts to "set aside" unlawful agency action, 5 U.S.C. § 706(2)—"contemplates nationwide relief from invalid agency action."  *Little Sisters of the Poor v. Pennsylvania*, 140 S. Ct. 2367, 2412 n.28 (2020) (Ginsburg, J., dissenting).

"Courts across the country interpret the APA [this] way." *Texas v. United States*, No. 6:21-CV-00016, 2022 WL 2109204, at *46 (S.D. Tex. June 10, 2022), *cert. granted*, No. 22A17 (U.S. July 21, 2022) (collecting cases). The preliminary injunction requested here would temporarily set aside the Secretary's authorization of the HEROES Act waiver and bar him from publishing the waiver in the Federal Register, thereby prohibiting implementation of the Cancellation.[4] Such programmatic relief is consistent with the Supreme Court's order staying the OSHA COVID-19 vaccine mandate pending full review. *See NFIB*, 142 S. Ct. at 666–67.

Additionally, an injunction limited to certain States and certain "individual loans," Opp'n 45, would fail "to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). MOHELA services accounts for borrowers throughout the country. *See* PI Mem. 6. So a state-specific injunction will not protect against the harms to Missouri through MOHELA. Nor would an injunction confined to loans serviced by MOHELA. Defendants have approximately nine different servicers of federal loans. *Who's My Student Loan Servicer*, U.S. Dep't of Educ., https://tinyurl.com/2p9xkya8 (last visited October 11, 2022). Thus, Defendants could easily skirt an injunction running only to MOHELA-serviced loans by transferring the loans eligible for the Cancellation to other providers. That, in the end, would cause MOHELA and Missouri more harm than it alleviates.

There is also "a substantial likelihood that a geographically-limited injunction would be ineffective because" student loan borrowers and accounts "move among states." *Texas DAPA*

---

[4] Strictly speaking, this preliminary relief is not an objectionable "nationwide injunction." Those injunctions explicitly direct the defendants that they must (or must not) act toward nonparties. But here, Plaintiffs seek a preliminary injunction directed only to Defendants—one setting aside what the Secretary has already done to implement the Cancellation (the authorization of the waiver) and preventing him from doing anything further (publishing the waiver). That order need not specify how the Secretary is to act toward nonparties.

*Case*, 809 F.3d at 188; *see also Pennsylvania v. President U.S.*, 930 F.3d 543, 576 (3d Cir. 2019), *rev'd on other grounds Little Sisters of the Poor v. Pennsylvania*, 140 S. Ct. 2367 (2020) (similar). That is especially true of Plaintiffs' tax harms.  Interstate migration means that a borrower currently living in California with a loan serviced in Wisconsin may reside in Iowa in 2026.  Cancelling that debt inflicts injury on Iowa.  An effective injunction thus cannot be confined to specific States.

It is no different for the harms from FFELP consolidations.  Because Defendants' attempt to close the consolidation pathway is unauthorized, as previously discussed, the incentive to consolidate remains.  And those consolidations—which are occurring for borrowers scattered across the country, *see* Talent Decl. Ex. A, at 81–82—harm entities servicing those FFELP loans (MOHELA), entities holding those FFELP loans (ASLA and MOHELA), and investors in securities backed by those FFELP loans (NIC).  To prevent those injuries, confining the injunction to certain localities won't work.

## CONCLUSION

The Court should grant Plaintiffs' motion for a preliminary injunction.

Dated: October 11, 2022

Respectfully submitted,

**DOUGLAS J. PETERSON**
**Attorney General of Nebraska**

*/s/ James A. Campbell*
James A. Campbell
  *Solicitor General of Nebraska*
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68509
(402) 471-2686
Jim.Campbell@nebraska.gov
*Counsel for Plaintiffs*

**LESLIE RUTLEDGE**
**Attorney General of Arkansas**

*/s/ Dylan L. Jacobs*
Nicholas J. Bronni
  *Solicitor General of Arkansas*
Dylan L. Jacobs
  *Deputy Solicitor General of Arkansas*
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-2007
Dylan.Jacobs@arkansasag.gov
*Counsel for State of Arkansas*

**DEREK SCHMIDT**
**Attorney General of Kansas**

*/s/ Shannon Grammel*
Shannon Grammel
  *Deputy Solicitor General*
Office of the Kansas Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
(785) 296-2215
shannon.grammel@ag.ks.gov
*Counsel for State of Kansas*

**ERIC S. SCHMITT**
**Attorney General of Missouri**

*/s/ Michael E. Talent*
D. John Sauer, #58720MO
  *Solicitor General of Missouri*
Michael E. Talent, #73339MO
  *Deputy Solicitor General of Missouri*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
(314) 340-4869
Michael.Talent@ago.mo.gov
*Counsel for Plaintiffs*

**JEFFREY S. THOMPSON**
**Solicitor General of Iowa**

*/s/ Samuel P. Langholz*
Samuel P. Langholz
  *Assistant Solicitor General*
Office of the Iowa Attorney General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 281-5164
jeffrey.thompson@ag.iowa.gov
sam.langholz@ag.iowa.gov
*Counsel for State of Iowa*

**ALAN WILSON**
**Attorney General of South Carolina**

*/s/ J. Emory Smith, Jr.*
J. Emory Smith, Jr.
  *Deputy Solicitor General*
Office of the Attorney General of South
Carolina
P.O. Box 11549
Columbia, SC 29211
803-734-3680
ESmith@scag.gov
*Counsel for State of South Carolina*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 11, 2022, a true and correct copy of the foregoing and any attachments were filed electronically using the Court's CM/ECF system and, through that system, were served on counsel for all parties.

/s/ James A. Campbell
James A. Campbell