1

```
1                   UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
2                        EASTERN DIVISION

3

4    STATE OF NEBRASKA, et al., )
                               )
5         Plaintiffs,          )
                               )
6         v.                   )No. 4:22-CV-01040 HEA
                               )
7    JOSEPH R. BIDEN, JR. In    )
     His Official Capacity As   )
8    the President of the United)
     States of America, et al., )
9                              )
          Defendants.          )
10

11                   PRELIMINARY INJUNCTION HEARING

12              BEFORE THE HONORABLE HENRY E. AUTREY
                   UNITED STATES DISTRICT JUDGE
13
                        OCTOBER 12, 2022
14

15   APPEARANCES:

16   For Plaintiffs:       James A. Campbell, Esq.
                           ATTORNEY GENERAL OF NEBRASKA
17
                           Michael E. Talent, Esq.
18                         Dean John Sauer, Esq.
                           OFFICE OF THE MISSOURI ATTORNEY GENERAL
19
     For Defendants:       Brian David Netter, Esq.
20                         Cody Taylor Knapp, Esq.
                           Samuel Rebo, Esq.
21                         U.S. DEPARTMENT OF JUSTICE - CIVIL DIV.

22   REPORTED BY:          ANGELA K. DALEY, CSR, RMR, FCRR, CRR
                           Official Court Reporter
23                         United States District Court
                           111 South Tenth Street, Third Floor
24                         St. Louis, MO  63102
                           (314) 244-7978
25      PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION
```

2

1          **(PROCEEDINGS STARTED AT 10:30 A.M.)**

2          THE COURT:  Good morning, everybody.  This is the

3     matter of State of Nebraska, State of Missouri, State of

4     Arkansas, State of Iowa, State of Kansas, and State of South

5     Carolina, plaintiffs, versus Joseph R. Biden, Jr. in his

6     official capacity as President of the United States of

7     America, Miguel Cardona in his official capacity as Secretary,

8     United States Department of Education, and the United States

9     Department of Education, defendants, embodied in case number

10    4:22-CV-01040.  The matter is before the Court on this date

11    for purposes of proceeding on a hearing for a preliminary

12    injunction in the matter sought by the plaintiffs against the

13    defendants.

14          Plaintiffs are present through counsel; defendants

15    are present through counsel.  For the record, we are also

16    broadcasting, if you will, consistent with the authority

17    issued in the pilot program that allows for the audio

18    broadcast of certain civil proceedings of interest and

19    importance to the public.

20          Counsel for plaintiffs, are you ready to proceed?

21          MR. CAMPBELL:  We are, Your Honor.

22          THE COURT:  All right.  For the record, would you

23    introduce yourselves in that regard.

24          MR. CAMPBELL:  Sure, Your Honor.  James Campbell on

25    behalf of plaintiff states.  I'm with the Nebraska Attorney

3

1   General's Office.  I have two colleagues with me.

2          MR. TALENT:  Michael Talent, Deputy Solicitor General

3   for the State of Missouri.

4          MR. SAUER:  And John Sauer, Solicitor General for the

5   State of Missouri.

6          THE COURT:  And are you all going to be engaged in

7   presenting and arguing the matter today or will it just be

8   Mr. Campbell?

9          MR. CAMPBELL:  It will just be me, Your Honor.

10          THE COURT:  All right.  Counsel for defendants, would

11   you introduce yourselves for the record.

12          MR. NETTER:  Yes, Your Honor.  Good morning.  Brian

13   Netter, U.S. Department of Justice, for the defendants.  I am

14   joined by two colleagues, who I will let introduce themselves.

15          MR. KNAPP:  Good morning, Your Honor.  Cody Knapp

16   with the Department of Justice.

17          MR. REBO:  Good morning.  Samuel Rebo with the

18   Department of Justice.

19          THE COURT:  Now, Mr. Rebo, before we started, I was

20   informed by the clerk that you had not entered as of yet but

21   you were in the process of doing so.

22          MR. REBO:  That's correct, Your Honor.

23          THE COURT:  Has that process been completed?  Are you

24   now entered as a matter of record?

25          MR. REBO:  I'm in the process of doing that, Your

4

1  Honor.  I don't think it's been completed yet.

2          THE COURT:  All right.  What does that mean, that you

3  are in the process of doing that?

4          MR. REBO:  That means that I'm trying to get the

5  credentials to -- I created an account on PACER recently, Your

6  Honor, and I am waiting for from my side the Department of

7  Justice to approve that, at which point I'm going to be

8  entering an appearance in this case.

9          THE COURT:  All right.  That having been said then,

10  you will not be presenting or arguing anything today?

11          MR. REBO:  That's correct, Your Honor.

12          THE COURT:  All right.  And, Mr. Netter, you will be

13  arguing on behalf of the defendants?

14          MR. NETTER:  Yes, Your Honor.

15          THE COURT:  All right.  Before we begin, are there

16  any preliminary matters that we need to take up with reference

17  to argument?

18          MR. CAMPBELL:  I don't believe so, Your Honor.

19          THE COURT:  All right.  Well, as they say, let's get

20  at it.

21          MR. CAMPBELL:  Your Honor, two questions.  Would you

22  prefer argument from up there?

23          THE COURT:  Please.

24          MR. CAMPBELL:  And then the second question is, would

25  you like me to keep the mask on for the argument or take it

5

1  off?

2        THE COURT:  You can remove it for purposes of

3  arguing.

4        Proceed.

5        MR. CAMPBELL:  The defendants' Mass Debt Cancellation

6  is an extravagant assertion of agency power.  It will erase

7  almost a half trillion of the outstanding 1.6 trillion in

8  student loans, and in the process, it will eliminate all

9  outstanding loans for approximately 20 million --

10       THE COURT:  Okay, and before we get into that type of

11  argument, can we have some background as to what the facts are

12  that arguably create a basis for your seeking relief.

13       MR. CAMPBELL:  Sure.  So, Your Honor, would you like

14  facts about the program and about the plaintiffs and how they

15  are impacted by it?  Are those the facts that you would

16  prefer?

17       THE COURT:  Briefly.

18       MR. CAMPBELL:  Okay.  So the program has a couple

19  central eligibility requirements.  The program purports to

20  eliminate a significant amount of student loan debt.  The

21  first requirement is that someone has to have a direct loan

22  held by the federal government or what's called a FFEL loan

23  held by the federal government and I believe also maybe a

24  Perkins loan held by the federal government, although that is

25  not relevant for purposes of our claims.  And then the next

6

1    requirement is that the individual not have earned more -- if

2    they are filing as an individual, filing taxes, not have

3    earned more than $125,000 per year or if they are filing as a

4    married individual, as a household, not earned more than

5    $250,000 a year.  So those are the essential eligibility

6    facts.

7         And in terms of the relief provided under this, the

8    cancellation that is given, it's either 10,000 if the borrower

9    did not receive a Pell Grant or 20,000 if the borrower did

10   receive a Pell Grant.  That's essentially the --

11        THE COURT:  So is it an automatic 10,000 or 20,000 or

12   is it dependent?  Is 10,000 the maximum that can be granted or

13   does everybody who applies and their application is accepted

14   automatically get $10,000 taken off?

15        MR. CAMPBELL:  As long as they have at least $10,000

16   in loans still outstanding, yes, they do.

17        THE COURT:  Okay.  So at least 10,000.  If you have

18   30,000 in loans, you still only get 10,000 taken off; correct?

19        MR. CAMPBELL:  Correct, unless you received a Pell

20   Grant, in which case you would get the 20.

21        THE COURT:  Exactly.  Okay.  Go ahead.

22        MR. CAMPBELL:  So this program impacts the plaintiff

23   states in a number of ways, and I will start with the facts

24   regarding those.  The first is Missouri's interest and harms

25   through MOHELA.  MOHELA is the Missouri Higher Education Loan

7

1    Authority.  It is a state entity.  It's described in state law

2    as a public instrumentality.  It is charged with the, quote,

3    essential public function, end quote, of providing loans for

4    students in the state and also for supporting educational

5    institutions in the state.  So that entity is affected in a

6    number of ways.  I will highlight just one in particular.

7    First is that they are a provider -- or I should say a

8    servicer of direct federal loans, meaning that they are one of

9    the nine entities that are charged with servicing direct

10   federal loans; therefore, they are going to be one of the

11   entities that is directly involved in effectuating the

12   cancellation.

13        Now, they are harmed in a number of ways as I said,

14   but I think the most straightforward is this.  We indicated in

15   the reply brief we filed yesterday that in their most recent

16   fiscal year, they earned $89 million in revenue from servicing

17   federal loans, and that revenue is a function of the number of

18   accounts that they service.  So what this program is going to

19   do is it's going to cancel roughly half of the outstanding

20   accounts, and that's by defendants' own admission.  They

21   recognized that about half of eligible -- I think they say

22   about 45 percent of eligible borrowers will have all of their

23   loans eliminated under this.

24        THE COURT:  So where does that $89 million go?  Where

25   did it go?  Who gets it?  What happens to it?

8

1    MR. CAMPBELL: So it goes into MOHELA's funds, and

2    part of it obviously covers expenses, and whatever is left can

3    be used to do what the statute requires it to do, which is

4    provide loans to students and to support higher education in

5    the state.

6    THE COURT: So the $89 million in revenue is used to

7    provide student loans or some of it is used to provide loans

8    to students?

9    MR. CAMPBELL: Some of it is. And the support for

10   that is in the financial statement for fiscal year 2022 that

11   we cited in the reply brief yesterday. There is a discussion

12   of how MOHELA originated approximately $4 million in loans

13   last year, and so that is funded by the money that they

14   otherwise generate.

15   So those are the harms -- at least one key harm as to

16   MOHELA. Focusing now on the tax harms that we allege, there

17   are a number of states, specifically we've highlighted four,

18   Nebraska, Iowa, South Carolina, and Kansas, who all suffer

19   direct tax harm from this program. The way that goes is that

20   they currently do not tax student loan debt discharge, but

21   they are set to start doing that at the end of 2025. So by

22   this cancellation forcing all of this massive amount of

23   discharge into the present time, they are depriving the states

24   of the ability to tax it once their laws are indicating that

25   they will start doing that. So that is a present harm because

9

1  there right now is a pool, as I said at the outset, of

2  $1.6 trillion in outstanding student loan debt, and a

3  significant amount of that, nearly a half trillion, is going

4  to be eliminated very soon as a result of this program.  As a

5  result of that, that's going to take away the massive pool

6  that is available for the states to tax and it's going to

7  cause them a direct tax harm.

8          Then the last set of harms --

9          THE COURT:  So are there other types of federal

10  government action in the past or currently pending that could

11  impact or impair a state or a number of states' ability to

12  collect, maintain, or increase their collection of tax

13  revenue?

14          MR. CAMPBELL:  Your Honor, there might be.  I'm not

15  familiar, but this is what we have identified as a direct harm

16  because it's taking an existing pool --

17          THE COURT:  So when you say "direct harm", are you

18  saying injury in fact?

19          MR. CAMPBELL:  I am saying injury in fact, and I am

20  also identifying that it is traceable to the action.

21          THE COURT:  So the impairment -- the federal

22  government's action that might impair collection of taxes by a

23  state is a direct injury.  Is that what you are saying?

24          MR. CAMPBELL:  Yes, it is, Your Honor.

25          THE COURT:  And your authority for that is?

10

1          MR. CAMPBELL:  *Wyoming versus Oklahoma*, which is a

2    U.S. Supreme Court decision that we cited in both our opening

3    brief as well as in our reply brief.

4          THE COURT:  And that's what *Wyoming* says, that the

5    impairment of a state's ability to collect or impose taxes is

6    an injury in fact?

7          MR. CAMPBELL:  More precisely it says that an injury

8    that directly reduces the taxes that they are going to recover

9    is an injury in fact.  And so the defendants respond and they

10   say, well, you could change your law to avoid this problem.

11   That's one of their main responses to the tax harm.  But as we

12   indicated in the brief we filed yesterday and the Fifth

13   Circuit took this position in the Texas *DAPA* case that forcing

14   a state to change its laws is itself an injury.  So the

15   defendants can't avoid the injury here by simply forcing the

16   states to engage in another one.

17          Moving now to the last set of harms -- well, maybe

18   it's not the last, but the next set of harms is what we have

19   called the consolidation harms.  The consolidation harms are

20   the harms that result to plaintiff states because of the

21   programs incentivizing the consolidation of non-federally held

22   FFEL loans.  So this argument takes a little background to

23   unpack.  The first point that I would highlight is the

24   difference between two different kinds of FFEL loans.  There

25   are FFEL loans that are held by the federal government, and

11

1    there are FFEL loans that are held by non-federal entities.

2    So what the defendants initially did in announcing this

3    program is they indicated that if you had one of these

4    non-federally held FFEL loans, that you could consolidate it

5    into a direct loan in order to become eligible, and that not

6    surprisingly prompted widespread consolidation, and that

7    consolidation harmed the plaintiff states in a number of ways.

8    I will highlight two of them.

9           The first is to Missouri and to Arkansas,

10   specifically through their agencies MOHELA and then ASLA is

11   the name of the Arkansas agency.  That's the Arkansas Student

12   Loan Authority.  They both are holders of these privately held

13   FFEL loans.  So by holding those loans, they generate income

14   and they also help to secure bonds and notes from the FFEL

15   loans that they hold, but now those FFEL loans are being

16   consolidated, which means they are being eliminated, and as a

17   result, they are being adversely affected by it.  Specifically

18   in the Williams declaration that we filed in support of our

19   motion, he indicates that the State of Arkansas has lost

20   roughly 5 to $6 million through the consolidation of FFEL

21   loans.

22          And then the other set of injuries that fall under

23   the consolidation rubric would be that to the State of

24   Nebraska.  The State of Nebraska invests in securities that

25   are backed by these FFEL loans.  And so by investing in those,

12

1   they are seeking to profit off the long-term interest payments

2   that are generated by those loans, but what this program does

3   by incentivizing the consolidation is it cuts off that ongoing

4   income stream, retires the investment early, and prevents the

5   State of Nebraska from receiving the interest that it had

6   bargained for as part of buying that security.

7           So the federal government's response to this argument

8   is that they now allegedly changed the program they say, and

9   so this incentive to consolidate no longer exists.  Now, the

10  details of this change can be found in an alteration to their

11  website on December (sic) 29th.  On December (sic) 29th, they

12  changed the language on their website that said you can

13  consolidate these non-federally held FFEL loans in order to

14  make them eligible as a direct loan and they changed it and

15  they said instead that only if you filed an application to

16  consolidate before September 29th were you eligible and those

17  that might file a consolidation application after that date

18  are not.

19          There is a couple responses to why that doesn't

20  eliminate our harms.  The first response is that that change

21  in the program was unauthorized by the Secretary's

22  authorization of the waiver.  So if you look at the document

23  they filed, which is signed by the Secretary giving

24  authorization for the waiver, it says that -- and this is

25  document 27-1.  It's one of the exhibits attached there.  It

13

1    says that there are a number of loans eligible for this, and

2    one of them is direct federal loans.  Once the consolidation

3    occurs, what's left is a direct federal loan, so they can't

4    carve this consolidation pathway out of the program because

5    doing that would be outside the authority that the Secretary

6    has given them.  So our argument is that that attempt to close

7    the consolidation pathway is unauthorized and, therefore, the

8    incentive to consolidation still exists.

9           But in addition to that, we also argue that even if

10   they did close the consolidation pathway for now, there are at

11   least two reasons why we still have standing and why we are

12   still suffering ongoing injuries.  The first point is that the

13   defendants argue -- oh, I'm sorry, is that consolidation takes

14   time.  That's the first point, consolidation takes time.  So

15   anything that started before September 29th, that

16   consolidation still may not be done.  So if this Court were to

17   enter an injunction now and if that injunction were in part to

18   put a pause on those ongoing consolidations, then that would

19   help to remedy the ongoing harms that the states are

20   experiencing.

21          In addition, there is -- particularly considering the

22   amount of authority that the defendants think they have under

23   the HEROES Act, there is nothing stopping them if they are

24   right on the scope of their authority from telling people that

25   they can once again engage in this consolidation, and because

14

1    we know that voluntary cessation of unlawful activity is not

2    enough to moot a case, that simply doesn't work to wipe out

3    all of the plaintiffs' injuries.  We still have those

4    injuries.  The defendants could change their policy back

5    again, and we should be allowed to vindicate those injuries in

6    court.

7             So, Your Honor, that gives you the facts and a

8    discussion of a lot of the standing issues, the injury issues,

9    the irreparable harm issues.  The last point I would

10   highlight -- well, first, all of those harms I discussed are

11   irreparable.  We have explained that in our briefing, but just

12   to highlight a few points.  On the MOHELA harms, the money

13   that they lose from servicing these loans, there is no way to

14   get that money back.  Once the loans are cancelled, once their

15   number of accounts shrink, thereby shrinking their income,

16   that money is gone.  You can't sue the federal government for

17   damages as we know because of the Doctrine of Sovereign

18   Immunity, so that is an irreparable harm.

19            Similarly, the other injuries that I talked about,

20   the consolidation harms, once these loans have been

21   consolidated, there is no way to fully remedy all of the

22   harms.  Now, admittedly we argue in our brief and we think

23   it's true that there is a way for the Court on a permanent

24   injunction to provide us some measure of relief for those

25   consolidation harms, but I don't think they can be fully

15

1   redressed once the debt is -- once the loan is consolidated,

2   and, therefore, the injury is irreparable.

3          So what the defendants have done here -- turning now

4   to the merits unless the Court has any further questions on

5   standing and irreparable harm.

6          THE COURT:  I do have questions on standing.

7          MR. CAMPBELL:  You do?

8          THE COURT:  Yes.  The parties in the case are the

9   President of the United States as well as the Secretary and

10  the Department, so let's talk about standing in relation to

11  the President.  You know, factually as you have outlined here

12  in open court and in the pleadings, you have set up the

13  ingredients for a cake -- let's call it the ingredients for a

14  cake -- but it's kind of hard to make a cake if you don't have

15  a pan to put the cake in, and that pan for me is standing,

16  okay?  So it doesn't matter if you've got all the ingredients.

17  It doesn't matter if they are all fresh and tasty and they are

18  all laid out and you have prepped everything and the oven is

19  nice and hot and it's ready to go and your guests are coming

20  shortly and you need to have that cake all done for them to

21  enjoy.  If you don't have a pan or if you don't have the right

22  pan after you have mixed all those ingredients, you can't make

23  that cake, and your guests are going to show up and they are

24  going to be unhappy, they are going to be dissatisfied, they

25  might even be angry because they are all coming to eat some

16

1   cake, okay?

2           Standing is that cake.  So what's the standing?

3   What's the President cake pan?

4           MR. CAMPBELL:  Your Honor, are you referring

5   specifically to against the President, standing against the

6   President?

7           THE COURT:  Uh-huh.

8           MR. CAMPBELL:  Your Honor, the reason we included the

9   President in this case is because he was the one that first

10  made the announcement of this program, and at the time we

11  filed the lawsuit, all we had were press releases and

12  announcements.  Now in light of the federal government's

13  filings as well as some things that they have done in the last

14  few days that I would love to discuss when I get to the

15  merits, we have a lot more than that.  It's very clear that we

16  have final agency action and that the Administration,

17  specifically the Department and the Secretary, are moving

18  forward with this.  So while we included the President

19  initially out of an abundance of caution, I don't think

20  whether we have standing against the President ultimately

21  matters so long as we have standing against the Department and

22  the Secretary, which we do.

23          THE COURT:  So is that the same as conceding or

24  confessing that you don't have standing against the President

25  because that's what it sounds like you are saying because thus

17

1    far the only thing that you have said with regard to having

2    the President of the United States as a party in this lawsuit

3    is that the President made an announcement.

4            MR. CAMPBELL:  Your Honor, yes, the President --

5            THE COURT:  I know he made an announcement.

6    Everybody that watches the news knows he made an announcement

7    or read a newspaper or watched CNN or, I don't know, maybe

8    even watched The View if that's your thing, not mine.  But is

9    the President making an announcement sufficient to give you

10   standing to bring the President in as a party to the lawsuit,

11   any lawsuit, but in particular this lawsuit?

12           MR. CAMPBELL:  Your Honor, we thought it was when the

13   only actions we had were announcements, press releases, and

14   websites.

15           THE COURT:  Okay.  You thought it was.  So now do you

16   think it isn't?

17           MR. CAMPBELL:  No, I continue to think it's enough

18   for purposes of --

19           THE COURT:  Okay.  So if you think you have enough

20   standing to bring the President in to sue the President, tell

21   me what that is.

22           MR. CAMPBELL:  So, Your Honor, this would not fall

23   under --

24           THE COURT:  Beyond the President made an

25   announcement.

18

1          MR. CAMPBELL:  This would not fall under our APA

2    claim.  We do not have standing to sue the President under the

3    APA, but this would --

4          THE COURT:  Yeah, that's true, thank you.

5          MR. CAMPBELL:  But this would fall we believe under

6    our direct constitutional, the ultra vires separation of

7    powers claim we're raising.

8          THE COURT:  So articulate that for me please.

9          MR. CAMPBELL:  Because we're ultimately challenging

10   this Mass Debt Cancellation, and the consolidation at best we

11   can tell originated with the directive from the President to

12   the Secretary to the Department, and so we are suing everyone

13   involved in that chain.  But again, Your Honor, I would just

14   stress even if the Court thinks we don't have standing against

15   the President, we do have standing against the other two

16   defendants, and I think that that's what's key here.

17         THE COURT:  So again I'm asking, are you now

18   conceding and admitting that you do not have standing against

19   the President?

20         MR. CAMPBELL:  Your Honor, I'm not.

21         THE COURT:  Because here's the deal, okay?  Either

22   you do or you don't.  Standing is not like, well, maybe we do,

23   maybe we don't, we'll see later on if we do.  No, that's

24   something that we need to address upfront because it is some

25   immediacy.  Whether it is the President of the United States

19

1   or John Q. Citizen, if they shouldn't be in the lawsuit at the

2   outset, then they shouldn't be in the lawsuit because nobody

3   wants to be challenged with defending something that they

4   should not rightfully be involved in.  That's how that law

5   stuff works; right?  Okay?  Okay.  And pragmatically, it

6   increases the burden on the plaintiff as the plaintiff may go

7   forward if the plaintiff goes forward and it imposes an

8   unnecessary burden on the defendant who may not necessarily

9   and should not be involved in the lawsuit from the beginning.

10          So let me ask you again and preface this by saying

11   that when a lawyer tells me if the President or the party

12   isn't or should not be involved in the lawsuit, then we have

13   claims against other parties, all right, that's tantamount to

14   me as that lawyer saying, okay, Judge, we agree, that party

15   should not be in the lawsuit.  So I'm asking you, should the

16   President be in the lawsuit standing-wise or should the

17   President not be in the lawsuit standing-wise?  If the

18   President should not be in the lawsuit standing-wise, then

19   let's get that out of the way and move forward with those

20   individual defendants that are properly before the Court

21   because you do, in fact, have standing to pursue claims

22   against them because otherwise, we muddle things up and we

23   waste time talking about parties that we shouldn't be talking

24   about.  I'm a pragmatist in that regard, but it also has some

25   considerable legal standing, no pun intended.

20

1          MR. CAMPBELL:  Sure.  Your Honor, on that point, we

2    will readily concede that there is no standing against the

3    President under the APA.

4          THE COURT:  All right.  Having conceded that, then on

5    that issue, the President is out on the APA?

6          MR. CAMPBELL:  That's correct.

7          THE COURT:  Okay.  Go ahead.

8          MR. CAMPBELL:  However, we do still think that there

9    is standing for that direct constitutional claim.

10          THE COURT:  All right.  And I am still waiting to

11    hear more about that.

12          MR. CAMPBELL:  Sure.  So to unpack that, standing has

13    three requirements.  There is the injury requirement, the

14    causation requirement, and the redressability requirement.  We

15    believe that again when we filed this lawsuit, all we had were

16    press releases and announcements, and all of that came and

17    originated from the President, so filing a lawsuit including

18    the President we believed was a legitimate argument because if

19    we could get an injunction, then that would stop all of the

20    harm from happening.  So that's our argument on that point,

21    Your Honor.

22          THE COURT:  Okay.

23          MR. CAMPBELL:  Moving now to the merits, one of the

24    points that I would like to emphasize right at the outset is

25    that this is a massive use of federal agency power; as I said

21

1   at the beginning, roughly a half a trillion dollars of the

2   outstanding $1.6 trillion in student loans.  I think it's also

3   important to know that the agency is trying to do this despite

4   the fact that Congress has repeatedly rejected bills that

5   would have achieved this same goal.  So the defendants here

6   are just not content to leave this in Congress's own hands.

7   What they are trying to do is go around Congress, and this

8   they can't do.

9          They claim that they have authority under the HEROES

10   Act, but the HEROES Act is a statute that gives specific

11   authority to help specific people that are facing harms from a

12   national emergency.  It does not allow the Administration to

13   use that statute in response to the end of a national

14   emergency to benefit practically every borrower in the

15   country.  The defendants have kept this program shrouded in

16   secrecy for over a month, but as more details emerge, the

17   unlawfulness of this program becomes more apparent every day.

18   And I would like to highlight a few of the recent developments

19   showing that.

20          First is on Friday, the defendants filed their

21   Rationale Memo that attempted to explain why they have

22   authority to do this, but all that memo does is show the

23   arbitrariness of their actions, and I will highlight one

24   example in particular.  We have explained more in the brief,

25   but the first example is there is nothing in that Rationale

22

1   Memo that says anything about considering reasonable

2   alternatives.  However, the U.S. Supreme Court made it clear

3   in the Board of Regents case that it is incumbent upon an

4   agency when making a change like this to consider reasonable

5   alternatives.  There are a number of reasonable alternatives

6   that were available.  The Department could have decided to

7   continue the forbearance that it currently has on student loan

8   payments and interest accrual or it could have decided to

9   extend or enlarge the repayment period and then reamortize the

10  loans which would have been a way to bring down the ongoing

11  monthly payments, and the ongoing monthly payments are one of

12  the key points that the defendants rely on to justify this

13  program.  But it's not just that Rationale Memo that shows the

14  arbitrariness and unlawfulness here.  It's also an OMB

15  application --

16          THE COURT:  Would the defendants have been satisfied

17  with one of those other options, any/or?

18          MR. CAMPBELL:  I don't know, Your Honor, because they

19  didn't even consider them, so I'm assuming that they wouldn't

20  have been.

21          THE COURT:  Not my question.

22          MR. CAMPBELL:  I'm assuming that they wouldn't have

23  been.

24          THE COURT:  It has nothing to do with whether they

25  would have considered it.  My question is, would the

23

1   defendants have been satisfied with one of those other options

2   since the crux, the gravamen, of the problem here is the debt

3   cancellation issue?

4           MR. CAMPBELL:  I think it's very safe to assume they

5   would not have been okay with a different option.

6           THE COURT:  But in short, no options would have been

7   satisfactory to the defendants.

8           MR. CAMPBELL:  I think that's true because --

9           THE COURT:  Very interesting.  Go ahead.

10          MR. CAMPBELL:  Because they were dead set on Mass

11  Debt Cancellation.

12          THE COURT:  That's not my question.  You are avoiding

13  my question.

14          MR. CAMPBELL:  I'm sorry, Your Honor.

15          THE COURT:  If they chose one of the other options,

16  they would not have been dead set on mass debt collection as

17  indicated by your statement just now.  So if that's the case,

18  if they, in fact, would have chosen one of the other options

19  and had not been set on mass debt collection, then the

20  question is would the defendants have been satisfied then with

21  the exercise of one of the other options?

22          MR. CAMPBELL:  I don't believe they would have been.

23          THE COURT:  Okay.  So then the defendants would have

24  been diametrically opposed to anything that would relate to

25  the relief of any debt, which might suggest then that the

24

1    defendants might also be opposed to forbearance because of the

2    emergency that was announced during the pandemic and the

3    forbearance that the Secretary granted during the pandemic at

4    the height of the pandemic and the extension of that, which

5    now is extended up to what, December of this year, the initial

6    forbearance and announcement of forbearance and hope for a

7    forbearance and order regarding same that launched the action

8    of the Secretary by the predecessor to President Biden,

9    President Trump.  So then are the defendants unsatisfied,

10   dissatisfied, and feel that the action of the forbearance is

11   also ultra vires, is also illegal, and is also against the

12   spirit and letter of the HEROES Act?

13           MR. CAMPBELL:  Your Honor, you asked if the

14   defendants would be against that.  Did you mean the

15   plaintiffs?

16           THE COURT:  I meant the plaintiffs, yeah.

17           MR. CAMPBELL:  No, the plaintiffs are not challenging

18   the forbearance.

19           THE COURT:  And when I said defendants earlier, I

20   meant plaintiffs, too.  Would the plaintiffs be satisfied with

21   any other options?

22           MR. CAMPBELL:  Your Honor, the plaintiffs would be

23   satisfied with any other option -- with some other options.  I

24   am not saying any other options.

25           THE COURT:  Other options as indicated.

25

1          MR. CAMPBELL:  Yeah, there are certain options --

2          THE COURT:  And I think you referenced those in your

3    documents that you filed.

4          MR. CAMPBELL:  Yes.

5          THE COURT:  Your writings.

6          MR. CAMPBELL:  Yes, we reference a number of

7    alternatives, not conceding that we as the plaintiffs would

8    have been okay with all of the alternatives in the brief, but

9    we would have been okay with continued forbearance, for

10   example, because that would have been a non-agency action.  It

11   wouldn't have even been something we could challenge.

12         THE COURT:  Right.  Okay.  So let me -- if I confuse

13   defendants and plaintiffs again, correct me immediately

14   because it's a rarity these days post pandemic that I have

15   plaintiffs and defendants in a civil case in the courtroom,

16   and in the criminal cases, most instances are pleas or

17   hearings and the defendant who is typically confined is

18   sitting where you are sitting.  So in my head, I think

19   defendant as opposed to plaintiff because as we know

20   customarily, the plaintiff always sits closest to the jury

21   box.  So correct me if I get that confused again.

22         MR. CAMPBELL:  Sure.  Will do.

23         THE COURT:  Go ahead.

24         MR. CAMPBELL:  So to return to the OMB documents that

25   were published yesterday, now these are not referred to in our

26

1  reply brief because we didn't notice them until after we filed

2  the reply brief yesterday, but they are on OMB's website, they

3  are a matter of public record.  It reveals a number of very

4  interesting things about the program.  The first one that I

5  would highlight is that those documents show that you either

6  have to have the requisite income being low enough in 2020 or

7  in 2021, in one of the two years.  So what that makes clear is

8  that someone who is in a household earning, say, $240,000 a

9  year in 2020 and then they got a massive promotion at work and

10 now they are earning roughly a million dollars a year in 2021

11 and roughly 2 million dollars a year in 2022, that person is

12 eligible for this cancellation.  That more so than perhaps

13 some other things we have said so far in the case highlights

14 the arbitrariness of what the Agency is doing.

15        There is another interesting thing in those

16 administrative documents.  One of the things that the

17 defendants rely on in defending the massive scope of this

18 program is they point to the need for administrative

19 convenience.  They say that they can't engage in many

20 particularized inquiries, so they need administrative

21 convenience across the board.  But what the OMB papers show is

22 that they estimate that approximately 30 million people are

23 going to need to file applications, and more so, that up to

24 5 million people are going to have to go through a detailed

25 income verification process.  All of that, of course, is

27

1  requiring at least some measure of individualized inquiry.  So

2  I think that undermines a lot of what the defendants are

3  saying about the need for administrative convenience.

4       And so I have talked about what we have learned

5  through the memo, the Rationale Memo, filed on Friday.  I've

6  talked about what we've learned through the OMB papers

7  published yesterday, and who knows what we'll find out

8  tomorrow, but with every increasing step, more and more is

9  showing that the defendants are violating the law,

10  particularly the APA.  So the way I would characterize what's

11  going on, Your Honor, is that the federal government is

12  engaged in a so far hidden, ever-changing, and increasingly

13  crumbling escapade of lawlessness.  Everything we learn more

14  about the program shows that the Department is making this up

15  as they go, they are acting without Agency authority, and they

16  are flouting the HEROES Act, which doesn't give them the broad

17  authority they claim.

18       Now, when the Court looks at the merits of our

19  claims, we have essentially three of them.  There are two APA

20  claims.  The first is exceeding statutory authority and in

21  violation of the Constitution, the second APA claim is

22  arbitrary and capriciousness, and the third claim is the

23  direct constitutional ultra vires separation of powers claim

24  we've raised.

25       The first question to ask when deciding that first

28

 1   question, whether they are acting in excess of their statutory

 2   authority, is whether the Major Questions Doctrine applies.

 3   The Major Questions Doctrine was recently addressed by the

 4   U.S. Supreme Court just in June in the case of *West Virginia*

 5   *versus EPA*, and what the Court acknowledged there is that

 6   Courts must presume that Congress does not intend to silently

 7   or ambiguously delegate to agencies the power to make

 8   decisions of great economic and political significance, but

 9   that's exactly what the defendants are trying to do here, to

10   make a decision and make an action of great economic and

11   political significance; therefore, it calls for Courts to

12   presume that Congress didn't give them that power.

13          Now, there are four factors that we highlight and

14   that the defendants don't even really contest that show the

15   Major Questions Doctrine applies here.  The first is what I

16   just mentioned, which is, is this an action of major economic

17   and political significance.  They admit that point on page 30

18   of their brief.  Second point is that this cancellation seeks

19   to achieve an outcome that Congress has conspicuously and

20   repeatedly rejected.  They don't deny that point.  Third, this

21   cancellation is an unprecedented use of the HEROES Act.  They

22   don't deny this either.  They never cite any instance where

23   the HEROES Act has been used to eliminate debt yet alone to do

24   it on such a vast scale.  Now, in fairness, they do argue that

25   the Secretary has some power to eliminate debt, but they cite

29

1   to other provisions in the Higher Education Act.  They don't

2   cite to the HEROES Act as an example of a situation where they

3   have ever forgiven debt before.

4          And the last factor showing that the Major Questions

5   Doctrine applies is the sheer scope of defendants' claim to

6   authority under the HEROES Act.  They take a statute that

7   focuses on providing relief for particular groups adversely

8   affected by a national emergency, and they transform it into a

9   tool for canceling hundreds of billions of dollars in student

10  loan debt for borrowers worldwide and -- and I think this is

11  key -- they indicate in their Rationale Memo -- this is at

12  document 27-1 at 14 -- they indicate that they could discharge

13  all borrower's entire loan amounts if necessary to mitigate a

14  risk they perceive to delinquency and default rates rising.

15  So what they have asserted is an extravagant claim of

16  authority, and for that reason, the Major Questions Doctrine

17  applies.

18         That then takes us to the question of whether they

19  can prove clear congressional authorization for what they have

20  done, and, Your Honor, this they can't do either.  I would

21  highlight three ways in which they are acting beyond the

22  statutory text.  The first way is that the HEROES Act requires

23  that the relief afforded must be, quote, necessary to ensure,

24  end quote.  They included "borrowers won't fall into a worse

25  position in relation to their loans."  But the defendants

30

1    clearly do not comply with this, and you can illustrate it

2    through a number of examples, but I will give you one.

3    Consider a borrower who continues to owe $10,000 on their

4    loans and they live in a household that makes $240,000 a year.

5    That person is -- they have not shown that forgiving that

6    person's remaining $10,000 is necessary to ensure that someone

7    in a household making almost a quarter million dollars needs

8    that to avoid falling into a worse situation.

9          The second way in which they flout the HEROES Act is

10   that it requires that the affected individuals included in the

11   program must be at risk of facing a worse financial position

12   in relation to their loan, but again they can't comply with

13   this either.  They don't even come close to designing a

14   program that complies with that.  Another example, if the

15   program had someone who at the beginning of the pandemic was

16   in a household earning a hundred thousand dollars a year and

17   now that household income has grown to $200,000 a year, they

18   cannot show that that household -- everyone in a household

19   like that is in a position where they are at risk of facing

20   worse outcomes regarding their loans.  In fact, there is no

21   way they are facing worse outcomes concerning their loans

22   particularly in light of the ongoing forbearance.

23         And the last point that I would highlight is the

24   HEROES Act limits the Secretary's power to helping borrowers

25   who face financial risks because of the national emergency;

31

1   the key words being "because of."  But they are trying to

2   invoke this power two and a half years after the pandemic

3   started and just as the President said that the pandemic is

4   over, and they are trying to do it as the pandemic is exiting.

5   They simply don't have power that broad under the HEROES Act,

6   and they are reading the phrase "because of" too broadly.

7         So that, Your Honor, is in a nutshell why the

8   defendants are acting in excess of their statutory authority

9   and why they are violating the Constitution by infringing the

10  Separation of Powers Doctrine.

11        That brings me to the arbitrary and capriciousness

12  claim, which we have briefed a lot of that.  I will just hit a

13  few points to highlight it.  Your Honor, I mentioned at the

14  outset -- or I mentioned earlier about the fact that their

15  Rationale Memo shows that they haven't considered any

16  reasonable alternatives.  That shows the arbitrary

17  capriciousness of their actions.  Next, they fail to consider

18  important aspects of the Act.  So one of the requirements of

19  the Act is that the Secretary's power is limited to providing

20  relief to affected individuals.  Affected individuals is a

21  component, a key component, of the statute, but in the

22  Rationale Memo, the Agency never even recognizes that

23  requirement of the statute, and that failure to do so is again

24  a Hallmark of arbitrary and capricious action.

25        Another point on arbitrary and capriciousness, there

1    is nothing in the Rationale Memo that even attempts to justify

2    the $250,000 household income cut-off.  Nothing.  There is not

3    a single mention trying to justify that.  That, too,

4    highlights the arbitrariness of the action.  The defendants

5    neither did they consider any reliance interests.  They didn't

6    even consider whether reliance interests were present.  We are

7    dealing here with a massive student loan market, and this is a

8    significant shock wave to it, and they didn't even take the

9    time to consider whether there were entities out there such as

10   plaintiff states who have reasonable reliance interests at

11   stake.  That, too, is arbitrary and capricious under the Board

12   of Regents case.

13            And the last point -- and, Your Honor, I only have a

14   few minutes left.  The last point I would make on the

15   arbitrary and capricious argument is I think something

16   particularly key, and that is this September 29th change that

17   the defendants tried to do.  That's when they tried to take

18   this consolidation pathway, the FFEL loan consolidation

19   pathway, and to close it.  Again, we argue that that's an

20   unauthorized change and that it's illegitimate and that the

21   pathway is still open, but even if it did close the pathway,

22   all it did was create two classes of borrowers that are

23   entirely arbitrarily divided.  So now you have borrowers with

24   non-federally held FFEL loans who if they applied to

25   consolidate before September 29th, they are eligible, but if

33

1    they did not apply to consolidate before that date, they are

2    supposedly not eligible.  There is no basis for that in any of

3    the Agency documents.  They don't ever try to explain that

4    distinction.  They don't ever try to justify that distinction.

5         And I think it's important to note that by the

6    defendants doing something, they have done something very

7    interesting there.  They purport to continue to recognize the

8    consolidations that started prior to September 29th, and in

9    doing so, they recognized that consolidated loans do, in fact,

10   fall under this program.  So what that does is simply

11   highlight the fact that they didn't have authority to try to

12   close that pathway in the first point because all of the

13   consolidation loans because they become direct loans are

14   included in the waiver that -- or in the authorization of the

15   waiver that came from the Secretary.

16        Your Honor, we also -- that's all I have on the APA

17   claim.  We also have our ultra vires separation of powers

18   claim.  The defendants seem to acknowledge that we can bring

19   that claim procedurally, we can bring an equitable cause of

20   action, and they say that if we have an APA claim, that we

21   might not be able to bring it then, but all that to say that

22   that claim is on the table and we should prevail on that claim

23   for the same reasons I articulated why the defendants have

24   acted in excess of their statutory authority.

25        So the only thing that brings the Court left to

34

1  consider in terms of the factors for injunctive relief is the

2  last two factors.  We have talked about standing and

3  irreparable harm.  We have talked about the likelihood of

4  success on the merits, and that leaves the last two factors,

5  public interest and balance of harms.  The balance tips

6  sharply in plaintiffs' favor for two reasons:  First,

7  plaintiffs face substantial irreparable harm as I discussed

8  before.  There is significant sums of money at stake here, and

9  because of sovereign immunity that the federal government has,

10  the plaintiffs can't recover those funds on the back end.  And

11  the second reason is that borrowers are already protected by

12  the ongoing forbearance.  So when you weigh the balance, the

13  balance comes out in favor of the plaintiffs.

14       And as to public interest, the most critical factor

15  is that, as Courts have said time and time again, there is no

16  public interest in perpetuating unlawful agency action.

17  Indeed, the Supreme Court just said in *Alabama Association of*

18  *Realtors*, our system does not permit agencies to act

19  unlawfully even in the pursuit of desirable ends.

20       So for all these reasons, we ask the Court to enter a

21  preliminary injunction that enjoins the defendants from

22  further implementing or enforcing the cancellation and that

23  also enjoins the Secretary from officially publishing the

24  waiver in the Federal Register.  Your Honor, we ask for a

25  prompt ruling on this because the Agency is moving very

35

1   quickly to put this in place, and as I have indicated before,

2   once the cancellation goes into effect, a lot of things cannot

3   be turned back.

4           The last point that the defendants make is that the

5   injunction should be constrained.  They say that if we do get

6   an injunction, it should be confined to particular states or

7   in some other way.  Your Honor, we firmly oppose that argument

8   for a couple different reasons.  The first is that the APA's

9   directive to set aside unlawful agency action contemplates

10  national relief within its scope.  That's what setting aside

11  does.  If you set it aside, it no longer exists and,

12  therefore, it has national impact.  The second reason is that

13  placing a geographical limitation on the injunction will not

14  afford complete relief to the plaintiffs, and I will use

15  Missouri and MOHELA as an example of that.  As I mentioned --

16  well, I didn't mention before, but the facts in our brief make

17  clear that MOHELA services accounts for borrowers all

18  throughout the country, so you can't -- so confining the

19  injunction to just a particular state simply won't work.

20          On the other hand, the defendants seem to imply that

21  maybe you could put an injunction in place that only applies

22  to loans serviced by MOHELA, but that wouldn't work either

23  because the federal government has approximately nine

24  servicers of federal loans, so what they could then do is just

25  transfer all the MOHELA accounts that are eligible for a

36

1   discharge to some other servicer and go directly around the

2   injunction on that basis.

3          So we would ask the Court for the injunction that

4   simply enjoins further implementation and enforcement of the

5   program and that directs the Secretary not to publish the

6   waiver.  That's all I have, Your Honor.

7          THE COURT:  Thank you.  Mr. Netter.  Proceed.

8          MR. NETTER:  Thank you, Your Honor.  May it please

9   the Court.  With the Court's permission, I would start with

10  some brief table setting before moving on to the standing and

11  merits points.  More than 50 years ago, Congress adopted the

12  Higher Education Act which created a robust system of federal

13  financial aid that has helped untold millions of Americans to

14  access opportunities for post secondary education.  Then and

15  now, Congress vested the Secretary of Education with broad

16  authority to administer the student loan program, including a

17  general power to compromise, waive, or release any claim held

18  by the Department.  On top of that general authority, nearly

19  20 years ago, Congress saw fit to grant additional special

20  powers to the Secretary of Education to respond to wars and

21  national emergencies.  Under the HEROES Act, the Secretary of

22  Education has the authority to waive or modify any aspect of

23  the student loan program as he or she deems necessary to

24  prevent individuals who are affected by the national emergency

25  from experiencing an adverse economic effect in respect to

37

1  their student loans.

2      Under the HEROES Act, a larger economic effect

3  unlocks a proportionately larger response.  It is the very

4  design of the statute for the magnitude of available relief to

5  rise and fall with the magnitude of the national emergency.

6  When COVID-19 was declared a national emergency on March 18,

7  2020, it was immediately apparent that the pandemic would have

8  wide ranging economic effects, and that is why just two days

9  later, then Secretary of Education Betsy DeVos invoked her

10  authority under the HEROES Act to relieve borrowers with

11  eligible loans of their obligations to make their periodic

12  loan payments and reset their interest rates to zero percent.

13      Just as the prior Administration provided student

14  loan relief that it deemed necessary to protect borrowers from

15  adverse economic consequences stemming from the early days of

16  the pandemic, the incumbent Administration has done the same,

17  undertaking the analysis to determine how to protect borrowers

18  from ending up worse off economically in relation to their

19  student loans because of the national emergency.

20      Now, as the Court knows, the six plaintiff states

21  here filed this action to prevent that relief from going out.

22  Their lawsuit we believe to be misguided, and the relief that

23  they seek is unavailable, both because they lack standing and

24  because their claims on the merit are unavailing.

25      Now, I will move quickly to the threshold standing

38

1    points and then a discussion of the merits, but I did want to

2    start first with a timing point because I know that when

3    Courts are asked to enter emergency relief, that timing

4    considerations can be of foremost importance.  When the case

5    was first filed, we were able to represent to the Court that

6    there would be no issuance of student debt relief prior to

7    October 17th based on a number of prefatory steps that need to

8    take place beforehand.  In our opposition brief that we filed

9    on Friday, we were able to represent that no loan forgiveness

10    will be issued prior to October 23rd, which we expect will

11    provide the Court with some additional time to resolve the

12    matter at hand compared to the schedule that was originally

13    devised.

14         And with that, we can move on to --

15         THE COURT:  Can I get another law clerk?  Judge

16    humor.  Go ahead.

17         MR. NETTER:  Your Honor, being unable to grant that

18    request, I will move on to a discussion of standing.  And as

19    the Court indicated, the first question here is whether there

20    is standing as to the President of the United States or

21    whether the President of the United States is a proper

22    defendant for reasons that include and expand beyond standing,

23    and we think the answer to that question is an easy no.  The

24    plaintiff states have acknowledged that they do not have

25    standing, do not have authority to sue the President under the

1   APA.  The president doesn't constitute an agency.  In any

2   event, their only claims here are for prospective relief in

3   the nature of an injunction.  Courts don't have the authority

4   to enjoin the President of the United States and Courts have

5   not exercised authority to issue declaratory judgments against

6   the United States.  So even if the President had a

7   policy-making role here beyond announcing what the Department

8   of Education had determined, the President is not a proper

9   defendant in this case.

10          With respect to the remaining defendants, the

11  plaintiffs have identified three categories, which they

12  actually describe as four categories, of reasons why they say

13  that there is standing.  First, the incentive to consolidate

14  they say results in injuries for their FFEL loan portfolios

15  and FFEL relationships; second injury is associated with

16  MOHELA's role as a servicer of direct loans; and third, tax

17  consequences stemming from the debt forgiveness.  So let's

18  start with the injuries supposedly stemming from the incentive

19  to consolidate.

20          THE COURT:  Let's back up for a moment.  On the

21  standing issue, at what point did the Secretary -- did the

22  Department announce that they were going to engage in loan

23  cancellation?

24          MR. NETTER:  So, Your Honor, we think that the formal

25  act that sets into motion and authorizes the forgiveness is

40

1    actually the publication today in the Federal Register of the

2    notice which the plaintiffs asked to have enjoined, which

3    obviously can't be enjoined because it has already happened,

4    but the formal notice of the invocation of HEROES that was

5    made available yesterday by the Federal Register for public

6    inspection and appears in today's issue of the Federal

7    Register.

8              THE COURT:  So then the formal announcement was today

9    from the Department, Secretary, and the President announced in

10   August; correct?

11             MR. NETTER:  Yes, Your Honor.

12             THE COURT:  An order I believe, correct me if I'm

13   wrong, regarding loan forgiveness, correct, in summary?

14             MR. NETTER:  So, Your Honor, the actions here, the

15   decisions, are made by the Secretary of Education and by his

16   subordinates.

17             THE COURT:  Not my question.  I am talking about the

18   President right now, okay?  Did or did not the President make

19   an announcement in August that there was going to be loan

20   forgiveness?

21             MR. NETTER:  Yes.  So alongside -- along the same

22   timeline as the Secretary of Education was reviewing the

23   papers that we have filed in the record here, the President

24   did announce that the Department of Education would be

25   proceeding along a path of invoking the HEROES Act.  That's

41

1    true, Your Honor.

2           THE COURT:  And then the Department, the Secretary,

3    so announced; right?

4           MR. NETTER:  Yes, Your Honor.

5           THE COURT:  Okay.  Go ahead.

6           MR. NETTER:  Okay.  So I think that takes us to the

7    injuries supposedly stemming from the incentive to

8    consolidate, and the theory there is the plaintiff states

9    believe that they are better off if the indebtedness that

10   resides within privately-held FFEL loans stays there.  But

11   it's important to recognize that the claims that the

12   plaintiffs made here are all prospective in nature.  They want

13   a forward-looking injunction to prevent future actions that

14   the Department of Education might undertake, and there is

15   nothing that the Court can do prospectively to remedy those

16   supposed injuries stemming from FFEL consolidation because as

17   the plaintiff states discussed, the Department of Education

18   announced -- and today's notice in the Federal Register

19   establishes -- that only FFEL consolidations that were applied

20   for prior to September 29th are eligible for the loan

21   forgiveness.

22          Now, I was surprised to see the arguments in

23   yesterday's reply brief, the states arguing that the

24   September 29th cut-off date is somehow unlawful and should not

25   be considered by a Court because the injury that the plaintiff

42

1   states have come before the Court to assert with respect to

2   consolidation is an injury that is resolved by that cut-off

3   date.  Now, they have taken the position that they were

4   surprised by the announcement of the cut-off date.  I would

5   refer the Court, of course, to the decision memo which

6   indicates that although the Secretary -- let me get you the

7   right page number here.  Although the Secretary was -- oh,

8   there it is.  This is docket 27-1, page 1.  "The paper that

9   was presented to the Secretary is not an exhaustive list of

10  all the decisions required to operationalize a

11  pandemic-connected loan discharge program nor is it a complete

12  inventory of all pieces of supporting evidence that the

13  Department considered."  And this is in part the peril of

14  filing a lawsuit based on press statements before the policy

15  details have all come out here.

16          We don't think that the plaintiff states can revive

17  their standing by asserting that an action that I would think

18  that they acknowledge removes their injury with respect to

19  this incentive to consolidate ought to be subject to challenge

20  by somebody else.  They don't assert the authority to

21  challenge the September 29th cut-off date themselves.  We

22  don't believe that any such challenge would have merit because

23  the operating facts, the considerations driving the invocation

24  of HEROES here, pertain to the emergence from the payment

25  pause, a payment pause that did not apply to individuals with

43

1   privately-held FFEL loans in conjunction with a need to create

2   a program that was operationally effective.  So plaintiffs we

3   don't believe have any authority to assert that concern nor

4   would it succeed if they could.

5          Moreover, the plaintiffs now assert that their harms

6   would still exist because it would be possible for the Court

7   to order consolidations that are in progress to be cancelled

8   such that the possibility of them losing certain accounts

9   would be somehow mitigated.  But let me note in that respect

10  that the right of FFEL borrowers to consolidate to a direct

11  federal loan in some circumstances is a preexisting authority

12  that was not part of the invocation of HEROES here, and that

13  appears at 34 CFR 685.220.  The states don't offer any

14  authority or any justification for why the action of

15  individual borrowers who have FFEL loans who seek to

16  consolidate into direct loans, you know, why that's

17  impermissible in the ordinary course, why it should be

18  impermissible here, why a Court would have any authority to

19  enjoin those actions.  None of that is part of the complaint

20  here.  As a result, we don't see any harms that do still exist

21  as a result of the prospect that there would be an incentive

22  to consolidate moving forward.

23          Now, I think it's worth noting also that the vast

24  majority of student debt in this country is not privately

25  held.  More than 90 percent of that student debt is held by

44

1    the Department.  So the FFEL loans that are within the

2    separate box that are privately held and those that pertain to

3    the plaintiff states here are a very small percentage of this

4    program, and we don't have any evidence from the plaintiffs

5    here as to the nature of the projected impact of this supposed

6    incentive to consolidate as the program currently exists.

7         Now, the plaintiff states said that there is some

8    sort of a voluntary cessation argument that they want to make,

9    and there is an exception to the Mootness Doctrine for

10   voluntary cessation by a defendant, but this is not a mootness

11   situation.  You can only -- a case can only become moot if

12   there was standing when the case was filed, and here the

13   Department had already decided on the contours of the program

14   before the lawsuit was filed, had already set the

15   September 29th eligibility cut-off, and there is no prospect

16   of just the website being changed again as the plaintiff

17   states indicated because the official declaration of the

18   HEROES Act, which was published in today's Federal Register,

19   establishes that September 29th cut-off.  So were there to be

20   some separate relief that were available to FFEL loan holders,

21   it would have to be an entirely separate action that wouldn't

22   properly be considered alongside this one.

23        I would note although it didn't come up today that

24   the plaintiff states in their briefs also identified some

25   quasi sovereign injuries they called them, which basically

45

1   amount to the fact that some states invest in FFEL loan

2   portfolios and use the proceeds of those investments to invest

3   in other priorities, such as higher education more broadly.

4   We put those in the first bucket here because those are

5   essentially a part of the same injury.  The only injury to the

6   investments associated with FFEL loans would be if the FFEL

7   loans could be -- if there was the incentive to consolidate

8   those to direct loans.  So if there is no forward-looking

9   incentive to consolidate, there is no hit on these FFEL

10  portfolios and no effect on the pension funds that some of the

11  plaintiff states were complaining about.

12          THE COURT:  So is that the same to say or if you are

13  saying, maybe I am misunderstanding, but are you saying that

14  those investments, well, just could turn out to be bad

15  investments and not the consequence of any direct activity on

16  behalf of the Department/federal government?

17          MR. NETTER:  So we are saying that, but we are also

18  saying more.  So it's certainly the case that the prospects of

19  investments rise or fall for any number of different reasons

20  that have to do with, you know, macro economic circumstances

21  and actions by independent third parties.  But here --

22          THE COURT:  Pandemics.

23          MR. NETTER:  Pandemics, exactly.  Here, however, the

24  supposed injuries that the states are asserting is that the

25  FFEL portfolios will become smaller and they will generate

46

1  smaller amounts of interest which will then reduce the bond

2  yields on bonds that are funded by these FFEL loans because

3  there will be this Incentive to Consolidate Act, and that

4  incentive doesn't exist, so the chain of causation that the

5  plaintiff states have identified just doesn't work, and even

6  if it did, this is a circumstance in which because the statute

7  allows consolidation under any circumstances and because the

8  Department of Education does not make promises that the

9  programs are going to remain a certain size at any point in

10  time, I don't think there would be any injury there anyway,

11  but there certainly isn't injury based on a theory of an

12  incentive to consolidate given that the program as it has

13  appeared in the Federal Register contains the cut-off date of

14  September 29th.

15          I would move next, Your Honor, to the issues with

16  MOHELA and its role as a federal contractor that services

17  direct loans.  There are at least three reasons why that claim

18  to standing doesn't work.  The first is that Missouri, which

19  is the only plaintiff state with a relationship to MOHELA,

20  Missouri hasn't established that it can sue for MOHELA's

21  injuries.  MOHELA as a matter of state law, sure, it is a

22  creature of the State of Missouri, but it can sue and be sued

23  and is financially self-sustaining.  If and when MOHELA is

24  sued, the state has disclaimed legal liability to pay the

25  judgment.  And we thought it was notable that in supplying

47

1    MOHELA documents to this Court -- and this is at ECF 5-1,

2    Mr. Talent's declaration -- the states had to rely on the

3    Missouri Sunshine Act in order to obtain documents.  Now, in

4    my experience, it's not the ordinary course that when you are

5    representing the interest of a client, that you have to resort

6    to FOIA or some sort of Sunshine Act in order to obtain

7    information about that client to assert your own injury.  So

8    we think that there are plenty of indications here that if

9    MOHELA has an injury, then perhaps MOHELA could be a plaintiff

10   but that the State of Missouri has not established the

11   predicates for asserting injuries that belong to MOHELA.

12           Even if MOHELA had filed this action, however, a

13   lawsuit for injunctive relief in federal district court would

14   be unavailable because any injury is really a function of the

15   federal contract that MOHELA has entered into with the United

16   States that would be subject to all of the rules and

17   regulations that pertain to contract disputes in the Contract

18   Dispute Act which channels certain suits to the Court of

19   Federal Claims.  And in this respect, I would refer the Court

20   to two aspects, the two passages in the contracts that the

21   states submitted as part of their initial motion:

22           The first, ECF 5-1, page 317, where the agreement

23   says the government makes no guarantee to any contractor that

24   their organization will retain their current loan servicing

25   volume and the Government reserves the right to periodically

48

1    review and equitably adjust the rate structure to maintain

2    effectiveness of the services provided; second, we have ECF

3    5-1 at 350 which specifies that the contract is subject to 41

4    U.S.C. Chapter 71, which is the Contract Disputes Act.

5    "Failure of the parties to reach agreement on any request for

6    equitable adjustment relating to this contract shall be a

7    dispute to be resolved in accordance with the federal

8    acquisition regulations, which is incorporated herein by

9    reference.  The contractor shall proceed diligently with

10   performance of this contract pending final resolution of any

11   dispute arising under the contract."

12          So the states say, well, we are not making a contract

13   claim, we are making an APA claim.  But for purposes of

14   understanding the injury, we think there are only two outcomes

15   here because all they are saying is that they are losing the

16   proceeds of the contract, that they're not going to make as

17   much money if these discharges go forward.  Either their

18   contract entitles them to greater compensation, in which case

19   if they have a claim, they have to proceed through the CDA

20   pathway and that would be the Court of Federal Claims, or

21   particularly given that the Government has made no guarantee

22   that they are going to retain their current volume and their

23   claim is that they are losing a volume of contracts, they

24   would have no contractual right to more payment, and if they

25   have no right, they have no injury and no claim.

49

1      THE COURT:  But isn't their claim really about not

2  being able to maintain the stream of revenue because of the

3  act of the Department in forgiving those loans?  They can't

4  sue for the obvious reason to recoup those funds, and for

5  purposes of an injunction and irreparable harm, isn't that

6  something where you have no adequate remedy at law and the

7  harm that you are likely to suffer is not calculable in money

8  damages, those two things?  They may be calculable in money

9  damages, but they have no remedy at law because they can't sue

10  the government; right?

11      MR. NETTER:  So I don't think that's right, Your

12  Honor, and I want to draw a distinction between the injuries

13  that they have asserted as the holder of assets who are

14  entitled to interest or investment revenue from those assets

15  and their role as the servicer, which is just an

16  administrative provider of services under a federal contract.

17  In the latter case, you know, they are doing the work.  They

18  are sending out statements.  They are maintaining a website.

19  And the contract says that there is this process for

20  determining how much you are supposed to get paid, and that

21  process, that payment, can be updated equitably, and there is

22  a process for the service provider if it believes it is not

23  being compensated appropriately to go to the Court of Federal

24  Claims if it satisfies all the prerequisites.

25          So there is, in fact, a way if the plaintiff states

50

1    believe that they were promised to be paid a certain amount

2    for the services that they were expecting to be performing and

3    that, you know, they are no longer going to get paid that

4    amount and it is inequitable for them to be paid less under

5    the circumstances, well that's what these provisions of the

6    contract I just read, that's what they dictate.  That's the

7    process that they create.  Because at the end of the day, this

8    is about the money that MOHELA is or is not going to be paid

9    for its services as the servicer of direct loans that are held

10   by the Department of Education.  This is a contract dispute

11   and the APA claim is secondary.  The injury is a contractual

12   injury for which there is a mechanism that they can pursue if

13   they are really concerned about the amount that they are being

14   compensated under their contract.

15           I would add also that we raise a zone of interest

16   argument in our opposition brief because there seems to be a

17   particular disconnect here as between a service provider who

18   provides administrative services under a large federal program

19   and the objectives of the HEROES Act, which is supposed to be

20   providing relief to borrowers in times of a national crisis.

21   It does not seem to us that the plaintiff states in the

22   context of MOHELA as a service provider fall within the zone

23   of interest of the HEROES Act and they, therefore, cannot

24   raise an APA claim to assert their objection to the

25   administrative action.

51

1        Now, one point that the states made in its reply

2   brief last night was that they are injured because they use

3   MOHELA's funds to generate revenue that they said today MOHELA

4   can use for other purposes, and I just want to point that that

5   doesn't speak to who the proper plaintiff is as between

6   Missouri or MOHELA, and this seems, you know, to me very much

7   parallel to a circumstance in which you have a parent

8   corporation and a subsidiary.  A parent corporation is always

9   hoping that its subsidiary is going to be more profitable

10  because the subsidiary can generate dividends and then those

11  dividends can either be used for desirable purposes or they

12  can be funneled up to the parent corporation itself, but that

13  doesn't mean that a parent corporation can file suit whenever

14  its subsidiary's revenues are reduced.

15        So I think, Your Honor, that brings us to the

16  incidental effects on state tax revenue, and Mr. Campbell

17  cited the *Wyoming* case as the supposed basis for the right of

18  these states to have standing here because of the projection

19  that they will lose tax revenue here, and I would respond with

20  that assertion of a state with the assertion of another state,

21  the case of *Pennsylvania*, *Pennsylvania versus New Jersey*.

22  This is 426 U.S. 660.  It's a 1976 decision of the U.S.

23  Supreme Court.  And let me read a short passage from that

24  case.  "The injuries to the plaintiffs' fiscs were

25  self-inflicted resulting from decisions by their respective

52

1    state legislatures.  Nothing required Maine, Massachusetts,

2    and Vermont to extend a tax credit to their residents for

3    income taxes paid to New Hampshire, and nothing prevents

4    Pennsylvania from withdrawing that credit for taxes paid to

5    New Jersey.  No state can be heard to complain about damage

6    inflicted by its own hand."

7              That's precisely what's happening here.  The states

8    have voluntarily determined for the time being that they are

9    going to follow the federal definition of adjusted gross

10   income for purposes of computing state tax liability.  They

11   are not required to do so.  It is entirely possible for them

12   to disaggregate their state tax system from the federal

13   standard.  Their decision not to do so amounts to a

14   self-inflicted harm.  And even the Fifth Circuit's decision in

15   the Texas *DAPA* case, which was also mentioned by Mr. Campbell,

16   that establishes the same proposition.

17             In distinguishing *Pennsylvania* from *Wyoming*, the

18   Fifth Circuit acknowledged that *Pennsylvania* would govern if

19   it were possible in that case to disassociate Texas law and

20   federal law, which it did not believe on the facts of that

21   case to be possible.  Here because the only thing that these

22   plaintiff states are doing is borrowing the federal definition

23   of income and, therefore, incorporating the non-taxability

24   through 2025 of student loan discharges, the states are

25   entirely free to choose to tax these matters however they

53

1   please, and if they decide to stick with the federal standard,

2   that's a self-inflicted injury that doesn't amount to a basis

3   to maintain standing.

4           So unless the Court has any further questions on

5   standing, I am happy to move on to the merits of this

6   invocation of the HEROES Act.

7           THE COURT:  Go right ahead.

8           MR. NETTER:  So to begin with some basic principles,

9   the Secretary of Education has authority to waive or modify

10  statutory or regulatory requirements so that affected

11  individuals aren't placed in a worse position financially in

12  relation to their financial assistance because of their status

13  as affected individuals.  So the Secretary here has determined

14  that there are provisions that can be waived or modified,

15  particularly 20 U.S.C. 1087dd(c), which is the requirement

16  that there be agreements to provide for the repayment of the

17  principal amount.  There are affected individuals here.  The

18  definition of affected individuals in 20 U.S.C. 1098ee covers

19  any individual who resides or works in an emergency area.  The

20  national emergency for COVID covers all 50 states and all the

21  permanently occupied U.S. territories.

22          So the focus that the plaintiffs have made with

23  respect to affected individuals, they say, well, what about

24  individuals who have been outside the United States and have

25  not worked in the United States over the past two and a half

54

1   years who nevertheless have student loans that they would like

2   to have discharged.  There is another definition of affected

3   individuals within 20 U.S.C. 1098ee, which is any individual

4   who suffered direct economic hardship as a direct result of a

5   national emergency as determined by the Secretary, an

6   indication that Congress was intending to grant discretion to

7   the Secretary to determine when that condition was

8   established.  It does seem hard to believe that there are many

9   individuals out there who haven't been affected directly by

10  the pandemic, either the pandemic as it has manifested in the

11  United States or more broadly.

12          In any event, the HEROES Act also makes clear that

13  because this is a statute that's supposed to be administered

14  in a case of national emergencies, that there doesn't need to

15  be case-by-case evaluation.  The statute itself says that you

16  don't have to do a case-by-case assessment, which is not

17  something that is frequently baked into statutes authorizing

18  administrative relief.  Moreover, the operative standard here

19  is not that there is a limitation on anybody who is not an

20  affected individual benefiting from the relief program; it's

21  that the Secretary is authorized to provide such relief to

22  ensure that affected individuals are not placed in a worse

23  position financially in relation to their financial

24  assistance, and that ultimately is an empirical question for

25  which the Secretary has reviewed substantial data which we

55

1   summarize in our brief and is contained also in some of the

2   exhibits thereto.

3        I would flag a couple of these sources of data here;

4   first, survey data demonstrating that borrowers are

5   considerably less able to keep up with loan payments now

6   compared to pre-pandemic, supporting the inference that there

7   remain economic effects that have not been resolved.  There is

8   data from the CFPB demonstrating that delinquencies of

9   non-student loan debt by student loan borrowers have returned

10  to pre-pandemic levels even though those individuals aren't

11  currently paying down the debt on their student loans, and

12  that supports the inference that if and when additional debt

13  burdens are added, delinquencies will rapidly exceed

14  pre-pandemic levels.

15       The Secretary also considered historical evidence

16  stemming from other payment pauses, for example, in the case

17  of hurricanes or wild fires.  And in recent circumstances in

18  which payments were paused because of national emergencies,

19  the default rates skyrocketed when the payment pause ended,

20  rising from 0.3 percent to 6.5 percent.  That's a 21-fold

21  increase.  The Decision Memo also considered the sensitivity

22  of payment rates to borrower income, the relationship between

23  Pell eligibility, family wealth, and delinquency rates, and

24  the historical evidence as to how much principal reduction is

25  needed to meaningfully reduce default risks.

56

 1          Now, I want to get into the specific challenges that

 2   the plaintiff states have raised here, but first it's

 3   important to pause on the legal standard.  Again, this is an

 4   emergency statute.  This is a statute designed to work in

 5   emergency situations.  And as I mentioned before, Secretary

 6   DeVos invoked the HEROES Act just two days after then

 7   President Trump declared the Coronavirus pandemic, and that

 8   ought to be informative of the sort of analysis that Congress

 9   anticipated and the sort of review that is warranted by a

10   federal court.  Congress waived the procedural requirements of

11   the APA providing specifically that there need not be

12   case-by-case decision making and used expansive language to

13   describe both the domain in which the Secretary would be

14   permitted to operate and the authority of the Secretary to

15   make decisions based on his assessment within that domain.

16   And this is all because Congress was focused on providing

17   pathways for relief in emergency contexts.

18          When there is a rule that is not subject to notice

19   and comment rulemaking -- and nobody argues here that this

20   rule should have been subjected to notice and comment

21   rulemaking -- the APA standard needs to be informed by the

22   overriding statute and its purposes, and it requires that

23   there be a rational connection between the facts found and the

24   choice made.  Now, I want to emphasize that this is a highly

25   deferential standard, made even more so given the emergency

57

1    nature of the proceedings and the need in this particular case

2    to head-off harms that borrowers are set to experience in less

3    than three months.

4         Now, the states focus first on the Major Questions

5    Doctrine, and they say that this is a major question that

6    should be subject to a different form of statutory analysis

7    because the amounts of money at issue here are so large.  We

8    don't think that that is a correct understanding of the

9    purpose of the Major Questions Doctrine.  So at a higher level

10   of abstraction, what's going on here?  Administrative agencies

11   have authority to operate because it has been delegated by

12   Congress, and the Supreme Court in a very limited number of

13   cases have said that sometimes when there is an unexpected use

14   of a federal statute, it can't be presumed that Congress was

15   actually delegating that authority in that context, such the

16   Court should be more skeptical.

17        THE COURT:  So then are you saying, Mr. Netter, that

18   that means that an administrative agency has the authority to

19   act within the parameters of the authority granted to them by

20   Congress?

21        MR. NETTER:  Yes, Your Honor.  So it's crucial here

22   that this is a statute about emergencies.  It's a statute

23   about national emergencies, and it seems hard to fathom that

24   Congress wouldn't have understood at the time that a larger

25   national emergency is going to prompt and necessitate a larger

58

1   action by the Secretary of Education.  As a reference point

2   here, the cost of the payment pause, which is not challenged

3   by anybody --

4            THE COURT:  So then how do we determine whether an

5   administrative agency has been granted the authority to engage

6   in a particular act that is being challenged?

7            MR. NETTER:  Well, Your Honor, necessarily that's a

8   function of looking at the statute and its underlying

9   purposes, right?  So the instances in which the Supreme Court

10  has invoked the Major Questions Doctrine have been

11  circumstances in which it believed there was a statutory

12  backwater that nobody could have contemplated would be used

13  in a --

14           THE COURT:  So then how do you distinguish the *West*

15  *Virginia* case, major question case, from this case?

16           MR. NETTER:  I think that that -- what I was just

17  starting to describe is precisely what the Court thought was

18  happening in the *West Virginia* case, which was that there was

19  this statutory backwater that had not been understood by many

20  people over a long period of time to offer relief within that

21  universe, and it had been reconceptualized to launch an

22  administrative program.  That's not what's happening here.

23  There are large programs invoked under HEROES because the

24  harms resulting from a national emergency are large.  So the

25  costs of foregoing payments, of freezing interest for two and

59

1  a half years on all the direct federal loans, that's a nine

2  figure amount.  That's $150 billion give or take, right?  So

3  the reference to, oh, well, this is a nine figure amount of

4  determining to relinquish these debt obligations as the nation

5  emerges from the pandemic, that's not shocking.  That's just a

6  function of the fact that there is a 1.6 trillion-dollar

7  portfolio of student loans that's managed by the Secretary of

8  Education.  Congress legislated against the backdrop of that

9  large portfolio, so saying that there is a lot of money at

10  stake here is not really representative.  It's not probative

11  of the question of whether this was within the scope of what

12  Congress authorized.

13       THE COURT:  Well, but saying that there is a lot of

14  money involved here and a lot of money at stake here, isn't

15  that also quantifying not only the economic impact but the

16  political impact as well?  I mean, as I understand the states'

17  argument, that is the crux of the argument as it relates to

18  the major question issue.  Isn't that right?

19       MR. NETTER:  So there are certainly political

20  questions that are in the ether here, but I don't think that

21  the sorts of political questions that are discussed in the

22  Major Questions Doctrine cases are what's going on here.

23       THE COURT:  Okay.

24       MR. NETTER:  I think there are always going to be

25  policy decisions made by administrative agencies, and the

60

1    ordinary rule is that the political branches should be the

2    ones to make political decisions and thereafter the people get

3    a choice to elect their representatives and their president.

4            The plaintiff states cite some examples of

5    legislation that was introduced that would have eliminated,

6    you know, vastly larger amounts of student debt, and they

7    said, okay, well, if Congress wasn't willing to do that, then,

8    therefore, it shouldn't be willing to do this either and we

9    should draw an inference, and we don't think that that's the

10   right inference here, not least because the relief here is

11   specifically tied to the national emergency, and also even

12   with respect to the payment pause here, under the CARES Act,

13   Congress required there to be a payment pause for portions of

14   2020, but both before that time and after that time, Secretary

15   DeVos used her authority under the HEROES Act to initiate the

16   payment pause and to extend it afterwards.  So the fact that

17   there may be some legislative activity in an area is not

18   indicative of whether the preexisting authority -- and here

19   the HEROES Act has been around for approximately 20 years --

20   whether that's sufficient to support the agency action.

21           THE COURT:  Well, let me ask you this.  Someplace,

22   and correct me if I'm wrong, but I thought I reviewed in

23   someplace in the documents that were filed either -- well,

24   perhaps even by both parties that the economic fall-out in

25   terms of dollars would be in excess of 1 trillion.  Did I read

61

1    that someplace?

2         MR. NETTER:  No, Your Honor.  No.

3         THE COURT:  Okay.  Well, what would the economic

4    fall-out be if all loans -- if loans were cancelled to the

5    extent that the Secretary expects those loans to be cancelled,

6    what is the anticipated economic fall-out?

7         MR. NETTER:  So the numbers that I have seen are in

8    the ballpark of $300 billion.

9         THE COURT:  300 billion?

10        MR. NETTER:  Right, so of the same order of magnitude

11   as the economic hit from the payment pause.

12        THE COURT:  All right.  I was a little off.

13   $300 billion, it's a lot, but not really when you look at the

14   overall debt of the nation, all right, and the budgets that

15   Congress passes whenever they get around to passing them,

16   okay?  But it's still $300 billion, which is a nice chunk of

17   money.  So the $300 billion, does that not rise to the level

18   of great economic impact?  And, of course, as you said

19   politically, there may necessarily always be some political

20   policy issues concerned in any act, but looking at it from the

21   standpoint of the *West Virginia* case at least as the first

22   prong for consideration, the economic and political impact,

23   doesn't $300 billion fall into that category?

24        MR. NETTER:  So, Your Honor, I don't want to disagree

25   that $300 billion is a large sum of money, but our

62

1  understanding of the test that the Supreme Court has laid out

2  is that it's necessarily contextual.  And here the objective

3  of Congress was to provide a mechanism for supporting the

4  economy and for supporting borrowers from the economic

5  consequences of a national emergency, and in that context, it

6  would seem to undermine Congress's objective and not to

7  reinforce Congress's objective to require there to be

8  legislation when an emergency is sufficiently broad, right?

9  So if the notion of the HEROES Act is when there is a national

10  emergency, the Secretary of Education should have the

11  responsibility for making sure that individuals' student loans

12  don't propel the national economy and the local economies when

13  there are smaller national emergencies into disarray, then

14  when there is a larger national emergency, you know,

15  Congress's expectation one would think logically is that the

16  authority of the Secretary should grow, not contract.

17         And the reason why the Major Questions Doctrine

18  shouldn't apply here or certainly shouldn't apply to

19  invalidate the action here is because the statute itself is

20  contemplating the provision of authority that parallels the

21  scope of a particular problem.  It's cabined by the economic

22  association, the economic consequences of a national emergency

23  such that as the emergency grows, so does the authority of the

24  Secretary.  And it would be hard to dispute at this point two

25  and a half years into the pandemic that there have been

63

1   substantial economic effects and that there continue to be

2   substantial economic effects from the pandemic.

3          And perhaps that's a good opportunity to address the

4   point that the states have made about the end of the pandemic,

5   that this relief is being offered as part of the wind-down.

6   Now, I certainly don't see any part of the statute that says

7   that if there is a hurricane, you can only provide people

8   relief while the hurricane is still spinning.  In an ordinary

9   context for a national emergency, something happens and people

10  have to dig out from whatever that emergency was, and that's

11  the concept of the statute here, that the effects have to have

12  been caused by the national emergency or by a circumstance of

13  war, and the relief has to be, you know, designed to remedy

14  those harms.  But the fact that the pandemic conditions are

15  improving now seems neither here nor there especially given

16  that the economic analysis that was before the Secretary of

17  Education, you know, discussed specifically, you know, what

18  the latent economic harms are that materialized when there is

19  a payment pause that then expires.  And there is real data on

20  that.  The 21-fold increase of delinquencies is a really

21  striking figure, and given what the economic indicators are

22  currently as demonstrated by the CFPB and the survey data,

23  there is a real need for the relief that the Secretary

24  determined he was going to provide under his authority under

25  the HEROES Act.

64

1      So I think, Your Honor, that takes us to the APA

2 claims where the dividing line between these claims are not

3 entirely clear.

4      THE COURT:  Sure.

5      MR. NETTER:  But to address some other sundry points

6 that the plaintiff states have made, they focus on the use of

7 the word "necessary" in the statute because the HEROES Act

8 does say that the Secretary has the authority to provide such

9 relief as may be necessary to ensure that the statutory

10 objectives are met.  And I would refer the Court on this point

11 to pages 22 and 23 of the opinion of the Office of Legal

12 Counsel as to a contemplated exercise of the HEROES Act, and

13 what that passage explains quite helpfully is that when

14 Congress uses the word "necessary," depending on context, it

15 can have a number of different meanings.  And here, in

16 context, what "necessary" means is appropriate or effective to

17 accomplish those statutory ends.

18      And I would focus the Court's attention particularly

19 on the words "to ensure that."  Congress's objective or the

20 text that Congress used in implementing its objectives under

21 the HEROES Act were not to have a minimalist standard of

22 cabining the Secretary's authority.  The statutory text as a

23 whole and specifically that clause that contains the word

24 "necessary," it says "necessary to ensure", ensuring conveys

25 breadth and given that none of this authority needed to be

65

1  exercised on a case-by-case basis.  We also have past

2  administrative practice that is consistent with the current

3  exercise including the payment pause, which was not narrowly

4  tailored in the way that the plaintiff states seem to suggest

5  would have been necessary.

6          I would note also that the first waivers that were

7  issued under the HEROES Act in 2003, they provided -- they had

8  different rationales for different subsets of affected

9  individuals but provided the relief to all the affected

10  individuals as a group, whether or not the subset of

11  rationales applied to them.  Congress reauthorized the HEROES

12  Act after that agency action, and usually in those

13  circumstances, we view that statutory reauthorization as an

14  endorsement of the approach to the administrative process.  So

15  we do not believe that there is merit to the argument that the

16  Secretary misunderstood the word "necessary" in this context.

17          I also want to discuss the suggestion that, you know,

18  perhaps the Secretary should have just continued the payment

19  pause or, you know, done some other related task because that

20  was the status quo under the *Regents* case.  As a formal

21  matter, we don't think that this is a circumstance in which a

22  payment pause was the status quo because the payment pause was

23  time limited.  It expired of its own force.  This was not a

24  circumstance in which the agency had to pull down the payment

25  pause in order to put something else up.  Moreover, there is a

66

1    bit of a non sequitur here in the suggestion that the

2    Secretary should have been considering a payment pause in lieu

3    of providing the relief that is necessary to emerge from a

4    payment pause, right, because if the alternative is not to

5    emerge from the payment pause, well, the issue that the

6    Secretary was considering is always going to emerge

7    eventually, right?  If you continue the payment pause for

8    longer, there is still going to be a point in time where you

9    are emerging from that payment pause.

10            Now, to be sure, the states have identified some

11   other alternatives that they say perhaps the Secretary should

12   have considered, but for that I think it's important to

13   recognize and to remember that this is not a notice and

14   comment process, that if this were the more formalized style

15   of notice and comment rulemaking in which interested parties

16   are able to, you know, offer alternatives and the agency is

17   supposed to consider them and explain why it's adopting one

18   reason or another, that's one form of rulemaking that was

19   available to Congress, but Congress chose a different more

20   expedited approach here, and it would be almost worse for an

21   agency to have to predict all of the alternatives that the

22   plaintiffs now say should have been considered here and a

23   circumstance in which Congress has specifically disclaimed any

24   obligation to undergo notice and comment rulemaking.  The

25   standard here is whether there is a rational connection

67

1   between the facts found and the relief that was accorded.

2   Here, there was more than sufficient evidence that was before

3   the Secretary and for which the Secretary deemed it

4   appropriate to provide this relief to remedy the harms that he

5   assessed to exist under the statutory standard that he was

6   committed to apply.

7          And let me say briefly, Your Honor, that although the

8   states had not terribly much to say about the ultra vires

9   claims, we don't really think the Court needs to get into

10  those claims at all because to the extent they're available

11  and they ought not be available when there is an APA remedy in

12  theory, there would be a higher standard such that, you know,

13  all the reasons why the APA claims fail and why the Major

14  Questions Doctrine arguments fail, those are sufficient to

15  defeat the ultra vires claim which shouldn't exist in this

16  context anyway.

17         So, Your Honor, speaking from a higher level of

18  abstraction on these APA claims, the states have tried to

19  identify some fringe cases.  You know, they say because there

20  was economic data about individuals making $125,000 a year and

21  the Secretary exercises authority as to pairs, married

22  couples, earning $250,000 a year, you know, what if there was

23  somebody earning $240,000 a year, why isn't there specific

24  evidence in that case to substantiate that award of relief,

25  and that is the antithesis of what is contemplated by the

68

1  HEROES Act, which specifies that there need not be a

2  case-by-case analysis.  And one can only imagine what this

3  program would look like, a program that is necessary to help

4  the country emerge from the pandemic and to help resume the

5  payment of student loans as of the end of this year, what that

6  program would look like if it were necessary for the

7  Department of Education to consider individualized

8  circumstances in every case.  Instead, the only way to

9  administer a program of this magnitude is to set standards and

10  not to have a narrow tailoring sense of overbreadth that is

11  practically unavailable and is specifically not required under

12  the terms of this statute.

13         So the states say that because of their injuries,

14  this Court should exercise its equitable authority to enter

15  preliminary injunctive relief to stop the partial discharges

16  from going out and to maintain the indebtedness of those

17  individuals -- not just those individuals who live in Nebraska

18  and the other plaintiff states or those who have loans

19  serviced by MOHELA, but for some reason for everybody.  We

20  don't think that makes any sense at all.  It's not equitable

21  to maintain debt that the Secretary of Education has

22  determined needs to be forgiven to help the affected

23  individuals emerge from the national emergency.  We don't

24  think that the scope of the emergency or the scope of the

25  injury that the states have asserted is in any way parallel to

69

1   the benefits that will stem from the relief that the Secretary

2   has deemed to be necessary, and we certainly don't think that

3   an injunction of the breadth of what they are asking for is at

4   all necessary to maintain the status quo even if they had

5   established that they had a sufficient injury that needed to

6   be protected based on a likelihood of success on the merits.

7   None of those conditions are satisfied.

8           Instead, Your Honor, we ask the Court to deny the

9   motion for preliminary injunctive relief.  We also think at

10  this juncture, it would be appropriate for the Court to

11  obviously dismiss the President, who is not a proper defendant

12  in this case, and because our standing arguments we believe to

13  be meritorious, those would also be a sufficient basis for the

14  case as a whole to be dismissed so that this exercise of

15  emergency authority that was contemplated by the President and

16  is implemented by the Secretary of Education can proceed.

17          THE COURT:  So what is the status quo?  What would

18  the status quo be?

19          MR. NETTER:  Well, the status quo right now as things

20  stand is that the Department is undergoing the preliminary

21  steps that are necessary to implement this program.

22          THE COURT:  And so if an injunction were issued, the

23  maintenance of the status quo would be what?

24          MR. NETTER:  I mean, I think that's up to the

25  plaintiffs to describe, but they say that they are injured

1    from --

2         THE COURT:  Well, that's what I am saying.  From the

3    perspective of what you understand from what they have filed

4    and what they have argued, what do you think that status quo

5    would be?

6         MR. NETTER:  Oh, I think that that status quo would

7    be keeping people in debt, you know, not paying out the -- or

8    not processing these discharge applications.  But, you know,

9    that creates in itself another harm.  The reason that this

10   program was crafted was so that these applications could be

11   processed by the time that the payment pause is lifted so that

12   the defaults and delinquencies that are feared and that the

13   evidence suggests will occur, so that they can be averted.  So

14   on the other side of the scale here, there is a really

15   substantial cost both to the individuals and to the objectives

16   of the United States to any sort of pause here, and it's not

17   warranted by the legal arguments that are before this Court.

18        THE COURT:  So let me ask you this.  The Higher

19   Education Act gives the Secretary authority with respect to

20   student loans; right?

21        MR. NETTER:  Yes, Your Honor.

22        THE COURT:  Okay.  And under the Higher Education

23   Act, the Secretary within his or her authority can forgive

24   loans, cancel loans on a case-by-case basis; is that correct?

25        MR. NETTER:  Yes, Your Honor.

71

1          THE COURT:  And that's the Act from 1965?

2          MR. NETTER:  Correct.

3          THE COURT:  The HEROES Act, which the Secretary bases

4     his authority now for this loan cancellation, is related to

5     the Higher Education Act; right?

6          MR. NETTER:  It is, Your Honor.

7          THE COURT:  Okay.  And the HEROES Act enacted in 2003

8     from a historical perspective was the result of wanting to

9     provide -- Congress wanting to provide some relief to those

10    who had student loans and may have been affected by the

11    occurrences of 9/11, at least in part; right?

12         MR. NETTER:  Yes, Your Honor.

13         THE COURT:  Okay.  Which gave the Secretary the

14    ability to make certain decisions with regard to those loans

15    to benefit those individuals; right?

16         MR. NETTER:  We agree.

17         THE COURT:  All right.  And it talks about those in

18    the military; right?

19         MR. NETTER:  Indeed.

20         THE COURT:  All right.  And it talks about those in

21    the military who might have been harmed as a result of certain

22    military consequences; right?

23         MR. NETTER:  Yes.

24         THE COURT:  All right.  And then it says, well, or

25    national emergency; right?

72

1          MR. NETTER:  Yes.

2          THE COURT:  Okay.  And so presumably since neither

3    the plaintiffs or the defendants have really referenced it,

4    those national emergencies are not limited to military

5    activity.  Would that be a fair statement?

6          MR. NETTER:  Oh, absolutely, and historically they

7    have not been so limited.

8          THE COURT:  Uh-huh.  And nobody's really talked about

9    what a national emergency is.  There is some brief reference

10   in the documents but not really.  So what is a national

11   emergency and what is the basis for that conclusion?  Is there

12   any legislative history in relation to what Congress meant by

13   a national emergency and does the statute itself, the HEROES

14   Act from 2003 as made permanent in 2007, define what a

15   national emergency is?

16         MR. NETTER:  So, Your Honor, standing here I am not

17   familiar with the legislative history of the definition of

18   national emergency.

19         THE COURT:  Well, you should be.

20         MR. NETTER:  Except for the fact, Your Honor, that --

21         THE COURT:  Because this is your case that you are

22   defending, and legislative history is a necessary part of

23   legislation.  It just doesn't fall out of the air.

24         MR. NETTER:  I understand that, Your Honor.  There

25   are statutes and historical precedents that permit the

73

1    President authority to declare national emergencies that then

2    release certain emergency funds.

3         THE COURT:  Yeah, we got that, but does the statute

4    define what a national emergency is?

5         MR. NETTER:  No, there is no definition of national

6    emergency in 1098ee.

7         THE COURT:  Does the statute define or declare what

8    the Secretary can consider as to what a national emergency is?

9         MR. NETTER:  No.  There is no specific provision

10   other than identifying there needs to be a national emergency

11   at a national, state, or local level.

12        THE COURT:  Okay.  Thank you.

13        MR. NETTER:  But as Your Honor indicates, you know,

14   the existence of the HEA dating back to 1965, that's the

15   backdrop against which Congress enacted the HEROES Act in

16   2003, so the suggestion that it was, you know, impossible to

17   contemplate that the authority of the Secretary of Education

18   which have long been understood to include the authority to

19   release debts would have been somehow excluded from the

20   authority of the HEROES Act is unsupported by history.  And

21   here with respect to the question of a national emergency,

22   there is no dispute on either side of this case that President

23   Trump's declaration of a national emergency which has been

24   extended through the present date satisfies the statutory

25   requirements here.

74

1         THE COURT:  Thank you.

2         MR. NETTER:  Thank you, Your Honor.

3         THE COURT:  Anything further, Mr. Campbell?

4         MR. CAMPBELL:  I'm sorry, Your Honor, I didn't ...

5         THE COURT:  Anything else?

6         MR. CAMPBELL:  May I have just a few minutes of a

7    rebuttal?  Should I keep it short or would the Court rather

8    not hear anything further?

9         THE COURT:  Define few minutes.

10        MR. CAMPBELL:  I will keep those few minutes --

11        THE COURT:  It's the lawyer in me.

12        MR. CAMPBELL:  Yeah, fair enough.  I will -- may I

13   have five minutes?

14        THE COURT:  Okay.

15        MR. CAMPBELL:  I'm going to have to talk fast then.

16        THE COURT:  You don't have to talk fast.  You just

17   have to talk pointedly, say more with fewer words, which is

18   hard for us lawyers to do sometimes.

19        MR. CAMPBELL:  It is.  Thank you, Your Honor.

20        THE COURT:  Go ahead.

21        MR. CAMPBELL:  Just a few points.  On the standing

22   regarding the September 29th change, the key question whether

23   it's standing or mootness -- that was an issue that was

24   raised -- is when the change was publicly implemented.  That

25   didn't happen until September 29th after we filed the lawsuit.

75

1   They might have decided to make the change before and sent

2   some internal emails about it, but it actually didn't happen

3   until after, so this is a mootness question, not a standing

4   question.

5        I want to talk about the harms to MOHELA.  They

6   allege that MOHELA -- that the harms aren't flowing to the

7   State of Missouri, but that ignores the fact that in the

8   statute creating MOHELA, it specifically says that it is a

9   public instrumentality and it is charged with the essential

10  public function of providing loans for students in the state

11  and of supporting higher education institutions.  So this

12  absolutely does flow back to the state, and their attempt to

13  insulate that is wrong.

14       They talk about the CDA, the Contract Disputes Act,

15  but as we indicated in our reply brief, it does not apply to

16  an APA challenge to a rule, a regulation, or other agency

17  action like we have in this situation.  And to highlight that

18  point, this argument about the CDA, the Contract Disputes Act,

19  has been raised by the federal government time and time again

20  in all of their attempts to defend against the COVID-19

21  vaccine mandate on federal contractors, and as best we can

22  tell, not a single judge has accepted that argument including

23  Judge Noce here in this district.

24       They also --

25       THE COURT:  So what happened with the case with Judge

76

1    Noce ultimately?

2         MR. CAMPBELL:  The states prevailed, got a

3    preliminary injunction.

4         THE COURT:  Yes, I know that, but what happened to

5    the case ultimately?

6         MR. CAMPBELL:  It's pending appeal before the Eighth

7    Circuit.  It was argued just a few weeks ago.

8         THE COURT:  Wasn't it argued in front of the Supreme

9    Court also?

10        MR. CAMPBELL:  Not that one, Your Honor.  There was a

11   different vaccine mandate case -- two different vaccine

12   mandate cases that went to the Supreme Court.

13        The defendants also want to talk about the zone of

14   interest test under the APA, and they say that MOHELA doesn't

15   fall under that zone of interest, but that argument flatly

16   fails because when you look at the HEROES Act itself, it says

17   that the Secretary needs to consider the administrative

18   requirements of administering the student loan program and the

19   integrity of the student loan program.  Who is more essential

20   to that question than the servicers of the student loan, so

21   they fall squarely within the zone of interest.

22        And then they mention -- the defendants mention that

23   our tax harm is self-inflicted.  It's not for the reasons we

24   have explained in our reply brief, but even if it were, the

25   Supreme Court in its recent *Cruz versus FEC* decision

77

1   specifically said, and I will quote, that even if an injury --

2   if an unlawful action is, quote, fairly traceable to such

3   action, standing exists even if the injury could be described

4   in some sense as willingly occurred.  So that point simply

5   doesn't hold.

6          Moving now to the merits, they talked about the

7   statutory reauthorization of the HEROES Act and said that

8   because that followed after the beginning of forbearance, that

9   that tells us something about what Congress thinks.  It maybe

10  tells us something about what Congress thinks of forbearance,

11  but it tells us nothing about what Congress thinks -- and I am

12  not even sure that it does that because it was just such a

13  rote administrative reauthorization, but it certainly tells us

14  nothing about cancellation, the scope at issue here.

15         Defendants mention the Board of Regents case and they

16  want to dismiss the fact that they failed to consider any

17  alternatives because they say that this case doesn't involve

18  notice and comment rulemaking.  Well, neither did the Board of

19  Regents case.  That was a decision, an agency memo, issued by

20  the head of that agency and it was outside of that process.

21         Lastly, the plaintiffs say that we rely on the fringe

22  cases in showing that they simply haven't shown any

23  authorization under the HEROES Act, but this isn't a case of

24  fringe cases.  This is an instance of a policy that gives mass

25  debt cancellation to highly wealthy individual, people who are

78

1  in households earning just under a half million dollars a

2  year.  This isn't a fringe case.  This is an issue where the

3  federal government has simply not come close to justifying

4  what it's doing under the statutory authorization they have.

5        Thank you for the extra time, Your Honor.

6        THE COURT:  Thank you.  Okay.  Thank you, Counsel,

7  for your appearance today.  Thank you for your arguments.

8  Thank you for answering my questions.  Thank you for listening

9  to my questions so that you could contemplate answering them.

10  Erica, we'll show the matter as under submission, and you will

11  hear from me soon.  Okay.  Thank you.  We will be in recess.

12        **(PROCEEDINGS CONCLUDED AT 12:30 P.M.)**

13

14

15

16

17

18

19

20

21

22

23

24

25

79

<u>CERTIFICATE</u>

1

2

3       I, Angela K. Daley, Registered Merit Reporter and

4   Certified Realtime Reporter, hereby certify that I am a duly

5   appointed Official Court Reporter of the United States

6   District Court for the Eastern District of Missouri.

7       I further certify that the foregoing is a true and

8   accurate transcript of the proceedings held in the

9   above-entitled case and that said transcript is a true and

10  correct transcription of my stenographic notes.

11      I further certify that this transcript contains

12  pages 1 through 78 inclusive and that this reporter takes no

13  responsibility for missing or damaged pages of this transcript

14  when same transcript is copied by any party other than this

15  reporter.

16      Dated at St. Louis, Missouri, this 14th day of October,

17  2022.

18

19

20      _____

        /S/Angela K. Daley
21      Angela K. Daley, CSR, RMR, FCRR, CRR
        Official Court Reporter
22

23

24

25