# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| STATE OF NEBRASKA, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 4:22CV1040 HEA |
| ) | |
| JOSEPH R. BIDEN, JR., et al., ) | |
| ) | |
| Defendants. ) | |

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Plaintiffs' Motion for Preliminary Injunction [Doc. No. 3]. Defendants have filed their response in opposition to the Motion. The parties appeared in person for a hearing on the Motion on October 12, 2022. The Court has thoroughly reviewed the pleadings, affidavits, exhibits, and memoranda of law submitted by the respective parties, and has considered the arguments presented at the hearing. For the reasons set forth below, the Court concludes Defendants' arguments are well-taken and this matter will be dismissed.

### Facts and Background

On September 29, 2022, six states – Nebraska, Missouri, Arkansas, Iowa, Kansas and South Carolina (Plaintiff States) – brought this action for declaratory and injunctive relief against Defendants President Joseph R. Biden, Jr., Secretary of Education Miguel Cardona, and the United States Department of Education,

alleging the Department's student debt relief plan contravenes the separation of powers and violates the Administrative Procedure Act (APA) because it exceeds the Secretary's statutory authority and is arbitrary and capricious.

Higher Education Act of 1965

Title IV of the Higher Education Act of 1965, as enacted and amended (HEA), by Congress provides the Secretary of Education (Secretary) authorization to "assist in making available the benefits of postsecondary education to eligible students" through the provision of federal financial aid. 20 U.S.C. § 1070 *et seq*. The HEA establishes several student loan programs, like the William D. Ford Direct Loan Program and the Federal Family Education Loan Program (FFELP). New FFELP loans stopped being issued on July 1, 2010. HEA loans that originated after July 1, 2010 have been issued under the Direct Loan Program (Direct Loans). FFELP borrowers still in repayment can generally consolidate their FFELP loans into Direct Loans at no cost. *See* 34 C.F.R. § 685.220. The HEA also provides how and when loans can be paid, including repayment options, like income-based repayment plan, and forgiveness, like public service loan forgiveness. *See, e.g.,* 34 C.F.R. § 685.219; 20 U.S.C. §§ 1098e; 1087e(d)(1); 1078(b)(9)(A)(v).

The Higher Education Relief Opportunities for Students Act of 2003

In 2003, Congress enacted the Higher Education Relief Opportunities for Students Act of 2003 (HEROES Act). Pub. L. 108-76, 117 Stat. 904 (2003)

2

(codified at 20 U.S.C. §§ 1098aa-1098ee). The HEROES Act allows the Secretary to "waive or modify any statutory or regulatory provision applicable to the student financial assistance programs under title IV of the Act as the Secretary deems necessary in connection with a war or other military operation or national emergency …" 20 U.S.C. § 1098bb(a)(1). "The term 'national emergency' means a national emergency declared by the President of the United States." *Id.* at § 1098ee(4). The Secretary's waiver or modification must be "necessary to ensure that" one of certain statutory objectives is achieved, including to ensure that "recipients of student financial assistance ... who are affected individuals are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals" and that administrative requirements placed on those are "minimized, to the extent possible without impairing the integrity of the student financial assistance programs, to ease the burden on such students and avoid inadvertent, technical violations or defaults." *Id.* at § 1098bb(a)(2). The HEROES Act explicitly states that the Secretary is "not required to exercise this waiver or modification authority…on a case-by-case basis." *Id.* at § 1098bb(b)(3). The HEROES Act defines "affected individuals" to include people who reside or are employed "in an area that is declared a disaster area by any Federal, State, or local official in connection with a national emergency" or who "suffered direct economic hardship as a direct result of a war

3

or other military operation or national emergency, as determined by the Secretary." *Id.* at § 1098ee(2)(C)–(D).

### COVID-19 Pandemic

Most recently, the Secretary has used the HEROES act to provide relief in response to the COVID-19 pandemic, which was declared by former President Trump as a national emergency in March 2020. Accordingly, on March 20, 2020, the Secretary relied on the HEROES Act to pause the accrual of interest and repayment for all federally held student loans from March 13, 2020 until March 27, 2020. On March 27, 2020, Congress directed the Secretary to extend these policies until October 1, 2020 under the Coronavirus Aid, Relief, and Economic Security Act. Pub. L. No. 116-136, § 3513, 134 Stat. 281, 404 (2020) ("CARES Act"). When the CARES Act authorization expired, the Secretary, Defendant Cardona, invoked the HEROES Act again to continue the student loan payment and interest pause through December 31, 2022.

### Student Loan Debt Relief Plan

On August 24, 2022, President Biden announced the Department's student debt relief plan to address the financial harms caused by the COVID-19 pandemic and ensure a smooth transition back to repayment status. The Secretary announced that the HEROES Act authorizes him to provide a "one-time" debt relief to federal student loan borrowers affected by the COVID-19 pandemic. The Department

plans to provide up to $20,000 in debt relief to Pell Grant recipients with loans held by the Department and up to $10,000 in debt relief to non-Pell Grant recipients. Borrowers are eligible for this relief if their individual income was less than $125,000 or $250,000 for households in 2020 or 2021. Direct Loans qualify for the debt relief. Relief for FFELP loans only qualify to those borrowers who consolidated their FFELP loans into Direct Loans as of September 29, 2022.

<u>The Instant Motion</u>

In addition to filing this lawsuit, on September 29, 2022, Plaintiffs moved for preliminary injunction, pursuant to Federal Rule of Civil Procedure 65, seeking to enjoin Defendants from implementing or enforcing their debt relief for student loans and to enjoin Defendants from publishing a waiver or modification under the HEROES Act to effectuate the student loan debt cancellation.[1]

At the hearing, the parties argued in support of their respective positions. Defendants confirmed that no student debt relief would occur before October 23, 2022.

---

[1] On September 30, 2022, the parties filed a stipulation, proposing an expedited schedule for resolving the instant motion. Plaintiffs also agreed to withdraw their Motion for Temporary Restraining Order if the Court granted their stipulation to allow the parties to file their briefs and schedule a hearing on the preliminary injunction. On October 17, 2022, the Court granted Plaintiffs' formal notice of withdrawal for their Motion for Temporary Restraining Order.

5

## Legal Standards

Preliminary Injunction

It is axiomatic that the standard for issuance of the "extraordinary and drastic remedy" of a temporary restraining order or a preliminary injunction is very high, *see Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997), and by now very well established. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008), quoting *Munaf v. Green*, 553 U.S. 674, 689-90 (2008). "Whether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant, (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant, (3) the probability that movant will succeed on the merits, and (4) the public interest." *Dataphase Sys., Inc. v. C.L. Sys., Inc.,* 640 F.2d 109, 113 (8th Cir. 1981). "At the base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id*.

Article III Standing

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const., Art. III, § 2. "One element of the case-or-controversy requirement" is that Plaintiffs "must establish that they have standing to sue." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). Article III standing is a

6

threshold inquiry in every federal case that determines whether the Court has the power to decide the case. *See, e.g., United States v. One Lincoln Navigator 1998*, 328 F.3d 1011, 1013 (8th Cir. 2003); *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

"The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). The "standing inquiry has been especially rigorous when reaching the merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Id.*, quoting *Raines*, 521 U.S. at 819–20. "Relaxation of standing requirements is directly related to the expansion of judicial power." *United States v. Richardson*, 418 U.S. 166, 188 (1974).

"The party invoking federal jurisdiction bears the burden of establishing standing." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). The "irreducible constitutional minimum" of standing consists of three elements. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 332 (2016), citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "To satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant[s]; and 3) it is

7

likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000), quoting *Lujan,* 504 U.S. at 560–561. "For an injury to be particularized, it must affect the plaintiff in a personal and individual way." *Spokeo*, 578 U.S. at 332 (internal quotation marks omitted). Further, a "concrete" injury requires a "'de facto' injury, that is, to actually exist." *Id.* "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Clapper*, 568 U.S. at 409.

## Discussion

As articulated above, most fundamental to the Court's determination is the issue of standing. "[S]tanding is to be determined as of the commencement of the suit." *Lujan*, 504 U.S. at 570 n. 5. If a Plaintiff lacks Article III standing to bring its claim, the Court has no subject matter jurisdiction over the suit. *Miller v. Redwood Toxicology Lab., Inc*., 688 F.3d 928, 934 (8th Cir. 2012). "[W]here one plaintiff establishes standing to sue, the standing of other plaintiffs is immaterial." *Nat'l Wildlife Fed'n v. Agric. Stabilization and Conservation Serv*., 955 F.2d 1199, 1203 (8th Cir. 1992) (quoting *Bowen v. Kendrick*, 487 U.S. 589, 620 n. 15 (1988).

8

"[T]he question whether a particular state agency ... is ... an arm of the State, and therefore 'one of the United States' within the meaning of the Eleventh Amendment, is a question of federal law." *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 n. 5 (1997). In answering that federal question, however, courts must "consider[ ] the provisions of state law that define the agency's character." *Id*. Specifically, courts assess the agency's degree of autonomy and control over its own affairs and, more importantly, whether a money judgment against the agency will be paid with state funds. *See Regents*, 519 U.S. at 430; *Hadley v. N. Ark. Cmty. Technical Coll.*, 76 F.3d 1437, 1439 (8th Cir. 1996), cert. denied, 519 U.S. 1148 (1997).

<u>Plaintiff State of Missouri and MOHELA</u>

The Higher Education Loan Authority of the State of Missouri (MOHELA) is authorized to act as a servicer for federally held student loans, including Direct Loans and FFELP loans. MOHELA, a non-profit entity, was established by statute in 1981 as "a public instrumentality and body corporate" and deemed exercises of the powers conferred in the legislation to be "the performance of an essential public function." Mo. Rev. Stat. § 173.360. The statute also gave MOHELA the authority "to sue and be sued" and "to acquire, hold and dispose of personal property." Mo. Rev. Stat. § 173.385.

9

Missouri contends MOHELA is suffering from several ongoing financial harms because of the Department's student debt relief plan, mainly focusing on the harms caused by consolidating FFELP loans into Direct Loans. For instance, because MOHELA will lose a vital established source of income when FFELP loans are consolidated into Direct Loans, it deprives MOHELA of an asset it currently owns and the ongoing interest payments and revenue the FFELP loans would have generated. Missouri argues this will harm MOHELA's ability to issue bonds and access debt markets because the entity uses the income it receives from the student loans as security for bond payments. Missouri claims MOHELA is also enduring injury in the form of compliance costs by undertaking significant efforts to comply with the student debt relief plan.

Missouri, the only Plaintiff state with a relationship to MOHELA, alleges its sovereign and quasi-sovereign interest is harmed because MOHELA's loss of revenue, limited access to debt markets and lesser borrowing capacity from the student debt relief will impair MOHELA's ability to provide student loans and financial aid assistance to its residents.

Missouri, however, fails to connect the alleged harms to MOHELA as harms to the State of Missouri, *i.e.*, does Missouri establish it has standing to sue on MOHELA's behalf? Missouri maintains it can sue for MOHELA because MOHELA is a state entity that performs "essential public function[s]" that includes

ensuring "post-secondary education students have access to student loans" and providing financial support to Missouri's public colleges and universities. Mo. Rev. Stat. § 173.360.

Missouri does impose some control over MOHELA, which is assigned by statute to its Department of Education, like authorization for the Governor to appoint five members of the seven-member board and requiring a yearly report on its income, expenditures, bonds, and other forms of indebtedness issued. Mo. Rev. Stat §§ 173.445, 173.360. However, when it was established, MOHELA's revenues and liabilities were specifically and completely independent of the State of Missouri. The enabling legislations stated in relevant part that "[t]he proceeds of all bonds or other forms of indebtedness issued by the authority and of all fees permitted to be charged by the authority and of other revenues derived shall not be considered part of the revenue of the state…shall not be required to be deposited into the state treasury, and shall not be subject to appropriation by the general assembly." Mo. Rev. Stat. § 173.425. The statute also states that "[t] he state shall not be liable in any event for the payment of the principal of or interest on any bonds of the authority or for the performance of any pledge, mortgage, obligation, or agreement of any kind whatsoever which may be undertaken by the authority." Mo. Rev. Stat § 173.410. Additionally, "[n]o breach of any such pledge, mortgage, obligation, or agreement may impose any pecuniary liability upon the state or any

11

charge upon the general credit or taxing power of the state." Mo. Rev. Stat. § 173.410. These provisions make clear that the legislature intended to create a self-sustaining and financially independent agency. The express financial separation of MOHELA established by Missouri law and the lack of any obligation for Missouri to pay MOHELA's debts, strongly militates against finding MOHELA to be an "arm of the State."

Missouri has not met its burden to show that it can rely on harms allegedly suffered by MOHELA. MOHELA, *not the State*, is legally liable for judgments against it. MOHELA cannot pay any debt of the state, and the State is in no way obligated to pay any debt that it incurs. Mo. Rev. Stat. § 173.386. "The vast majority of MOHELA's funds are segregated from state funds and controlled exclusively by MOHELA." *Dykes v. MOHELA*, 2021 WL 3206691, at *4 (E.D. Mo. July 29, 2021) (finding that MOHELA was not an "arm of the state" for purposes of Eleventh Amendment sovereign immunity). There is no legal obligation or evidence that Missouri has paid or would pay any judgment on behalf of MOHELA. Further, the Court has found no cases where Missouri affirmatively sued on behalf of MOHELA or stepped in to shield MOHELA from its legal or financial obligations with its immunity. MOHELA is a "self-sustaining and financially independent agency." *Id.* MOHELA can sue and be sued in its own name and retains financial independence from the state. Indeed, Missouri appears

to recognize this distinctiveness. In preparation for this action, Missouri made a Missouri Sunshine Law request to obtain documents from MOHELA.[2] Therefore, its claimed financial harms are not attributable to the state in which it operates, and Missouri cannot establish standing to bring its claims[3] or establish standing through any arguments relating to MOHELA.

Consolidation

Plaintiff States Arkansas and Nebraska[4] claim several harms from the Department's student debt relief plan's incentive to consolidate FFELP loans into Direct loans. However, on the same date the instant motion was filed, the Department announced that as of September 29, 2022, borrowers with federal student loans not held by the Department cannot obtain the one-time student debt relief by consolidating those loans into Direct Loans. Following the announcement, the consolidation cut-off decision was published in the Federal Register. Plaintiffs

---

[2] Curiously, the State of Missouri's "dot.gov" website fails to include MOHELA as an agency/department of the state, whereas, the Department of Health and Senior Services, which was the subject of Judge Noce's Opinion in *Missouri v. Biden*, 576 F.Supp.3d 622 (E.D. Mo December 20, 2021), is specifically included. Likewise, MOHELA's "dot.com" website contains no reference to its status as a division/department/agency of the State of Missouri. *See* https://www.mo.gov/ and https://www.mohela.com/ (Last visited October 20, 2022).

[3] Since MOHELA is not a party to this lawsuit, the Court will not address the issue raised by Defendants that exclusive jurisdiction lies in the Court of Federal Claims pursuant to the Contract Disputes Act.

[4] Missouri's claims that MOHELA will be harmed by the incentive to consolidate will not be addressed since the Court has already determined Missouri does not have standing to bring claims on behalf of MOHELA. As to the sole claim alleged by Iowa, Kansas, and South Carolina, it will be addressed separately.

13

argues the consolidation cut-off does not impact their claims because the Department may change their mind about the consolidation cut-off. Plaintiff also contends because consolidation takes time, the preliminary injunction could stop the consolidation of those FFELP that have not yet completed the process. However, the student debt relief plan at issue here is separate from a borrower's ability to consolidate. Borrowers are still able to consolidate FFELP loans into Direct Loans pursuant to the conditions listed in 34 C.F.R. § 685.220, but those FFELP loans consolidated after September 29, 2022, will no longer be eligible for the one-time student debt relief. Because Plaintiffs seek only prospective relief, they must articulate an ongoing injury. The lack of the ongoing incentive to consolidate defeats the claims of Arkansas and Nebraska as set forth below.

*Arkansas and ASLA*

The Arkansas Student Loan Authority (ASLA), a division of the Arkansas Development Finance Authority, is "the instrumentality of the state charged with a portion of the responsibility of the state to provide educational opportunities in keeping with all applicable state and federal laws." Ark. Code Ann. § 15-5-1902(a)(2). ASLA's mission includes: "(1) Making loans; (2) Purchasing loans and security interests in loan participations as authorized; (3) Paying incidental expenses in connection with loans; (4) Paying expenses of authorizing and issuing bonds; (5) Paying interest on bonds until revenues are available in sufficient

14

amounts from the bonds; and (6) Funding reserves as necessary." *Id.* § 15-5-1904(c). ASLA is authorized to act as a servicer for federally held student loans under the FFELP. *See* Plaintiffs' Exhibit 5, Williams Decl., ¶¶ 3, 5. ASLA generates revenue through collecting an administrative fee, which is calculated based on a percentage of the total outstanding FFELP loan balance. *Id*. ¶ 6. A portion of that administrative fee is paid out by ASLA for administrative and serving costs, and the excess is retained as revenue. *Id.* The revenue primarily goes to ASLA's operating expenses, but could be used to finance additional student loans. *Id.*

Arkansas, the only Plaintiff with a relationship to ASLA, alleges its financial and proprietary interest is harmed because the reduction in ASLA's revenue caused by the incentive to consolidate FFELP loans into Direct Loans could limit its ability to provide education opportunities to Arkansans through financing further student loans. However, ASLA only holds FFELP loans, which are not subject to relief under the Department's plan. As discussed, *supra*, FFELP loans consolidated into Direct Loans after September 29, 2022 will no longer be eligible for the relief at issue. Therefore, the lack of the ongoing incentive to consolidate FFELP loans into Direct Loans defeats standing; there is no longer an ongoing injury to ASLA's revenue stream that could be a consequence of the Department's student debt relief plan. Arkansas's only remaining claim is that the Department *could* decide to

declare FFELP loans eligible for cancellation, which *could* reduce ASLA's revenue and *could* limit its student loan financing. This position is too attenuated to show a concrete and particularized injury for the purposes of standing. A "concrete" injury is a "de facto" injury that actually exists. *Spokeo*, 578 U.S. at 332. Arkansas has presented no other basis outside of claims connected to its alleged harms from consolidation. Therefore, Arkansas has not met its burden of establishing standing in this case.

*Nebraska and NIC*

The Nebraska Investment Council (NIC) is responsible for investing various assets held by the State of Nebraska, including the State's pension fund. Neb. Rev. Stat. § 72-1239.01. The NIC has multiple accounts with Nebraska's state funds invested in privately held FFELP student loan asset-backed securities (SLABS). *See* Plaintiffs' Exhibit 2, Walden-Newman Decl., ¶ 3. NIC's investment firm has advised NIC that it expects the Department's student debt relief plan will increase prepays for FFELP SLABS. *Id.* ¶ 8.

Nebraska argues that the consolidation of FFELP loans into Direct Loans will cause investors in SLABS to receive money back earlier than anticipated, ending the interest income flow that SLABS generate, which will likely cause financial injury to NIC. Further, when the FFELP loans are pre-paid, the SLABS market declines, which Nebraska contends will lower the value of NIC's

16

investments. Because of the harm to its investments, Nebraska claims the student debt relief plan harms its quasi-sovereign interest in protecting the well-being of its public employees, including pensioners of the state. This claimed injury to the NIC's investments would only exist if the incentive to consolidate the FFELP loans into Direct Loans remained. Because the FFELP loans consolidated into Direct Loans after September 29, 2022 will not be included in the student debt relief under the Department's plan, Nebraska's speculative chain of possibilities does not establish that potential financial injuries are ongoing or certainly impending. Nebraska has not met its burden; Nebraska lacks standing to bring this claim.

<u>The States of Nebraska, Iowa, Kansas, and South Carolina</u>

Plaintiff States Nebraska Iowa, Kansas, and South Carolina attempt to assert a threat of imminent harm in the form of lost tax revenue in the future. Currently, federal student loan discharges are not taxable under federal law between December 31, 2020 and January 1, 2026. Nebraska, Iowa, Kansas, and South Carolina have chosen to adopt this definition of taxable income in their own state tax codes. They likewise plan to tax federal student loan discharges that occur after January 1, 2026. Nebraska, Iowa, Kansas, and South Carolina argue that they will lose tax revenue to the extent that the total amount of loan discharges they

currently project to occur after January 1, 2026, is reduced because of the Department's student debt relief plan.

These future lost tax revenues are merely speculative. Moreover, there is nothing imminent about what may happen several years in the future. The Department's student loan debt relief plan does not prohibit the States from proposing, enacting or implementing legislation. These States' sovereign power to set its own tax policy is not implicated by the student debt relief plan, and their legislatures are free to propose and pass tax revenue plans as they see fit.

The effect upon future taxation is uncertain. [T]hreatened injury must be certainly impending to constitute injury in fact… allegations of possible future injury" are not sufficient." *Clapper*, 568 U.S. at 409. The tenuous nature of future income tax revenue is insufficient to establish a cognizable injury to support standing to bring this action.

## Conclusion

Because Plaintiff States – Nebraska, Missouri, Arkansas, Iowa, Kansas, and South Carolina – have failed to establish Article III standing, the Court lacks jurisdiction to hear this case. It should be emphasized that "standing in no way depends upon the merits of the Plaintiff[s'] contention that the particular conduct is illegal." *Warth*, 422 U.S. at 500. While Plaintiffs present important and significant challenges to the debt relief plan, the current Plaintiffs are unable to proceed to the

resolution of these challenges. "Standing is a threshold inquiry; it requires focus on the part[ies] seeking to have [their] complaint heard in a federal court, and it eschews evaluation of the merits. The court is not to consider the weight or significance of the alleged injury, *only whether it exists*." *Coalition for the Environment v. Volpe*, 504 F.2d 156, 168 (8th Cir. 1974) (emphasis added).

Therefore, the case will be dismissed for lack of jurisdiction.

Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that this action is **DISMISSED.**

A separate Order of Dismissal in accordance with this Opinion, Memorandum and Order is entered this same date.

Dated this 20th day of October, 2022.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE