UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES, | ) ) ) ) |
| v. | ) ) ) Case No. 1:20-cr-10306-GAO ) |
| PETER BRAND and JIE "JACK" ZHAO, | ) ) ) |
| Defendants. | ) ) |

## MEMORANDUM OF LAW OF JOSHUA MILLER IN SUPPORT OF MOTION TO QUASH TRIAL SUBPOENA OR FOR A PROTECTIVE ORDER

Joshua Miller ("Miller"), a non-party subpoenaed witness, submits this memorandum of law in support of his motion to quash the trial subpoena served on him by the government or for a protective order.

## INTRODUCTION

On April 4, 2019, the Boston Globe published an online article written by Miller headlined "He bought the fencing coach's house.  Then his son got into Harvard" (the "Article").  See **Exhibit B** to Declaration of Joshua Miller ("Miller Dec.").  The Article contained statements made by Defendant Jie "Jack" Zhao during an April 2, 2019, interview conducted by Miller at the Hilton Boston Logan Airport.  The interview was recorded with Zhao's consent.  Miller Dec. ¶ 3.  In November 2020, some 19 months after the Article, the government charged Zhao and Brand with engaging in a scheme in which Zhao allegedly made various payments to and for the

benefit of Brand as bribes, in exchange for Brand's facilitating the admission of Zhao's sons to Harvard as recruited fencers.[1]

Miller respectfully requests that the subpoena be quashed on the grounds that his testimony is not central to or essential to the government's case. The government has charged and proceeded with this case based on its own ample investigatory powers. Miller's testimony would be largely redundant of the documentary evidence and testimony already obtained by the government, including the anticipated testimony Alex Ryjik, a cooperating witness who has personal knowledge of the transactions at issue. Should the Court find that the government has carried its burden of demonstrating that Miller's First Amendment interests are outweighed by the government's interest in obtaining statements made by Zhao, Miller requests that the Court follow the procedure endorsed by the First Circuit in United States v. LaRouche Campaign, 841 F.2d 1176, 1182 (1st Cir. 1988) and review the interview recording *in camera* to determine whether and to what extent Zhao's statements are relevant and admissible. If the Court finds that any portion of the recording is admissible, Miller's testimony still would be unnecessary because the recording may be admitted by lay witnesses familiar with Zhao's voice, including but not limited to cooperating witness Ryjik. See Fed. R. Evid. 901(b)(5); United States v. Panico, 435 F.3d 47 (1st Cir. 2005); United States v. Garcia-Alvarez, 541 F.3d 8 (1st Cir. 2008).

## STATEMENT OF FACTS

### A.    Summary of the Evidence Obtained by the Government

Court filings summarize extensive evidence obtained by the government in support of its charges. See, e.g., n.1, supra. The principal purpose of the alleged conspiracy, according to the

---

[1] See ECF No. 172 at 1 (Joint Pre-Trial Memorandum; *see also* ECF No. 3-1 (affidavit of special agent Elizabeth Keating in support of criminal complaint); ECF No. 56 (Superseding Indictment ("Indictment" or "S.I.")).

government, was for Brand to facilitate the admission of Zhao's sons to Harvard in exchange for bribes totaling more than $1.5 million. S.I. ¶¶ 7, 8(b). Cooperating witness Ryjik allegedly aided the plan by communicating with Brand on behalf of Zhao. Id. ¶¶ 10-12, 15-18; ECF No. 172 at 2 (identifying Ryjik as the cooperating witness). The information Ryjik provided "has been corroborated by other evidence, including documents, emails, and text messages." ECF no. 3-1 at page 5 n.2. Ryjik is on the government's witness list. ECF No. 172 at 8.

### 1. The Government's Evidence of Communications Concerning the Admission of Zhao's Older Son

On or about May 2, 2012, Brand allegedly sent the following text message to Ryjik: "Jack doesn't need to take me anywhere and his boys don't have to be great fencers. All I need is a good incentive to recruit them[.] You can tell him that[.]" S.I. ¶ 10. Two months later, Ryjik texted Brand asking: "Is there space for[...] your favorite Chinese supporter?" Brand replied: "Of course as long as Z[h]ao cones [sic] through with the financial support[.]" Brand added: "He is my no 1 recruit as long as my future us [sic] secured." Id. ¶ 11. Later that month, Brand texted Ryjik to inquire whether he had "spoken to Zhao yet." Ryjik responded: "Off [sic] course call me when u can[.]" Id. ¶ 12.

In October 2013, Brand texted Ryjik saying, "I can use the donation to the foundation after tomorrow." Id. ¶ 14. The following day, after receiving an email informing him that Harvard had deemed the admission of Zhao's son as "likely," Brand texted the confidential informant: "Your man is good to go. Don't say anything to him until he receives the call from admissions." Id. ¶ 16. In December 2013, Zhao emailed Brand an acceptance letter that Zhao's son had received from Harvard that day. Zhao wrote: "Hi Boss...It is official now. I just want to thank you for what you did, really appreciate." Id. ¶ 18.

### 2. The Government's Evidence of Payments Made by Zhao

In February 2013, Zhao contributed approximately $1 million to Ryjik's fencing charity as a "purported donation[.]" Id. ¶ 13. In October 2014, shortly after Zhao's son began studies at

Harvard, the fencing charity contributed $100,000 to the Peter Brand Foundation. The payment was funded by Zhao's $1 million dollar contribution. Id. ¶¶ 14, 19.

In June and July 2015, Zhao wrote two checks to Penn State University in the total amount of $8,428.66 to pay for Brand's son's tuition. Id. ¶ 20. He also (a) wrote a check to the U.S. Department of Education in the amount of $32,339.92, to pay Brand's son's educational loans, id. ¶ 21; (b) made payments totaling $119,051.52 to pay off the mortgage on Brand's home in Needham, Massachusetts, id. ¶ 22; (c) paid $2,573.45 to pay the Needham water and sewer bill for Brand's home and $34,563.25 to GM Financial to pay Brand's car loan, id. ¶¶ 23-24; and (d) paid $50,000 into an escrow account for Brand's purchase of a condominium in Cambridge, Massachusetts, id. ¶ 25. In May 2016, Zhao bought Brand's Needham home for $989,500, "well above its assessed value." Id. ¶ 26. Brand used the sales proceeds to fund his purchase of the Cambridge condominium. Id.

### 3. The Government's Evidence Concerning the Admission of Zhao's Younger Son

In June 2016, Brand emailed an Associate Director of Harvard Athletics, stating that he had offered recruiting slots to Zhao's younger son and four other prospective students. Id. ¶ 27. Brand later emailed Zhao's son to inform him he should send in a completed application by September 15 in order to be considered for a "likely" letter. Id. ¶ 28. Zhao's son received the "likely" letter in September 2016. Id. ¶ 29. Between August 2016 and April 2017—"during the period in which Zhao's son's Harvard application was pending"—Zhao paid a Massachusetts-based residential construction company at least $154,626.41 for renovations to Brand's Cambridge condominium. Id. ¶ 30.

### B. Miller's Boston Globe Article

The Article reported that the Globe interviewed Zhao at the Hilton Boston Logan Airport after flying from Virginia to Boston "because he wanted to explain everything in person, and, in his words, look the reporter in the eye." Miller Dec., **Exhibit B** at 2. With Zhao's consent,

Miller recorded the Logan Airport interview, which is approximately 50 minutes long. Id. ¶ 3.

The Article attributed the following quoted statements to Zhao from the interview:

- [Referring to Defendant Brand:] "We have a freshman weekend or whatever that we went to the fencing room, sit down, talk with him[.] . . . The more we talk, I really like this guy."

- "He did not ask me, 'Jack, can you buy me a house?' No. No. No. That is just not the situation[.]"

- "From my perspective, I'm just making his life better plus making a good investment[.]"

- [Referring to Brand's house:] "pretty cozy[.]"

- "You can ask me why didn't you check the market value of the house? I did not because I trust him[.] . . . He gave me the price. . . . I said, 'fine.'"

- "[W]hy would I use my own name" [on the real estate documents if he had seen a conflict with the admissions process and the purchase].

- "If I know the policies that the coach cannot sell to students or parents of student, I would not do it. I have no idea, right? I don't think there's any violation or anything[.]"

- [Referring to his instructions to a real estate agent in 2017:] "I told him: Sell the first one who gives the offer!"

- "Nerdy boys and we want them to be athletes, right?"

- "You know, I am the only one flying people business class to those because I pay big respect to the coaches[.]"

- "[Alex Ryjik] always introduced the parents to Brand[.]"

## ARGUMENT

### A.   The First Amendment and Federal Common Law Protect the Press from Compelled Disclosure of Newsgathering Information and Materials.

In order to "enable members of society to cope with the exigencies of their period," the Amendment necessarily provides structural protections for all of the activities needed to gather and disseminate information to the public. See Thornhill v. Alabama, 310 U.S. 88, 102 (1940). See generally Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 576 (1980) ("[w]ithout

some protection for seeking out the news, freedom of the press could be eviscerated."). Thus, "[t]he press is not only shielded when its speaks out, but when it performs all the myriad tasks necessary for it to gather and disseminate the news." Brennan, Address, 32 Rutgers L. Rev. 173, 177 (1979).

These principles have led to the widespread recognition that the First Amendment protects journalists from the needless disclosure of sources, investigative techniques, and both confidential and non-confidential work product. "Courts afford journalists a measure of protection from discovery initiatives in order not to undermine their ability to gather and disseminate information. [Citation omitted]. Journalists are the personification of a free press, and to withhold such protection would invite a 'chilling effect on speech,' … and destabilize the First Amendment." In re Cusumano, 162 F.3d 708, 714 (1st Cir. 1998). See also United States v. LaRouche Campaign, 841 F.2d 1176, 1182 (routine compulsion of even non-confidential information threatens First Amendment interests). See generally Branzburg v. Hayes, 408 U.S. 665, 710 (1972) (Powell, J. concurring); Bruno & Stillman, Inc. v. Globe Newspaper Co., 633 F.2d 583, 598-99 (1st Cir. 1980).[2]

In Cusumano, for example, the First Circuit affirmed a trial court order quashing the subpoenas of two academic authors in the United States' antitrust case against Microsoft. After learning that two authors were writing a book in which employees of a Microsoft competitor were quoted as attributing their company's economic problems to "self-inflicted wounds" rather than to anti-competitive behavior, Microsoft subpoenaed the author's manuscript and underlying interview notes and tape recordings. Reviewing the trial court's order quashing the subpoena, the First Circuit found that Microsoft's need for the subpoenaed materials "admittedly is

---

[2] See also Shoen v. Shoen, 48 F.3d 412, 418 (9th Cir. 1995) and Gonzales v. National Broadcasting Co., Inc., 194 F.3d 29, 30 (2d Cir. 1999)("Shoen II") (First Amendment protects against unnecessary discovery of even non-confidential journalistic work product).

substantial in the sense that relevant information likely exists" concerning the company's "primary defense." 162 F.3d at 716. Nevertheless, because Microsoft could have obtained the same information by direct discovery of the persons interviewed by the authors, and in view of the fact that forced disclosure would harm the author's future research efforts, as well as those of other similarly situated authors, the First Circuit held that the trial court "acted well within its discretion" in denying the discovery. 162 F.3d at 717. See also In re Request from the United Kingdom Pursuant to the Treaty, 718 F.3d 13, 24 (1st Cir. 2013) ("A balancing of First Amendment concerns vis-à-vis the concerns asserted in favor of the compelled disclosure of academic and journalistic information is the law in this circuit for all First Amendment cases and, as explained in our analysis above, 'at least in situations distinct from Branzburg [i.e., grand jury subpoenas]," there is room for courts to require direct relevance.").

In LaRouche, the First Circuit recognized that routinely requiring journalists to produce "outtakes, notes, and other unused information, even if non-confidential" threatens at least four legitimate newsgathering interests:   (1) "the risk of "'judicial intrusion' into the newsgathering . . . process"; (2) "the disadvantage of a journalist appearing to be . . . a research tool of government"; (3) creating a "disincentive to 'compile and preserve non-broadcast material'"; and (4) "the burden on journalists' time and resources in responding to subpoenas." 841 F.2d at 1182 (emphasis added). In the Court's words:

> To the extent that compelled disclosure becomes commonplace, it seems likely indeed that internal policies of destruction of materials may be devised and choices as to subject matter made, which could be keyed to avoiding disclosure requests or compliance therewith rather than to the basic function of providing news and comment. In addition, frequency of subpoenas would not only preempt the otherwise productive time of journalists and other employees, but measurably increase expenditures for legal fees.

Id. See also id. ("Finally, observing Justice Powell's essential concurring opinion in Branzburg, 'certainly, we do not hold . . . that state and federal authorities are free to annex the news media as an investigative arm of government.'") (citation and some internal quotation marks omitted).

The LaRouche Court also endorsed "sensitive district court conduct of in camera reviews to respond to the generalized First Amendment concerns that would be triggered by too easy and routine a resort to compelled disclosure of nonconfidential material." Id. at 1183. In camera review, the Court noted, would allow district courts "to balance the competing constitutional interests, limiting disclosure of journalistic products to those cases where their use would, in fact, be of significant utility." Id. (citing United States v. Burke, 700 F.2d 70, 78 n. 9 (2d Cir. 1983) ("We encourage the courts to inspect potentially sensitive documents, especially in situations where, as here, the record reveals that the [media's] work papers were not sufficiently voluminous to render in camera review impracticable.")).[3]

The Department of Justice recognized similar principles in its recently amended "Policy regarding obtaining information from, or records of, members of the news media; and regarding questioning, arresting, or charging members of the news media." See **Exhibit A** hereto. The Policy declares that "the use of compulsory legal process to seek information from or records of non-consenting members of the news media constitutes an extraordinary measure, not a standard investigatory practice." Id. at 5. Other than in circumstances not present here, the Department may only use compulsory process for the purpose of obtaining information from or records of a member of the news media "acting within the scope of newsgathering" to "authenticate for evidentiary purposes information or records that have already been published, in which case the authorization of a Deputy Assistant Attorney General for the Criminal Division is required[.]" Id. at 9.[4] The Policy also requires the official authorizing compulsory legal process to find that

---

[3] See also United States v. Shay, No. 92–10369–RWZ, 1993 WL 263493, *2 (D. Mass. 1993) (ordering in camera review of news outtakes pursuant to LaRouche).

[4] The Policy permits the use of compulsory process in cases where the news media consents or when necessary to prevent imminent or concrete risk of death or serious injury, or incapacitation or destruction of critical infrastructure. Id.

(a) the government has exhausted all reasonable alternative, non-media sources for the information; (b) the subpoena is "narrowly drawn," directed at "material and relevant information regarding a limited subject matter"; and (c) "avoid[s] interference with unrelated newsgathering[.]" Id. at 12.

The balancing process required in considering a motion to quash a subpoena of a journalist thus includes consideration of the following factors:

1.      Whether the party seeking disclosure has met its burden of demonstrating that the information sought is truly relevant, and that its request is not a "fishing expedition." Bruno & Stillman, 633 F.2d at 597; Cusumano, 162 F.3d at 716.

2.      If the party seeking disclosure meets its initial burden, the court next considers whether the objecting party has shown a basis for withholding the information, as for example, by demonstrating either a reasonable expectation of harm that would result from disclosure. Bruno & Stillman, 633 F.2d at 597; Cusumano, 162 F.3d at 716.  See also Larouche, 841 F.2d at 1182. See generally Herbert v. Lando, 441 U.S. 153, 174 (1979).

3.      Finally, the court considers whether the asserted interest in disclosure outweighs the resulting harm to the free flow of information and whether the competing interests may be accommodated by measures such as requiring the exhaustion of alternative sources.  Bruno & Stillman, 633 F.2d at 597-98; Cusumano, 162 F.3d at 716-17; United Kingdom, 718 F.3d at 24.

"While obviously the discretion of the trial judge has wide scope, it is a discretion informed by an awareness of First Amendment values and the precedential effect which decision in any one case would be likely to have." Bruno & Stillman, 633 F.2d at 598.  Where, as here, testimony is sought from a non-party witness, "concern for the unwarranted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs." Cusumano, 162 F.3d at 717.  "Mindful that important First Amendment values are at stake," id. at 710, "detailed findings of fact and explanation of the decision would be appropriate."  Bruno & Stillman, 633 F.2d at 598.

B.   **The First Amendment Interests in Avoiding the Compelled Testimony of Reporters Outweighs the Interest in Miller's Testimony.**

As the First Circuit recognized in LaRouche, a non-party such as Miller may be at a disadvantage in attempting to address the specific evidentiary arguments in a case to which it is a stranger.  841 F.2d at 1183.  That does not relieve the government of demonstrating that the testimony it seeks from a reporter is directly relevant, not cumulative of other evidence in the case, and cannot be obtained from another witness (such as Ryjik).  For example, Miller has no unique evidence about the payments made by Zhao (which presumably may be proven by financial records) or communications (both oral and electronic) between Zhao, Ryjik, and Brand.  See ECF No. 3-1 at 14, ¶ 61 (describing meeting between Zhao and Ryjik shortly after publication of Globe Article); see generally Cusumano, 612 F.3d at 716-717 (interests of non-party witnesses are entitled to "special weight" and existence of alternative sources favors non-disclosure by the press).  Nor is the subpoena, but its terms, limited to "authentic[ating] for evidentiary purposes information or records that have already been published."  See Exhibit A at 8.[5]

---

[5] Judge Rakoff's decision in United States v. Treacy, 603 F. Supp. 2d 670 (S.D.N.Y. 2009), cited by the government in the parties' joint pre-trial memorandum, does not dictate a contrary result. ECF No. 172 at 4.  Treacy recognized that the protection for journalists "applies to both confidential and non-confidential information, as well as to both published and unpublished information." Id. at 672 (citations omitted).  After considering the relevance of the information sought and the ability to obtain the information from another source, the court narrowly circumscribed the permissible areas of inquiry.  Id. at 673.  The fact-intensive nature of the inquiry was emphasized in a subsequent decision by Judge Rakoff granting a motion to quash a subpoena of a reporter for published information concerning the circumstances of an arrest.  See Lebowitz v. City of New York, 948 F.Supp.2d 392, 394-95 (S.D.N.Y. 2013). As Judge Rakoff stated: "the reporter's privilege stems from a desire to protect journalists from being regularly subpoenaed, and thus from being transformed, in effect, into the investigative agents of courts and litigants." Id. at 395.  "That rationale applies with equal force to information gleaned from personal observations as to information obtained from interviews or other newsgathering activities." Id.

DB3/ 204387657.1

Should the Court decide that the statements made by Zhao to Miller are directly relevant and neither cumulative nor readily available from other sources, Miller respectfully requests that, as in LaRouche, the Court conduct an in camera review of the recorded interview in order to "to balance the competing constitutional interests, limiting disclosure of journalistic products to those cases where their use would, in fact, be of significant utility." 841 F.3d at 1183.

If the in camera review establishes that any of Zhao's statements on the recording are admissible and grants the parties access to those portions of the recording, Miller's testimony still would not be needed.   The Federal Rules of Evidence permit authentication of a tape recording by any lay witness who is familiar with the speaker's voice.  Fed. R. Evid. 901 provides:

> (a) In General. To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.
>
> (b) Examples. The following are examples only--not a complete list--of evidence that satisfies the requirement:
>       ***
> (5) Opinion About a Voice. An opinion identifying a person's voice--whether heard firsthand or through mechanical or electronic transmission or recording-- based on hearing the voice at any time under circumstances that connect it with the alleged speaker.

Fed. R. Civ. P. 901 (a) and (b)(5).  As the Advisory Committee Notes explain: "Since aural voice identification is not a subject of expert testimony, the requisite familiarity may be acquired either before or after the particular speaking which is the subject of the identification, in this respect resembling visual identification of a person rather than identification of handwriting."   Id., Advisory Committee Notes, Example 5.

In Panico, for example, two state troopers identified a voice on a telephone recording as the defendant.  435 F.3d 47.  The Court concluded that lay witness identification, "based on a witness's prior familiarity with a voice, is a common place way in which voices are identified." Id. at 49 (citing Fed. R. Evid. 901(b)(5) and Weinstein's Federal Evidence, § 901.06[1]).  "It is not enough to bar an identification, either of voices or faces, that the procedures were

-11-

'suggestive'' it must <u>also</u> be shown that, under the 'totality of the circumstances,' the identification was 'unreliable.'" <u>Id.</u> (emphasis in original) (citations omitted). <u>See also</u> <u>Garcia-Alvarez</u>, 541 F.3d at 14-15 (upholding identification based on lineup and having the defendant repeat an alleged threat, despite that defendant was the only person in the lineup who had a Dominican accent as described by victim).

In this case, assuming that Zhao does not stipulate to the recording, Rule 901 authorizes Ryjik to authenticate the statements made by Zhao on the recording. The record shows that Ryjik, who was the high school fencing coach for Zhao's two sons, has had numerous communications with Zhao over the years. <u>See</u>, <u>e.g.</u>, ECF No. 3-1 at 14, ¶ 61 (describing a meeting between Zhao and Ryjik shortly after the Article was published); <u>see also</u> <u>id.</u> at 3, 6, 7. There may be other government witnesses familiar with Zhao's voice who also can authenticate the recording. In all events, there should be no need for Miller to testify even if the Court deems any statements on the recording relevant and admissible.

## CONCLUSION

For the foregoing reasons, Joshua Miller respectfully requests that his motion to quash trial subpoena be granted or, in the alternative, a protective order issue providing for an <u>in camera</u> review of the recording of Miller's interview and, should the Court determine that the recording contains relevant, non-cumulative evidence, further providing that the recording should be authenticated by a witness or witnesses other than Miller.

JOSHUA MILLER,

By his attorneys,

/s/ Jonathan M. Albano
Jonathan M. Albano, Bar No. 013850
jonathan.albano@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Federal Street
Boston, MA  02110-1726
Telephone:    +1.617.341.7700
Facsimile:    +1.617.341.7701

Dated: November 3, 2022

## CERTIFICATE OF SERVICE

I, Jonathan M. Albano, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on November 3, 2022.

/s/Jonathan M. Albano
Jonathan M. Albano

DB3/ 204387657.1

# EXHIBIT A



# Office of the Attorney General
## Washington, D. C. 20530

October 26, 2022

MEMORANDUM TO ALL DEPARTMENT EMPLOYEES

FROM:             THE ATTORNEY GENERAL

SUBJECT:          NEW REGULATIONS REGARDING OBTAINING INFORMATION
                  FROM OR RECORDS OF MEMBERS OF THE NEWS MEDIA; AND
                  REGARDING QUESTIONING, ARRESTING, OR CHARGING
                  MEMBERS OF THE NEWS MEDIA

     A free and independent press is vital to the functioning of our democracy.  In recognition of the important national interest in a free and independent press, on July 19, 2021, I issued a memorandum revising the Department's policy regarding the use of compulsory legal process for the purpose of obtaining information from or records of members of the news media.  I also asked the Deputy Attorney General to undertake a review to further explain, develop, and codify protections for the news media in regulations.  After the conclusion of that review, which involved consultation with relevant internal and external stakeholders, including federal prosecutors and members of the media, I am today issuing the revised regulations, which can be found at 28 CFR 50.10.

     The revisions codify the July 2021 directive that the Department will no longer use compulsory legal process for the purpose of obtaining information from or records of members of the news media acting within the scope of newsgathering, except in limited circumstances. Other revisions are intended to clarify the scope of the policy, specify the standards and approvals required in matters in which compulsory legal process is still permitted, tighten procedures for the review and safeguarding of information, and fill gaps in the previous regulations.

     To ensure consistent application and understanding of this policy throughout the Department, the relevant Justice Manual provisions will be updated with further guidance, and the Criminal Division's Office of Enforcement Operations will provide comprehensive training across the Department regarding the new policy's substance, standards, approval levels, and consultation requirements.

     I am grateful to the many Department personnel who participated in the review process that resulted in the revised regulations.

BILLING CODE: 4410-14

DEPARTMENT OF JUSTICE

28 CFR Part 50

Docket No. OAG 179; AG Order No. 5524-2022

Policy Regarding Obtaining Information From or Records of Members of the News Media;

and Regarding Questioning, Arresting, or Charging Members of the News Media

AGENCY: Office of the Attorney General, Department of Justice.

ACTION: Final rule.

SUMMARY: This rule amends the regulations setting forth the policy of the Department of

Justice regarding the use of compulsory legal process, including subpoenas, search warrants, and

certain court orders for the purpose of obtaining information from or records of members of the

news media. The rule also amends the Department's regulations establishing its policy

regarding questioning, arresting, or charging members of the news media.

DATES: This rule is effective on [INSERT DATE OF PUBLICATION IN THE FEDERAL

REGISTER].

FOR FURTHER INFORMATION CONTACT: Ashley Dugger, Acting Director, Office of

Enforcement Operations, Criminal Division, (202) 514-6809.

SUPPLEMENTARY INFORMATION:

Discussion

On July 19, 2021, the Attorney General issued a memorandum revising the Department's

policy regarding the use of compulsory legal process for the purpose of obtaining information

from or records of members of the news media. The memorandum asked the Deputy Attorney

General to undertake a review process to further explain, develop, and codify in regulations the

protections provided for in the memorandum. After the conclusion of that review and consultation with relevant internal and external stakeholders, the Attorney General is issuing this final rule to revise the existing provisions in the Department's regulations at 28 CFR 50.10.

The revisions replace the regulations' prior balancing test and codify the Attorney General's July 2021 directive that the Department of Justice will no longer use compulsory legal process for the purpose of obtaining information from or records of members of the news media acting within the scope of newsgathering, except in limited circumstances. Other revisions are intended to clarify the scope of the policy, specify the approvals required in the circumstances in which compulsory legal process is allowed, tighten procedures for the review and safeguarding of information, and fill gaps in the previous regulations.

**Regulatory Certifications**

*Administrative Procedure Act, 5 U.S.C. 553*

Because, for purposes of the Administrative Procedure Act, this regulation concerns general statements of policy, or rules of agency organization, procedure, or practice, notice and comment and a delayed effective date are not required. See 5 U.S.C. 553(b)(A), (d).

*Regulatory Flexibility Act*

Because this final rule is not promulgated as a final rule under 5 U.S.C. 553 and was not required under that section to be published as a proposed rule, the requirements for the preparation of a regulatory flexibility analysis under 5 U.S.C. 604(a) do not apply. In any event, the Attorney General, in accordance with 5 U.S.C. 605(b), has reviewed this regulation and by approving it certifies that this regulation will not have a significant economic impact on a substantial number of small entities because it pertains to administrative matters affecting the Department.

*Executive Orders 12866 and 13563 - Regulatory Planning and Review*

This action has been drafted and reviewed in accordance with Executive Order 12866 of September 30, 1993, Regulatory Planning and Review, section 1(b), Principles of Regulation.

This rule is limited to agency organization, management, or personnel matters as described by section 3(d)(3) of Executive Order 12866, and therefore is not a "regulation" as defined by that Executive Order. Accordingly, this action has not been reviewed by the Office of Management and Budget.

*Executive Order 12988 - Civil Justice Reform*

This regulation meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988 of February 5, 1996.

*Executive Order 13132 - Federalism*

This regulation will not have substantial direct effects on the States, on the relationship between the national government and the States, or on distribution of power and responsibilities among the various levels of government. Therefore, in accordance with Executive Order 13132 of August 4, 1999, this rule does not have sufficient federalism implications to warrant the preparation of a federalism assessment.

*Unfunded Mandates Reform Act of 1995*

This rule will not result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995, Public Law 104-4.

*Congressional Review Act*

This action pertains to agency management and does not substantially affect the rights or obligations of non-agency parties; accordingly, this action is not a "rule" as that term is used by the Congressional Review Act (Subtitle E of the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA)). Therefore, the reporting requirement of 5 U.S.C. 801 does not apply.

**List of Subjects in 28 CFR Part 50**

Administrative practice and procedure, Crime, News, Media, Subpoena, Search warrants.

Accordingly, for the reasons stated in the preamble, part 50 of title 28 of the Code of Federal Regulations is amended as follows:

**PART 50 — STATEMENTS OF POLICY**

1. The authority citation for part 50 continues to read as follows:

**Authority:** 5 U.S.C. 301; 18 U.S.C. 1162; 28 U.S.C. 509, 510, 516, and 519; 42 U.S.C. 1921 *et seq.*, 1973c; and Pub. L. 107-273, 116 Stat. 1758, 1824.

2. Section 50.10 is revised to read as follows:

**§ 50.10 Policy regarding obtaining information from or records of members of the news media; and regarding questioning, arresting, or charging members of the news media.**

(a) *Statement of principles.*

(1) A free and independent press is vital to the functioning of our democracy. Because freedom of the press can be no broader than the freedom of members of the news media to investigate and report the news, the Department's policy is intended to provide protection to members of the news media from certain law enforcement tools and actions, whether criminal or civil, that might unreasonably impair newsgathering. The policy is not intended to shield from accountability members of the news media who are subjects or targets of a criminal investigation

4

for conduct outside the scope of newsgathering.

(2) The Department recognizes the important national interest in protecting journalists from compelled disclosure of information revealing their sources, sources they need to apprise the American people of the workings of their government. For this reason, with the exception of certain circumstances set out below, the Department of Justice will not use compulsory legal process for the purpose of obtaining information from or records of members of the news media acting within the scope of newsgathering.

(3) In determining whether to seek, when permitted by this policy, information from or records of members of the news media, the Department must consider several vital interests: protecting national security, ensuring public safety, promoting effective law enforcement and the fair administration of justice, and safeguarding the essential role of a free press in fostering government accountability and an open society, including by protecting members of the news media from compelled disclosure of information revealing their sources. These interests have long informed the Department's view that the use of compulsory legal process to seek information from or records of non-consenting members of the news media constitutes an extraordinary measure, not a standard investigatory practice.

(b) *Scope and definitions.*

(1) Covered persons and entities. This policy governs the use of certain law enforcement tools and actions, whether criminal or civil, to obtain information from or records of members of the news media.

(2) Definitions.

(i) "Compulsory legal process" consists of subpoenas, search warrants, court orders issued pursuant to 18 U.S.C. 2703(d) and 3123, interception orders issued pursuant to 18 U.S.C.

2518, civil investigative demands, and mutual legal assistance treaty requests—regardless of whether issued to members of the news media directly, to their publishers or employers, or to others, including third-party service providers of any of the forgoing, for the purpose of obtaining information from or records of members of the news media, and regardless of whether the compulsory legal process seeks testimony, physical or electronic documents, telephone toll or other communications records, metadata, or digital content.

(ii) "Newsgathering" is the process by which a member of the news media collects, pursues, or obtains information or records for purposes of producing content intended for public dissemination.

(A) Newsgathering includes the mere receipt, possession, or publication by a member of the news media of government information, including classified information, as well as establishing a means of receiving such information, including from an anonymous or confidential source.

(B) Except as provided in paragraph (b)(2)(ii)(A) of this section, newsgathering does not include criminal acts committed in the course of obtaining information or using information, such as: breaking and entering; theft; unlawfully accessing a computer or computer system; unlawful surveillance or wiretapping; bribery; extortion; fraud; insider trading; or aiding or abetting or conspiring to engage in such criminal activities, with the requisite criminal intent.

(3) Exclusions.

(i) The protections of this policy do not extend to any person or entity where there is a reasonable ground to believe the person or entity is:

(A) A foreign power or agent of a foreign power, as those terms are defined in section 101 of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1801);

6

(B) A member or affiliate of a foreign terrorist organization designated under section 219(a) of the Immigration and Nationality Act (8 U.S.C. 1189(a));

(C) Designated as a Specially Designated Global Terrorist by the Department of the Treasury under Executive Order 13224 of September 23, 2001 (66 FR 49079);

(D) A specially designated terrorist as that term is defined in 31 CFR 595.311 (or any successor thereto);

(E) A terrorist organization as that term is defined in section 212(a)(3)(B)(vi) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(vi));

(F) Committing or attempting to commit a crime of terrorism, as that offense is described in 18 U.S.C. 2331(5) or 2332b(g)(5);

(G) Committing or attempting to commit the crimes of providing material support or resources to terrorists or designated foreign terrorist organizations, providing or collecting funds to finance acts of terrorism, or receiving military-type training from a foreign terrorist organization, as those offenses are defined in 18 U.S.C. 2339A, 2339B, 2339C, and 2339D; or

(H) Aiding, abetting, or conspiring in illegal activity with a person or organization described in paragraphs (b)(3)(i)(A) through (G) of this section.

(ii) The determination that an exclusion in paragraph (b)(3)(i) of this section applies must be made by the Assistant Attorney General for National Security.

(c) *Compulsory legal process for the purpose of obtaining information from or records of a member of the news media acting within the scope of newsgathering.* Compulsory legal process for the purpose of obtaining information from or records of a member of the news media acting within the scope of newsgathering is prohibited except under the circumstances set forth in paragraphs (c)(1) through (3). (Note that this prohibition on using compulsory legal process

applies when a member of the news media has, in the course of newsgathering, only received, possessed, or published government information, including classified information, or has established a means of receiving such information, including from an anonymous or confidential source.) The Department may only use compulsory legal process for the purpose of obtaining information from or records of a member of the news media acting within the scope of newsgathering, as follows:

(1) To authenticate for evidentiary purposes information or records that have already been published, in which case the authorization of a Deputy Assistant Attorney General for the Criminal Division is required;

(2) To obtain information or records after a member of the news media agrees to provide or consents to the provision of the requested records or information in response to the proposed compulsory legal process, in which case authorization as described in paragraph (i) of this section is required; or

(3) When necessary to prevent an imminent or concrete risk of death or serious bodily harm, including terrorist acts, kidnappings, specified offenses against a minor (as defined in 34 U.S.C. 20911(7)), or incapacitation or destruction of critical infrastructure (as defined in 42 U.S.C. 5195c(e)), in which case the authorization of the Attorney General is required.

(d) *Compulsory legal process for the purpose of obtaining information from or records of a member of the news media not acting within the scope of newsgathering.*

(1) The Department may only use compulsory legal process for the purpose of obtaining information from or records of a member of the news media who is not acting within the scope of newsgathering:

(i) When the member of the news media is the subject or target of an investigation and

8

suspected of having committed an offense;

(ii) To obtain information or records of a non-member of the news media, when the non-member is the subject or target of an investigation and the information or records are in a physical space, device, or account shared with a member of the news media;

(iii) To obtain purely commercial, financial, administrative, technical, or other information or records unrelated to newsgathering; or for information or records relating to personnel not involved in newsgathering;

(iv) To obtain information or records related to public comments, messages, or postings by readers, viewers, customers, or subscribers, over which a member of the news media does not exercise editorial control prior to publication;

(v) To obtain information or records of a member of the news media who may be a victim of or witness to crimes or other events, or whose premises may be the scene of a crime, when such status (as a victim or witness or crime scene) is not based on or within the scope of newsgathering; or

(vi) To obtain only subscriber and other information described in 18 U.S.C. 2703(c)(2)(A), (B), (D), (E), and (F).

(2) Compulsory legal process under paragraph (d)(1) of this section requires the authorization of a Deputy Assistant Attorney General for the Criminal Division, except that:

(i) To obtain information or records after a member of the news media agrees to provide or consents to the provision of the requested records or information in response to the proposed compulsory legal process, such compulsory legal process requires authorization as described in paragraph (i) of this section governing voluntary questioning and compulsory legal process following consent by a member of the news media; and

9

(ii) To seek a search warrant for the premises of a news media entity requires authorization by the Attorney General.

(e) *Matters where there is a close or novel question as to the person's or entity's status as a member of the news media or whether the member of the news media is acting within the scope of newsgathering.*

(1) When there is a close or novel question as to the person's or entity's status as a member of the news media, the determination of such status must be approved by the Assistant Attorney General for the Criminal Division.

(2) When there is a close or novel question as to whether the member of the news media is acting within the scope of newsgathering, the determination of such status must be approved by the Assistant Attorney General for the Criminal Division. When the Assistant Attorney General finds that there is genuine uncertainty as to whether the member of the news media is acting within the scope of newsgathering, the determination of such status must be approved by the Attorney General.

(f) *Compelled testimony.*

(1) Except as provided in paragraph (f)(2) of this section, members of the Department must obtain the authorization of the Deputy Attorney General when seeking to compel grand jury or trial testimony otherwise permitted by this section from any member of the news media.

(2) When the compelled testimony under paragraph (f)(1) of this section has no nexus to the person's or entity's activities as a member of the news media, members of the Department must obtain the authorization of a Deputy Assistant Attorney General for the Criminal Division and provide prior notice to the Deputy Attorney General.

(3) Such authorization may only be granted when all other requirements of this policy

regarding compulsory legal process have been satisfied.

(g) *Exhaustion.*

(1) Except as provided in paragraph (g)(2) of this section, the official authorizing the compulsory legal process must find the following exhaustion conditions are met:

(i) The Government has exhausted all reasonable avenues to obtain the information from alternative, non-news-media sources.

(ii) The Government has pursued negotiations with the member of the news media in an attempt to secure the member of the news media's consent to the production of the information or records to be sought through compulsory legal process, unless the authorizing official determines that, for compelling reasons, such negotiations would pose a clear and substantial threat to the integrity of the investigation or pose the risks described in paragraph (c)(3) of this section. Where the nature of the investigation permits, the Government must have explained to the member of the news media the Government's need for the information sought in a particular investigation or prosecution, as well as its willingness or ability to address the concerns of the member of the news media.

(iii) The proposed compulsory legal process is narrowly drawn. It must be directed at material and relevant information regarding a limited subject matter, avoid interference with unrelated newsgathering, cover a reasonably limited period of time, avoid requiring production of a large volume of material, and give reasonable and timely notice of the demand as required by paragraph (j) of this section.

(2) When the process is sought pursuant to paragraphs (d)(1), (i), or (l) of this section, the authorizing official is not required to find that the exhaustion conditions in paragraphs (g)(1)(i)–(ii) of this section have been satisfied, but should consider requiring those conditions as

appropriate.

(h) *Standards for authorizing compulsory legal process.*

(1) In all matters covered by this section, the official authorizing the compulsory legal process must take into account the principles set forth in paragraph (a) of this section.

(2) Except as provided in paragraph (h)(3) of this section, when the member of the news media is not the subject or target of an investigation and suspected of having committed an offense, the official authorizing the compulsory legal process must take into account the following considerations:

(i) In criminal matters, there must be reasonable grounds to believe, based on public information or information from non-news-media sources, that a crime has occurred, and that the information sought is essential to a successful investigation or prosecution. The compulsory legal process may not be used to obtain peripheral, nonessential, or speculative information.

(ii) In civil matters, there must be reasonable grounds to believe, based on public information or information from non-news-media sources, that the information sought is essential to the successful completion of the investigation or litigation in a case of substantial importance. The compulsory legal process may not be used to obtain peripheral, nonessential, cumulative, or speculative information.

(3) When paragraph (h)(2) of this section would otherwise apply, but the compulsory legal process is sought pursuant to paragraphs (i) or (l) of this section, the authorizing official is not required to, but should, take into account whether the information sought is essential to a successful investigation, prosecution, or litigation as described in paragraphs (h)(2)(i)–(ii) of this section.

(4) When the member of the news media is the subject or target of an investigation and

12

suspected of having committed an offense, before authorizing compulsory legal process, the authorizing official is not required to, but should, take into account the considerations set forth in paragraphs (h)(2)(i)–(ii) of this section as appropriate.

(i) *Voluntary questioning and compulsory legal process following consent by a member of the news media.*

(1) When the member of the news media is not the subject or target of an investigation and suspected of having committed an offense, authorization by a United States Attorney or Assistant Attorney General responsible for the matter must be obtained in order to question a member of the news media on a voluntary basis, or to use compulsory legal process if the member of the news media agrees to provide or consents to the provision of the requested records or information in response to the proposed process. When there is any nexus to the person's activities as a member of the news media, such authorization must be preceded by consultation with the Criminal Division.

(2) When the member of the news media is the subject or target of an investigation and suspected of having committed an offense, authorization by a Deputy Assistant Attorney General for the Criminal Division must be obtained in order to question a member of the news media on a voluntary basis, or to use compulsory legal process if the member of the news media agrees to provide or consents to the provision of the requested records or information in response to the proposed process.

(j) *Notice of compulsory legal process to the affected member of the news media.*

(1) Members of the Department must provide notice to the affected member of the news media prior to the execution of authorized compulsory legal process under paragraph (c) of this section unless the authorizing official determines that, for compelling reasons, such notice would

13

pose the risks described in paragraph (c)(3) of this section.

(2) Members of the Department must provide notice prior to the execution of compulsory legal process authorized under paragraphs (d)(1)(ii)–(vi) of this section to a member of the news media that is not the subject or target of an investigation and suspected of having committed an offense, unless the authorizing official determines that, for compelling reasons, such notice would pose a clear and substantial threat to the integrity of the investigation or would pose the risks described in paragraph (c)(3) of this section and so informs the Deputy Attorney General in advance.

(3) If the member of the news media has not been given notice under paragraphs (j)(1) or (j)(2) of this section, the United States Attorney or Assistant Attorney General responsible for the matter must provide notice to the member of the news media as soon as it is determined that such notice would no longer pose the concerns described in paragraphs (j)(1) or (j)(2) of this section, as applicable.

(4) In any event, such notice must be given to the affected member of the news media within 45 days of the Government's receipt of a complete return made pursuant to all forms of compulsory legal process included in the same authorizing official's authorization under paragraphs (c) or (d)(1)(ii)–(vi), except that the authorizing official may authorize delay of notice for one additional 45-day period if the official determines that, for compelling reasons, such notice continues to pose the same concerns described in paragraphs (j)(1) or (j)(2) of this section, as applicable.

(5) Members of the Department are not required to provide notice to the affected member of the news media of compulsory legal process that was authorized under paragraph (d)(1)(i) of this section if the affected member of the news media is the subject or target of an investigation

14

and suspected of having committed an offense.

(i) The authorizing official may nevertheless direct that notice be provided to the affected member of the news media.

(ii) If the authorizing official does not direct that such notice be provided, the official must so inform the Deputy Attorney General, and members of the Department who are responsible for the matter must provide the authorizing official with an update every 90 days regarding the status of the investigation. That update must include an assessment of any harm to the investigation that would be caused by providing notice to the member of the news media. The authorizing official will consider such update in determining whether to direct that notice be provided.

(6) Notice under this policy may be given to the affected member of the news media or a current employer of that member if that employer is also a member of the news media.

(7) A copy of any notice to be provided to a member of the news media shall be provided to the Director of the Office of Public Affairs and to the Director of the Criminal Division's Office of Enforcement Operations at least 10 business days before such notice is provided, and immediately after such notice is provided to the member of the news media.

(k) *Non-disclosure orders.*

(1) In seeking authorization to use compulsory legal process to obtain information from or the records of a member of the news media, members of the Department must indicate whether they intend to seek an order directing the recipient of the compulsory legal process not to disclose the existence of the compulsory legal process to any other person or entity and shall articulate the need for such non-disclosure order.

(2) An application for a non-disclosure order sought in connection with compulsory legal

process under paragraph (c) of this section may only be authorized if the authorizing official determines that, for compelling reasons, disclosure would pose the risks described in paragraph (c)(3) of this section and the application otherwise complies with applicable statutory standards and Department policies.

(3) An application for a non-disclosure order sought in connection with compulsory legal process under paragraphs (d)(1)(ii)–(vi) of this section regarding a member of the news media that is not the subject or target of an investigation and suspected of having committed an offense may only be authorized if the authorizing official determines that, for compelling reasons, disclosure would pose a clear and substantial threat to the integrity of the investigation or would pose the risks described in paragraph (c)(3) of this section and the application otherwise complies with applicable statutory standards and Department policies.

(4) An application for a non-disclosure order sought in connection with compulsory legal process under paragraph (d)(1)(i) of this section regarding a member of the news media that is a subject or target of an investigation and suspected of having committed an offense may be authorized if the application otherwise complies with applicable statutory standards and Department policies.

(5) Members of the Department must move to vacate any non-disclosure order when notice of compulsory legal process to the affected member of media is required (after any extensions permitted) by paragraph (j) of this section.

(l) *Exigent circumstances involving risk of death or serious bodily harm.*

(1) A Deputy Assistant Attorney General for the Criminal Division may authorize the use of compulsory legal process that would otherwise require authorization from the Attorney General or the Deputy Attorney General if the Deputy Assistant Attorney General for the

16

Criminal Division determines that:

(i) The exigent use of such compulsory legal process is necessary to prevent the risks described in paragraph (c)(3) of this section; and

(ii) Those exigent circumstances require the use of such compulsory legal process before the authorization of the Attorney General or the Deputy Attorney General can, with due diligence, be obtained.

(2) In authorizing the exigent use of compulsory legal process, a Deputy Assistant Attorney General for the Criminal Division should take into account the principles set forth in paragraph (a) of this section; ensure that the proposed process is narrowly tailored to retrieve information or records required to prevent or mitigate the associated imminent risk; and require members of the Department to comply with the safeguarding protocols described in paragraph (p) of this section.

(3) As soon as possible after the approval by a Deputy Assistant Attorney General for the Criminal Division of a request under paragraph (l)(1) of this section, the Deputy Assistant Attorney General must provide notice to the designated authorizing official, the Deputy Attorney General, and the Director of the Office of Public Affairs.  Within 10 business days of the authorization under paragraph (l)(1) of this section, the United States Attorney or Assistant Attorney General responsible for the matter shall provide a statement to the designated authorizing official containing the information that would have been provided in a request for prior authorization.

(m) *Arresting or charging a member of the news media.*

(1) Except as provided in paragraph (m)(2) of this section or in circumstances in which prior authorization is not possible, members of the Department must obtain the authorization of

17

the Deputy Attorney General to seek a warrant for an arrest, conduct an arrest, present information to a grand jury seeking a bill of indictment, or file an information against a member of the news media.

(2) Except in circumstances in which prior authorization is not possible, when the arrest or charging of a member of the news media under paragraph (m)(1) of this section has no nexus to the person's or entity's activities as a member of the news media, members of the Department must obtain the authorization of a Deputy Assistant Attorney General for the Criminal Division and provide prior notice to the Deputy Attorney General.

(3) When prior authorization was not possible, the member of the Department must ensure that the designated authorizing official is notified as soon as possible.

(n) *Applications for authorizations under this section.*

(1) Whenever any authorization is required under this section, the application must be personally approved in writing by the United States Attorney or Assistant Attorney General responsible for the matter.

(2) Whenever the authorizing official under this section is the Attorney General or the Deputy Attorney General, the application must also be personally approved in a memorandum by the Assistant Attorney General for the Criminal Division.

(3) The member of the Department requesting authorization must provide all facts and applicable legal authority necessary for the authorizing official to make the necessary determinations, as well as copies of the proposed compulsory legal process and any other related filings.

(4) Whenever an application for any authorization is made to the Attorney General or the Deputy Attorney General under this section, the application must also be provided to the

Director of the Office of Public Affairs for consultation.

(o) *Filter protocols.*

(1) In conjunction with the use of compulsory legal process, the use of filter protocols, including but not limited to keyword searches and filter teams, may be necessary to minimize the potential intrusion into newsgathering-related materials that are unrelated to the conduct under investigation.

(2) While the use of filter protocols should be considered in all matters involving a member of the news media, the use of such protocols must be balanced against the need for prosecutorial flexibility and the recognition that investigations evolve, and should be tailored to the facts of each investigation.

(3) Unless compulsory legal process is sought pursuant to paragraphs (i) or (l) of this section, members of the Department must use filter protocols when the compulsory legal process relates to a member of the news media acting within the scope of newsgathering or the compulsory legal process could potentially encompass newsgathering-related materials that are unrelated to the conduct under investigation.  The Attorney General or the Deputy Attorney General may waive the use of filter protocols only upon an express finding that there is a *de minimis* risk that newsgathering-related materials that are unrelated to the conduct under investigation would be obtained pursuant to the compulsory legal process and that any filter protocol would pose a substantial and unwarranted investigative burden.

(4) Members of the Department should consult the Justice Manual for guidance regarding the use of filter protocols to protect newsgathering-related materials that are unrelated to the conduct under investigation.

(p) *Safeguarding.* Any information or records that might include newsgathering-related

materials obtained from a member of the news media or from third parties pursuant to this policy must be closely held so as to prevent disclosure of the information to unauthorized persons or for improper purposes. Members of the Department must consult the Justice Manual for specific guidance regarding the safeguarding of information or records obtained from a member of the news media or from third parties pursuant to this section and regarding the destruction and return of information or records as permitted by law.

(q) *Privacy Protection Act.* All authorizations pursuant to this section must comply with the provisions of the Privacy Protection Act (PPA), 42 U.S.C. 2000aa(a) et seq. Members of the Department must consult the Justice Manual for specific guidance on complying with the PPA. Among other things, members of the Department are not authorized to apply for a warrant to obtain work product materials or other documentary materials of a member of the news media under the PPA suspect exception, see 42 U.S.C. 2000aa(a)(1) and (b)(1), if the sole purpose is to further the investigation of a person other than the member of the news media.

(r) *Anti-circumvention.* Members of the Department shall not direct any third party to take any action that would violate a provision of this section if taken by a member of the Department.

(s) *Failure to comply.* Failure to obtain the prior authorization required by this section may constitute grounds for an administrative reprimand or other appropriate disciplinary action.

(t) *General provision.* This section is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United

States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

10.26-22
Date

Merrick B. Garland
Attorney General